# Appendix

Findings of Fact & Conclusions of Law, Oct. 11, 2024, ECF No. 1157 ...........App. A

Defendants' Motion for Stay, Oct. 15, 2024, ECF No. 1175 ..........................App. B

Transcript of Bench Trial, Sept. 22, 2023 (Testimony of Keith Ingram) .......App. C

Transcript of Bench Trial, Oct. 4, 2023 (Testimony of Cesar Espinosa)....... App. D

Transcript of Bench Trial, Oct. 16, 2023 (Testimony of Jonathan White) .....App. E

# APPENDIX A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | 5:21–CV–0844–XR |
| | § | [Consolidated Cases] |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## (CLAIMS UNDER SECTION 208 OF THE VOTING RIGHTS ACT)

## TABLE OF CONTENTS

INTRODUCTION .............................................................................................................. 1
PROCEDURAL HISTORY ............................................................................................... 3
FINDINGS OF FACT ........................................................................................................ 5
    THE CHALLENGED PROVISIONS ............................................................................ 6
        Section 6.01 – Transportation Disclosures (Curbside Voting) ............................ 6
        Section 6.04 – Amendments to Oath of Assistance ............................................ 7
        Sections 6.03, 6.05, 6.07 – Assistor Disclosures ............................................... 8
        Section 6.06 – Ban on Compensated Mail–Ballot Assistance ......................... 11
        Section 7.04 – Canvassing Restriction ............................................................ 12
    THE PARTIES ............................................................................................................ 14
    The Plaintiffs ............................................................................................................ 14
        The HAUL-MFV Plaintiffs ............................................................................. 15
            The Arc of Texas ...................................................................................... 15
            Delta Sigma Theta Sorority, Inc. .............................................................. 16
        The OCA Plaintiffs ......................................................................................... 17
            OCA-Greater Houston .............................................................................. 17
            The League of Women Voters of Texas .................................................... 18
        The LUPE Plaintiffs ....................................................................................... 19
            La Union Del Pueblo Entero ..................................................................... 19
            Mexican American Bar Association of Texas ........................................... 21
            Familias Inmigrantes Estudiantes Luchar ................................................ 21
        The LULAC Plaintiffs .................................................................................... 22
            League of United Latin American Citizens ............................................... 22
        Defendants ....................................................................................................... 23
        The State Defendants ...................................................................................... 23
            The State of Texas ..................................................................................... 23
            Texas Attorney General ............................................................................ 23
            Texas Secretary of State ............................................................................ 26
        County Defendants .......................................................................................... 27
            County Election Officials .......................................................................... 27
            County District Attorneys ......................................................................... 28
    IMPACT OF THE CHALLENGED PROVISIONS .................................................. 30
    Transportation Disclosure (§ 6.01) .......................................................................... 30
    Oath of Assistance (§ 6.04) and Assistor Disclosures (§§ 6.03, 6.05, 6.07) ........... 32
    Ban on Compensated Assistance (§ 6.06) ................................................................ 52
    The Canvassing Restriction (§ 7.04) ........................................................................ 55
CONCLUSIONS OF LAW .............................................................................................. 57
    SUBJECT MATTER JURISDICTION ..................................................................... 57
    SECTION 208 PREEMPTION ................................................................................... 77
        Portions of the Oath of Assistance (§ 6.04) are preempted by Section 208 .......... 85
        The Assistor Disclosures (§§ 6.03, 6.05, 6.07) are preempted by Section 208 ...... 91
        Bans on Compensated Assistance (§§ 6.06 and 7.04) are preempted by Section 208 ................. 95
    PERMANENT INJUNCTION OF S.B. 1 §§ 6.03–6.07 AND 7.04 .......................... 98
        Injunctive relief as to the Secretary's forms and instructions implicates Purcell. .................. 101
        Injunctive relief as to election officials' conduct implicates Purcell. ..................... 102
        Enjoining enforcement proceedings does not implicate the Purcell principle. ........................ 102
CONCLUSION .............................................................................................................. 106

# INTRODUCTION

On September 7, 2021, Texas Governor Greg Abbott signed into law the Election Protection and Integrity Act of 2021, an omnibus election law commonly referred to as "S.B. 1." *See* Election Integrity Protection Act of 2021, S.B. 1, 87th Leg., 2d Spec. Sess. (2021).

Premised on the state legislature's authority to make all laws necessary to detect and punish fraud under article VI, section 4 of the Texas Constitution, S.B. 1 modified various provisions of the Texas Election Code, imposing, among other things, new restrictions on voter assistance and in-person canvassing activities. *See, e.g.*, S.B. 1 §§ 6.01, 6.03–6.07, 7.04 (JEX-1 at 50–56, 59–60).

Several private plaintiffs filed lawsuits, challenging certain provisions of S.B. 1 as unconstitutional and otherwise unlawful under federal voter-protection statutes. For judicial economy, these were consolidated under the above-captioned case, which was first filed.[1]

Four Plaintiffs groups—the HAUL Plaintiffs,[2] the OCA Plaintiffs,[3] the LUPE Plaintiffs,[4] and the LULAC Plaintiffs[5]—collectively challenge S.B. 1 §§ 6.01, 6.03–6.07, and 7.04 (the "Assistance Provisions") as preempted by Section 208 of the Voting Rights Act ("VRA"), 52 U.S.C. § 10508, which guarantees qualified voters the right to vote with an assistor of their choice.

---

[1] *See* ECF No. 31 (consolidating *OCA-Greater Houston v. Esparza*, No. 1:21-cv-780 (W.D. Tex. 2021); *Houston Area Urban League v. Abbott*, No. 5:21- cv-848 (W.D. Tex. 2021); *LULAC Texas v. Esparza*, No. 1:21-cv-786 (W.D. Tex. 2021) and *Mi Familia Vota v. Abbott*, No. 5:21-cv-920 (W.D. Tex. 2021) under the lead case.

[2] For the purposes of the HAUL Plaintiffs' Section 208 claims, this group includes The Arc of Texas, Delta Sigma Theta Sorority, Inc., and Mi Familia Vota. ECF No. 199 (HAUL Compl.) ¶¶ 287–94 (Count V).

[3] For the purposes of the OCA Plaintiffs' Section 208 claims, this group includes OCA-Greater Houston, The League of Women Voters of Texas, and REVUP-Texas. *See* ECF No. 200 (OCA Compl.) ¶¶ 176–81 (Count IV); Text Order dated Apr. 14, 2022 (granting Texas Organizing Project's withdrawal from the case); ECF No. 551 (granting Workers Defense Action Fund's withdrawal from the case and dismissing its claims with prejudice).

[4] This group includes La Unión del Pueblo Entero, Friendship-West Baptist Church, the Southwest Voter Registration Education Project, Texas Impact, the Mexican American Bar Association of Texas, Texas Hispanics Organized for Political Education, Jolt Action, the William C. Velasquez Institute, FIEL Houston Inc., and James Lewin. ECF No. 208 (LUPE Compl.) ¶¶ 266–71 (Count V).

[5] For the purposes of the LULAC Plaintiffs' Section 208 challenges, this group includes LULAC Texas, Voto Latino, Texas Alliance for Retired Americans, and Texas AFT. *See* ECF No. 207 (LULAC. Compl.) ¶¶ 287–94 (Count IV).

Plaintiffs allege that S.B. 1's new disclosure requirements (§§ 6.01, 6.03, 6.05, 6.07), modifications to the oath of assistance (§ 6.04), ban on compensated assistance (§ 6.06) and in-person canvassing restriction (§ 7.04) subvert the protections of Section 208 by narrowing the class of eligible assistors, requiring voters to take additional steps as a prerequisite to receiving assistance, and deterring voters from requesting—and assistors from providing—assistance in the voting process. Following a six-week bench trial, the Court largely agrees.

After careful consideration, the Court issues the following findings of fact and conclusions of law pursuant to FED. R. CIV. P. 52(a) bearing on Plaintiffs' Section 208 claims.

## PROCEDURAL HISTORY

Plaintiffs filed their original complaints in August and September 2021, seeking to enjoin the State of Texas and the Secretary of State and Attorney General of the State of Texas (together, the "State Defendants") and local election officials from enforcing many provisions of S.B. 1, including provisions that, like most of the Assistance Provisions, impose criminal liability.

In December 2021, the Texas Court of Criminal Appeals held in *State v. Stephens* that the Election Code's delegation of unilateral prosecutorial authority to the Attorney General to prosecute election crimes violated the separation-of-powers clause of the Texas Constitution. 663 S.W.3d 45 (Tex. Crim. App. 2021). The court explained that the Texas Constitution assigns to county and district attorneys, members of the judicial branch, the "specific duty" to represent the state in criminal prosecutions. *Id.* at 52. The Attorney General, as part of the state's executive branch, has no similar, independent power under the Texas Constitution. Thus, the Attorney General can prosecute election crimes only with the consent of local prosecutors through a deputization order. *Id.* at 47.

Following *Stephens*, Plaintiffs amended their complaints to join local district attorneys from several Texas counties as Defendants.[6] The State Defendants moved to dismiss these complaints in their entirety, including Plaintiffs' Section 208 challenges. The Court denied the motions as to those challenges in August 2022, concluding that the VRA waived sovereign immunity and created a private right of action to enforce Section 208, and that Plaintiffs had adequately alleged standing to assert their Section 208 claims.[7]

---

[6] Plaintiffs filed their Second Amended Complaints, the operative pleadings, in January 2022. *See* ECF Nos. 199, 200, 207, 208.

[7] *See La Union del Pueblo Entero v. Abbott*, 614 F. Supp. 3d 509 [LULAC], 618 F. Supp. 3d 388 [OCA], 618 F. Supp. 3d 449 [HAUL], 618 F. Supp. 3d 504 [LUPE], (W.D. Tex. 2022). The Court dismissed the HAUL Plaintiffs' claims against the Governor, however, concluding that their injuries were not fairly traceable to him.

In May 2023, the State Defendants joined in a motion for summary judgment filed by a group of Republican committees (the "Intervenor-Defendants"),[8] arguing that: (1) state-law restrictions and requirements on assistors "of the voter's choice" do not violate Section 208 and therefore cannot be preempted; and (2) Section 208 permits state-law restrictions on who may serve as an assistor beyond the limitations provided in federal law. *See* ECF No. 608 at 27–30. The District Attorney of Harris County, Kim Ogg, also moved for summary judgment, asserting that Plaintiffs lacked standing. *See* ECF No. 614. The Court carried the motions with the case and addresses their arguments herein to the extent that they were not disposed in the Court's orders disposing of the State Defendant's motions to dismiss.

The Court held a bench trial from September 11, 2023, to October 20, 2023. In all, the parties presented about 80 witnesses (both live and by deposition testimony), nearly 1,000 exhibits, and producing over 5,000 pages of trial transcripts. The Court heard testimony from voters, Plaintiffs' organizational representatives and volunteers, former and current state and local officials, and expert witnesses.

The parties submitted proposed findings of fact and conclusions of law in January 2024,[9] and presented closing arguments on February 13, 2024.

---

[8] The Intervenor-Defendants include the Harris County Republican Party, the Dallas County Republican Party, the Republican National Committee, the National Republican Senatorial Committee, and the National Republican Congressional Committee. The Court initially denied their motion to intervene for failing to identify a legally protectable interest at stake in this litigation or show that the State Defendants' representation of any such interest would be inadequate. *See* ECF No. 122 at 2–7. The Fifth Circuit reversed, concluding that the Committees' interest in S.B. 1's provisions concerning party-appointed poll watchers—an interest raised for the first time on appeal—warranted intervention. *La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 306 (5th Cir. 2022). Accordingly, the Committees were allowed to intervene. It is not clear to the Court that their interest in the provisions applicable to *partisan* poll watchers establishes a commensurate interest in voter assistance regulations. Nonetheless, because the State Defendants joined the arguments in the Committees' motion for summary judgment, *see* ECF No. 610, the Court considers the Intervenor-Defendants' motion and briefing.

[9] *See, e.g.*, ECF Nos. 850, 852 (Plaintiffs, jointly); ECF No. 855 (LUPE); ECF No. 856 (HAUL); ECF No. 843-1 (Dallas County DA); ECF No. 845 (Harris County DA); ECF Nos. 861, 862 (State Defendants and Intervenor-Defendants). The parties also submitted supplemental briefing on the Supreme Court's recent decision in *FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024). *See* ECF Nos. 1138, 1140, 1142–45.

**FINDINGS OF FACT**

1.      Under S.B. 1, Texas law recognizes the following interactions as crimes under the

Texas Election Code (the "Election Code" or "TEC"):

   a.      A man helps his blind wife of 20 years cast her ballot at the polls without
   first securing a representation from her that she is "eligible for assistance."
   Even if he completes her ballot according to her exact instructions, he faces
   up to two years in prison and a fine of up to $10,000. *See* TEC § 276.018(b);
   TEX. PENAL CODE § 12.35; Tr. at 3991:1–5.

   b.      While meeting with a client about his tax return, a staff member for a
   community organization that provides free income tax services agrees to
   help translate the man's mail-in ballot. The client fills out his own ballot,
   with accurate translation assistance from the staff member. Even though the
   ballot reflects the clients wishes, the staff member faces up to two years in
   prison, she and her employer may be fined up to $10,000, and the client's
   ballot may not be counted. *See* TEC §§ 86.0105(a), (c); TEX. PENAL CODE
   § 12.35; TEC § 86.010(d); Tr. at 3996:8–3997:5.

   c.      An elderly woman with arthritis answers her door to find a college student
   from her alma mater canvassing for a ballot measure that would create an
   endowment for their school. Mentioning her arthritis, the woman asks the
   student for help completing her mail ballot and offers the student an iced
   tea and cookies as a token of her appreciation. The student agrees and
   completes the ballot according to the voter's instructions. The voter and the
   student each face up to 10 years in prison and fines of up to $10,000. *See*
   TEC §§ 276.015(a)–(c), (f); TEX. PENAL CODE § 12.34; Tr. at 1904:1–
   1906:5, 3995:11–24.

2.      Plaintiffs assert that, by criminalizing these routine interactions and imposing

additional requirements on voters and their assistors, various provisions of S.B. 1 have frustrated

qualified voters' rights under federal law to voting assistance from a person of their choice.

3.      Section 208 of the Voting Rights Act provides:

   Any voter who requires assistance to vote by reason of blindness, disability,
   or inability to read or write may be given assistance by a person of the
   voter's choice, other than the voter's employer or agent of that employer or
   officer or agent of the voter's union.

52 U.S.C. § 10508.

4.      Section 208 creates a federally guaranteed right of an assistant of the voter's choice when "voting," which includes "all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration . . . or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast[.]" 52 U.S.C. § 10310(c)(1).

5.      Congress enacted Section 208 "[t]o limit the risks of discrimination" against voters with who require assistance and "avoid denial or infringement of the[ir] right to vote." S. Rep. No. 97-417 at 62 (May 25, 1982). As the Senate Report explains:

> Clearly, the manner of providing assistance has a significant effect on the free exercise of the right to vote by such people who need assistance. Specifically, it is only natural that many such voters may feel apprehensive about casting a ballot in the presence of, or may be misled by, someone other than a person of their own choice. As a result, people requiring assistance in some jurisdictions are forced to choose between casting a ballot under the adverse circumstances of not being able to choose their own assistance or forfeiting their right to vote. The Committee is concerned that some people in this situation do in fact elect to forfeit their right to vote. Others may have their actual preference overborne by the influence of those assisting them or be misled into voting for someone other than the candidate of their choice." The Committee has concluded that the only kind of assistance that will make fully 'meaningful' the vote of the blind, disabled, or those who are unable to read or write, is to permit them to bring into the voting booth a person whom the voter trusts and who cannot intimidate him.

*Id.* at 472.

**THE CHALLENGED PROVISIONS**

**Section 6.01 – Transportation Disclosures (Curbside Voting)**

6.      Texas provides curbside voting for voters who are "physically unable to enter the polling place without personal assistance or likelihood of injuring the voter's health," allowing them to vote from the convenience and safety of a vehicle during early voting or on Election Day. TEC § 64.009(a); *see* Tr. at 4355:22–4356:2.

7. Section 6.01 of S.B. 1 modified Texas's curbside voting procedures by requiring a person who "simultaneously" provides seven or more voters with transportation to a polling place for curbside voting to complete and sign a form—prescribed by the Secretary of State and provided by an election officer—reporting her name, address, and whether she is only providing transportation or also serving as an assistant to the voters. TEC §§ 64.009(e), (f), (h).[10]

8. Section 6.01 further provides that "a poll watcher is entitled to observe any activity conducted under this section," other than the preparation of a voter's ballot with an assistor of the voter's choice. TEC § 64.009(e). Poll watchers are thus entitled to observe drivers as they fill out the form prescribed by the Secretary of State.

9. Completed forms must be delivered to the Secretary of State as soon as practicable. TEC § 64.009(g). The Secretary must make the form available to the Attorney General for inspection upon request. *Id.*

**Section 6.04 – Amendments to Oath of Assistance**

10. Section 6.04 of S.B. 1 amends the oath that a person assisting a voter is required to swear (the "Oath of Assistance" or "Oath") by adding the underlined and bolded language:

> I swear (or affirm) **under penalty of perjury** that **the voter I am assisting represented to me they are eligible to receive assistance**; I will not suggest, by word, sign, or gesture, how the voter should vote; [I will confine my assistance to **reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot**;][11] answering the voter's questions, to stating propositions

---

[10] The driver need not provide the disclosures if the person is related to each voter within the second degree by affinity or the third degree by consanguinity under TEX. GOV'T CODE § 573.023. TEC § 64.009(f-1).

[11] The requirement that a person who assists a voter must confine assistance to reading the ballot, marking the ballot, and directing the voter to do the same was enjoined in *OCA of Greater Houston v. Texas*, No. 1:15-CV-679-RP, 2022 WL 2019295, at *4 (W.D. Tex. June 6, 2022).[11] Accordingly, this Court held that "all claims in this consolidated action challenging the portions of section 6.04 that the district court recently enjoined . . .are moot." *LUPE v. Abbott*, 614 F. Supp. 3d 509, 513 n.3 (W.D. Tex. 2022).

The United States brought a Section 208 claim in this consolidated action challenging the oath language enjoined in *OCA-Greater Houston v. Paxton (OCA-Greater Hous. II)*, No. 1:15-CV-679-RP, 2022 WL 2019295, (W.D. Tex. June 6, 2022), which was rendered moot by the injunction. *See LUPE v. Abbott*, 614 F. Supp. 3d at 513 n.3.

~~on the ballot, and to naming candidates and, if listed, their political parties;~~ I will prepare the voter's ballot as the voter directs; **I did not pressure or coerce the voter into choosing me to provide assistance**; [and] I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; **I will not communicate information about how the voter has voted to another person**; **and I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted.**

TEC § 64.034. An offense under this subsection is a state jail felony, punishable by up to two years in prison and a fine of up to $10,000 and will result in the rejection of the voter's ballot. TEC § 276.018(a)(2)–(b); TEX. PENAL CODE §§ 12.35(a), (b).

11.     An assistor must take the Oath of Assistance (and complete the disclosure form) for each voter she assists. Election officials, on the other hand, are not required to take the Oath or complete the disclosure form. *See* TEC § 64.034. When a voter receives assistance from an election official, however, Texas law permits poll watchers to be present at the voting station, and the watchers are entitled to examine the ballot before it is deposited in the ballot box. TEC § 33.057(a).

12.     The Oath of Assistance must be printed on BBM carrier envelopes and signed by the assistor. TEC § 86.013(e); *see* LUPE-009 (form BBM carrier envelope prescribed by the Secretary of State).

13.     Providing mail ballot assistance without signing the Oath is a state jail felony unless the assistor is a close relative of the voter or is physically living with the voter when the assistance is provided. *See* TEC § 86.010(h)(1).

**Sections 6.03, 6.05, 6.07 – Assistor Disclosures**

14.     Before S.B. 1, the Election Code provided that, if assistance was provided by a person of the voter's choice at a polling place, an election officer must enter the person's name and address on the poll list beside the voter's name. *See* TEC § 64.032(d). A person providing

mail-ballot assistance was required to provide his or her signature, printed name, and a residential address. *See* TEC § 86.010(e); JEX-1 at 53.

15.     Sections 6.03, 6.05 and 6.07 of S.B. 1 added provisions imposing new disclosure and documentation requirements on persons who provide voter assistance.

16.     Section 6.03 provides: "A person, other than an election officer, who assists a voter in accordance with this chapter is required to complete a form stating: (1) the name and address of the person assisting the voter; (2) the relationship to the voter of the person assisting the voter; and (3) whether the person assisting the voter received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee." TEC § 64.0322(a).

17.     The Secretary of State must prescribe the Assistor Disclosure form. TEC § 64.0322(b). As prescribed by the Secretary, the form also contains the "Oath of Assistance," discussed below. *See* LUPE-189 ("Oath of Assistance Form").

18.     Section 6.05 amended the Election Code to require a person who assists a mail-in voter to disclose their relationship with the voter and any compensation from a candidate, campaign, or political committee on the assisted-voter's BBM carrier envelope. TEC § 86.010(e). The Election Code already required assistors to provide their names and addresses on the carrier envelope. *See id.*; JEX-1 at 53.

19.     Section 6.07 amends the disclosures on the BBM carrier envelopes that must be completed by anyone providing ballot-dropping assistance to add a space indicating the assistor's relationship to the voter (along with the person's name and address, which were already required). TEC § 86.013(b).

20.     As prescribed by the Secretary of State, the form BBM carrier envelope does not distinguish between assistance in completing the ballot and ballot-dropping assistance. *See* LUPE-

009 ("If you are assisting a voter by depositing the Carrier Envelope in the mail or with a common or contract carrier, you must complete the assistant section below.").

21.     Providing BBM assistance without completing the Assistor Disclosures is a state jail felony, punishable by up to two years' confinement and a fine of up to $10,000 and may result in the rejection of the voter's ballot. TEC § 86.010(g); TEX. PENAL CODE §§ 12.35(a), (b). The criminal consequences are inapplicable, however, to mail-ballot assistance provided by a close relative of the voter or a person who was physically living with the voter when the assistance was provided. *See* TEC § 86.010(h)(2).

22.     Although the Assistor Disclosures required under §§ 6.03 and 6.05 are technically distinct from the required Oath of Assistance set forth in § 6.04, the requirements are, as a practical matter, indistinguishable to assistors. As the images below demonstrate, on both the "Oath of Assistance" form and the form mail ballot carrier envelope prescribed by the Secretary, the space for the assistor's signature (subscribing to the Oath) appears in the same section as the disclosure requirements—directly under the printed Oath language.

*Oath of Assistance*



LUPE-189 at 1.

*Form Mail Ballot Carrier Envelope*



LUPE-009 at 2.

23.     Moreover, the provisions impose identical consequences for non-compliance. Knowingly providing assistance without completing the Oath (evidenced by the assistor's signature) or the relevant disclosure fields on mail-in ballots (1) is a state jail felony and (2) may result in the rejection of the voter's ballot. *See* TEC §§ 86.010 (d), (f)–(g).

**Section 6.06 – Ban on Compensated Mail–Ballot Assistance**

24.     Section 6.06 of S.B. 1 makes it a state jail felony, for a person who is not an attendant or caregiver previously known to the voter, to compensate or offer to compensate another person—or to solicit, receive, or accept compensation—for assisting voters with their mail-in ballots. TEC §§ 86.0105(a), (c).

25.     For purposes of this section, "compensation" means "anything reasonably regarded as an economic gain or advantage, including accepting or offering to accept employment for a fee,

accepting or offering to accept a fee, entering into a fee contract, or accepting or agreeing to accept money or anything of value." *Id.*; *see also* TEX. PENAL CODE § 38.01(3).

26.     The prohibition on compensation does not apply if the person assisting the voter is an "attendant" or "caregiver" previously known to the voter. Tr. at 1906:23–1907:2. S.B. 1, however, does not define "attendant" or "caregiver," Tr. at 1907:3–6, nor has the Secretary published any guidance or training on how to interpret either term. Tr. at 1907:7–12, 1908:17–24. Further, the Secretary of State's Office does not define the phrase "previously known to the voter," nor has it published any guidance or training on how the phrase should be interpreted. Tr. at 1909:3–13. At trial, former Director of the Elections Division in the Secretary of State's Office Keith Ingram testified that it does not matter how long the voter has actually known the attendant or caregiver before providing voter assistance; it could be "15 years" or "15 minutes." Tr. at 1909:14–22.

## Section 7.04 – Canvassing Restriction

27.     Section 7.04 of S.B. 1 creates three new, third-degree felonies under the Election Code, each imposing up to ten years in prison and a fine of up to $10,000 on anyone who gives, offers, or receives some "compensation or other benefit" for "vote harvesting services." [12] TEC § 276.015(f); TEX. PENAL CODE § 12.34.

---

[12]While Section 7.04 of S.B. 1 sets out a ban on "vote harvesting," *see* TEC § 276.015, Plaintiffs generally refer to the provision as a "ban on in-person canvassing" or "voter interaction ban." *See, e.g.*, ECF No. 848 ¶ 97; ECF No. 849 ¶ 296. In the Court's view, all three characterizations are misleading in multiple respects. Regardless of how the term is defined in the Election Code, the scope of Section 7.04's proscriptions reach conduct well beyond any common understanding of "vote harvesting." On the other hand, the provision does not ban canvassers from interacting with voters altogether—it prohibits *compensated* interactions in the *presence of a mail ballot*. To describe Section 7.04's proscription more accurately and impartially, the Court refers to the challenged provisions as the "Canvassing Restriction" throughout this order.

Section 7.04 also added Election Code provisions addressing the solicitation of applications to vote by mail (TEC § 276.016), the distribution of early voting ballots and balloting materials (TEC § 276.017), and unauthorized alterations to election procedures (TEC § 276.019). For the purposes of this order, however, "Section 7.04" refers only to the Canvassing Restriction, codified at TEC § 276.015.

28.     "Vote harvesting services" include any "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." TEC § 276.015(a)(2).

29.     A "benefit" is "anything reasonably regarded as a gain or advantage, including a promise or offer of employment, a political favor, or an official act of discretion, whether to a person or another party whose welfare is of interest to the person." TEC § 276.015(a)(1).

30.     Using these definitions, Section 7.04 creates three third-degree felonies:

> (b)  A person commits an offense if the person, directly or through a third party, knowingly provides or offers to provide vote harvesting services in exchange for compensation or other benefit.
>
> (c)  A person commits an offense if the person, directly or through a third party, knowingly provides or offers to provide compensation or other benefit to another person in exchange for vote harvesting services.
>
> (d)  A person commits an offense if the person knowingly collects or possesses a mail ballot or official carrier envelope in connection with vote harvesting services.

TEC §§ 276.015(b)–(d).

31.     There are a number of exceptions. The Canvassing Restriction "does not apply" to:

> (1)   an activity not performed in exchange for compensation or a benefit;
>
> (2)   interactions that do not occur in the presence of the ballot or during the voting process;
>
> (3)   interactions that do not directly involve an official ballot or ballot by mail;
>
> (4)   interactions that are not conducted in-person with a voter; or
>
> (5)   activity that is not designed to deliver votes for or against a specific candidate or measure.

TEC § 276.015(e).

## THE PARTIES

### The Plaintiffs

32.     Plaintiffs are membership-driven, non-partisan civil rights and social advocacy groups in Texas with members who require voting assistance due to a disability, blindness, or an inability to read or write the language in which ballot is written. Their staff and volunteers have regularly assisted voters with disabilities and/or voters with limited English proficiency ("LEP"), including mail voters, cast their ballots.

33.     Plaintiffs conduct in-person voter outreach and engagement activities, including voting assistance and transportation to the polls. Despite the diversity of their respective missions in the state—e.g., encouraging civic participation, empowering voters with disabilities, improving infrastructure in the colonias—the Plaintiff organizations rely on in-person voter advocacy to advance their causes. These voter engagement efforts include neighborhood door-knocking campaigns, voter registration drives, candidate forums, town hall meetings, tabling at community events, and exit-polling. During some outreach events, voters have taken out their mail ballots while speaking with organizers to ask questions about their ballots or request voting assistance.

34.     Plaintiffs' volunteers often receive refreshments, t-shirts, pens, gas cards, and other tokens of appreciation for their canvassing and assistance efforts.

35.     Plaintiffs' organizational representatives testified at trial that the Challenged Provisions have frustrated their voter engagement and turnout efforts by chilling their members' willingness to provide voter assistance due to fear of criminal liability. Moreover, some of Plaintiffs' members with disabilities who typically vote with assistance decided to forgo assistance altogether to avoid subjecting their preferred assistors to criminal sanctions.

36.     Collectively, Plaintiffs seek declaratory and injunctive relief and ask the Court to enjoin the Attorney General ("AG"), and Secretary of State ("Secretary" or "SOS") of Texas, and several local election officials and prosecutors from enforcing the Challenged Provisions.

**The HAUL-MFV Plaintiffs**

37.     Together, the HAUL-MFV Plaintiffs challenge the Transportation Disclosure (S.B. 1 § 6.01), the Amended Oath (§ 6.04), and the Assistor Disclosures (§§ 6.03. 6.05, 6.07), seeking injunctive relief against the Secretary, the AG, and the local election officials and the DAs of Bexar County and Harris County. *See* ECF No. 199 ¶ 323.

### *The Arc of Texas*

38.     The Arc of Texas (the "Arc") is a non-profit organization founded in 1953 by parents of children with intellectual and developmental disabilities ("IDD") to advocate for their children to have access to education, employment, community supports, and other areas of community life. Tr. at 3492:18–25, 3493:1–5. The Arc has 7,000 individual members across the state.[13] Tr. at 3495:20–25, 3496:4–24.

39.     The Arc's mission is to "promote, protect, and advocate for the human rights and self–determination of Texans with intellectual and developmental disabilities." Tr. at 3490:23–25, 3493:7–9. In pursuit of that mission, The Arc engages in legislative advocacy and grassroots advocacy to help empower people with IDD advance public policy and. Tr. at 3493:10–21; 3494:5–10. Voting is "the backbone" of The Arc's work because it is critical to members' self-

---

[13]Although individual members previously paid membership dues, The Arc stopped charging fees after concluding that they were a barrier for people with IDD being able to join the organization. Tr. at 3497:17–25, 3498:1–3 (noting that people with IDD often "live in poverty and don't have extra money to pay membership dues."). Thus, members can join The Arc of Texas in several other ways, including by subscribing to their Disability Dispatch email, making a donation, serving on the board, or serving on a committee. Tr. at 3495:22–25, 3496:1–3, 3497:10–16.

determination and voting rights advocacy has been a priority since The Arc's founding. Tr. at 3499:23–3500:12, 3499:23–3500:12.

40.     As discussed in greater detail herein, several members of the Arc with disabilities have been unable to vote with their assistor of choice due to the burdens imposed by S.B. 1's Assistor Disclosure requirement and amended Oath of Assistance, including Jodi Lydia Nunez Landry. Tr. at 3229:15.

### *Delta Sigma Theta Sorority, Inc.*

41.     Plaintiff Delta Sigma Theta Sorority, Inc. ("DST" or the "Sorority") is a national, nonprofit, nonpartisan organization of Black, college-educated women, focused on serving the Black community through social action. Tr. at 2081:1–20. DST has 75 Chapters in Texas, including chapters in Bexar, Harris, and Travis Counties, and 21,450 members registered to vote in Texas. Tr. at 2083:13–25.

42.     The Sorority organizes its social action under what it calls its "Five Point Programmatic Thrust": educational development, economic development, international awareness and involvement, physical and mental health, and political awareness and involvement. Tr. at 2081:7–13.

43.     In support of this mission, DST has participated in voting rights efforts since its founding in 1913. Tr. at 2082:23–2083:8. The organization's civic engagement programs include voter registration drives, voter education, candidate forums, and voter assistance and transportation programs. Tr. at 2086:21–2087:15.

44.     DST Chapters in Texas provide voter assistance to residents of nursing homes and senior care facilities who need help filling out applications for ballots by mail ("ABBMs"), address changes, and ballots by mail ("BBMs") and voting in-person. Tr. at 2088:1–18, 2199:9–19.

45.     Before S.B. 1, DST members regularly provided transportation to the polls by participating in Souls to the Polls, a caravanning initiative that partners with churches to drive voters to their voting location. Tr. at 2088:8–15.

46.     Members of DST include individuals that have disabilities and depend on assistance to cast their vote. Tr. at 2110:3–11.

**The OCA Plaintiffs**

47.     Together, the OCA Plaintiffs challenge the Ban on Compensated Assistance (S.B. 1 § 6.06), seeking injunctive relief against the Secretary, the AG, the County Clerks of Harris and Travis Counties, and the DAs of Harris and Bexar Counties. *See* ECF No. 200 ¶ 181.[14]

***OCA-Greater Houston***

48.     Plaintiff OCA-Greater Houston ("OCA") is a membership-driven organization dedicated to advancing the social, political, and economic well-being of Americans of Asian and Pacific Island descent ("AAPIs"), largely in Harris, Brazoria, and Fort Bend counties. Tr. at 1684:8–12, 1685:1–3, 1686:16–17, 1688:10–14.

49.     The organization's mission comprises four main goals: (1) advocate for social justice, equal opportunity, and fair treatment; (2) promote civic participation, education, and leadership; (3) advance coalition and community building; and (4) foster cultural heritage. Tr. at 1689:6–13.

50.     To further this mission, OCA engages in numerous election-related activities carried out by volunteers and paid staff, all of whom are OCA members. Tr. at 1687:22–1688:6, 1693:21–25. Before S.B. 1 was enacted, OCA regularly hosted election events, including in-person

---

[14] OCA-Greater Houston, REV UP Texas, and the League of Women Voters Texas voluntarily withdrew their Section 208 challenges to S.B. 1 § 6.04. *See* ECF No. 753 at 5 nn.4–5

candidate forums (Tr. at 1694:21–1696:8), "AAPI meet-and-greets" with AAPI political candidates (Tr. at 1699:24–1702:2), and voting machine demonstrations (Tr. at 1706:12–1707:3). Attendees often brought their mail-in ballots to these events and received assistance, including language assistance, from OCA volunteers and staff. Tr. at 1696:9–1697:8, 1697:22–1699:7, 1700:1–1702:2, 1706:12–1707:3.

51.     OCA has also engaged in canvassing efforts through volunteers and staff, who knocked on voters' doors to provide information about voting. Tr. at 1702:3–17. As they were door-knocking, some bilingual OCA canvassers assisted voters who requested language assistance with their mail-in ballots. Tr. at 1703:17–20. OCA staff and volunteers have provided mail-ballot assistance while conducting exit-polling at polling locations, where voters also requested (and received) assistance with their mail-ballots from OCA. Tr. at 1706:4–11, 1723:6–13.

52.     OCA's voting-related activities are carried out by volunteers and paid staff. Tr. at 1687:22–1688:6, 1693:21–25. OCA provides its members and volunteers with benefits like food and beverages at in-person events where they provide voting assistance to LEP voters. Tr. at 1694:4–20, 1697:22–25.

### The League of Women Voters of Texas

53.     The League of Women Voters of Texas ("LWV" or the "League") is a non-partisan organization founded in San Antonio in 1919 with over 3,000 dues-paying members, including members in Harris and Travis Counties. Tr. at 1580:1–4, 1585:18–22, 1586:7–19, 1587:19–21,

54.     The League's mission is to empower voters and defend democracy. Tr. at 1580:1–4. The League actively works to register eligible citizens to vote, ensure that voters' ballots count, help voters obtain mail-in ballots, vote by mail, and obtain voter assistance when needed. Tr. at 1580:1–8, 1581:9–18, 1589:12–15, 1589:25–1590:3.

55.     The League has members who use assistants when they vote by mail, and members who assist others with their vote by mail ballots. Tr. at 1578:3–8, 1589:12–1590:3. League members assist mail-in voters who are family, friends, in nursing homes, in assisted living centers, or in homes where voters with disabilities live. Tr. at 1590:16–25. Members of the League "offer[] tea, or coffee, or water," to assistors that help them and other voters vote by mail. Tr. at 1591:1–1592:5, 1590:4–12.

**The LUPE Plaintiffs**

56.     Together, the LUPE Plaintiffs challenge the Oath of Assistance S.B. 1 (S.B. 1 § 6.04), Assistor Disclosures (§§ 6.03, 6.05, 6.07), the Ban on Compensated Assistance (§ 6.06), and the Canvassing Restriction (§ 7.04) seeking injunctive relief against the Secretary, the AG, and the election officials and prosecutors of Dallas and El Paso Counties and the Travis County District Attorney. *See* ECF No. 208 ¶ 267.

*La Union Del Pueblo Entero*

57.     La Union Del Pueblo Entero ("LUPE") is a non-partisan, membership organization headquartered in San Juan, Texas, with members primarily in Hidalgo, Cameron, Willacy, and Starr Counties, Texas. Tr. at 58:13–16.

58.     LUPE organizes its approximately 8,000 members and other colonia residents on issues that affect low-income neighborhoods, including drainage, lighting, paved roads, safety, emergency services, trash pickup, among others. Tr. at 88:8–24. In addition to civic engagement organizing, LUPE is a social services hub for the community and provides income tax services, language translation services and family-based immigration legal services. Tr. at 61:3–17

59.     In recent years, LUPE's primary organizing focus has been civic engagement and educating voters about their right to vote. Tr. at 60:10–61:2. LUPE relies on paid staff members,

temporary paid canvassers, and volunteers to engage with voters in-person. Tr. at 88:1–7. LUPE members speak to voters on issues promoted by LUPE, including urging voters to support certain non-partisan ballot measures. Tr. at 88:1–24.

60.     LUPE organizers advocate for ballot measures in a variety of settings, including when meeting with community members in neighborhoods, at LUPE events, at union halls, and in the LUPE offices. Tr. at 89:7–18. While canvassing neighborhoods in support of ballot measures, LUPE organizers have been invited into voters' homes and asked for assistance with voters' mail-in ballots. Tr. at 71:1–72:15, 75:11–75:17, 119:20–120:18. LUPE members also often bring mail ballots to meetings at LUPE offices and union halls. Tr. at 90:4–24.

61.     LUPE's membership includes individuals who use assistance to vote by mail and in-person, including elderly and/or disabled voters and voters with limited English proficiency ("LEP") or low-literate. Tr. at 63:19–64:6, 65:7–65:13, 75:18–77:4, 77:17–78:2, 84:4–84:25, 85:1–85:4, 87:3–87:21, 97:11–97:17, 119:20–120:18, 116:22–117:7, 3676:11–25. Some of these members are not literate in English or Spanish. Tr. at 64:7–65:6.

62.     Members of LUPE include voters who are disabled and vote with assistance in person and by mail. Tr. at 63:19–64:6, 65:7–65:13, 96:15–97:17, 75:18–77:4, 77:17–78:2, 84:4–84:25, 85:1–85:4, 119:20–120:18, 116:22–117:7, 87:3–87:21, 3676:11–25.

63.     LUPE staff members and volunteers have been asked for assistance with voting by mail and in-person at the polls elderly and disabled voter and have provided such assistance. *See* Tr. at 145:16–20, 145:25–146:4, 150:9–13, 150:19–151:2, 157:14–158:9; LUPE-284, Maria Gomez Dep. at 41:24–42:24, 11:15–12:10, 15:17–20, 29:9–12. 40:24–42:2. LUPE trains its organizers to provide voter assistance consistent with the law, to limit assistance to what is requested by the voter, and to carry out the wishes of the voter. Tr. at 78:3–78:15.

64.     LUPE often provides its volunteers with t-shirts or gas cards, particularly because there is little public transportation in the Rio Grande Valley. Tr. at 122:3–19.

### *Mexican American Bar Association of Texas*

65.     The Mexican American Bar Association of Texas ("MABA") is a volunteer-based professional membership association of Latino lawyers across Texas with approximately 500 members. Tr. at 2533:20–23, 2535:9–10.

66.     Although MABA is non-partisan, it routinely encourages voters to support a candidate or measure. Tr. at 2535:19, 2542:6–8.

67.     MABA encourages its attorneys to provide pro bono services and support voter engagement in their local communities. Tr. at 2533:24–2534:4, 2535:11–2536:5. MABA engages in voter outreach and education by tabling at local community events, such as candidate forums. Tr. at 2535:21–2536:5. MABA members also provide voter assistance. *See, e.g.*, Tr. at 2539:3–4. Members are concerned that they are committing a crime if they accept meals, gas cards, swag or other forms of compensation while performing these activities. Tr. at 2542:6–20.

### *Familias Inmigrantes Estudiantes Luchar*

68.     Familias Inmigrantes Estudiantes Luchar ("FIEL"), translated to English means "Immigrant Families and Students in the Fight." Tr. at 2430:12–19. FIEL is an immigrant-led civil rights organization with approximately 16,000 members in the Greater Houston area. Tr. at 2431:21–25. FIEL employs eight paid staffers. Tr. at 2433:18–22. FIEL's mission is to organize and empower people, and to make sure that people know their rights and that they exercise their rights in the community. Tr. at 2434:21–2435:1. FIEL focuses on work related to access to higher education, community organizing, and civic engagement, including voter outreach. Tr. at 2435:2–14.

69.     Before S.B. 1 was enacted, FIEL furthered its mission of voter outreach and civic engagement by assisting its members in voting at the polls. Tr. at 2438:9–11, 2444:24–2445:3. FIEL typically partnered with another organization to take people to vote and provide translation and other assistance at the polls. Tr. at 2438:12–16.

**The LULAC Plaintiffs**

70.     The LULAC Plaintiffs challenge the Canvassing Restriction (S.B. 1 § 7.04), seeking relief against the AG, the Secretary, election officials and district attorneys in Bexar, Travis, Hidalgo, Dallas and El Paso Counties. ECF No. 207.

*League of United Latin American Citizens*

71.     The League of United Latin American Citizens ("LULAC") is a national Latino civil rights organization founded in 1929 in Corpus Christi, Texas. Tr. at 1632:9–11. The group has about 4,000 to 5,000 dues-paying members within Texas, as well roughly 80,000 to 90,000 "eMembers" in the state. There are 30 to 40 LULAC councils in Texas, including in Dallas, San Antonio, Houston, and El Paso. Tr. at 1634:6–20, 1637:3–7.

72.     LULAC's mission is "to improve the lives of Latino families throughout the United States" and "to protect their civil rights in all aspects." Tr. at 1633:10–18. Promoting the right to vote is "crucial" to LULAC's mission because when Latinos are "allowed to vote, they are able to choose candidates of their choice" who "will stand and work on issues that are important to them." Tr. at 1645:4–15.

73.     LULAC has volunteers that engage in voter registration and GOTV efforts every year. Tr. at 1645:23–1646:5. These efforts often focus on community members who face greater challenges when voting, including elderly Latinos and those who do not speak or write English.

Tr. at 1649:7–24. Accordingly, LULAC has historically run a voter assistance program for seniors, including many who are not literate or have physical disabilities. Tr. at 1654:20–1655:5.

74.     LULAC's members and volunteers who participate in these GOTV and voter assistance efforts often receive food and drink, gas credit, or other tokens of appreciation for their efforts. Tr. at 1655:19–1656:10, 1656:11–18.

**Defendants**[15]

75.     Collectively, Plaintiffs have sued the State of Texas, the Attorney General and Secretary of State of the State of Texas, and the chief election officials and district attorneys of several counties in Texas, including Harris County, Bexar County, Travis County, Dallas County, Hidalgo County, and El Paso County, all in their official capacities.

### **The State Defendants**

#### *The State of Texas*

76.     The State of Texas became the 28th state in the union in 1845.

#### *Texas Attorney General*

77.     Defendant Ken Paxton is the Attorney General of the State of Texas. His office, the Office of the Attorney General of Texas ("OAG"), is an executive department or agency of the State of Texas. ECF No. 753 ¶ 40.

78.     The AG has statutory duties for certain aspects of S.B. 1's enforcement scheme, including Sections 6.04, 6.05, 6.06 & 7.04. *Stephens* did not alter the authority of the AG to investigate allegations of election-related crimes, and, in some cases, the OAG considers its investigative duties to be "statutorily required" or "mandatory" for election-related allegations. Tr.

---

[15] Over the course of these proceedings, several Defendants sued in their official capacities were substituted by their successors in office pursuant to Federal Rule of Civil Procedure 25(d).

at 4041:18–4042:25; *see, e.g.*, TEC § 273.001 (providing that the AG "shall investigate" allegations of election crimes in elections covering more than one county). The AG may also "direct the county or district attorney . . . to *conduct* or *assist* the attorney general in conducting the investigation." *See* TEC § 273.002(1) (emphasis added); *see also id.* § 273.001 (district attorneys must investigate alleged violations referred to them).

79.     The AG has demonstrated a willingness to enforce, and has actually enforced, the Election Code, including S.B. 1. Tr. at 3909:8–17, 3913:9–3914:16. He publicly maintains that one of his key priorities is to investigate and prosecute allegations of voter fraud. *See, e.g.*, OCA-384, OCA-385, OCA-386.

80.     The OAG continues to operate the Criminal Prosecutions Division unit that prosecutes election-related allegations, known as the Election Integrity Division. Tr. at 3903:23–3905:4, 3905:11–15, 4039:14–19. As of March 17, 2023, the OAG had identified investigations of a possible violations of the Assistor Disclosure requirement for mail ballots (S.B. 1 § 6.03) and the Canvassing Restriction (S.B. 1 § 7.04). [16] *See* LULAC-86 at 6.

81.     Before *Stephens*, the OAG regularly prosecuted election crimes, including alleged unlawful-assistance and vote-harvesting schemes, in counties across Texas. *See* OCA-377 (showing 401 counts—not cases—of election crimes prosecuted by the OAG, alone or in conjunction with local prosecutors, between 2005 and 2022).

82.     Even after *Stephens*, Jonathan White, former Chief of the OAG Election Integrity Division, testified that the "vote harvesting" schemes (purportedly targeted by the Canvassing

---

[16] There may very well be additional investigations that the DA failed to produce during discovery. Throughout this litigation, the OAG has, invoking the investigative privilege, withheld documents discussing "actual or alleged illegal voting, election fraud, or other criminal conduct in connection with" voting and voter assistance. *See* ECF No. 992-3; ECF No. 992-16; *In Re U.S. Dep't of Homeland Sec.*, 459 F.3d 565, 568–69, n.2 (5th Cir. 2006) (the investigative privilege, also known as the "law enforcement privilege," protects government documents relating to an ongoing criminal investigation from release).

Restriction) and "assistance fraud" (purportedly targeted by the all the challenged provisions) remain among the three most common elections-related allegations that the OAG pursues. Tr. at 3915:3–8. For the November 2022 elections, the OAG established a 2022 General Election Integrity Team and publicly stated it was "prepared to take action against unlawful conduct where appropriate," highlighting offenses related to voter assistance and "vote harvesting." OCA-383.

83.     Although the AG may no longer unilaterally prosecute allegations of election-related crimes, *Stephens*, 663 S.W.3d at 51–55, the OAG enforces criminal election offenses through other mechanisms. After OAG investigations conclude, the OAG refers cases to local prosecuting attorneys[17] and often seeks opportunities to partner with DAs to prosecute such allegations through deputization by a DA or appointment *pro tem* by a district judge or the DA. Tr. at 3908:21–3909:17, 3909:1–12; 4043:21–4045:21; 4051:2–10.

84.     The OAG has specifically identified previous prosecutions in which it participated, including prosecutions for unlawful voting assistance and "vote harvesting" and prosecutions conducted by or with the assistance of local DAs in the following counties: Nolan County, Limestone County, Hidalgo County, Harris County, Navarro County, Brewster County, Gregg County, and Starr County. *See* OCA-377.

85.     Finally, the AG is tasked to enforce S.B. 1 against election officials who are subject to civil prosecution for Election Code violations. S.B. 1 § 8.01 (TEC §§ 31.128, .129, .130); *see* Tr. at 772:2–6. He is authorized under S.B. 1 § 8.01 (TEC § 31.129(b)) to assess civil penalties

---

[17] For example, after the prosecution of Hervis Rogers was dismissed in Montgomery County, the OAG referred the case to the Harris County DA, who brought charges against Mr. Rogers before a grand jury. Tr. at 4058:17–4059:24, 4062:7–12. The same procedure was used in the prosecution of Ignacio González Beltrán, whose case was dismissed in Montgomery County and referred by the OAG to Harris County, where it was presented to a grand jury. Tr. at 4063:3–4064:6.

against local officials who violate the law by failing to enforce certain provisions of S.B. 1, including provisions that Plaintiffs challenge.

### Texas Secretary of State

86.   Plaintiffs seek to enjoin Defendant Jane Nelson, the Secretary of State (the "Secretary") of the State of Texas, from enforcing the Challenged Provisions.

87.   The Secretary is the Chief Election Officer of Texas. TEC § 31.001(a). In that capacity, the Secretary is charged with "broad duties to oversee administration of Texas's election laws." *Ostrewich v. Tatum*, 72 F.4th 94, 100 (5th Cir. 2023) (quoting *Richardson v. Flores*, 28 F.4th 649, 654 (5th Cir. 2022)).

88.   It is the Secretary's duty to obtain and maintain uniformity in the interpretation, application, and operation of the election code and election laws outside the election code. TEC § 31.003; Tr. at 1827:6–12.

89.   These responsibilities include "prescribing official forms" for elections. Tr. at 1834:2–12; TEC §§ 31.001(a)–(b), 31.003. The Secretary, for example, is responsible for the design and content of the Assistor Disclosure form and BBM carrier envelopes. *See* Tr. at 1843:4–7; TEC §§ 64.0322(b), 86.013(d); LUPE-009; LUPE-189.

90.   The Secretary routinely issues guidance, directives, orders, instructions, and handbooks to county registrars of all 254 Texas counties, as well as to district attorneys, political candidates, and voters, on various election procedures, including changes implemented in S.B. 1. Tr. at 119:24–120:6, 125:4–21, 128:14–20, 129:3–14, 143:15–18, 159:9–160:11, 1831:7–14, 1875:5–10, 1875:18–25.

91.   The Secretary also collaborates with the OAG to enforce election laws in accordance with her mandatory duties under the Election Code. Tr. at 3913:9–19, 4054:16–4055:8.

92.   Under the Election Code, the Secretary must evaluate information she "receiv[es] or discover[s]" about potential election crimes and, if she "determines that there is probable cause to suspect that criminal conduct occurred, the [S]ecretary *shall* promptly refer the information to the attorney general" and provide all pertinent documents and information in his possession to the AG. TEC § 31.006 (emphasis added).

93.   In this capacity, the Secretary serves as "a gathering point for election complaints from individuals and election officials." Tr. at 3913:12–19. The Secretary logs each complaint received. Tr. at 4326:23–4327:2. Sometimes, the Secretary will also ask the complainant for additional information. Tr. at 1876:24–1879:21. Ultimately, the Secretary must determine whether the information in her possession satisfies the probable cause standard. Tr. at 1881:1–9. "If it's a close call, [the Secretary of State's Office] refer[s] it anyways, because it's better to err on the side of making sure that crimes are prosecuted." Tr. at 1877:14–21.

94.   The Secretary has received allegations related to mail ballot "vote harvesting," which she has referred to the OAG both before and after the passage of S.B. 1. Tr. at 1914:1–6.

**County Defendants**

95.   Plaintiffs have named various local election officials and prosecutors as Defendants in their official capacities for their roles in implementing and enforcing the Challenged Provisions.

*County Election Officials*

96.   Plaintiffs have sued local election administrators in several counties in Texas (the "EAs" or "County Clerks," as applicable) in their official capacity to enjoin them from enforcing the Challenged Provisions.

27

97. The HAUL Plaintiffs seek injunctive relief against the Bexar County EA and the Harris County Clerk.[18] *See* ECF No. 199. The OCA Plaintiffs seek injunctive relief against the County Clerks of Harris County and Travis County. *See* ECF No. 200. The LUPE Plaintiffs seek injunctive relief against the EAs of Dallas County and El Paso County. *See* ECF No. 208. The LULAC Plaintiffs seek injunctive relief against the Bexar County EA, the Harris County Clerk, the Travis County Clerk, the Hidalgo County EA, and the Dallas County EA. *See* ECF No. 207.

98. Local election officials administer Texas elections. They are responsible for administering the Oath of Assistance at polling places, TEC § 64.034, and for collecting and reviewing required disclosures at the polls and on the carrier envelopes of mail-in ballots, *id.* § 64.034. They also receive and review mail carrier and ballot envelopes to voters, *id.* § 86.002, receive and process marked ballots, *id.* §§ 86.006, 86.007(b), 86.011, verify voter signatures, *id.* § 87.027(i), and count the results, *id.* § 87.061.

### County District Attorneys

99. Plaintiffs seek to enjoin the District Attorneys of several counties in Texas (the "DAs" or "County DAs") from enforcing S.B. 1 §§ 6.04–6.06 and 7.04.

100. The HAUL Plaintiffs seek injunctive relief against the DAs of Bexar County, Harris County, and Travis County. *See* ECF No. 199. The OCA Plaintiffs seek injunctive relief against the Harris County DA and the Travis County DA. *See* ECF No. 200. The LUPE Plaintiffs seek injunctive relief against the DAs of Travis County, Dallas County and the 34th Judicial District, which includes El Paso, Culberson, and Hudspeth Counties. *See* ECF No. 208. The LULAC Plaintiffs name the DAs of Travis, Dallas, and Hidalgo Counties as Defendants. *See* ECF No. 207.

---

[18] The Harris County EA's office was abolished on September 1, 2023, pursuant to 88th Leg. R.S. Senate Bill 1750 (amending TEC § 31.050). ECF No. 753 ¶ 44 & n.12.

101.    County district attorneys are tasked with enforcement of the State's criminal laws and represent the State of Texas in all criminal cases in their district, unless conflicts arise. Tex. Const. art. 5, § 21; TEX. CODE CRIM. P. ART. 2.01; *see* TEX. GOV'T CODE § 43.180(b). Thus, by virtue of their positions, DAs are charged with investigating and prosecuting violations of the Election Code, including those among the Challenged Provisions. *See Stephens*, 663 S.W.3d at 55. Indeed, all prosecutions under the Election Code require the consent or authorization of the applicable DA. *See id.* (concluding that the Attorney General "can prosecute [crimes under the Election Code] with the permission of the local prosecutor but cannot initiate prosecution unilaterally.").

102.    The DAs for Travis, Dallas, and Hidalgo Counties each executed stipulations stating that he or she had *not* (1) adopted a policy refusing to prosecute crimes under S.B. 1, (2) instructed law enforcement to refuse to arrest individuals suspected of criminal conduct under S.B. 1, or (3) permitted an assistant DA to take either of the foregoing actions. *See* ECF No. 753-6 (Travis) ¶¶ 3–6; ECF No. 753-7 (Dallas) ¶¶ 3–4; ECF No. 753-13 (Hidalgo) ¶¶ 3–6.

103.    The Bexar County DA likewise signed a stipulation stating that his office has not disavowed any intent to investigate or prosecute crimes under S.B. 1. ECF No. 753-5 ¶¶ 2–6.

104.    The DA of the 34th Judicial District agreed not to enforce the provisions challenged by the LUPE Plaintiffs during the pendency of this action but stipulated that he has the authority to enforce crimes under the Election Code, would be free to do so at any time, and intends to fulfill his duty to enforce election crimes, subject to his prosecutorial discretion. ECF No. 753-8 ¶¶ 5–7.

105.    The Harris County DA's Office ("HCDAO") has previously prosecuted alleged violations under the Election Code and/or related to elections, including under provisions that were

amended by S.B. 1.[19] The Harris County DA has jointly prosecuted at least two election–related cases alongside the OAG in the past.[20]

106.    A newly enacted law House Bill 17 ("H.B. 17") curbs DAs' authority to adopt a policy against enforcing crimes under the Election Code. H.B. 17, which went into effect on September 1, 2023, provides that DAs may be removed from office if they adopt any policy that "prohibits or materially limits the enforcement of any criminal offense." H.B. 17 § 1 (adding TEX. LOC. GOV'T CODE § 813(B)).

**IMPACT OF THE CHALLENGED PROVISIONS**

107.    At trial, the Court heard testimony (live and by deposition designation) from numerous voters who qualify for voting assistance, individuals who have served as assistants in the past, and election officials describing the impact that the Challenged Provisions have impaired voters' ability to vote with their chosen assistors of their choice.

**Transportation Disclosure (§ 6.01)**

108.    Before S.B. 1, DST members regularly provided transportation to the polls by participating in Souls to the Polls, a caravanning initiative that partners with churches to drive voters to their voting location. Tr. at 2088:8–15.

109.    DST members who provide transportation assistance members are concerned about who may gain access to the personal information disclosed on the forms required under Section

---

[19] For example, in 2022, after the prosecution of Hervis Rogers was dismissed in Montgomery County, OAG referred the case to HCDAO, who presented charges against Rogers to a grand jury. Tr. at 4058:17–4059:24, 4062:7–12. In addition, HCDAO presented another charge to a grand jury regarding an alleged Election Code violation by Mr. González Beltrán after the case was similarly dismissed in Montgomery County. Tr. at 4063:3–4064:6.

[20] OCA-377 at 17 (noting certain cases that were "[p]rosecuted by or with assistance of local district/county attorney," including Harris County); *id.* at 14 (identifying joint prosecution of Anthony Rodriguez with Harris County in 2019); OCA-225 at 4 (Harris DA interrogatories identifying prosecution of Anthony Rodriguez under a provision amended or enacted by S.B. 1); OCA-377 at 6 (identifying joint prosecution of Avery Ayers with Harris County in 2015). The Harris DA further acknowledged prosecuting two other election–related violations in 2020 under provisions enacted or amended by S.B. 1. OCA-225 at 4 (identifying prosecutions of Richard Bonton and Natasha Demming).

6.01 and potential harassment by poll watchers, who are permitted to observe drivers subject to Section 6.01 as they complete the Transportation Disclosure form during curbside voting. Tr. at 2108:7–2109:3 ("Our members or even community members who provide transportation are afraid to fill out those forms. They don't know what's going to happen to the information that they put on those forms.").

110.    It is unclear whether drivers who refuse to complete the disclosure form will face any consequences. Unlike the provisions of S.B. 1 requiring individuals providing voting assistance to make similar disclosures on mail ballot carrier envelopes (TEC § 86.010(g).) and take the Oath of Assistance (TEC § 64.034), Section 6.01 does not, to the Court's knowledge, state that non-compliance is punishable as a state jail felony or will result in the rejection of a voter's ballot. Section 6.01 merely explains that SOS must maintain records of the drivers' disclosures and produce them to the AG upon request. TEC § 64.009(g). Instead, enforcement of Section 6.01 appears to be left to election officers, who would, presumably not permit the curbside voters to cast their ballots until the driver had completed the disclosure form.

111.    The Austin Alumnae Chapter of DST stopped providing transportation assistance to elderly, disabled individuals because of Section 6.01's transportation assistance disclosure requirement and the attendant criminal penalties assistors maybe subjected to under S.B. 1. Tr. at 2147:12–2148:3. The Austin Alumnae and Bay Area-Houston Chapters have been unable "to recruit members who are brave enough to assist with senior voters [with transportation to the polls] because of the fear[] of criminal penalties." Tr. at 2198:2–6. Members of the Fort Worth Chapter of DST had routinely provided transportation assistance to elderly voters at the Friendship Senior Center in Fort Worth, Texas. However, none of the members were willing to assist because of the burdens on assistance placed on Section 6.01 Tr. at 2197:3–17, 2198:20–24.

**Assistor Disclosures (§§ 6.03, 6.05, 6.07) and Oath of Assistance (§ 6.04)**

112.    The Assistor Disclosures and Oath requirements deter voters from requesting, and assistors from providing, assistance in the voting process. As a result, some voters who need assistance have forgone assistance altogether and struggled to complete their ballots. Those who engaged with election officials sacrificed their privacy while voting but still did not receive the assistance they needed.

113.    The Court heard trial and deposition testimony from several Texas voters who, due to their physical disabilities, require assistance in nearly every facet of their daily lives, including Jodi Nunez Landry, Laura Halvorson, Amy Litzinger, and Nancy Crowther. All four witnesses are members of the Arc.

114.    Although Ms. Nunez Landry, Ms. Halvorson, Ms. Litzinger, and Ms. Crowther are eligible for assistance under Texas and federal law, none of them received voting assistance from their assistors of choice in the 2022 primary or general election because of the burdens—including the threat of criminal liability—that S.B. 1's disclosure and oath requirements impose on assistors.

115.    These voters were not worried that their chosen assistors would influence their vote. Ms. Halvorson testified that she has never felt that one of her attendants was trying to influence her choices or would manipulate the way her ballot was marked. Tr. at 3318:3–11. Similarly, Ms. Litzinger explained that her personal care attendant is not able to manipulate how she votes because she is always present when they are assisting her with marking the ballot and ensures that she can see her ballot and verify what the attendant marks. *See, e.g.*, Tr. at 3296:20–3297:8.

116.    Instead, voters' primary concern was exposing their caregiver to criminal liability under S.B. 1 and losing the critical assistance they provide outside the voting process. Ms. Nunez Landry testified that her "worst fear is ending up in a nursing facility due to her inability to find

care attendants." Tr. at 3234:7–23 (has had difficulty finding personal care attendants due to shortage of home health care workers, who generally receive low wages without benefits and can earn more money working less physically demanding jobs); *see also* Tr. at 3331:2–18 (Halvorson) (finding replacement caregivers is "hard enough" without criminal penalties being added to the mix of what they are being asked to do).

117.     Voters with disabilities also fear being disenfranchised due to the mistaken perception by election workers and poll watchers that voters receiving assistance are being improperly coerced or influenced. As Ms. Halvorson explained, "especially if they don't have an understanding of disability," people may believe that "we're not able to make decisions for ourselves or we don't have the intellectual capacity to do so. . . . I [worry] that other people would perceive that my caregivers were influencing my vote, if they just see from across the room someone pressing buttons for me." Tr. at 3324:15– 3325:5, 3331:2–18.

**Voters have been deterred from requesting assistance.**

*Jodi Nunez Landry*

118.     Jodi Nunez Landry is a registered voter of Harris County, Texas and votes with assistance. Tr. at 3236:11–17; Tr. at 3234:1–6. Ms. Nunez Landry has a rare, untreatable, and progressive form of muscular dystrophy. Tr. at 3233:7–14. She uses a power wheelchair to navigate and requires assistance with most activities of daily living, including bathing, dressing, cooking, and cleaning. Tr. at 3233:2–14, 3235:10–3236:2

119.     Ms. Nunez Landry prefers to vote in person. Tr. at 3236:24–3237:14. She prefers to have her partner assist her with voting because she "can trust him and there's a certain amount of privacy there[.]" Tr. at 3243:5–25. Because her partner already understands the contours of her

disability, she does not need to give him a lengthy explanation of the assistance she needs. Tr. at 3234:2–6, 3236:24–3237:14.

120.    Ms. Nunez Landry has not asked her partner for voting assistance since S.B. 1 was enacted because she did not "want to put him in jeopardy" or draw attention to herself or have people assume that she was "being coerced" in light of S.B. 1' voter assistance provisions. Tr. at 3246:23–3247:6. She explained:

> I would have liked to have had my partner assist me but I knew under SB 1 that we were going to have to go through all sorts of difficulties to do that, and . . . I didn't want to put him through that. I'm really afraid of losing assistance and not having anyone, and also I don't want to draw more attention to myself.

Tr. at 3256:15–3257:4; *see also id.* at 3260:2–18 (stating that she was "too afraid to ask his assistance," noting that S.B. 1 has a "chilling effect" on voters who need assistance "makes it very burdensome and frightening for many of us to risk losing attendants or risk putting them in some type of legal jeopardy").

121.    In the November 2022 election, Ms. Nunez Landry could not access the remote that would allow her to vote independently at her voting station and, once she had it, found that it was not functioning properly. Tr. at 3244:25–3245:14. When the poll worker she asked for help did not understand the problem, he brought other unknown individuals to Ms. Nunez Landry's booth. Tr. at 3245:18–3246:10. Although they failed to help her, all three strangers watched as Ms. Nunez Landry made her selections.

122.    Discussing the loss of her privacy, Ms. Nunez Landry testified that it "made me really nervous" and "they all voted with me, much to my chagrin and frustration." Tr. at 3246:7– 8. Had she been able to receive assistance from her partner, "he could have touched the screen and

it would have all been rather effortless." Tr. at 3246:16–17. When she finally finished voting, she "was very, very angry." Tr. at 3246:21–22.

### *Laura Halvorson*

123.    Laura Halvorson is a registered voter in Bexar County. Tr. at 3315:25. Ms. Halvorson has chronic muscular respiratory failure and muscular dystrophy, a progressive condition that has worsened since her diagnosis. Tr. at 3311:14–22. Presently, Ms. Halvorson relies on a breathing machine and a power wheelchair. Tr. at 3312:2–3.

124.    Ms. Halvorson requires "total care" for everyday life, including assistance with transferring, bathing, dressing, eating, and meal preparation. Tr. at 3312:9–12. To accomplish these daily tasks, Ms. Halvorson employs several personal care attendants. Tr. at 3312:15–17.

125.    In the March 2022 primary, Ms. Halvorson opted to vote by mail. Tr. at 3318:23–24. Her assistant, however, did not feel comfortable taking the Oath of Assistance and declined to assist Ms. Halvorson. Tr. at 3319:7–16. As a green card holder, her personal care attendant was not comfortable taking an oath under penalty of perjury that could risk her green card status. This was the first time a personal care attendant ever declined to assist Ms. Halvorson in voting. Tr. at 3319:14–16. Without her assistant, Ms. Halvorson struggled to complete the mail in ballot. Tr. at 3319:17–20. Her muscle weakness inhibited her ability to write legibly, Tr. at 3320:4–18, forcing her to fill out her ballot in ten- or fifteen- minute intervals over the course of two full days. Tr. at 3320:19–22.

126.    In the November 2022 general election, Ms. Halvorson voted in-person. Tr. at 3322:5–10. She again voted without assistance to avoid exposing her assistants to potential liability. Tr. at 3322:11–18, 3323:10–24. Ms. Halvorson believes S.B. 1's Oath is intimidating, ambiguous, and that her caregivers may be accused of influencing her vote by simply helping her

cast it. Tr. at 3324:11–3325:5. When Ms. Halvorson arrived to vote, her remote control had a glitch that essentially inverted the controls. Tr. at 14–17. She struggled to highlight voting machine choices, and when was able to do so, could not deduce what the candidate's party affiliation was. Tr. at 3327:13–23. Ms. Halvorson testified that, when she sought help from poll workers, they snidely told her to push the buttons. Tr. at 3328:6–11. After nearly 45 minutes at the poll booth, Ms. Halvorson weakly delivered it into the counting machine. Tr. at 3329:1–8; 3330:1–3.

### *Amy Litzinger*

127.    Amy Litzinger is a registered voter in Travis County. Tr. at 3281:14–17. Ms. Litzinger has spastic quadriplegic cerebral palsy, which impairs her stability and ambulation and limits her muscle strength. Tr. at 3275:19–24. Additionally, Ms. Litzinger has dysautonomia, which affects involuntary functions, such as her digestion, breathing, and heart rate and temperature regulation. Tr. at 3276:2–6.

128.    Due to these conditions, Ms. Litzinger uses a power wheelchair and other mobility devices. Tr. at 3276:8–10. Because her muscle strength fluctuates, Ms. Litzinger cannot always operate these devices, Tr. at 3276:18–22, and often requires the assistance with her daily activities. Tr. at 3279:11–15. Ms. Litzinger requires assistance to get in and out of bed, to the shower, and to use the restroom. Tr. at 3279:16–25. She cannot lift or raise anything heavier than two pounds— which inhibits her ability to write and open doors. Tr. at 3277:16–3278:6. Ms. Litzinger owns a mobility van, which her assistors use to drive her around the city. Tr. at 3277:10–14. They must also secure Ms. Litzinger into her power wheelchair using a "chest clip" and "strap" and secure her power wheelchair in the van. Tr. at 3277:4–9.

129.    Although she is eligible to vote by mail, Ms. Litzinger prefers to vote in person because she anticipates that her disability will produce conflicting handwriting samples on a mail

ballot—her own handwriting fluctuates with her strength, and she sometimes relies on assistors to complete her ballot. Tr. at 3282:14–21.

130.    Ms. Litzinger prefers to have her personal care attendant assist with voting. Since she has limited dexterity, the poll worker would have to interact with intimate parts of her body, which could be unsafe or uncomfortable for both individuals. Tr. at 3286:11–3287:4. She also relies on her personal care attendant to get to the polling site. Her attendant drives her van, loads and unloads Ms. Litzinger from the van, ensures there are no barriers to enter the voting space, requests curbside voting, handles her ID, and places the completed ballot in the machine. Tr. at 3284:13–3285:23. Ms. Litzinger also relies on an attendant when voting by mail, as she did in 2020. Ms. Litzinger needs someone to open the envelope, fill it out, and tape it down so she can sign it. Tr. at 3287:20–3288:5.

131.    All of Ms. Litzinger's attendants have expressed to her that they are uncomfortable taking the Oath of Assistance, and accordingly, none of them have provided voting assistance since S.B. 1 was enacted. Tr. at 3293:17–21.

132.    During the May 2022 primary, when Ms. Litzinger approached the ballot machine to vote in person, she realized her chest clip was still fastened. Tr. at 3289:23–3290:2. She was uncertain if the assistant could release the clip or if that would be considered impermissible voting assistance. Tr. at 3290:2–5. Thus, Ms. Litzinger voted with the chest clip fastened and remembered it was "quite painful." Tr. at 3290:13–17. Due to the discomfort, she struggled to complete the five-page ballot. Tr. at 3290:15–17.

133.    In the November 2022 general election, Ms. Litzinger spoke at length with her attendant about the Oath. Ultimately, to avoid exposing the attendant to criminal liability under the Oath, especially concerning Ms. Litzinger's "eligibility" for assistance, they decided that the

attendant would provide Ms. Litzinger with transportation assistance but would not help her inside the polling place. Tr. at 3291:4–3292:5. Thus, Ms. Litzinger held her own notes and was ultimately unable to review them while she voted because she dropped them and could not pick them up. Tr. at 3292:6–9. Despite Ms. Litzinger's decision to vote without assistance, poll workers attempted to have the attendant sign the Oath simply because she was in the room with Ms. Litzinger. Tr. at 3292:9–17. During the entire time Ms. Litzinger was voting, three people debated whether she needed assistance and ultimately watched her vote. Tr. at 3293:1–13. She described the process as nerve-wracking and noted that "for something that was designed to keep my ballot private, I didn't think . . . it was very private because everyone [was] watching me vote and debating whether [I was] self-sufficient or not." Tr. at 3292:21–3293:4–7.

### Nancy Crowther

134.    Nancy Crowther, a registered voter in Travis County, is a member of The Arc. HAUL-413, Crowther Dep. at 16:22–25, 17:4–5, 30:5–12. Ms. Crowther has a progressive neuromuscular disease and requires a personal care attendant to complete major life activities. She cannot sit up by herself, so her attendant helps her get dressed, use the bathroom, transfer in and out of her wheelchair, and use her CPAP machine for her sleep apnea. Ms. Crowther also uses her attendant to complete household tasks and personal hygiene. Her attendant is with her for most of her daily activities. *Id.* at 23:25–24:8, 18:3–9, 30:5–12.

135.    Ms. Crowther did not take her attendant with her to vote in May 2022 because of her fears that the Oath could jeopardize her relationship with her attendant: "I would be mortified . . . if they were to get in trouble just for helping me." *Id.* at 52:11–53:4, 54:7–14. Ms. Crowther explained that, even though she will need more and more help over time as her disability

38

progresses, she does not want to expose her attendants to "danger" that "they aren't paid for" by asking for their assistance under the conditions imposed by S.B. 1.

### The Oath of Assistance (§ 6.04) deters voting assistance.

136. The Oath of Assistance under Section 6.04 of S.B. 1, as enjoined by Judge Pitman, provides:

> I swear (or affirm) **under penalty of perjury** that **the voter I am assisting represented to me they are eligible to receive assistance**; I will not suggest, by word, sign, or gesture, how the voter should vote; **I did not pressure or coerce the voter into choosing me to provide assistance**; [and] I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; **I will not communicate information about how the voter has voted to another person**; **and I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted**.

TEC § 64.034.

137. Aside from the amended language that has not already been enjoined, Plaintiffs challenge the chilling effect on voting assistance created by the Oath's "penalty of perjury" language, the requirement that the voter represent his or her eligibility for assistance and assistor statements concerning eligibility and "pressure or coerc[ion]."

### *The "penalty of perjury" language deters assistance.*

138. At trial, voters,[21] assistors,[22] and election officials[23] alike characterized the "penalty of perjury" language in the amended Oath as "intimidating," "scary," and "threatening." Several witnesses who assisted voters in elections prior to S.B. 1's enactment testified that they are no longer willing to serve as assistors due to the threat of criminal sanctions under the Oath.[24]

---

[21] *See, e.g.*, Tr. at 3324:10–14 (Halvorson).

[22] *See, e.g.*, Tr. at 147:10–148:8 (Rocha); Tr. at 3208:9–17; Tr. at 3217:12–3218:1 (Miller); Tr. at 2439:24–2440:10 (Espinosa); Tr. at 2540:21–23 (Ortega).

[23] *See, e.g.*, Tr. at 175:6–176:8 (Wise); Tr. at 1312:25–1314:9 (Longoria)

[24] *See, e.g.*, Tr. at 2443:20–2444:14 (Espinosa); Tr. at 2539:12–19 (Ortega).

139. Witnesses also pointed out that the "penalty of perjury" language can interact with other language in the Oath to prohibit assistors from providing the assistance a voter requires. For example, an assistor must swear "under the penalty of perjury," that they "will not suggest, by word, sign, or gesture, how the voter should vote." Although this language appeared in the Oath before S.B. 1, the "penalty of perjury" language poses barriers to assistance to voters with intellectual disabilities and certain cognitive and physical impairments who need to be reminded of their selections, discussed in a previous conversation with their chosen assistor. *See, e.g.*, Tr. at 3491:9–20 (explaining that "cuing" is a common method of assistant voters with IDD); *see also* Tr. at 3740:19–23; LUPE-002 ¶ 40, Table 1 (stating that approximately 1,082,500, or one-third of voting-eligible Texans with disabilities, have a "cognitive impairment," defined as difficulty remembering, concentrating, or making decisions).

140. Before voting curbside, Toby Cole, a disability rights attorney and Harris County voter with quadriplegia, goes through a sample ballot with his assistant, who helps him research candidates and mark the sample ballot. During the voting process, Mr. Cole asks his assistant to reference the sample ballot to remind him of his previous selections:

> I don't remember things the way I did when I was younger. I need someone to help me . . . I rely on my assistants to help me remind me of things. . . . And so I specifically request the people that help me, that they help remind me of what I've told them I want to do and how I want to vote.

Tr. at 702:10–703:19, 706:19–707:20. Thus, read together with the "penalty of perjury" language, Mr. Cole understands this portion of the Oath to mean that he must either change how he votes or require his assistor to commit perjury. Tr. at 710:20–711:11. Mr. Cole is not the only attorney concerned about the "perjury" language. MABA members find this language alarming because they do not want to subject themselves to the consequences of being accused of perjury—and potentially be disbarred—for providing voter assistance. Tr. at 2538:8–14.

141.     Voters with disabilities testified that they believed the "penalty of perjury" language will deter some people from voting altogether:

> I talk to a lot of people after they get disabled…as you make things harder, you just start cutting things out…it's too hard to find someone to feed me, or it's embarrassing, so I don't want to go to dinner. It's too hard to get on an airplane to go travel, so I just don't do that. And so every time you put even one little road bump or one little barrier in front, it just makes it that much harder, and so you don't do it…I look at the oath and it says "I swear under the penalty of perjury."…That's a big deal. That's a scary deal. [A]m I going to have somebody that may get deported or thrown in jail come help me? No, I'm just not going to vote. I'm just not going to exercise that right.

Tr. at 714:6–18, 715:1–14. Ms. Halvorson stated that many of her friends with disabilities are worried about their caregivers facing these issues with the penalty of perjury and "[s]ome of them may not be going out and voting like they used to, due to it." Tr. at 3332:11–18.

142.     Finally, there is some uncertainty about the type of "assistance" that triggers the Oath requirement in the first place. Ms. Litzinger did not ask her attendant to unfasten her chest clip while she was voting out of concern that it would trigger the Oath requirement. Tr. at 3290:2–5. Mr. Ingram testified that whether an attendant who wheels a voter who uses a wheelchair to the poll booth (but does not actually help her cast the ballot) must take the Oath is "a very gray area and kind of depends on the presiding judge." Tr. at 4420:18–4422:6. Mr. Ingram suggested that a voter faced with such a situation could ask the presiding judge for a reasonable accommodation (by permitting her attendant to move her to the poll booth without taking the Oath).[25] Alternatively, Mr. Ingram suggested that the attendant could "just take the Oath of Assistance, and whether you help the voter or not, you're in the polling place legally at that point." Tr. at 4420:18–4422:6. But,

---

[25] Of course, there is no guarantee that a presiding judge would in fact grant such an accommodation. *Cf.* TEC § 276.019 ("public official or election official may not create, alter, modify, waive, or suspend any election standard, practice, or procedure mandated by law or rule in a manner not expressly authorized by" the Election Code); TEC § 1.002 (recognizing qualified individuals' right to "*request*[] a reasonable accommodation or modification to any election standard, practice, or procedure mandated by law," but not their right to *receive* any such accommodations) (emphasis added).

of course, this response just begs the question. Voters and attendants want to know what kind of assistance can be provided, if any, *without* trigging the Oath requirement.

143.    <u>Voter Eligibility for Assistance</u>. Voters and assistors testified that these portions of the Oath addressing the voter's eligibility to receive assistance were troubling, in numerous respects.

144.    To begin, although the Oath requires the voter to affirm his eligibility for assistance, it does not define who is "eligible" to receive voting assistance or explain who determines eligibility. *See* TEC § 64.034. As a result, both voters and assistors expressed confused about the eligibility requirements.[26] Tr. at 3251:16–3252:11 (Nunez Landry); Tr. at 3561:2–3562:17, 3575:1–10 (Cranston); Tr. at 149–25 (Rocha).

145.    Mr. White testified that the new language in the Oath probably requires the assistant to obtain a representation of eligibility from the voter. Tr. at 3991:1–5.

146.    Voters expressed discomfort with the requirement to represent their eligibility to their assistors or explain the basis for their eligibility. As several voters with disabilities pointed out, the requirement that the voter affirmatively represents his or her eligibility amounts to an *additional* eligibility requirement. Ms. Nunez Landry testified that, while her partner served as her assistor before S.B. 1, she had never specifically told him that she was eligible to receive assistance. Tr. at 3252:17–3253:2. She felt that it would be "very undemocratic" if her vote did not count because she failed to represent her eligibility and that she "would feel disenfranchised"

---

[26] Adding to the confusion, the Secretary of State's "VOTER INFORMATION" poster, which must be posted in every polling place and voting station, provides an incorrect and overly-narrow definition of eligibility for voter assistance:

>   a.    You have: (6) The right to assistance while casting your ballot if you cannot write, see the ballot, understand the language in which it is written, or cannot speak English, or communicate only with sign language, and want assistance in communicating with election officials.

LUPE-265, https://perma.cc/LKS6-HGJH; TEC § 62.011.

and like a "a second-class citizen." Tr. at 3252:17–3253:2. Mr. Cole stated that the provision is

"offensive" because it requires him to share private health information with his assistor to receive

the assistance he needs to vote—something he is not required to do in any other aspect of his life

in order to receive the assistance he needs. Tr. at 695:6–7.

147.    While the Oath does not explicitly require voters to explain the basis for their

eligibility, in practice, assistors who want to ensure that a voter's ballot will be counted must also

confirm that the voter is eligible to receive assistance, because, as the Oath cautions, the voter's

ballot may not be counted if he or she is ineligible. TEC § 64.034.

148.    Critically, because it does not contain a scienter requirement, the Oath appears as

it is written to hinge on *actual* eligibility, regardless of the assistor's *or* voter's beliefs about the

voter's eligibility. In other words, the provision of assistance itself, even if it is given in accordance

with the voter's wishes, may result in the rejection of the voter's ballot. Thus, from an assistor's

perspective, to avoid disenfranchising the very voters he hopes to assist, he must confirm that

voters who have asked for his help are eligible for assistance and cannot reasonably rely on the

voter's representation of their own eligibility.

149.    How assistors are supposed to confirm a voter's actual eligibility without asking

the voter to disclose private health information is not at all clear. *See, e.g.*, Tr. at 147:1–9 (LUPE

staff member is uncertain whether a voter who asks for help because he cannot see too well has

sufficiently represented his eligibility); Tr. at 2543:21–16 (MABA members are concerned

because they cannot guarantee that they have the knowledge to attest to someone's disability). Mr.

White testified that "anyone who takes this oath is determining what that means to them," Tr. at

3989:10–16, but acknowledged that "it would certainly be the interpretation of the D.A. in that

county where [the potential] offense took place" that would determine whether an assistor would be prosecuted, Tr. at 4105:13–21.

150.    Assistors and witnesses with disabilities also testified that the statements regarding eligibility in the Oath were likely to subject voters receiving assistance to greater scrutiny in the polls, especially those with disabilities that are not readily perceptible. For example, Jennifer Miller, whose daughter, Danielle, requires voting assistance due to dysgraphia, worried that because Danielle's disability is not always visible, her daughter's vote might not be counted based on someone else's perception that she was ineligible for assistance. Tr. at 3215:16–3216:8. Even voters with *visible* disabilities attempting to vote *without* assistance have been subject to undue scrutiny, such as Ms. Litzinger, have had their privacy invaded while voting due to election officials' questions about her need for assistance. *See* Tr. at 3293:1–13; *see also* Tr. at 3245:18– 3246:10 (Nunez Landry).

151.    Pressure or coercion. Voters and assistors expressed concerns about the Oath provision requiring assistors to swear that they "did not pressure or coerce the voter into choosing me to provide assistance" due to confusion about the meaning of "pressure" under such circumstances. *See* Tr. at 2540:11–16 (MABA organizational representative stating that, as an attorney, she would like to see a definition or context for the words "pressure" and "coerce").

152.    For example, assistors worry that encouraging voters to seek assistance if they need it or calling them to ask about their plans to vote could be construed as "pressuring" a voter to choose them as assistors. Tr. at 2540:11 (MABA).

153.    Witnesses also explained that the practical reality of relationships between caregivers and their clients means that many voters may have few potential assistors to choose from. For example, Ms. Nunez Landry asked:

> What does pressure or coerce mean in this context? And I think especially if people…are under penalty of perjury they may be afraid, and for so many of us who don't have options on who is going to help us, is that coercion? Is that pressure? I just think there is going to be so much confusion that my fear is that people will be too afraid to help us.

Tr. at 3249:21–3250:2.

154.     Ms. Miller, whose daughter requires voting assistance, worried that parents could face prison time based on simple logistical matters: if a voter prefers that her father assist her, for example, but it is more convenient for her mother to take her to the polls, has the mother "pressured" the voter into choosing the mother by relaying this information to her daughter? Tr.at 3206:11–3207:4; *see also* Tr. at 3207:20–25, 3214:13–3215:9.

155.     Cameron County Election Administrator Remi Garza testified that he believed the "I did not pressure" language in the Oath could make people hesitant to provide assistance based on the fear that they could be understood to be pressuring the voter to take their assistance: "The wording is vague enough where …they might be concerned that they are going to violate the oath if they signed it." Tr. at 733:21–734:7

156.     <u>Communication to others about how the voter has voted.</u> Plaintiffs did not meaningfully challenge the language in the Oath barring assistors from "communicat[ing] information about how the voter has voted to another person," either at trial or in any of their post-trial briefing. The Court thus considers any challenge to this language to have been waived. Additionally, it is difficult to see how this language could possibly frustrate Section 208, which was enacted in large part to protect voters' privacy.[27]

---

[27] Still, the Court observes that it is unclear whether this proscription applies to the *substance* of the voter's ballot or the *manner* in which the ballot was cast.

**The Assistor Disclosure requirements (§§ 6.03, 6.05, and 6.07) deter voting assistance.**

157.     Sections 6.03 and 6.05 of S.B. 1 require a voter assistor to record and swear to their relationship to the voter and indicate whether the assistor received or accepted any form of compensation or benefit from a candidate campaign or a political action committee. Section 6.03 creates a new form with this requirement for assistors in the polling place and Section 6.05 adds this requirement to the mail ballot carrier envelope. TEC § 86.010(e).

158.     Section 6.07 revises the mail ballot carrier envelope to require a person who deposits the carrier envelope in the mail to indicate that person's relationship to the voter. *Id.* at 55. Even before S.B. 1, the mail ballot carrier envelope required assistors to disclose their name and address. *See* TEC § 86.010(e); JEX-1 at 53.

159.     Assistors and county election officials testified that the form requirement, coupled with the Oath of Assistance, created delays during in-person voting. Tr. at 81:15–25 (Chavez Camacho); Tr. at 383:14–18 (Scarpello); Tr. at 732:8–733:17 (Garza); Tr. at 1057:12–24 (Callanen); Tr. at 2316:16–20 (Ramon). Ms. Rocha, a LUPE employee, testified that, on two occasions when agreed to assist voters at the polls under S.B. 1, she left the voter to stand in a separate line for assistors and, by the time she had completed the disclosures, the voter was being assisted by other people. Tr. at 150:6–18, 151:3–14, 152:6–153:3, 153:4–17, 150:9–12, 150:14– 151:2, 157:14–158:9. Extended wait times at the polls are especially burdensome on voters with physical disabilities, and waiting in line is the most common difficulty that voters with disabilities face. *See* Tr. at 3756:1–19; LUPE-002, Table 10.

160.     In addition to the potential delays caused by the Oath of Assistance Form at the polls, potential assistors who, like many of Plaintiffs' staff and volunteers, do not have preexisting

relationships with voters they help vote by mail or at the polls have a well-founded concern about providing the information required by Sections 6.03 and 6.05.

161.    Even absent evidence of fraud or coercion, the consequences for both the voter and the assistor for failing to disclose their relationship on a mail ballot are severe: the voter's ballot may not count, and the assistor faces up to two years in prison and a fine of up to $10,000. *See* TEC § 86.010(g). These criminal sanctions, however, are inapplicable to mail-ballot assistance provided by a close relative of the voter or someone who lives with the voter. *See* TEC § 86.010(h)(2).

162.    Jonathan White, the State's top voter fraud prosecutor, testified that, in his view, "normal assistance" is a voter being assisted by family members or caregivers. Tr at 3987:15–23. With respect to Section 6.03, Mr. White testified that having information about assistors' relationships to voters can help distinguish between workers with no relationship to the voter versus the folks who are assisted by family members or caregivers, which he considers more legitimate assistance. Tr. at 3987:1–14. Still, the OAG's tracker of election crime prosecutions resolved does not identify a single case of voter assistance fraud relating to assistance provided in the polling place. Tr. at 4034:16–20; OCA-377 at 1–12.

163.    Despite Mr. White's impression that voter assistance provided by members of trusted community organizations (rather than, e.g., family members or caregivers) is somehow suspect, in 2020, approximately one-fifth of voters with disabilities received voting assistance from non-family members. LUPE-002 ¶ 102. This is unsurprising, as Texans with disabilities are more likely to live alone, less likely to be married, and more likely to be separated, divorced, or widowed. Tr. at 3747:20–25; LUPE-002, Table 4. And, irrespective of Mr. White's perception that "caregivers" are "normal" assistants, a caregiver who provides BBM assistance is still subject to

47

criminal sanctions for failing to disclose his relationship to the voter, unless the caregiver is *also* a close relative of the voter or lives with the voter. *See* TEC § 86.010(h)(2).

164.    Sections 6.05 has deterred DST members from helping mail-in voters because these provisions threaten assistors with criminal liability for failing to satisfy these disclosure requirements or violating the Oath, which appears in the same section of the ballot envelope. Tr. at 2202:9–14. DST chapters have had difficulty recruiting members who are willing to place themselves at risk to provide in-person voter assistance at the polls. Tr. at 2199:16–2200:3, 2202:9–14, 2203:10–15.

165.    Out of fear of prosecution pursuant under Sections 6.04 and 6.05 of S.B. 1, LUPE staff and volunteers turn away voters who ask for their assistance, and instead encourages them to ask a family member or a friend for assistance. Tr. at 82:6–12, 111:10–111:20, 118:16–119:4. Cris Rocha, a LUPE employee, is only willing to assist voters at the polls if she is the last person the voter can use as an assistor. Tr. at 145:21–24; 48:22–149:3, 156:12–18. Maria Gomez, a LUPE volunteer who has provided voting assistance for over 25 years, is no longer willing to provide assistance due to the threat of criminal sanctions under S.B. 1. LUPE-284, Gomez Dep. at 13:19–14:15, 32:2–8, 17:2–13, 33:7–35:9, 40:24–42:2.

166.    FIEL no longer conducts voter caravans because its members feel uneasy about running afoul of requirements put in place by S.B. 1, including the Oath and the Oath of Assistance Form (which includes the required Assistor Disclosures). Tr. at 2450:3–20. Without these caravans to the polls, FIEL is unable to engage as many voters as possible and help them actively participate in the voting process. Tr. at 2451:1–5.

167.    FIEL has also struggled to recruit volunteers to provide in-person voter assistance at the polls since the enactment of S.B. 1 due to FIEL members' concerns about the Oath and the

48

Assistor Disclosure requirements. Tr. at 2444:10–14, 2444:24–2445:7, 2451:19–25, 2452:1–11.

Indeed, while before S.B. 1 about 100 FIEL members volunteered to assist voters at the polls, in

2022, there were at most 20 members who did so. Tr. at 2470:22–25. Cesar Espinosa, the founding

executive director of FIEL, no longer provides voter assistance due to his concerns about the

Oath's "penalty of perjury" language and the Assistor Disclosure requirements. Tr. at 2430:3–4,

2439:6–23, 2444:24–2445:7; *see also* Tr. at 2445:4–22 (Espinosa) (describing FIEL member

Debany Gonzales, who was a very active voter assistant at the polls, but is no longer willing to

assist voters due to amended language of the Oath of Assistance); Tr. at 2445:23–2446:22, 2447:6–

13 (Espinosa) (describing Tonya Rodriguez, naturalized citizen with LEP, who sought, but did not

receive, translation assistance from a FIEL member at the polls and struggled to cast her ballot in

person).

168.     Mr. Espinosa is particularly concerned about the Assistor Disclosures because

when he volunteers at the polls, he often provides translation assistance to voters with whom he

has no direct relationship. Tr. at 2443:24–2443:3. Asked about his concerns, Mr. Espinosa stated:

> [T]he number one question that . . .  pops into my head is why is this table
> even necessary?  Or what is my information that I provided here going to
> be used for?  How is it going to be stored?  Who is going to be able to handle
> it or see it? Who is going to be able to see my signature?

Tr. at 2442:6–2443:9

169.     Consistent with Mr. Espinosa's concerns about the Assistor Disclosure

requirements, community stakeholders submitted letters to the Texas legislature, anticipating that

S.B. 1's additional paperwork and disclosure requirements were likely to have a "chilling effect"

on voter assistance. *See* HAUL-216 (testimony regarding S.B. 1 before the Senate State Affairs

Committee by Alex Cogan, Manager of Public Policy and Advocacy for The Arc, asserting that

the new Assistor Disclosure requirements would "create a chilling effect that decreases the availability of support for Texas with disabilities to exercise their right to vote").

**Election officials are inadequate substitutes for private assistors**

170.    By deterring assistance by private assistors, the Assistant Disclosure and Oath requirements encourage voters to forgo assistance altogether or receive assistance from an election official. Election officials are imperfect substitutes for voters' chosen assistors for at least two practical reasons.

171.    First, election officials may be unable to provide the kind of assistance the voter requires. For example, an election official who does not speak the same language as a voter who needs assistance will be unable to translate and mark the voter's ballot. Similarly, a voter with cognitive or memory impairments will be unable to receive "cuing" assistance from election officials who are unfamiliar with how the voter intends to vote. Finally, it may be unsafe or uncomfortable for voters with physical disabilities to receive assistance from an election official who is unfamiliar with the contours of their disabilities and needs. For example, Ms. Litzinger explained that it takes over two months to train a personal care attendant to safely transfer her out of her wheelchair due to her balance issues. Tr. at 3281:1–17.

172.    Second, voters who receive assistance from election officials are forced to sacrifice the privacy of their ballot. Their selections must be disclosed not only to the county elections official(s) providing the assistance but to any poll watchers observing the activity. TEC § 33.057(a).

173.    Thus, S.B. 1's Oath and Assistor Disclosure requirements leave many voters in need of assistance with a choice between three dignitary harms—voting without any assistance, losing their privacy while voting, or foregoing the voting process altogether. *See* Tr. at 707:25–

708:14 (Cole) (describing the loss of his privacy when an official prevented his assistant from helping him vote as a violation).

174.    This is precisely the choice that the right to assistance under Section 208 was intended to avoid: "As a result, people requiring assistance in some jurisdictions are forced to choose between casting a ballot under the adverse circumstances of not being able to choose their own assistance or forfeiting their right to vote. The Committee is concerned that some people in this situation do in fact elect to forfeit their rights to vote." S. Rep. No. 97-417 at 472.

175.    Dr. Douglas Kruse, Plaintiffs' expert witness on S.B. 1's impact on voters with disabilities, explained that adding additional requirements to the assistance process for both voters and assistors increases the likelihood that voters with disabilities will be disenfranchised:

> It doesn't sound like a big deal . . . but it's an extra hurdle. It's an extra thing to do. Combined with all the other barriers that people with disabilities face, it's an extra thing to — simply to remember, but there's also an extra issue that both the assister and the person with the disability may be uncertain about. It's an extra hurdle. It kind of exacerbates the other issues that — in combination with all the other hurdles that people with disabilities face, that they — that may make it more difficult to exercise the right to vote.

Tr. at 3776:19–3777:8; LUPE-002 ¶ 101 ("[I]t is highly likely that many Texans with disabilities will find it difficult or impossible to obtain the assistance they require given the restrictions imposed by section 6.04 . . . and will cause some Texans with disabilities to be disenfranchised[.]").

176.    Trial testimony by voters reified these predictions about the impact that additional barriers to voting can have on voters with disabilities

177.    Ms. Crowther explained that S.B. 1 has hampered her ability to receive assistance in voting because it puts her attendants in a position of "danger" that "they aren't paid for" and she would not want to put them in a situation that has legal ramifications even though she will need

more and more help over time as her disability progresses. HAUL-413, Crowther Dep. at 80:8–

81:8. As Ms. Crowther summarized:

> That something as meaningful as voting is to me, that I need assistance with. . . has now a bump . . . in the process, to where now it's become more threatening to bring an attendant in. . . why would I want to bring. . . my attendant, into that role and have them get all freaked out about, You mean to tell me if I help you do something that is not on this form. . . I could get in trouble? And it's just not worth it when your life is dependent on your attendant or your caregiver or your spouse or anything. It's just not worth it.

*Id.* at 98:6–22.

178.    Mr. Cole testified that each provision of S.B. 1 that makes voting marginally harder

for disabled people makes it less likely that they will vote:

> Well, it just makes it hard. You know, the thing that we have, and I talk to a lot of people after they get disabled, is as you make things harder, you just start cutting things out. You know, it's too hard to find someone to feed me, or it's embarrassing, so I don't want to go to dinner. It's too hard to get on an airplane to go travel, so I just don't do that. And so every time you put even one little road bump or one little barrier in front, it just makes it that much harder, and so you don't do it.

Tr. at 714:17–715:15.

**Ban on Compensated Assistance (§ 6.06)**

179.    Section 6.06 of S.B. 1 prevents voters from choosing Plaintiffs' staff members and

volunteers to assist them with their mail ballots because they receive "compensation" for their

assistance efforts. It creates a state jail felony for offering, soliciting or receiving compensation for

assisting mail ballot voters, unless the compensated assistor is an "attendant or caregiver

previously known to the voter." TEC § 86.0105.

180.    At trial, Jonathan White testified that offering or accepting compensation for mail

ballot assistance is a state jail felony, with a sentence of up to two years, *even if there is no fraud

in the assistance and the assistor marks the ballot consistent with the wishes of the voter*. Tr. at

3996:8–3997:5. He confirmed that Section 6.06 "criminalizes compensation for assistance" as

opposed to criminalizing fraud in assistance. Tr. at 3995:25–3996:7. Formerly, the Election Code prohibited payment for performance-based work, i.e. paying someone to assist mail voters on a quota basis. Tr. at 3991:18–3992:15. S.B. 1 extended the offense, making it a crime to provide, receive or ask for compensation to assist a mail ballot voter regardless of whether the assistance is on a per capita basis. Tr. at 3992:3–7, 12–19.

181.    Mr. White confirmed that Section 6.06 "appear[s] to apply to [the] scenario" in which a paid canvasser for a nonprofit Get Out the Vote organization engages with voters and provides mail ballot assistance at the voter's request. Tr. at 3993:22–3995:10. He testified that if his office encountered a GOTV group that paid its organizers to provide mail ballot assistance as a public service while canvassing, he would be concerned that this activity is used as a subterfuge for voter fraud, and "we'd be looking for the fraud at the bottom of things." Tr. at 3995:11–24. Again, however, a conviction under TEC § 86.0105 requires no evidence of fraud or coercion.

182.    Indeed, these provisions potentially expose *voters* to liability for providing tokens of appreciation to assistors who help them complete their mail ballots. Keith Ingram confirmed that a voter who offered a volunteer $20—or offered to buy a friend lunch—to help him complete his mail-ballot could be liable under Section 6.06. Tr. at 1904:1–1906:5.

183.    This is not a fanciful hypothetical. Grace Chimene, testifying on behalf of the League, was especially worried that volunteer activities' during door-to-door canvassing could expose *voters* to criminal liability: "It's not just my concern for the League members, but it's also a concern if just a voter that were helping provides compensation, or the place that they live provides compensation of some type that they may be committing a crime." Tr. at 1592:1–5. Members of the League "offer[] tea, or coffee, or water," to assistors that help them and other voters vote by mail. Tr. at 1591:1–1592:5, 1590:4–12. To avoid jeopardizing voters and

volunteers, institutions like assisted care centers that historically welcomed the League as assistors now discourage the League from sending people to assist residents. Tr. at 1593:9–22. Texans— including League members—residing in these facilities who relied on the League for years are no longer able to obtain assistance voting from the individuals of their choice.

184.    As a result of S.B. 1's prohibition on compensated mail-ballot assistance, voters may no longer choose Plaintiffs' staff members and volunteers who accept "anything of value" to assist them with their mail ballots. TEC § 86.0105; TEX. PENAL CODE § 38.01(3).

185.    Before S.B. 1, LUPE staff would assist members to complete their mail ballots one-on-one and provide assistance, either at the LUPE offices, in house meetings, or at LUPE's union hall events. Some members would call LUPE and ask LUPE to go to their home to help them fill out their ballot by mail and LUPE would provide that assistance in the members' homes. Tr. at 87:3–21, 3676:11–25.

186.    LUPE has stopped assisting voters who request their help completing mail ballots. Tr. at 119:20–120:18. As LUPE's executive director Tania Chavez testified, LUPE has stopped assisting members with their mail ballots because "[it] will mean that our staff could be jailed, that I could be put in prison, that any volunteer that receives any kind of compensation could be then prosecuted, and so we have refrained from doing so." Tr. at 82:20–84:3.

187.    Now, when a LUPE member comes to the LUPE office and requests help with their mail ballot, LUPE informs the member that LUPE cannot provide assistance and tells the voter that they should find help with their family or friends. Tr. at 86:9–86:13, 86:14–87:2, 87:3–87:21. LUPE staff will not provide mail ballot assistance to LUPE members who are elderly and/or disabled or otherwise need assistance to vote by mail and choose LUPE staff as their assistors. Tr. at 86:9–86:13, 86:14–87:2, 87:3–87:21.

188.     LUPE is not alone in its decision to stop providing mail ballot assistance. OCA no longer offers voters assistance. Tr. at 1722:3–16. The League has stopped providing voting assistance at some retirement homes and assisted care centers out of the fear the voters—including League members—will "compensate" their assistors with refreshments. Tr. at 1620:7–1621:1. MABA members are no longer willing to provide voting assistance because members fear that they might inadvertently commit a crime, potentially costing them their law licenses. Tr. at 2543:14–2544:23. LULAC volunteers "scaled . . . down" their GOTV efforts and decided not to conduct voter outreach with seniors, many of whom require voting assistance, for "fear that they could be subject to prosecution if they help seniors vote by mail." Tr. at 1655:10–18.

**The Canvassing Restriction (§ 7.04)**

189.     The Canvassing Restriction applies to anyone who knowingly gives or receives some "compensation or other benefit" for an "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." TEC § 276.015(a)(2).

190.     Section 7.04 interferes with community organizers' ability to assist voters with their mail-ballots because its prohibition on "in-person interactions" in the "presence of a mail ballot" does not include an exception for mail-ballot assistance. *See* Tr. at 758:8–19, 758:22–759:12 (Cameron County EA Remi Garza); Tr. at 841:15–842:9, 844:13–25 (DeBeauvoir); Tr. at 496:2–8 (Scarpello).

191.     Mr. White testified that if his office encountered a GOTV group that paid its organizers to provide mail ballot assistance as a public service while canvassing, he would be concerned that this activity is a subterfuge for voter fraud. Tr. at 3995:11–24. He acknowledged, however, that prior to S.B. 1, the Election Code already criminalized: assisting a voter who is not

eligible for assistance or did not ask for assistance; voting a ballot differently than the voter wished or directed the assistant to vote the ballot; suggesting to the voter during the voting process how the voter should vote, or attempting to influence or coerce the voter receiving assistance. Tr. at 3923:21–3924:14, 3925:4–6.

192.    Finally, like Section 6.06, the Canvassing Restriction can be read to impose criminal liability on the very voters it purports to protect. For example, a like-minded voter who asks for voting assistance from a GOTV volunteer and invites him inside for an iced tea would arguably violate Section 7.04. *See* TEC § 276.015 (making it a crime to offer a benefit for the canvasser's "services").

193.    Trial testimony establishes that there is widespread confusion about the meaning of the Canvassing Restriction. Even local election administrators ("EAs") are unsure about how to interpret Section 7.04. *See, e.g.*, Tr. at 496:5–8 (Dallas County EA Michael Scarpello) ("I don't know what ballot harvesting means," "it could be interpreted a lot of different ways based on the definition . . . put into the law.").

194.    Witnesses were particularly uncertain about how to interpret the terms "compensation" and "physical presence"—neither of which is defined in the statute—and how Section 7.04 impacts organizers' ability to provide voting assistance. Despite this confusion, state officials have not offered any definitive answers about the scope of the Canvassing Restriction. The Secretary of State has not provided any guidance. Tr. at 1914:7–14, 1924:7–18. Nor has the OAG. Tr. at 1924:24–1925:3.

195.    In response to Section 7.04, many Plaintiffs groups stopped hosting in-person events where voters had frequently brought their mail ballots for voting assistance and stopped providing assistance to voters.[28]

## CONCLUSIONS OF LAW

### SUBJECT MATTER JURISDICTION

Before addressing the merits of Plaintiffs' challenges under Section 208, the Court must first consider its subject matter jurisdiction over Plaintiffs' claims. Subject matter jurisdiction is a federal court's statutory or constitutional power to adjudicate a case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998).

As the Court has previously explained, Section 208 of the VRA permits private enforcement by both individual voters who need assistance and private organizations representing their interests. *See, e.g.*, *La Unión del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 388, 426 (W.D. Tex. 2022) (citing *OCA-Greater Houston v. Texas (OCA-Greater Hous. I)*, 867 F.3d 604, 609–614 (5th Cir. 2017)).[29] Because this civil action arises under federal law, the Court has federal question jurisdiction under 28 U.S.C. § 1331.

Sovereign immunity does not limit the Court's subject matter jurisdiction over this action. Section 208 claims are enforceable against state officials because, in enacting the VRA, Congress

---

[28] Tr. at 1718:20–24, 1721:2–10, 1721:3–1722:22 (OCA has stopped hosting in-person events where members have historically brought mail-in ballots and received voting assistance, including candidate forums, and no long offers voters assistance or rides to the polls); Tr. at 1593:9–22, 1620:7–1621:1 (The League has been discouraged from providing assistance to voters at assisted living facilities and determined that it "would turn away members with their mail-in ballots from candidate forums"); Tr. at 82:20–84:3 (LUPE has stopped assisting members with their mail ballots because "[it] will mean that our staff could be jailed, that I could be put in prison, that any volunteer that receives any kind of compensation could be then prosecuted, and so we have refrained from doing so."); Tr. at 2543:14–2544:23 (MABA members are no longer willing to provide voting assistance because members fear that they might inadvertently commit a crime, potentially costing them their law licenses).

[29] *See also Ark. United v. Thurston*, 517 F. Supp. 3d 777, 790, 798 (W.D. Ark. 2021); *New Ga. Project v. Raffensperger*, 484 F. Supp. 3d 1265, 1301 (N.D. Ga. 2020); *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 233–36 (M.D.N.C. 2020); *Fla. State Conf. of NAACP v. Lee*, 576 F. Supp. 3d 974, 988–90 (N.D. Fla. 2021).

validly abrogated state sovereign immunity. *See id.* at 433 (citing *OCA-Greater Hous. I*, 867 F.3d at 614).

Finally, the Court considers Plaintiffs' standing to assert their Section 208 challenges because standing "is a component of subject matter jurisdiction." *HSBC Bank USA, N.A. as Tr. for Merrill Lynch Mortg. Loan v. Crum*, 907 F.3d 199, 202 (5th Cir. 2018).

## Standing

### Legal Framework

It is well settled that a plaintiff invoking a federal court's jurisdiction must establish standing by satisfying three irreducible requirements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

The elements of standing are "not mere pleading requirements but rather an indispensable part of the plaintiff's case." *Lujan*, 504 U.S. at 561. Thus, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* In a case that proceeds to trial, plaintiffs must establish all three elements by a preponderance of the evidence. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("[I]n a case like this that proceeds to trial, the specific facts set forth by the plaintiff to support standing "must be supported adequately by the evidence adduced at trial."). These requirements ensure that plaintiffs have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." *Massachusetts v.*

*EPA*, 549 U.S. 497 (2007) (quoting *Baker v. Carr*, 369 U.S. 186 (1962)) (quotation marks removed).

"[P]laintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury" for the self-evident reason that "injunctive and declaratory relief 'cannot conceivably remedy any past wrong.'" *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998)).

To constitute an injury in fact, a threatened future injury must be (1) potentially suffered by the plaintiff, not someone else; (2) "concrete and particularized," not abstract; and (3) "actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* at 720–21 (citations omitted). The injury must be "imminent . . . to ensure that the alleged injury is not too speculative for Article III purposes." *Id.* at 721 (quoting *Lujan*, 504 U.S. at 564 n.2). For a threatened future injury to satisfy the imminence requirement, there must be at least a "substantial risk" that the injury will occur. *Stringer*, 942 F.3d at 721 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Nonetheless, "[t]he injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an identifiable trifle." *OCA-Greater Hous. I*, 867 F.3d at 612) (quotations omitted). "This is because the injury in fact requirement under Article III is qualitative, not quantitative, in nature." *Id.* (quotations omitted).

Juridical entities may establish standing under an associational or organizational theory of standing. *Id.* at 610.

"Associational standing is a three-part test: (1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted, nor the

relief requested requires participation of individual members." *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 143 S. Ct. 2141, 2157 (2023) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). Participation of individual members is not required where, as here, the association seeks prospective and injunctive relief, rather than individualized damages. *Consumer Data Indus. Ass'n v. Texas*, No. 21-51038, 2023 WL 4744918, at *4 n.7 (5th Cir. July 25, 2023).

"By contrast, 'organizational standing' does not depend on the standing of the organization's members. The organization can establish standing in its own name if it 'meets the same standing test that applies to individuals.'" *OCA-Greater Hous. I*, 867 F.3d at 610 (citations omitted) (quoting *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999)).

"When the suit is one challenging the legality of government action or inaction" and "the plaintiff is himself an object of the action (or forgone action) at issue[,] . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561–62. An organization can establish a likely future injury if it intends "to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979); *see, e.g.*, *Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 439 (5th Cir. 2014) (charitable organizations had standing to challenge statute prohibiting their use of bingo proceeds for political advocacy as an unconstitutional burden on their political speech).[30]

---

[30] *See also S. Christian Leadership Conf. v. Sup. Ct. of State of La.*, 252 F.3d 781, 788 (5th Cir. 2001) (concluding that "at least some" of the plaintiffs—law students and faculty and community and student organizations—had standing to challenge a Louisiana Supreme Court rule restricting representation by student-practitioners because the

Finally, an unregulated organization can also demonstrate the requisite injury by showing

that the challenged conduct or regulation has "perceptibly impaired" the organization's "core

business activities." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024)

(citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Such "business activities"

need not be profit-driven. *See Havens*, 455 U.S. at 379 n.20 ("That the alleged injury results from

the organization's noneconomic interest in encouraging open housing does not [affect] the nature

of the injury suffered, and accordingly does not deprive the organization of standing."). "It has

long been clear that economic injury is not the only kind of injury that can support a plaintiff's

standing." *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 263 (1977). Still, a

mission-driven organization must proffer evidence of interference with its core activities to ensure

it has a personal stake in the outcome of case beyond its "abstract social interests." *Havens*, 455

U.S. at 379.[31]

The effect on the organization's activities need not be great. *OCA-Greater Hous. I*, 867

F.3d at 612; *see also Havens*, 455 U.S. at 379. In *Havens*, for example, the Supreme Court held

that the organizational plaintiff, HOME, had standing to sue a real estate company, Havens, for

providing false information to HOME's black employees about apartment availability on four

occasions. *Havens*, 455 U.S. at 368–69. "Critically, HOME not only was an issue-advocacy

organization, but also operated a housing counseling service." *All. for Hippocratic Med.*, 602 U.S.

at 394. HOME asserted that these discriminatory racial steering practices "perceptibly impaired

---

operations of law-school clinics were "directly regulate[d]" and "[s]everal of the client organizations would be unable to obtain representation by the clinics").

[31] *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 263 (1977) (recognizing that non-profit's interest in building a low-cost housing project arose "not from a desire for economic gain, but rather from an interest in making suitable low-cost housing available in areas where such housing is scarce" and concluding that "[t]he specific project [the plaintiff] intends to build, whether or not it will generate profits, provides that 'essential dimension of specificity' that informs judicial decisionmaking").

[its] ability to provide counseling and referral services for low-and moderate-income homeseekers." *Havens*, 455 U.S. at 379.[32] HOME alleged only that its counseling services had been "frustrated" by Havens's conduct—not that HOME had been forced to stop providing the services altogether. *Cf. La. Fair Hous. Action Ctr. at, Inc. v. Azalea Garden Props., L.L.C.*, 82 F.4th 345, 35 (5th Cir. 2023) ("HOME could not place African American clients into housing at Havens's complex when Havens was engaged in illegal racial steering."). Still, the Court concluded that if Havens had impaired HOME's ability to provide such services, "there can be no question that the organization has suffered injury in fact." *Havens*, 455 U.S. at 379.

"When the plaintiff is an unregulated party, causation 'ordinarily hinge[s] on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well.'" *All. for Hippocratic Med.*, 602 U.S. at 383 (quoting *Lujan*, 504 U.S. at 562). But plaintiffs generally cannot show causation by "rely[ing] on speculation about the unfettered choices made by independent actors not before the court." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 415 n.5 (2013) (quotation marks omitted). "Therefore, to thread the causation needle in those circumstances, the plaintiff must show that the 'third parties will likely react in predictable ways' that in turn will likely injure the plaintiffs." *All. for Hippocratic Med.*, 602 U.S. at 383 (quotation marks omitted) (citing *California v. Texas*, 593 U.S. 659, 675 (2021)). The "line of causation between the illegal conduct and injury"—the "links in the chain of causation," *Allen*

---

[32] In describing its injuries, HOME also alleged that it "had to devote significant resources to identify and counteract [Havens]'s racially discriminatory steering practices." *Havens*, 455 U.S. at 379. As the Supreme Court recently confirmed, however, *Havens* does not stand for the expansive theory that "standing exists when an organization diverts its resources in response to a defendant's actions." *All. for Hippocratic Med.*, 602 U.S. at 395. "[A]n organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* at 394; *see also Azalea*, 82 F.4th at 355 ("We [] hold [that] 'diverting' resources from one core mission activity to another, i.e., prioritizing which 'on-mission' projects, out of many potential activities, an entity chooses to pursue, does not suffice—organizations daily must choose which activities to fund, staff, and prioritize. Nor do conclusory allegations that an organization's diversion of resources 'impaired or impeded' some planned projects.").

*v. Wright*, 468 U.S. 737, 759 (1984)—must not be too speculative or too attenuated, *Clapper*, 568 U.S. at 410–11.

The causation requirement is satisfied where it is sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs. *All. for Hippocratic Med.*, 602 U.S. at 386. In *Department of Commerce v. New York*, for example, the Supreme Court recognized states' standing to challenge the reinstatement of the citizenship question on the census because noncitizens would "likely react in predictable ways to the citizenship question"—i.e., by failing to respond to the census altogether—"even if they do so unlawfully and despite the requirement that the Government keep individual answers confidential." 588 U.S. 752, 767–68 (2019). The depression of the response rate among non-citizens would, in turn, cause them to be undercounted in the census results and injure states with disproportionate numbers of non-citizens through, *e.g.*, the loss of federal funds, diminishment of political representation, and the degradation of census data. The Court concluded that the states' "theory of standing thus [did] not rest on mere speculation about the decisions of third parties; it relie[d] instead on the predictable effect of Government action on the decisions of third parties." *Id.* at 768.

The defendant's conduct contributes to a plaintiff's injuries, even if it is not the sole cause of those injuries. *Massachusetts v. E.P.A.*, 549 U.S. 497, 523 (2007). Similarly, the traceability requirement is not a proximate cause standard; it can be satisfied with a showing that the alleged injury was only indirectly caused by the defendant. *Bennett v. Spear*, 520 U.S. 154, 168 (1997).

An injury is redressable when it is "likely" as opposed to merely "speculative" that a decision in a plaintiff's favor would grant the plaintiff relief. *OCA-Greater Hous. I*, 867 F.3d at 610. A plaintiff does not need to demonstrate that a favorable decision will "relieve [their] every injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). They only need to show that a decision

in their favor will "relieve a discrete injury to [them]self." *Id.* Even "the ability 'to effectuate a partial remedy' satisfies the redressability requirement." *Uzuegbunam v. Preczewski*, 592 U.S. 279 (2021) (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992)); *see also Netsphere, Inc. v. Baron*, 703 F.3d 296, 314 (5th Cir. 2012) (explaining so long as "there is some means by which [the court] can effectuate a partial remedy, [there] remains a live controversy" (citation omitted)). Plaintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement by "demonstrat[ing] 'continuing harm or a real and immediate threat of repeated injury in the future.'" *James v. Hegar*, 86 F.4th 1076, 1081 (5th Cir. 2023) (quoting *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1285 (5th Cir. 1992)). A threatened future injury suffices for standing so long as "there is a substantial risk that the harm will occur." *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 (5th Cir. 2024) (quoting *Susan B. Anthony List*, 573 U.S. at 158).

When multiple plaintiffs seek the same injunctive relief, only one needs to establish standing. *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). Here, the Court must identify at least one organization in each Plaintiff group with standing to seek injunctive against local election officials and DAs in their respective jurisdictions.

**<u>Analysis</u>**

At the outset, the Court observes that the State Defendants and Intervenor-Defendants appear to be confused about the basis for Plaintiffs' standing, insisting that Section 208 does not afford Plaintiffs a "right" to provide voting assistance. *See, e.g.*, ECF No. 608 at 643.

To be clear, the "right" to provide assistance is not now, nor has it ever been, at issue in this case. Defendants are correct, of course, that Section 208 did not create such a right—just as the FHA did not create a "right" to provide housing referrals.

Defendants' confusion appears to stem from the fact that most Plaintiffs have two bases for standing under Section 208: associational standing (based on injuries to their members entitled to voting assistance) and organizational standing (based on impairment of the organizations' ability to provide voting assistance). The concept is not difficult: some of Plaintiffs' members *require* voting assistance, while others *provide* voting assistance. The former establish a basis for associational standing; the latter establish a basis for organizational standing.

As in *Havens*, the organizational injury here is a perceptible impairment of one of Plaintiffs' core services—voter assistance—resulting from violations of a federal law—Section 208. And, to the extent that a rule directly regulates the Plaintiff organizations (rather than their individual assistors), Plaintiffs unquestionably have standing to challenge it. *See Lujan*, 504 U.S. at 561–62.

### Sections 6.01 – Curbside Voting Transportation Disclosure

DST challenges Section 6.01's requirement that a driver transporting seven or more voters to the polls for curbside voting complete a disclosure form stating her name, address, and whether she is serving as an assistor. Because Section 6.01 does not regulate DST directly, DST must demonstrate that "third parties will likely react in predictable ways that in turn will likely injure the plaintiffs." *All. for Hippocratic Med.*, 602 U.S. at 383.

DST asserts that Section 6.01 has deterred its members from providing transportation to the polls. ECF No. 856 ¶ 968 (citing Tr. at 2196:21–2197:7). While the Court agrees that DST has suffered a perceptible impairment to one of its core voter activities—transporting voters to the polls—DST has not shown that its injury is fairly traceable to Section 6.01, which applies only to curbside voting.

The State Defendants object that DST cannot establish standing because the obligation to provide the Transportation Disclosures bears no "close relationship" to "traditional[]" legal injuries. ECF No. 862 ¶ 62(k) (quoting *TransUnion*, 594 U.S. at 431). The Court disagrees. The Supreme Court has recognized the deterrent effect that disclosure requirements can have on associative activities. *See, e.g.*, *Shelton v. Tucker*, 364 U.S. 479, 486 (1960) (striking down law requiring teachers to disclose all of the organizations to which they had belonged in the past five years because "[e]ven if there were no disclosure to the general public, the pressure upon a teacher to avoid any ties which might displease those who control his professional destiny would be constant and heavy"); *Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958); *see also Dep't of Com. v. New York*, 588 U.S. at 767 (finding no clear error in district court's conclusion that the reinstatement of a citizenship question on the census was likely to discourage non-citizens from responding to the census).

DST has not shown, however, that its members who drive voters to the polls have engaged or intend to engage in conduct that is "arguably proscribed" under Section 6.01 by transporting more than seven voters to polls for curbside voting. *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 545 (5th Cir. 2008) ("Without concrete plans or any objective evidence to demonstrate a 'serious interest' [to engage in proscribed conduct], [plaintiff] suffered no threat of *imminent injury*."); *see also Whitmore v. Arkansas*, 495 U.S. 149, 155–56 (1990) ("A federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing.").

Given Section 6.01's limited application, it is not "sufficiently predictable" that DST members would respond to Section 6.01's regulation of transportation for more than seven curbside voters by refusing to provide transportation to the polls altogether—even for voters

casting their ballots inside the polling place. *All. for Hippocratic Med.*, 602 U.S. at 383. Thus, the Court concludes that DST has failed to thread the causation needle establishing a connection between Section 6.01 and the injury DST members have caused to DST's organizational interests.

Accordingly, DST has not established standing to challenge Section 6.01's Transportation Assistance disclosure requirement, and its claim must be dismissed without prejudice for a lack of subject matter jurisdiction.

### Sections 6.03, 6.04, 6.05 and 6.07 –Oath of Assistance and Assistor Disclosures

Sections 6.03, 6.04, and 6.05 of S.B. 1 establish new procedures for voter assistors, specifically by requiring the assistor to disclose certain information—their name, address, relationship to the voter, and whether they are being compensated by a candidate, campaign, or political committee—on a form at the polling place (Section 6.03) or on the mail ballot carrier envelope (Section 6.05) and by requiring assistors to take a revised Oath (Section 6.04).

Section 6.04 of S.B. 1, amending the Oath of Assistance, is challenged by the HAUL Plaintiffs (including The Arc) and the LUPE Plaintiffs. Sections 6.03 and 6.05 are challenged by the HAUL and LUPE Plaintiffs. Section 6.07 is challenged only by the HAUL Plaintiffs.

<u>The Arc has associational standing to challenge § 6.04.</u>

As a result of the Oath of Assistance requirements set forth in S.B. 1 § 6.04, members of The Arc who qualify for assistance under Section 208 voted without the assistors of their choice, both in-person and by mail, in Harris County, Bexar County, and Travis County. [33]

---

[33] Ms. Halvorson, a registered voter in Bexar County and a member of The Arc, voted without assistance for the very first time in the March 2022 primary (by mail) because her personal care attendant was uncomfortable taking the Oath of Assistance printed on the mail carrier envelope. Tr. at 3318:25–3319:20. In the November 2022 general election, Ms. Halvorson voted in person, again voting without assistance due to fear of exposing her personal attendant to potential criminal liability. Tr. at 3322:5–18, 3323:10–24.

Ms. Nunez Landry, a registered voter of Harris County and a member of The Arc, voted without her chosen assistant— her partner—in both the March 2022 primary and the November 2022 general election because she did not want to

Ms. Nunez Landry, Ms. Halvorson, Ms. Litzinger, and Ms. Crowther have each suffered an injury in fact and each would have standing to sue in her own right. Even if voters requiring assistance successfully cast a ballot, their right under Section 208 is violated if they voted without an assistor of their choice or forwent assistance altogether. *See* Consent Decree, *United States v. Hale County*, No. 5-05CV0043-C (N.D. Tex. Apr. 27, 2006) (requiring election administrators to provide language assistance to voters with limited English-language proficiency who had voted in an election in which the County failed to permit assistance to those voters); *Democracy N.C. v. N.C. State Bd. of Elections*, 590 F. Supp. 3d 850, 869 (M.D.N.C. 2022) (holding legally blind plaintiff who voted absentee with his wife's assistance had standing to challenge a law restricting assistance that would prevent him from seeking assistance from staff at nursing home). As long as the amended Oath of Assistance remains in effect, these voters will be unwilling to expose their attendants to criminal liability by asking for their assistance. Thus, there is a "substantial risk" that the injury will occur. *Stringer*, 942 F.3d at 721.

The members' interests in voting with the assistors of their choice are germane to the purposes of The Arc, which works to empower people with disabilities in the voting process.[34]

Plaintiffs' injuries arising out of S.B. 1's amended Oath language are traceable to the Secretary because she has created forms implementing Section 6.04. *See* LUPE-009 (mail ballot

---

expose him to criminal liability. Tr. at 3236:11–17; Tr. at 3234:1–6, 3256:15–3257:4. She did not receive any assistance while voting in either election.

Amy Litzinger, a registered voter in Travis County and a member of The Arc. Tr. at 3281:14–17. Ms. Litzinger voted without assistance from her personal attendant in the March 2022 primary and November 2022 general election because she and her attendant were concerned about criminal liability under the Oath. Tr. at 3291:4–3292:5.

Ms. Crowther did not take her attendant with her to vote in May 2022 because of her fear that the Oath could jeopardize her relationship with her attendant. HAUL-413, Crowther Dep. at 52:11–53:4, 54:7–14.

[34] The Arc's mission is to "promote, protect, and advocate for the human rights and self–determination of Texans with intellectual and developmental disabilities." *Id.* at 3490:23–25, 3493:7–9. Voting is "the backbone" of The Arc's work because it is critical to members' self-determination and voting rights advocacy has been a priority since The Arc's founding. Tr. at 3499:23–3500:12, 3499:23–3500:12.

carrier envelope) and LUPE-189 (Oath of Assistance form). The Oath regulates Ms. Nunez Landry, Ms. Halvorson, Ms. Litzinger, and Ms. Crowther directly by requiring them to represent their eligibility to potential assistors as a condition of their eligibility.

Plaintiffs' injuries from these provisions are fairly traceable to the local election officials who are responsible for administering the Oath in polling places, TEC § 64.034, and printing, sending, receiving, and reviewing mail carrier and ballot envelopes, TEC §§ 86.002–.004, 86.008–.009, 86.011. Thus, their injuries are fairly traceable the Bexar County EA, Harris County Clerk, and Travis County Clerk, because Plaintiffs' members suffered their injuries while voting in those jurisdictions.

The Arc members' injuries are also traceable to the DAs in those counties and the State Defendants based on the chilling effect that the credible threat of criminal enforcement of the Oath against their assistors have had on their willingness and ability to receive assistance from their chosen assistors. Although Ms. Nunez Landry, Ms. Halvorson, Ms. Litzinger, and Ms. Crowther are not themselves subject to criminal sanctions under § 6.04, given the practical realities of these voters' relationships with their chosen assistors—including their physical dependence on their attendants for assistance outside of voting—their unwillingness to expose their assistors to criminal liability is "sufficiently predictable" to establish causation for standing purposes. *All. for Hippocratic Med.*, 602 U.S. at 386.

Similarly, their attendants' unwillingness to provide in-person or mail-ballot assistance due to potential criminal liability under S.B. 1 is not speculative—attendants specifically cited the "penalty of perjury" and "eligibility" language in the Oath as their reasons for declining to provide assistance. Tr. at 3319:7–16 (Ms. Halvorson's attendant told her that she was unwilling to take the Oath of assistance "under penalty of perjury" due to her green card status); Tr. at 3291:4–3292:5

(Ms. Litzinger's attendant was not comfortable assisting her due to fear of criminal liability under the Oath, especially with respect to the meaning of "eligibility" and "assistance"). Indeed, the chilling effect on assistors was *actually foreseen* by disability rights advocates who testified before the Texas legislature in opposition to S.B. 1. *See, e.g.*, HAUL-216.

Thus, The Arc's "theory of standing thus does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable [and actual] effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 588 U.S. at 767 (recognizing that citizenship question on the census was likely to depress non-citizens' response rate).

The State of Texas enforces election crimes, including violations of the Oath of Assistance through county and local prosecutors. *Stephens*, 663 S.W.3d at 52. The State has not disavowed enforcement. *KVUE, Inc. v. Moore*, 709 F. 2d 922, 930 (5th Cir. 1983) (holding that plaintiffs had standing to pursue a pre-enforcement challenge in part because "the state has not disavowed enforcement"), *aff'd sub nom. Texas v. KVUE-TV, Inc.*, 465 U.S. 1092 (1984). Individual County DAs *may not* disavow such enforcement under Texas law. *See* TEX. LOC. GOV'T CODE § 87.011(3)(B) (prohibiting district attorneys from adopting an enforcement policy of refusing to prosecute a type or class of criminal offense).[35]

Plaintiffs' organizational injuries are also traceable to the AG, who, even after *Stephens*, retains "broad investigatory powers" under the Election Code, State's Br. at 49, *LUPE v. Scott*, No. 22-50775 (5th Cir. Dec. 9, 2022), ECF No. 62, and may "direct the county or district attorney . . . to *conduct* or *assist* the attorney general in conducting the investigation." *See* TEC § 273.002(1)

---

[35] Neither the Bexar County DA nor the Travis County DAs have disavowed enforcement of the challenged provisions. *See* ECF No. 753-5 (Bexar County) ¶¶ 2–6; ECF No. 753-6 (Travis County) ¶ 2. Coupled with TEX. LOC. GOV'T CODE § 87.011(3)(B), the Harris County DA's history of accepting referrals for Election Code prosecutions from the AG following S.B. 1, *see supra* ¶ 98, is sufficient to establish a substantial threat of future injury to Plaintiffs' members' right to assistance under Section 208.

(emphasis added); *see also id.* § 273.001 (district attorneys must investigate alleged violations referred to them). On top of this investigatory power, "the Attorney General can prosecute with the permission of [a] local prosecutor," *Stephens*, 663 S.W.3d at 55, and no County DA has disavowed a willingness to let the AG pursue cases within their counties.

An order declaring the challenged language in the amended Oath unlawful and enjoining its enforcement would remove the chilling effect on voter assistance that the provisions presently impose on these members of The Arc and their assistors. *See Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006) (finding "redressability prong[] of the standing inquiry . . . easily satisfied" where "[p]otential enforcement of the statute caused the [plaintiff's] self-censorship, and the injury could be redressed by enjoining enforcement of the [statute]"); *McCraw*, 504 F. Supp. 3d at 582 (W.D. Tex. 2020), *aff'd*, 90 F.4th 770 (5th Cir. 2024) (similar).

In short, with respect to their Section 208 challenge to S.B. 1 § 6.04, members of The Arc are "sufficiently adverse" to the State Defendants and the election officials and DAs of Bexar County, Harris County, and Travis County to present a case or controversy within this Court's jurisdiction. *Babbitt*, 442 U.S. at 302.

<u>DST and the LUPE Plaintiffs have organizational standing to challenge §§ 6.03–6.05, 6.07</u>

DST, LUPE, MABA, and FIEL have had difficulty recruiting members to provide voting assistance services due to the threat of criminal sanctions under S.B. 1's Assistor Disclosure and Oath requirements, and some members have stopped providing assistance altogether.[36]

---

[36] Tr. at 2203:10–15, 2202:9–14, 2110:12–2111:1, 2148:25–2149:10 (DST chapters have had difficulty recruiting members who are willing to risk criminal liability to provide assistance, by mail or in-person, under S.B. 1, and some chapters have ceased providing voting assistance altogether due to the threat of enforcement of the Assistor Disclosure and amended Oath requirements); Tr. at 80:2–82:12, 150:15 (LUPE's staff and volunteers who assist voters are frightened by the new oath language, and as a result LUPE's staff and volunteers have restricted their assistance to voters, encouraging voters to seek assistance from friends and family members before turning to LUPE); *see also* Tr. at 145:25–46:4 (LUPE employee Chris Rocha); LUPE-284 at 13:19–14:15; 32:2–8; 17:2–13 (LUPE volunteer Maria Gomez); Tr. at 2543:16–23 (MABA members are no longer willing to provide voter assistance due to fears about the

71

The Assistor Disclosure requirements are burdensome to assistors and have also caused delays at polling places that have interfered with voting assistance.[37] Providing such assistance is a core part of their respective missions.[38]

Plaintiffs' organizational injuries are fairly traceable to S.B. 1 §§ 6.03–6.05. The chilling effect that the Assistor Disclosure and Oath requirements would have on individuals' willingness to provide voting assistance—and the downstream effects on organizations' ability to perform voter assistance services—was "sufficiently predictable" to establish causation for standing purposes. *All. for Hippocratic Med.*, 602 U.S. at 386; *see Shelton*, 364 U.S. at 486, *NAACP*, 357 U.S. at 462; *Dep't of Com. v. New York*, 588 U.S. at 767. Indeed, the chilling effect on assistors was *actually foreseen* by disability rights advocates who testified before the Texas legislature in opposition to S.B. 1. *See, e.g.*, HAUL-216.

Here again, the organizations' injuries are traceable to the Secretary, who creates forms implementing the requirements, and to local election officials, who administer oaths, collect disclosures, and review mail ballots in the counties in which DST, LUPE, MABA, and FIEL operate.[39] Their organizational injuries are also fairly traceable to the State Defendants and the

---

Oath requirements); Tr.at 2470:22–25, 2430:3–4, 2439:6–23, 2444:24–2445:7 (FIEL has had difficulty recruiting volunteers to provide voter assistance at the polls and some members have stopped providing assistance).

[37] Tr. at 81:15–25 (Chavez Camacho); Tr. at 383:14–18 (Scarpello); Tr. at 732:8–733:17 (Garza); Tr. at 1057:12–24 (Callanen); Tr. at 2316:16–20 (Ramon).

[38] Tr. at 2081:7–13, 2086:21–2087:15 (DST provides in-person and mail-ballot voter assistance in support of its "political awareness and involvement" mission); Tr. at 60:10–61:2 (LUPE provides voting assistance to support its mission of increasing civic engagement in the colonias); Tr. at 2533:24–2534:4, 2535:11–2536:5 (MABA provides voter assistance to support its mission to promote public service by its members and promote civic engagement); Tr. at 2438:9–11, 2444:24–2445:3 (FIEL furthered its mission of voter outreach and civic engagement by assisting its members in voting at the polls).

[39] All Plaintiffs operate within the State of Texas and thus are subject to enforcement by the State Defendants. LUPE serves voters in Hidalgo County, Tr. at 58:13–16, and. FIEL serves voters in Harris County. MABA and DST have chapters throughout Texas, including Bexar, Harris, Dallas, and Travis Counties Tr. at 2533:21–23, 2536:17–20 (MABA); Tr. at 2083:13–25 (DST).

local DAs in those counties based on the chilling effect that the "credible threat" of criminal enforcement has on their willingness to provide BBM assistance.

Even before S.B. 1, the Election Code required election officials to note an assistor's name and address next to each voter they assisted in the poll list, TEC § 64.032(d) (1986), and required assistors to provide the same information and their signature on the outside of voters' mail-ballot carrier envelopes, TEC § 86.010(e), JEX-1 at 53. Accordingly, Plaintiffs cannot establish that any injuries arising from the mere *disclosure* of assistors' names and addresses—at the polls or on the mail ballot carrier envelopes—would be redressed by an order enjoining enforcement of Sections 6.03 and 6.05. Section 6.03 did not relieve election officials of their duty to separately record assistors' names and addresses in the poll list under TEC § 64.032(d). Indeed, the Secretary has issued several form poll lists that contain spaces for recording assistors' names and addresses.[40] Being required to provide duplicative information on a separate form for each voter that an assister helps is undoubtedly burdensome.

An order declaring the challenged language in the amended Oath and the Assistor Disclosure requirements unlawful and enjoining their enforcement would remove the chilling effect on voter assistance that has impaired the organization's ability to provide assistance services to voters.

The Court concludes that DST, LUPE, MABA, and FIEL are "sufficiently adverse" to the State Defendants, the election officials and DAs of Bexar, Harris, Travis, and Dallas Counties and the 34th Judicial District to present a case or controversy within this Court's jurisdiction. *Babbitt*, 442 U.S. at 302.

---

[40] *See, e.g.*, Tex. Sec'y of State, Form 7-57, https://perma.cc/RAZ3-2G7K; Tex. Sec'y of State, Form 7-59, https://perma.cc/NN7T-PM9P; Tex. Sec'y of State, Form 7-61, https://perma.cc/G79M-NWKG; *see also* Tex. Sec'y of State, Texas Requirements for Electronic Pollbook Forms at 2, https://perma.cc/TH7A-2D79 (requiring poll book to entry for each voter to contain fields for assistor's name and address).

**Section 6.06 – Prohibition on Compensated Mail-Ballot Assistance**

Section 6.06 is challenged by the OCA Plaintiffs and the LUPE Plaintiffs. OCA, the League, LUPE, and MABA are regulated by Section 6.06 of S.B. 1 because they have provided their staff members and volunteers with "compensation," as it is broadly defined under TEX. PENAL CODE § 38.01(3), for assisting voters, including mail voters.[41] As a result, Plaintiffs have stopped assisting mail voters.[42]

"When the suit is one challenging the legality of government action or inaction" and "the plaintiff is himself an object of the action (or forgone action) at issue[,] . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561–62.

Again, because their conduct is being directly regulated by Section 6.06 and exposes the OCA Plaintiffs (and their members) to criminal liability, their organizational injuries—their inability to provide mail-ballot assistance—is fairly traceable to the State Defendants and to the DAs in the jurisdictions in which Plaintiffs operate.[43]

Both the OCA and LUPE Plaintiffs' name local election officials as Defendants to their Section 208 challenges to the S.B. 1 § 6.06. *See* ECF No. 200 at 61; ECF No. 208 at 76. Plaintiffs have not identified, and the Court cannot locate, any reason to believe that their organizational

---

[41] *See* Tr. at 1694:21–1696:8, 1699:24–1702:2, 1706:12–1707:3 (OCA provided meals, beverages, snacks, academic credit, shirts, and other nominal gifts to volunteers, who provide assistance to mail voters during OCA events); Tr. at 1598:6–15 (League volunteers who assist members and other voters "often get little pens," "stickers" "cookies" "doughnuts" and "pizza"); Tr. at 75:11–17, 124:14–127:13 (LUPE relies primarily on paid staff members); Tr. at 2539:3–4, 2542:6–20 (MABA are concerned that they are committing a crime if they accept meals, gas cards, swag or other forms of compensation while providing voting assistance).

[42] Tr. at 1717:5–13, 1719:3–22, 1723:6–19, 1724:3–15, 1726:21–1727:6 (OCA); Tr. at 1620:7–1621:1 at (LWV); Tr. at 86:9–86:13, 86:14–87:2, 87:3–87:21 (LUPE); Tr. at 2542:17–20, 2543:16–23, 2544:14–16 (MABA).

[43] All Plaintiffs operate within the State of Texas and thus are subject to enforcement by the State Defendants. OCA operates primarily in Harris County, Tr. at 1688:10–14, and the League operates chapters throughout the State of Texas, including in Travis County, Tr. at 1586:12–13. LUPE serves voters in Hidalgo County, Tr. at 58:13–16, and MABA operates throughout the State of Texas. Tr. at 2533:21–23.

injuries caused by the Section 6.06 are fairly traceable to (or redressable by) local election officials, who have no criminal enforcement authority under the Election Code. Accordingly, Plaintiffs lack standing to sue these local election officials in connection with their challenges to Section 6.06.

**Section 7.04 – Canvassing Restriction**

Section 7.04 is challenged by the LUPE Plaintiffs and the LULAC Plaintiffs. At trial, Plaintiffs established by a preponderance of the evidence that LUPE and LULAC and their staff and volunteers are presently and prospectively subject to Section 7.04.

Both organizations:

(a) have supported ballot measures and/or candidates in the past and intend to do so in the future;[44]

(b) have advocated for their positions through in-person voter engagement efforts, such as neighborhood block-walking, tabling in public places, and hosting candidate forums, town hall meetings, and other events at their offices and in members' homes;[45]

(c) reasonably expect mail-in ballots to be present during such interactions with voters, who often take out their ballots at election events or in conversations with door-to-door canvassers because they have questions about the ballot or needed voting assistance;[46] and

(d) maintain staff and/or volunteers who receive some "benefit" in exchange for their in-person canvassing efforts.[47]

---

[44] Tr. at 89:2–18 (LUPE has supported ballot measures, including a drainage bond, the creation of a health care district in Hidalgo County, increased broadband access in South Texas); Tr. at 2542:6–8 (MABA routinely encourages support for candidates and ballot measures by tabling at local events, such as candidate forums); Tr. at 1632:25–1633:9 (LULAC does not endorse particular candidates but has taken positions on issues such as school and municipal bond measures, state constitutional amendments, and ballot propositions affecting taxes and public education).

[45] Tr. at 71:1–72:15, 75:11–75:17, 90:4–24, 119:20–120:18 (LUPE members brought mail ballots to LUPE offices and meetings and take them out during interactions with door-to-door canvassers and asked for voting assistance); Tr. at 2535:21–2536:5 (MABA tables at local events, including candidate forums and provides voter assistance ); Tr. at 1654:2–1657:19 (LULAC members provided voter assistance during their GOTV efforts with senior citizens).

[46] *See id.*

[47] Tr. at 75:11–17 (LUPE relies primarily on paid staff members and temporary paid canvassers); Tr. at 2542:17–20, 2544:14–16 (MABA volunteers are concerned that accepting gas cards, meals, swag, or a bottle of water will expose them to criminal liability); Tr. at 1654:2–1657:19 (LULAC volunteers receive modest compensation in the form of raffle tickets, food, and gasoline money).

Accordingly, the LUPE and LULAC Plaintiffs can no longer ask staff members to provide mail-ballot assistance as part of their jobs or treat volunteers who provide such assistance during in-person events.[48] Again, because their conduct is being directly regulated by the Canvassing Restriction and exposes Plaintiffs to criminal liability, their organizational injury—their inability to provide mail-ballot assistance—is fairly traceable to the State Defendants and to the DAs in the jurisdictions in which Plaintiffs operate.[49]

These injuries are also "likely to be redressed by a favorable judicial decision." *Spokeo, Inc.*, 578 U.S. at 338. An order declaring that S.B. 1 § 7.04 is preempted by Section 208 and enjoining its enforcement by the State Defendants and County DAs would remove the restrictions and burdens on assistors that have frustrated Plaintiffs' ability to provide voting assistance services and Texas voters' right to vote with their chosen assistors under Section 208.

The LUPE and LULAC Plaintiffs' position with respect to Section 7.04's Canvassing Restriction is "sufficiently adverse" to the State Defendants and the County DAs to present a case or controversy within this Court's jurisdiction. *Babbitt*, 442 U.S. at 302.

Both the LUPE and LULAC Plaintiffs' name local election officials as Defendants to their Section 208 challenges to the Canvassing Restriction. *See* ECF No. 207 at 60; ECF No. 208 at 76. Plaintiffs have not identified, and the Court cannot locate, any reason to believe that their organizational injuries caused by the Canvassing Restriction are fairly traceable to local election officials, who have no criminal enforcement authority under the Election Code. Accordingly,

---

[48] *See* Tr. at 120:19–120:25 (LUPE staff and volunteers to fear prosecution and to stop assisting voters when they are canvassing on a ballot measure); Tr. at 2543:16–23 (MABA members are no longer willing to provide voter assistance); Tr. at 1655:10–18 (LULAC volunteers "scaled . . . down" their GOTV efforts and decided not to conduct voter outreach with seniors, many of whom require voting assistance, for "fear that they could be subject to prosecution if they help seniors vote by mail").

[49] All Plaintiffs operate within the State of Texas and thus are subject to enforcement by the State Defendants. LUPE serves voters in Hidalgo County, Tr. at 58:13–16, and MABA and LULAC have chapters throughout the State of Texas, Tr. at 2533:21–23 (MABA); Tr. at 1634:6–20 (LULAC).

Plaintiffs lack standing to sue these local election officials in connection with their challenges to Section 7.04.

## SECTION 208 PREEMPTION

### Legal Framework

Section 208's text is "unambiguous." *OCA–Greater Hous. I*, 867 F.3d at 614. It provides that voters with disabilities and voters unable to read or write are entitled to voting assistance from "a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508.

The Supremacy Clause of the U.S. Constitution requires preemption of any state statute that, when enacted, makes compliance with both federal and state law impossible or "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting Section 208. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (internal citations omitted).

Congress enacted Section 208 with the "clear purpose to allow [a] voter to decide who assists them" during the voting process. *Ark. United v. Thurston (Ark. United II)*, 626 F. Supp. 3d 1064, 1085 (W.D. Ark. 2022), *appeal docketed*, No. 22-2918 (8th Cir. Sept. 12, 2022). It found "this broad protection was necessary to prevent discrimination against voters who require assistance because 'many such voters may feel apprehensive about casting a ballot in the presence of, or may be misled by, someone other than a person of their own choice.'" *Id.* at 1085–86 (citing S. Rep. No. 97-417 at 62 (1982)). The Senate Report explained that Section 208 was necessary "to limit the risks of discrimination against voters in these specified groups and avoid denial *or infringement* of their right to vote." *Id.* (emphasis added).

Section 208 provides covered voters with more than a bare right to assistance in the poll booth. Rather, it ensures that they will have access to any kind of assistance they need, at any step of the voting process, from a person of their choice other than their employer or a representative of their union. *See, e.g.*, *OCA-Greater Hous. I*, 867 F.3d at 615 (explaining that assistance to vote "plainly contemplates more than the mechanical act of filling out the ballot sheet"). Section 208 thus preempts state laws that impermissibly constrain access to voting assistance in various ways. *See id.* at 614 (concluding that a limitation on assistance "beyond the ballot box"—even with "near–unfettered choice of assistance *inside the ballot box*"—"impermissibly narrows the right guaranteed by Section 208" (emphasis in original)); *see also OCA Greater Hous. v. Texas* (*OCA-Greater Hous. II*), No. 1:15-CV-679, 2022 WL 2019295, at *3 (W.D. Tex. June 6, 2022) (modifying injunction to enjoin new state law "limiting the activities eligible for assistance to 'marking or reading the ballot'" (citation omitted)).

Because a state law can interfere with a voter's substantive rights under Section 208 by regulating assistors just as readily as by regulating voters needing assistance, laws regulating assistors may stand as obstacles to accomplishing Congress's objectives in enacting Section 208. Determining whether they in fact frustrate Congress's purpose is "a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000); *see also Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963); *Arizona v. United States,* 567 U.S. 387, 399 (2012); *Felder v. Casey*, 487 U.S. 131, 151 (1988) (state law preempted where it "interferes with and frustrates the substantive right Congress created").

Consistent with Section 208's text, context, and history, courts have found state laws regulating assistors to be preempted both because compliance with such laws makes full

compliance with Section 208 impossible, *see Disability Rts. N.C. v. N.C. State Bd. of Elections (Disability Rts. N.C. II)*, No. 5:21-CV-361-BO, 2022 WL 2678884, at *4–6 (E.D.N.C. July 11, 2022); *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 235 (M.D.N.C. 2020), and because such laws "pose[] an obstacle to Congress's clear purpose to allow the voter to decide who assists them at the polls," *Ark. United II*, 626 F. Supp. 3d at 1085; *see also, e.g.*, *OCA-Greater Hous. I*, 867 F.3d at 614–15.

In support of their view that states are permitted to further restrict voters' choice of assistor—beyond the two groups excluded by the text of the statute—the State Defendants insist that Section 208 only guarantees "an" assistor of the voter's choice, not "the" assistor of the voters' choice. *See* ECF No. 862 ¶ 551 (citing *Priorities USA v. Nessel*, 487 F. Supp. 3d 599, 619 (E.D. Mich. 2020), *rev'd and remanded*, 860 F. App'x 419 (6th Cir. 2021)).[50] Thus, according to the State Defendants, "Section 208 recognizes that covered voters have the right to select a someone as an assistor, as opposed to having one chosen for them, but it does not guarantee them their first choice; nor does it foreclose Texas from enacting reasonable regulations on whom might assist voters and the procedural prerequisites assistors must follow." *Id.* The Court is not persuaded by the State Defendants' tortured grammatical analysis, which is unsupported by the plain text of Section 208, Congress's legislative intent, or common sense.

To begin, nothing in the text of Section 208 allows states to impose additional limitations or exceptions not stated in the statute. "[W]here Congress explicitly enumerates certain exceptions

---

[50] The Court is neither bound nor persuaded by *Nessel*, which has also been rejected by other courts. *See, e.g.*, *Ark. United I*, 2020 WL 6472651, at *4 ("[T]he Court is unconvinced by the opinion in *Nessel*."). Nessel flouts the settled canon that enumerated statutory exceptions are presumed to be exclusive, engages in an undue burden analysis unsupported by the statute and preemption law, and misreads the legislative history by overlooking the importance of voter choice as Congress's chosen remedy. *Compare Nessel*, 487 F. Supp. 3d at 619 (relying solely on dictionary definition of "a" to interpret Section 208), with *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1481 (2021) (explaining that courts must look at the statutory context to determine the meaning of "a"); *see also United States v. Alabama*, 778 F.3d 926, 933 (11th Cir. 2015) ("We have repeatedly found . . . that the context of a statute required us to read 'a' or 'an' to mean 'any' rather than 'one.'").

to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *Hillman v. Maretta*, 569 U.S. 483, 496 (2013) (quoting *Andrus v. Glover Constr. Co*., 446 U.S. 608, 616–17 (1980)); *see also United States v. Rand*, 924 F.3d 140, 144 (5th Cir. 2019). As the Fifth Circuit analogized in another context:

> [W]hen Congress provided the two exceptions to the . . . requirement, it created all the keys that would fit. It did not additionally create a skeleton key that could fit when convenient. To conclude otherwise "would turn this principle on its head, using the existence of two exceptions to authorize a third very specific exception."

*Parada v. Garland*, 48 F.4th 374, 377 (5th Cir. 2022) (quoting *Quebrado Cantor v. Garland*, 17 F.4th 869, 874 (9th Cir. 2021)).

No other exceptions are provided, and nothing in the statute suggests that extra-textual exceptions can be imposed or implied. *See Ark. United v. Thurston (Ark. United I)*, No. 5:20-CV-5193, 2020 WL 6472651, at *4 (W.D. Ark. Nov. 3, 2020) ("[T]here is nothing in the statutory language to suggest that a state may burden, unduly or otherwise, the right [to choice] articulated in § 208."). "The express exclusion of only two groups is significant, because it implies that all other categories of assisters are permitted. If Congress intended to exclude more categories, or to allow states to exclude more categories, it could have said so." *Disability Rts. N.C. v. N.C. State Bd. of Elections*, No. 5:21-CV-361-BO, 2022 WL 2678884, at *4 (E.D.N.C. July 11, 2022) ("[O]ther than these two excluded groups, the plain language of Section 208 gives voters unrestricted choice over who may assist them with the voting process").

The Senate Judiciary Committee's Report—which is the "authoritative source for legislative intent" regarding the 1982 amendments to the Voting Rights Act, *Thornburg v. Gingles*, 478 U.S. 30, 43 n.7 (1986)—confirms Congress's intent that covered voters must be allowed assistance "from a person of their own choosing, with two exceptions" only. S. Rep. No. 97-417

at 2; *see also Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1481 (2021) (explaining that courts must look at the statutory context to determine the meaning of "a"). Indeed, Congress viewed the guarantee of choice as so central to its remedial scheme that it noted Section 208's employer exception should yield in certain circumstances where "the burden on the individual's right to choose a trustworthy assistant would be too great to justify application of the bar on employer assistance." Rep. No. 97-417 at 64.

The State Defendants' reading also flatly contradicts Texas's own interpretation of Section 208. The Election Code provides that, "on the voter's request, the voter may be assisted by *any* person selected by the voter other than the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs." TEC § 64.032(c) (emphasis added). In *OCA-Greater Hous. I*, Texas argued that this provision "track[s] the plain language of Section 208," 867 F.3d at 615, and the Fifth Circuit approved of this reading, interpreting the state law assistor provisions as granting physically disabled voters "the right to select *any* assistor of their choice, subject only to the restrictions expressed in Section 208 of the VRA itself." *Id.* at 608. Texas and the Fifth Circuit have used "a" and "any" interchangeably when interpreting Section 208 without adopting the contrived distinction the State Defendants now propose. *Id.*; *cf. United States v. Naranjo*, 259 F.3d 379, 382 (5th Cir. 2001) ("'Such *a* violation' . . . refers to . . . *any* violation . . . .").

The facts of *OCA-Greater Hous. I* itself foreclose the State Defendants' interpretation. In that case, Mallika Das, a registered voter in Williamson County, brought her son to serve as an interpreter in the polling place. Her son was barred from assisting Ms. Das, however, under a Texas statute, TEC § 61.033, that limited the class of eligible interpreters in each county to individuals

registered to vote in the same county. Because he was registered to vote in Travis County, Mr. Das's son was prohibited from serving as his mother's interpreter in Williamson County.

The Fifth Circuit affirmed the district court's conclusion that denying Ms. Das the right to select her son as an interpreter violated her right to vote with assistance from the person of her choice under Section 208. The Fifth Circuit did *not* conclude, as the State Defendants propose here, that the interpreter provision was consistent with Section 208 because it still permitted Ms. Das to make a choice among the narrow class of translators eligible under state law. That is, even though Ms. Das could have chosen someone else—any voter registered in Williamson County who spoke her language—to serve as her translator, her right to assistance from "a" person of her choice under Section 208 was violated because the law precluded her from receiving assistance from "the" person she actually chose—her son.

The State Defendants insist that the Fifth Circuit's decision in *OCA-Greater Hous. I* is inapposite because it hinged on the VRA's capacious definition of "vote," rather than regulating assistors themselves. ECF No. 862 ¶¶ 562–68. But the translator restriction violated Section 208 only because, under the VRA's expansive definition of "voting," narrowing the class of eligible *translators* necessarily narrowed the class of eligible *assistors* beyond the two categories identified in the text of Section 208. In reaching this conclusion, the Fifth Circuit clarified that a "state cannot restrict [Section 208's] federally guaranteed right by enacting a statute tracking its language, then defining terms more restrictively than as federally defined." 867 F.3d at 615.

The indefinite "a" (as opposed to the definite "the") is appropriate because the identity of the chosen assistor is (and cannot be not) known to the reader of the statute. Moreover, the indefinite article clarifies that Section 208's protections are enforceable against attempts by states and local governments (and their officials) to encroach on a voter's choice of assistor; it is not

enforceable against putative assistors themselves. A right to assistance from "the" person of a voter's choice would imply that chosen assistors *must* provide the assistance requested of them. But Section 208 does not permit voters to conscript assistors who are unwilling or unable to help; it prohibits regulations that effectively narrow the universe of willing and eligible assistors from which a voter can choose.[51]

The State Defendants' reading would eviscerate Section 208 by permitting states to give voters a "choice" between two assistors hand-picked by the state because voters could receive assistance from "a person" of their choice between the two possibilities. Section 208's use of "a" to modify "person" does not obviate Section 208's essential guarantee, and it is no evidence of an "intent by Congress to allow states to restrict a federally created right, for Congress does not 'hide elephants in mouseholes.'" *Disability Rts. N.C. v. N.C. State Bd. of Elections (Disability Rts. N.C. I)*, 602 F. Supp. 3d 872, 878 (quoting *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001)).

In their motion for summary judgment, the Intervenor-Defendants suggest that S.B. 1's restrictions on choice of assistor are "exactly the type of laws Congress sought to leave undisturbed

---

[51] It is self-evident that the assistor must be actually *capable* of providing the assistance the voter needs in order to serve as an assistor. The State Defendants' and Intervenor-Defendants fanciful hypotheticals about the scope of voters' right to receive assistance are unavailing. For example, Intervenor-Defendants argue that Plaintiffs' reading would allow a voter to select an incarcerated person as an assistor. ECF No. 608 at 35. As the court in *Ark. United I* explained, "a common-sense reading of § 208 suggests that any assistor chosen by a voter must be willing and able to assist. If a chosen person declines to assist the voter or simply does not show up at the polling place, that person has not violated § 208." 626 F. Supp. 3d 1064, 1087 (W.D. Ark. 2022). "And an incarcerated person would not be able assist at the polling place for reasons that are completely unrelated to [Texas's] elections laws." *Id.*

At trial, counsel for the State Defendants similarly posited that Plaintiffs' reading of Section 208 would require election officials to admit assistors who refuse to provide assistance unless they can bring a firearm into the polling place. Not so. There is no question that assistors remain subject to generally applicable laws. At issue here, however, are laws that regulate voting assistors in their capacity as voting assistors (rather than as members of the general public). But regulations governing "voter assistance" must "be established in a manner which *encourages greater participation* in the electoral process." S. Rep. No. 97-417 at 241. Because the provisions in S.B. 1 challenged in this case regulate voter assistance specifically, the question before the Court is whether those provisions "encourage greater participation in the electoral process."

when it enacted Section 208." ECF No. 608 at 35. But the Senate Report refutes that. It directly addresses which contemporary state laws Section 208 intended to leave undisturbed: those in "many states [that] already provide for assistance by a person of the voter's choice." S. Rep. No. 97-417 at 63. Congress could have preserved other more restrictive state laws by adding more exceptions to the text of Section 208. It didn't. Instead, the Senate Judiciary Committee was clear that guaranteeing voters their choice of assistor was "the most effective method of providing assistance while at the same time conforming to the pattern already in use in many states." *Id.* at 64. States may not second guess that decision. And while the Senate Committee recognized the states' rights "to establish necessary election procedures . . . designed to protect the rights of voters," it also clearly stated the intention that any such voter assistance procedures "be established in a manner which *encourages greater participation* in the electoral process." *Id.* at 241 (emphasis added); *see, e.g.*, *id.* at 240 ("Specifically, it is only natural that many such voters may feel apprehensive about casting a ballot in the presence of, or may be misled by, someone other than a person of their own choice . . . The Committee is concerned that some people in this situation do in fact elect to forfeit their right to vote.").

Finally, given the evidence adduced at trial, the State Defendants' grammatical argument is purely academic: several voters who testified at trial have voted without assistance from their chosen assistors under S.B. 1 because of its burdensome requirements on both voters and assistors.

**Analysis**

Section 208 of the federal Voting Rights Act prohibits states from limiting voters' right to assistance and preempts conflicting state laws. S.B. 1 §§ 6.03–6.07 and 7.04 are preempted, in whole or in part, by Section 208 of the VRA because:

- Section 6.04 requires voters to represent to their assistors that they are eligible for assistance as a condition of receiving assistance.

- Section 6.04 deters voter assistors by requiring them to swear, under penalty of perjury, to additional information, including that they did not pressure or coerce the voter into choosing them to assist, and that they obtained a representation of eligibility of assistance from the voter. Section 6.04 also deters voters from using their chosen assistors for fear of placing them at risk of criminal prosecution.

- Sections 6.03, 6.05 and 6.07 deter assistors by requiring them to complete an additional form with duplicative information and disclose their relationship to a voter as a prerequisite to providing voter assistance.

- Sections 6.06 and 7.04 deny mail voters the ability to choose assistors who are compensated or receive "anything reasonably regarded" as an economic gain or advantage.

### **Portions of the Oath of Assistance (§ 6.04) are preempted by Section 208**

Section 6.04 of S.B. 1 amends the Oath by adding the underlined and bolded language:

> I swear (or affirm) **under penalty of perjury** that **the voter I am assisting represented to me they are eligible to receive assistance**; I will not suggest, by word, sign, or gesture, how the voter should vote; I will prepare the voter's ballot as the voter directs; **I did not pressure or coerce the voter into choosing me to provide assistance**; I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; **I will not communicate information about how the voter has voted to another person**; **and I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted.**

TEC § 64.034.

The Oath of Assistance set forth in S.B. 1 § 6.04 restricts the right of assistance protected under Section 208 by conditioning voters' eligibility for assistance on their "represent[ation] to [their chosen assistor that] they are eligible to receive assistance."

This new restriction on the right to assistance and other provisions of the Oath have also deterred voters from requesting assistance and narrowed the universe of willing assistors, thereby "interfer[ing] with and frustrat[ing] the substantive right Congress created" under Section 208.

*Felder*, 487 U.S. at 151. Accordingly, those portions of Section 6.04, described below, are preempted by Section 208 of the VRA.

### The "penalty of perjury" language is preempted by Section 208.

The State Defendants assert that the "penalty of perjury" language in the Oath cannot frustrate Section 208 because the Oath has always been taken under penalty of perjury. *See* ECF No. 862 ¶ 455. It is true that, since 1974, it has been a Class A misdemeanor "make[] a false statement under oath" with "intent to deceive and with knowledge of the statement's" meaning TEX. PENAL CODE § 37.02; *see also id.* § 12.21 (Class A misdemeanors can impose fines of up to $4,000 and up to one year in confinement). S.B. 1, however, added a new provision increasing the penalties for perjury as to oaths under the Election Code, making it a state jail felony to "knowingly or intentionally make a false statement or swear to the truth of a false statement" in an oath with "the intent to deceive." TEC § 276.018.

In any event, neither of the scienter requirements set forth in either perjury provision appear in the Oath itself, with confusing results. What does it mean, for example, for an assistor to "knowingly" make a false statement that he "understand[s] that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted." Suggesting that an assistor can be criminally liable for "knowingly" failing to understand a fact appears to be a contradiction in terms. The Oath could have said, "I am not knowingly assisting someone who is ineligible for assistance." As written, however, the Oath requires assistors to confirm that voters are eligible to receive assistance to ensure that their assistance will be effective (i.e., that the voter's ballot will count). Similarly, voters with cognitive disabilities or memory impairments may need their assistors to remind them how they intended to vote or visually point out the voter's preferred candidate on the ballot. Because of the assistance he requires when voting, Mr. Cole understands

this portion of the Oath to mean that he must either change how he votes or require his assistor to commit perjury. Tr. at 710:20–711:11.

At trial, voters,[52] assistors,[53] and election officials[54] alike characterized the "penalty of perjury" language in the amended Oath as "intimidating," "scary," and "threatening." Without any reference to the scienter requirement of the Election Code's perjury provision, there is nothing in the Oath to mitigate these concerns. Even attorneys involved in voting assistance are concerned about the reference to "perjury" in the Oath. MABA members find this language alarming because they do not want to subject themselves to the consequences of being accused of perjury—and potentially be disbarred—for providing voter assistance. Tr. at 2538:8–14; *see also* Tr. at 710:20–711:11 (Cole).

As it is written, the "penalty of perjury" language has deterred assistors from providing qualified voters with assistance and deterred voters from requesting assistance they need to vote, thereby frustrating Section 208's purpose.

### *The statements regarding voter eligibility are preempted by Section 208.*

Section 6.04 conditions a voter's eligibility for assistance on her willingness to make a representation about her eligibility—in effect adding a new requirement to her eligibility for assistance. That new requirement is preempted by Section 208, which affords voters the right to assistance from their chosen assistor regardless of their representations to the assistor about why they need assistance in the voting process. A voter's eligibility for assistance is determined by the conditions described in Section 208: blindness, disability, or inability to read or write. 52 U.S.C.

---

[52] *See, e.g.*, Tr. at 3324:10–14 (Halvorson).

[53] *See, e.g.*, Tr. at 147:10–148:8 (Rocha); Tr. at 3208:9–17; Tr. at 3217:12–3218:1 (Miller); Tr. at 2439:24–2440:10 (Espinosa); Tr. at 2540:21–23 (Ortega).

[54] *See, e.g.*, Tr. at 175:6–176:8 (Wise); Tr. at 1312:25–1314:9 (Longoria).

§ 10508. Imposing additional eligibility requirements on voters impermissibly narrows the class of voters Section 208 was intended to protect.

Moreover, the Election Code's fixation with voter eligibility for assistance undermines any assertion that Section 6.04 protects voters who need assistance. On its face, Section 6.04's eligibility language appears to protect only the inverse class of people—those who do *not* need assistance. In other words, Section 6.04 gestures at the possibility of fraudulent assistance targeting some ill-defined category of people who, for some reason *other than* blindness, disability, or the inability to read or write, are especially vulnerable to manipulation. But "protecting" voters who are *ineligible* for assistance does nothing to protect *eligible* voters. Assistance to an eligible voter is no less effective because the same assistance is provided to someone who does not need it. More importantly, Congress did not pass a law to protect voters who are *ineligible* for assistance; it passed a law to protect those who need it. Texas cannot establish laws that protect the former at the expense of the latter.

Finally, it is not even clear to the Court that the Election Code even operates to "protect" ineligible voters from "coercion" because even ballots voted in accordance with a voter's wishes may be voided if the voter received unauthorized assistance. *See* TEC § 64.037 ("If assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted."). This possibility—that an otherwise valid ballot might be tossed out based on a mistaken belief about a voter's eligibility for assistance—discourages assistance. Assistors with any uncertainty about the meaning of "eligibility" or whether a particular individual is legally eligible will refrain from

providing assistance.[55] *See, e.g.*, Tr. at 3291:4–3292:5 (Litzinger); Tr. at 147:1–9 (LUPE); Tr. at 2543:21–16 (MABA).

The Oath's eligibility language is preempted because it "promise[s] to deter otherwise lawful assistors from providing necessary aid to a vulnerable population." *Disability Rts. of Miss. v. Fitch*, 684 F. Supp. 3d 517, 520 (S.D. Miss. 2023), *vacated as moot*, 2024 WL 3843803 (5th Cir. Aug. 14, 2024) (enjoining state law criminalizing third-party mail ballot collection and regulating the "identity of allowable assistors" based on the ill-defined categories of exempt assistors and broad impact on the state's voting population, coupled with the threat of criminal sanctions). *Id.* at 52.[56]

### *The statement regarding "pressure or coerc[ion]" is preempted by Section 208.*

The Oath's statement that the assistor did not "pressure or coerce" the voter into choosing the assistor to provide assistance suffers from the same defects as the eligibility statements. Specifically, the Oath does not define "pressure or coerce" or include a scienter element.

Rather, by its text, the Oath requires an assistor to accurately judge the *actual* consequences of their conduct on another person's state of mind, judged against two undefined terms. But this

---

[55] Upon the suggestion by counsel for the State Defendants that voters concerned about their eligibility for assistance should contact the SOS office regarding the requirements of the Oath, Ms. Nunez Landry responded: "So I guess all disabled people have to call the Secretary of State to find out precisely whether we're eligible to vote [with assistance] and whether we're pressured or coerced? They are going to be a very busy office I would think." Tr. at 3265:21–3266:11. Impracticality aside, counsel's proposal would not cure the Oath's Section 208 problem because, much like the representation of eligibility, it would impose an additional eligibility requirement on voters who need assistance (i.e., that they confirm their eligibility with the SOS).

[56] The court highlighted the dearth of evidence justifying the restrictions on ballot-dropping assistance:

> Defendants were unable to provide any data illustrating whether Mississippi has a widespread ballot harvesting problem. Seemingly, no fact-findings or committee-finding investigations or legislative committee inquiries have focused upon this perceived threat. This may explain why the definitional approach of the statute is so barren.

> Plaintiffs, contrariwise, have provided this court with examples of how S.B. 2358, which subjects violators to criminal penalties, would deter eligible absentee voters[.]

*Disability Rts. of Miss.*, 684 F. Supp. 3d at 521–22.

language fails to provide assistors with any notice about the standard of conduct to which they are swearing or affirming. *See Coates v. City of Cincinnati*, 402 U.S. 611, 612 (1971). In *Coates*, for example, the Supreme Court held that an ordinance prohibiting conduct that was "annoying to persons passing by" was unconstitutionally vague because "[c]onduct that annoys some people does not annoy others." 402 U.S. at 614. The ordinance required "men of ordinary intelligence" to "guess at its meaning" because it specified "no standard of conduct . . . at all." *Id.*

Similarly, the Eleventh Circuit recently struck down a statute prohibiting "activity with the . . . effect of influencing a voter" as unconstitutionally vague because, even if the meaning of "influence" was clear, because "[k]nowing what it means to influence a voter does not bestow the ability to predict which actions will influence a voter." *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 947 (11th Cir. 2023). "How," the court asked, "is an individual seeking to comply with the law to anticipate whether his or her actions will have the subjective effect of influencing a voter?" *Id.* "If the best—or perhaps only—way to determine what activity has the 'effect of influencing' a voter is to ask the voter, then the question of what activity has that effect is a 'wholly subjective judgment[ ] without statutory definition[ ], narrowing context, or settled legal meaning[ ].'" *Id.*

Of course, the constitutionality of the Oath's "pressure or coerce" language is not before the Court; the question is whether the language frustrates Section 208 by deterring lawful voting assistance. But the vagueness analysis explains the chilling effect that the "pressure or coerce" statement has on assistance. *See* Tr. at 2540:11–16 (MABA) (assistors do not want to sign an oath swearing to conduct that appears without definition or context); Tr. at 3249:21–3250:2 (Nunez Landry) (worried that assistors will be too afraid to provide assistance due to confusion about the meaning of the terms); Tr. at 733:21–734:7 (Garza) ("The wording is vague enough where . . . they

might be concerned that they are going to violate the oath if they signed it."). It is unreasonable to expect assistors to swear an oath, under penalty of perjury, that requires them to guess at its meaning. *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) ("Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.").

The Court concludes that the chilling effect of the Oath's vague statement requiring assistors to swear that they did not "pressure or coerce" voters into choosing them as assistors frustrates Section 208's purpose. The language is therefore preempted by Section 208.

### The Assistor Disclosures (§§ 6.03, 6.05, 6.07) are preempted by Section 208

The requirements that assistors complete an additional form disclosing duplicative information at the polls and disclose their relationships with the voters they assist have deterred voters from requesting assistance and narrowed the universe of willing assistors and thereby "interfer[ed] with and frustrat[ed] the substantive right Congress created" under Section 208. *Felder*, 487 U.S. at 151. Accordingly, S.B. 1 §§ 6.03 and 6.05 (as implemented by 6.07) are preempted by Section 208 of the VRA.

The Supreme Court has recognized the deterrent effect that disclosure requirements can have on associative activities. *See, e.g.*, *Shelton*, 364 U.S. at 486, *NAACP*, 357 U.S. at 462; *Dep't of Com. v. New York*, 588 U.S. at 767.[57] And, in this case, individuals who assist voters with whom they do not have a preexisting relationship—including staff members and volunteers for the Plaintiff organizations—have good reason to be concerned about the basis for the disclosure requirement.

---

[57] It's worth noting that the disclosure of an assistor's address and relationship to the voter on the outside of the mail ballot carrier envelope risks public exposure of that information given (1) the potential delay between the time the mail ballot is completed and the time it is mailed or dropped off, and (2) the right to public inspection of the mail carrier envelopes after the election. TEC § 86.014(b).

The State Defendants insist that such disclosures "help enforce" Section 208 "by having assistors articulate their relationship to the voter, which lets county election officials flag violations of the law." ECF No. 862 ¶ 605. But both trial testimony and the text of S.B. 1 § 6.05 indicate that the purpose of the "relationship disclosure" requirement is not to identify either of the categories of prohibited assistors under Section 208. After all, the Oath of Assistance already requires in-person and mail-ballot assistors to swear or affirm that they do not belong to either of the proscribed classes. *See, e.g.*, TEC § 64.034 ("I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs[.]").

Instead, the "Voter Relationship Disclosure" requirement appears to be designed to distinguish between assistors with no relationship to the voter and assistors who are family members and caregivers to the voter, who Mr. White characterized as providing "normal assistance." *See also* TEC § 86.010(h)(2) (excusing close relatives from criminal penalties for failing to disclose their relationship to the voter).

But Section 208 is indifferent to Mr. White's theories about "normal assistance." Aside from the two relationships explicitly identified in the text, Section 208 leaves the choice of assistor entirely up to the voter. To be sure, some voters may prefer to vote with the assistance of a close family member or friend. Others might be more comfortable receiving help from a stranger who has been trained by a trusted community organization to provide high-quality voting assistance. Such an assistor may be more familiar with the voting process (and thus help the voter avoid common pitfalls) and, as a stranger serving multiple voters in an election period, may be less likely to remember or care how an individual voter casts his or her ballot. Neither Mr. White nor the State of Texas is permitted to second-guess the basis for the voter's selection.

The "Voter Relationship Disclosure" discourages community organizations like the Plaintiffs from providing voter assistance services by implicitly requiring that they have an articulable relationship to the voters they assist *beyond* "assistor." But nothing in the text of Section 208 suggests that Texas can adopt rules that discourage certain categories of assistors by, e.g., subjecting them to greater scrutiny, greater administrative burdens, and greater penalties for non-compliance than the state's preferred assistors. Such laws "pose[] an obstacle to Congress's clear purpose to allow the voter to decide who assists them at the polls," *Ark. United II*, 626 F. Supp. 3d at 1085; *see also, e.g.*, *OCA-Greater Hous. I*, 867 F.3d at 614–15; *see also Cummings v. Missouri*, 71 U.S. 277, 278 (1866) ("[W]hat cannot be done directly cannot be done indirectly.").

Here, Texas seeks to supplant its belief that assistors should have a close, personal relationship with voters over Congress's judgment that voters should be empowered to choose anyone other than their employer or union representative. Texas may not substitute its judgment for that of Congress, or for that matter, Texans who require voting assistance. *See Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 164 (2016) (explaining that "[s]tates may not seek to achieve ends, however legitimate, through . . . means that intrude" on federal power); *see also Ark. United II*, 626 F. Supp. 3d at 1086 (noting there is no "exception to the Supremacy Clause when a state has a compelling interest in enacting a statute that conflicts with federal law").

While the Senate Committee recognized the states' rights "to establish necessary election procedures . . . designed to protect the rights of voters," it also clearly stated the intention that any such voter assistance procedures "be established in a manner which *encourages greater participation* in the electoral process." S. Rep. No. 97-417 at 63 at 241 (emphasis added). Thus, any regulations of the assistors must encourage—or at a minimum not discourage—people from providing voting assistance.

Congress's concern for voters cannot serve as the basis for gutting the very means Congress chose to address that issue. In fact, these differing paths to a common goal underscore that preemption is appropriate. *See Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 529 (5th Cir. 2013) ("As the Supreme Court has cautioned, . . . 'conflict is imminent' when 'two separate remedies are brought to bear on the same activity.'" (quoting *Crosby*, 530 U.S. at 380)); *see also United States v. Locke*, 529 U.S. 89, 115 (2000) ("[A] state law is not to be declared a help because it attempts to go farther than Congress has seen fit to go." (quoting *Charleston & W. Carolina Ry. Co. v. Varnville Furniture Co.*, 237 U.S. 597, 604 (1915))).

The "Voter Relationship Disclosure" requirement set forth in S.B. 1 §§ 6.03–6.04 (and implemented by S.B. 1 § 6.07) and the requirement that in-person assistors complete a separate disclosure form under S.B. 1 § 6.03 is preempted by Section 208.

The State Defendants correctly observe that none of the Plaintiffs challenge the requirement that assistors disclose whether they "received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee" under TEC § 64.0322(a) or § 86.010(e)(3). *See* ECF No. 862 at 216–17. Plaintiffs' failure to challenge that disclosure requirement preserves the question on mail ballot carrier envelopes, but it does not save the separate disclosure form prescribed by the Secretary of State for in-person voting. *See* LUPE-189. For the compensation question to have any meaning, the assistor would still be required to provide duplicative information—his name (and probably address)—on the form for identification purposes. The answer to a single yes-or-no question cannot justify imposing an entirely new form on each chosen assistor. The Secretary and local election officials can comply with Section 6.03 by adding the answer to this question to the poll lists, alongside the assistor's name and address.

*See* TEC § 63.004 (permitting the Secretary to combine the poll list, the signature roster, or any other form used in connection with the acceptance of voters at polling places).

**<u>Bans on Compensated Assistance (§§ 6.06 and 7.04) are preempted by Section 208</u>**

The prohibitions on compensated assistance set forth in S.B. 1 §§ 6.06 and 7.04 conflict with the text of Section 208 of the VRA because they facially restrict the class of people who are eligible to provide voting assistance beyond the categories of prohibited individuals identified in the text of the statute—the voter's employer (or an agent of the employer) or union representative.[58]

In doing so, Sections 6.06 and 7.04 "interfere[] with and frustrate[] the substantive right Congress created" under Section 208. *Felder*, 487 U.S. at 151. S.B. 1 §§ 6.06 and 7.04 are thus preempted by Section 208 of the VRA. Sections 6.06 and 7.04 make it an "impossibility" for an eligible voter to choose an assistor who is permitted by Section 208 but disqualified by S.B. 1 because that assistor is compensated (or receives an economic benefit) either to provide mail ballot assistance or to advocate for a ballot measure. *Fla. Lime & Avocado Growers*, 373 U.S. at 142–43.

Section 6.06's exception for family members and "attendant or caregiver previously known to the voter" does nothing to save the rule from preemption. Implicitly acknowledging that neither

---

[58] The State Defendants assert that assistance by paid canvassers falls outside the purview of Section 7.04 because it is not "designed to deliver votes for or against a specific candidate or measure." ECF No. 862 ¶ 479 (citing TEC §276.05(e)); *see also* ECF No. 608 at 36. But any efforts designed to increase *turnout* among voters who are already likely to vote for the organization's preferred candidate or measure are, arguably "designed to deliver votes for the candidate or measure." Thus, training canvassers on how to provide non-coercive voting assistance to LEP and disabled voters upon request during candidate forums or block-walking would be arguably "designed to deliver votes for a specific candidate or measure" if the organization's outreach efforts were directed toward like-minded voters.

The expansive reach of the term "interaction"—as opposed to "communication" or "speech" or "advocacy"— compels the same conclusion because it very clearly encompasses *both* core political speech *and* voting assistance. *See Interaction*, Merriam-Webster, https://www.merriam-webster.com/dictionary/interaction (last visited Sept. 24, 2024) (defining "interaction" means "mutual or reciprocal action or influence"). Nothing in the text of the Canvassing Restrictions suggests that a voter who asks a canvasser for voting assistance while discussing a ballot measure begins a new, distinct "interaction" that is no longer imbued with the canvasser's original intent.

"caregiver" nor "previously known to the voter" are defined in the Election Code, the State Defendants have taken the position that "[t]he ban on compensation applies only in the narrow circumstance when an individual is paid specifically to assist the voter with their ballot." ECF No. 862 ¶ 653 (citing Tr. at 1902:4–8). The "caregiver or attendant" exception to Section 6.06 suggests that just the opposite is true. By exempting paid caregivers and attendants "to ensure that Section 6.06 would not interfere with their duties," as the State Defendants describe it, Section 6.06 impliedly *does* interfere with the duties of *other* professionals who might provide mail-ballot assistance in the ordinary course of their employment. It would prohibit a high school teacher, for example, from providing mail-ballot assistance to students with disabilities during a civics unit. It would likewise prevent a legal aid attorney from translating his client's mail ballot, and an activities director at an assisted living facility from helping disabled voters cast their BBMs.

Moreover, the State Defendants' position squarely conflicts with testimony by their own witnesses. For example, the State Defendants insist that nothing in Sections 6.06 or 7.04 prevent "individuals with paid jobs, such as canvassing, from assisting the voter." ECF No. 862 ¶ 653.[59] At trial, however, Mr. White confirmed that Section 6.06 "appear[s] to apply to [the] scenario" in which a paid canvasser for a nonprofit Get Out the Vote organization engages with voters and provides mail ballot assistance at the voter's request. Tr. at 3993:22–3995:10. Similarly, while the State Defendants purportedly endorse Mr. Ingram's position that reimbursement is not "compensation," *see* ECF No. 862 ¶ 653 (citing Tr. at 1903:10–1904:2), Mr. White testified that

---

[59] The State Defendants themselves have taken inconsistent positions on the question of whether Section 7.04 reaches voter assistance activity. *Compare* ECF No. 862 ¶ 653 (arguing that nothing prevents paid canvassers from providing voter assistance) with *La Union del Pueblo Entero v. Abbott*, No. 22-50775, ECF No. 92 at 2 (5th Cir. Oct. 9, 2024) (suggesting that an injunction against criminal enforcement of the Canvassing Restriction would somehow impact selectively quoted instructions pertaining to the Assistor Disclosure requirements). If, as the State Defendants would have it, the Canvassing Restriction always permitted paid canvassers to provide mail-ballot assistance, enjoining criminal enforcement of the Canvassing Restriction should have no impact on how canvassers provide such assistance.

he would need to perform *legal research* to determine what kinds of economic benefits would violate Section 6.06. Tr. at 3992:20–3993:21 (conceding that he would need to "review[] the case law" to determine whether a meal, bus fare, or a gift bag containing a t-shirt constitute prohibited compensation).

Even if S.B. 1 purports to share Section 208's goal of preventing voter coercion, Congress decided that an assistor of choice, as opposed to an election official, would best ensure that the voter's intent is carried out when marking the ballot. *See* H.R. Rep. No. 227, 97th Cong., 1st Sess. 14 (1981) (discussing need to deter coercion of voters by election officials). Thus, S.B. 1's voter assistance provisions "involve[] a conflict in the method of enforcement. The Court has recognized that a '[c]onflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy.'" *Arizona v. United States*, 567 U.S. at 406 (quoting *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 287 (1971)).[60]

---

[60] Even under the State Defendants' proposed balancing test, Sections 6.06 and 7.04 would fail. The Senate Report states that any voter protection laws must be implemented to "encourage participation in the electoral process." S. Rep. No. 97-417 at 63 at 241. The trial record shows that several, non-partisan community organizations have stopped providing mail-ballot assistance to voters because they compensate their staff members (with salaries) and volunteers (with nominal gifts). *See, e.g.*, Tr. at 1722:3–16 (OCA); Tr. at 86:9–86:13, 86:14–87:2, 87:3–87:21, 86:9–86:13, 86:14–87:2, 87:3–87:21 (LUPE); Tr. at 2543:14–2544:23 (MABA). Worse, both Mr. White and Mr. Ingram acknowledged that, in addition to exposing their assistors to criminal liability under Sections 6.06 and 7.04, voters themselves could face jail time under either provision for offering to buy their assistor lunch as a token of appreciation. Tr. at 1904:1–1906:5. Members of the League have stopped providing assistance at assisted living facilities based on this very concern. Tr. at 1620:7–1621:1. Threatening volunteers who accept water bottles and the voters who offer them with years in prison and thousands of dollars in fines can hardly be said to "encourage participation in the electoral process."

The State Defendants insist that these provisions protect voters from incentive structures that increase the likelihood of assistors applying pressure on the voter in pursuit of partisan or ideological ends. But nothing in the text of either Section 6.06 or 7.04 limits the application of criminal liability to those who receive or offer compensation to "apply pressure" for partisan or ideological ends. Nor is there any evidence that bottles of water, t-shirts, bus fare, or a person's receipt of their normal salary constitute "an incentive structure that increases the likelihood" of such pressure. Indeed, the State Defendants failed to proffer a shred of evidence showing that S.B. 1's assistance provisions actually protect voters from undue influence or encourage participation by voters who need assistance. Weighed against the effect of excluding these broad categories of non-partisan assistors and exposing voters and assistors alike to criminal liability, the burden that Sections 6.06 and 7.04 impose on voters' right to vote with assistance from a person of their choice cannot be justified by the State Defendants' vague gesture toward voter protection.

The text of Section 208 does not permit the restrictions on the class of eligible assistors imposed by Sections 6.06 and 7.04 of S.B. 1. Accordingly, those provisions are preempted.

## PERMANENT INJUNCTION OF S.B. 1 §§ 6.03–6.07 AND 7.04

### Legal Standard

A party seeking a permanent injunction must prove: (1) that it has succeeded on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest. *Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021). The Court addresses each factor in turn.

Further, in accordance with Federal Rule of Civil Procedure 65(d)(1), an order granting a permanent injunction must "(A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail ... the act or acts restrained or required." *Scott v. Schedler*, 826 F.3d 207, 208 (5th Cir. 2016) (quoting FED. R. CIV. P. 65(d)(1)). According to the Fifth Circuit, this means the injunction must not be vague or overbroad. *Id.* "[A]n injunction is overly vague if it fails to satisfy the specificity requirements set out in Rule 65(d)(1), and it is overbroad if it is not 'narrowly tailor[ed] . . . to remedy the specific action which gives rise to the order' as determined by the substantive law at issue." *Id.* (quoting *Doe v. Veneman*, 380 F.3d 807, 813 (5th Cir. 2004)).

### Analysis

Plaintiffs have satisfied all four factors required for injunctive relief. *Valentine*, 993 F.3d at 280.

First, for the reasons set forth in this order, the Court concludes that the Sections 6.03–6.07 and 7.04 of S.B. 1. are preempted, at least in part, by Section 208. Plaintiffs have thus succeeded on the merits of their Section 208 claims challenging those provisions.

Second, the Court concludes that failure to grant the requested injunction will result in irreparable injury to Plaintiffs and their members by interfering with voters' rights and ability to vote with help from their chosen assistors.

Plaintiffs have established that Sections 6.03, 6.04, 6.05, and 6.07 of S.B. 1 have deterred members from requesting—and their chosen assistors from providing—voting assistance guaranteed under Section 208 due to the credible *threat* of enforcement. *See also Babbitt*, 442 U.S. at 302 ("a plaintiff need not first expose himself to actual arrest or prosecution" to establish a cognizable harm). As a result, voters, including some of Plaintiffs' members, have forgone assistance to which they are lawfully entitled and will continue to do so as long as those provisions remain in effect. "Courts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (collecting cases); *see also Purcell v. Gonzalez*, 549 U.S. 1, 7 (2006) (recognizing the "strong interest in exercising the fundamental political right to vote") (citing *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972)).

Finally, it is clear to the Court that the injunction would not disserve the public interest, and, to the contrary, will serve the public interest by protecting individuals' right to vote with help from their chosen assistors under Section 208 and their fundamental right to vote. *See Dunn*, 405 U.S. at 336 (stating that protecting the right to vote is of particular public importance because it is "preservative of all rights.") (citing *Reynolds v. Sims*, 377 U.S. 533, 562 (1964)).

Even recognizing the importance of the fundamental right to vote, a court must weigh any protective action against the potential for confusion and disruption of the election administration under the "*Purcell* principle." *See Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018). The *Purcell* principle provides that, as a general rule, federal courts "should not alter state election laws in the

period close to an election." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28 (2020) (Kavanaugh, J., concurring) (upholding Seventh Circuit's stay of injunction entered six weeks before the general election). In *Purcell*, the Supreme Court reversed a lower court's order enjoining the implementation of a proposition, passed by ballot initiative two years earlier, that required voters to present identification when they voted on election day. Reversing the lower court, the Court emphasized that the injunction was likely to cause judicially-created voter confusion in the face of an imminent election. *Purcell*, 549 U.S. at 2, 6.

The Supreme Court has recognized that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Purcell*, 549 U.S. at 4–5. The *Purcell* principle's logic extends only to injunctions that affect the mechanics and procedures of the act of voting. *See, e.g.*, *Republican Nat'l Comm. v. Democratic Nat'l Comm. ("RNC v. DNC")*, 140 S. Ct. 1205, 1207 (2020) (extension of absentee ballot deadline); *Mi Familia Vota v. Abbott*, 834 F. App'x 860, 863 (5th Cir. 2020) (mask mandate exemption for voters); *Tex. Alliance for Retired Ams. v. Hughs*, 976 F.3d 564, 566–67 (5th Cir. 2020) (new ballot type eliminating straight-ticket voting); *Democratic Nat'l Comm. v. Wis. State Leg.*, 141 S. Ct. at 31 (extension of absentee ballot deadline).

Even when *Purcell* applies, however, it does not constitute an absolute bar on all injunctive relief in the runup to an election. *See Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring). Rather, it directs courts to consider whether: (1) "the underlying merits are entirely clearcut in favor of the plaintiff;" (2) "the plaintiff would suffer irreparable harm absent the injunction;" (3) the "plaintiff has [] unduly delayed bringing the complaint to court;" and (4) "the changes in question are at least feasible before the election without significant cost, confusion, or

hardship." *Id.*; *see also Robinson v. Ardoin*, 37 F.4th 208, 228 n.11 (5th Cir. 2022) (per curiam) (citing *Merrill* concurrence as authority on *Purcell*). The Court concludes that Plaintiffs have satisfied the first three elements with respect to all their successful Section 208 challenges. Thus, the Court must determine, with respect to each challenged provision, whether the conduct to be enjoined affects the mechanics of voting and, if so, the feasibility of implementing any injunctive relief before the November 2024 election.

### *Injunctive relief as to the Secretary's forms and instructions implicates Purcell.*

Plaintiffs have succeeded on the merits of their Section 208 challenges to two forms designed by the Secretary of State: the "Oath of Assistance Form" used to collect Assistor Disclosures at the polls (LUPE-189) and the mail ballot carrier envelope (LUPE-009). Specifically, she will be required to withdraw the Oath of Assistance Form, remove the "Relationship to Voter" line from the mail-ballot carrier envelope, and revise the Oath printed on the mail ballot carrier envelope to reflect the language below:

> I swear (or affirm) that I will not suggest, by word, sign, or gesture, how the voter should vote; I will prepare the voter's ballot as the voter directs; I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; I will not communicate information about how the voter has voted to another person.

The Secretary will also be required to revise any training and instructional materials for state and county election officials to remove language that reflects the substance of the Enjoined Oath Language or the Voter Relationship Disclosure requirements. Any injunctive relief against the Secretary as to Sections 6.03, 6.04, 6.05, and 6.07 of S.B. 1 will plainly implicate *Purcell* and it is not feasible for the Secretary to redesign any of these materials in the weeks before the November 2024 general election.

Accordingly, the Court will stay any injunction applicable to the Secretary's forms until after the November 2024 general election.

### *Injunctive relief as to election officials' conduct implicates Purcell.*

Injunctive relief as to election officials' administration of the Oath and Assistor Disclosure requirements for both in-person and mail-in voting clearly implicates *Purcell*.

The Court will not enjoin the County Election Officials from using either of the forms prescribed by the Secretary of State in administering the November 2024 general election for the same reasons set forth above.

Of course, it would be feasible, in terms of both cost and hardship, to enjoin officials from giving *effect* to certain portions of the forms by, e.g., permitting assistors to skip the "Relationship to Voter" line on the disclosure form at the polls or accepting mail ballots omitting that information. It would be similarly feasible to direct officials to administer the revised Oath orally at the polls. Nonetheless, due to the potential for voter confusion about the procedural discrepancies between in-person and mail-in voting, the Court will not enjoin officials from implementing the requirements of Sections 6.03, 6.04, and 6.05 of S.B. 1 until after the November 2024 general election.

### *Enjoining enforcement proceedings does not implicate the Purcell principle.*

With respect to criminal enforcement of S.B. 1 §§ 6.04, 6.05, 6.06, and 7.04, injunctive relief against the State Defendants and County DAs would not affect the procedures for voting by mail from a voter's perspective.

Enjoining enforcement proceedings premised on violations of the Enjoined Oath Language, for example, does not require any changes to the Oath as it is printed on the mail ballot carrier envelope or the Oath of Assistance Form or any of the inserts used in the mail voting

process. *See, e.g.*, LUPE-009 at 2; LUPE-189 at 2; Tex. Sec'y of State, Form 6-29, https://perma.cc/N5FYXSCL; Tex. Sec'y of State, Form 6-26, https://perma.cc/QGT9-UH9E.

The first insert urges voters to report "attempts to pressure or intimidate" them to their local county elections office, local district attorney, or the Secretary of State. To state the obvious, an injunction against enforcement has no impact on the general public's ability to report activity—criminal or otherwise—to the officials responsible for collecting such reports. Enjoining criminal enforcement of the Enjoined Oath Language would not impair any official's ability to enforce provisions of the Election Code criminalizing efforts to "pressure or intimidate" a voter. For example, the Election Code already imposes criminal penalties against "effort[s] to influence the independent exercise of the vote of another in the presence of the ballot or during the voting process," TEC § 276.013, or voting (or attempting to vote) a ballot belonging to another person, or attempting to mark another person's ballot without their consent or specific direction, TEC § 64.012. Similarly, it is already a crime for an assistor to "suggest[] by word, sign, or gesture how the voter should vote" while providing such assistance or to "prepare[] the voter's ballot in a way other than the way the voter directs or without direction from the voter." TEC § 64.036.

The second insert explains to voters that their assistor's failure to sign the Oath and complete the Assistor Disclosures is a state jail felony unless the person is one of certain close relatives of the voter or physically living in the same dwelling. Tex. Sec'y of State, Form 6-26, https://perma.cc/QGT9-UH9E. Again, the Court is not directing any change to the inserts, the Oath, or the Assistor Disclosure requirements at this time. Instead, injunctive relief against enforcement of the provisions would simply prevent the Secretary from referring alleged violations of the Enjoined Oath Language or the Voter Relationship Disclosure requirement to the Attorney

General, and prevent the Attorney General and the State of Texas (through its local prosecutors) from investigating and prosecuting such violations.

The Election Code itself acknowledges a distinction between its administrative procedures and their enforcement. For example, the Oath of Assistance, printed on the mail ballot carrier envelope and Oath of Assistance Form, does not reflect the scienter requirement set forth in the criminal enforcement provision. *Compare* LUPE-009, LUPE-189, and TEC § 64.034 with TEC § 276.018. Likewise, the Election Code—and the forms that implement it—requires *all* assistors to complete the Assistor Disclosures. *See* LUPE-009, LUPE-189, and TEC § 64.0322. The provision imposing criminal liability on *some* mail-ballot assistors—but not others—who knowingly fail to comply with the requirements is codified under a separate provision, TEC § 86.010(h)(2), but neither the distinction between types of assistors nor the scienter requirement appears on the BBM carrier envelope. *See* LUPE-009.

Any objection to enjoining criminal enforcement of the Enjoined Oath Language or Voter Relationship Disclosure requirement, in effect, amounts to an objection to the limited relief that the injunction will afford. That is, both requirements will undoubtedly continue to have some chilling effect on voter assistance in the November 2024 election. To be sure, with respect to the November 2024 election, Plaintiffs' prospective injuries will not be fully relieved. But *Purcell* does not require courts to double-down on the unjust effects of unlawful election rules by continuing to permit criminal enforcement of those provisions. *See Longoria v. Paxton*, 585 F. Supp. 3d 907, 935 (W.D. Tex. 2022) (less than three weeks before primary, enjoining statute criminalizing solicitation of vote-by mail applications), *vacated and remanded on other grounds*, 2022 WL 2208519 (5th Cir. 2022); *Chancey v. Ill. State Bd. of Elections*, 635 F. Supp. 3d 627, 629–30, 644 (N.D. Ill. 2022) (declining to apply *Purcell* less than a month before an election,

reasoning that an injunction of the campaign finance law at issue "did not implicate the same concerns" as *Purcell*, as because "it is difficult to imagine . . . that if relief is granted, then voters will be confused about whether, how, where, when, or for whom they can vote"); *Coal. for Good Governance v. Kemp*, 558 F. Supp. 3d 1370, 1393 (N.D. Ga. 2021) (enjoining SB 202 provision imposing criminal penalties one month before election); *Towbin v. Antonacci*, 885 F. Supp. 2d 1274, 1295–96 (S.D. Fla. 2012) (similar).

The Court is not considering a preliminary injunction of a new election law intended to mitigate its administrative consequences before an upcoming election. At most, *Purcell* justifies a temporary stay of otherwise *permanent* injunctive relief, and, even then, only to the extent that an injunction materially impacts election administration. The effect of an injunction prohibiting criminal enforcement is limited to the criminal realm. Indeed, injunctions against criminal enforcement are, by their nature, removed in space and time from the mechanics and procedures of voting. Prosecutions simply do not occur at the polls (or, as the case may be, during block-walking and candidate forums); they require investigation, evidence, and due process.

In the same vein, the Attorney General and County District Attorneys may very well be pursuing investigations and prosecutions arising out of violations of these provisions that occurred in *previous* elections. Regardless of the upcoming election, those investigations and prosecutions constitute enforcement of state laws that are preempted by Section 208 of the VRA. How could an injunction of such enforcement activity possibly implicate *Purcell*? Indeed, considering the State Defendants' continued reliance on the investigative privilege in the course of this litigation, it is difficult to imagine that voters are so accustomed to the enforcement of these provisions that they would be confused by an injunction that—for the purposes of November 2024 election—changes nothing about how or when they cast their ballot, by mail or in person.

Because criminal investigations and prosecutions necessarily follow the offending conduct in time, the only prospective interest that the AG and DAs can plausibly allege would be impaired by injunctive relief is the deterrent effect of the provisions arising from the threat of enforcement. However, given that the chilling effect on voting assistance is the very feature that renders the challenged provisions infirm under Section 208, permitting the State Defendants and local prosecutors to continue to threaten criminal enforcement is unlikely to serve the public interest.

## CONCLUSION

For the foregoing reasons, the Court concludes that Sections 6.06 and 7.04 of S.B. 1 and portions of Sections 6.03, 6.04, 6.05, and 6.07 of S.B. 1 are preempted by Section 208 of the VRA.

The motions for summary judgment filed by the Intervenor-Defendants (ECF No. 608) and the Harris County District Attorney (ECF No. 614) are **DENIED** as to Plaintiffs' Section 208 claims.

The HAUL Plaintiffs' Section 208 challenge to S.B. 1 § 6.01 is **DISMISSED WITHOUT PREJUDICE** for lack of subject matter jurisdiction.

### Section 6.04 (TEC § 64.034) – The Oath of Assistance

With respect to the HAUL and LUPE Plaintiffs' Section 208 challenges to S.B. 1 § 6.04, codified at TEC § 64.034:

The Court **DECLARES** that the following statements in the Oath of Assistance, codified at TEC § 64.034, are preempted by Section 208 of the Voting Rights Act:

- "under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance";

- "I did not pressure or coerce the voter into choosing me to provide assistance; and"

- "I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted."

Plaintiffs' challenges to the Oath's statement that "I will not communicate information about how the voter has voted to another person" are dismissed.

The Attorney General and Secretary of State of Texas, the District Attorneys of Bexar County, Harris County, Travis County, Dallas County, Hidalgo County, and the 34th Judicial District, and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, are **PERMANENTLY ENJOINED** from implementing, enforcing, or giving any effect to the following language in the Oath of Assistance, codified at TEC § 64.034 (the "Enjoined Oath Language"):

- "under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance";

- "I did not pressure or coerce the voter into choosing me to provide assistance; and" and

- "I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted."

Nothing in this order should be read to enjoin the Attorney General, the Secretary, or the County District Attorneys from enforcing the surviving portions of the Oath under TEC § 276.018(b).

Accordingly, the Attorney General may not investigate potential violations, refer potential violations to District Attorneys for investigation or prosecution, or prosecute any potential violation of the Enjoined Oath Language with the consent or at the request of any county or local prosecutor or appointment *pro tem* by a district judge. Likewise, all county and local prosecutors are permanently enjoined from deputizing the Attorney General, appointing him *pro tem*, or seeking his appointment *pro tem* from or by a district judge to prosecute alleged violations of the Enjoined Oath Language that occur within their jurisdictions.

In the interest of clarity, injunctions against enforcement extend to civil penalties and civil investigations and enforcement proceedings (e.g., writs of mandamus) against election officials pursuant to Section 8.01 of S.B. 1 (codified at TEC §§ 31.129, 31.130),

The Secretary of State is **PERMANENTLY ENJOINED** from implementing the Enjoined Oath Language. The Secretary shall revise any applicable forms and training and instructional materials for state and county election officials to remove language that reflects the substance of the Enjoined Oath Language. This injunction is **STAYED**, however, **until after the November 2024 general election**.

The Bexar County Elections Administrator, Harris County Clerk, Dallas County Elections Administrator, and El Paso County Elections Administrator are **PERMANENTLY ENJOINED** from implementing the Enjoined Oath Language. This injunction is **STAYED**, however, **until after the November 2024 general election**. Nothing in this order should be read, however, to prevent local election officials from providing reasonable accommodations to voters consistent with TEC § 1.022.

### Sections 6.03, 6.05, 6.07 (TEC § 64.034) – Voter Relationship Disclosure

With respect to the LUPE and HAUL Plaintiffs' Section 208 challenges to S.B. 1 §§ 6.03, 6.05, and 6.07:

The Court **DECLARES** that the Oath of Assistance Form and Voter Relationship Disclosure requirement, codified at TEC §§ 64.0322(a)(2) and 86.010(e)(2) (and implemented by TEC §§ 64.0322(b) and 86.013(b)) are preempted by Section 208 of the Voting Rights Act.

The State Defendants and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, are **PERMANENTLY ENJOINED** from implementing, enforcing, or giving any effect to TEC § 86.010(e)(2). All county and local

prosecutors are agents of the State of Texas in prosecuting crimes under the Election Code. *Stephens*, 663 S.W.3d at 52.

Accordingly, the Attorney General may not investigate potential violations of TEC § 86.0105, refer potential violations of TEC § 86.010(e)(2) to county or local prosecutors for investigation or prosecution, or prosecute any potential violation of TEC § 86.010(e)(2) with the consent or at the request of any county or local prosecutor or appointment *pro tem* by a district judge. Likewise, all county and local prosecutors, as agents of the State of Texas, are permanently enjoined from deputizing the Attorney General, appointing him *pro tem*, or seeking his appointment *pro tem* from or by a district judge to prosecute alleged violations of TEC § 86.010(e)(2) that occur within their jurisdictions.

In the interest of clarity, injunctions against enforcement extend to civil penalties and civil investigations and enforcement proceedings (e.g., writs of mandamus) against election officials pursuant to Section 8.01 of S.B. 1 (codified at TEC §§ 31.129, 31.130).

The Secretary of State is **PERMANENTLY ENJOINED** from implementing the Voter Relationship Disclosure requirement. The Secretary shall revise all applicable forms and training and instructional materials for state and county election officials to remove language that reflects the substance of the Voter Relationship Disclosure requirement. This injunction is **STAYED**, however, **until after the November 2024 general election**.

The Bexar County Elections Administrator, Harris County Clerk, Dallas County Elections Administrator, and El Paso County Elections Administrator are **PERMANENTLY ENJOINED** from using the Oath of Assistance Form (LUPE-189) or implementing the Voter Relationship Disclosure requirement. This injunction is **STAYED**, however, **until after the November 2024**

**general election**. Nothing in this order should be read, however, to prevent local election officials from providing reasonable accommodations to voters consistent with TEC § 1.022.

### Section 6.06 (TEC § 86.0105) – Ban on Compensated Mail-Ballot Assistance

With respect to the OCA and LUPE Plaintiffs' Section 208 challenges to S.B. 1 § 6.06:

The Court **DECLARES** that the ban on compensated mail-ballot assistance, codified at TEC § 86.0105, is preempted by Section 208 of the Voting Rights Act.

The State Defendants, and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, are **PERMANENTLY ENJOINED** from implementing, enforcing, or giving any effect to TEC § 86.0105. All county and local prosecutors are agents of the State of Texas in prosecuting crimes under the Election Code. *Stephens*, 663 S.W.3d at 52.

Accordingly, the Attorney General may not investigate potential violations of TEC § 86.0105, refer potential violations of TEC § 86.0105 to county or local prosecutors for investigation or prosecution, or prosecute any potential violation of TEC § 86.0105 with the consent or at the request of any county or local prosecutor or appointment *pro tem* by a district judge. Likewise, all county and local prosecutors, as agents of the State of Texas, are permanently enjoined from deputizing the Attorney General, appointing him *pro tem*, or seeking his appointment *pro tem* from or by a district judge to prosecute alleged violations of TEC § 86.0105 that occur within their jurisdictions.

The OCA and LUPE Plaintiffs' Section 208 claims challenging S.B. 1 § 6.06 against the Harris County Clerk, Travis County Clerk, Dallas County Elections Administrator, and El Paso County Elections Administrator, as applicable, are **DISMISSED WITHOUT PREJUDICE** for lack of subject matter jurisdiction.

### Section 7.04 (TEC § 276.015) – Canvassing Restriction

With respect to the LUPE and LULAC Plaintiffs' Section 208 challenges to S.B. 1 § 7.04:

The Court **DECLARES** that the Canvassing Restriction, codified at TEC § 276.015, is preempted by Section 208 of the Voting Rights Act.

The State Defendants and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, are **PERMANENTLY ENJOINED** from implementing, enforcing, or giving any effect to TEC § 86.0105. All county and local prosecutors are agents of the State of Texas in prosecuting crimes under the Election Code. *Stephens*, 663 S.W.3d at 52.

Accordingly, the Attorney General may not investigate potential violations of TEC § 276.015, refer potential violations of TEC § 276.015 to county or local prosecutors for investigation or prosecution, or prosecute any potential violation of TEC § 276.015 with the consent or at the request of any county or local prosecutor or appointment *pro tem* by a district judge. Likewise, all county and local prosecutors, as agents of the State of Texas, are permanently enjoined from deputizing the Attorney General, appointing him *pro tem*, or seeking his appointment *pro tem* from or by a district judge to prosecute alleged violations of TEC § 276.015 that occur within their jurisdictions.

The LUPE and LULAC Plaintiffs' Section 208 claims challenging S.B. 1 § 7.04 against the Dallas County Elections Administrator, El Paso County Elections Administrator, Bexar County Elections Administrator, Travis County Clerk, Harris County Clerk, and Hidalgo County Elections Administrator, as applicable, are **DISMISSED WITHOUT PREJUDICE** for lack of subject matter jurisdiction.

It is so **ORDERED**.

**SIGNED** this 11th day of October, 2024.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

APPENDIX B

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNIÓN DEL PUEBLO ENTERO, *et al.*,

    *PLAINTIFFS,*

v.

                        CASE NO. 5:21-CV-00844-XR

GREGORY W. ABBOTT, *et al.*,

    *DEFENDANTS.*

**STATE DEFENDANTS' AND INTERVENOR-DEFENDANTS' OPPOSED MOTION
FOR STAY PENDING APPEAL OR, IN THE ALTERNATIVE, FOR
ADMINISTRATIVE STAY PENDING APPEAL AND REQUEST FOR EXPEDITED
CONSIDERATION**

# TABLE OF CONTENTS

Table of Contents .................................................................................................. ii

Table of Authorities ............................................................................................. iii

Background ............................................................................................................ 1

Argument ............................................................................................................... 3

    I.    *Purcell* Bars this Court's Injunctions Against Sections 6.04, 6.05, 6.06, 6.07 and 7.04. ................. 3

    II.   Defendants Are Likely to Succeed on the Merits. ............................................................ 6

        A.  Plaintiffs lack standing. ............................................................................................. 6

        B.  Plaintiffs are unlikely to succeed on the merits of their Section 208 claims. ................ 9

    III.  State Defendants and the Public Interest Will Be Irreparably Injured Absent a Stay, but Plaintiffs Will Not Be. ........................................................ 19

Conclusion & Relief Requested ........................................................................... 19

Certificate of Conference ..................................................................................... 21

Certificate of Service ............................................................................................ 21

TABLE OF AUTHORITIES

**Cases**

*Aldridge v. Miss. Dep't of Corr.,*
990 F.3d 868 (5th Cir. 2021) ............................................................... 14

*Barrosse v. Huntington Ingalls, Inc.,*
70 F.4th 315 (5th Cir. 2023) ................................................. 14, 16, 17

*Burdick v. Takushi,*
504 U.S. 428 (1992) ............................................................................ 19

*Burson v. Freeman,*
504 U.S. 191 (1992) ............................................................................ 18

*California v. Texas,*
593 U.S. 659 (2021) .............................................................................. 7

*City of Austin v. Paxton,*
943 F.3d 993 (5th Cir. 2019) ................................................................ 7

*Crawford v. Marion Cnty. Election Bd.,*
553 U.S. 181 (2008) .............................................................................. 7

*Democracy N. C. v. N. C. State Bd. of Elections,*
476 F. Supp. 3d 158 (M.D.N.C. 2020) ......................................... 11, 12

*DNC v. Wisc. State Leg.*, 141 S. Ct. 28 (2020) ...................................... 4

*E.T. v. Paxton,*
19 F.4th 760 (5th Cir. 2021) ............................................................... 19

*Food Mktg. Inst. v. Argus Leader Media,*
588 U.S. 427 (2019) ............................................................................ 10

*Ill. Bd. of Elections v. Socialist Workers Party,*
440 U.S. 173 (1979) ............................................................................ 19

*LUPE v. Abbott*, No. 24-50783 (5th Cir. Oct. 15, 2024) ................. 3, 4, 7

*Marshall v. Goodyear Tire & Rubber Co.,*
554 F.2d 730 (5th Cir. 1978) .............................................................. 18

*Maryland v. King,*
567 U.S. 1301 (2012) (Roberts, C.J., in chambers) ............................ 19

*Merrill v. Milligan*,
142 S. Ct. 879 (2022) (Kavanaugh, J., concurring) ................................................................... 4

*Mi Familia Vota v. Ogg*,
105 F.4th 313 (5th Cir. 2024) ................................................................................................... 4

*Milliken v. Bradley*,
418 U.S. 717 (1974) ............................................................................................................... 18

*Nken v. Holder*,
556 U.S. 418 (2009) ................................................................................................................. 3

*OCA Greater Houston v. Texas*,
No. 1:15-cv-679, 2022 WL 2019295, at *1 (W.D. Tex. June 6, 2022) ................................... 2

*OCA-Greater Houston v. Texas*,
867 F.3d 604 (5th Cir. 2017) ................................................................................................. 12

*Ostrewich v. Tatum*,
72 F.4th 94 (5th Cir. 2023) ................................................................................................. 4, 7

*Priorities USA v. Nessel*,
487 F. Supp. 3d 599 (E.D. Mich. 2020) ......................................................................... 10, 18

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) .......................................................................................................... 4, 5, 6

*Ray v. Texas*,
No. CIV.A.2-06-CV-385TJW, 2008 WL 3457021 (E.D. Tex. Aug. 7, 2008) ....................... 11

*Republican Nat'l Comm. v. Mi Familia Vota*,
No. 24A164, 2024 WL 3893996, at *1 (Aug. 22, 2024) ......................................................... 5

*Reynolds v. Sims*,
377 U.S. 533 (1964) ................................................................................................................. 6

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947) ................................................................................................... 11, 12, 13

*Richardson v. Flores*,
28 F.4th 649 (5th Cir. 2022) ................................................................................................... 4

*Robinson v. Ardoin*,
37 F.4th 208 (5th Cir. 2022) ................................................................................................... 4

*Robinson v. Ardoin*,
86 F.4th 574 (5th Cir. 2023) ................................................................................................... 6

*Salazar v. Mamon*,
750 F.3d 514 (5th Cir. 2014) ................................................................. 12

*Storer v. Brown*,
415 U.S. 724 (1974) .................................................................... 11, 19

*Teltech Sys. v. Bryant*,
702 F.3d 232 (5th Cir. 2012) ................................................................. 11

*Tex. State LULAC v. Elfant*,
52 F.4th 248 (5th Cir. 2022) ............................................................... 8, 9

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ...................................................................... 7, 8

*United States v. Baylor Univ. Med. Ctr.*,
711 F.2d 38 (5th Cir. 1983) (per curiam) .................................................... 3

*VanDerStok v. Garland*,
86 F.4th 179 (5th Cir. 2023) ................................................................. 10

*Veasey v. Abbott*,
870 F.3d 387 (5th Cir. 2017) (per curiam) ................................................... 19

*Veasey v. Perry*,
574 U.S. 951 (Oct. 14, 2018) (Ginsburg, J., dissenting) ....................................... 6

*Veasey v. Perry*,
769 F.3d 890 (5th Cir. 2014) ............................................................. 6, 19

*Vote.Org v. Callanen*,
39 F.4th 297 (5th Cir. 2022) ................................................................. 19

*Vote.Org v. Callanen*,
89 F.4th 459 (5th Cir. 2023) ................................................................. 11

*Yates v. Collier*,
868 F.3d 354 (5th Cir. 2017) ................................................................. 13

*Young Conservatives of Tex. Found. v. Smatresk*,
73 F.4th 304 (5th Cir. 2023) ................................................................. 11

*Zimmerman v. City of Austin*,
881 F.3d 378 (5th Cir. 2018) ............................................................. 8, 9

**Statutes**

52 U.S.C. § 10508 .................................................................................. 10, 12, 14

An Act Relating to Election Integrity and Security, 87th Leg., 2d C.S., ch. 1,
    2021 Tex. Gen. Laws 3873 ................................................................. 1, 17

Minn. Stat. § 204C.15 (2023) ............................................................... 17

Tex. Elec Code
    § 276.015 .......................................................................................... 2

    § 64.034 ............................................................................................ 2

    § 86.010(e) ........................................................................................ 1

    § 86.0105 .......................................................................................... 2

    § 86.013(b) ........................................................................................ 2

    § 64.0322(a) ...................................................................................... 1

    § 64.036(a)(1) ................................................................................... 16

    § 64.036(a)(4) ................................................................................... 16

    § 64.037 ............................................................................................ 16

    § 86.004(b) ........................................................................................ 5

Tex. Penal Code § 37.02 ....................................................................... 2, 9

**Rules**

Fed. R. Civ. P. 62(d) ............................................................................. 3

**Other Authorities**

S. Rep. No. 97-417 (1982) .................................................................... 12, 13, 15, 18

Defendants Greg Abbott, in his official capacity as Texas Governor; Warren "Ken" Paxton, in his official capacity as Attorney General of Texas; Jane Nelson, in her official capacity as Secretary of State; the State of Texas; and Intervenor-Defendants (collectively "Defendants") file this Opposed Motion to Stay the Court's Findings of Fact and Conclusions of Law on Plaintiffs' challenges under Section 208 of the Voting Rights Act ("VRA"). Alternatively, should the Court deny Defendants' Motion to Stay, Defendants seek a seven-day administrative stay to allow Defendants to seek relief from the Fifth Circuit.

A stay is warranted for several reasons. *First*, *Purcell* prohibits the Court's injunctions against enforcement of sections 6.04, 6.05, 6.06, 6.07, and 7.04. *Second*, Plaintiffs lack standing to challenge sections 6.03, 6.04, 6.05, and 6.07. *Third*, the Court erred in holding Section 208 preempts reasonable regulations of voter assistance. *Finally*, the equities heavily favor a stay.

BACKGROUND

In September 2021, Governor Greg Abbott signed into law the Election Protection and Integrity Act of 2021, an omnibus election law commonly referred to as S.B. 1. *See* An Act Relating to Election Integrity and Security, 87th Leg., 2d C.S., ch. 1, 2021 Tex. Gen. Laws 3873. Multiple lawsuits soon followed, which were ultimately consolidated into the present action.

Plaintiffs challenged various provisions of S.B. 1 under Section 208 of the VRA. *First*, they challenged several S.B. 1 provisions requiring assistors to provide information. Section 6.03 requires assistors (other than election officers) to "complete a form stating: (1) the name and address of the person assisting the voter; (2) the relationship to the voter of the person assisting the voter; and (3) whether the person assisting the voter received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee." Tex. Elec. Code § 64.0322(a). Section 6.05 requires those providing assistance to individuals voting by mail to disclose their relationship with the voter and whether they received compensation from a political entity. Tex. Elec Code § 86.010(e). Section 6.07 amends the disclosures on the mail-ballot

carrier envelopes so that assistors can provide the information required by section 6.05. Tex. Elec Code § 86.013(b).

*Second*, Plaintiffs challenged section 6.04, which, as relevant to this motion, adds two mandatory representations to the voter assistance oath.[1] Assistors must state that (1) the assisted voter represented they were eligible for assistance and (2) they did not "pressure or coerce the voter into choosing [them] to provide assistance." Tex. Elec Code § 64.034. Section 6.04 also informs assistors that the oath is under penalty of perjury—something which has been true since 1974. *See* Tex. Penal Code § 37.02.

*Third*, Plaintiffs challenged section 6.06, which makes it a felony to compensate someone, offer to compensate someone, or solicit, receive, or accept compensation for assisting voters. Tex. Elec Code § 86.0105. The provision does not apply if the assistor is an "attendant" or "caregiver" previously known to the voter. *Id.*

*Fourth*, Plaintiffs challenged section 7.04's prohibition on vote harvesting, which is defined as "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." Tex. Elec Code § 276.015. To be guilty, an individual must have knowledge as to each element. *Id.*

After a bench trial, the Court enjoined enforcement of each of the foregoing challenged provisions. It stayed its injunction against all defendants with respect to section 6.03, and against the Secretary of State and the county election officials regarding sections 6.04, 6.05, and 6.07. ECF No. 1173 at 106–111. The Court, however, immediately enjoined enforcement proceedings under sections 6.04, 6.05, 6.06, and 7.04. *Id.* The Court issued its opinion on October 11, 2024—weeks after ballots were sent out and in the middle of the ongoing 2024 General Election.

---

[1] A different court already enjoined enforcement of part of the oath. *OCA Greater Houston v. Texas*, No. 1:15-cv-679, 2022 WL 2019295, at *1 (W.D. Tex. June 6, 2022). This Court also rejected Plaintiffs' challenge to the part requiring assistors to represent that they will not "communicate information about how the voter has voted to another person." ECF No. 1173 at 107.

## ARGUMENT

The Court can and should stay its injunctions pending appeal. Fed. R. Civ. P. 62(d). A four-factor test governs the Court's consideration of a motion for a stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009). The movant "need only present a substantial case on the merits when a serious legal question is involved and show that the balance of equities weighs heavily in favor of granting the stay." *United States v. Baylor Univ. Med. Ctr.*, 711 F.2d 38, 39 (5th Cir. 1983) (per curiam) (cleaned up). Defendants easily satisfy this standard—for several reasons.

## I. *Purcell* Bars this Court's Injunctions Against Sections 6.04, 6.05, 6.06, 6.07 and 7.04.

Today, the Fifth Circuit granted a stay pending the appeal of this Court's previous Findings of Fact and Conclusions of Law regarding certain challenges to S.B. 1 Section 7.04 (at ECF No. 1157). Order Granting Stay, Dkt. 112-1, *LUPE v. Abbott*, No. 24-50783 (5th Cir. Oct. 15, 2024). There, a unanimous panel concluded *Purcell* forecloses this Court's efforts to enjoin three-year-old voting laws just weeks before the 2024 presidential election. *Id.* at 3, 7.

The Fifth Circuit rejected this Court's attempt to limit *Purcell* to the "mechanics and procedures of the act of voting," describing it as unsupported and contrary to established law. *Id.* at 4. The Fifth Circuit further held that "S.B. 1 does regulate the mechanics of voting," because Section 7.04 protects the privacy of mail voting. So too here. *First*, Section 7.04 is at issue in the Court's latest opinion, just as it was in the previous, and exerts an equal impact on the privacy of mail voting. *Second*, the additional provisions subject to the Court's latest injunction all protect the integrity of ballots cast by voters in need of assistance. The only time such assistance is necessary is *during voting*—which starts in six days on October 21, 2024.

Finally, the Fifth Circuit noted that because neither the Attorney General nor the Secretary of State enforces S.B. 1, "the practical effect" of this Court's previous injunction was "to prevent

3

enforcement of S.B. 1, but only in certain counties in Texas." *Id.* at 5 (citing *Richardson v. Flores*, 28 F.4th 649, 654 (5th Cir. 2022); *Ostrewich v. Tatum*, 72 F.4th 94, 101 (5th Cir. 2023); and *Mi Familia Vota v. Ogg*, 105 F.4th 313, 332 (5th Cir. 2024) (additional citations omitted)). The confusion arising from the uneven application of S.B. 1 under the Court's previous injunction is compounded by the Court's latest injunction. The Court has again issued an injunction that will only apply to certain counties, but this injunction covers several election regulations instead of just one, and stays parts of the multifarious injunction but not others. Whether to stay an injunction of election regulations under *Purcell* requires weighing "considerations specific to election cases." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). "Chief amongst those considerations is the potential for an injunction issued close to an election 'to confuse voters, unduly burden election administrators, or otherwise sow chaos or distrust in the electoral process.'" *LUPE*, No. 24-50783, Dkt. 112-1 at 4 (citing *Robinson v. Ardoin*, 37 F.4th 208, 228 (5th Cir. 2022)). An eve-of-the-election injunction against multiple election regulations that can only apply during voting, and that may or may not apply to a voter depending on time or place, is precisely the "chaos" *Purcell* forbids.

This Court misapplied the *Purcell* principle by limiting its scope to "mechanics and procedures of the act of voting." ECF No. 1173 at 100. Not only has the Fifth Circuit now explicitly rejected that approach, but the Supreme Court has never articulated—much less adopted—such a narrow conception of *Purcell*. *Merrill v. Milligan*, 142 S. Ct. 879, 880–81 (2022) (Kavanaugh, J., concurring) ("When an election is close at hand, the rules of the road must be clear and settled."). After all, when courts change election rules close to an election, it creates the perception that judges are trying to influence election results. *See Purcell*, 549 U.S. at 4–5 ("Court orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls."); *DNC v. Wisc. State Leg.*, 141 S. Ct. 28, 30 (2020) ("Last-minute change . . . invit[e] confusion and chaos and erod[e] public confidence in electoral outcomes.").

This Court failed to adhere to that rule here. Trial in this case concluded nearly a year ago, and closing arguments were presented eight months ago. Yet the Court waited until after ballots were mailed to issue its opinion, thus compounding confusion and creating a logistical nightmare

for election officials. *See* Tex. Elec. Code § 86.004(b) (ballots in circulation 45 days before November 5). To change *five* election rules and to proscribe their enforcement amidst voting "result[s] in voter confusion," undermines confidence in the integrity of Texas's elections, and creates an "incentive to remain away from the polls." *Purcell*, 549 U.S. 1 at 4–5. That risk is even greater here, as multiple Plaintiff Organizations have claimed they are training Texans about the enjoined provisions, *see, e.g.*, Tr. 1620:2–6, 1628:2–15, Tr. 1723:14–19 (Sept. 21, 2024), but now do not have the time to communicate the Court's changes given the immediacy of the election.

Moreover, as the Fifth Circuit observed concerning Section 7.04, the newly-enjoined S.B. 1 provisions *do* directly impact election procedures. Section 6.03's form requirement, 6.04's revised voter assistance oath, and section 6.06's limit on compensated voter assistance regulate assistance and protect voters *during voting*. The form requirements of sections 6.05 and 6.07 perform the same function during mail voting. Section 7.04 does not apply to ordinary voter assistance at all. But it does regulate in-person interactions with voters in the presence of ballots, prohibiting paid canvassers from attempting to influence votes when a ballot is physically present. All of these rules are procedural safeguards that govern interactions during the voting process itself and safeguard the integrity of elections.

The Court's attempt to carve out from *Purcell*'s domain enforcement of the challenged provisions—by criminal investigations or civil actions to compel compliance by election officials—fails. ECF No. 1173 at 105-06, 108. Neither the Supreme Court nor the Fifth Circuit has ever adopted such a carve-out. In fact, just a few months ago, the Supreme Court stayed an injunction against an Arizona election rule backed up by criminal penalties. *See Republican Nat'l Comm. v. Mi Familia Vota*, No. 24A164, 2024 WL 3893996, at *1 (Aug. 22, 2024) (permitting enforcement of Ariz. Rev. Stat. Ann. § 16-121.01(C)). The Court's immediate prohibition of civil actions to compel election officials to comply with the enjoined provisions is also barred by *Purcell*. After all, enjoining *enforcement* of a challenged rule is functionally equivalent to enjoining *application* of the rule: Thus, even an injunction against enforcement of the challenged rule violates *Purcell* because it "den[ies] the public interest in *enforcement* of the [State's] laws." *Veasey v. Perry*, 769 F.3d 890, 895 (5th Cir.

2014) (emphasis added); *see also Veasey v. Perry*, 574 U.S. 951 (Oct. 14, 2018) (Ginsburg, J., dissenting) (dissenting from majority's upholding of Fifth Circuit stay "of the District Court's final judgment enjoining the *enforcement* of Senate Bill 14") (emphasis added).

Here as well, the Court's injunction against enforcement of sections 6.04, 6.05, 6.06, 6.07, and 7.04 will leave individuals free to violate those provisions with impunity, thus wrecking the protections the Texas Legislature judged essential to safeguard voter integrity during the 2024 Elections. The Court recognized this point, but answered it by doubling down on the merits. *See* ECF No. 1173 at 106. *Purcell* prohibits precisely that move because it applies *regardless* of the Court's view of the merits. *See Reynolds v. Sims*, 377 U.S. 533, 585 (1964) (approving stay pending appeal "where an impending election [was] imminent" even though Supreme Court agreed challenged rule was unlawful); *Purcell*, 549 U.S. at 4-5; *see also Veasey*, 769 F.3d at 895 (explaining that the Supreme Court and courts of appeals have granted *Purcell* stays in decisions that "have both upheld and struck down state statutes and affirmed and reversed district court decisions, so the timing of the decisions rather than their merits seems to be the key"). The Court should stay its order in full pending appeal.

## II. Defendants Are Likely to Succeed on the Merits.

Defendants are also likely to succeed on the merits. To start, Plaintiffs clearly lack standing to challenge sections 6.03, 6.04, 6.05, and 6.07. Plaintiffs' Section 208 claims are also meritless because Section 208 preserves States' prerogative to adopt reasonable regulations of voter assistance to protect voters, which is all S.B. 1 does.[2]

### A. Plaintiffs lack standing.

Plaintiffs lack standing to challenge several of the provisions enjoined by the Court.

---

[2] Defendants preserve two additional merits arguments. *First*, the State Defendants have sovereign immunity because Congress did not clearly abrogate it in Section 208. *See* ECF No. 862 at 29-30. The Fifth Circuit erred in rejecting that argument in *OCA Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017). *Second*, Plaintiffs lack a private right of action to sue under Section 208. ECF No. 862 at 165; *but see Robinson v. Ardoin*, 86 F.4th 574, 587-88 (5th Cir. 2023) (holding that Section 2 of the VRA confers a private right of action).

*First*, as noted by the Fifth Circuit, neither the Secretary of State nor the Attorney General enforce S.B. 1. *LUPE*, No. 24-50783, Dkt. 112-1 at 5. This non-enforcement demonstrates that the Secretary of State and Attorney General have sovereign immunity to Plaintiffs' claims. *See Osterwich v. Tatum*, 72 F.4th 94, 101 (5th Cir. 2023). This non-enforcement also demonstrates that Plaintiffs can show neither traceability nor redressability under the traditional standing analysis. *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019) (acknowledging "significant overlap between the *Ex parte Young* analysis and Article III standing); *California v. Texas*, 593 U.S. 659, 669–70 (2021) (where standing is premised on enforcement authority, Plaintiffs cannot show traceability absent an injury resulting from the defendant's actual or threatened *enforcement*") (emphasis original).

*Second*, all Plaintiffs lack standing to challenge sections 6.03, 6.05, and 6.07. These provisions merely require would-be assistors to provide a few pieces of information on a form. The obligation to provide such information is not a cognizable injury because it has no "close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2021) (cleaned up). Although violations of constitutional rights can satisfy *TransUnion*, *see id.* at 424–25, the obligation of an assistor to provide a few pieces of information on a form obviously does not violate any right to vote. *See, e.g.*, *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198 (2008) (explaining that "usual burdens of voting" do not impose constitutional injury).

The Court did not rely on individual or associational standing, but held instead that Delta Sigma Theta ("Delta") and the LUPE Plaintiffs have organizational standing to challenge these provisions. ECF No. 1173 at 71–73. That is multiply erroneous. Most obviously, neither Delta nor the LUPE Plaintiffs actually *challenged* section 6.07; only HAUL and the Arc of Texas ("Arc") challenged that section. *See id.* at 67 ("Section 6.07 is challenged only by the HAUL Plaintiffs."); ECF No. 862 at 51-61, 64–77 (documenting claims of these litigants). And the Court did not analyze the standing of HAUL or Arc to challenge section 6.07, so the Court should (at minimum) stay its ruling as to section 6.07.

7

The Court's standing analysis is also incorrect with respect to the supposed organizational injuries caused by sections 6.03 and 6.05. The Court claimed that these disclosure requirements caused a decreased willingness of people to provide assistance, ECF No. 1173 at 71–72, but that assertion does not hold. The trial evidence cited by the Court deals almost entirely with supposed fears of perjury charges traceable to the voter assistance oath. *Id.* Not a single witness said the form requirements alone would prevent them from providing voter assistance; nor could they, because such a claim would be incredible. Any such claim depends on the premise that potential assistors will not fill out the forms (and thus not provide assistance) because of a fear of prosecution. But Plaintiffs' fear of prosecution is *far too speculative* to confer standing. *See, e.g.*, *Tex. State LULAC v. Elfant*, 52 F.4th 248, 256–57 (5th Cir. 2022). Crediting a fear of prosecution—which would render the refusal of assistors to fill out the forms actually traceable to sections 6.03, 6.05, and 6.07—requires finding that (1) a potential assistor would violate the voter assistance laws, (2) someone would discover the violation and report the violation to a prosecutor, and (3) that the prosecutor would exercise his discretion to bring charges. *Cf. id.* Not a single witness testified they will do anything arguably prohibited by the voter assistance laws, and crediting a fear of prosecution is impermissibly "depend[ent] . . . on the actions of third-part[ies]." *Zimmerman v. City of Austin*, 881 F.3d 378, 390 (5th Cir. 2018).

The Court also suggested Plaintiffs have suffered an organizational injury because form requirements result in delays in providing voting assistance. ECF No. 1173 at 71-72. The Court, however, did not say *what kind of delays*, and no witness quantified the delays attributable to the disclosure requirements. Moreover, common sense suggests any delays would be *de minimis*. It does not take long to write one's name and relationship to the voter on a paper and check a box about whether one received compensation. Such *de minimis* delays have no "close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 417 (cleaned up).

*Third*, Plaintiffs lack standing to challenge section 6.04's revisions to the voter-assistance oath. The Court found standing on the premises that (1) the revisions will cause fears of

prosecution and (2) those fears will cause individuals to refuse to provide voter assistance to Arc members or cause Arc members to refuse assistance to avoid exposing assistors to criminal liability. ECF No. 1173 at 67-71. But the first premise fails as a matter of law. Fears of prosecution under section 6.04 are far too "speculative" to confer standing. *Tex. State LULAC*, 52 F.4th at 256-57. No Plaintiff has alleged any intent to engage in conduct "arguably proscribed" by this provision. *Id.* at 256. For example, there is no testimony that any Plaintiff or would-be assistor intends to pressure someone to accept voter assistance in violation of section 6.04, so no prosecution for violating the oath could occur. Even if a Plaintiff did violate the oath, several more unlikely things would need to happen for anyone to be prosecuted: (1) someone would discover that violation, (2) someone would report the violation to a prosecutor, and (3) the prosecutor would have to exercise discretion to bring charges. *Cf. id.* at 256-57. Any fear of prosecution is under section 6.04 is far too "speculative" and "depend[ent] . . . on the actions of third-part[ies]" to confer standing. *Zimmerman*, 881 F.3d at 390.

Moreover, any fear of perjury charges by Plaintiffs and assistors is not *caused* by section 6.04 because the voter-assistance oath has been subject to penalty of perjury since 1974. *See* Tex. Penal Code § 37.02. Section 6.04 merely tells the public what was already true under Texas law. Plaintiffs therefore lack standing to challenge section 6.04.[3]

**B. Plaintiffs are unlikely to succeed on the merits of their Section 208 claims.**

Defendants are also likely to succeed on appeal because the Court's analysis of the merits is erroneous as a matter of law. Under the Court's reading, Section 208 allows voters who require assistance to choose *any* person, under *any* conditions, to be their assistor. ECF No. 1173 at 78, 91. That interpretation would result in Section 208 effectively preempting all state regulations of voter assistance.

---

[3] Defendants also maintain, and preserve their position, that Plaintiffs lack standing to challenge sections 6.06 and 7.04.

Section 208, however, does not sweep nearly so broadly. To the contrary, Section 208 allows States to enact reasonable regulations of voter assistance, and all enjoined provisions satisfy any applicable standard.

      1.  **Section 208 permits reasonable state regulations of voter assistance.**

Section 208 provides:
"Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union."

52 U.S.C. § 10508.

The "proper starting point" for this Court "lies in a careful examination of the ordinary meaning and structure of the law itself." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019). And here, Congress said that a voter who requires assistance may be given assistance by "*a* person of the voter's choice," 52 U.S.C. § 10508 (emphasis added)—not *the* or *any* person of the voter's choice.

That distinction is critical and intentional. In the very same sentence, Congress stipulated that "*any* voter who requires assistance" has a right under Section 208. Congress could have also said "*any* person of the voter's choice," but it declined to do so. *Cf. VanDerStok v. Garland,* 86 F.4th 179, 203 n.5 (5th Cir. 2023) (noting that "textual distinction" was "particularly powerful" because Congress knew how to use another term when it wanted). Thus, Section 208 "does not say that a voter is entitled to assistance from *the* person of his or her choice or *any* person of his or her choice," and thus allows for reasonable "state law limitations on the identity of persons who may assist voters." *Priorities USA v. Nessel*, 487 F. Supp. 3d 599, 619 (E.D. Mich. 2020).

Congress's decision makes sense. Consider what it would mean if any voter in need of assistance could receive assistance from *any* person of the voter's choice. Texas would not be able to ban convicted felons from providing voter assistance because a voter in need of assistance may well choose such a person to be her assistor. And, if the voter makes that choice, Texas would presumably have to make that person available—even if he were incarcerated and serving a life

sentence—because otherwise it would be impeding a voter from receiving assistance from *any* "person of the voter's choice." The absurdities from reading language into the statute which Congress purposefully omitted are endless. That is not "common sense," ECF No. 1173 at 79, but a clear sign the Court's sweeping interpretation of Section 208 as conferring on those needing assistance a right to be assisted by *any* person they choose, *id.* at 78, 91, is incorrect.

Moreover, to the extent Section 208 is unclear or ambiguous, it must be interpreted *not* to preempt state law. Courts "start with the assumption that the historic police powers of the States were not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947); *Young Conservatives of Tex. Found. v. Smatresk*, 73 F.4th 304, 313 (5th Cir. 2023). This presumption "applies with particular force when Congress legislates in a field traditionally occupied by state law." *See Teltech Sys. v. Bryant*, 702 F.3d 232, 236 (5th Cir. 2012) (internal quotation marks omitted). That is the case here, where regulation of state and federal elections is a heartland duty of the state legislature. *See Storer v. Brown*, 415 U.S. 724, 730 (1974); *see also Teltech Sys.*, 702 F.3d at 236 (applying presumption even in an area of "significant federal presence" because it was also a traditional area of State regulation).

From Section 208's plain text and the presumption against preemption, it follows that States retain authority to adopt reasonable regulations of voter assistance. The relevant question is whether voters retain a real choice in who helps them navigate the electoral process. *See Ray v. Texas*, No. CIV.A.2-06-CV-385TJW, 2008 WL 3457021, at *7 (E.D. Tex. Aug. 7, 2008) (upholding Texas statute that made it a criminal offense if a person signed multiple mail-ballot applications as a witness); *Democracy N. C. v. N. C. State Bd. of Elections*, 476 F. Supp. 3d 158, 233–36 (M.D.N.C. 2020) (enjoining a statute that limited assistance to a voter's near relative or legal guardian when requesting an absentee ballot.). In conducting this inquiry, courts must respect the "State's considerably authority to set its electoral rules and the considerable deference to be given to election procedures so long as they do not constitute invidious discrimination." *Vote.Org v. Callanen*, 89 F.4th 459, 481 (5th Cir. 2023).

The Court's contrary reasoning fails. *First*, the Court suggested that, because Section 208 specifies that "a person of the voter's choice" *cannot* include "the voter's employer or agent of that employer or officer or agent of the voter's union," 52 U.S.C. § 10508, those are the *only* limitations on the voter's ability to choose whoever she wishes to assist her. ECF No. 1173 at 77–78. But that language merely provides a *cap* on the Section 208 right. It does not purport to provide a floor that prohibits all State regulation at all—let alone in a "clear and manifest" manner. *Rice*, 331 U.S. at 230.

*Second*, the Court believed *OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017), already decided that Section 208 bans regulations on voter assistance. ECF No. 1173 at 78, 81-83. But that case "at bottom" concerned "how broadly to read the term 'to vote' in Section 208," *OCA-Greater Houston*, 867 F.3d at 614, not whether "a person of the voter's choice" means "*any* person of the voter's choice." Thus, the portion of that opinion briefly mentioning a voter's "right to choose any person they want" for assistance invoked by this Court is dictum.

*Third*, the Court suggested Defendants' proposed test would "eviscerate Section 208." ECF No. 1173 at 83. The Court even suggested Defendants believe that the State could limit individuals from choosing between two potential assistors. That is obviously not what Defendants believe, and no challenged provision does anything close to that. Defendants *agree* with other cases adopting and enforcing a more reasonable construction of Section 208. *See, e.g.*, *Democracy N. C.*, 476 F. Supp. 3d at 233–36.

*Fourth*, the Court relied on cherry-picked legislative history. ECF No. 1173 at 77–78. To start, the statute unambiguously does not preempt reasonable state regulations, rendering reliance on legislative history unnecessary. *Salazar v. Mamon*, 750 F.3d 514, 518 (5th Cir. 2014). In all events, the legislative history *disproves* the Court's thesis. Even in the language the Court identified, Congress was clear that voters must be allowed assistance only "from *a* person of their own choosing." S. REP. No. 97-417, at 2 (1982) (emphasis added). Moreover, the Senate Judiciary Committee emphasized that Section 208 preempts state election laws "only to the extent that they *unduly* burden the right recognized in [Section 208], with that determination being a practical one

dependent upon the facts." *Id.* at 63 (emphasis added). In fact, that committee acknowledged that voters who need assistance "are more susceptible than the ordinary voter to having their vote unduly influenced or manipulated." *Id.* Thus, the committee recognized that Section 208 did not interfere with "the legitimate right of any State to establish necessary election procedures" so long as they are "designed to protect the rights of voters." *Id.* at 63.

The Senate Judiciary Committee Report confirms what Section 208's plain text makes clear: Congress did not ban States from adopting reasonable regulations of voter assistance. And it certainly did not do so in a "clear and manifest" manner. *Rice*, 331 U.S. at 230. If Congress had wanted to ban States from regulating voting assistance entirely, it would have said so expressly; it would not have sought "to effect such a fundamental change in law through circuitous means." *Yates v. Collier*, 868 F.3d 354, 369 (5th Cir. 2017). The Court's contrary holding was error, and it infected the Court's entire preemption analysis.

### 2.  Properly Understood, Section 208 Does Not Preempt S.B. 1.

When properly construed, Section 208 does not preempt sections 6.03, 6.04, 6.05, 6.06, 6.07, and 7.04. The Court erred in holding otherwise.

#### a.  S.B. 1 §§ 6.03, 6.05, and 6.07.

The Court held that Section 208 preempts the assistor disclosures required by sections 6.03, 6.05, and 6.07 because "[t]he requirements that assistors complete an additional form disclosing duplicative information at the polls and disclosed their relationships with the voters they assist have deterred voters from requesting assistance and narrowed the universe of willing assistors." ECF No. 1173 at 91. Thus, the Court concluded those requirements "interfere[] with and frustrate[] the substantive right Congress created under Section 208." *Id.* (cleaned up).

There is, however, no direct conflict between S.B. 1's disclosure requirements and Section 208. The disclosure requirements do not limit the scope of assistance voters may receive; once the assistor satisfies the procedural prerequisites of sections 6.03 and 6.05, the assistor may perform any action necessary to make a vote effective. And section 6.07—far from limiting the action of any

potential assistor—merely requires the creation of a space on the carrier envelope for information to be provided.

Thus, under S.B. 1, a voter who requires assistance "may be given assistance by a person of the voter's choice." 52 U.S.C. § 10508. That person must simply disclose his relationship to the voter and whether he received compensation for his assistance. And S.B. 1 is not brought into conflict with Section 208 merely because an assistor might refuse to comply with § 6.03 or § 6.05. If anything, Section 208 acknowledges that the person the voter selects may refuse to provide assistance. 52 U.S.C. § 10508 (stating the voter "*may* be given assistance by *a person* of the voter's choice" (emphasis added)). An assistor's refusal to aid a voter because of S.B. 1 is no more in conflict with Section 208 than an assistor's refusal to aid a voter because delivering a ballot to the election office or waiting in line is too inconvenient for the would-be assistor.

Neither do S.B. 1's disclosure requirements "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Aldridge v. Miss. Dep't of Corr.*, 990 F.3d 868, 875 (5th Cir. 2021) (citation omitted). "For a state law to be conflict preempted, a high threshold must be met." *Barrosse v. Huntington Ingalls, Inc.*, 70 F.4th 315, 320 (5th Cir. 2023) (internal quotation marks omitted). "Courts may not conduct a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives," because such an inquiry "would undercut the principle that it is Congress rather than the courts that preempts state law." *Id.* (internal quotation marks omitted).

S.B. 1's disclosure requirements fall far below that threshold. Indeed, rather than impede federal policy, those requirements help *enforce* it by having assistors articulate their relationship to the voter, which lets county election officials flag violations of both state *and* federal law. As all agree, federal law precludes the "voter's employer or agent of that employer or officer of agent of the voter's union" from the pool of potential assistors. 52 U.S.C. § 10508. Requiring assistors to provide information about themselves and their relationship to the voter helps ensure prohibited parties are not providing assistance. Nor does the Court's suggestion that the disclosure requirements are redundant because assistors must already swear or affirm that they are not

14

prohibited from aiding the voter change things. ECF No. 1173 at 92. There is no reason the Texas Legislature needs to trust the assistors' unelaborated assurances they are eligible; the information required by sections 6.03 and 6.05 helps the State ensure compliance with federal law and verify that voters are not taken advantage of, which was Congress's policy in enacting Section 208 in the first place. *See* S. REP. No. 97-417, at 240 (1982) (Section 208 was enacted "to avoid possible intimidation or manipulation of the voter"). Section 208 does not preclude a policy of "trust but verify."

Regardless, the supposed burden of complying with S.B. 1's disclosure requirements is *de minimis*. All they require is that an individual who assists a voter provide basic information about themselves and the assistance they provided. Plaintiffs have not provided—and the District Court has not identified—any examples of voters who could not obtain assistance because their chosen assistors did not want to write down their name or whether they were compensated. Indeed, the corporate representatives of Delta and FIEL Houston testified that they were aware of no member who had refused to provide voter assistance because of the relevant requirements. *See* Oct. 2, 2023 Tr. at 2124:8–19, 2124:25–2125:7; Oct. 4, 2023 Tr. at 2465:5–7. And even if Plaintiffs could find isolated examples of individuals deterred from providing assistance because of S.B. 1's disclosure requirements, it cannot be that a State regulation's validity depends on a fishing expedition for people weary of following simple, commonsense rules.

Sections 6.03, 6.05, and 6.07 therefore do not pose an obstacle to Congress's objectives in Section 208 and are not preempted by it.

### b. **S.B. 1 § 6.04.**

The Court also held that Section 208 preempts section 6.04's additions to the Oath of Assistance. *First*, the Court said that section 6.04's clarification that the Oath is "under penalty of perjury" has "deterred assistors from providing qualified voters with assistance and deterred voters from requesting assistance," and has thus "frustrat[ed] Section 208's purpose." ECF No. 1173 at 87. *Second*, the Court held that the required affirmation that the voter "represented [that]

15

they are eligible to receive assistance" and the clarification that ballots voted with unauthorized assistance "may not be counted" are impermissible "additional eligibility requirement[s]." *Id.* at 87-89. *And third*, the addition that the assistor must affirm that he "did not pressure or coerce the voter into choosing [him] to provide assistance" is, according to the Court, preempted because it is too vague and thus chills assistors from aiding voters. *Id.* at 89-91.

Each conclusion is wrong. Again, it is not "impossible" to "comply[] with both federal law and state law." *Barrosse*, 70 F.4th at 320 (citation omitted). Far from it. A voter can be assisted by "a person of the voter's choice" under S.B. 1; all that the assistor must do is sign a simple declaration. If an assistor is too busy to aid a voter until Wednesday, that does not mean the state law setting the election for Tuesday conflicts with Section 208. Neither does S.B. 1 conflict with Section 208 merely because an assistor would prefer not to comply with a simple state rule.

And, just like the disclosure requirements, section 6.04 does not "frustrate" Section 208's purpose but, in fact, furthers it. The additions to the Oath of Assistance serve to implement already-existing obligations under state law, which were all designed to ensure that voters who need assistance are not manipulated or coerced and that voter assistance procedures are reserved for those who need it. Tex. Elec. Code § 64.036(a)(1), (4) (making it an offense to "provid[e] assistance to a voter who is not eligible for assistance" or "to a voter who has not requested assistance or selected the person to assist the voter"); § 64.037 (stipulating that "[i]f assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted"). And those policies align perfectly with Congress's various policies for enacting Section 208, which, as explained above, were to protect qualified voters who need assistance.

There is also no indication that section 6.04 is any obstacle at all to *anyone* seeking assistance to vote. Indeed, the lack of burden involved in signing the Oath is underscored by the fact that no Plaintiff challenged the pre-existing state laws which *already* made it an offense to provide assistance to ineligible voters and the like and to complete the Oath under penalty of perjury. The Court relied upon speculative concerns that the Oath might have a "chilling effect" on assistors. ECF No. 1173 at 90. But in the almost two years since S.B. 1 took effect, Plaintiffs

could not identify a single person who was prosecuted under section 6.04—let alone wrongly prosecuted. *See, e.g.*, Oct. 4, 2023 Tr. at 2467:16-19, 2496:14-2497:4.

The Court thus erred when it held that § 6.04 met the "high threshold" required before a state law is found to be conflict-preempted. *Barrosse*, 70 F.4th at 320.

### c.   S.B. 1 § 6.06 and § 7.04

The Court held that "[t]he prohibitions on compensated assistance" in sections 6.06 and § 7.04 "conflict with the text of Section 208" because "they facially restrict the class of people who are eligible to provide voting assistance beyond the categories of prohibited individuals identified in the text of the statute." ECF No. 1173 at 95.

Neither provision conflicts with Section 208.  Section 6.06 does not prevent *any* person in the universe from providing assistance; it merely requires that the assistor not accept compensation for providing assistance unless the assistor was previously known to the voter. As former Elections Division Director Keith Ingram confirmed at trial, this is not a demanding standard; it merely prevents *complete strangers* from seeking people out and providing voter assistance while being compensated *specifically* to provide voter assistance. *See* Sept. 22, 2023 Tr. at 1902:4–8. It does not prevent individuals from being reimbursed for their expenses, *id.* at 1903:10–1904:2, and it does not prevent individuals with paid jobs, such as canvassing, from assisting the voter in due course. *See*, *e.g.*, Oct. 16, 2023 Tr. at 3994:14–23.

For its part, section 7.04 does not apply to voter assistance at all. Merely providing voter assistance is not an act "designed to deliver votes for or against a specific candidate or measure" under section 7.04. S.B. 1 § 7.04. Political canvassers would cross the line only if they attempted to persuade the assisted individual to vote in a particular way—an action that is *not* part of voter assistance under Texas law or Section 208. Indeed, other states also prohibit such advocacy by those providing voter assistance. *See, e.g.*, Minn. Stat. § 204C.15 (2023). As is true of section 6.06, section 7.04 does not limit a single person in the universe from providing voter assistance; it merely

17

prevents would-be assistors paid by political entities from *simultaneously* urging support for candidates and measures while providing assistance.

Moreover, both sections 6.06 and 7.04 are precisely the type of reasonable state regulation of voter assistance that Congress intended to preserve in Section 208. *See Priorities USA*, 487 F. Supp. 3d at 619. Congress recognized that voters who need assistance "are more susceptible than the ordinary voter to having their vote unduly influenced or manipulated." S. REP. No. 97-417, at 62 (1982). To that end, both sections 6.06 and 7.04 are designed to protect voters from incentive structures that increase the likelihood of assistors applying pressure on the voter in pursuit of partisan or ideological ends. And the only burden the Court or Plaintiffs have identified is that some potential assistors might have an abstract or idiosyncratic fear that prosecutors will overzealously stretch the words of S.B. 1 beyond even their farthest limit. ECF No. 1173 at 95-98. Yet neither Plaintiffs nor the Court have identified a *single example* of a prosecution under either provision, and it is not appropriate to strike down state laws based on speculation that Texas's prosecutors and judges will enforce the challenged provisions unreasonably—all before a single state court has even had the chance to interpret these provisions. *See, e.g.*, *Burson v. Freeman*, 504 U.S. 191, 210 n.13 (1992).

Finally, Plaintiffs are unlikely to succeed in defending this Court's injunction against section 7.04 because it is overbroad. An injunction must be "narrowly tailored" to redress the injury of the relevant plaintiff. *Marshall v. Goodyear Tire & Rubber Co.*, 554 F.2d 730, 733 (5th Cir. 1978); *see also Milliken v. Bradley*, 418 U.S. 717, 744 (1974) (the "scope" of a federal-court "remedy is determined by the nature and extent of the … violation" it redresses). Here, the Court found that section 7.04 improperly prohibits compensated individuals from providing voter assistance. ECF No. 1173 at 95–98. Even if that holding is right, it does not justify enjoining all of section 7.04, which applies in *many* situations beyond voter assistants pushing people to support a candidate or measure. At minimum, the Court must narrowly tailor its injunction to only apply in that specific situation.

III.    **State Defendants and the Public Interest Will Be Irreparably Injured Absent a Stay, but Plaintiffs Will Not Be.**

Enjoining officials from carrying out validly enacted, constitutional laws governing elections imposes irreparable harm. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). "It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure.'" *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)). And it is one of the most fundamental obligations of the State to enact clear and uniform laws for voting to ensure "fair and honest" elections, to bring "order, rather than chaos, [to] the democratic process[]," and ultimately to allow the vote to be fully realized. *Storer*, 415 U.S. at 730. The Court's injunctions undermine those crucial interests.

The public interest is also undermined for the same reasons. After all, when a State is the moving or appealing party, "its interest and harm merge with the public." *Vote.Org v. Callanen*, 39 F.4th 297, 309 (5th Cir. 2022) (quoting *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam)). Moreover, as noted, the Court's injunctions "necessarily" impose "irreparable harm" on the State and the public by "denying the public interest in enforcement of" the State's laws. *Veasey*, 769 F.3d at 895.

At the same time, Plaintiffs will not be irreparably harmed absent a stay. In considering whether a plaintiff is irreparably harmed absence a stay, "the maintenance of the status quo is an important consideration." *E.T. v. Paxton*, 19 F.4th 760, 770 (5th Cir. 2021). Here, a stay would maintain the status quo that has existed in Texas since September 7, 2021, when S.B. 1 was signed into law. Several elections—including at least six primary, general, and constitutional amendment elections administered statewide—have successfully taken place under S.B. 1's rules. There is no reason to change the status quo until this litigation concludes in an orderly manner.

### CONCLUSION & RELIEF REQUESTED

For the foregoing reasons, the Fifth Circuit should have the opportunity to review this Court's decision before Texas's law is permanently enjoined and the State—and corresponding

public interest—is irreparably harmed. Given that the ongoing 2024 General Election has already commenced, Defendants respectfully request that the Court grant this motion by 5:00 p.m. CST on October 17, 2024.

Date: October 15, 2024

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Legal Strategy

RYAN D. WALTERS
Chief, Special Litigation Division

Respectfully submitted.

*/s/ Ryan G. Kercher*
RYAN G. KERCHER
Deputy Chief, Special Litigation Division
Tex. State Bar No. 24060998

KATHLEEN T. HUNKER
Special Counsel
Tex. State Bar No. 24118415

ZACHARY W. BERG
Special Counsel
Tex. State Bar No. 24107706

WILLIAM D. WASSDORF
Deputy Chief, General Litigation Division
Tex. State Bar No. 24103022

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel: (512) 463-2100
ryan.kercher@oag.texas.gov
kathleen.hunker@oag.texas.gov
zachary.berg@oag.texas.gov
will.wassdorf@oag.texas.gov

**COUNSEL FOR STATE DEFENDANTS**

JOHN M. GORE
E. STEWART CROSLAND
LOUIS J. CAPOZZI, III
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
jmgore@jonesday.com
scrosland@jonesday.com
lcapozzi@jonesday.com

**COUNSEL FOR INTERVENOR-DEFENDANTS**

### CERTIFICATE OF CONFERENCE

I certify that State Defendants reached out to counsel via email on October 14, 2024. Counsel for OCA Plaintiffs, LUPE Plaintiffs, HAUL Plaintiffs, MFV Plaintiffs, and LULAC Plaintiffs indicated that they were opposed to this motion; counsel for the United States, El Paso County, and Dallas County Defendants indicated that their clients take no position on the motion. Counsel for Intervenor-Defendants consent to the motion. Counsel for the remaining parties, have not yet responded as to whether they oppose this motion.

*/s/ Ryan G. Kercher*
RYAN G. KERCHER

### CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on October 15, 2024, and that all counsel of record were served by CM/ECF.

*/s/ Ryan G. Kercher*
RYAN G. KERCHER

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

## ORDER GRANTING STATE DEFENDANTS' AND INTERVENOR-DEFENDANTS' MOTION FOR STAY PENDING APPEAL OR, IN THE ALTERNATIVE, FOR ADMINISTRATIVE STAY PENDING APPEAL AND REQUEST FOR EXPEDITED CONSIDERATION

On this day, the Court considered State Defendants and Intervenor-Defendants' Opposed Motion for Stay Pending Appeal, or in the Alternative for Administrative Stay Pending Appeal, and Request for Expedited Consideration. After due consideration of the motion, and all other relevant briefing, the Court finds said motion meritorious.

IT IS HEREBY ORDERED that Defendants' Opposed Motion for Stay Pending Appeal, or in the Alternative, for Administrative Stay Pending Appeal, and Request for Expedited Consideration is GRANTED.

IT IS FURTHER ORDERED that the injunction issued on October 11, 2024, is stayed while case is on appeal.

SIGNED ON _____, 2024.


_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

APPENDIX C

```
 1                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE WESTERN DISTRICT OF TEXAS
 2                       SAN ANTONIO DIVISION

 3
     LA UNION DEL PUEBLO ENTERO,        .
 4   ET AL,                             .
                                        .
 5            PLAINTIFFS,               .
          vs.                           . DOCKET NO. 5:21-CV-844-XR
 6                                      .
     GREGORY W. ABBOTT, ET AL,          .
 7                                      .
              DEFENDANTS.               .
 8

 9

10                  TRANSCRIPT OF BENCH TRIAL
            BEFORE THE HONORABLE XAVIER RODRIGUEZ
11                UNITED STATES DISTRICT JUDGE
                      SEPTEMBER 22, 2023
12

13

14

15

16   APPEARANCES:
     FOR THE PLAINTIFFS:      NINA PERALES, ESQUIRE
17                            FATIMA MENENDEZ, ESQUIRE
                              JULIA LONGORIA, ESQUIRE
18                            MALDEF
                              110 BROADWAY
19                            SUITE 300
                              SAN ANTONIO TX 78205
20

21                            LEAH TULIN, ESQUIRE
                              BRENNAN CENTER FOR JUSTICE AT NY
22                             US SCHOOL OF LAW
                              1140 CONNECTICUT AVENUE NW
23                            SUITE 1150
                              WASHINGTON DC 20036
24

25
```

1752

```
 1
 2                        AMIR BADAT, ESQUIRE
                         NAACP LEGAL DEFENSE & EDUCATIONAL
 3                       FUND INC
                         40 RECTOR STREET, FIFTH FLOOR
 4                       NEW YORK NY 10006
 5
 6
 7
 8                       CHRISTOPHER DOOLEY DODGE, ESQUIRE
                         DANIELA LORENZO, ESQUIRE
 9                       UZOMA N. NKWONTA, ESQUIRE
                         MARCOS MOCINE-MCQUEEN, ESQUIRE
10                       ELIAS LAW GROUP LLP
                         250 MASSACHUSETTS AVENUE NW
11                       SUITE 400
                         WASHINGTON DC 20001
12
13
14
15
16
17  FOR THE DEFENDANTS:  RYAN G. KERCHER, ESQUIRE
                         KATHLEEN HUNKER, ESQUIRE
18                       WILLIAM WASSDORF, ESQUIRE
                         MONROE DAVID BRYANT, JR., ESQUIRE
19                       ETHAN QUINN SZUMANSKI, ESQUIRE
                         ZACHARY BERG, ESQUIRE
20                       TEXAS ATTORNEY GENERAL
                         P.O. BOX 12548
21                       MC 009
                         AUSTIN TX 78711
22
23                       LOUIS J. CAPOZZI, III, ESQUIRE
                         JONES DAY
24                       51 LOUISIANA AVENUE NW
                         WASHINGTON DC 20001
25
```

23-50885.39375

```
 1
 2
 3                          CORY REN LIU, ESQUIRE
                            BUTLER SNOW LLP
 4                          1400 LAVACA STREET
                            SUITE 1000
 5                          AUSTIN TX 78701
 6
 7
 8
 9
10
11
12
13
14
15   REPORTED BY:           GIGI SIMCOX, RMR, CRR
                            OFFICIAL COURT REPORTER
16                          UNITED STATES DISTRICT COURT
                            SAN ANTONIO, TEXAS
17
18
19
20
21
22
23
24
25
```

Case 5:24-50826-D Document 26 Page Filed 02/07/24 Filed 10/18/2024
Case 5:21-cv-00844-XR Document 915 Filed 10/18/2024 Page 150 of 518

Keith Ingram – Examination                                    1865

```
 1        (12:59 p.m.)

 2        COURT SECURITY OFFICER:  All rise.

 3        THE COURT:  Thank you.  Please be seated.

 4        MR. KANTERMAN:  Thank you, Your Honor.  Jason

 5   Kanterman from Fried, Frank, Harris, Shriver & Jacobson on

 6   behalf of the LUPE plaintiffs.  And Your Honor, we're going to

 7   call Keith Ingram to the stand.

 8        COURTROOM DEPUTY CLERK:  Raise your right hand.

 9                          *  *  *

10        (Oath administered and, KEITH INGRAM, witness, Sworn.)

11                          *  *  *

12        MR. KANTERMAN:  Your Honor, before we begin the

13   examination, for the record, the LUPE plaintiffs will elicit

14   testimony from Mr. Ingram in support of all of their claims

15   across all of the sections that have been challenged in this

16   case.

17        THE COURT:  Thank you.

18        MR. KANTERMAN:  And Your Honor, as the Court will

19   hear, Mr. Ingram was formerly employed by the Secretary of

20   State's Office, previously served in the Elections Division,

21   and testified on numerous occasions in this case as the

22   30(b)(6) witness; so therefore, pursuant to Federal Rule of

23   Evidence 611(c)(2), I'd request leave to ask leading questions

24   of Mr. Ingram, because he's a witness identified with an

25   adverse party.
```

```
 1              MR. KERCHER:  No objection.

 2              THE COURT:  You may proceed.

 3              MR. KANTERMAN:  Thank you, Your Honor.

 4                      DIRECT EXAMINATION

 5   BY MR. KANTERMAN:

 6   Q.  Mr. Ingram, good afternoon.

 7   A.  Howdy.

 8   Q.  Good to see you again.  Please state your full name for the

 9   record.

10   A.  Brian Keith Ingram.

11   Q.  Mr. Ingram, you previously worked for the Secretary of

12   State's Office?

13   A.  I did.

14   Q.  In the Elections Division?

15   A.  I did.

16   Q.  Before going into details about your job with the Secretary

17   of State's role, I'd like to talk a little bit about your

18   personal educational background and employment history.

19       After graduating from college, you went on to law school?

20   A.  I did.

21   Q.  At the University of Texas School of Law?

22   A.  Yes.

23   Q.  You graduated from University of Texas School of Law in

24   1993?

25   A.  1993, yes, sir.
```

1    Q.  With a Juris Doctorate degree?

2    A.  Yes.

3    Q.  After graduating from law school, you proceeded into

4    private practice?

5    A.  I did.

6    Q.  Worked for a number of firms?

7    A.  Three, I guess.

8    Q.  And after your time in private practice in the late 2000s,

9    you went on to work for Governor Perry's office?

10   A.  That's true.

11   Q.  You worked for the Governor's Office for approximately

12   four years?

13   A.  I did.

14   Q.  And after that, you transitioned over to the Secretary of

15   State's Office?

16   A.  I agree.

17   Q.  And that was generally in January of 2012?

18   A.  Yes, it was January 5, 2012.

19   Q.  Thank you for the clarification.

20       When you first joined the Secretary of State's Office, you

21   were given the title of director of the Elections Division; is

22   that right?

23   A.  I agree.

24   Q.  Director is the most senior title in the Elections

25   Division?

1    A.   It is.

2    Q.   And you held that role for more than ten years?

3    A.   Eleven years, two months, five days.

4    Q.   And that was up until March of 2023?

5    A.   Yes, sir.

6    Q.   At which point you transitioned out of the director role

7    into more of a special projects role?

8    A.   I agree.

9    Q.   And in that new role, you reported to the new director of

10   the Elections Division?

11   A.   I agree.

12   Q.   And that was Ms. Christina Adkins?

13   A.   Yes.

14   Q.   Now that we've had an opportunity to discuss your

15   background, I'd like to talk more about your time at the

16   Secretary of State's Office and your role in the Elections

17   Division.

18       During your time as director, you managed and oversaw the

19   Elections Division?

20   A.   Agree.

21   Q.   And during that time, there were approximately 30 employees

22   in that division?

23   A.   That's right.

24   Q.   All of those individuals ultimately reported to you?

25   A.   They did.

 1    Q.  And you ultimately reported to the executive leadership
 2    team at the Secretary of State's Office?
 3    A.  I agree with that.  Specifically, the deputy secretary.
 4    Q.  And the Secretary of State as well; is that right?
 5    A.  Of course.
 6    Q.  And generally, your job as director was to help the
 7    secretary fulfill their responsibility as chief elections
 8    officer of the State of Texas?
 9    A.  Agreed.
10    Q.  And as part of that role, you helped the secretary prepare
11    for and ultimately implement SB1?
12    A.  That's true.
13    Q.  Let's discuss some of the things that you and your office
14    did prior to SB1's enactment.  Among other things, you and your
15    office met with legislative staff to discuss impending voting
16    legislation, including SB1?
17    A.  Well, in the regular session, it was SB7 and HB6, but, yes,
18    sir.
19    Q.  And you also met with individual legislators before the
20    bill became SB1?
21    A.  Agreed.
22    Q.  And you also met with legislative committees before the
23    bill became SB1?
24    A.  I did.  I testified before several committees.
25    Q.  During some of those meetings, setting aside just for the

1   moment the testimony that you provided, you would -- you and

2   your office would advise legislators, their staff, or

3   legislative committees about the bill language?

4   A.  Our role in the Secretary of State's Office is to be a

5   resource for the legislature, and so if they had a question

6   about how certain language would be implemented or what we

7   thought it meant or if they thought -- if we thought there

8   would be a problem in the implementation, those are the kind of

9   questions we would get.  We didn't usually get asked about

10  language unless the legislature had a question about it.

11  Q.  But, for example, if an individual legislator approached

12  you or your office and asked for your advice about whether some

13  language that they were considering proposing would work in the

14  real world, your office would provide them with that advice?

15  A.  Sort of.  I mean, it's our goal to help the legislature get

16  where it wants to go without doing any damage along the way, so

17  sometimes we might suggest alternative ways to achieve the same

18  goal without some side effects.

19  Q.  And, in fact, it's part of the Secretary of State's role to

20  advise on the technical implementation process of

21  voting-related legislation or future voting-related

22  legislation?

23  A.  When they ask.  It's not our job to volunteer or try to

24  somehow change legislation outside of the resource witness

25  role.

1    Q.  Let's talk a little bit about some of the things you did

2    and your office did to help implement SB1.  We'll start first

3    with discussing drafting of forms.

4        In addition to the legislative interactions we discussed,

5    the Elections Division changed a number of forms that it

6    publishes following the enactment of SB1?

7    A.  I agree.

8    Q.  And, for example, the Secretary of State's Office revised

9    the application for a ballot-by-mail form that it promulgated?

10   A.  We did.

11   Q.  And the Secretary of State's Office also changed the voter

12   assistance oath form?

13   A.  Yes.

14   Q.  And it did so to accommodate new changes in the law brought

15   about by SB1?

16   A.  Agreed.

17   Q.  For example, SB1 changed the language of the assister oath.

18   A.  It did.

19   Q.  And the Secretary of State's Office changed the voter

20   assistance oath form to conform with this new language.

21   A.  Agreed.

22   Q.  As director of the Elections Division, no form or policy

23   could be published without your approval when you were the

24   director?

25   A.  I can't envision a circumstance where it would have.  I

23-50885.39494

1   don't know if it was possible.  I guess it's possible, but I
2   don't think it ever happened.
3   Q.  You would agree, though, that no form could be published if
4   the deputy Secretary of State disagreed with it?
5   A.  Agreed.
6   Q.  And the same for the Secretary of State.  No form could be
7   published by the Elections Division if the Secretary of State
8   ultimately disagreed with it?
9   A.  Agreed.
10  Q.  You would agree that any form provided to voters should be
11  designed so that a voter who follows the instructions on that
12  form will ultimately have the form accepted?
13  A.  I agree with that.  The most important thing for a form to
14  do is to follow the law.  A good form is a guide to the law
15  and, of course, if it guides through the law successfully, then
16  the voter will be successful.
17  Q.  And so we could agree, then, that any form put out by the
18  Secretary of State's Office, the goal of that form would be
19  that if a voter followed it to the T, it would ultimately get
20  accepted?
21  A.  Agreed.  For whatever purpose the form is supposed to be
22  used for, you bet.
23  Q.  In addition to changing forms and having meetings with the
24  legislature, the Elections Division also issues documents known
25  as "advisories"; is that right?

1    A.  We do.

2    Q.  Advisories are something the division would send out,

3    something more formal than a mass e-mail, but generally a mass

4    communication relating to voted-related topics?

5    A.  Agreed.  We would do advisories on discrete topics of law.

6    Usually the advisory was a combination of legal stuff as well

7    as practical implementation stuff, steps to take.

8    Q.  And so let's talk just a little bit more about that.  These

9    advisories that you would send out may go to county elections

10   officials?

11   A.  That's true.

12   Q.  It might go to cities?

13   A.  Sometimes, yes.

14   Q.  They might go to other political subdivisions throughout

15   the state?

16   A.  Agreed.

17   Q.  These advisories might, as you've already mentioned,

18   provide official instructions to these elections officials from

19   the Secretary of State's Office?

20   A.  Agreed.

21   Q.  Those advisories might, for example, offer interpretation

22   from the Secretary of State's Office of certain provisions of

23   SB1?

24   A.  Yes.  I mean, but usually our role is to follow the law as

25   it's written, so there's not a lot of interpreting to be done.

23-50885.39496

1    However, sometimes to make a statute work, it has to be

2    interpreted around the edges a little bit, and so that's our

3    job under 31.003 of the Election Code is to obtain and maintain

4    uniformity in the interpretation of the Election Code if the

5    election falls outside of the Code, so sometimes to harmonize

6    existing law with a new statute, some interpretation has to be

7    done, but our goal always was to begin and end with the text.

8    Q.  But it is true that sometimes when you are offering those

9    interpretations in furtherance of your office's goals, those

10   would appear in advisories that your office would send out?

11   A.  I don't know if we put it in the advisory as an

12   interpretation, but that's what ended up in the advisory was

13   our interpretation, if interpretation was needed.

14   Q.  As the director of the Elections Division, you were

15   ultimately the person authorized to make interpretations of law

16   for the division?

17   A.  Well, as I said in my deposition, we've got a whole lot of

18   folks who review our work, and so there's not anything that we

19   do that is not vetted.  So, you know, sure, it's my name that

20   it goes out under, and it's my authority that it goes out

21   under, but it's not only my work.

22   Q.  No advisory would be sent out from the Elections Division

23   under your name if you disagreed with it?

24   A.  I agree with that.

25   Q.  And no advisory would be sent out from the Elections

1  Division if the deputy Secretary of State disagreed with it?
2  A.  Probably not.
3  Q.  And the same is true for the Secretary of State?
4  A.  That's right.
5  Q.  The Division also provided or published trainings relating
6  to SB1's changes to voting laws in Texas; is that right?
7  A.  That's right.
8  Q.  For example, the Division has provided seminars for county
9  election officials to teach them about changes to the election
10  law requirements?
11  A.  Agreed.
12  Q.  And on how to implement those changes in their counties?
13  A.  Yes.  The seminar for county election officials is usually
14  in July of an even-numbered year or an odd-numbered year, and
15  so the SB1 was not completed until September of that year, so
16  we missed our chance with the seminar to teach the counties
17  about it.
18  Q.  Your office has also provided trainings and webinars to
19  ballot boards; is that right?
20  A.  Agreed.  More recently.  That's only a more recent
21  phenomena.
22  Q.  Those webinars or trainings to the ballot boards may have
23  included topics relating to mail ballots following enactment of
24  SB1?
25  A.  Agreed.

1  Q.  You'd also provide trainings on how certain forms

2  promulgated by the Secretary of State's Office could and should

3  be used?

4  A.  I don't know -- I mean, sort of.  The forms that are

5  designed to be used by the voters -- we obviously don't train

6  voters on our forms.  The forms that are supposed to be used by

7  candidates, we do talk to the political parties in every

8  odd-numbered year about the candidate applications.  We also

9  talk to city schools and other political subdivisions and

10  county election officials about the application process in

11  accepting applications, because they do independent

12  applications for office.

13  Q.  And so while you don't necessarily provide training to

14  individual voters about forms, fair to say that you have in the

15  past provided training to entities who receive or accept those

16  ballots on how to use those forms?

17  A.  Right.

18  Q.  The Secretary of State's Office also creates training for

19  poll watchers, right?

20  A.  We do.  It's a part of SB1 for the first time.

21  Q.  And poll watchers may not serve unless they've completed

22  this training?

23  A.  Agreed.

24  Q.  Secretary of State's Office also reports complaints that it

25  receives relating to various election crimes to the Attorney

1    General's Office?

2    A.  One of the functions of our office is to review complaints

3    from the public or from election officials and determine

4    whether or not there's reasonable cause to suspect a crime has

5    occurred.  And if we believe that, you know, on the face of the

6    document that it looks like the elements of a crime have been

7    met, we will refer that to the Attorney General for further

8    action.

9    Q.  And I'm going to unpack that with you in just a moment, so

10   thank you.  But before I get there, as the director of the

11   Elections Division of the Secretary of State's Office, it was

12   ultimately up to you to decide whether to refer a complaint to

13   the Attorney General's Office or not?

14   A.  Yes, most of the complaints.  I'm the one that would review

15   them and decide what the disposition was going to be.  There

16   were a few that were pretty close calls that I would, you know,

17   bring before the rest of the attorneys and have our general

18   counsel to see what they thought, you know, if it was a close

19   call.  Usually, if it's a close call, we'd refer it anyway,

20   because it's better to err on the side of making sure that

21   crimes are prosecuted.

22   Q.  And so you've given me a good amount already about the

23   process that you used in deciding whether to refer something,

24   but let's just run through it a little bit more to make sure I

25   have it.

1       As a general matter, a complaint would come into your

2   office and would ultimately be scanned in and sent to you for

3   review; is that fair?

4   A.   Agreed.

5   Q.   And you personally reviewed every complaint that came in?

6   A.   I did.

7   Q.   And then you personally would decide what to do next?

8   A.   I agree.

9   Q.   You would, for example, as you've mentioned, consider

10  sending a disposition letter?

11  A.   To the person who sent the complaint, sure.

12  Q.   Thank you for clarifying.

13      And if you chose to send a disposition letter to the

14  complainant, you might ask your support staff to draft that

15  letter for you and send it back to the complainant; is that

16  right?

17  A.   Agreed.

18  Q.   Another option that you had at your disposal was to refer

19  internally to Secretary of State's Office the complaint you

20  received to a Secretary of State lawyer for further review?

21  A.   Right.  And usually with instructions to refer or not

22  refer, but to write a specific kind of letter in response to

23  the complaint.

24          THE COURT:  Let me backtrack.  I'm assuming

25  "disposition letter" meant no merit?  Why don't you explain

Case 5:24-cv-05826-DMC Document 26 Page 164 Date Filed 01/18/2024
Case 5:24-50826-DMC Document 9 Page 164 Date Filed 01/18/2024

Keith Ingram - Examination                    1879

 1    what that means.
 2            MR. KANTERMAN:  I think that's a very fair point, Your
 3    Honor.
 4    BY MR. KANTERMAN:
 5    Q.  Mr. Ingram, when you and I refer to the term "disposition
 6    letter," is it fair to say that a disposition letter would be
 7    sent to a complainant if you determined that there was no merit
 8    and the complaint was not worth investigating further?
 9    A.  Well, it's kind of both things.  If we write a letter in
10    response to a complaint, sometimes it's a referral to the
11    Attorney General and we do cc the complainant, so they get a
12    response either way.  But if we decide that there's not any
13    merit or if it needs more factual information in order to
14    justify referring it, then we will send that letter to the
15    complainant and ask them for more information or tell them, you
16    know, *We're sorry this happened to you, but it's not a crime*
17    *under any set of circumstances.*  Or we sometimes say, *We're*
18    *sending a copy of this complaint to the local election*
19    *officials so that they can address this in training, so it*
20    *won't happen with their workers again.*  You know, those are
21    kind of the three normal answers to a complainant.
22    Q.  Thank you.
23            MR. KANTERMAN:  Your Honor, I'm happy to explore
24    further unless -- thank you.
25    BY MR. KANTERMAN:

```
 1   Q.  When making a determination about how to proceed with a
 2   particular complaint, there was a standard or a process that
 3   you would apply.  I think you've already alluded to that as the
 4   reasonable cause to suspect that a crime has occurred, right?
 5   A.  Agreed.  That's in 31.006 of the Code.
 6   Q.  And in applying that standard, you would review the
 7   elements of any particular election crime, compare that with
 8   the allegations in the complaint you received, and ultimately
 9   see if there was a match?
10   A.  Agreed.
11   Q.  And so long as a complaint alleged facts that your office
12   believed constituted criminal activity, you would send the
13   complaint on to the Attorney General's Office for review?
14   A.  I am a sorry, I lost that question.
15   Q.  I'm happy to repeat it.  As long as a complaint alleges
16   sufficient facts that your office believes constitutes criminal
17   activity, you would send that complaint on to the Attorney
18   General's Office for review?
19   A.  Right.  If it created a reasonable cause to suspect that a
20   crime has occurred.
21   Q.  And I think you mentioned earlier that even if it was a
22   close call in your mind about whether the complaint satisfied
23   that standard, you would err on the side of forwarding those,
24   too, to the Attorney General's Office?
25   A.  Absolutely.
```

1   Q.  Now, you'd agree that the reasonable cause to suspect
2   standard is subjective?
3   A.  It is.  Well, I mean a reasonable person would they have
4   cause to suspect.  That's always been an objective standard,
5   but I don't know how objectively you can measure it.
6   Q.  In fact, it's probably fair to say it was a judgment call
7   on your part on whether you thought there was enough of an
8   allegation in a complaint to forward along or not?
9   A.  Agreed.
10  Q.  Now, to be clear, while the Secretary of State's Office
11  refers election complaints to the Attorney General's Office, it
12  is not the only referring agency or referring source in the
13  state.
14  A.  Agree with that.
15  Q.  And that means anybody can go to any county attorney or any
16  district attorney and complain about something that they think
17  is criminal activity, including election-related criminal
18  activity and lodge a complaint.
19  A.  Sure.  There's a part of the Election Code that says if two
20  or more voters swear in writing to the facts, then the D.A. has
21  to investigate.  So, I mean, it's both voluntarily as well as
22  mandatory if they do it right.
23  Q.  Mr. Ingram, let's transition now to talk about SB1, and
24  I'll ask Derek, please, to publish the statute, which is
25  already in evidence as Joint Exhibit 1.

1    Mr. Ingram, you've got the statute in front of you on the
2  screen, but if it's helpful, I've got a paper copy.  Happy to
3  provide that to you too.
4  A.  This is fine.
5  Q.  Thank you.  Before we dig into the substance of my
6  questions on SB1, is it fair to say that you're familiar with
7  the statute?
8  A.  Yes.
9  Q.  In fact, you've engaged with this statute regularly since
10  its enactment?
11  A.  Not so much recently, but very much in 2022.
12  Q.  I want to first begin by discussing Section 4.09.
13  Generally, sir, 4.09 makes it a crime to knowingly distance or
14  prevent a poll watcher from observing an activity in a manner
15  that would make observation not reasonably effective.
16  A.  Right.
17  Q.  And Section 4.07(f) -- which I'll give Derek a moment to
18  pull up on the screen for you -- provides that where a poll
19  watcher is entitled to observe an election activity under SB1,
20  they are entitled to sit or stand near enough to see and hear
21  the activity.
22    Is that right?
23  A.  That's what it says.  It's important to note that this law
24  doesn't change anything substantively.  It just set out in
25  words what we already believed the law to be.  So conveniently

1    near or close enough to see and hear the observed activity;

2    that they're entitled to observe any election activity in the

3    polling place, all of these things were already known and put

4    in place by poll workers.  So this didn't change the law

5    substantively.  It did not give more abilities to poll watchers

6    to do whatever they wanted to do.  It was still within the same

7    constraints that you couldn't disrupt the voting process.  You

8    couldn't talk to voters.  I mean, all of those things are still

9    the same.  It just made very clear what an observer was

10   entitled to observe.  You know, it didn't change the

11   relationship between the observer and the poll workers.

12   Q.  And I appreciate that explanation, Mr. Ingram, but just for

13   purposes of the question I asked, you would agree that 4.07(f)

14   provides that where a poll watcher is entitled to observe,

15   they're entitled to sit or stand near enough to see and hear

16   the activity?

17   A.  Right.  You can see up there in (a) that a watcher was

18   entitled to sit or stand conveniently near the observed

19   activity before.  And now it's near enough to see and hear.

20   That's the same thing.

21   Q.  Section 4.07(e), provides that a poll watcher may not be

22   denied free movement where election activity is occurring; is

23   that right?

24   A.  Agreed.  And that was the case before.  If you got in their

25   way and you obstructed them, you were going to be convicted of

Keith Ingram – Examination                    1884

1    a crime, Class B misdemeanor, for obstructing a poll watcher.

2    And we had several complaints that were referred to the

3    Attorney General for exactly that crime, and we would still

4    refer them today.

5    Q.  The phrase "reasonably effective" as used in Section 4.09

6    is not defined anywhere in SB1, right?

7    A.  Well, I think everybody knows that the whole point of

8    observing election activity is to be able to effectively

9    observe it so that if something is going on, you can make

10   notes, you can bring it to the attention of your principal, and

11   it might be the basis for an election contest.  That's the

12   whole reason to have observers in the polling places, so that

13   they can effectively observe election activities.

14   Q.  And I appreciate that explanation, but my question was a

15   little bit more narrow.  The phrase "reasonably effective" as

16   used in Section 4.09 is not defined anywhere in SB1, right?

17   A.  I don't believe it is, no.

18   Q.  And the Secretary of State's Office does not have any

19   opinion as to the meaning or definition of the term "reasonably

20   effective" as that phrase is used in this section?

21   A.  If you're asking if we've got anything in our materials, we

22   refer to the statutory language.

23   Q.  The determination of whether some action makes observation

24   not reasonably effective requires a subjective assessment,

25   fair?

1   A.   Yeah.  And the one making that assessment in the first

2   instance is the election judge.

3   Q.   And we'll get to that, and so I appreciate that.

4       Fair to say, though, that differing parties have differing

5   views about what makes observation reasonably effective?

6   A.   I would agree with that.  I think that it's probably on a

7   spectrum from more effective to less effective, and at some

8   point it gets to be so much less effective that it's not

9   effective at all.

10  Q.   You would agree with me that poll watchers, in your

11  experience, tend to be maximalists in their view of how close

12  they're entitled to be to any activity?

13  A.   In my experience, poll watchers are definitely maximalists

14  and so are poll workers, so what we've got is a situation where

15  two people are very much with their feet in concrete, and

16  that's why this language was added to the Code, to make both

17  sides understand, with more words, what the roles are and

18  what's expected of them.

19  Q.   Now, because the Secretary of State's Office does not have

20  an opinion or definition beyond what SB1 says, it would just

21  tell the presiding judge, who you said is responsible for

22  making the determination in the first instance, to use their

23  best judgment when deciding who's right?

24  A.   Agree with that.  And, you know, we encourage them to call

25  back to their election official in the county and make sure

1   that everybody is on the same page with regard to their

2   proposed actions.  Sometimes they call us from the polling

3   place.  Sometimes the election official will call us, and we're

4   happy to give our best guess about what to do, but every time

5   that we talk to somebody about potentially taking action

6   against a poll watcher, we remind them that it's a crime if

7   you're not justified in your action.  So you need to be

8   careful.  But that was our advice before SB1.  That's our

9   advice since SB1.

10  Q.  And so I want to unpack that just a little bit.  The

11  Secretary of State's Office would tell the elections judge to

12  be careful about rejecting a poll watcher's complaint about not

13  having a reasonably effective ability to observe because it's a

14  crime to obstruct a poll watcher?

15  A.  Exactly.

16  Q.  And the Secretary of State's Office would also tell the

17  elections judge to think carefully about what they're doing?

18  A.  Absolutely.  And when we've had conversations with election

19  officials because of poll watchers in Central Count or the

20  ballot board, we've told them the same thing.  And we've had

21  complaints against election officials for obstructing poll

22  watchers in Central Count, and we've referred those over to the

23  Attorney General.

24  Q.  The Secretary of State's Office would also recommend the

25  elections judge consider calling the county attorney before

23-50885.39509

1   making a final choice on any dispute?

2   A.  If they've got that luxury, yes, sir, that's the best

3   advice, because the county attorney is the one that's going to

4   be representing them.

5   Q.  But in the end, the Secretary of State's Office would tell

6   the elections judge it's ultimately their call?

7   A.  Absolutely.

8   Q.  While the Secretary of State's Office doesn't have an

9   official opinion as to the meaning of the phrase "reasonably

10  effective," it does have a view as to what types of activities

11  might render observation not reasonably effective, right?

12  A.  Right.  Like I said, we've got a spectrum from more

13  effective to less effective, and the further you get toward

14  less effective, that's when you get into not reasonably

15  effective.

16  Q.  So let's try to discuss a little bit about that spectrum.

17  The Secretary of State's Office's view is that even so much as

18  just standing between the watcher and the activity being viewed

19  could violate Section 4.09.

20  A.  Yes.  If you're obstructing their view of the activity,

21  then yes.

22  Q.  And the Secretary of State's Office would also say that

23  making the watcher stay in the designated area could also

24  violate section 4.09.

25  A.  Absolutely.

1   Q.  And the Secretary of State's Office would say watchers
2   can't be put into some sort of a pen.
3   A.  Agree with that.  And that was the law before SB1, and
4   that's the law after SB1.  That hasn't changed at all.
5   Whenever an election official tries to relegate watchers to a
6   particular area of Central Count and doesn't let them have free
7   movement, we would talk to those election officials before SB1
8   and remind them that obstructing a poll watcher is a crime.
9        So, you know, every single Election Day that I've been --
10  that I was in that job, we started the day with poll watchers,
11  usually from Dallas, sometimes from Houston, sometimes from
12  Austin or Bexar County, but every day we would start with poll
13  watchers demanding to be let into Central Count and not kept in
14  a pen.  And every single Election Day we would tell the
15  election officials *"You can't keep them in a pen."*
16  Q.  And so similarly, the Secretary of State's Office would
17  say, *"Watchers can't be held behind a wall."*
18  A.  That's right.  Or between a glass partition in the
19  activity.
20  Q.  Now, the Secretary of State's Office has no position about
21  what distance is close enough to see or hear under
22  Section 4.09, right?
23  A.  Well, it's -- yeah, it's just as subjective as conveniently
24  near.  They're both subjective distance requirements, and it's
25  going to depend on how well their eyesight is and how well

1   their hearing works before they're close enough to see and

2   hear.  Or before they're conveniently near, whichever standard

3   you're dealing with.

4   Q.  And in your view, and the view you applied when you were

5   director of the Elections Division, is that asking a poll

6   watcher to stand ten feet back from voting booths could

7   constitute a violation of Section 4.09?

8   A.  Yes, absolutely.  And all of that became much more

9   litigated, more of a real problem in 2020 with COVID.

10  Q.  The Secretary of State's Office can't say whether a poll

11  official violates 4.09 by demanding that a poll watcher stand

12  one foot away from a voter?

13  A.  Yeah, I don't know.  It could be unreasonable.  It could

14  render their service unusable, but in most cases I don't think

15  it would, so that's a very difficult question to answer in the

16  abstract.

17  Q.  As a general matter, the Secretary of State's Office

18  doesn't really get into those details?

19  A.  Well, we get into it when we're called about it, so

20  sometimes, you know, you get a call, and you're on speakerphone

21  and both teams are stressing their position and trying to get a

22  ruling from you on the spot, so we get involved in those

23  situations sometimes.

24  Q.  Mr. Ingram, I want to turn our discussion now to another

25  provision of SB1, and that's going to be Section 4.06(h).  You

1  would agree that 4.06(h), which for the record, I'll note is on

2  the screen in front of you, provides that poll watchers must

3  swear an oath not to disrupt the voting process or harass

4  voters.

5      Right?

6  A.  Agree with that.

7  Q.  The term "disrupt" is not defined in SB1.

8  A.  I agree with that.

9  Q.  And the term "harass" is also not defined in SB1.

10 A.  Yes.

11 Q.  Despite the lack of definition for these terms in the

12 statute, the Secretary of State's Office would agree that there

13 are lots of ways you could harass a voter?

14 A.  I never have stopped to think about the ways that you could

15 harass a voter.  So I don't have an opinion on that at all.

16 You know, obviously, if you're getting in their personal space

17 when they're trying to cast their ballot, that's illegal and

18 should not be done, and that's what I would think would be the

19 harassment.

20     I heard about one situation in Williamson County where a

21 poll watcher wanted to review a voter's ballot before it went

22 into the scanner, and they yanked it out of the voter's hand.

23 That was harassing that voter and should not be done.

24 Q.  And so it sounds like, sir, we agree one way you could

25 harass a voter is trying to see what they're marking on their

1   ballot?

2   A.  Agreed.

3   Q.  And one way you could harass a voter is to get in their

4   personal space?

5   A.  Right.  I mean, sometimes at the check-in table you can't

6   avoid being in their personal space if you're going to

7   adequately observe the check-in process, so I wouldn't say that

8   the personal space invasion is always harassment.  It could be.

9   Q.  And another way you could harass a voter is by standing too

10  close to them?

11  A.  Again, it could be or it could be just doing what you have

12  to do to have a reasonable observation of the check-in process.

13  Q.  And the determination of whether or not there is harassment

14  is going to be left up in the first instance to the presiding

15  elections judge?

16  A.  The presiding judge under 32.075 has the responsibility to

17  maintain order in the polling place, so yes.

18  Q.  And in every election since you've been with the Secretary

19  of State's Office, there has been some tension between poll

20  watchers who want to observe the activity and poll workers who

21  feel like they're being crowded?

22  A.  I agree with that.  And I'd also agree that every election

23  there's tension between poll watchers and election officials in

24  Central Count about the observation process.

25  Q.  Sir, I'll direct the conversation now to Section 8.01 of

23-50885.39514

1   SB1.  And separate from Section 4.09's creation of a criminal

2   penalty, Section 8.01 creates a civil penalty for anyone

3   convicted of a criminal offense arising under SB1.  Is that

4   right?

5   A.  Yeah, I can't see all of the Section 31.129, so I don't

6   know, is that it?

7   Q.  Sure.  We'll make that available to you.  Please bear with

8   us just one moment.

9   A.  Okay.  That's what I thought.  Yeah, it's not the violation

10  of a provision of SB1 that triggers this.  It's a violation of

11  the Election Code.

12  Q.  So a violation of the Election Code could subject an

13  offender to civil penalty under 8.01?

14  A.  Right.  It could subject an election official as that term

15  is defined up in 31.128 to a civil action.

16  Q.  And that civil action or civil penalty that we're

17  discussing would provide that anyone convicted of a crime may

18  no longer serve as an elections official?

19  A.  I don't agree with that.  Go back up so I can see the rest

20  of 31.129 -- back down, I mean.  Yeah, I don't agree with that.

21  31.128 says if you're convicted of a crime under this code,

22  you're disqualified.  It doesn't say anything about having a

23  civil penalty and that qualifying you or not qualifying you in

24  the future.

25  Q.  So maybe if we change my question just a bit.  If you're

 1  convicted of a crime, you'd agree that you'd be disqualified
 2  under this section; is that fair?
 3  A.  Under 31.128.
 4  Q.  Let's turn our attention now if we could to Section 5.13,
 5  please.  Section 5.13(b) provides that a mail ballot may be
 6  accepted only if certain identifying information is provided on
 7  the carrier envelope or signature sheet; is that right?
 8  A.  I didn't get to read all of it.
 9  Q.  Please take your time.  Just let me know when you're ready.
10     (Pause.)
11  A.  Okay.  Yeah, the identifying information has to be on there
12  before it's accepted.
13  Q.  And Section 5.13 also requires an early voting clerk to
14  reject a mail-in ballot if the required identification
15  information on the carrier envelope is either missing or does
16  not match the information that the voter previously provided on
17  their voter registration application.
18  A.  What it says is if a voter provides information required
19  and it identifies the same voter.  Well, "identifies the same
20  voter" is broader than what they submitted on their voter
21  registration application.  That means anything that's in that
22  voter's record that matches what they put on the carrier is
23  sufficient to justify acceptance.  This is not a memory game
24  for voters to have to remember what they put on their
25  application and get it right.  This is for them to use a number

1    that identifies them as the voter.

2    Q.  Mr. Ingram, I'd like to ask you some questions about what

3    is sometimes referred to as the "HB2512 process."  Are you

4    familiar with that?

5    A.  I am.

6    Q.  You'd agree that when I use the term "HB2512 process," this

7    refers to a bill in the 2013 legislative session called HB2512

8    that amended the Transportation Code to provide for the

9    Secretary of State's Office to have access to information in

10   the driver's license file to assist with voter registration?

11   A.  Agreed.

12   Q.  And pursuant to HB2512, Secretary of State's Office created

13   an annual process where it would try to maximize the number of

14   full Social Security numbers that you had in your database?

15   A.  Agreed.

16   Q.  And the HB2512 process, as it's known, allows the Secretary

17   of State to get information from the driver's license record to

18   supplement voter registration records and use it for voter

19   registration purposes?

20   A.  Right.

21   Q.  I'm going to show you what's already in evidence as

22   LUPE 289.

23       Mr. Ingram, you've got that on the screen in front of you?

24   A.  I do.

25   Q.  And you recognize LUPE 289 as an e-mail from Kristi Hart to

1  you and Mr. Adam Bitter dated December 20, 2021?

2  A.  Agreed.

3  Q.  Ms. Hart is the team manager; is that right?

4  A.  She is.

5  Q.  And this communication says, *"As you know, we ran a*

6  *comparative process over the weekend.  We did run queries prior*

7  *to and following the process.  That information is listed*

8  *below."*

9      Do you see that?

10  A.  I do.

11  Q.  And here, the word "query" means a search run across a

12  database; is that right?

13  A.  Right, this query is with regard to the voter registration

14  database.

15  Q.  And "before," as that term is used, means before you did

16  the HB2512 matching process, right?

17  A.  Agreed.

18  Q.  And so before the HB2512 matching process, on December 20,

19  2021, in the team database, the number of active and suspense

20  voting records with no Texas driver's license number was

21  1.3 million plus a little?

22  A.  Agreed.

23  Q.  And then after the process it was 493,823, right?

24  A.  Agreed.

25  Q.  The number went down by approximately 800,000?

23-50885.39518

1    A.  It did.

2    Q.  And if we go back down to the fourth row of LUPE 289, it

3    says *"Number of active and suspense voting records with neither*

4    *TDL or SSN in the record."*  The after number is 106,911, right?

5    A.  Agreed.

6    Q.  And that box gives us the number of voters with neither

7    Texas driver's license nor Social Security numbers, right?

8    A.  That's right.

9    Q.  And so it's fair to say that on December 20, 2021, there

10   were that many active and suspense voters who did not have

11   either of the numbers required by SB1 in the team database?

12   A.  Agreed.  But they're only required by SB1 if you are voting

13   by mail.

14   Q.  We can take down what's been marked as LUPE 289, and I'd

15   ask, Derek, to please put up what's been marked as LULAC 75.

16       Mr. Ingram, you have LULAC 75 in front of you?

17   A.  I do.

18   Q.  Again, you'll acknowledge this is an e-mail sent from

19   Kristi Hart to you, Ms. Adkins, and Mr. Bitter on December 23,

20   2022, right?

21   A.  Correct.

22   Q.  After the HB2512 process in December 2022, it's fair to say

23   that 463,393 voters had no Texas driver's license number on

24   their record?

25   A.  I agree with that.

1    Q.  And after the HB2512 process in December of 2022, it's fair

2    to say that 392,084 voters had no Social Security number on

3    their voter record?

4    A.  I agree with that.

5    Q.  Together, that's over 850,000 voters who may put an ID

6    number on a mail ballot that does not match their registration

7    record.

8    A.  I wouldn't agree with that, no.  I would look at the bottom

9    two fields, the bottom two where it talks about they have a TDL

10   but a null value for SSN, and where they've got at least a four

11   of SSN but null for TDL, that's the universe of people that

12   we're talking about, or the people in the middle column that

13   have neither one.  Those are the ones, not the top two, the

14   bottom three.

15       And this is precisely why we emphasize in our education

16   materials to put both numbers.  That's why Secretary Scott

17   emphasized it.  I'm sure Secretary Nelson is doing the same,

18   because it increases the voter's chance of success if they put

19   both numbers.  If either one is identifying the same voter,

20   then that carrier envelope or application for ballot-by-mail

21   gets accepted.

22   Q.  So it sounds like you would at least agree with me that

23   there are 93,867 voters have neither Texas driver's license nor

24   Social Security numbers in the team database as of December 22,

25   2022?

1   A.  Right, I agree with that, December 23rd.

2   Q.  The report that we're looking at is only run once a year,

3   right?

4   A.  Yes.

5   Q.  And December 2022 is the last time this report has been

6   run?

7   A.  It's the last time as of the time that I knew anything

8   about it.  Whether they've run it again this summer for some

9   reason, I don't know.  Haven't heard.  I'm not part of that

10  process anymore.

11  Q.  You'd agree that this report was run after voters and

12  counties work to get ID numbers into the voter registration

13  databases in the 2022 primary and general elections, right?

14  A.  I agree with that.  And you can see the result of that work

15  in that middle number here, because in the other dataset from

16  '21, it was 106,000.  Well, 11,000 have already been knocked

17  off before we did the process, and now that it's down 13,000

18  after the process.  So that diminution in that number with zero

19  values for either one is evidence of the work that was done in

20  '21 to get people to supply those numbers.

21      The only way these numbers are ever going to go is down.

22  Q.  Let's turn our attention to Section 6.06 of SB1, and I'll

23  give Derek just a moment to pull it up for you.

24      Mr. Ingram, do you have that on your screen in front of

25  you?

1  A.  I do.

2  Q.  You'd agree that Section 6.06 makes it a state jail felony

3  for a person to compensate or offer to compensate another

4  person or to solicit, receive, or accept compensation for

5  assisting voters?

6  A.  I agree with that.

7  Q.  And relatedly, Section 6.03, which we'll pull up for you,

8  requires an assister to complete an oath form stating, among

9  other things, they have not received or accepted any form of

10 compensation or other benefit from a candidate, campaign, or

11 political committee?

12 A.  I agree with that.  It was a crime before SB1, and it was a

13 more specific crime after SB1.

14 Q.  You'd agree that the oath we're talking about in Section

15 6.03 is sworn to under penalty of perjury, correct?

16 A.  Agree.

17 Q.  Returning to 6.06(e), that section defines "compensation"

18 as an economic benefit as defined by Section 38.01 of the Penal

19 Code?

20 A.  I know it incorporates by reference the Penal Code.  I'm

21 not seeing that on this screen.

22       THE COURT:  Yes, you're in the wrong section.

23       MR. KANTERMAN:  6.06(e).  Do I have the wrong section?

24       THE COURT:  No, he -- displayer has -- you correctly

25 named it.  It's just not what's showing up on the screen.

1          THE WITNESS:  There it is.

2     BY MR. KANTERMAN:

3     Q.  Mr. Ingram, do you now have 6.06(e) in front of you?

4     A.  I do.

5     Q.  And would you agree that it references Section 38.01 of the

6     Penal Code?

7     A.  I agree with that.

8     Q.  Section 38.013 of the Texas Penal Code describes "economic

9     benefit" as *"anything reasonably regarded as an economic gain*

10    *or advantage, including money or anything of value."*

11    A.  Okay.

12    Q.  And so you would agree with that?

13    A.  I'll take your word for it.  I haven't looked at the Penal

14    Code, but I don't have any reason to doubt that you read it

15    correctly.

16    Q.  In your view, there's no difference between the terms

17    "paying" and "compensating," right?

18    A.  Agreed.

19    Q.  And so you understand under Section 6.06, the section

20    creates a felony where a person offers or, in fact, provides

21    money or anything of value in exchange for assisting voters?

22    A.  It didn't create the felony.  The felony already existed

23    since, I believe, 2013.  It was, I believe, House Bill 206 that

24    created the compensation prohibition, so that's not a new

25    creation.

1   Q.  You would agree that it contains reference to the fact that

2   a felony would occur if a person offers or, in fact, provides

3   money or anything of value in exchange for assisting voters?

4   A.  Agree with that, that the difference is it used to be that

5   you had to be paid for piecework, and this made it a little

6   broader to say if you assist voters at all and get paid for it,

7   then you're committing a crime.  This doesn't mean that people

8   who are otherwise paid to assist a voter in their regular life,

9   they also can help them with their ballot.  It's not -- this is

10  not covering that activity.

11  Q.  And so the answer to my question was, yes, you understand

12  Section 6.06 references a felony which occurs if a person

13  offers or, in effect, provides money or anything of value in

14  exchange for assisting voters?

15  A.  In exchange for the assistance.  I agree with that.  And

16  also it creates a crime for -- or changes the crime so that

17  it's clear if you solicit payment for assisting voters.

18  Q.  And you understand also that an assister who, in fact,

19  accepts money or anything of value from a candidate, campaign,

20  or political committee, and swears under oath pursuant to

21  Section 6.03 that they did not accept anything of value,

22  violates that oath and commits perjury?

23  A.  So, obviously, campaigns hire people to canvass for votes

24  in neighborhoods.  I mean, there's -- door-knocking and shoe

25  leather is part of the election experience in America.

1    That's -- nothing in this prohibits that, affects that, changes

2    that in any way.  Campaigns can pay people to canvass

3    door-to-door.  No question about it.  This is not that.

4        What we're talking about is paying somebody specifically to

5    assist a voter with their ballot.  "Assistance" is a term of

6    art.  "Assistance" is not general information.  It's not

7    education.  "Assistance" is a thing that's defined in the

8    Election Code.

9    Q.  Sir, my question, I think, was different, and that was

10   whether you understand that an assister who, in fact, accepts

11   money or anything of value from a candidate, campaign, or

12   political committee and swears under oath that they haven't,

13   violates the oath set forward in Section 6.03?

14   A.  I can't answer the question the way you ask it, because the

15   way you ask it is, if I'm paid by a campaign and then I go

16   assist a voter and swear I didn't get paid, am I lying?  No,

17   maybe not.  I don't know.  It depends on why you got paid.  If

18   you got paid to canvass for votes, and you happen to assist a

19   voter, that's not implicated by this section at all.  So you

20   wouldn't be lying on your oath.  You didn't get paid a $20

21   bonus for assisting that voter.  You didn't get paid extra.

22   You know what I mean?

23       So you're trying to lump in something that's perfectly

24   legal in the First Amendment with something that's not legal,

25   and that's what I'm trying to make sure we've got very

Case 5:24-cv-00816-DCR Document 286 Page: 188 Date Filed: 02/03/24 Page 1 of 518
Case 5:24-cv-00844-DCR Document 91 Filed 02/03/24 Page 1 of 246
Keith Ingram – Examination                              1903

1    distinctly separated.

2    Q.  And so I understand that you cannot answer the question the

3    way I posed it to you.

4    A.  I agree with that, because I don't know the answer.

5    Depends on what's happening.  I need more facts.

6    Q.  Let's discuss a few hypotheticals that may help us supply

7    some of the facts and further understand the Secretary of

8    State's Office's understanding of these provisions and

9    application.

10       Mr. Ingram, assume, please, for the moment, that an elderly

11   voter calls the local senior center and asks for assistance

12   with completing a mail ballot.  Follow me so far?

13   A.  Absolutely.

14   Q.  Assume further that the senior center volunteer agrees to

15   help the voter and, in fact, offers to do so.  Still good?

16   A.  Offers to use them?

17   Q.  Offers to do so.  Offers to assist.

18   A.  Okay, sure.

19   Q.  And assume further that the voter offers to pay the

20   volunteer's bus fare to visit her at her home to get the

21   assistance that's been requested.  Do you have all of that?

22   A.  I do.

23   Q.  Under that hypothetical, the Secretary of State's Office

24   believes the assister can accept the bus fare without violating

25   Section 6.06?

23-50885.39526

1    A.  Absolutely.  They can get their expenses reimbursed.

2    That's not payment.  That's keeping from going negative.

3    Q.  Another hypothetical -- and you can ignore facts that we

4    just set up.  New facts.

5        Assume for the moment that a community member hires a local

6    teenager and asks them to assist with completing the ballot and

7    offers to pay the teenager $20 to do so.  Understood?

8    A.  Okay.

9    Q.  Under that scenario, the Secretary of State's Office would

10   say Section 6.06 has been violated?

11   A.  We would strongly discourage somebody from taking $20 to

12   assist a voter, yes.

13   Q.  And if they did, it would be the Secretary of State's

14   Office's position that 6.06 has been violated?

15   A.  If I received a complaint with that set of facts in it,

16   yes, I would refer that to the Attorney General.

17   Q.  For example, if a voter says, *Hey, Jimmy, come by.  I'll*

18   *pay you 20 bucks to help me with this ballot,* that violates the

19   statute?

20   A.  I'm sorry.  I missed it.

21   Q.  Sure.  Happy to give it again.

22       If a voter says, *Hey, Jimmy, come by, and I'll pay you 20*

23   *bucks to help me with this ballot,* in the Secretary of State's

24   Office's view, they violated Section 6.06?

25   A.  Agreed.

1    Q.  Another hypothetical.  Assume a blind voter needs

2    assistance with completing a mail ballot.  Good so far?

3    A.  Okay.

4    Q.  Assume that this blind voter calls an old college friend

5    and asks for assistance with the ballot and offers further to

6    meet the friend at a local restaurant at which they will fill

7    out the ballot together.  Still following me?

8    A.  Sure.

9    Q.  Assume that the blind voter offers to and does, in fact,

10   buy lunch for the friend in exchange for his assistance.  Still

11   good?

12   A.  Yeah, I don't know if that's the way that would normally go

13   down.  The way that normally would go down is --

14            THE COURT:  That's not the question, sir.

15            THE WITNESS:  Well, I'm just --

16            THE COURT:  Sir, stop.  You're not going to argue with

17   me.

18            THE WITNESS:  No, sir.

19            THE COURT:  Finish your question.

20            MR. KANTERMAN:  Thank you, Your Honor.

21   BY MR. KANTERMAN:

22   Q.  The most previous hypothetical.  Assume that the blind

23   voter offers to and does, in fact, buy lunch for the friend in

24   exchange for his assistance.

25   A.  If it's definitely for the exchange -- in exchange for the

1    assistance, then, yes, that would be referable, but normally

2    that's going to be something that you do for your friend

3    because he's helping you out.  It's not for the assistance;

4    it's just because you got the opportunity to see your friend

5    and you're happy to see him.

6    Q.  It's your testimony that if a blind voter offers to and

7    does, in fact, buy lunch for the friend in exchange for his

8    assistance, that there has been a violation of SB1?

9    A.  There's definitely a potential violation.  It would depend

10   on the facts of the exchange, but on that hypothetical, with

11   those facts, I would agree that we've got a facial violation.

12       Now, whether or not anybody would ever complain about it

13   and whether it would ever get prosecuted, highly doubt it.

14   Q.  Mr. Ingram, you would agree that there are certain

15   exceptions to 6.06's application, right?

16   A.  I don't know.  I'd have to look at the Code.

17   Q.  Derek, if you wouldn't mind, please, let's pull up

18   Section 6.06(f).

19       Mr. Ingram, on the screen in front of you should be a copy

20   of Joint Exhibit 1, which is already in evidence displaying

21   6.06(f.)  Do you have that?

22   A.  I do.

23   Q.  Section 6.06(f) provides that 6.06's prohibition on

24   compensating assisters does not apply if the person assisting

25   the voter is an attendant or caregiver previously known to the

1    voter.

2    A.   Agree with that.

3    Q.   SB1 does not define the term "attendant."

4    A.   I agree.

5    Q.   And it also doesn't define the term "caregiver."

6    A.   Agree.

7    Q.   The Secretary of State's Office does not have a definition

8    of the term "caregiver" as that's used in this section.

9    A.   Other than Webster's, we don't have any special definition,

10   no, sir.

11   Q.   And same for the term "attendant"?

12   A.   Agreed.

13   Q.   And despite the words "attendant" and "caregiver," each

14   appearing separately in the statute, the Secretary of State's

15   Office understands the terms to mean generally the same thing?

16   A.   I mean, it can have slightly different job functions.

17   "Attendant" might be somebody that, you know, is more like

18   running errands.  "Caregiver" is somebody that has to make sure

19   that somebody is taken care of and able to do their activities

20   of daily life, so they're a little different, but the point is

21   that they're previously being paid for something besides

22   assisting a voter.

23   Q.   So you would generally agree, at least despite minor

24   differences in their functions, the roles and titles, the words

25   mean the same thing?

23-50885.39530

1    A.  It means somebody that's previously engaged by the voter to

2    take care of them.

3    Q.  Now, the Secretary of State's Office has not published any

4    guidance on how to interpret the term "attendant" as that term

5    is used in this section, right?

6    A.  I agree with that, but we've not had any questions about it

7    either.

8    Q.  But you agree you hadn't published any guidance on it?

9    A.  Usually we publish guidance in order to cut off questions.

10   There haven't been any questions.

11   Q.  And so you would agree that you have not published any

12   guidance on it?

13          MR. KERCHER:  Objection, Your Honor.  Asked and

14   answered.  He responded yes at the very beginning.

15          THE COURT:  That's asked and answered.

16   BY MR. KANTERMAN:

17   Q.  The Secretary of State's Office has not published any

18   trainings on the term "attendant."

19   A.  No.

20   Q.  And the Secretary of State's Office has not published any

21   guidance on how to interpret the term "caregiver"?

22   A.  Agreed.  Again, we haven't had any questions about it, so

23   there hasn't been any perceived need to do any such training or

24   education.

25   Q.  As we discussed, 6.06(f)'s exception requires the caregiver

1   or attendant to have been previously known to the voter, right?

2   A.  Agreed.

3   Q.  SB1 does not define the phrase "previously known to the

4   voter"?

5   A.  It does not.

6   Q.  And the Secretary of State's Office has not published any

7   guidance on how the phrase "previously known to the voter"

8   should be interpreted?

9   A.  Agreed.

10  Q.  And the Secretary of State's Office has not published any

11  trainings on how the phrase "previously known to the voter"

12  should be interpreted?

13  A.  Agree with that.

14  Q.  Setting aside the fact the Secretary of State's Office has

15  not provided guidance on this matter, in your view, it doesn't

16  matter how long the voter has known the attendant or caregiver

17  before voter assistance is provided under this section?

18  A.  Well, I agree with that.

19  Q.  Could be 15 years?

20  A.  Could be 15 years.  Could be 15 minutes, if they're fresh

21  on the job.  But their job is something other than assisting a

22  voter, then it's fine.

23  Q.  But you would agree the explanation you just provided to me

24  cannot be found anywhere in SB1?

25  A.  Sure, it's right here.  I mean, the whole point of

1    attendant or caregiver is that their job is to do more than
2    just assisting the voter with voting.
3    Q.  You can't say with certainty whether prosecutors would
4    agree with your interpretation of the length of relationship
5    that we just discussed, right?
6    A.  I have no ability to control what prosecutors do.  I know
7    that most of them, if they have a question about an election
8    law statute, will call the Secretary of State's Office and ask
9    us what we think.  We get that question a lot.
10   Q.  But ultimately, as you said, you don't have any control
11   over the prosecutorial decision-making in the end?
12   A.  Absolutely not.
13   Q.  Mr. Ingram, let's turn now to Section 7.04.  Confirming,
14   sir, you've got that on the screen in front of you?
15   A.  I do.
16   Q.  You would agree that Section 7.04 codifies several new
17   felony offenses relating to vote harvesting?
18   A.  I mean, I agree it does what it does, yes.  Doesn't
19   specifically define "vote harvesting."
20   Q.  Let's work towards that.  So Section 286.015(b) makes it
21   unlawful to directly or through a third party -- I'll pause for
22   a moment while this populates on your screen.
23       (Pause.)
24       Sir, do you have that in front of you?
25   A.  Okay.

1    Q.  Generally agree that 7.04 makes it unlawful to knowingly

2    provide or offer to provide vote-harvesting services in

3    exchange for compensation or other benefit?

4    A.  Agreed.

5    Q.  And it also makes it unlawful to provide or offer to

6    provide compensation in exchange for those vote-harvesting

7    activities?

8    A.  Agreed.

9    Q.  For purposes of these sections, a "benefit" is *"anything*

10   *reasonably regarded as a gain or advantage"*?

11   A.  That's what it says.

12   Q.  And you mentioned a moment ago that this section also

13   defines "vote harvesting," and it defines vote-harvesting

14   services to mean *"any in-person interaction with one or more*

15   *voters in the physical presence of an official ballot or a*

16   *ballot voted by mail intended to deliver votes for a specific*

17   *candidate or measure."*

18   A.  Uh-huh, I agree with that.

19   Q.  So for an activity to be considered vote harvesting under

20   this provision, the activity must include, one, in-person

21   interaction with one or more voters; and two, be in the

22   physical presence of an official ballot or ballot voted by

23   mail?

24   A.  Agreed.

25   Q.  I want to --

Case 5:24-cv-00816-DC Document 26-9 Page 197 Date Filed 10/08/2024
Case 5:24-50826 Document 9 Page 197 Date Filed 10/03/2024

Keith Ingram – Examination                    1912

1    A.  And intended to produce a vote for a particular candidate

2    or measure.

3    Q.  I want to begin by discussing the in-person interaction

4    requirement.  In the Secretary of State's Office's view, a

5    telephonic discussion between two individuals would not satisfy

6    the in-person requirement, right?

7    A.  Agree with that.

8    Q.  Sitting across the table from an individual would satisfy

9    the in-person requirement, right?

10   A.  Sure.

11   Q.  And in the Secretary of State's Office's view, in order for

12   the in-person interaction requirement to be met, the

13   interacting individuals must be close enough to see or hear

14   each other; is that right?

15   A.  They have to be in the physical presence of each other,

16   yes.

17   Q.  And so you would agree that they would have to be close

18   enough to see or hear each other?

19   A.  They've got to be with each other, yes.

20   Q.  If I asked you to put a number on how close that would be,

21   you couldn't do that, right?

22   A.  No, no, I couldn't.  The point of vote harvesting is that

23   you are both present, across a table, catty-corner from each

24   other, whatever, in the presence of the ballot.  And

25   politiqueras, when they get hired by a candidate, they don't

1  care who you vote for president, they don't care about U.S.

2  Senate, they don't care about anything except the race that

3  they got hired on.  So when they get down to that school

4  district race, then they want to make sure that the voter

5  checks the box for their preferred candidate.  That's vote

6  harvesting.  That's the whole point of it.

7       So if you've got an interaction with two people that is

8  15 feet apart or close, it doesn't really matter.  The point is

9  that the vote-harvester is trying to do is to make sure that on

10  that particular candidate or measure, the voter goes a

11  particular way.  And that can be done from 15 feet, it can be

12  done from 5 feet.  I'm not going to put a number on it.  If

13  that's what's happening, that's vote harvesting.

14  Q.  Based upon that description you just gave us, I assume it

15  would be the Secretary of State's Office's view it doesn't need

16  to give a precise measurement or distance of closeness, because

17  everybody would know it if they saw it.  Everybody sees it when

18  it happens, everybody would understand what's going on; is that

19  right?

20  A.  Whether everybody would know, I don't know, but if I get a

21  complaint with a set of facts in it that is like what I

22  described -- like what (a)2 here describes, then I would refer

23  that to the Attorney General.  What everybody knows, I don't

24  know what they know.  I have zero insight into what everybody

25  knows.

1      What I do know is if I get a complaint, and it talks about

2  physical presence, intimidation, making sure that a voter

3  marked one box one way, I would consider that vote harvesting,

4  and I would get it over to the Attorney General for

5  investigation.  And I have, in fact, done so, before SB1 and

6  since SB1.

7  Q.  You would agree, though, that the Secretary of State's

8  Office has not published any guidance specifying how close two

9  individuals must be for an interaction to be considered

10  in-person under 7.04?

11  A.  I agree with that.  We have not published any such

12  guidance.

13  Q.  And you have not published any such trainings?

14  A.  I agree with that.

15  Q.  And we alluded to it earlier.  We can squarely address it

16  now.  Let's discuss the requirement that a ballot be physically

17  present under 7.04.

18      You'd agree that SB1 does not define what it means for a

19  ballot to be physically present, right?

20  A.  I agree with that.

21  Q.  For example, SB1 does not designate the proximity within

22  which a ballot must be to a conversation for it to be deemed

23  physically present.

24  A.  I agree that the statute doesn't say anything about that.

25  Q.  The Secretary of State's Office has no official opinion

1    about whether a ballot being within ten feet of a discussion is

2    close enough to constitute physical presence for this section?

3    A.  I don't know how else to say this.  If the ballot is in the

4    kitchen, and we're in the living room, and we're talking about

5    our preferred candidates, that's First Amendment.  That's not

6    implicated by this section at all.  So whether that's ten feet

7    or 8 feet, it doesn't matter.  That's not what's going on.

8    What's going on is a perfectly normal -- I'm trying to persuade

9    you to vote for my candidate.  I can get paid for that.  I can

10   go do it all day long, and it will never, ever, ever implicate

11   this section.

12       The whole point of this section is whenever the voter and

13   the harvester get together and they're reviewing the ballot

14   together, and then they get down to that candidate, and the

15   harvester makes sure they check the right box, that's

16   harvesting.  So anything other than that is First Amendment.

17       I mean, we've got the right to pay canvassers to go solicit

18   votes for our preferred candidate.  That's not implicated by

19   this.  This is whenever you've got a particular mission to

20   deliver a particular number of votes for a particular candidate

21   and you make sure that the voter checks that box.  That means

22   that the ballot has to be in front of both of you and you both

23   have to know it's there and you both have to be looking at it.

24   This is not a situation where you can be caught by accident.

25   Vote-harvesters know exactly what they're doing.

1    Q.  So I think you agreed with me that the Secretary of State's

2    Office has no official opinion about whether a ballot being

3    within ten feet of a discussion is close enough to constitute

4    physical presence for this section.

5    A.  Almost never would that be.  I can imagine, I guess, a

6    very --

7                THE COURT:  Sir, that's not the question.

8                THE WITNESS:  I'm sorry.

9                THE COURT:  It will go a whole lot easier if you just

10   answer the question.  The question is, does the Secretary of

11   State's Office have a position?

12               THE WITNESS:  Not really, no, sir.

13   BY MR. KANTERMAN:

14   Q.  As a general matter, if a discussion is proceeding and a

15   ballot is 5 feet away, generally, the Secretary of State's

16   Office doesn't think that the ballot is sufficiently nearby to

17   constitute physical presence for this section, right?

18   A.  I agree with that.

19   Q.  Yet, in the Secretary of State's Office's view, there are

20   circumstances that might render a ballot which is 5 feet away

21   from a conversation sufficiently nearby to deem it physically

22   present.

23   A.  It's hard to envision.

24   Q.  I'll give you an example.  If a conversation is occurring

25   at a large conference room table and the ballot is 5 feet away

1  from the two speakers but still on the table that, in the

2  Secretary of State's Office's view, might be enough to

3  constitute physical presence under this section.

4  A.  Doubtful, but maybe.  It just depends.

5  Q.  But the Secretary of State's Office can't give a blanket

6  opinion or blanket guidance about how close in proximity a

7  ballot must be to a conversation for it to be deemed physically

8  present for this section.

9  A.  I agree with that.

10  Q.  You'd agree that any decision would have to be made on a

11  case-by-case basis?

12  A.  Well, whether or not voter-harvesting is going on is always

13  going to be decided on a case-by-case basis, yes.  Proximity to

14  the ballot is one of the factors.

15  Q.  And if I pressed for a more specific set of guidance about

16  proximity, you'd tell me it's just you or the director

17  reviewing a complaint and applying their judgment?

18  A.  As far as what we do.  Now, whether or not a prosecutor

19  agrees with us is a different story entirely.

20  Q.  But while you were director, a decision as to whether

21  someone violated this section, for purposes of assessing a

22  complaint, you'd simply just have to know it when you saw it?

23  A.  If the allegation in the complaint is that Ms. Rodriguez or

24  Mr. Smith paid me $50 if I would go vote for commissioner

25  so-and-so for the school board, then that gets it referred to

1    the Attorney General.  That's either 3602 or vote harvesting,

2    but either way, that gets referred.  It's not Keith Ingram

3    deciding, does it fit in the statute or doesn't it?

4            MR. KANTERMAN:  Your Honor, I don't know if now would

5    be a good time for a short break?

6            THE COURT:  Yes.

7            COURT SECURITY OFFICER:  All rise.

8            *(2:22 p.m.)*

9                                        *   *   *

10           *(2:39 p.m.)*

11           COURT SECURITY OFFICER:  All rise.

12           THE COURT:  Thank you.  Please be seated.

13           MR. KANTERMAN:  Thank you, Your Honor.

14   BY MR. KANTERMAN:

15   Q.  Mr. Ingram, I've been handed a number of questions from my

16   colleagues, and I'd like to just circle back on some of them to

17   make sure I've closed some gaps, so I appreciate your patience.

18       I don't think I asked you earlier, but when we discussed

19   some of the legislative meetings that your office was having, I

20   wanted to ask two additional questions.  The first is whether

21   on some occasions your office would propose language to achieve

22   what a particular legislator or committee member might want to

23   accomplish?

24   A.  In general or with regard to SB7/SB1?

25   Q.  In general.

1    A.  In general, that is one of the functions of our office,

2    sure.  We will propose language if a legislator tells us what

3    they want to do, and they want us to draft something, it always

4    goes to a "leg." council after we submit it.  That didn't

5    happen on SB1 or SB7.

6    Q.  I'll ask Derek to please pull back up LULAC 75.

7         Mr. Ingram, we looked at this document earlier, right?

8    A.  We did.

9    Q.  And you highlighted row four as being relevant, the row

10   where the post number says 298,217, correct?

11   A.  Yes, and as well as the bottom and the middle.

12   Q.  And I'll stay with row four just for a moment, please.

13   A.  Okay.

14   Q.  These are the voters who, if they put their Social Security

15   number on the mail ballot, will not match to their voter

16   registration record?

17   A.  That's right.

18   Q.  And row five, I believe, is the row that you had just

19   indicated you also identified?

20   A.  That's right.

21   Q.  Row five, which you'll note has been highlighted in green,

22   these are the voters who, if they put their Texas driver's

23   license number on the mail ballot, will not match to their

24   voter registration record?

25   A.  Right.  And I just want to make clear that when we talk

1   about "matching," we mean identify the same voter.  That's what

2   the statutory language is.

3   Q.  And taken together, there are 667,685 voters who could put

4   a valid driver's license or Social Security, the last four, on

5   a mail ballot and not match to their voter registration record?

6   A.  Agree with that.  That's the number that we want to get

7   down, and it's going to continue to decrease.

8   Q.  And so I want to talk a bit about that assertion.  You

9   would also agree, though, that each year a new group of Texas

10  voters turns 65 years old?

11  A.  I agree with that, but these numbers reflect all active and

12  suspense voters.  These are not limited to people over 65.  So

13  out of the almost 18 million voters that we have, this is the

14  total number with one or the other number but not the other

15  one.

16  Q.  But you would agree that there are a new set of voters who

17  would turn 65 every year?

18  A.  I agree with that, yes.

19  Q.  And some Texas voters who turn 65 may choose to vote by

20  mail?

21  A.  Agreed.

22  Q.  We could take LULAC 75 down.  Thank you very much.

23      Mr. Ingram, since implementing SB1, the Secretary of

24  State's Office has not done any analysis of the impact SB1 has

25  had on minority groups?

1   A.  I agree with that.

2   Q.  Secretary of State's Office has not done any analysis, for

3   example, the impact of SB1 on Black voters?

4   A.  I agree with that.

5   Q.  Secretary of State's Office has not done any analysis of

6   the impact of SB1 on Latino voters?

7   A.  Agreed.

8   Q.  Secretary of State's Office has not done an analysis, the

9   impact of SB1 on Asian voters?

10  A.  Agree with that.

11  Q.  Same true for Pacific Islander voters?

12  A.  Agreed.

13  Q.  And the Secretary of State's Office has not done any

14  analysis on the impact of SB1 on voters with disabilities?

15  A.  Agreed.

16  Q.  We spoke earlier about the fact that in March of 2023, your

17  role at the Secretary of State's Office changed.

18  A.  Yes, sir.

19  Q.  And your role changed shortly after an interaction you had

20  with Representative Swanson during testimony that you provided

21  at a March 9, 2023 Texas House Committee Meeting.

22  A.  Agreed.

23  Q.  Generally, that meeting, you were explaining that

24  notwithstanding the challenges that the Harris County election

25  had had in 2022, the November general election was the best one

1  Harris County had had since they implemented an election
2  administrator.
3  A.  I agree with that.
4  Q.  When you provided that testimony at the Texas House
5  Committee, you thought you were making accurate statements
6  regarding that election?
7  A.  I did.  It was accurate.
8  Q.  And Representative Swanson took issue with the views you
9  were expressing.
10 A.  She did.  She misunderstood what I said.  She thought that
11 I was saying they had a good election.  I was not saying that.
12 I was saying they had the best election they had had since they
13 had an EA.  That was a fairly low bar.
14 Q.  And that disagreement was in part because Representative
15 Swanson was expressing there to be, in her view, vast problems
16 in Harris County relating to ballot paper shortages and
17 Republican-heavy areas; isn't that right?
18 A.  I agree with that.  There was a litany of things she listed
19 in that hearing.
20 Q.  And during the exchange that you had with Representative
21 Swanson, you became frustrated with the representative.
22 A.  I did.  I don't like to have my testimony misunderstood or
23 mischaracterized.  I speak plainly, because I want to be
24 understood.
25 Q.  And that frustration that you had with Representative

1   Swanson was because you believed she was, in fact,

2   mischaracterizing your testimony?

3   A.  I agree with that.

4   Q.  After that hearing, the Secretary of State was not pleased

5   with your exchange with the Representative.

6   A.  That's right.

7   Q.  And following that exchange, your role at the Secretary of

8   State's Office changed?

9   A.  It did.

10  Q.  Simply put, as you understand it, the Secretary of State

11  thought that it was best for her and for you to change your

12  role.

13  A.  I agree with that.

14          MR. KANTERMAN:  Just a moment, Your Honor, if I could.

15          Mr. Ingram, thank you for your time.

16          Your Honor, I have no further questions.  I do pass to

17  my colleagues, who I understand have some additional questions.

18          MR. GENECIN:  Good afternoon, Your Honor.  I'm Victor

19  Genecin for the Haul plaintiffs.

20          (2:47 p.m.)

21                        EXAMINATION

22  BY MR. GENECIN:

23  Q.  Good afternoon, Mr. Ingram.

24  A.  Howdy.

25  Q.  A little while ago when you were testifying, you described

1    your view of vote harvesting.  Do you recall doing that?

2    A.  I agree we were talking about the new statute in SB1 and

3    its definition.

4    Q.  You explained what you understood the concept of vote

5    harvesting to mean; is that right?

6    A.  That's right.

7    Q.  Now, has the Secretary of State's Office put out any

8    written guidance to set forth the definition of vote harvesting

9    that you provided to the Court this afternoon?

10   A.  No, sir.  We go with the statute.  The criminal enforcement

11   is not something that we generally do, so we don't educate on

12   it.  The only role that the criminal pieces have for us is

13   whether or not something is a crime on the face of a complaint.

14   You know what I mean?  Our office doesn't implement the

15   criminal section, so that -- all those criminal laws and

16   things, you know, we sort of scan them, we know exactly -- we

17   know generally what they say, but it's not our job to educate

18   on those.

19   Q.  So that definition that you provided is not set down in

20   writing anywhere?

21   A.  The definition that I provided came straight out of the

22   statute, so you can look at 27.601, what was it 016(a)(2), and

23   you'll get the definition.

24   Q.  Has your understanding of the vote-harvesting law been

25   adopted by the Attorney General in an opinion of the Attorney

1    General, as far as you know?

2    A.  I don't think they've issued any opinions with regard to

3    vote harvesting.

4    Q.  Now, with regard to your testimony a little bit earlier, do

5    you remember you testified about the concept that the old poll

6    watcher provision that spoke of poll watchers being permitted

7    to be conveniently near meant the same thing as in the new law

8    which says that they have a right to be near enough to see and

9    hear?

10   A.  Agree with that.

11   Q.  You remember that testimony?

12   A.  No substantive difference.

13   Q.  Okay.  And has your view that there's no substantive

14   difference between those two phrases found its way into any

15   written guidance by the Secretary of State's Office?

16   A.  I don't know if we've gotten written guidance on it.  I

17   know that I've presented several legislative updates regarding

18   SB1, and that was my consistent position in front of several

19   different county audiences, including county judges, county

20   commissioners, and county election officials.

21   Q.  I'm asking, though, has there been anything in writing from

22   the Secretary of State's Office to that effect?

23   A.  Well, I don't know what the particular slide said.  You

24   know, I don't know if there's something in writing to accompany

25   what I was saying, but I know that whenever I teach that

1   provision of SB1, that I taught it to be the same as the

2   pre-existing standard.

3   Q.  Do you know if the Attorney General has issued any opinion

4   about the meaning of "near enough to see and hear"?

5   A.  As far as I know, they haven't issued any opinion on that,

6   no, sir.

7   Q.  And you also spoke about the question of what paid

8   canvassers would be allowed to do under SB1, remember that?

9   A.  Okay, uh-huh.

10  Q.  Has the Secretary of State's Office issued any written

11  guidance about what paid canvassers are or are not permitted to

12  do?

13  A.  No, sir.  That's, again, something that's beyond our scope.

14  Q.  Now, during your time as director of elections for the

15  Secretary of State's Office through the month of March of 2023,

16  were you familiar with the Secretary's obligations to voters

17  with disabilities under the Americans With Disabilities Act?

18  A.  Well, the Americans With Disabilities Act is not a voting

19  statute.  It has incidental implications with regard to

20  accessibility of polling locations, but HAVA is the more direct

21  law governing elections with regard to the disabled.

22  Q.  Let's start with Americans With Disabilities Act.  To the

23  extent the Americans With Disabilities Act applied to

24  elections, were you familiar with its requirements?

25  A.  Well, not in detail, no, sir.  There's I don't know how

1   many hundreds of pages in the Code of Federal Regulations about

2   ADA's requirements for accessibility.  We depended upon the

3   Coalition for Texans with Disabilities as well as Texans for

4   Disability Rights.  We depended on them.  They do surveys at

5   polling locations, they do audits in counties, and then they

6   send us those results, and we make sure that the County takes

7   those results seriously and makes changes sometimes to the

8   location, sometimes to a different location, so that they can

9   be accessible to all voters.

10  Q.  Were you familiar with the Secretary's obligations under

11  HAVA?

12  A.  Yes.

13  Q.  Were you familiar with the Secretary's obligations to

14  voters with disabilities under Section 504 of the

15  Rehabilitation Act?

16  A.  I don't know what that is.

17  Q.  Were you familiar with the Secretary's obligations to

18  voters with disabilities under Section 208 of the Voting Rights

19  Act?

20  A.  I do know that, yes, sir.

21  Q.  And during your tenure as director of elections, is it

22  correct that your office did not have written policies

23  regarding the State's obligations under the Americans with

24  Disabilities Act with regard to the administration of

25  elections?

1   A.  As I said before, we depend upon the Coalition for Texans

2   with Disabilities and Texans --

3          THE COURT:  It goes a lot easier if you would just

4   listen to the question and answer the question.

5          THE WITNESS:  The point is that we had them present

6   our seminars with written material --

7          THE COURT:  No, sir, that's not the question.  The

8   question is did you have written policies.

9          THE WITNESS:  Our office did not.  Our office

10  outsourced that to the experts, and we used their materials in

11  our seminars.

12  BY MR. GENECIN:

13  Q.  And to your knowledge, does the Secretary of State's Office

14  now have written policies regarding the State's obligations

15  under the Americans with Disabilities Act?

16  A.  No, sir.

17  Q.  No.  You don't know or the office still does not have such

18  written policies?

19  A.  I haven't looked on the website lately.  I would be

20  surprised if they had policies there.  They did not in March,

21  and there was no plans for such.

22  Q.  Is it correct that no one at the Secretary of State's

23  Office is assigned responsibility of monitoring the Division of

24  Elections compliance with the ADA?

25  A.  That's not true.  We've had a staff attorney assigned to

1    that role throughout my time at the office.  Christine Ramon
2    was the last one who was assigned that role, and she has not
3    been replaced yet, and I don't know if Christine has got
4    somebody else assigned that responsibility now.
5    Q.  Could we, Derek, have Mr. Ingram's deposition of March 29th
6    of 2023, please.  And if you'd go to page eight, please, at the
7    bottom, lines 24 and 25.
8        Yes.  If you would have a look at the testimony there.
9    A.  I think that's exactly what I just said.
10   Q.  Well, I think at that time we asked the question, *"Is there
11   someone in your office who is assigned the responsibility for
12   monitoring compliance with the Americans with Disabilities
13   Act?"*  And you answered, *"No, sir."*
14   A.  I agree with that, and that's exactly what I said.  I said
15   Christine Ramon was responsible for it, and she had left a year
16   and a half ago, and we were farming those questions out to all
17   the lawyers.  And then I said that we didn't have anybody
18   assigned.  As far as I know, that remains the case.  Christina
19   could have assigned somebody since March.  This was March of
20   '23.  I don't think I've said anything inconsistent in this
21   room.
22   Q.  Could we take that down.  And thank you, sir.
23       Secretary of State's Office employs trainers who provide
24   peer-to-peer support to county election officials on issues
25   related to elections; is that right?

1    A.   Agreed.

2    Q.   And is it correct that the Secretary of State's Office does

3    not provide internal training about the Americans with

4    Disabilities Act to those peer-to-peer trainers?

5    A.   Agree with that.

6    Q.   Is the correct --

7    A.   I take that back.  We have had presentations in the office

8    to our lawyers and the trainers about ADA and accessibility.

9    That is not something that we do regularly, but it has

10   occurred.  And again, we rely on Coalition for Texans With

11   Disabilities and Texas for Voters with Disability Rights.

12   Q.   You think you didn't remember that when you were deposed on

13   March 29th?

14   A.   Probably not.

15   Q.   I could show you your deposition where you said that

16   Secretary of State's Office did not provide internal training

17   about the ADA to its peer-to-peer trainers.

18   A.   No, I agree with that.  That's what I said.  I think I was

19   mistaken.

20   Q.   So you corrected your deposition testimony here today?

21   A.   I have now.

22   Q.   Okay.  Is it correct that the peer-to-peer trainers

23   employed by the Secretary of State's Office have not conducted

24   any trainings to county officials on their obligations under

25   the ADA outside of consulting with them on the physical

1    accessibility of polling places?

2    A.  That's probably right.

3    Q.  And is it correct that the Secretary of State's Office has

4    not done anything to educate voters with disabilities about

5    their rights under Section 108 of SB1 to request reasonable

6    modifications to SB1 under the law?

7    A.  I don't know.  We have a voter-facing website

8    votetexas.gov, and I don't know if we updated the disability

9    page or not.

10   Q.  As of your deposition in 2022, would it be fair to say that

11   you had not yet done anything to educate voters with

12   disabilities about their rights under Section 108?

13   A.  Agree with that.

14   Q.  And you don't know if any such efforts have been made since

15   then?

16   A.  I agree with that.

17   Q.  So I'd like to turn now to recordkeeping required by SB1.

18   Do the counties maintain records of each request for an

19   absentee ballot that they receive?

20   A.  They should.

21   Q.  And the counties are legally mandated, are they not, to

22   enter that information into TEAM?

23   A.  They are.

24   Q.  When I say "TEAM," we mean the -- it's the Texas Election

25   Administration Management system?

1    A.  It is.

2    Q.  But even though the counties are required to enter records

3    of each request for an absentee ballot that they receive into

4    TEAM, they don't always do so, do they?

5    A.  It didn't really matter until we had a requirement for a

6    ballot tracker, and so since that's occurred in '21, we have

7    had much higher compliance.

8    Q.  But you still don't have anywhere close to a hundred

9    percent compliance, do you?

10   A.  I don't know.  I would say it's pretty high.  I don't know

11   if it's close to a hundred percent.  I don't know what you

12   consider close to a hundred percent, but it's definitely a good

13   80, 85 percent.

14   Q.  Are you able to tell me which counties do not provide

15   information concerning the requests for absentee ballots that

16   they receive?

17   A.  I can't off the top of my head.  I could get Kristi to

18   print something out of TEAM.  There would be a report.

19   Q.  Okay.  Do the counties maintain records of the date on

20   which they receive each application for a ballot by mail?

21   A.  They're supposed to.

22   Q.  And they're supposed to enter that information into TEAM,

23   aren't they?

24   A.  They are.

25   Q.  And are you able to tell the Court which counties don't

1    provide that information for TEAM?

2    A.  No, sir.  Most do.

3    Q.  Okay.  Do the counties maintain records of whether each

4    application for ballot-by-mail was accepted or rejected?

5    A.  Yes.  I don't know if you mean final acceptance or

6    rejection or interim, but we now have a cure period, so it

7    matters.

8    Q.  Well, we're not talking here -- just to be clear, we're

9    talking ABBM's.  Talking about the applications for

10   ballots-by-mail and not by the ballots-by-mail themselves?

11   A.  I understand that, but still, there's an interim phase

12   where it could be incomplete and need more information that is

13   a status of rejected, but it gets cured, and then it's accepted

14   and the ballot is sent.

15   Q.  Well, do the counties maintain records of those initial

16   rejections?

17   A.  They're supposed to, but what we would have recorded in our

18   TEAM system is the final status, which could be the initial

19   status, and they could have just filled in another application

20   for ballot-by-mail that did get accepted, and so that would be

21   a separate transaction in the database.

22   Q.  Can you tell me which counties are not providing

23   information about their rejections?

24   A.  Not off the top of my head.  We can run a report, but most

25   counties are doing their job with regard to mail ballot

1    recording since SB1.

2    Q.  And it's your testimony they've been doing that since SB1

3    was enacted?

4    A.  No.  We had a rough patch there in the first primary

5    election where we had less than stellar compliance, but since

6    then, it's been getting better and better and better.

7    Q.  And do the counties keep information regarding each ballot

8    that they send to a voter?

9    A.  They should, yes, sir.

10   Q.  And is a record of each ballot that had to be sent to a

11   voter information that the counties are required to enter into

12   TEAM?

13   A.  What they're required to do is put into TEAM the date that

14   a ballot was mailed.

15   Q.  And is it true that there are counties that don't put that

16   information into TEAM?

17   A.  Some don't.

18   Q.  And turning now to the rejection.  Do counties keep records

19   of their final rejections of applications for ballot-by-mail?

20   A.  Yes.

21   Q.  And they're required to enter that information into TEAM?

22   A.  They are.

23   Q.  They don't always do that, do they?

24   A.  Some don't.

25   Q.  Again, do you know which counties don't?

1    A.  We can run a report.

2    Q.  Okay.  Any particular problem children occur to you?

3    A.  No.

4    Q.  And do the counties --

5    A.  That's a hard question to answer because some counties are

6    problematic on some things and not on others.

7    Q.  Do counties maintain records of each ballot-by-mail that is

8    filed with them?

9    A.  Yes.

10    Q.  And is that information required to be enter into TEAM?

11    A.  When they receive back a ballot, yes, sir, that's supposed

12    to be recorded in TEAM.

13    Q.  And do all the counties comply with their obligation to

14    enter that information?

15    A.  Not all of them.

16    Q.  And are they required to enter the date on which they

17    received each ballot-by-mail?

18    A.  Yes, sir.

19    Q.  And do they -- do all the counties enter that information

20    into TEAM?

21    A.  Not all of them.

22    Q.  And are the counties required to maintain information about

23    whether each ballot-by-mail is accepted or rejected?

24    A.  The final disposition will be recorded in TEAM.

25    Q.  And well, they're required to enter the final

23-50885.39558

1   information -- final disposition into TEAM; is that right?

2   A.  They're also required to enter the interim dispositions.

3   Q.  Do you have a hundred percent compliance with either the

4   interim dispositions or the final dispositions from the

5   counties?

6   A.  More on the final than the interims.

7   Q.  Are the counties required to maintain records of the

8   notification that they send to each voter of the rejection of

9   his or her ballot by mail when a voter's ballot-by-mail is

10  rejected?

11  A.  I can't answer that.  You talking about an interim

12  rejection or the final rejection?  The answer is both, but I

13  want to make sure that we know what we're talking about.

14  Q.  Let's talk about interim first.  Are the counties required

15  to maintain record of their notification to a voter of their

16  interim --

17              (Court reporter clarification.)

18  BY MR. GENECIN:

19  Q.  Are the counties required, under SB1, to maintain records

20  of the interim rejection of a voter's ballot-by-mail?

21  A.  Of their notice to the voter, yes.

22  Q.  And are they required to record that notice to the voter in

23  TEAM?  Or to record information concerning the notice to the

24  voter?

25  A.  I don't think so.  I'd have to go back and look at House

1   Bill 1382 again.  But I don't think that information is

2   required.  You know, maybe some do, some don't, but the

3   important thing is the final acceptance or rejection.

4   Q.  So with regard to the final, are the counties required to

5   maintain records of the final rejection?

6   A.  Yes.

7   Q.  And are they required to enter that information into TEAM?

8   A.  They are.

9   Q.  And do all the counties enter the information concerning

10  their final rejections into TEAM?

11  A.  Not all.

12  Q.  Are you able to tell us which counties don't?

13  A.  It's easier to run a report, but I don't have the

14  information in front of me.

15          MR. GENECIN:  Thank you.  Your Honor, I'll pass the

16  witness.

17          THE COURT:  Anything further on this side?

18          MR. DODGE:  Just a handful more, Your Honor.  If we

19  could pull up Joint Exhibit 1 and go to page 33.

20          (3:07 p.m.)

21                          EXAMINATION

22  BY MR. DODGE:

23  Q.  Good afternoon, Mr. Ingram.  My name is Chris Dodge.  I

24  represent the LULAC plaintiffs in this case.

25      I'd like to return to -- with some questions about the mail

1    ballot provisions in SB1 that you were discussing earlier.  You

2    see Section 5.02 on the screen now right?

3    A.  I see the first part of it, yes.

4    Q.  Section 5.02 states that *"an applicant seeking a mail*

5    *ballot should include the number of the applicant's driver's*

6    *license, election identification certificate or personal*

7    *identification card issued by the Department of Public Safety*

8    *on the application,"* correct?

9    A.  Agreed.

10   Q.  And Section 5.08 contains an identical statement regarding

11   the mail ballot carrier envelope?

12   A.  I believe so, yes.

13   Q.  And you agree that for a voter who has been issued a Texas

14   driver's license, Sections 5.02 and 5.08 require that driver to

15   list their driver's license?

16   A.  I agree that the statute has this hierarchy.  I believe

17   that they copied this from the Help America Vote Act, which has

18   a very similar hierarchy.

19   Q.  And under Section 5.02 and 5.08, Secretary's Office cannot

20   amend the application or carrier envelope to require any

21   additional identification number; is that right?

22   A.  Agreed.

23   Q.  And county officials cannot require mail ballot applicants

24   or voters to include additional ID information on their

25   applications or carrier envelopes?

23-50885.39561

1   A.  They cannot say that such is required.  They can put a

2   notice in the carrier envelope information, the mail ballot

3   information, that says you increase your odds of success if you

4   put both, but it's not a requirement to put both.  But they

5   definitely can communicate to voters, extraneous from the form,

6   that if you've got two numbers, use two numbers.

7   Q.  But you agree counties aren't required to do that?

8   A.  They are not.

9   Q.  And you agree the Secretary's Office cannot require

10  counties to do that?

11  A.  Agreed.  We can encourage them to.  We can tell them that

12  other counties do it, and we can advise them that it's a great

13  idea.

14  Q.  You agree the application in carrier envelope instructions

15  published by the Secretary's Office after SB1 went into effect

16  track the statutory language of Section 5.02 and Section 5.08,

17  right?

18  A.  I agree.

19  Q.  Switching gears, I have some questions about election

20  security.  At the time of the 2020 general election, it was

21  your view that Texans could have a great deal of confidence in

22  the mail ballot system?

23  A.  Agreed.

24  Q.  As of the 2020 general election, it was your view that

25  Texans could have a great deal of confidence in the electoral

1    process generally?

2    A.   Agreed.

3    Q.   At the time of the 2020 election, Texas mail ballot system

4    and electoral process had robust built-in security checks?

5    A.   Agree with that.

6    Q.   Prior to SB1, election officials in Texas confirmed that

7    each person who applied to vote-by-mail was, in fact,

8    registered to vote before issuing them a ballot?

9    A.   Absolutely.

10   Q.   And also prior to SB1, officials in Texas would make sure

11   that the address listed on the application was the same as the

12   address in the voter's registration file?

13   A.   Agreed.  Or else they would send the statement of residence

14   that had to be returned before the ballot was counted.

15   Q.   Prior to SB1, officials in Texas would verify that the

16   signature on the voter's application to vote by mail matched

17   the signature in the voter's file, on the voter's application?

18   A.   Agreed.  But again, when we talk about "matching," what we

19   really mean is does the signature on the application, signature

20   on the carrier envelope identify the same voter.  "Identify the

21   same voter" is operative language.  That sort of devolves

22   colloquially into "matching," but it's not really matching.

23   It's does it identify the voter?

24   Q.   But you agree that process was in place prior to SB1?

25   A.   Yes.

1    Q.  I appreciate that clarification.

2    A.  SB1 said that if somebody provides a number, it creates a

3    rebuttable presumption that the signatures identify the voter,

4    so it changed the weight of the signature comparison from more

5    to less.  It made the number the more objective standard, the

6    most important, and then shifted the burden of proof to anybody

7    that wants to prove it's not the same voter, that they're going

8    to have to do it.

9    Q.  Prior to SB1, each mail ballot contained a unique serial

10   number so you could identify which ballot went to which voter?

11   A.  Agreed.

12   Q.  Mr. Ingram, do you agree there are people who seek to cast

13   doubt on the--

14                    *(Court reporter clarification.)*

15   BY MR. DODGE:

16   Q.  I said, Mr. Ingram, do you agree that there are people who

17   seek to cast doubt on the legitimacy of Texas's electoral

18   system?

19   A.  There are such people, yes.

20            MR. DODGE:  Pass the witness.

21            THE COURT:  Anything else from this side?  Any cross?

22            MR. KERCHER:  Not at this time, Your Honor.  We

23   reserve the right to call this witness during our

24   case-in-chief.

25            THE COURT:  You may step down, sir.

```
 1              THE WITNESS:  Yes, sir.
 2              THE COURT:  You're remaining under the rule, so only
 3    discussions with the lawyers.  No discussions with any other
 4    witnesses.
 5              THE WITNESS:  Yes, sir.
 6              THE COURT:  Where do we --
 7              MS. TULIN:  Leah Tulin with the Brennan Center on
 8    behalf the LUPE plaintiffs.  Your Honor, at this time, LUPE
 9    plaintiffs would seek to move into evidence LUPE 232, State
10    143, LUPE 292 and LULAC 75.  I believe I misspoke during my
11    examination of Ms. Adkins, and said that LUPE 232 had already
12    been admitted, but I do not believe that is the case.
13              THE COURT:  Any objection from anybody on this side on
14    LUPE 232 or 292?
15              MR. WASSDORF:  No, Your Honor.
16              THE COURT:  No objections over here?
17              MR. LIU:  No objection.
18              THE COURT:  And LUPE 232 and 292 were admitted.  Any
19    objection to State 143?  Hearing none, 143 State is admitted.
20              Any objection to LULAC 75?
21              MR. WASSDORF:  No, Your Honor.
22              THE COURT:  No objection to LULAC 75.  That's
23    admitted.
24              MS. TULIN:  Thank you, Your Honor.  There are two
25    exhibits that were not used today that I would also like to
```

1                          *   *   *   *   *

2    UNITED STATES DISTRICT COURT

3    WESTERN DISTRICT OF TEXAS

4

5         I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.  I

7    further certify that the transcript fees and format comply with

8    those prescribed by the Court and the Judicial Conference of

9    the United States.

10

11   Date signed:  September 22, 2023

12   /s/ Gigi Simcox

13   /s/ Angela M. Hailey

14   United States District Court
     Official Court Reporters
15   CSRs, CRRs, RPRs, RMRs
     Official Court Reporter
16   262 West Nueva Street
     San Antonio, Texas  78207

17

18

19

20

21

22

23

24

25

APPENDIX D

```
1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
2                    SAN ANTONIO DIVISION

3
     LA UNION DEL PUEBLO ENTERO,      .
4    ET AL,                           .
                                      .
5              PLAINTIFFS,            .
          vs.                        . DOCKET NO. 5:21-CV-844-XR
6                                     .
     GREGORY W. ABBOTT, ET AL,        .
7                                     .
               DEFENDANTS.            .
8

9

10               TRANSCRIPT OF BENCH TRIAL
          BEFORE THE HONORABLE XAVIER RODRIGUEZ
11             UNITED STATES DISTRICT JUDGE
                    OCTOBER 4, 2023
12

13

14

15

16   APPEARANCES:
     FOR THE PLAINTIFFS:      NINA PERALES, ESQUIRE
17                            FATIMA MENENDEZ, ESQUIRE
                              JULIA LONGORIA, ESQUIRE
18                            MALDEF
                              110 BROADWAY
19                            SUITE 300
                              SAN ANTONIO TX 78205
20

21                            VICTOR GENECIN, ESQUIRE
                              NAACP LEGAL DEFENSE & EDUCATIONAL
22                            FUND INC
                              40 RECTOR STREET, FIFTH FLOOR
23                            NEW YORK NY 10006

24

25
```

```
 1

 2

 3

 4   FOR THE DEFENDANTS:      RYAN G. KERCHER, ESQUIRE
                             KATHLEEN HUNKER, ESQUIRE
 5                           WILLIAM WASSDORF, ESQUIRE
                             DAVID BRYANT, JR., ESQUIRE
 6                           TEXAS ATTORNEY GENERAL
                             P.O. BOX 12548
 7                           MC 009
                             AUSTIN TX 78711
 8

 9                           LOUIS J. CAPOZZI, III, ESQUIRE
                             JONES DAY
10                           51 LOUISIANA AVENUE NW
                             WASHINGTON DC 20001
11

12

13

14

15   REPORTED BY:            GIGI SIMCOX, RMR, CRR
                             OFFICIAL COURT REPORTER
16                           UNITED STATES DISTRICT COURT
                             SAN ANTONIO, TEXAS
17

18

19

20

21

22

23

24

25
```

CESAR ESPINOSA – DIRECT

1    *(San Antonio, Texas; October 4, 2023, at 8:45 a.m., in*
2    *open court.)*
3             THE COURT:  Good morning.
4             MR. PARRENO:  Good morning, Your Honor.  LUPE
5    plaintiffs will call Cesar Espinosa.
6        (CESAR ESPINOSA, having been duly sworn, testified as
7    follows:)
8             MR. PARRENO:  Good morning.  My name is Kenneth
9    Parreno and I'm an attorney on behalf of the LUPE plaintiffs.
10            Mr. Espinosa will testify in support of LUPE
11   plaintiffs' challenge to Section 4.09, Section 6.03, and
12   Section 6.04.
13            THE COURT:  Thank you.
14                      DIRECT EXAMINATION
15   BY MR. PARRENO:
16   Q.  Mr. Espinosa, would you please state your name for the
17   record?
18   A.  Cesar Espinosa.
19   Q.  And would you mind just first spelling your first and last
20   name for us?
21   A.  First name is C-E-S-A-R.  The last name is
22   E-P-S-I-N-O-S-A.
23   Q.  And, Mr. Espinosa, where do you live?
24   A.  I live in Houston, Texas.
25   Q.  What do you do for a living?

*Gigi Simcox, RMR, CRR*

CESAR ESPINOSA – DIRECT

1  A.  I am currently the executive director of FIEL Houston.

2  Q.  How long have you had that position?

3  A.  I am the founding executive director, so I've been there

4  since May of 2007.

5  Q.  Let's get to know a little bit more about FIEL.  Can you

6  give us a brief description of what FIEL is?

7  A.  FIEL is the largest immigrant–led civil rights

8  organization in Harris County.

9  Q.  And what sort of activities do you–all do?

10  A.  We have different programs aimed at empowering and

11  educating the community.

12  Q.  And FIEL, do you mind spelling that for us actually,

13  please?

14  A.  Yes.  It's F–I–E–L.

15  Q.  Is that an acronym for something?

16  A.  Yes.

17  Q.  What is that an acronym for?

18  A.  It's *Familias Inmigrantes Estudiantes Luchar*, or which is

19  an acronym for Immigrant Families and Students in the Fight.

20  Q.  And where in Houston is FIEL located?

21  A.  We are based in Southwest Houston but we have members

22  across the Greater Houston Area.

23  Q.  Could you tell us a little bit about why FIEL was created?

24  A.  FIEL was created in order to help –– in 2007 help students

25  attain higher education.

*Gigi Simcox, RMR, CRR*

23-50885.40053

2431
CESAR ESPINOSA – DIRECT

1   Q.   Could you say a little more about that.

2   A.   So in 2007 there was not really a group that would help

3   young people access scholarships or financial aid so we began

4   what we thought was going to be a small group of students and

5   eventually it grew to what it is today.

6   Q.   And you said you've been the executive director since its

7   founding.  What are your responsibilities as the executive

8   director of FIEL?

9   A.   Well, I am –– my responsibilities are to oversee

10  day-to-day operations, to manage staff, and to make sure that

11  programs are running as the way they are intended, but I am a

12  very hands-on executive director, so I do everything from

13  answering phones to be out in the community constantly.

14  Q.   You said "hands-on," could you give us a little bit

15  more –– could you elaborate a little bit more on what you mean

16  by "hands on?"

17  A.   Yes.  So I'm not afraid or opposed to, you know, doing

18  other tasks that require –– that are required of me and I love

19  being out in the community doing presentations and things like

20  that.

21  Q.   Is FIEL a membership organization?

22  A.   Yes.

23  Q.   How many members does FIEL have?

24  A.   At the last count we have 16,000 members in the Greater

25  Houston Area.

*Gigi Simcox, RMR, CRR*

CESAR ESPINOSA – DIRECT

1    Q.  Could you tell me a little bit more about this membership?
2    A.  So members pay a membership due a year and they basically
3    have access to our services and what we do.
4    Q.  So why don't you tell me a little more about who these
5    members are.
6    A.  These members are community members, anybody who wants to
7    be involved or engaged or who needs a service from the
8    organization.
9    Q.  Could you tell us a little bit more about them, like who
10   these individuals are?
11   A.  They are just community people, people who have families,
12   folks who require services.
13   Q.  You said one of the — the I in FIEL stands for
14   *immigrantes*.  Do you all serve — are there a lot of
15   individuals who are related to immigrants in this
16   organization?
17   A.  Yes.  So we have — a large part of our membership are
18   immigrants, either newly arrived or folks who have been here
19   for a long time, and we have many members in our membership
20   who are mixed-status families.
21   Q.  What do you mean by that?  Could you explain what mixed
22   status means?
23   A.  Mixed status is families who may have members in their
24   family members who are first generation, or newly arrived
25   immigrants, who may have family members who are naturalized

*Gigi Simcox, RMR, CRR*

23-50885.40055

2433

CESAR ESPINOSA – DIRECT

1  citizens, or natural born citizens.

2  Q.  And you alluded to this already, but where do FIEL members

3  reside?

4  A.  FIEL members reside in the Greater Houston Area, but we

5  have a large concentration of membership in Southwest Houston,

6  which is close to our offices, or where our office is.

7  Q.  And you mentioned this before, that FIEL members pay dues,

8  but how much are those dues?

9  A.  Individual membership dues for FIEL are $60 a year; $120

10  for families; and children are $20 additional.

11  Q.  I'm sorry.  Just to clear up, $60 a year, is that for one

12  person or multiple people?

13  A.  For — $60 a year would be for one person; $120 per

14  couple; and if they want to add kids onto that, it's $20 extra

15  additional.

16  Q.  And is there any leadership structure to FIEL?

17  A.  Yes, there is.

18  Q.  Could you tell us a little bit about what that leadership

19  structure looks like?

20  A.  So we have a staff of eight which are, you know, paid

21  staff from the organization, but we also are managed by our

22  board and by our members.

23  Q.  Could you describe that board a little bit more?

24  A.  So our board consists of five people, five community

25  people who get elected by our membership.

*Gigi Simcox, RMR, CRR*

CESAR ESPINOSA — DIRECT

1  Q.  What does that board do?

2  A.  The board oversees more of the direction of our mission,

3  make sure that we are fulfilling our mission, that we are in

4  good standing.

5  Q.  How does the election of that board work?

6  A.  It works on staggered terms, one year off, one year on,

7  and then they are elected by their peers, who are members who

8  are in good standing.

9  Q.  You mentioned that there are eight paid staffers at FIEL.

10 Can you tell us a little bit more, still broadly, about what

11 those staffers' responsibilities are?

12 A.  There are some folks who are paralegals in our office and

13 some folks who do management and we have two organizers.

14 Q.  And what do the organizers do?

15 A.  The organizers go out and talk to the community, educate

16 them on rights, on different things, and basically try to

17 empower people to do what they need to do.

18 Q.  And as the executive director, are you among paid staff of

19 FIEL?

20 A.  Yes, I am.

21 Q.  You talked a little bit about the ins and outs of FIEL as

22 an organization, but zooming back a little bit, could you tell

23 us about FIEL's mission as an organization?

24 A.  So our mission is to organize and empower people, to make

25 sure that people know their rights, and that they exercise

*Gigi Simcox, RMR, CRR*

CESAR ESPINOSA − DIRECT

1  their rights in the community.

2  Q.  Are there any substantive areas that relate to your

3  mission?

4  A.  Yes.  We are particularly focused in access to higher

5  education, and community organizing, and civic engagement.

6  Q.  Can you say a little more about civic engagement, what do

7  you mean by that?

8  A.  In civic engagement, we want people to participate fully

9  in the −− in either local politics, or whatever governance

10  that they are in, but we also encourage them to be active

11  participants by voting.

12  Q.  So is it fair to say that voter outreach in civic

13  engagement is part of FIEL's mission?

14  A.  Yes.

15  Q.  Broadly, what activities does FIEL undertake to further

16  its mission?

17  A.  Well, we have community forums.  We do house visits.  We

18  talk to people one−on−one, whether it's out on the street or

19  in person, and I personally talk to anybody who will listen to

20  me, whether it's at the supermarket or wherever, so we try to

21  be constant about recruiting people and letting people know

22  about their rights.

23  Q.  Can you talk a little bit more about those conversations

24  with people and what spaces do those take place?

25  A.  Well, they can take place really anywhere, but we host

*Gigi Simcox, RMR, CRR*

23-50885.40058

CESAR ESPINOSA – DIRECT

1  specific forums dealing on specific topics, like we host
2  special events when we're at a venue, or something like that,
3  but folks can also come to our office, or like I said we go to
4  people's houses to meet them where they are the most
5  comfortable.
6  Q.  Let's talk a little bit more about FIEL's members.  Are
7  some FIEL members registered voters?
8  A.  Yes.  Some members are registered voters.
9  Q.  Among FIEL members who are registered voters, are there
10  any individuals who have limited English proficiency and
11  require assistance when voting?
12  A.  Yes.  Many members have limited English proficiency and
13  require assistance while voting.
14  Q.  And among FIEL members who are registered voters, are
15  there any individuals who are disabled and require assistance
16  when voting?
17  A.  There are members who are disabled and require assistance
18  while voting.
19  Q.  Are there any FIEL members who assist voters who vote in
20  person?
21  A.  Yes.  We do have members that assist people while voting.
22  Q.  And for any given election are there any FIEL members who
23  are first-time voters?
24  A.  Yes.  So we, through one of our programs, one of the
25  outcomes is that we help guide people through a legal process

*Gigi Simcox, RMR, CRR*

CESAR ESPINOSA - DIRECT

1  and we have many folks who are naturalized citizens.

2  Q.  Whose first time it is to vote?

3  A.  And whose first time it is to vote.

4  Q.  I know you're the executive director of FIEL, but just to

5  be clear, are you also a member of the organization?

6  A.  Yes.

7  Q.  Mr. Espinosa, you mentioned that part of FIEL's mission is

8  voter outreach and civic engagement.  Prior to the enactment

9  of SB 1, what had FIEL done to further that part of its

10  mission?

11  A.  We had helped guide members at the polls by accompanying

12  them.  We had helped with translation services mostly, and

13  also like voter outreach forums or education forums.

14  Q.  Can you talk a little bit more about those voter outreach

15  forums?

16  A.  So what we would do during a lot of these forums is a lot

17  more complex than just explaining to people like the

18  technicalities of voting, but rather almost like a small

19  civics lesson on how it works and what they need to do, and

20  how their vote will be counted, and things like that.  So we

21  take the time to be able to teach a lot of first-generation

22  voters or first-time voters the importance of their vote.

23  Q.  Are there any other places where these conversations

24  happen?

25  A.  Yes.  They happen everywhere really, whether it is a, you

CESAR ESPINOSA – DIRECT

1  know, that we are going to somebody's home and doing this, or
2  whether they are coming to us, or whether it's on the phone,
3  or even sometimes through like social media or electronic
4  channels.
5  Q.  Are there any resources y'all provide to voters?
6  A.  We provide — we used to provide the assisters and we
7  provide like voter guides or — yeah, voter guides so they can
8  know what voting is going to be like for them.
9  Q.  And you talked about assistance at the polls, am I
10 remembering that correctly?
11 A.  Correct.
12 Q.  Can you talk a little bit about what that is like?
13 A.  So we would — usually we would partner up with an
14 organization who is already doing like an activity at the
15 polls, take people to vote, and we would be there to provide
16 translation services or assister services.
17 Q.  Derek, could you please pull up LUPE Exhibit 172.  Thank
18 you, Derek.
19     Mr. Espinosa, do you see the document on your screen?
20 A.  Yes.
21 Q.  Are you familiar with this document?
22 A.  Yes.
23 Q.  Can you describe what this document is in your own words?
24 A.  This is the oath of assistance, which is a new document
25 under SB 1 which now requires people to swear, affirm by this

*Gigi Simcox, RMR, CRR*

CESAR ESPINOSA – DIRECT

1  in order to be able to be assisters to a voter.

2  Q.  Have you ever assisted any voters at the polling place?

3  A.  Yes.

4  Q.  Did you ever assist voters before the enactment of SB 1?

5  A.  Yes.

6  Q.  Did you ever assist voters after the enactment of SB 1?

7  A.  No.

8  Q.  When you assisted voters before the enactment of SB 1,

9  what did that assistance look like?

10  A.  So oftentimes it would be kind of like a companionship for

11  voters, or for people who felt uneasy about entering the

12  voting space by themselves, but a lot of times it was for

13  people who had limited English proficiency.  We would — even

14  something as simple like, this is where to turn, and things

15  like that, we would go with them and translate or help them --

16  guide them in that process.

17  Q.  And you are saying the phrase or using the word "we would

18  go," but did that include you?

19  A.  Yes.  So when I talk about we, it's me and the FIEL

20  members, but I would go.

21  Q.  Do you have any concerns about the oath that you see on

22  the screen?

23  A.  Yes, there is many concerns.

24  Q.  So, Mr. Espinosa, let's start with drawing your attention

25  to the following phrase, "I swear or affirm under penalty of

*Gigi Simcox, RMR, CRR*

1 perjury that the voter I am assisting represented to me that
2 they are eligible to receive assistance," do you see that?
3 A.  Yes.
4 Q.  How does that part make you feel?
5 A.  It makes me feel uneasy because there's words in there
6 that are very daunting, like the "penalty of perjury," and
7 then there's questions that — or there's words in there that
8 raise more questions to me, like who, how would somebody know
9 they may be eligible if they are not familiar with the
10 process, et cetera, et cetera.
11 Q.  Now, let me draw your attention to that same line of the
12 exhibit where we left off after the word "assistance."  And
13 that part begins, "I will not suggest by word, sign, or
14 gesture how the voter should vote," do you see that?
15 A.  Yes.
16 Q.  How does that part make you feel?
17 A.  It, once again, makes me feel very uneasy because now I
18 feel like I should have to very much police myself as to what
19 I say, what I do, how I move, so it adds an extra layer of —
20 it adds an extra layer of complexity to an already complex
21 exercise.
22 Q.  You said you have to "police" yourself, can you talk a
23 little bit more about that?
24 A.  So where it says "sign or gesture" on how one should vote,
25 I — like what can be considered a sign or a gesture?

*Gigi Simcox, RMR, CRR*

2441
CESAR ESPINOSA – DIRECT

1  Q.  So I'd like to draw your attention to the same line where
2  we left off, but I want to move forward a little bit to the
3  part that begins "I did not pressure or coerce the voter into
4  choosing me to provide assistance," do you see that?
5  A.  Correct.
6  Q.  How does that part of the oath make you feel?
7  A.  It makes me feel, once again, uneasy because we usually
8  encourage people that if they need assistance that they should
9  seek assistance, and we wouldn't want that to be
10  miscategorized as pressuring people to choosing us to provide,
11  or choosing me to provide assistance.
12  Q.  How does it make you personally feel about assisting
13  individuals to vote?
14  A.  It just makes me feel very uneasy and very uncomfortable
15  because there are all these added rules or stipulations.
16  Q.  Can you say more about that, with respect to this specific
17  phrase?
18  A.  Well, I mean, if I'm going to volunteer to do something
19  thinking I'm doing the right thing, but then I'm going to get
20  in trouble for it, or — yeah, in trouble for it, then I may
21  be less likely or less inclined to do it, just in order to
22  avoid issues.
23  Q.  And what is an example of one of those things you would
24  volunteer to do that you are concerned about getting in
25  trouble with?

*Gigi Simcox, RMR, CRR*

23-50885.40064

CESAR ESPINOSA – DIRECT

1  A.  Just even translating, I would be concerned that if I'm

2  saying something in Spanish but I am being monitored by a

3  monolingual person that they may be interpreting that as me

4  trying to influence anything, if they are unable to understand

5  what I'm saying.

6  Q.  I'd like to draw your attention to the table in the middle

7  of the document.  Do you see that table?

8  A.  Yes.

9  Q.  Is there anything about that table that concerns you?

10  A.  Most of it.

11  Q.  Could you elaborate?

12  A.  I mean, the number one question that –– or the number one

13  thing that pops into my head is why is this table even

14  necessary?  Or what is my information that I provided here

15  going to be used for?  How is it going to be stored?  Who is

16  going to be able to handle it or see it?  Who is going to be

17  able to see my signature?  So there are a lot more questions

18  than answers, when it relates to this form.

19  Q.  How do you feel about the part that asks for the address

20  of resident and the relationship of assistant to voter?

21  A.  Well, so the address of the assistant, once again, I would

22  want to know who is going to have access to this?  What is it?

23  How is my data going to be stored?

24      And the part of the relationship of the assistant to voter

25  really confuses me because most of the time when we are

*Gigi Simcox, RMR, CRR*

23-50885.40065

CESAR ESPINOSA - DIRECT

1  volunteering, we are making new friends at the polls and we
2  don't necessarily have a direct relationship to them, but
3  rather we are volunteering to help somebody in need.
4  Q.  And how does — how do these feelings you just described
5  affect your likelihood that you will volunteer to assist
6  people at the polls?
7  A.  They make me very uneasy, so the likelihood that I will
8  assist voters greatly declines or is almost not existent at
9  this point.
10 Q.  And you said earlier that you have not volunteered to
11 assist at the polls since the enactment of SB 1, is that
12 correct?
13 A.  That is correct.
14 Q.  Can you tell us a little bit more about that decision?
15 A.  So because all these other issues are tacked onto this
16 activity, or almost — almost threats of penalty of perjury,
17 things like that, then it just makes us — it makes me feel
18 very uneasy about going into that space and potentially making
19 a mistake that could affect me in the future.
20 Q.  Are you aware of any concerns by FIEL members — by other
21 FIEL members about this document?
22 A.  Yes.  FIEL members have expressed concern about this
23 document.
24 Q.  So what is your understanding of those concerns?
25 A.  My understanding is that there is a shared sense of

*Gigi Simcox, RMR, CRR*

CESAR ESPINOSA – DIRECT

1    uneasiness about this document in particular.

2    Q.  Could you elaborate?

3    A.  People — our members have expressed concern when it

4    relates to the language of this document.

5    Q.  And what language are you referring to?

6    A.  The part where it says "penalty of perjury," the question

7    of who is eligible to receive assistance, the sign or gesture,

8    and feeling like they may be interpreting it as pressuring

9    people to vote or to be able to ask for assistance.

10   Q.  And what is your understanding of how those concerns

11   affect the likelihood of FIEL members to volunteer to assist

12   individuals at the polls?

13   A.  My understanding is that it makes FIEL members less likely

14   to volunteer to assist people at the polls.

15   Q.  Do you know of any FIEL members who before the enactment

16   of SB 1 assisted voters in the polls but who have stopped

17   doing so after SB 1 was enacted?

18   A.  Yes.

19   Q.  Can you give us an example besides yourself?

20   A.  There was a member by the name of Debany Gonzales, who,

21   she prior to SB 1, she would be very active in helping people

22   and assisting people at the polls, and after the enactment of

23   SB 1 she is no longer a participant in that program.

24   Q.  So taking a step back, back to your prior assistance at

25   the polls, that is your assistance before the enactment of SB

CESAR ESPINOSA - DIRECT

1  1, are the voters that you assisted in the past FIEL members?
2  A.  Yes, the voters that we have assisted have been FIEL
3  members.
4  Q.  And now since SB 1 there have been FIEL members who must
5  vote without you, even though you may be their assister of
6  choice?
7  A.  Yes, there has been FIEL members who have done that.
8  Q.  Going back to the example of Miss Gonzales, did Miss
9  Gonzales previously, before SB 1, volunteer to assist voters
10 who were FIEL members?
11 A.  Yes.
12 Q.  And now are there FIEL members who must vote without her?
13 A.  Yes.
14 Q.  Still sticking with Miss Gonzales, what is your
15 understanding of why that — why Miss Gonzales no longer
16 volunteers to assist voters at the polls?
17 A.  My understanding is that she's wary or concerned about the
18 language on this oath of assistance.
19 Q.  And what language?
20 A.  The "under penalty of perjury," the "who is eligible to
21 receive assistance," and then the part where she would have to
22 police herself to not suggest by word, sign, or gesture.
23 Q.  Do you know of any FIEL members who before SB 1 voted in
24 person with an assister, but who after SB 1 voted in person
25 but without an assister?

*Gigi Simcox, RMR, CRR*

23-50885.40068

CESAR ESPINOSA – DIRECT

```
1   A.   Yes.
2   Q.   Can you give us an example?
3   A.   We have a member by the name of Tonya Rodriguez, who
4   before SB 1 she requested — because of her limited English
5   proficiency had requested — she felt more comfortable having
6   an assister, and then after SB 1 she voted without an assister
7   but she found the process very cumbersome and very
8   overwhelming.
9   Q.   So before SB 1 she had requested an assister and voted
10  with that assister, is that right?
11  A.   That is correct.
12  Q.   And was that assister a FIEL member?
13  A.   That is correct, yes.
14  Q.   Can you talk a little bit more about the assistance that
15  she was seeking?
16  A.   She is a first time — or she is a naturalized citizen so
17  she had requested translation services as she would feel more
18  comfortable in her native tongue.
19  Q.   And so after SB 1 is your understanding that she was not
20  able to vote with the assister of her choice who was a FIEL
21  member, is that correct?
22  A.   That is correct.
23  Q.   And you said your understanding is that it was more
24  difficult, can you explain what that means?
25  A.   So a process that should be available or easy for anybody
```

*Gigi Simcox, RMR, CRR*

CESAR ESPINOSA — DIRECT

1  to cast their — I mean, to take part in for some of our
2  community members it gets very complicated if they don't have
3  assistance and translation services, or even have somebody
4  accompany them to make them feel more welcomed or more
5  comfortable.
6  Q.  And, specifically, with respect to Miss Rodriguez, can you
7  describe how that was more difficult, your understanding of
8  how that was more difficult for her?
9  A.  My understanding of how that was more difficult is she had
10  a more difficult time entering the polling place, finding her
11  way around, and she felt very anxious about was she going to
12  fill in the right thing, was she interpreting what she was
13  reading correctly, things of that nature.
14  Q.  Earlier you identified a number of pre-SB 1 activities
15  FIEL has engaged in to further its mission of voter outreach
16  and civic engagement.  For example, you talked about forums
17  with voters, and individual conversations with voters.  Has SB
18  1's requirements regarding the oath and the assister form made
19  it more difficult for FIEL to conduct those activities?
20  A.  Yes.
21  Q.  So we are going to talk a little bit more about that.  Why
22  do you say that SB 1's changes to this document have affected,
23  for example, those forums with individuals?
24  A.  In all the time that I have been executive director of
25  FIEL, we have never seen what we perceive to be such an

*Gigi Simcox, RMR, CRR*

CESAR ESPINOSA – DIRECT

1  intrusive or complex law or change, so it doubles or triples

2  our time to have conversations with people to be able to

3  explain to them the complexity of this and what can and cannot

4  be done.

5  Q.  Let's talk specifically about those forums, how did those

6  forums look differently after the enactment of SB 1?

7  A.  So there was an –– after the forums, or once we explained

8  these things, the oath of office, or other parts of this new

9  law, there was a lot of uncertainty and a lot more questions

10  in terms of what can happen or what can be done.

11  Q.  And you said the oath of office, but just to be clear, did

12  you mean the oath of assistance?

13  A.  Yes, the oath of assistance.

14  Q.  And how did FIEL respond to those questions?

15  A.  Well, we generally –– when something –– when we are

16  dealing with stuff like this we usually try to explain it to

17  the best of our ability and we explain it as many times as

18  needed so our community feels comfortable.

19  Q.  And how did that affect the timing or the pace of these

20  forums?

21  A.  Well, it made the forums go by a lot slower.  It doubled

22  the time.  It increased the time that we were having to do Q

23  and A, so it extended these forums.

24  Q.  And how did SB 1's effect on these forums impact FIEL's

25  ability to achieve its mission?

*Gigi Simcox, RMR, CRR*

CESAR ESPINOSA — DIRECT

1   A.  Well, it hindered our ability to achieve our mission
2   because if we are having to spend more time on this, then we
3   are having to spend less time on other activities.
4   Q.  And how did it affect your mission as it relates to civic
5   engagement and voter outreach?
6   A.  Well, it hindered our ability to fully reach out to as
7   many people as we had in the past because we were currently
8   having to spend more time with people that needed the extra
9   guidance or extra explanations.
10  Q.  And so how did this change as a result — how did these
11  changes as a result of SB 1 differ from what FIEL ordinarily
12  did with respect to forums?
13  A.  So we had to just invest a little more time and resources
14  into these forums where we haven't in the past.
15  Q.  You also mentioned that before SB 1, FIEL would do —
16  well, before SB 1 would FIEL do a sort of ride or caravan to
17  the polls?
18  A.  Yes.
19  Q.  Did FIEL staff and members still do this type of caravan
20  to the polls —
21  A.  No.
22  Q.  Sorry.  Let me just finish.
23      Did FIEL staff and members still do this type of caravan
24  to the polls after the enactment of SB 1?
25  A.  No.  After the enactment of SB 1, we no longer do these

23-50885.40072

CESAR ESPINOSA - DIRECT

1  caravans.

2  Q.  And why not?

3  A.  We don't do them because we are uneasy or feel uneasy

4  about what actions we could take that would be — could be

5  misconstrued and we could get in trouble for it.

6  Q.  When you say "we can get in trouble for it," who are you

7  referring to?

8  A.  I'm referring to myself and FIEL members.

9  Q.  And why do you say it's SB 1's changes to the oath in the

10  assister form that led to this effect?

11  A.  Well, as I had explained before, it's just that level of

12  complexity.  It creates uneasiness among myself and our

13  members and we don't want to do something that we think we are

14  doing right but then end up getting in trouble for it in the

15  future.

16  Q.  And were you responding to any concerns from FIEL members?

17  A.  Yes.  We had — FIEL members had expressed concerns about

18  either caravaning, whether we were able to do so, or about

19  assisting people who were able to do that still, and so as a

20  response we decided to make changes to our program.

21  Q.  And how did SB 1's effect on FIEL's caravan efforts impact

22  the organization's ability to achieve its mission?

23  A.  Well, we feel that it definitely undermines it because we

24  are no longer able to empower people and move people to do

25  what they need to.

CESAR ESPINOSA – DIRECT

1  Q.  Can you explain a little bit more about that.

2  A.  We want people to be -- once again our mission is to

3  engage people and have them actively participate, and if we

4  are no longer able to do these activities then we don't feel

5  as we are fulfilling our mission.

6  Q.  Do you anticipate FIEL organizing this type of caravan

7  effort for the 2024 General Election?

8  A.  No.

9  Q.  Why not?

10 A.  We still feel very uneasy.  We're still, there's more

11 questions than answers at this moment in regards to this law

12 so we would just feel uncomfortable in putting anybody,

13 including ourselves, in jeopardy.

14 Q.  You also mentioned that before SB 1, FIEL staff members --

15 staff and members would provide voter assistance at the polls,

16 like translation assistance, did that type of assistance still

17 happen after SB 1 was enacted?

18 A.  No.

19 Q.  How did SB 1's requirements around the oath and assister

20 form affect FIEL's efforts around this type of in-person

21 assistance?

22 A.  It greatly undercut or undermined them because now people

23 feel less inclined to volunteer, so we have seen a significant

24 number in drop-offs for people volunteering to help out with

25 these tasks.

CESAR ESPINOSA - DIRECT

1  Q.  You said a significant drop-off, can you explain that a

2  little more?

3  A.  I mean, we are talking about where before we would have

4  teams of 24 dwindled down to like people of six, or teams of

5  six, so we have seen a significant drop-off in people stepping

6  up and wanting to provide this type of assistance.

7  Q.  And what is your concern — I'm sorry.  What is your

8  understanding of why that drop-off resulted?

9  A.  My understanding is that people are concerned about the

10 language under SB 1, and, therefore, they just would rather

11 not enter into that space.

12 Q.  And how did SB 1's effect —— I'm sorry.  Let me take a

13 step back.

14     And you said concern about SB 1's language.  What language

15 are you referring to?

16 A.  The oath of assistance where it talks about like penalty

17 of perjury, the question of gesturing, or influencing

18 somebody's vote, are all concerns that FIEL members have

19 brought up to our attention — to my attention.

20 Q.  How did SB 1's effect on FIEL's in-person assistance

21 effort impact FIEL's ability to achieve its mission?

22 A.  Well, if we are able to assist less people then we know

23 that less people may be more inclined to participate.

24 Q.  And do you anticipate FIEL organizing these types of

25 efforts for the 2024 General Election?

CESAR ESPINOSA – DIRECT

1   A.  No.

2   Q.  Why not?

3   A.  At this time we find ourselves with dwindling numbers of

4   people who are willing to volunteer for these types of

5   efforts, so it may just not be feasible to do them.

6   Q.  You also mentioned that before SB 1, FIEL would create

7   resources that were handed out to voters, like flyers, that

8   address some of the requirements around voting.  Did FIEL

9   still makes these types of flyers after the enactment of SB 1?

10  A.  Yes, we did.

11  Q.  How did SB 1's requirements around the oath and assister

12  form affect those flyers?

13  A.  They have doubled or tripled the amount of information we

14  have to print out.

15  Q.  Doubled or tripled the information you have to print out?

16  A.  Correct.

17  Q.  What has that done to these flyers or handouts?

18  A.  They have become more complex, they have -- we've been

19  able -- we have to fit a lot more information into a limited

20  scope, and for a smaller organization like ours that is a big

21  deal.

22  Q.  Has that had any affect on the size of these flyers or

23  handouts?

24  A.  Yes.  They have doubled or tripled in size, because before

25  we would do a one-pager, or we would try to minimize

23-50885.40076

CESAR ESPINOSA — DIRECT

1  information into one page.  We are now having to find — we
2  are now finding that we are having to print out a lot more
3  material to explain all the contents.
4  Q.  And you said before, that means before the enactment of SB
5  1, is that right?
6  A.  Correct.
7  Q.  And how does having to print out more pages affect the
8  costs incurred by FIEL?
9  A.  Well, it has increased the cost of printing for this
10  particular program.
11  Q.  By how much, would you say?
12  A.  It's doubled or tripled in size.
13  Q.  And why do you say that it's SB 1's changes — why do you
14  say that it's SB 1's changes that have led to this effect?
15  A.  Well, following the guide of people having more questions
16  at forums, we also want to make sure that people get their
17  questions answered, whether or not they want to attend a forum
18  or after they attend a forum that they have something to take
19  away so that they can revisit at a later time and get their
20  questions answered before they call us or come back.
21  Q.  And, just to be clear, what are some examples of the types
22  of questions you are receiving that were addressed in these
23  extra pages?
24  A.  So a lot of the questions that were addressed were can
25  people still receive assistance, what type of assistance can

*Gigi Simcox, RMR, CRR*

CESAR ESPINOSA – DIRECT

1  people receive, things of that nature.

2  Q.  And how did SB 1's affect on these handouts or flyers

3  impact the organization's ability to achieve its mission?

4  A.  Well, the more resources we have to allocate to this then

5  other programs suffer or we have to undermine other programs,

6  and, therefore, we are not able to complete our mission as an

7  organization.

8  Q.  Thank you for walking me through all of that,

9  Mr. Espinosa.

10     Derek, could you please pull up Joint Exhibit 1, and

11  specifically Section 4.09, which begins I believe on page 29,

12  line 2 of the exhibit.

13     Mr. Espinosa, on your screen is Section 4.09 of SB 1 which

14  defines an offense committed by a poll worker with respect to

15  poll watchers.  Are you familiar with this part of SB 1.

16  A.  Yes.

17  Q.  Do you have any concerns about Section 4.09 of SB 1?

18  A.  Yes.

19  Q.  I'd like to draw your attention to the phrase on line 8

20  which states that a poll worker commits an offense by, quote,

21  "taking any action to obstruct the view of a watcher or

22  distance the watcher from the activity or procedure to be

23  observed in a manner that would make observation not

24  reasonably effective," and that ends on line 11.

25     Do you see that?

CESAR ESPINOSA - DIRECT

1  A.  Yes.

2  Q.  How does that part of Section 4.09 make you feel?

3  A.  It makes me feel very uneasy.

4  Q.  Why is that the case?

5  A.  In my opinion, it's very open to interpretation, what can

6  be any action, what can be misconstrued as an action to

7  obstruct, and then the part where it says "reasonably

8  effective," is very open to interpretation.  So what may be

9  reasonably effective to me may not mean the same thing to the

10  person standing next to me or in between us, or things of that

11  nature.

12  Q.  Are you aware of any concerns from other FIEL members

13  about Section 4.09?

14  A.  Yes.  FIEL members have expressed concerns about this

15  particular section.

16  Q.  What is your understanding?

17  A.  My understanding is that, once again, it leads people to

18  feel uneasy because now not only do they have to focus on the

19  task at hand but also in the back of their mind be thinking

20  about these other things that could potentially go wrong.

21  Q.  And how does what you just described, in your

22  understanding, affect the likelihood that members would

23  volunteer to be poll workers?

24  A.  In my understanding it has greatly decreased the

25  likelihood that people will volunteer to do these types of

23-50885.40079

CESAR ESPINOSA – DIRECT

1  things.

2  Q.  Before SB 1 did FIEL encourage members to work as poll

3  workers?

4  A.  Yes.

5  Q.  What did those efforts look like?

6  A.  We would encourage people, let people know what that

7  entailed, and really encourage them to take part in those

8  activities.

9  Q.  How would you — would there be any organizing around

10  these type of efforts?

11  A.  Yes.  We would recruit people and train them to, you know,

12  do what they needed to do.

13  Q.  As poll workers?

14  A.  As poll workers.

15  Q.  Since the enactment of SB 1, how has Section 4.09 affected

16  those efforts?

17  A.  They have really hindered those efforts.  We, once again,

18  find ourselves at a lack of people interested in taking part

19  in these things, so it makes our work, our organizing work, a

20  lot more difficult.

21  Q.  Why do you believe it's Section 4.09 that's having those

22  effects?

23  A.  We have heard it from members ourselves who feel that

24  these procedures are a lot more restrictive.

25  Q.  All right.  Mr. Espinosa, you walked us through a lot of

*Gigi Simcox, RMR, CRR*

1  change -- well, strike that.

2      Mr. Espinosa, you walked us through changes in FIEL's

3  operations that resulted from SB 1's requirements around the

4  oath of assistance and assister form and on poll workers.  As

5  a result of those changes has FIEL had to shift resources away

6  from other organizational efforts?

7  A.  Yes.

8  Q.  What efforts did FIEL have to shift resources away from?

9  A.  We've had to take resources away from other programs to be

10 able to fulfill the new needs of the voter assistance program.

11 Q.  Could you give us a little more examples.

12 A.  So we have an access to higher education program where we

13 help students apply for college or apply for financial aid for

14 college and universities, and that's one of the programs that

15 has taken a major hit because of these -- of SB 1.

16 Q.  Let's talk about those higher education efforts.  Tell us

17 what those meetings looked like before SB 1.

18 A.  So, generally, we would have four meetings leading up or

19 starting around financial aid season or beginning of financial

20 aid season which starts in October, so we would have four

21 meetings, one in October, one in November, one in December,

22 and then one in January to be able to help and assist, guide

23 people to obtaining financial aid.

24 Q.  And what was the purpose of these meetings in the first

25 place?

23-50885.40081

CESAR ESPINOSA - DIRECT

1  A.  So the first meeting would, just like anything, would be

2  an explanation meeting and introductory meeting to how

3  students could get access to financial aid.

4      The second meeting would be an introduction to their

5  parents.  Many of these students are first-generation

6  students, meaning that their parents may be immigrants and may

7  have never gone through this process before.

8      And then the third meeting would be an actual meeting to

9  gather documents and things like that.

10     And then the final, fourth meeting, would be aimed at

11 actually sitting down with our members and helping them fill

12 their financial aid forms.

13 Q.  And why was this structure four meetings over the course

14 of the cycle important?

15 A.  It's much like everything else, our community requires

16 more assistance when it comes to understanding the systems and

17 it's almost like having to explain to them step by step on

18 what needs to be done to make them feel comfortable and help

19 them understand these systems, which can be very complex.

20 Q.  Prior to SB 1, how many students would you serve?

21 A.  Prior to SB 1 we would serve about — every year we had

22 about 4,000 students that we served.

23 Q.  And what changed after SB 1 was enacted?

24 A.  So after SB 1 was enacted, because we have to spend more

25 time explaining, or we have to allocate more time to

23-50885.40082

CESAR ESPINOSA – DIRECT

1  explaining voter — the SB 1, or voting, we had to cut these
2  forums by half because we have to allocate two more forums to
3  the voting rather than start off with the two forms that we
4  usually do for financial aid.
5  Q.  So you said cut them in half, what do you mean by that,
6  like cut the number, cut the timing?
7  A.  So in 2022 we had four forums related to voting under SB 1
8  or voting in general, and, therefore, we had to only — we
9  were only left a capacity to hold two forums under access to
10  higher education.
11  Q.  How did that affect the number of students that FIEL
12  reached?
13  A.  The number went down significantly, by 1500.  It went down
14  significantly, by about 1500, so we were only able to reach
15  about 2500 students.
16  Q.  Do you believe that SB 1 resulted in that change?
17  A.  Yes, because we were left with limited time and resources
18  to be able to do the outreach on this particular program.
19  Q.  And how did this affect FIEL's ability to achieve its
20  mission?
21  A.  Well, if we're not able to talk to people and explain to
22  people, we're left with limited time and resources, then it
23  undermines our ability to empower people.
24  Q.  In the fall semester of 2023 how many meetings do you
25  expect to have?

23-50885.40083

CESAR ESPINOSA - DIRECT

1   A.   We unfortunately expect to only have two meetings again.

2   Q.   Why only two and not the four that you used to have?

3   A.   Because we are, number one, we — our funding.  We haven't

4   been able to raise enough funds because we didn't hit our

5   target number last year.  And, number two, we are still

6   spending time on explaining — or spending more time on

7   explaining voter guides than we can allot to be able to have

8   more on our higher education board.

9   Q.   And how do you think that will affect FIEL's mission?

10  A.   Unfortunately, it will, once again, hinder our ability to

11  outreach as many students as we have in the past, and,

12  therefore, can potentially hurt our ability to, once again,

13  get funding next year to be able to expense this.

14  Q.   You mentioned that FIEL also cut back — well, you

15  mentioned that FIEL had to double or triple the size of the

16  handouts, meaning the page numbers of handouts that you've

17  given to voters.  Did that have an affect on the operations of

18  the organization?

19  A.   Yes.

20  Q.   How so?

21  A.   We were forced to find different or alternative means to

22  give clients copies of their documents or things like that

23  under our legal department.

24  Q.   Were there other departments that were effected by this

25  step back?

23-50885.40084

CESAR ESPINOSA - DIRECT

1  A.  Well, every department really was.  We were trying to

2  figure out a way to cut costs on everything, so for a lot of

3  them — a lot of other programs or most other programs at FIEL

4  we were forced to go digital.

5  Q.  And so as a general matter for those programs were hard

6  copies given to FIEL members after the enactment of SB 1?

7  A.  No.

8  Q.  Why do you say — well, do you believe that these were —

9  this cutback was a result of SB 1 requirements?

10 A.  Yes.

11 Q.  Why do you say that?

12 A.  Because our printing costs increased and we were trying

13 to — we're a small organization and we were trying to figure

14 out what we could do away with to be able to provide

15 information to people that requested it.

16 Q.  How did eliminating hard copies in these other programs

17 that you've described affect FIEL's ability to achieve its

18 mission?

19 A.  It made it more complicated and it left us with less —

20 made people feel uneasy, because oftentimes people want to —

21 in our community, they don't think something is real unless

22 they get it on paper, so it was a burden to be able to

23 transfer some of these other programs digitally.

24 Q.  Can you say a little bit more about this burden?

25 A.  So people are — a lot of our members, not only are they

1  limited English proficiency but also have a hard time

2  accessing a computer or internet, and, therefore, for

3  something that may be easy for us to handle, they are unable

4  to do so.

5      In fact, in the year 2021 we did a study in a separate

6  city in the Houston area called Pasadena, which was unrelated

7  to SB 1, but going and asking questions in this area we found

8  out that 76 percent of people in the Pasadena area do not have

9  access to internet or -- to internet or laptop at home.

10  Q.  So how does this affect FIEL's mission generally?

11  A.  Well, if people can't access the information, then they

12  are not going to be as -- we would like them to participate,

13  or they may feel more wary about the services that we are

14  providing to them.

15      (Off the record discussion)

16          MR. PARRENO:  No further questions at this time.

17          THE COURT:  Anything else on this side?

18          Any cross?

19          MR. CAPOZZI:  Yes, Your Honor.

20                      CROSS-EXAMINATION

21  BY MR. CAPOZZI:

22  Q.  Good morning, Mr. Espinosa.  How are you today?

23  A.  Good.  And yourself, how are you?

24  Q.  I'm great.  Thank you for asking.

25      You are familiar with SB 1, Section 4.09, right?

*Gigi Simcox, RMR, CRR*

CESAR ESPINOSA - CROSS

1   A.  Correct.

2   Q.  Have you served as a poll worker before?

3   A.  I have, yes.

4   Q.  And you voted in 2022, right?

5   A.  I did not vote, no.

6   Q.  Have you ever personally witnessed inappropriate behavior

7   by a poll watcher since SB 1 was enacted?

8   A.  No, not at this time.

9   Q.  You didn't identify a specific number of FIEL Houston that

10  was unwilling to serve as a poll worker in 2022, right?

11  A.  Correct.

12  Q.  And you're not aware of any member of FIEL Houston being

13  threatened with prosecution under SB 1, right?

14  A.  That I am aware of, no.

15  Q.  Do you know how many poll workers feel — I'm sorry.

16  Strike that.

17      Do you know how many members of FIEL Houston served as

18  poll workers in 2018?

19  A.  No.  At this time, no.

20  Q.  Do you know how many FIEL Houston members served as poll

21  workers in 2022?

22  A.  No.  At this time, no.

23  Q.  Let's talk about voter assistance a little bit.  You are

24  familiar with SB 1, Section 6.03, which requires those who

25  assist voters to fill out a form providing their name and

*Gigi Simcox, RMR, CRR*

CESAR ESPINOSA - CROSS

1  address, their relationship to the assisted voter, and whether

2  they accepted any form of compensation from a candidate,

3  campaign, or political committee, right?

4  A.  Correct.

5  Q.  And you haven't identified a specific member of FIEL

6  Houston who has refused to fill out this form, right?

7  A.  Correct.

8  Q.  You are familiar with SB 1, Section 6.04, which revises

9  the voter assistance oath, right?

10  A.  Can you repeat the question for me?

11  Q.  Of course.  You are familiar with SB 1, Section 6.04,

12  which revises the voter assistance oath, right?

13  A.  Yes.

14  Q.  Brian, can we pull up Joint Exhibit 1, Section 6.04.

15      You said you previously served -- I'm sorry.  Strike that.

16      You said you have previously provided voter assistance,

17  right?

18  A.  Correct.

19  Q.  And you are aware that there was a voter assistance oath

20  before SB 1, right?

21  A.  Yes.

22  Q.  And so you have taken that oath before, right?

23  A.  Yes.

24  Q.  Brian, can we zoom out just to see the entire section.

25      So you can see the oath on the screen in front of you,

*Gigi Simcox, RMR, CRR*

2466

CESAR ESPINOSA - CROSS

1  right?

2  A.  Yes.

3  Q.  Okay.  I'll just let this settle.

4      So you see where the oath starts on line 26, where it says

5  "I swear or affirm," right?

6  A.  Correct.

7  Q.  And you understand that the underlined text is text added

8  by SB 1, right?

9  A.  Correct.

10  Q.  And so text that is not underlined was in the law before

11  SB 1, right?

12  A.  Correct.

13  Q.  So the language, "I will not suggest by word, sign, or

14  gesture how the voter should vote," was in the oath before SB

15  1, right?

16  A.  Correct.

17  Q.  You said that you and members of FIEL Houston are

18  concerned by this language, right?

19  A.  Correct.

20  Q.  But that concern is not caused by SB 1, right?

21  A.  In my opinion, it is directly tied to under penalty of

22  perjury, which is underlined and was added under SB 1, so it

23  emphasizes that people, if they do any gesture or anything,

24  can be charged with perjury.

25  Q.  Is it your impression that before SB 1 the voter

*Gigi Simcox, RMR, CRR*

2467

CESAR ESPINOSA – CROSS

1  assistance oath was not under penalty of perjury?

2  A.  It was –– it's under our prerogative that that was not

3  added on there, so it was not emphasized, but it still took it

4  very seriously.

5  Q.  Okay.  You haven't identified a specific member of FIEL

6  Houston who refused to take this oath in 2022, right?

7  A.  Correct.

8  Q.  You are familiar with SB 1, Section 6.05, which requires

9  someone assisting a voter filling out their mail ballot to

10  provide certain information on the carrier envelope, right?

11  A.  Correct.

12  Q.  And you haven't identified a specific member of FIEL

13  Houston who refused to provide the information required by

14  Section 6.05, right?

15  A.  We don't generally participant in mail-in ballots, so...

16  Q.  Okay.  Stepping back a little bit, you haven't identified

17  any member of FIEL Houston who has been threatened with

18  prosecution because of SB 1, right?

19  A.  Not at this time, no.

20  Q.  You said that you feel uneasy about providing voter

21  assistance, right?

22  A.  Correct.

23  Q.  Can you identify a specific person who asked you to

24  provide voter assistance in 2022 where you refused to provide

25  voter assistance?

*Gigi Simcox, RMR, CRR*

CESAR ESPINOSA - CROSS

1   A.  We just haven't been approached as we have before because
2   we're not at the capacity that we were in the past, so out of
3   caution or overcaution we just, even when it comes to people
4   who may be uneasy to take the oath or may not be interested in
5   taking an oath, part of that has been because we have seen a
6   significant number of drop-off and people even willing to step
7   into these spaces.
8   Q.  I understand, but you are not able to identify now a
9   specific person who asked you for voter assistance in 2022
10  where you said no?
11  A.  No, just because I'm not participating in these types of
12  efforts anymore.
13  Q.  You mentioned Miss Gonzales who is also worried about
14  providing voter assistance, right?
15  A.  Correct.
16  Q.  Can you identify a specific person who asked Miss Gonzales
17  for voter assistance in 2022 where Miss Gonzales said no?
18  A.  I cannot at this time because she is no longer willing to
19  participate in this activity.
20  Q.  You mentioned Tonya Rodriguez, a member of FIEL Houston,
21  correct?
22  A.  Correct.
23  Q.  And you said she was able to vote in 2022, right?
24  A.  She was able to vote but she found it a lot more
25  cumbersome to be able to do so.

*Gigi Simcox, RMR, CRR*

1  Q.  Okay.  And you haven't identified a specific number of
2  FIEL Houston who was unable to vote in 2022 because of SB 1,
3  right?
4  A.  We have not identified, but that doesn't mean that they
5  don't exist.
6  Q.  Okay.  I want to talk a little bit about the voting
7  related work that FIEL Houston does.  You would agree that
8  when the legislature changes the election laws educating
9  voters about those changes is important, right?
10  A.  Very important, yes.
11  Q.  FIEL Houston has been educating its members and the public
12  about voting rules for a long time now, right?
13  A.  Correct, yes.
14  Q.  How many years have you been with the organization?
15  A.  I've been with the organization 16 years now, but I have
16  been part of the spaces for the last 22 years, or 23 years.
17  I'm 38 now.
18  Q.  And so you've been educating voters for a long time?
19  A.  Yes.
20  Q.  You testified that FIEL Houston had to divert resources to
21  educating voters because of SB 1, correct?
22  A.  Correct.
23  Q.  Can you say how much FIEL Houston has spent on voter
24  education because of SB 1?
25  A.  We cannot quantify that at this time.

23-50885.40092

2470
CESAR ESPINOSA – CROSS

1  Q.  If the legislature repealed SB 1, FIEL Houston would
2  educate its members and the public about those rule changes,
3  right?
4  A.  We would have to, yes.
5  Q.  You talked about forums, voter education forums, right?
6  A.  Correct.
7  Q.  I think you described them as civics lessons on how voting
8  works, right?
9  A.  Um-hum.
10  Q.  That's a yes?
11  A.  Yes.
12  Q.  Thank you.  So in those forums you discussed some of the
13  roles that are in SB 1, right?
14  A.  Correct.
15  Q.  And you also discussed rules that preexisted SB 1, right?
16  A.  Correct, yes.
17  Q.  And you did these forums before SB 1 was enacted, right?
18  A.  We did, yes.
19  Q.  Let's just talk about volunteers for a moment.  Do you
20  know how many volunteers FIEL Houston had for elections in
21  2018?
22  A.  In 2018, I believe we had about 24 teams.  Each team made
23  up of maybe four people, so maybe about 100 people.
24  Q.  And in 2022 how many volunteers?
25  A.  Maybe about 20 at the very most.

23-50885.40093

2471

CESAR ESPINOSA - CROSS

1  Q.  You talked about how FIEL Houston used to provide

2  transportation caravans to the polls, right?

3  A.  Correct.

4  Q.  And you said that FIEL Houston no longer does this because

5  of concern about SB 1's voter assistance provisions, right?

6  A.  Correct.

7  Q.  Is it your understanding that transporting voters to polls

8  is voter assistance regulated by SB 1?

9  A.  It is my understanding that our members feel uneasy

10  because they don't fully understand the complexity of SB 1.

11  Q.  But you personally, do you understand transporting voters

12  to the polls to be voter assistance regulated by SB 1?

13  A.  I understand that it can be policed by it, and, therefore,

14  I feel uneasy about doing it now.

15  Q.  Can you say which part of the law —— I'm sorry.  Let me

16  start that again.

17      Can you say which part of SB 1 limits FIEL Houston's

18  ability to transport voters to the polls?

19  A.  There's no particular language that we feel that would

20  limit us, but anything that can be taken as us and —— what's

21  the word I'm looking for?  Anything that can be taken as us

22  course or telling people who to vote for or how to do it, is

23  something that makes us generally uneasy.

24  Q.  Okay.  Can you identify FIEL Houston's budget for the 2020

25  year?

*Gigi Simcox, RMR, CRR*

CESAR ESPINOSA - CROSS

1  A.  For the 2020 year, it was about $250,000.  We're a small

2  organization.

3  Q.  Can you identify FIEL Houston's budget for 2022?

4  A.  For 2022, about $300,000.

5  Q.  So FIEL Houston's budget has increased in recent years?

6  A.  It has, yes.

7  Q.  You talked about meetings to help students apply for

8  financial aid at college, right?

9  A.  Correct.

10  Q.  And you said that post-SB 1 you host two meetings instead

11  of four, right?

12  A.  Correct.

13  Q.  So at these meetings, post-SB 1, you still introduced

14  students to the rules about financial aid, right?

15  A.  Yes.

16  Q.  Do parents still come to the meetings?

17  A.  Sometimes they don't.  We try to have as much -- so in

18  order to understand some of the programs, you really have to

19  understand our community, and sometimes people are unable to

20  attend every meeting because they may have three or four jobs

21  and we try to have as much time with them so that we can try

22  to outreach to as many of them as possible and make it

23  comfortable and make it accessible to them so they can get the

24  information that they need.

25  Q.  So sometimes the parents come to the meetings and

*Gigi Simcox, RMR, CRR*

23-50885.40095

CESAR ESPINOSA – REDIRECT

1  sometimes they don't, right?

2  A.  Correct.

3  Q.  At these meetings do you still help students gather the

4  documents they need to apply for financial aid?

5  A.  We do, but it's an uphill battle because we're working

6  with high school age kids.

7  Q.  Yes, I understand.  And do you still help students fill

8  out the forms they need to apply for financial aid at these

9  meetings?

10  A.  We have, yes, but at a less number, less capacity than we

11  have in the past years.

12  Q.  In your testimony you didn't identify a specific part of

13  FIEL Houston's normal programming that you had to forego

14  altogether because of SB 1, right?

15  A.  No, but we had to forego the touches that we have with

16  people and that can have a detrimental effect to us, and as an

17  overall organization.

18          MR. CAPOZZI:  Thank you for your time today.

19          THE COURT:  Anything else on this side?

20          Any redirect?

21          MR. PARRENO:  Yes, Your Honor.

22                  REDIRECT EXAMINATION

23  BY MR. PARRENO:

24  Q.  Hi, again, Mr. Espinosa.  Mr. Espinosa, you have served as

25  a voter assister in the past but you have not worked as a poll

23-50885.40096

JOE CARDENAS − DIRECT

1  worker, correct?

2  A.  Correct.

3          MR. PARRENO:  No further questions, Your Honor.

4          THE COURT:  With that, you can step down, sir.  Thank

5  you.

6          THE WITNESS:  Thank you.

7          THE COURT:  And your next witness.

8          MISS PERALES:  Nina Perales for the LUPE plaintiffs.

9          LUPE plaintiffs call Mr. Joe Cardenas, III.

10     (JOE CARDENAS, having been duly sworn, testified as

11  follows:)

12          THE WITNESS:  Good morning, Judge.

13          MISS PERALES:  Your Honor, Mr. Cardenas will testify

14  in support of LUPE plaintiffs' challenges to Article 6 of SB

15  1, as well as Sections 4.09 and 8.01.

16                     DIRECT EXAMINATION

17  BY MISS PERALES:

18  Q.  Good morning.

19  A.  Good morning.

20  Q.  Please state your name for the record.

21  A.  Joe Cardenas, III.

22  Q.  What do you do for a living?

23  A.  I am a teacher.

24  Q.  And where do you teach?

25  A.  I teach Louise, which is in Wharton County.

DAN SMITH – CROSS

```
 1          Any redirect?

 2          MR. GENECIN:  Your Honor, thank you.  No redirect.

 3          THE COURT:  You may step down.  Thank you, sir.

 4          We'll resume at 9:00.

 5                            -oOo-

 6     I certify that the foregoing is a correct transcript from

 7  the record of proceedings in the above-entitled matter.  I

 8  further certify that the transcript fees and format comply

 9  with those prescribed by the Court and the Judicial Conference

10  of the United States.

11

12  Date:  10/04/23          /s/  Gigi Simcox
                             United States Court Reporter
13                           262 West Nueve Street
                             San Antonio TX 78207
14

15

16                           /s/  Chris Poage
                             United States Court Reporter
17                           262 West Nueve Street
                             San Antonio TX 78207
18

19

20

21

22

23

24

25
```

*Gigi Simcox, RMR, CRR*

APPENDIX E

3900

```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF TEXAS
 2                      SAN ANTONIO DIVISION

 3

   LA UNION DEL PUEBLO ENTERO,     .
 4 ET AL,                          .
                                   .
 5           PLAINTIFFS,           .
        vs.                        . DOCKET NO. 5:21-CV-844-XR
 6                                 .
   GREGORY W. ABBOTT, ET AL,       .
 7                                 .
             DEFENDANTS.           .
 8

 9

10              TRANSCRIPT OF BENCH TRIAL
        BEFORE THE HONORABLE XAVIER RODRIGUEZ
11           UNITED STATES DISTRICT JUDGE
                  OCTOBER 16, 2023
12

13

14

15

16 APPEARANCES:
   FOR THE PLAINTIFFS:      NINA PERALES, ESQUIRE
17                          FATIMA MENENDEZ, ESQUIRE
                            JULIA LONGORIA, ESQUIRE
18                          MALDEF
                            110 BROADWAY
19                          SUITE 300
                            SAN ANTONIO TX 78205
20

21

22                          JENNIFER A. HOLMES, ESQUIRE
                            NAACP LEGAL DEFENSE & EDUCATIONAL
23                          FUND INC
                            40 RECTOR STREET, FIFTH FLOOR
24                          NEW YORK NY 10006

25
```

3901

```
 1

 2

 3

 4

 5

 6   FOR THE DEFENDANTS:     RYAN G. KERCHER, ESQUIRE
                             KATHLEEN HUNKER, ESQUIRE
 7                           WILLIAM WASSDORF, ESQUIRE
                             TEXAS ATTORNEY GENERAL
 8                           P.O. BOX 12548
                             MC 009
 9                           AUSTIN TX 78711

10

11

12

13

14   REPORTED BY:           GIGI SIMCOX, RMR, CRR
                             OFFICIAL COURT REPORTER
15                           UNITED STATES DISTRICT COURT
                             SAN ANTONIO, TEXAS
16

17

18

19

20

21

22

23

24

25
```

JONATHAN WHITE – DIRECT

```
 1        (San Antonio, Texas; October 16, 2023, at 9:00 a.m., in
 2   open court.)
 3             THE COURT:  What do we have?
 4             MR. KERCHER:  We have been conferring, Your Honor,
 5   with plaintiffs about the best way to proceed.  The parties
 6   continue to, let us say, confer about exhibits and
 7   admissibility.  There will probably come a time when we need
 8   to argue about some remaining set of objections.  We're
 9   probably not there yet.
10             So plaintiffs will not rest until they get their
11   exhibits in, as you might well imagine.  We propose moving
12   forward, then, with our next witness, who would be
13   Mr. Jonathan White.
14             THE COURT:  Yeah.  Any problem with that approach?
15             MISS PERALES:  No, Your Honor.
16             THE COURT:  Yeah.  Your witness.
17             MR. KERCHER:  Your Honor, the State defendants call
18   Jonathan White to the stand.
19        (JONATHAN WHITE, having been duly sworn, testified as
20   follows:)
21                       DIRECT EXAMINATION
22   BY MR. KERCHER:
23   Q.  Good morning, sir.  Could you please state your name for
24   the record.
25   A.  Good morning.  My name is Jonathan White, J-O-N-A-T-H-A-N.
```

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE – DIRECT

1  Q.  Mr. White, are you currently an employee of the Office of
2  the Attorney General for the State of Texas?
3  A.  Yes, I am.
4  Q.  How long have you been employed by the OAG?
5  A.  A little over 15 years, 15 and a half years, something
6  like that.
7  Q.  Are you an attorney, sir?
8  A.  Yes, sir.
9  Q.  Has your work with the OAG been primarily in criminal law
10 or civil?
11 A.  Fully in criminal law.
12 Q.  And what was the first division you worked in at the OAG?
13 A.  Criminal Prosecutions Division.
14 Q.  Were elections crimes a part of the work that you did in
15 the Criminal Prosecution Division?
16 A.  That's correct.  They were a part of my caseload in my
17 section, White Collar Crime and Public Integrity.
18 Q.  Did your caseload of election crimes grow, shrink, or stay
19 the same during your time in Criminal Prosecutions?
20 A.  It grew.
21 Q.  And during that time, did Criminal Investigations Division
22 devote more resources to election crimes over time?
23 A.  Yes, they did.
24 Q.  Can you describe for the Court the relationship between
25 the Criminal Prosecutions Division and the Criminal

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE – DIRECT

1  Investigations Division?

2  A.  Criminal Prosecutions is an attorney driven division,

3  while Criminal Investigations is law enforcement led and, you

4  know, they investigate certain — certain types of crimes, and

5  we prosecute certain types of crimes and criminal

6  prosecutions.

7  Q.  And we've talked about how the resources that Criminal

8  Investigations — excuse me.  I thought I was over this — the

9  Criminal Investigations devoted to elections crimes grew over

10  time as you were in Criminal Prosecutions.  Was there a

11  section in Criminal Investigations that handled these kinds of

12  crimes?

13  A.  Yeah, it started out as the Special Investigations Unit,

14  which became the Election Fraud Unit, and is now the Election

15  Integrity Unit.

16  Q.  And what was your role vis-a-vis this election integrity

17  evolution with Criminal Investigations?

18  A.  Yeah.  As my role turned into a section chief with an

19  Election Fraud Section, which became an Election Integrity

20  Section, and then a stand-alone division, my role was to work

21  directly with those investigators to improving the quality of

22  investigations and coordination between our respective units.

23  Q.  You said eventually your work in Criminal Prosecutions

24  rolled into a separate division.  What division was that?

25  A.  First it was — it became a section within Criminal

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE – DIRECT

1  Prosecutions, and then it became a section within the Special

2  Prosecutions Division, which also held human trafficking,

3  before becoming a stand-alone division, the Election Integrity

4  Division.

5  Q.  And has the human trafficking work at the agency also

6  rolled into its own division?

7  A.  That's correct.

8  Q.  Once the Election Integrity Division was created, what was

9  your role in that division?

10  A.  I was the division chief.

11  Q.  What was the purpose of the Election Integrity Division?

12  A.  To investigate — although, in a sense of investigation

13  was primarily the role of the criminal investigation side, but

14  to prosecute election offenses and pursue justice with regard

15  to those offenses in Texas.

16  Q.  And you used a phrase "pursue justice."  Is that your

17  understanding of the duty of a prosecutor?

18  A.  Correct.

19  Q.  To your understanding as a prosecutor, is the duty to

20  pursue justice different from a duty to pursue convictions?

21  A.  Yes.  I would say that those are different duties, and the

22  duty that a prosecutor is under is to pursue justice, not to

23  seek convictions.

24  Q.  You also noted that the investigation aspect of the

25  Election Integrity Division was largely in the — with the

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE — DIRECT

1  investigators.  Can you describe for the Court how as a

2  prosecutor you would gain personal knowledge over cases that

3  your office wound up prosecuting, in a general sense?

4  A.  Sure.  In every case, before a charging decision would be

5  made, I would need to personally lay eyes on the evidence

6  itself, the original election records.  I would need to listen

7  to any interviews.  I would need to see all original evidence

8  of whatever the elements were that needed to be established in

9  those cases before making a charging decision.  I wouldn't be

10 able to take an investigator's word for it.

11 Q.  What were your duties as chief of the Election Integrity

12 Division?

13 A.  To do the things that I just mentioned, as well as to

14 supervise a group of attorneys, legal assistants, research

15 specialists, and to help guide investigations; to identify

16 factual and evidentiary issues at the investigation phase; and

17 to help sort of begin with the end in mind to see if this is a

18 viable case or not.  We're not going to waste resources on

19 pursuing it, so I could try to allocate scarce resources that

20 way.

21 Q.  Without getting into the details of any individual cases,

22 can you help the Court understand what your level of

23 involvement in terms of understanding the caseload and what

24 the facts of cases were that came through your division when

25 you were division chief?

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE — DIRECT

1    THE COURT:  And just to be clear, what years are we
2  talking about now?
3    THE WITNESS:  So I would have been chief for — since
4  approximately 2020.  And prior to that, I was a section chief
5  since perhaps 2018 or so, and prior to that I was working
6  these cases primarily as the prosecutor who had sort of a
7  specialty in elections investigations and prosecutions within
8  the Criminal Prosecutions Division.
9    THE COURT:  So in answering his last question, what
10  year are we talking about?
11    THE WITNESS:  This would have been from 2018 forward.
12    THE COURT:  To today?
13    THE WITNESS:  No.  No, sir.  I'm no longer in that
14  role.
15    THE COURT:  So 2018 to when?
16    THE WITNESS:  December 1st of 2022.
17    THE COURT:  And I'm sorry.  Do you remember his last
18  question?
19    THE WITNESS:  I think I do.
20    THE COURT:  Okay.
21    THE WITNESS:  The only thing that I would add is that
22  prior to that, my involvement would have been as the lead
23  prosecutor on a significant number of those cases, perhaps 100
24  or so, in my time from 2008 forward.
25

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE – DIRECT

1  BY MR. KERCHER:

2  Q.  And when you were not a lead prosecutor but serving in

3  this more administrative role as a division chief, what level

4  of familiarity did you have with the individual cases that

5  were coming through your division?

6  A.  A very high level of familiarity when it came to the

7  actual elements of the offense.  Those are what would need to

8  be pinned down before we made a charging decision going

9  forward.

10  Q.  And you mentioned to the Court just now you are no longer

11  in that role.  When did you leave that role?

12  A.  December 1st of 2022.

13  Q.  And why did you leave that role?

14  A.  I would say some personal reasons, I guess.  Over the last

15  three years or, really, I don't know, the two years prior,

16  because the last year I've been in Medicaid fraud in my new

17  role, it just became something that I could see myself walking

18  away from.  And when the Court of Criminal Appeals stripped

19  our authority to prosecute, it — it helped with that

20  decision.

21  Q.  And when you mention the Court of Criminal Appeals

22  decision, are you referencing the *Stephens* decision?

23  A.  Yes, sir.

24  Q.  Briefly and generally, what is your understanding of that

25  decision and how it affected the OAG?

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE – DIRECT

1  A.  So the *Stephens* decision was that our statutory grant of
2  prosecution authority was unconstitutional based on a
3  separation of powers issue, and that the AG could no longer
4  unilaterally prosecute cases; so we had no authority to
5  prosecute under the law.  Cases would need to be referred to
6  district attorneys, local district attorneys and county
7  attorneys, for prosecution.
8  Q.  And when you say "no longer unilaterally," but these cases
9  would be referred to a local district attorney, does the OAG
10  continue to partner with local district attorneys in the
11  prosecution of election integrity crimes?
12  A.  We would, yes.
13  Q.  And is that a deputization process that an OAG employed
14  that an AAG would go through with the DA?
15  A.  It would either be a deputization process from the DA or
16  an appointment by a district judge if there were a recusal
17  motion, and we would be appointed DA Pro Tem.
18  Q.  If a local being district attorney did not want to charge
19  an election integrity crime but the AAG assigned from the OAG
20  did want to charge an election integrity crime, could the AAG
21  or the OAG move forward with that charge without the DA's
22  consent?
23  A.  No.
24  Q.  You mentioned now that you're in Medicaid fraud.  Can you
25  describe for the Court what you do now.

*Gigi Simcox, RMR, CRR*

3910

JONATHAN WHITE – DIRECT

1  A.  Sure.  Yeah, I'm in charge of the prosecutions in our

2  Medicaid Fraud Control Unit, and I'm a deputy chief over there

3  with responsibility over prosecutions and our small civil

4  unit.

5  Q.  And have you been in that role since leaving the Election

6  Integrity Division?

7  A.  That's correct.  I started December 1st of 2022.

8  Q.  Mr. White, have you read SB 1 that is the subject of this

9  litigation?

10  A.  I have read, I believe, all the pre-curser bills to SB 1

11  and the final bill that was passed, yes.

12  Q.  Brian, could you please bring up State Exhibit 89.

13      Mr. White, do you recognize this document?

14  A.  Yes, I do.

15  Q.  Can you generally describe what it is.

16  A.  This was a presentation given on election integrity that

17  was one of the responsive documents that I provided to the

18  team, that I understand was provided in discovery in this

19  case.

20  Q.  And you mention it being provided in discovery.  If we

21  pull back and look at the full document, you can see there is

22  a Bates number at the bottom of that document.

23      Do you see that?

24  A.  Yes, sir.

25  Q.  And that's State 054622?

Gigi Simcox, RMR, CRR

JONATHAN WHITE - DIRECT

1  A.  Yes, sir.

2  Q.  If we go to the last page of State 89, you can see there

3  is a Bates label that is State 054677.  Did I read that right?

4  A.  Correct.

5  Q.  Mr. White, who drafted this document, if you remember?

6  A.  Primarily myself, and I would have had some assistance

7  with the presentation from one or two people that were in my

8  division over the years.

9  Q.  Does this document show the activities of the Office of

10 Election Integrity at the OAG?

11 A.  It does discuss those activities and responsibilities, and

12 it was presented to -- I think primarily to the elections

13 administrator as a Secretary of State handling all

14 conferences.

15 Q.  And does it describe matters observed by your office while

16 under a duty to report?

17 A.  Sure.

18        MR. KERCHER:  Your Honor, we offer State 89.

19        THE COURT:  Any objection?

20        MISS PERALES:  No objection, Your Honor.

21        THE COURT:  89 is admitted.

22 BY MR. KERCHER:

23 Q.  Mr. White, you may have noticed that the image quality on

24 your screen has improved.  I'll represent to you that rather

25 now looking at the copy of the exhibit that we have submitted,

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE — DIRECT

1  we have now just gone to a PDF so that — with some greater

2  clarity so you can have a better view of the document that has

3  been admitted as State 89.

4      Brian, could we please go to page 5 of State 89.

5      Mr. White, when it says here that "534 election offenses

6  were prosecuted against 155 individuals as of July 29, 2021,"

7  what does that mean?

8  A.  Those numbers represent our prosecutions of various

9  election offenses over the years, and that goes back to

10  inception, at — which was I believe 2005, at least when we

11  started tracking our prosecutions of election offenses.

12  Q.  Okay.  Can you describe what the next bullet means when it

13  says "512 additional offenses currently pending prosecution in

14  court."

15  A.  That was the number of election offenses that we had

16  charged in court, whether district court or county court, but

17  predominantly I believe those were felony offenses, at that

18  time, as of that date.

19  Q.  Does that mean offenses charged but not resolved?

20  A.  Correct.  Charged and pending.  Pending trial, ultimately,

21  in court, and various stages of pretrial.

22  Q.  And the last bullet:  "386 active investigations involving

23  numerous suspects and numerous offenses," does that mean, as

24  of yet, uncharged potential offenses?

25  A.  Potential offenses that were in varying stages of

*Gigi Simcox, RMR, CRR*

3913
JONATHAN WHITE – DIRECT

1  investigation that could be referred for prosecution.
2  Q.  Where would you have collected the information to put on
3  this slide?
4  A.  The first two pieces of information would be obtained from
5  the comprehensive spreadsheet that I maintained of our
6  prosecutions pending and resolved, and the second –– the third
7  number came from our Criminal Investigations Division; just
8  the number of open active investigations that they had.
9  Q.  Let's talk a little bit about the investigation charging
10 process in the Election Integrity Division.  How did the OAG
11 receive referrals on election crimes?
12 A.  The investigations unit would receive referrals from a
13 variety of sources, primarily from the Secretary of State, who
14 was kind of a gathering point for election complaints from
15 individuals, election officials, things like that.  We would
16 also receive complaints from local law enforcement offices,
17 local prosecutors, election officials directly.  We welcomed
18 those.  And from citizens.  There was also a path for citizens
19 to refer cases directly to us.
20 Q.  And you mentioned that the Secretary of State's Office
21 served as a sort of gathering point for referrals for the OAG.
22 Did the Secretary of State's Office make prosecuting decisions
23 on the information that it gathered?
24 A.  They did not.
25 Q.  Once the OAG received a referral, would the OAG perform an

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE – DIRECT

1  investigation itself?

2  A.  A preliminary investigation would be performed to ensure

3  that the referral actually alleged a crime, the elements of a

4  crime, first and foremost, and to determine whether it was a

5  credible enough allegation to merit a full investigation.  And

6  from there, it would proceed to either full investigation or

7  be closed administratively on this side.

8  Q.  And I think that you have covered this, but now that

9  *Stephens* is the law in Texas, if OAG believes that there is a

10  case that merits charging, what does it do with that case?

11  A.  That case would be referred to a local prosecutor.

12  Q.  And when you described for the Court the limited ability

13  for the OAG to charge an election integrity crime after

14  *Stephens* and how it could only do so with the authorization of

15  a DA, does that apply specifically to the criminal provisions

16  of SB 1?

17  A.  Yes, it would apply to those provisions and any other

18  criminal provisions in the Election Code.

19  Q.  Brian, can we go to page 12, please.

20      Mr. White, how many election offenses can be committed in

21  the state of Texas?

22  A.  Yeah, at the time we put this presentation together, it

23  was over 100, and I suspect that it's probably over 150 or so

24  now.  More than — more than you can shake a stick at.

25  Q.  Brian, can we go to the next page, please.

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE – DIRECT

1    In your experience, which of those election crimes are
2  most common?
3  A.  Yeah, we would probably deal with ten or at the most 15 of
4  those statutes.  You know, commonly, most of the rest would be
5  just one-offs.  Some of them you would never see.  And those
6  offenses would revolve around the three areas on the slide,
7  which are:  Vote harvesting, assistance fraud, and illegal
8  voting.  Those were the three main categories.
9  Q.  And we have heard the term "vote harvesting" several times
10  in this trial, and this trial has been going on a long time,
11  but if you could briefly describe for the Court what you mean
12  when you say "vote harvesting."
13  A.  Sure.  "Vote harvesting," sometimes known as "mail ballot
14  fraud," is a process where, you know, typically, campaign
15  workers are paid operatives, proliferate mail ballots through
16  applications for mail ballot, and then go back to collect
17  those ballots from a voter and ensure that those are voted for
18  the candidate.
19  Q.  Okay.  Let's go to page 15, Brian.
20    Now, page 15 of State 89 talks about two parts of vote
21  harvesting.  Can you describe those for the Court, please.
22  A.  Sure.  The first part we would refer to as — or it's
23  commonly referred to as the "seeding phase," and that's the
24  part where you would generate applications for mail ballots in
25  your targeted precincts.  And that really sets the stage for

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE - DIRECT

1  the second part of the process, but that also is the number of
2  ballots that are generally going to be in play.  And during
3  the harvesting phase, you would go back to collect those
4  ballots and get those voted for the candidate that you are
5  supporting, and you would get some percentage of what you
6  seeded.
7  Q.  And when you talk about "seeding" the ABBMs how does that
8  happen?
9  A.  I mean, it's a pretty simple process.  It's just a — I
10  mean, the application for ballot-by-mail or mail ballot
11  application is — you know, it just requires basic information
12  about the voter and the voter's signature, check boxes for
13  which elections you are requesting mail ballots for.  Contains
14  the eligibility criteria for getting a mail ballot.  And so if
15  you're working this process from a vote-harvesting
16  perspective, you know, you have two basic choices.
17      One is you could actually forge those applications if you
18  wanted to, but it isn't that difficult to go door-to-door if
19  you're willing to do the work, talk to voters, and have them
20  sign up for mail ballots if they are eligible.
21  Q.  Is it right to say or not that the seeding phase pertains
22  to the application for ballot-by-mail and the harvesting phase
23  pertains to the actual ballot itself?
24  A.  Exactly.
25  Q.  Brian, can you please put up page 21.

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE — DIRECT

1    Mr. White, what are we looking at on 21 of State
2  Exhibit 89?
3  A.  So, again, this was presented in the context of
4  identifying things that elections officials could look for
5  potentially on the documents that they see to identify signs
6  of potential vote harvesting.  And here you would see the same
7  person filling out applications for mail ballots for voters so
8  that you know that there's some sort of coordinated activity
9  going on here.  You don't know exactly what at this point, but
10  you — similar handwriting would point out the fact that
11  you're dealing with folks that are signing up multiple
12  individuals to vote by mail.
13  Q.  Okay.  Let's go to the next page, please, Brian.
14    And what do we see here, Mr. White?
15  A.  So, again, these are taken from election documents, but
16  this is an example of forged signatures on an application for
17  ballot-by-mail.  Appear to have been done by the same
18  individual.  On the right is the application, and on the left
19  were the actual signatures of the voters that we verified on
20  their carrier envelopes.
21  Q.  And so by comparing the signatures, the putative
22  signatures on the right with the actual signatures on the
23  left, you were able to see, by visually inspecting, that these
24  were dissimilar enough to raise concern?
25  A.  That's right.  These would result in an interview with the

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE – DIRECT

1  voter to try to determine what happened.

2  Q.  Brian, let's go to page 23, please.

3     What are we looking at here, sir?

4  A.  These are some kind of –– I think these were a bit

5  historical.  Maybe 2014, there was an effort to collect

6  electronic signatures during the seeding phase of a

7  vote–harvesting operation.  I think this has been preempted by

8  law, but this is an example of potentially electronic

9  signatures appearing on applications, and these were not wet

10  ink signatures.

11  Q.  All right.  Let's go to the next page of State Exhibit 89.

12     Can you describe for the Court what we're seeing on this

13  slide.

14  A.  So this would be an example of electronically completed

15  applications where the text required from the voter is

16  provided in a typed form or computer–entered form.  These

17  would be atypical for something that would actually be filled

18  out by a voter, but we would look for, you know, if these were

19  all coming from the same precinct in large numbers, then that

20  could be evidence that there was some organized, you know,

21  vote–harvesting effort there.

22  Q.  Raise a red flag?

23  A.  Correct.

24  Q.  All right.  The next page please, Brian.  And are we on

25  page 25, Brian?

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE – DIRECT

1    So this is page 25 of State Exhibit 89.  What are we
2  looking at here, sir?
3  A.  So these are three examples from different investigations
4  of people who were engaged in vote-harvesting activity.  And
5  if you would have looked through the rest of the records, you
6  would have seen this name, address, signature, appear dozens,
7  and in some cases hundreds, of times.  The ones in the center
8  was, like, 700.  So "frequent flyer assistance" was kind of
9  what we called them.  Or professional assistance or, really,
10  they were vote harvesting.
11    I've — I left out one thing, and that's that, you know,
12  when you see that they are unrelated to the voter, we're not
13  talking about a family member, somebody with a last name
14  that's in common or something that's a one-off in a file.  We
15  wouldn't be interested in any of those.  We would only be
16  looking for those folks that appears dozens or hundreds of
17  times, and that's what we're communicating to the election
18  officials.
19  Q.  Okay.  So we've talked a little bit about the seeding
20  phase which has to do with the ABBMs.  Let's turn now to the
21  harvesting phase.
22    At a very high level of generality, what happens at the
23  harvesting phase?
24  A.  Sure.  The harvesting phase is where —
25  Q.  I'm sorry.  Let me interrupt you.

*Gigi Simcox, RMR, CRR*

23-50885.41542

JONATHAN WHITE – DIRECT

1    Brian, can we go to page 18.

2    All right.  Your answer, sir.  I'm sorry.

3 A.  The harvesting phase is where the — these workers would

4 return to these addresses where they had typically signed

5 folks up to vote already, and they would go back and they

6 would try to walk the voter through that process, either

7 suggest the —

8         MISS PERALES:  Objection, Your Honor.  The "how" is

9 excluded by the Court under the motion in limine.

10        MR. KERCHER:  I'll withdraw the question, Your Honor,

11 and admonish issue the witness.

12        THE COURT:  Thank you.

13 BY MR. KERCHER:

14 Q.  I appreciate the answer you were providing.  As you know,

15 Mr. White, the Court has ruled on a motion in limine, and so

16 we are limited in the level of detail you can provide at this

17 point.  I'm going to reask my question, and I'm going to ask

18 for you to provide only information that the plaintiffs could

19 glean from State Exhibit 89.

20    Does that make sense?

21 A.  Sure.

22 Q.  All right.  With that in mind, Mr. White, can you briefly

23 describe for the Court how the harvesting phase of vote

24 harvesting works.

25 A.  In the presentation I described it as paid operatives

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE – DIRECT

1  going out during the early voting period and filling out and

2  collecting mail ballots from voters to ensure that those votes

3  are cast for certain candidates.

4  Q.  Prior to SB 1, was vote harvesting illegal?

5  A.  Most of the key activities that comprise vote harvesting

6  were prohibited under the Election Code before SB 1, yes.

7  Q.  All right.  I didn't tell you I was going to quiz you, but

8  do you recall which provisions of the Election Code would have

9  been implicated by vote harvesting prior to SB 1?

10 A.  Sure.  Starting at the application phase, Section 84.0041

11 addresses fraud with regard to mail ballot applications.

12     Chapter 64.036, Unlawful Assistance, prohibits voters from

13 being told how to vote or influenced during the voting

14 process.  Chapter 273 –– I'm sorry –– 276.013 also prohibits

15 the influencing of a voter during the voting process, and

16 Chapter 86.0051 and 86.010 govern the handling of mail ballots

17 and prohibit a person from possessing a mail ballot except

18 under certain conditions, and if certain conditions are met;

19 as well as Chapter 86.006, which prohibits of the possession

20 of a ballot.

21 Q.  Something that we have heard about generally in this trial

22 are the different election needs or how they may be the same

23 from county to county across the State of Texas.  When it

24 comes to vote harvesting, are there geographical limitations

25 of where it can occur, in your experience?

*Gigi Simcox, RMR, CRR*

Case 5:21-cv-00844-D Document 302 Date Filed 02/18/2024
Case 5:21-cv-00844-D Document 302 Page Filed 02/14/24 Page 302 of 518

3922

JONATHAN WHITE – DIRECT

1  A.  No.

2  Q.  Are there particular types of elections that are more

3  vulnerable to vote harvesting in your experience?

4  A.  Yes.

5  Q.  What kinds?

6  A.  Those would be small elections, local elections, primary

7  elections, particularly run-offs.  School district elections,

8  special district, utility district-type elections, those would

9  be elections where the margins are close enough and the

10  turnout is small enough that vote harvesting could have an

11  impact.

12  Q.  Brian, can we take a look at page 28, please.  And can we

13  pull up whatever bullet points there might be.  Or is that it?

14  Thank you, sir.

15      Does page 28 of State Exhibit 89 describe, generally, your

16  thoughts regarding whether there are geographical limitations

17  to vote harvesting?

18  A.  Yes.

19  Q.  Can we go to page 29, Brian, and pull up all of the

20  bullets there as well.  This is 29?  Thank you, sir.

21      And then page 30.  Is this also page 30?  Perfect.  Thank

22  you, sir.

23      When a county receives applications for ballot-by-mail, is

24  there something that indicates that the ABBM is potentially --

25  may be potentially fraudulent, at a very general level?

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE – DIRECT

1  A.  There would be some clues as to whether vote harvesting
2  was involved based on the -- some of the slides that we
3  covered earlier.  Those handwriting clues and signature clues.
4  You know, Elections Office does have possession of prior
5  signatures from a voter that could be compared if they felt
6  like doing that at the application process, but mainly the
7  things that we talked about before, I think.
8  Q.  Brian, can we go to page 31.
9      Can you describe for the Court what information you were
10 providing for election officials on page 31 of State Exhibit
11 89.
12 A.  Sure.  This is based on a situation that came up a number
13 of times.  And if -- we were telling in this slide elections
14 offices that if they received, you know, a FedEx box that was
15 stuffed full of ballot applications, we were asking for them
16 to preserve the original box or envelope that those came in,
17 if they could for us, make a copy of the original batch of
18 ABBMs as it came to them, give us a call, or their local DA to
19 let us know about it, and then process the ABBMs as they
20 normally would, because under the law, those are still valid.
21 Q.  I want to turn your attention now to election integrity
22 cases involving voter assistance or fraud in the assistance
23 process, okay?
24      In your experience, can assistance, can voter assistance
25 be unlawful under the Election Code?

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE — DIRECT

1    A.   Sure.

2    Q.   Was that true before SB 1?

3    A.   Yes.

4    Q.   Brian, let's go to page 33, please.

5         Before SB 1, what types of things might have been

6    considered unlawful assistance?

7    A.   Under the statute at the time, assisting a voter who isn't

8    eligible for assistance or did not ask for assistance would

9    be — would violate the law.  Voting a ballot differently than

10   the voter wished or directed the assistant to vote the ballot;

11   if they were actually marking the ballot for the voter.  And

12   that's something that we would look at regularly.  And

13   suggesting to the voter during the voting process how the

14   voter should vote is something we would look at.

15   Q.   Okay.  Brian, let's go to the next page 34, please.

16        Can you describe for the Court, generally, the sequence of

17   events by which voter assistant — excuse me — assistance

18   fraud can occur.

19   A.   Sure.  There are a number of ways.  The one described here

20   is a more organized method, and it starts with a voter being

21   identified by a campaign worker, being transported to the

22   polling place in a van or something of that nature by a

23   campaign worker, given some sort of literature, like, a slate

24   of candidates on a slip of paper or a sample ballot, and then

25   assigned to an assistant at the polling place to take them

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE – DIRECT

1  through the process from, you know, the front of the line all
2  the way through voting, and to cast that vote or ensure that
3  the vote is cast for the paying candidates.
4  Q.  Before SB 1, was it illegal for a person who provided
5  assistance to a voter to try to influence or coerce the voter?
6  A.  In terms of the vote, yes.
7  Q.  Let's talk now about illegal voting.  Generally speaking,
8  what does "illegal voting" mean and how is it different from
9  what we've talked about so far?
10  A.  Yeah.  An illegal vote is an illegal vote cast by someone
11  who, you know, knew, had the requisite *mens rea* for the crime.
12  And that could be an ineligible vote or a double vote, voting
13  twice in the same election, impersonating another voter; and a
14  fourth method is to actually mark someone else's ballot in a
15  direction that they did not, I guess, direct or approve.
16  Q.  And I think we are showing you page 36 of 89.  Can we go
17  to 37, please.  And then 38, please.
18      And pages 36, 37, and 38, do these generally lay out the
19  kinds of illegal voting that you just described for the Court?
20  A.  Yes, sir.
21  Q.  Let's go to page 39.
22      What's the difference between voting a ballot of another
23  and marking a ballot of another?
24  A.  The context under voting another person's ballot is an
25  impersonation context, so whether it's in person, which is

*Gigi Simcox, RMR, CRR*

23-50885.41548

1  largely subverted by the voter ID law, or with a mail ballot

2  that isn't a person's vote, but they submit it, acting as if

3  they were that voter.

4      The latter situation in the slide that's up on the screen

5  now is marking a person's ballot without their consent or

6  without specific direction, so it's not contained in an

7  impersonation scenario necessarily.

8  Q.  We've walked through ballot harvesting, assistance fraud,

9  and illegal voting.  When people talk about election fraud,

10 are there in your — well, let's see.  When we talk about

11 election fraud in the context of the work that you've done,

12 are there other things that might be included in violations of

13 election integrity?

14 A.  Sure.

15 Q.  Brian, can we go to page 41.

16     Can you describe for the Court generally what the Election

17 Code — what election fraud means under the Texas Election

18 Code.

19 A.  Yes.  Under Chapter 276.013, which is one of the statutes

20 I mentioned earlier, this was sort of a broader provision,

21 which is designed to prohibit influencing a voter during the

22 voting process, causing a voter to register, obtain a ballot

23 or vote under false pretenses, or intentionally making a

24 misleading statement or false statement to election officials.

25 Q.  Brian, could we please pull up Joint Exhibit 1 and go to

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE – DIRECT

```
 1  Section 7.03.
 2      Mr. White, people have been sitting in that chair and
 3  asked this same information over and over again, but you're
 4  generally familiar that in legislation, the underlined portion
 5  is the verbiage that's added by the legislation?
 6  A.  Yes.
 7  Q.  We agree, right, that Section 7.03 of SB 1 amends
 8  Section 276.013 of the Election Code, which you just described
 9  for the Court?
10  A.  Correct.
11  Q.  If you look at 7.03(a), you can see that there were
12  already subsections 1, 2, and 3, correct?
13  A.  Correct.
14  Q.  And if we pull back at look at 7.03 a little bit more
15  broadly, there are several underlined sections, sub (a)(4)
16  through (9).
17  A.  Correct.
18  Q.  Is it your understanding that SB 1 added these additional
19  subsections to 276.013?
20  A.  Yes.
21  Q.  Now let's go back and look at 7.03(a), 1 through 3.
22  7.03 –– excuse me –– Section 276.013(a)(1) prior to SB 1,
23  would it have been unlawful to influence the independent
24  exercise of the vote of another in the presence of a ballot or
25  during the voter process?
```

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE - DIRECT

1  A.  Yes.

2  Q.  To your knowledge, did SB 1 change that?

3  A.  No.

4  Q.  Now, there's this new language that's underlined.  It

5  says:  "Including by altering the ballot of another or by

6  otherwise causing a ballot not to reflect the intent of the

7  voter."

8      In your experience, was it already a violation of 276.013

9  to alter the ballot of another to not reflect the intent of

10 the voter prior to SB 1?

11 A.  Yes.

12 Q.  All right.  Let's look at 7.03(b).  B describes the type

13 of offense that it is to breach Election Code 276.013.  Is

14 that right?

15 A.  Yes.

16 Q.  Prior to SB 1, what type of an offense was a breach of

17 276.013?

18 A.  Class A misdemeanor.

19 Q.  And after SB 1, how was that changed, if at all?

20 A.  Well, it was changed by reducing an attempt to a Class B

21 misdemeanor, which is kind of tricky, because the entire

22 statute was predicated on a person commits an offense if a

23 person makes any attempt to — or really makes an effort to,

24 which is the same as an attempt; so it muddies the waters on

25 how much of this statute it actually reduces to a Class B, but

*Gigi Simcox, RMR, CRR*

23-50885.41551

 1  potentially a lot of it, or all of it.
 2  Q.  And then is it right to say that (b)(1) elevates the level
 3  of offense if the purported — if the defendant in a case like
 4  this is an elected official?
 5  A.  That's what it does, yes.
 6  Q.  Mr. White, about how many times, if you know, did you give
 7  presentations containing the information similar to that in
 8  State Exhibit 89?
 9  A.  I don't know for sure.  I guess it's probably between five
10  and ten maybe.  I was pretty selective about giving
11  presentations.
12  Q.  Did you ever provide information like what is contained in
13  State Exhibit 89 in public testimony to the legislature?
14  A.  I would say I covered most, if not all, of that material
15  in my testimony before the legislature.
16  Q.  And does that include during the sessions where SB 1 and
17  its predecessors were considered?
18       MISS PERALES:  Your Honor, we would object on hearsay
19  grounds.  This is statements that he's saying he told the
20  legislature out of court and offered for the truth of the
21  matter asserted.
22       THE COURT:  That's overruled.
23  BY MR. KERCHER:
24  Q.  So I'll ask my question again.
25       Mr. White, we were talking about information you have

*Gigi Simcox, RMR, CRR*

1  provided to the legislature like what is contained in State
2  Exhibit 89.  And my follow-up question was whether you had
3  provided that kind of information to the legislature during
4  the sessions where SB 1 and its predecessors were considered?
5  A.  Yes.
6  Q.  Brian, can you please bring up State Exhibit 82.
7      Mr. White, I hope that your eyes will forgive the size of
8  State Exhibit 82.  Do you recognize this document?
9  A.  I do.
10 Q.  Can you tell the Court generally what it is.
11 A.  This is the spreadsheet that I maintained for our election
12 prosecutions.  This one is as of July 15th of 2022, and the
13 first part of the document is resolved prosecutions.  I'm
14 sorry.  This is the portion of the document that's resolved
15 prosecutions, and the second part would be pending
16 prosecutions.
17 Q.  Okay.  And if we look down at the bottom right-hand corner
18 of State Exhibit 82, we can see Bates Number State 112177, is
19 that right?
20 A.  Yes.
21 Q.  If we go through the last page and look at the Bates
22 number there, we see Bates Number State 112193, is that right?
23 A.  That's correct.
24 Q.  Mr. White, was this document made in the regular course of
25 business of the Election Integrity Division?

23-50885.41553

JONATHAN WHITE - DIRECT

1  A.  Yes.

2  Q.  Was it kept in the regular course of business?

3  A.  Yes.

4  Q.  Was it made at or near the time of the events or

5  conditions recorded?

6  A.  Yes.

7  Q.  Was it made by or from information transmitted by someone

8  with knowledge of the events or conditions recorded?

9  A.  Yes.

10         MR. KERCHER:  Your Honor, State defendants offer

11  State 82.

12         MISS HOLMES:  The HAUL plaintiffs object to this

13  exhibit on the basis of lack of foundation.

14         THE COURT:  That's overruled.

15         Any other objections?

16         State 82 is admitted.

17  BY MR. KERCHER:

18  Q.  Mr. White, does State 82 provide as complete and accurate

19  a list of resolved prosecutions that the OAG resolved from

20  approximately 2004 through approximately July 2022?

21  A.  Yes, sir.

22  Q.  Approximately how long were you personally responsible for

23  maintaining this list?

24  A.  Since at least 2019.  And I don't recall, there may have

25  been some time before that as well.

23-50885.41554

3932
JONATHAN WHITE - DIRECT

1  Q.  Do you recall being questioned about what is now State
2  Exhibit 82 at your first deposition in this case?
3  A.  Yes.
4  Q.  And you recall providing general information about cases
5  about which you had personal knowledge in response to
6  questioning by plaintiffs in this case?
7  A.  Yes.
8  Q.  I'm going to remind you of the Court's ruling on a motion
9  in limine.  I'm going to walk through those cases about which
10 you have personal knowledge from this list and admonish you
11 not to provide information beyond what you provided in your
12 deposition.  If you somehow remember information that you did
13 not at the time, we are not to get into that at this time.
14     Do you understand that instruction?
15 A.  Yes.
16 Q.  How familiar are you with the facts that are relevant to
17 the election fraud prosecutions that are reflected on State
18 Exhibit 82?
19 A.  In all the cases since 2018, I would be familiar with all
20 the operative facts pertaining to the elements of the crime.
21 More so if I was the actual prosecutor on these, which I was
22 on many of them, going all the way back to, say, 2008.
23 Q.  And do you have personal knowledge of the underlying
24 operative facts comprising the elements of the crimes charged
25 in any of these cases that have been favorably resolved where

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE - DIRECT

1  an assister was providing otherwise lawful in-person

2  assistance, attempted to influence or coerce the voter they

3  were assisting?

4  A.  Yes.

5  Q.  Brian, can we go to page 3.

6         THE COURT:  Before you do that, I guess I have a

7  question, because I'm not sure what a "favorable resolved

8  prosecution" means.  I mean, is that a conviction, or is that

9  a plea, or what is — how are you defining that term?

10        THE WITNESS:  We defined it on this spreadsheet in a

11  notation at the bottom as:  Resulting in a conviction either

12  through plea or jury trial, a deferred adjudication or

13  pretrial diversion or diversion-type program, with a

14  stipulation of guilt or an acknowledgment of the offense.

15  BY MR. KERCHER:

16  Q.  All right.  We are now on page 3 of Exhibit 82.  And I

17  will refer your attention to Christina Lichtenberger.  Do you

18  see that entry?

19  A.  Yes, sir.

20  Q.  Are you familiar with the underlying operative facts of

21  this case?

22  A.  Yes.  I was the prosecutor on this case.

23  Q.  Again, at the same level of generality that you provided

24  information on this case at your deposition in response to

25  plaintiffs questioning, can you give the Court an

1  understanding of what this case was about?

2  A.  Sure.  As it indicates on the spreadsheet, this was a

3  vote-harvesting case involving these three ladies.  Mail

4  ballot fraud.  Assistance fraud was also involved.

5  Q.  And you mention "these three ladies."  Are these part of

6  the same case?

7  A.  They stemmed from the same investigation, yes.

8  Q.  What was the final resolution of these cases?

9  A.  The Lichtenberger case, if we can zoom back out.

10  Q.  Take us over to the far right column, Brian.

11  A.  Lichtenberger pled guilty to a count, I believe, of

12  possession of a ballot and a count of unlawful assistance

13  under Chapter 64.036, and received a one-year deferred

14  adjudication and a fine.

15  Q.  And underneath the resolution of Ms. Lichtenberger's case

16  is the resolution of Andrea Campos Bierstedt's case.

17     Can you describe for the Court what the "pretrial

18  diversion of six months" means?

19  A.  That was a resolution with the Court for pretrial

20  diversion probation of six months' -- pretrial diversion

21  program with six months' probation and $3,500 what we called a

22  "donation" to the County.

23  Q.  Now, I think you said this in response to the Court's

24  question a moment ago, but when defendants in election

25  integrity cases charged by your office were put into a

*Gigi Simcox, RMR, CRR*

 1 | pretrial diversion, did they have to plea to or acknowledge
 2 | guilt to some crime in order to get the benefit of that
 3 | pretrial diversion program?
 4 | A.  That's correct.
 5 | Q.  Okay.  And below Ms. Bierstedt's is the resolution of
 6 | Ms. Alicia Perez, who you told us was also involved in this
 7 | investigation.
 8 |     What was the resolution of her case?
 9 | A.  She pled guilty to four counts of possession of a ballot
10 | and four counts of unlawful assistance and received probation
11 | and fine and court costs.
12 | Q.  All right.  Let's go to page 4, please.
13 |     THE COURT:  Before you leave that, the '06 is that
14 | meaning that these events occurred in 2006?
15 |     MR. KERCHER:  Brian, can you scroll over for the
16 | Court, please.
17 |     THE COURT:  Okay.  Well, then, I guess '10, is that
18 | when these violations of the Election Code occurred?
19 |     THE WITNESS:  This is the date of the resolution of
20 | the case, which were pled in Court on that date, and I believe
21 | they were stemming from the 2008 Primary Election in Duval
22 | County.
23 |     THE COURT:  Thank you.
24 | BY MR. KERCHER:
25 | Q.  Mr. White, you, in your deposition, identified a number of

23-50885.41558

JONATHAN WHITE – DIRECT

1  other defendants for whom —— with whom —— see if I can ask a

2  better question.

3      You have previously testified regarding familiarity with

4  the underlying facts of several other cases on what is now

5  State Exhibit 82, including on page 4, Gilda Hernandez, and

6  Margarita Ozuna, is that right?

7  A.  Yes, sir.

8  Q.  I will highlight those names for the Court to review at

9  its convenience rather than taking up additional time.

10      Can you briefly describe, again at the same level of

11  generality, the facts of those cases.

12  A.  Yes.  The Hernandez case was a Dallas County case, as

13  indicated in the first column, which was tried in Rockwell

14  County under our venue provision.  It was the 2010 Primary

15  election, and she was charged with illegal possession of a

16  ballot, unlawful assistance, and two other of offenses.

17  Q.  Okay.  And Margarita Ozuna in Cameron County?

18  A.  Yes.  That was in the Cameron County 2010 Primary, and she

19  was charged with unlawfully assisting a voter.

20  Q.  Okay.  On page 5, I'll direct your attention to Tomasa

21  Chavez, Facunda Garcia, and Bernice Garcia.

22      Tomasa Chavez, same level of generality.

23  A.  Yes.  Also in Cameron County, but a different election,

24  the 2010 Primary Election Run-off.  Charged with a number of

25  offenses and was convicted.  I believe the last two were

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE — DIRECT

1  convicted also of unlawful assistance of a voter.

2  Q.  And I believe you said that the — those charges stemmed

3  from a 2012 election, but we see the resolution dates are in

4  2015.  Why did it take so long, Mr. White?

5  A.  This investigation, I think, took — took quite some time,

6  maybe 18 months or more, and then we got these cases in the

7  system.  And election cases don't tend to float to the top of

8  the docket.  They tend to go the other way.  So, you know,

9  three years for a resolution wasn't uncommon at all.

10 Q.  And when you say "to the top of the docket," do you mean

11 to the top of your offices' docket or the Court's docket?

12 A.  The Court's docket, yeah.

13 Q.  Let's go to page 6.  I'll direct your attention —

14        MISS PERALES:  I'm sorry.  I just have a bit of

15 confusion.  You've referred to this as State's Exhibit 82.

16        THE COURT:  That's what it was admitted under.

17        MISS PERALES:  Okay.  And this chart is dated

18 July 2022?

19        MR. KERCHER:  Yes.

20        MISS PERALES:  Okay.  I'll clear it up on a break

21 with you.

22        MR. KERCHER:  Okay.

23        MISS PERALES:  Thank you.

24 BY MR. KERCHER:

25 Q.  All right.  I was referring your attention to Margarita

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE — DIRECT

1  Ozuna now on page 6.  Is this the same Margarita Ozuna who we
2  talked about earlier on page 4?
3  A.  That's correct.
4  Q.  Is she what we might call a repeat offender?
5  A.  She — she was.
6  Q.  Is this a similar operation to what she was charged with
7  previously?
8  A.  Correct.
9  Q.  Okay.  Now, Vicenta Verino?
10  A.  Yes, sir.
11  Q.  Are you familiar with the fact of that case?
12  A.  Yes, sir.  I was the prosecutor on all these cases.
13  Q.  Okay.  Generally, what happened there?
14  A.  Ms. Verino was charged with numerous ballot-harvesting
15  offenses and she pled guilty to unlawful assistance of a
16  voter.
17  Q.  And what about Sarah Perales?
18  A.  Ms. Perales was involved in the same activity and was
19  charged with — let's see.  Looks like two offenses.  Pled
20  guilty to a ballot-handling offense.
21  Q.  All right.  And what about Lupe Rivera?
22  A.  Yes.
23  Q.  Do you recall that case?
24  A.  Yes.
25  Q.  What were the facts of that case?

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE — DIRECT

1   A.  It was the 2013 municipal election, which was an election
2   where he was on the ballot, city commissioner.  And he was
3   charged with numerous ballot-handling — I mean,
4   ballot-harvesting offenses, including unlawful assistance to a
5   voter, which he pled guilty to.
6   Q.  Okay.  Let's skip ahead to page 9, Brian.
7       And I'll draw your attention to Cynthia K. Gonzales.  Are
8   you familiar with the facts of this case, sir?
9   A.  Yes, sir.
10  Q.  What happened here?
11  A.  This was an Oasis County case, was brought in San Patricio
12  County, an adjoining county stemming out of the Roxton 26
13  Primary Run-off, and Ms. Gonzales was convicted of unlawful
14  possession of a ballot.  The statute's called "Carrier
15  Envelope Action," which always gets looks in Court.  What the
16  heck is that?  And unlawfully assisting a voter with a mail
17  ballot under Chapter 86.010.
18  Q.  Of the cases that we've discussed from State 82, did any
19  of these offenses take place at a polling place?
20  A.  I believe all of these so far were with regard to mail
21  ballots.
22  Q.  Okay.  If we go to page 7 and look at Patricia Barton in
23  Medina County.  Did Ms. Barton's case take place at a polling
24  location?
25  A.  Yes, this one did.

23-50885.41562

JONATHAN WHITE — DIRECT

1  Q.  Can you generally describe with the same level of detail
2  what happened here.
3  A.  Yeah.  This was a violation of Chapter 61.008, which is
4  unlawfully influencing a voter in the polling place, and she
5  was also charged with electioneering.  And this one resulted
6  in a diversion program, but this was not in an assistance — a
7  voter assistance role.
8  Q.  During your time prosecuting election integrity cases for
9  the OAG, would you number the cases that the OAG charged to
10 resolution of plea agreement or conviction or diversion
11 program in the hundreds?
12 A.  Yes.
13 Q.  Brian, could we go to page 11, the Gregg County case for
14 Mr. Brown — or Ms. Brown.  Excuse me.
15     Do you recall — do you have any personal knowledge
16 Mr. White, about the allegations against Ms. Brown in this
17 case?
18 A.  Yes.  It's Mr. Brown.
19 Q.  Mr. Brown.  Sorry.  Shannon.
20     What election was involved, sir?
21 A.  This was the 2018 Gregg County Democratic Primary.  He was
22 the candidate.
23 Q.  And what were the nature of the charges against Mr. Brown?
24 A.  It was an organized vote-harvesting scheme.
25 Q.  And if we scroll over to the right-hand column, what was

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE - DIRECT

1   the disposition of that case?

2   A.   Mr. Brown pled guilty and was convicted of election fraud

3   under Chapter 276.013.

4   Q.   Thank you, Mr. White.

5        Brian, could we please bring up State Exhibit 93.

6        Mr. White, are you familiar with this document?

7   A.   Yes.  I drafted this.

8   Q.   Can you describe for the Court what it is.

9   A.   This is the indictment for those charges for Commissioner

10  Brown that we just discussed.

11  Q.   If we go to page 6, was this document signed by the

12  foreperson of the grand jury?

13  A.   Yes, sir.

14  Q.   If we go to page 7, was this document signed by the deputy

15  clerk?

16  A.   Yes.

17  Q.   And Brian, if we can go to the first page Bates number,

18  that's State 098001.

19       Did I read that correctly, sir.

20  A.   Yes.

21  Q.   And the Bates number on the last page.

22       State 098007.  Did I read that correctly?

23  A.   That's correct.

24  Q.   All right.  Brian, can we go to Count 1, please.

25       And before we get into the contents of this document, you

*Gigi Simcox, RMR, CRR*

3942

JONATHAN WHITE – DIRECT

1  said that you drafted it.  Did I hear that correctly?

2  A.  Yes.

3  Q.  Is this a case where the Office of the Attorney General

4  was working alongside a local DA, or is this a case that —

5  where the OAG individually prosecuted?

6  A.  Yes, this was prosecuted by the Gregg County District

7  Attorney's Office with our assistance.

8  Q.  Okay.  And does State Exhibit 93 put forth the activities

9  of your office?

10  A.  The results of those activities in — which resulted in

11  a — you know, grand jury charges and an indictment, yes.

12  Q.  And does it put forth matters observed by your office

13  while under a duty to report?

14  A.  Yes.

15        MR. KERCHER:  Your Honor, State defendants offer

16  State Exhibit 93.

17        MS. TULIN:  Your Honor, we would object based on

18  hearsay.

19        MR. KERCHER:  Your Honor, I've laid the predicate

20  that this is an exception to hearsay under 803, public record.

21        THE COURT:  Any other objections?

22        That objection is noted and overruled.  93 is

23  admitted.

24  BY MR. KERCHER:

25  Q.  Mr. White, looking at Count 1, it says, "Engaging in

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE — DIRECT

1 | organized election fraud with the intent to establish,
2 | maintain, and participate in a vote-harvesting organization;
3 | said organization consisting of Shannon Brown, Marlena
4 | Jackson, DeWayne Ward, and Charlie Burns, who collaborated in
5 | committing election offenses under Titles 1 through 7 of the
6 | Texas Elections Code."
7 | Before I move on, Mr. White, what do you understand that
8 | to mean?
9 | A.  So this is a violation of Election Code Chapter 276.012, I
10 | believe.  It was originally 11, but they passed two sections
11 | in the same section, so this, I believe, became 012; and
12 | that's organized election fraud.  It was patterned after the
13 | State Penal Code offense "Engaging in organized criminal
14 | activity," but tuned to deal with election offenses.
15 | And so if you engage in offenses under the Election Code,
16 | and you are part of a group that is dedicated to achieving
17 | those outcomes, then that's where this offense applies.
18 | Q.  Okay.  Brian, can we go to Count 2, please.  And let's see
19 | the whole count.
20 | Generally speaking, Mr. White, what does Count 2 allege?
21 | A.  Count 2 alleges a violation of Chapter 84.0041, which is
22 | fraudulent use of a mail ballot application, and that's that
23 | false information was provided that this voter was disabled,
24 | when the voter was not disabled.  That information was
25 | provided by the vote harvesters and not the voter.

*Gigi Simcox, RMR, CRR*

1  Q.  And when we are talking about "the voter" in Count 2,
2  Count 2 mentions Davonia Bradley.  Is that the voter we are
3  talking about?
4  A.  Yes, sir.
5  Q.  Do you understand that Ms. Bradley was disenfranchised by
6  this vote-harvesting scheme?
7  A.  Yes.
8  Q.  Let's go to Count 3, please.
9      What does Count 3 describe, sir?
10 A.  This is the same offense, but for a Yolita Johnson.  It
11 mentions that this offense is enhanced, and it's enhanced to a
12 third degree felony, and that's because it was committed more
13 than once in the same election.
14 Q.  And you mentioned the Yolita Johnson.  Can you tell the
15 Court whether or not you understand Ms. Johnson was
16 disenfranchised by this vote-harvesting scheme?
17 A.  Yes.
18 Q.  Count 4.  Can you describe what this is?
19 A.  Same offense for the voter Terri Thomas.
20 Q.  Count 5.
21 A.  This one is for Ricky Johnson.
22 Q.  Same offense, sir?
23 A.  Yes.
24 Q.  And Count 6?
25 A.  Same offense for Eric Taylor.

JONATHAN WHITE – DIRECT

1  Q.  Count 7?

2  A.  This is for Robert Harvey Jr., same offense.

3  Q.  And Count 8?

4  A.  Same offense for Veronica Moore.

5  Q.  Let's take a look at Counts 9 and 10 now.  These are both

6  entitled "Unlawful possession of a ballot or ballot envelope,"

7  is that right?

8  A.  That's correct.

9  Q.  Can you tell the Court, Mr. White, whether Mr. Brown

10 actually got his hands on ballots or not?

11 A.  That's correct.  That's what these counts indicate.

12 Q.  And Counts 9 and 10 name Davonia Bradley again, as well as

13 Tamika Buchanan, is that right?

14 A.  Correct.

15 Q.  Do you understand Tamika Buchanan was also disenfranchised

16 by this vote-harvesting scheme?

17 A.  Yes.

18 Q.  Let's go to page 5, Counts 19 through 23.  Again, without

19 getting into facts of this case that are not reflected in this

20 exhibit, do these counts share a common scheme?

21 A.  They do.

22 Q.  Generally speaking, what was that scheme as reflected in

23 the exhibit are?

24 A.  The scheme was to –– with intent to harm or defraud the

25 candidate Kasha Williams, who was Mr. Brown's opponent; that

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE – DIRECT

1  election records were falsified and submitted to procure mail

2  ballots for voters on the basis of disability when they were

3  not disabled.

4  Q.  Okay.  Brian, if we could go back to State 82 at the top

5  of page 12.

6      Let's look at the first Gregg County case, which you can

7  see refers to Marlena Jackson.  We just read Marlena Jackson's

8  name, is that right?

9  A.  Correct.

10  Q.  What was the allegation against Ms. Jackson?

11  A.  There were more than 100 counts against Ms. Jackson, and

12  they involved the same –– I think the same slate of offenses

13  that Mr. Brown was involved in; all related to an organized

14  vote-harvesting scheme.

15  Q.  Okay.  Brian, can we bring up State 91, please.

16      Do you recognize this document, sir?

17  A.  Yes, I do.  And maybe I misspoke.  This says there were 97

18  counts, so that would not be over 100.

19  Q.  What is this document?

20  A.  This is the indictment that I prepared that was presented

21  to the Gregg County grand jury.

22  Q.  Does this document set forth the activities of your

23  office?

24  A.  Yes.

25  Q.  And does it describe matters observed while under a legal

1 duty to report?

2 A.  Yes.

3      MR. KERCHER:  Your Honor, State defendants offer

4 State 91.

5      THE COURT:  Any objection?

6      MS. HOLMES:  We object to this document on hearsay

7 grounds and also relevance, because these are indictments and

8 not convictions.

9      MR. KERCHER:  Your Honor, we've laid the predicate

10 that this as is an exception to hearsay under 8038.  This

11 document is relevant because as we just saw, if we

12 cross-reference this document with State 82, this is not

13 simply an indictment.  This is giving the Court an

14 understanding of what it was that the resolved offenses were

15 charged.

16      THE COURT:  Yeah.  The objection is noted and

17 overruled.  91 is admitted.

18 BY MR. KERCHER:

19 Q.  Brian, can we go back to State 82, please.  Also at

20 page 12.

21      The next Gregg County case is Charlie Burns, Jr. do you

22 see that, Mr. White?

23 A.  Yes.

24 Q.  Are you familiar with that case?

25 A.  Yes, sir.

23-50885.41570

JONATHAN WHITE – DIRECT

1   Q.  And if we scroll over to the right-hand column of
2   Mr. Burns' case, Mr. Burns was convicted.  Is that your memory
3   as well?
4   A.  That's correct.
5   Q.  Brian, can we pull up State 92.
6       Do you recognize State 92, Mr. White?
7   A.  Yes, sir.
8   Q.  What is it?
9   A.  This is the indictment, also that I drafted, for Charlie
10  Burns, Jr., the same type of vote-harvesting offenses in this
11  same matter that was presented to the Gregg County grand jury.
12  Q.  Does this document set out the activities of your office?
13  A.  Yes, it does.
14  Q.  Does it set out matters observed while under a legal duty
15  to report?
16  A.  Yes.
17          MR. KERCHER:  Your Honor, State offers State 92.
18          THE COURT:  Any objection?
19          MS. HOLMES:  One moment, Your Honor.
20          Same objection.  Hearsay, as well as relevance.
21          THE COURT:  And same ruling.  92 is admitted.
22  BY MR. KERCHER:
23  Q.  All right.  If we go back to State 82 again, page 12, the
24  next Gregg County case is DeWayne Ward.  Do you see that?
25  A.  Yes.

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE – DIRECT

1  Q.  Do you recall the disposition of this case?

2  A.  Yes.  He was also convicted of same offense as Mr. Burns.

3  Q.  And one more time –– we'll do this one more time,

4  Mr. White.

5      If we could bring up State 90.

6      Do you recognize this document?

7  A.  Yes, sir.

8  Q.  What is it?

9  A.  This is the indictment pertaining to DeWayne Ward that

10  had, I believe, six counts of similar offenses to what we've

11  talked about.

12  Q.  And does State 90 set forth the activities of your office?

13  A.  Yes, it does.

14  Q.  Does it set forth matters observed while under a legal

15  duty to report?

16  A.  Yes, sir.

17      MR. KERCHER:  Your Honor, State defendants offers

18  State 90.

19      MS. HOLMES:  Same objection.  Hearsay and relevance.

20      THE COURT:  Same objection.  90 is admitted.

21  BY MR. KERCHER:

22  Q.  Brian, will you please pull up State 20199, please.  Thank

23  you.  One step ahead of me.

24      Mr. White, do you recognize this document?

25  A.  Yes, sir.

23-50885.41572

JONATHAN WHITE – DIRECT

1  Q.  Is this document related to the four convicted persons

2  from Gregg County we just discussed?

3  A.  Yes, sir.

4  Q.  And if we scroll down, we see that it says "This is for

5  immediate release."  What generally is this?

6  A.  This is a press release from the Attorney General's

7  Office.

8  Q.  Do you have personal knowledge of the information in this

9  press release?

10  A.  Yes.

11  Q.  Is the information in this press release true?

12  A.  I would say for the most part yes, sir.

13  Q.  When you say "for the most part," I'm terrified to ask the

14  next question.

15  A.  Sorry.

16  Q.  Is there any portion of this document where the

17  information is not correct or true?

18  A.  You know, I think anytime you have a press release, you

19  have some representations that are up for debate or

20  interpretation, but in terms of the factual statements about

21  the case, yes, they are accurate.

22  Q.  Then I'm going to move along.

23     Brian, can you please pull up LUPE 309.

24     Mr. White, what is this document, if you know?

25  A.  This is a press release involving a case we investigated

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE – DIRECT

1  and assisted with Denton County in investigating in Carollton,

2  Texas.

3  Q.  And who was arrested in this case?

4  A.  Zul Mohamed.

5  Q.  Do you have the personal knowledge of the facts related in

6  this press release?

7  A.  Yes, sir.

8  Q.  Is the information in this press release true?

9  A.  Yes.

10  Q.  How did you get personal knowledge about this case,

11  generally speaking?

12  A.  We were — we were asked in by the Denton County Sheriff's

13  Office to assist with an election offense that they were

14  investigating.  I reviewed original election documents and

15  evidence in this case.  I assisted with the preparation of the

16  probable cause affidavit for the search warrant — or search

17  warrants that were run involving this candidate, and we

18  subsequently invested similar allegations in Dallas County,

19  and I was privy to all of those documents as well.  And the

20  original evidence.

21        MR. KERCHER:  Your Honor, State defendants offer

22  LUPE 309.

23        THE COURT:  Any objection?

24        MS. TULIN:  No objection, Your Honor.

25        MS. HOLMES:  I'm sorry.  The HAUL plaintiffs do

*Gigi Simcox, RMR, CRR*

3952

JONATHAN WHITE – DIRECT

1  object to the exhibit on hearsay grounds.

2          MR. KERCHER:  Your Honor, we're not offering the

3  document to prove the truth the matter asserted.  Mr. White

4  has testified that the contents of the documents are true, and

5  that testimony we would offer for the truth, but we are not

6  offering the document itself to prove the truth of the matter

7  asserted.

8          THE COURT:  Objection is noted and overruled.

9  LUPE 309 is admitted.

10  BY MR. KERCHER:

11  Q.  Without going outside the facts described in LUPE 309, can

12  you describe for the Court the conduct with which Mr. Zul has

13  been charged?

14  A.  Yes.  Mr. Mohamed, as it says in the press release,

15  obtained a virtual mailbox in one of those mailbox stores

16  using a false ID, and then he had directed mail ballot –– or

17  he submitted mail ballot applications to have mail ballots

18  directed from at least 84 voters to that mailbox, and he was

19  arrested in possession of 25 actual mail ballots.

20  Q.  As reflected in LUPE 309, was Mr. Mohamed –– I'm sorry was

21  Mr. Zul –– I'm sorry.  Can you tell me –– because I have heard

22  it both ways.  Is it Mr. Zul or is it Mr. Mohamed?

23  A.  Zul Mohamed.

24  Q.  Thank you.  Again, without exceeding the contents of

25  LUPE 309, was Mr. Mohamed a candidate for office?

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE – DIRECT

1   A.  Yes.

2   Q.  Which office?

3   A.  Mayor of Carrollton.

4   Q.  Thank you, Brian.  We can pull this down.

5       We have so far, Mr. White, been talking about election

6   integrity cases prosecuted either exclusively by your office

7   prior to the *Stephens* decision or in concert with local DAs

8   after the *Stephens* decision.  Do the election integrity cases

9   that we have discussed today include election integrity cases

10  brought exclusively by local DAs?

11  A.  Yes.

12  Q.  To your knowledge, does the federal government also

13  prosecute election integrity cases?

14  A.  Yes.

15  Q.  Generally speaking, is there an overlap in the kind of

16  conduct that is regulated and prosecuted by the federal

17  government and by Texas prosecutors regarding election

18  integrity?

19  A.  Yes.

20  Q.  Brian, could you please bring up Texas Legs 0004047

21  through 49.

22      Mr. White, do you recognize this letter?

23  A.  Yes, sir.

24  Q.  To whom is the letter addressed?

25  A.  This was directed to Senator Bryan Hughes, who was the

*Gigi Simcox, RMR, CRR*

23-50885.41576

JONATHAN WHITE - DIRECT

1  Chair of the Senate Select Commission on election integrity
2  back in 2018.
3  Q.  Who wrote this letter, if you know?
4  A.  That would have been myself and then deputy first
5  assistant, now a district judge in the Northern District,
6  Brantley Starr.
7  Q.  What was the purpose of this letter?
8  A.  We were coming off of SB 5, which was a mail ballot
9  security bill that was passed in the special session of the
10 85th Legislature, and we were directing this committee toward
11 what next steps might be to secure election integrity in
12 Texas.
13 Q.  And we talked about the date of this letter being 2018.
14 Are the concerns about closing loopholes in Texas election
15 integrity laws reflected in this letter the result of anything
16 that happened in the 2020 Election?
17 A.  No.
18 Q.  Do you have personal knowledge of the information
19 reflected in this letter?
20 A.  Yes.
21 Q.  Is that information true?
22 A.  Yes.
23       MR. KERCHER:  Your Honor, State defendants offer
24 Texas Legs 0004047 through 49 as State Exhibit 319 not for the
25 truth of the matter asserted.

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE - DIRECT

1         THE COURT:  Any objections?

2         MISS PERALES:  Yes, Your Honor.  It is offered for

3 the truth of the matter asserted and, thus, it's hearsay, but

4 even if it's not offered for the truth of the matter asserted,

5 then, you know, for what purpose is it offered?  If it's

6 offered for its impact on the legislators who received it,

7 then we believe that there's a sword-and-shield issue that

8 comes up because of the assertion of legislative privilege by

9 those legislators.

10         Essentially, we're going to have an exhibit entered

11 into evidence that tells one side of the story, but we're

12 unable to probe the rest of it.

13         MR. KERCHER:  I'll address the hearsay concern first.

14         Mr. White has testified on the stand under oath that

15 the contents of the exhibit are true, and so we do not need to

16 offer it to prove the truth of the matter asserted.  We have

17 that via different testimony.

18         This is not a sword-and-shield problem.  We're not

19 offering this to show the effect on the legislators but to

20 show that there is a state interest by those who prosecute

21 Texas election integrity in closing loopholes in Texas

22 election integrity that have nothing to do with what the

23 plaintiffs have term "the Big Lie."

24         THE COURT:  But doesn't this have to be before the

25 legislature that enacted SB 1?  This is a 2018 letter.  I

*Gigi Simcox, RMR, CRR*

23-50885.41578

JONATHAN WHITE - DIRECT

1  don't understand that.

2        MR. KERCHER:  This is not offered, Your Honor, to

3  show that it was the impetus of SB 1, but rather to show there

4  is an ongoing state interest in closing election law.  It is

5  precisely because these concerns were raised prior to SB 1

6  that it goes to the weight of testimony about valid and good

7  faith concerns about closing loops in Texas election integrity

8  law.

9        MISS PERALES:  Your Honor, with all respect to my

10  friend Mr. White, I don't believe that any interest that

11  Mr. White might have as an individual prosecutor constitutes

12  state interest, as Mr. Kercher has framed it.  The interest

13  would come from Senator Hughes, and this loops back into the

14  sword-and-shield problem.  We're getting one side of it, but

15  we're unable to probe the other side.

16        THE COURT:  Yeah, this is going to need to come from

17  a legislator to say, "I was thinking about these issues as far

18  back as 2018."  I mean, you are presenting argument in the

19  form of sort of evidence.

20        The objections are noted.  Sustained.  319 is not

21  admitted.

22  BY MR. KERCHER:

23  Q.  Brian, can you please bring up State Exhibit 87.

24      Mr. White, do you recognize this document?

25  A.  Yes, sir.

JONATHAN WHITE – DIRECT

1  Q.  What is it?

2  A.  This is the spreadsheet or chart that's kept by our

3  investigative unit of all of the referrals that they receive,

4  whether from the Secretary of State or other sources.

5  Q.  Okay.  Was this document made during the regular course of

6  your Division's business?

7  A.  Yes.

8  Q.  Was it kept in the regular course of business?

9  A.  Yes.

10 Q.  Was it made at or near the time of the event or condition

11 recorded?

12 A.  That's correct.

13 Q.  Was it made by or from information transmitted by someone

14 with knowledge of the event or condition recorded?

15 A.  Yes.

16        MR. KERCHER:  Your Honor, State defendants offer

17 State Exhibit 87.

18        THE COURT:  Any objection?

19        MS. TULIN:  Your Honor, we do object.  We –– I

20 understand that Mr. Kercher has just laid the foundation for

21 the business record exception, but there is still hearsay

22 within hearsay problem.

23        MR. KERCHER:  I believe counsel is referring to ––

24 and Brian, if you could show us the column on the right-hand

25 side, which is the allegations –– these allegations, Your

*Gigi Simcox, RMR, CRR*

3958

JONATHAN WHITE - DIRECT

1   Honor, would not be offered to prove the truth of the matter

2   asserted, but merely to show that this is the information that

3   was referred to the Office of the Attorney General.

4          THE COURT:  That objection is noted and overruled.

5          Any other objections?

6          No other objections.  87 is admitted.

7          I'm kind of curious, though, how does 87 differ from

8   89?

9          THE WITNESS:  Would you like me to answer that, Your

10  Honor?

11         THE COURT:  Either way, yeah.

12         THE WITNESS:  So this is a spreadsheet that tracks

13  the referrals that were submitted for potential investigation

14  at the investigation level.  The prosecution spreadsheet is a

15  spreadsheet of prosecution results in court or cases pending

16  in court.

17         THE COURT:  And so both in 87 and 89, I don't see

18  numbers.  I'm assuming there was a lot more of 87 than there

19  was in 89, if we counted them.

20         THE WITNESS:  If we get the numbers correct, yes.

21         THE COURT:  Okay.  Now I get it.

22         THE WITNESS:  More on the referral spreadsheet than

23  the results spreadsheet, yes.

24         MR. KERCHER:  Your Honor, as we described for the

25  Court previously, we are going to break Mr. White's testimony

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE – DIRECT

1  into two pieces.  The first will be that evidence which we

2  believe does not infringe upon the Court's ruling on the

3  motion in limine, in which case plaintiffs will now have the

4  opportunity to cross-examine him on this portion of his

5  direct.

6          Following this, we will make our offer of proof.

7  Plaintiffs will ask for some time to prepare their cross and

8  then cross him on that portion.

9          I pass the witness for this purpose, Your Honor.

10         MR. NICHOLS:  If there's additional questions from

11  the defense side, would you like me to ask now?

12         THE COURT:  I don't care.  Go ahead.

13         MR. NICHOLS:  Okay.

14  BY MR. NICHOLS:

15  Q.  Good morning, Mr. White.

16  A.  Good morning.

17  Q.  You and I have known each other a little bit of time, is

18  that right?

19  A.  Going back, yes.

20  Q.  I think at the time you were hired into the AG's office,

21  at that time was -- was I the deputy for criminal justice?

22  A.  That's correct.

23  Q.  Okay.  So just a few follow-up questions on what you've

24  told the Court already.  The first is with respect to your

25  testimony about the duty of a district attorney under Texas

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE – DIRECT

1  law.

2      And, Brian, could we pull up Article 201 of the Texas Code

3  of Criminal Procedure?

4      Mr. White, do you see that on your screen?

5  A.  Yes, sir.

6  Q.  You were asked by counsel for the State defendants about

7  the duty of a district attorney in the state of Texas.  Do you

8  remember that?

9  A.  Yes.

10  Q.  If anyone were to ask you:  "Where do I go to find what

11  the duty is of a district attorney," is this the section that

12  you would refer them to?

13  A.  Yes, this and relevant portions of the Constitution.

14  Q.  Sure.  And you see that in Article 201, the fourth line

15  down, could you please read the sentence beginning "It shall

16  be."

17      Fourth line from the bottom.

18  A.  Ah, fourth from the bottom.  Okay.

19  Q.  My bad.

20  A.  "It shall be the primary duty of all prosecuting

21  attorneys, including any special prosecutors, not to convict

22  but to see that justice is done.  They shall not suppress

23  facts or secrete witnesses capable of establishing the

24  innocence of the accused."

25  Q.  And does Texas law also explicitly, unlike the federal

JONATHAN WHITE – DIRECT

1  Constitution, encapsulate and embody and codify the

2  presumption of innocence?

3          MISS PERALES:  Objection.  Leading.

4          THE COURT:  Sustained.

5  BY MR. NICHOLS:

6  Q.  Can you tell us whether or not Texas law, unlike federal

7  law, explicitly codifies the presumption of innocence?

8  A.  It does.

9  Q.  And Brian, I'm going to test your internet skills, but is

10  it possible for you to pull up Penal Code Section 201?

11      And Mr. White, are we now looking on the screen at

12  Section 201 of the Code of Criminal Procedure?

13  A.  The Texas Penal Code, yes, sir.

14  Q.  I'm sorry.  Texas Penal Code.  Let me get to the Code of

15  Criminal Procedure in a second.

16      But the penal code, Section 201, does it explicitly set

17  out the presumption of innocence under Texas law?

18  A.  Yes, it does.

19  Q.  And I'm going to try you one more time, Brian.  Sorry to

20  put you to the test.  Code of Criminal Procedure, 3803, 38.03.

21      And so does the -- does Texas law -- can you tell me

22  whether or not Texas law codifies the presumption of

23  innocence, unlike the federal system, not just once, but

24  twice?

25  A.  Yes, sir, in Article 38.03.

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE – DIRECT

1  Q.  And so do we see in Article 38.03 that:  "All persons are

2  presumed to be innocent, and no person may be convicted of an

3  offense unless each element of the offense is proved beyond a

4  reasonable doubt."

5      Did I read that correctly?

6  A.  Yes, that's correct.

7  Q.  And does Texas law also provide the fact that —

8  unfortunate choice of gender — "He has been arrested,

9  confined, or indicted for, or otherwise charged with, the

10  offense gives rise to no inference of guilt at his trial."

11      Did I read that correctly?

12  A.  That's correct.

13  Q.  Now, you also talked a little bit about investigations

14  during your testimony in direct with the counsel for the State

15  defendants, talked a little bit about who prosecutes election

16  code offenses.  We didn't really talk — you didn't really

17  talk too much about who investigates it or what type of law

18  enforcement agencies investigate offenses in Texas, including

19  Election Code offenses.

20      Do various counties in Texas have a sheriff's office?

21  A.  Yes.

22  Q.  And is the sheriff's office a law enforcement agency in

23  the state of Texas?

24  A.  Yes.

25  Q.  And do sheriff's offices, in your experience across the

*Gigi Simcox, RMR, CRR*

23-50885.41585

JONATHAN WHITE – DIRECT

1  state of Texas, investigate offenses that arise under the

2  Election Code?

3  A.  Occasionally.

4  Q.  And same thing with respect to, do various municipalities

5  and other localities have police departments?

6  A.  Yes, they do.

7  Q.  Are those law enforcement agencies?

8  A.  Yes.

9  Q.  And do those local law enforcement agencies from time to

10  time investigate potential violations of Texas law, including

11  Election Code violations?

12  A.  Yes.  And they have the authority to do so, yes.

13  Q.  And then in various localities in the state of Texas —

14      And Judge, you cut me off if I'm doing too much of a

15  civics lesson.

16      In various counties in the state of Texas, are there

17  officials called "constables"?

18  A.  Yes.

19  Q.  And do constables, depending on the jurisdiction, have

20  criminal jurisdiction over violations of the — of Texas law

21  that occur within their county; in other words, the county in

22  which they sit?

23  A.  I think that's probably true.

24  Q.  Yeah.  And you also mentioned that from time to time that

25  federal authorities look at Election Code or election

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE – DIRECT

1  irregularities.  So do those agencies, in your experience,

2  include the Federal Bureau of Investigation, for example?

3  A.  Correct.

4  Q.  Now, you talked a little bit about the authority that the

5  Attorney General's Office has to prosecute cases, so let's

6  just make sure that the record is clear on those.

7      I'm going to -- you were already on the Code of Criminal

8  Procedure, Brian, so could you pull up Article 207.

9      And you referred to a situation called an "attorney pro

10 tem," I believe, Mr. White, during your earlier testimony.

11 Did I hear that correctly?

12 A.  Yes.

13 Q.  Is this the section of Texas law that governs the

14 situation involving attorneys pro tem?

15 A.  That's correct.

16 Q.  And this is Article 207 of the Code of Criminal Procedure?

17 A.  Yes, sir.

18 Q.  And so under this provision, which the Court would look

19 at, read for the Court's -- at the Court's own leisure, under

20 this provision, under certain circumstances under the statute,

21 can the Attorney General's Office, in essence, be appointed as

22 the attorney for the State by a court?

23 A.  Correct.

24 Q.  And in those situations, does the representative of the

25 Attorney General's Office actually act as the attorney for the

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE — DIRECT

1  State in that case in which the office is appointed as an

2  attorney pro tem?

3  A.  Yes.  The attorney steps into the shoes of the district

4  attorney and uses that authority, and not the attorney's own

5  authority from wherever that attorney came from.  You

6  essentially step into the shoes of the local DA.

7          THE COURT:  Let me make sure I understand what's

8  happening post-*Stephens* now.  So post-*Stephens*, the Office of

9  the Attorney General or no Assistant Attorney General can

10  prosecute, right?

11          THE WITNESS:  Under their own authority, yes.

12          THE COURT:  Right.  But then under this section, an

13  Assistant Attorney General steps into the shoes of a District

14  Attorney.  Does the Assistant Attorney General still get paid

15  by the Attorney General's Office as they are doing these

16  duties?

17          THE WITNESS:  They would, and we —

18          THE COURT:  So this is like a work-around *Stephens*?

19          THE WITNESS:  Not really.  And *Stephens* didn't

20  actually mention the attorney pro tem scenario specifically.

21  They mention when an AAG might be appointed by a DA as a

22  special ADA and serve that way, but this would be analogous.

23  We have had prosecution assistants divisions going back

24  decades at the AG's office.  We are a resource for local

25  prosecutors when they need special expertise or they need to

*Gigi Simcox, RMR, CRR*

1   get out of a case because of a court conflict, and so we've

2   done that for many decades.

3       THE COURT:  Just curious to me that under *Stephens*

4   they say, no, you can't do it, but then the Assistant Attorney

5   General is still getting paid by the Attorney General's

6   Office, and they prosecute it.  Just seems odd.

7       And then I guess the other odd part about it is

8   recent legislation passed takes away the power of the district

9   attorney to not prosecute certain matters, so do local

10  district attorneys, if they are presented evidence of —

11  sufficient evidence of election fraud under this other

12  scenario that I'm thinking about — I can't remember the

13  legislation — do they have to prosecute the case?

14      THE WITNESS:  If I'm familiar with the law that was

15  passed, there's still going to be room for prosecutorial

16  discretion, so I don't think there's going to be any situation

17  where a local prosecutor is actually forced to prosecute a

18  case they don't believe should be prosecuted.

19      THE COURT:  But under this legislation, does the

20  Attorney General have the authority to remove the DA if the

21  Attorney General thinks that the DA is abusing its

22  discretionary powers?

23      THE WITNESS:  I have not seen a bill to that effect.

24      MR. NICHOLS:  I think, Judge, if I can help.  I think

25  the statute you are referring to is an amendment in the most

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE — DIRECT

1  recent legislative session to the statute under the — I

2  believe it's the local government code that deals with

3  removal.  So it's not — I mean, you can — don't need to take

4  my word for it.  You can go back and look at it, but the

5  concept under that is that a programmatic declaration by a

6  district attorney that he or she will not prosecute any

7  particular class of cases — don't hold me to the exact

8  language — is now included as one of the grounds in which

9  citizens, for example, could file a removal.

10         So it's not an affirmative duty — that's my read of

11  it.  You can read it.  It's not an affirmative duty on the

12  part of a district attorney to prosecute any particular case.

13  BY MR. NICHOLS:

14  Q.  But just to tie the loop together on the Court's

15  questions, so Article 207 still exists under Texas law

16  post-*Stephens*, correct?

17  A.  Correct, that's my understanding.

18  Q.  And so — and just to help with the Court's questions,

19  just to make sure it's clear, if you look at the fifth line or

20  the start of the fourth line to the fifth line, it's actually

21  the Court — the judge of the Court in which the attorney

22  represents the State that enters an order appointing the

23  Attorney General to be pro tem, correct?

24  A.  That's correct.  And it would follow a motion for a

25  recusal by that DA.

*Gigi Simcox, RMR, CRR*

1 Q. Right. So, for example, if there is a situation, an
2 Election Code situation where the person who may be accused of
3 an Election Code violation is a local official and the
4 district attorney feels like there may be a conflict, is that
5 one of the situations in which you might see a — such a
6 recusal motion?
7 A. Correct.
8 Q. All right. And let's tie the Court's question down
9 further.
10    Last time, Brian. I promise. Government Code 402.028.
11       MR. NICHOLS: And Judge while, he's pulling it up, I
12 appreciate the Court's questions, because there's been a lot
13 of talk, especially recently in Texas proceedings, about what
14 an attorney pro tem is, what a special prosecutor is; so I
15 appreciate the Court's questions, because I think there is
16 some uncertainty about what all this means.
17 BY MR. NICHOLS:
18 Q. So you talked about how a representative of the Attorney
19 General's Office can, in effect, be deputized to serve under
20 the direction of an elected district attorney?
21 A. Yes.
22 Q. And is this the section that we're talking about,
23 Government Code Section 402.028?
24 A. Correct.
25 Q. And does this make it clear that someone from the Attorney

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE – DIRECT

1  General's Office may provide assistance in the prosecution of
2  all manner of criminal cases when appointed to do so by the
3  local prosecutor?
4  A.  That's correct.
5  Q.  Now, with respect to just a couple more subjects, and I'm
6  going to be done.
7      With respect to State 89, could we pull that back up?
8      Now — and then if we go to — and we can look at as much
9  of this as we need to, but was this presentation, as I
10  understand it, State Exhibit 89, was this pre-SB 1?
11 A.  Correct.
12 Q.  In other words, all the information about cases and the
13 types of cases that you're seeing, this all was created before
14 the legislature passed SB 1?
15 A.  That's correct.
16 Q.  Last subject.  You were asked a little bit about illegal
17 voting, and I just want to ask you a few additional questions
18 on that.
19     Has it been — kind of crazy question.  Has it been
20 illegal in the state of Texas to illegally vote for quite a
21 long time?
22 A.  Yes.
23 Q.  And, Brian, if we just pull up Joint Exhibit 1 — and
24 actually, let me grab one other thing, Judge.
25          MR. NICHOLS:  Your Honor, may I approach?

*Gigi Simcox, RMR, CRR*

```
 1          THE COURT:  Yes.
 2   BY MR. NICHOLS:
 3   Q.  Mr. White, I'm going to hand you a copy of the Title 6 of
 4   the Election Code as printed off of the Texas legislature
 5   online website.  And I'm going to direct your attention to
 6   page 5 of 9.
 7   A.  Yes, sir.
 8   Q.  And on page 5 of 9, does that have the Section 64.012?
 9   A.  Correct.
10   Q.  What is the title of that provision of law?
11   A.  "Illegal Voting."
12   Q.  Is this the illegal voting offense that you spent time
13   talking to the Court about today?
14   A.  Yes, sir.
15   Q.  And then if you look helpfully at the bottom of the
16   statute, does it have kind of the legislative history in terms
17   of when the statute was first enacted?
18   A.  Correct.
19   Q.  And was the statute of illegal voting under the Election
20   Code -- not even taking into account prior legal provisions --
21   was it enacted in 1985?
22   A.  This version of the statute was, yes.
23   Q.  And, of course, the statute has been amended over the
24   years, correct?
25   A.  Correct.
```

23-50885.41593

JONATHAN WHITE – DIRECT

1  Q.  But in terms of the base offense of it being illegal to
2  vote illegally in Texas elections, has that been a part of
3  Election Code since 1985?
4  A.  Yes.  And before that in prior versions.
5  Q.  Yes, sir.  And so now if we go over to Joint Exhibit
6  Number 1, and we go over to —— I'm sorry.  It's Joint Exhibit
7  Number 1.  Oh, you got it.  If we go to Section 903.
8      So you see that there's a section of SB 1 entitled
9  "Section 903"?
10 A.  Yes, sir.
11 Q.  And so here the —— does this represent one of the
12 amendments to the illegal voting offense that have occurred
13 over the course of Texas history?
14 A.  Correct.  This would be the most recent.
15 Q.  And so let's just walk the Court through the changes that
16 were actually made to the statute in Section 903.  Bottom
17 line, was the one change that the *mens rea* requirement went
18 from just "knowingly" to "knowingly or intentionally"?
19 A.  Correct.
20 Q.  And then was there a second change that included another
21 method of voting illegally.  If one voted or attempted to vote
22 in an election in the State of Texas after voting in another
23 state in an election in which the federal office appears on
24 the ballot and the Election Day for both states is the same
25 day?

*Gigi Simcox, RMR, CRR*

3972
JONATHAN WHITE – DIRECT

1   A.  We believe that was always illegal under subsection(a)(1),
2   but this clarifies any issue with that.
3   Q.  Okay.  Then let's go to the rest of Section 903.  And not
4   to hide the headline, but as part of 903, was the penalty for
5   illegal voting, was it actually reduced?
6   A.  Yes.  It was reduced from a second degree felony to a
7   Class A misdemeanor.
8   Q.  And did it also –– in Section C of 903, did it also
9   contain some other protections in terms of not –– a person not
10  being convicted solely upon the fact that a person signed a
11  provisional ballot affidavit?
12  A.  That's correct.
13  Q.  And Mr. White, do you know whether anyone in this
14  courtroom is challenging Section 9.03 of SB 1 as being somehow
15  unconstitutional or violative of some federal statute?
16  A.  I'm not aware of that.
17          MR. NICHOLS:  Thank you, Judge.
18          THE COURT:  Any other questions on this side?
19          Why don't we take a break before we do cross.  So
20  let's take a 10 or 15.
21      (Recess)
22          MR. NICHOLS:  Judge, just one other topic I talked to
23  the other side about just real quick.
24          THE COURT:  Go ahead.
25

*Gigi Simcox, RMR, CRR*

23-50885.41595

JONATHAN WHITE – DIRECT

1  BY MR. NICHOLS:
2  Q.  Mr. White, I wanted to ask you briefly about the oath of
3  assistance that an assister needs to sign at the polling place
4  in order to assist a voter in the actual voting process.  Are
5  you familiar with that general concept?
6  A.  Yes.
7  Q.  And so if we go back –– and Brian, if we could go back to
8  Joint Exhibit Number 1.
9      *(Discussion off the record)*
10 BY MR. NICHOLS:
11 Q.  So if we go to –– and go to Section 604, please.  And so
12 you see that –– are you familiar with the fact that SB 1
13 changed the form of the oath; in other words, added some
14 language, took out some language, that kind of thing?
15 A.  Yes.
16 Q.  And so there's been some testimony to the Court that I
17 wanted to kind of get your vantage point on about the
18 inclusion here.  It says –– under the change under SB 1, it
19 says, "I swear or affirm" and the words are added "under
20 penalty of perjury."  Do you see that?
21 A.  Yes, sir.
22 Q.  And then if you look at –– could you also pull up HAUL 89.
23     And this is already in it the record, Judge.
24     It says –– do you see there under the Oath of Assistance
25 form that a person would actually sign at the polling place,

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE - DIRECT

1  it has that language, "I swear or affirm under penalty of

2  perjury"?

3  A.  Yes.

4  Q.  And all I want to ask you is, obviously, there was an oath

5  of assistance that preexisted SB 1, correct?

6  A.  Correct.

7  Q.  And regardless of whether or not it said "Under penalty of

8  perjury," were there provisions of Texas law, criminal law

9  that could be implicated if someone falsified or

10  misrepresented themselves with respect to this oath of

11  assistance?

12  A.  I can think of two off the top of my head.  One would be

13  perjury would have applied, to the original oath, and that's

14  Chapter 37.02, I believe, of the penal code.

15      Also Chapter 276.013, Election Fraud that we discussed

16  earlier, had the text up on the screen, if you provide a false

17  statement or a misleading statement to an election official,

18  then that would be a violation of 276.013 as well.

19  Q.  Regardless of whether you have the language "under penalty

20  of perjury"?

21  A.  Correct.

22  Q.  And let me just test your memory a little bit.  Is there

23  also a Texas Penal Code provision that's called "Tampering

24  with governmental record"?

25  A.  There is.

JONATHAN WHITE - CROSS

1  Q.  And so if someone signed an Oath of Assistance document

2  like one that was kept at a polling place, official

3  governmental record, and falsified that, would that tampering

4  with the governmental record criminal statute also potentially

5  come into play?

6  A.  Correct.  That's Section 37.10, I believe, of the penal

7  code.  Oh, yeah, there it is.

8       MR. NICHOLS:  That is all, Judge.  And I appreciate

9  the indulgence.

10       THE COURT:  Any cross?

11       MISS PERALES:  Yes, Your Honor.  May I approach the

12  witness?

13       THE COURT:  Yes.

14       MISS PERALES:  Your Honor, I request permission to

15  ask leading questions under Federal Rule of Evidence 611(c)(1)

16  because Mr. White is employed by the Texas Attorney General

17  and is thus an adverse party.

18       MR. KERCHER:  No objection.

19       THE COURT:  Go ahead.

20       MISS PERALES:  Thank you, Your Honor.

21                    CROSS-EXAMINATION

22  BY MISS PERALES:

23  Q.  Good morning, Mr. White.

24  A.  Good morning.

25  Q.  My name is Nina Perales.  I represent the LUPE plaintiffs,

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE – CROSS

1  and we've met more than once at your depositions, is that
2  right?
3  A.  That's right; three times prior to this.
4  Q.  I'm so sorry for that.
5     I'd like to start not with your job responsibilities when
6  you were the chief of the division, but shifting over slightly
7  to something else that you did, which was that when the
8  legislature was in the process of drafting some of Senate Bill
9  1 predecessor bills, you were involved in assisting
10 legislators, is that correct?
11 A.  Yes, I believe I was involved to some degree in that
12 process yes, ma'am.
13 Q.  And you were asked by legislators to provide guidance
14 regarding portions of those bills, correct?
15 A.  I think so, yeah, that would be true.
16 Q.  Thank you.
17    And you take the position that the communications you had
18 in advising legislators with regard to pending legislation is
19 covered by privilege, and that could include things like facts
20 you shared when provided in that context, correct?
21 A.  Yes, I think I would agree with that.
22 Q.  And you also take the position that legislative privilege
23 could also be involved where the legislator's mental
24 impressions could be revealed by the nature of the question
25 the legislator asked you and the answers that you provided

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE – CROSS

```
 1  back to the legislator, correct?
 2  A.  Yes, ma'am.
 3  Q.  Now, you were asked by legislators to testify on SB 1 and
 4  its predecessor bills, correct?
 5  A.  Yes, ma'am.
 6  Q.  But you won't talk about which portions of the SB 1
 7  predecessor bills you were asked by legislators to either
 8  testify on or provide guidance on, is that right?
 9  A.  I don't recall specific — I don't recall whether specific
10  provisions were discussed at this point actually, so...
11  Q.  My question is slightly different.  My question is that
12  you won't, because of the legislative privilege, talk about
13  which portions of the SB 1 predecessor bills you were asked by
14  legislators to provide guidance on, for example?
15  A.  Yeah.  I think there would be two reasons for that, for
16  potentially the privilege that you stated, but also the fact
17  that at this point I don't have a distinct memory of what
18  those sections might have been.
19  Q.  And because of the legislative privilege, you won't tell
20  us what legislators asked you to testify about with respect to
21  SB 1's criminal provisions, correct?
22  A.  Yes, it would be the same answer.
23  Q.  And because of the legislative privilege, you won't tell
24  us what the legislators asked you to testify about with
25  respect to SB 1's assister oath provisions, is that correct?
```

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE – CROSS

1  A.  And I'm just searching to see if I even have a memory of

2  that at all, but I think it would be the same answer.  It

3  would be both privilege and lack of memory as to whether that

4  even occurred.

5  Q.  And then my final similar question.  Because of the

6  legislative privilege, you won't tell us what legislators

7  asked you to testify about with respect to SB 1's mail ballot

8  ID provisions, correct?

9  A.  Same answer.  I don't recall any of that, and I think the

10  privilege would probably apply if I did.

11  Q.  I'd like to display State Exhibit 1, which is SB 1,

12  Section 4.06, page 27, lines 12 through 15.  These are

13  provisions we've gone over with the Court a number of times,

14  so I won't have you read it out loud.

15      But I just want to confirm with you that you understand

16  the term "an election officer" to include the election judge

17  at the polling place, correct?

18  A.  Yes, ma'am.

19  Q.  Let's go to page 29, lines 4 through 11.  That's

20  Section 4.09.

21      You don't know what action would obstruct the view of a

22  watcher, do you?

23  A.  No.  That would be a fact pattern; whatever that action

24  were that the prosecutor would have to consider in this case.

25  Q.  And, in fact, you suppose action that would obstruct the

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE - CROSS

1 view of a watcher could be anything, correct?

2 A.  Yeah, any action that fulfills that element of the

3 offense, yes.

4 Q.  And you also don't know what action would be to "distance

5 the watcher" from the activity or procedure, correct?

6 A.  Could be any number of things, I imagine.

7 Q.  And if you learned that in a polling place an election

8 judge had distanced a poll watcher from the voter at a voting

9 machine, that's not enough information upon which you could

10 make a decision whether there was a violation of Section 4.09,

11 correct?

12 A.  That would not reach all of the elements of this offense,

13 that's correct.

14 Q.  And looking at 4.09(a), which is what we are looking at

15 here, you can't give me an example of something that is now

16 unlawful because of this new language, correct?

17 A.  I suppose I could think of something, but these weren't

18 the types of offenses that I have a great deal of experience

19 in prosecuting, so I don't have a whole lot of facts.  But I'm

20 sure I could do so if I needed to.

21 Q.  So do you recall when I took your deposition on April 27,

22 2022?

23 A.  I recall that that happened, yes, ma'am.

24 Q.  All right.  Can we pull up page 134, line 21, to page 135,

25 line 6.  So it's actually line 22.

*Gigi Simcox, RMR, CRR*

3980

JONATHAN WHITE - CROSS

1    Do you recall my asking:  "Can you explain to me how this
2    new language in 4.09(a) makes unlawful [verbatim] behavior
3    that previously would have been unlawful?"
4    And your answer is — oh, I'm sorry.  It's page 134, line
5    21.  I asked you:  "So could you give me at least an example
6    of something that might have been lawful before but that is
7    now unlawful."
8    And your answer, which starts on line 24 and runs to 25:
9    "I could try to come up with something, but I typically —
10   that's not what — that's not what — that's not my role.  My
11   role is really to take a set of facts and determine whether or
12   not a law applies, not to do the opposite.  I'm sure there are
13   examples, but I would just — I think I would let the text of
14   the statute sort of have the final word."
15   Was that your answer?
16   A.  Yes, ma'am.
17        MR. KERCHER:  Objection, Your Honor, to the improper
18   impeachment.  We haven't — she failed to establish that there
19   is any contradiction.
20        THE COURT:  There is no contradictions.
21        MISS PERALES:  We can pull that down.  Thank you.
22   BY MISS PERALES:
23   Q.  And although you believe 4.09(a) uses reasonable person
24   standard, you are not comfortable sharing what is the distance
25   of the watcher from an activity at a voting machine that would

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE - CROSS

1  be reasonable or unreasonable, correct?

2  A.  No.  I don't think I could determine an exact distance

3  that that would be.

4  Q.  Now, in your job as chief of the Election Integrity

5  Division, you dealt with local prosecutors, is that correct?

6  A.  Yes, ma'am.

7  Q.  And you have experienced that local prosecutors have

8  varied interpretations of the same language within the Texas

9  Election Code, correct?

10  A.  I agree with that.

11  Q.  And you agree that if a law is unclear, there are

12  instances where prosecutorial discretion or interpretation

13  might play a role in determining whether a prosecution moves

14  forward, correct?

15  A.  Based on our burden of beyond a reasonable doubt, yes, I

16  think that's true.

17  Q.  Let's display LUPE 182, please.

18      Mr. White, do you recognize this as an investigative

19  report of the Election Integrity Unit?

20  A.  It appears to be yes, ma'am.

21  Q.  And if we look at the synopsis, which is about midway down

22  the page, does it appear to you that this is responding to a

23  complaint by a poll watcher that he was obstructed?

24  A.  Yes, that appears to be the case.

25  Q.  Now, if we scroll down to Bates page 182318, at the top

3982

JONATHAN WHITE - CROSS

1  where it has a paragraph 3 under the words "Introduction,"

2  it's fair to say that the Attorney General investigator

3  recommends prosecuting the county elections administrator, is

4  that right?

5  A.  No.  I don't see that.

6  Q.  Okay.  Do you see here where the investigator from the

7  Office of the Attorney General meets with the Guadalupe County

8  Attorney's Office and presents him with both the physical and

9  digital case file, which included the investigative report and

10  corresponding exhibits?

11  A.  Correct.  That wouldn't be a recommendation for

12  prosecution.

13  Q.  I see.  But — so thank you —

14  A.  It's the standard.

15  Q.  — thank you for the clarification.

16      And so the AG's investigator hands over the material from

17  the investigation to the county attorney, is that right?

18  A.  Correct.

19  Q.  Now, if we go to page 182313, paragraph 1.54, about

20  two-thirds of the way down, do you see the language or the

21  sentence that starts:  "Hayes informed me that she contacted

22  the Texas Secretary of State's Office for guidance on the

23  matter and was told that she did not have to present the tapes

24  to" — and the name is redacted — "because the early voting

25  activities were no longer taking place."

*Gigi Simcox, RMR, CRR*

1    Do you see that?

2  A.  I do.

3  Q.  And then the following sentence, "Miss Hayes relayed the

4  information provided by the Secretary of State to" –– name

5  redacted –– "and he seemed upset that his request was not

6  going to be fulfilled."

7    Do you see that there?

8  A.  I do.

9  Q.  Now, if we go back to page 182318, and we go to the

10  conclusion, paragraph 3.05, we see that ultimately the

11  Guadalupe County Attorney's Office chooses not to prosecute

12  the elections administrator.  Do you see that there?

13  A.  Yes, ma'am.

14  Q.  But it is the case that the elections administrator was

15  investigated by the Attorney General's Office for poll watcher

16  obstruction, based on this report, yes?

17  A.  It appears that an allegation was investigated, and I

18  wasn't familiar with this case because it was after my time,

19  so I don't know the background information here.

20  Q.  Let's take a look at LUPE 183, please.

21    Would you agree with me that this is an investigative

22  report also of the Election Integrity Unit?

23  A.  Yes.  I've not seen this –– or I don't recall this

24  document, but that's what it appears to be, yes, ma'am.

25  Q.  And at page 182319 at the synopsis, it also involves the

JONATHAN WHITE – CROSS

1  investigation of a complaint regarding obstruction of a poll
2  watcher by an election judge, correct?
3  A.  Not exactly.  A refusal to accept a poll watcher is a
4  different statute, I believe.
5  Q.  It is a different portion of SB 1, isn't it?
6  A.  I would take your word for that, yes, ma'am.  You know the
7  bill a lot better than I do I'm sure.
8  Q.  Possibly not.
9      And here again, if we go to 182331 at the conclusion, the
10  investigator concludes there's not probable cause, is that
11  right?
12  A.  Yes.  In this case, that's what it appears to be.
13  Q.  But the election judge was still investigated and made a
14  part of this investigation.  He was interviewed as part of
15  this, is that right?
16  A.  I would take your word for that on the interview, but,
17  yes, I would agree that an allegation was investigated and
18  came to a "no probable cause" find.
19  Q.  Okay.  We can take that down now.
20      Now, prior to 2020, the Election Integrity Division with
21  respect to complaints from poll watchers that they were being
22  excluded only received a few, a smattering of poll watcher
23  complaints, is that correct?
24  A.  There were a few that I recall.
25  Q.  But then your division saw a spike in 2020 of poll watcher

*Gigi Simcox, RMR, CRR*

23-50885.41607

JONATHAN WHITE – CROSS

1  complaining that they had been excluded, is that correct?
2  A.  I'm sorry.  I was referring to 2020 as being the few.  I
3  guess prior to that, pretty few and far between, but there
4  might have been a little bit of a surge there in 2020, yes.
5  Q.  And it's fair to say up until the time that you left the
6  Election Integrity Division that you had not prosecuted any
7  alleged criminal conduct by watchers in the polling place, is
8  that correct?
9  A.  I think neither watchers nor obstruction that I recall.
10  Q.  If we could go back to SB 1, Section 4.01, page 24, line
11  11.  This is the provision where the election judge cannot
12  have the watcher removed other than for a violation of the
13  penal code unless the violation was observed by an election
14  judge or clerk.  Do you see that there?
15  A.  Yes, ma'am.
16  Q.  You would agree with me that there are quite a few
17  offenses that are in the election code that are not in the
18  penal code, correct?
19  A.  Correct.
20  Q.  And you would agree that it's possible to violate a
21  criminal provision of the Election Code without violating the
22  penal code, yes?
23  A.  In general yes, ma'am.
24  Q.  And you agree here in this paragraph G that a presiding
25  judge may not have a duly accepted watcher removed for

23-50885.41608

JONATHAN WHITE - CROSS

1  violating a criminal provision of the election code unless it

2  was also a violation of the penal code or observed by an

3  election judge or clerk?

4         MR. NICHOLS:  Objection, Your Honor.  That's actually

5  mischaracterizing the provision.  I think it's violating a

6  provision of this code.  I don't think it's limited to --

7         MISS PERALES:  It doesn't say "this code."  It says

8  "Violation of the penal code."

9  BY MISS PERALES:

10  Q.  Do you see that language there, Mr. White, on line 15?

11  A.  I do.  I see a reference on line 13 and line 15 of

12  violations.

13  Q.  Okay.  So would you understand with me that this provision

14  means that unless the act is seen, observed, by an election

15  judge or clerk, the presiding judge may not have the watcher

16  removed for violating the code except if it is a violation of

17  the penal code?

18  A.  I think that's basically correct, yes, ma'am.

19  Q.  So just to put it in real-life terms, if a voter reports

20  to the presiding judge that he saw a watcher trying to

21  influence a voter's vote, which is a crime in the Election

22  Code, but not the penal code, the presiding election judge

23  cannot remove the watcher unless the presiding judge or the

24  election clerk observes that activity?

25  A.  Under this section, I believe so, yes.

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE - CROSS

1  Q.  Thank you.

2      Let's go -- I was going to stay in this document.  Let's

3  go to page 51, line 27.  And then flowing on to the next page.

4  Thank you.

5      I'm going to direct your attention to Section 6.03 of SB 1

6  which talks about the submission of information by a voter

7  assister.  With respect to this provision's requirement that

8  assisters provide their relationship to the voter, you believe

9  that having information about assisters who are not related to

10 the voters can help you distinguish between workers with no

11 relationship to the voter versus the folks who are assisted by

12 family members or caregivers, which in your view are the more

13 typical type of legitimate assistance, correct?

14 A.  I think that's basically true, yes.

15 Q.  And when you are talking about normal assistance, you

16 characterize that in terms of voters being assisted by people

17 with whom they have a familial relationship or caregivers,

18 correct?

19 A.  Yes, although a close friend, someone trusted, should be

20 included in that list.  Yes, ma'am.

21 Q.  But, generally, you frame that in terms of caregivers and

22 family members, isn't that right?

23 A.  I think I've said that before, yes, ma'am.

24 Q.  Now, you also agree that you want it to be very easy for

25 people to get the assistance that they need to vote, correct?

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE - CROSS

1   A.   Sure.

2   Q.   Nevertheless, there are some situations in which you think

3   there might be -- if we can go down to the oath now.  It's

4   time to go to the oath.  Section 6.04, page 52, line 26, I

5   believe.  Are we on page 52?  I can't tell.  Okay.

6        Starting at line 26 and going over to line 1 of the

7   following page, the oath.  Now, you'll see some of that is in

8   pink, and that was only as a way to mark that some of this is

9   no longer in the statute.

10       There's some language here in the oath:  "I will not

11  suggest by word, sign, or gesture how the voter should vote."

12       Do you see that there?

13  A.   Yes, ma'am.

14  Q.   Now, in a situation where a voter with a memory or

15  cognitive impairment has worked with the assister in advance

16  to go and vote and the assister is in the polling place

17  providing a reminder as to what they had discussed previously,

18  you think that's a tough question whether it violates the

19  oath, isn't that correct?

20  A.   In a technical sense of interpreting this statute to that

21  specific set of facts, yeah, I think that's tough.  In terms

22  of prosecutorial discretion, probably not.

23  Q.   And then you believe that the activity of the assister to

24  provide somebody with a memory or cognitive impairment with a

25  reminder of that or a prompt of that past conversation does

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE - CROSS

1  potentially violate that language in the oath:  "I will not
2  suggest by word, sign, or gesture how the voter should vote,"
3  correct?
4  A.  In a technical sense, yes, ma'am.
5  Q.  And you think it's an interesting question whether such
6  assistance would potentially violate the Election Code, right?
7  A.  Yes, because you have to look at what the intent of the
8  law was versus the actual language and see there might be
9  conflict there, yes, ma'am.
10  Q.  And even though you haven't personally come to a
11  conclusion about this question, you would agree with me that
12  an assister, before signing the oath of assistance, has to
13  make that determination for themselves whether that behavior
14  would violate the oath, correct?
15  A.  I think that's fair to say that anyone who takes this oath
16  is determining what that means to them.
17  Q.  Now, I think we've gone you've gone over this a little bit
18  before, but if an assister disregards a voter's preference
19  when marking the ballot, that assister can be charged under
20  464.036, correct?
21  A.  Among others, yes, ma'am.
22  Q.  Yes, unlawful assistance.  Then there's 64.012, "Illegal
23  Voting," yes?
24  A.  Yes, ma'am.
25  Q.  And then also 276.013, "Election Fraud," yes?

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE – CROSS

1   A.  Yes, ma'am.

2   Q.  And if an assister tried to influence or coerce a voter's

3   vote, the assister could be charged under 64.036, "Unlawful

4   Assistance," yes?

5   A.  Yes, ma'am.

6   Q.  And possibly 276.013, "Election Fraud," correct?

7   A.  I would agree with that.

8   Q.  And those provisions have all been in the Texas Election

9   Code before SB 1, correct?

10  A.  Yes, ma'am.

11  Q.  Let's look a little higher in the oath.  It's still there.

12  We don't have to move anywhere.

13      On line 26 where it says, "I swear or affirm under penalty

14  of perjury," you see that language — you've already discussed

15  it a little bit with my friend, Mr. Nichols.  Do you see that

16  there?

17  A.  Yes, ma'am.

18  Q.  Now, you agree that the new language, quote, "under

19  penalty of perjury," unquote, does alert the assistant that

20  the oath that they are making is subject to penalty of perjury

21  and they may or may not have thought of that when they took an

22  oath previously, and you think it does put them on some sort

23  of notice, correct?

24  A.  Yeah, for those not familiar, then, yes, I think it

25  absolutely would.

*Gigi Simcox, RMR, CRR*

3991

JONATHAN WHITE – CROSS

1    Q.  And now, with respect to the representation of eligibility

2    for assistance, that's on line 27 and 1, you think that the

3    oath probably requires the assistant to obtain a

4    representation of eligibility from the voter, correct?

5    A.  Yes, ma'am.

6    Q.  And you agree with me that the assister oath does not set

7    out the criteria for eligibility for assistance for a voter,

8    correct?

9    A.  Not directly, no, ma'am.

10   Q.  And you would agree that you cannot look at someone and

11   know whether or not they have a disability, correct?

12   A.  I would agree with that.  Some disabilities are certainly

13   invisible.

14   Q.  And you would agree that some eligible voters receiving

15   assistance at the polling place appear to be able-bodied, and

16   thus there appears to be nothing wrong with them, correct?

17   A.  Yes, ma'am.

18   Q.  Let's go a little bit further down to Section 6.06,

19   page 54, line 20.  There we go.

20       This goes on for a little bit below that, but this is the

21   important part that I want to draw your attention to.  Looking

22   at the language that's been crossed out and the language

23   that's new, would you agree with me that the pre-SB 1 language

24   of this statute which includes the words "Performance-based

25   compensation," criminalized paying someone to assist mail

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE - CROSS

1  voters on a quota basis, correct?

2  A.  Yes, if all of the other elements are met, yes, ma'am.

3  Q.  And SB 1 expanded the offense to include not just

4  compensating somebody but also to offer compensation to

5  somebody for mail ballot assistance, is that right?

6  A.  Yes.  I would review the rest of the statute, but I think

7  what you are saying is correct, yes, ma'am.

8  Q.  And SB 1 also expanded the offense by eliminating the

9  requirement that the payment be for performance-based work,

10  right, or payment per head, correct?

11  A.  Correct.

12  Q.  And so now it is an offense to pay an individual to assist

13  voters by mail regardless of whether it is on a per capita

14  system, correct?

15  A.  I agree with that.

16  Q.  And then also it is an offense to receive or ask for

17  compensation to assist vote by mail, correct?

18  A.  Yes.  And if there was anything that came after that I'm

19  not sure.

20  Q.  Let's go to page 54, line 13, to the definition of

21  compensation.  Page 54, line 13.  Look at that, that's the

22  wrong page number.  All right.  Well, let me just look and see

23  if I can find it.  It might be on the next page.  It might be

24  a different provision.  Let's just talk about compensation.

25      While I make John's life very difficult over there in the

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE – CROSS

1  corner we might not be able to find it with respect to SB 1's
2  language with compensation.
3      It does refer to Section 38.01 of the penal code which
4  defines an economic benefit as anything reasonably regarded as
5  an economic gain or advantage, including accepting or offering
6  to accept employment for a fee, accepting or offering to
7  accept a fee, entering into a fee contract, and then at the
8  end, quote, "or accepting or agreeing to accept money or
9  anything of value," unquote.
10     Are you familiar with that provision in the penal code?
11 A.  I've reviewed that before, yes, ma'am.
12 Q.  And if you were asked whether anything of value could
13 encompass a gift bag, for example, with a T-shirt in it, you
14 would normally go and do some research and see if there's any
15 case law to flesh that out because you don't know the answer,
16 is that right?
17 A.  I mean, I think reviewing case law would always be a good
18 decision in that context.
19 Q.  And you would have the same answer with respect to a mail
20 ballot assister receiving a meal or a bus fair, correct?
21 A.  Potentially.
22 Q.  Now, with respect to this provision here that we see in
23 front of us, you are not sure that you can answer whether a
24 paid canvasser for a nonprofit Get Out the Vote organization
25 can enter a voter's home and assist the voter in completing

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE – CROSS

1  the mail ballot, correct?

2  A.  I don't think I understand the question.  I'm sorry.

3  Q.  So if we take a situation where a paid canvasser for a

4  nonprofit Get Out the Vote organization needs to know if

5  entering a voter's home and assisting the voter with the mail

6  ballot is an offense or not under this section, you are not

7  sure you can answer that question, correct?

8  A.  And we're talking about which section?

9  Q.  Oh.  We have to go back up.  Thank you, John, for finding

10  the other provision.

11      Page 54, line 20.  If we expand that a little bit and onto

12  page 55 so the witness can see a little bit more, flowing over

13  a little bit on to page 55.

14      So looking at Section 6.06 which creates the offense of

15  being paid to assist a mail ballot voter and we take the

16  question whether a paid canvasser for a nonprofit Get Out the

17  Vote organization can enter a voter's home and assist the

18  voter completing the mail ballot, you are not sure whether you

19  can answer the question whether that's an offense or not, is

20  that right?

21  A.  Based on the facts that you gave which did not include

22  compensation in exchange for assisting voters, I would say

23  there's no offense in your scenario.

24  Q.  But, we, in the scenario, this is a paid canvasser who is

25  going door to door, so if you will agree with me that this

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE – CROSS

1  person is being paid to knock doors, engage with voters and
2  provide assistance if requested, it's also true that you're
3  not sure whether you can answer the question whether that is
4  an offense under this provision?
5  A.  Zooming in doesn't exactly help.  I'm sorry.
6      Yeah.  I mean, if you're telling me that a person is being
7  paid, being compensated to assist voters subject to Section
8  86.010, which has very specific elements in the Election Code,
9  then, yes, this statute would appear to apply to that
10 scenario.
11 Q.  But it's also true that you haven't seen that fact pattern
12 before, when you were with the Election Integrity Division, is
13 that right?
14 A.  I don't recall ever seeing a situation where we were
15 dealing with people just trying to provide a public service
16 who weren't also trying to sway the direction those votes were
17 cast.  So I think the answer is, no, I haven't seen that.
18 Q.  But you would be concerned with that because your concern
19 would be whether or not some of these types of hypotheticals
20 are used as subterfuge for the actual activity, which would be
21 voter fraud, correct?
22 A.  Yeah.  I think if I understand your question correctly,
23 I'd agree with that, that we'd be looking for the fraud at the
24 bottom of things, yes, ma'am.
25 Q.  So we've talked a lot about different offenses for marking

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE - CROSS

1  the ballot in a way that is against the wishes of the voter
2  and you've talked about that extensively today and I won't go
3  over it with you, but you would agree with me that this
4  provision, Section 6.06 criminalizes the assistance itself and
5  not fraud in the assistance?
6  A.  I would say that it criminalizes compensation for
7  assistance.
8  Q.  Okay.  Thank you.
9      If we can go to page 54, line 23, which I think is right
10 there near the bottom of the page.  Oh, it says a person
11 commits an offense, but you're aware that in paragraph C it
12 does say that the offense is a state jail felony, correct?
13     A little bit onto the next page, if you wouldn't mind, to
14 paragraph C.
15     Do you see on there on line 9?
16 A.  Yes, I do see that section.
17 Q.  Okay.  And you know that a state jail felony means a jail
18 sentence of up to two years and not less than six months,
19 correct?
20 A.  Yes, ma'am, or probation would always be an option without
21 a criminal record.
22 Q.  And thus, under Section 6.06, providing assistance for
23 compensation even without fraud is a state jail felony?
24 A.  I think I agree with your question.  Compensation for
25 assistance under the statute is -- offering or accepting is

*Gigi Simcox, RMR, CRR*

Case 5:21-cv-00844-D Document 987 Filed 02/12/24 Page 377 of 518
Case 5:21-cv-00806-D Document 26 Filed 09/18/24 Page 377 of 518

3997

JONATHAN WHITE - CROSS

```
 1   covered by the statute, yes, ma'am.
 2   Q.  Regardless of whether the assister marks the ballot
 3   consistent with the wishes of the voter or inconsistent with
 4   the wishes of the voter, correct?
 5   A.  Correct.  Those elements are not in the statute.
 6   Q.  You understand that the Voting Rights Act provides a
 7   framework where a voter can choose any person to assist the
 8   voter, correct?
 9   A.  Correct.
10   Q.  And under that framework you understand that we can't
11   categorically restrict certain people from assisting voters,
12   correct?
13   A.  Certain groups of people and types of people, yes, that's
14   correct, aside from employers and labor unions.
15   Q.  Right.  And as the chief prosecutor of election law
16   violations in Texas, which you were, you would have been
17   concerned if assistance that was guaranteed under federal or
18   state law were prohibited by another part of the election
19   code, correct?
20   A.  I agree any assistance that's guaranteed under federal or
21   state law, I would be concerned with that not being provided.
22   Q.  And you believe that a system that arbitrarily
23   disenfranchises eligible voters who cast lawful ballots and
24   follow the rules erodes public confidence in the integrity of
25   elections, don't you?
```

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE - CROSS

1  A.  I think in a general sense I would have to agree with that

2  statement.

3  Q.  Shifting away from the vote by mail for just a quick

4  moment, you believe that voting by personal appearance is less

5  vulnerable to fraud than mail voting, correct?

6  A.  Correct.

7  Q.  And you believe that because the security feature that are

8  present in in-person voting are better than those present in

9  vote by mail, correct?

10  A.  Essentially, yes, ma'am.

11  Q.  Let's go forward to Section 7.04 of SB 1 the vote

12  harvesting provision that's page 58 line 26.  Flowing over to

13  page 59 line 2.  Now, again, you went over this with

14  Mr. Nichols I believe but Section 7.03(a) creates offenses

15  like marking the ballot inconsistent with the voter's wishes,

16  do you recall that conversation you had a few minutes ago?

17  A.  Is that the additions to Chapter 276.013.

18  Q.  Yes, sir.

19  A.  Yes.  I saw some of those.

20  Q.  So now we are going to shift to 7.04 which is about vote

21  harvesting.  In your view, vote harvesters could show up at a

22  voter's house and inform the voter that they can vote by mail,

23  tell them all they need to do is vote by mail, and that the

24  individual is available to assist the voter, correct?

25  A.  Under this specific statute or the election code as a

23-50885.41621

JONATHAN WHITE – CROSS

1   whole?

2   Q.  No, just stepping back.  Do you remember your slide show

3   from earlier today, you talked about the seeding phase of vote

4   harvesting.  This is where purportedly the harvester goes to

5   the voter's house and says, you can vote by mail, I'd like to

6   help you do that, do you recall that?

7   A.  Yes, ma'am.

8   Q.  Okay.  And so you do believe that that's part of an

9   illegal vote harvesting seeding phase, right?

10  A.  No, I wouldn't agree with that.

11  Q.  Okay.  Do you believe that in the seeding phase it's easy

12  to get an actual signature from the voter because the

13  harvester is just helping the voter get a mail ballot?

14  A.  Yes.  I think it's relatively easy to obtain a signature

15  from a voter for an application for mail ballot versus the

16  mail ballot itself.  It's relatively easier, yes, ma'am.

17  Q.  But you would agree with me that it's not illegal or

18  fraudulent to show up at a voter's house and offer to help the

19  voter complete an application for ballot by mail, correct?

20  A.  I don't believe that, based on just those facts, it

21  violates any provision in the election code that I'm aware of.

22  Q.  Now let's go to how vote harvesting is defined in this new

23  part of the election code which was brought in by SB 1.

24       Here, you see the creation of an offense of vote

25  harvesting, right, and at line 7 it says "vote harvesting

23-50885.41622

Case 5:24-cv-08844-DB Document 26 Page Filed 08/02/24 Page 1 of 13
Case 5:24-50826 Document 9 Page ID 80 Date Filed 01/18/2024

4000
JONATHAN WHITE – CROSS

1   services means," and then it talks about the in-person
2   interaction with one or more voters in the physical presence
3   of an official ballot, do you see that there?
4   A.  Yes, ma'am.
5   Q.  And you believe that if an organizer for a community
6   organization is paid to persuade mail ballot voters in person
7   in the presence of the ballot to vote for a ballot measure,
8   that comes awfully close to paid vote harvesting efforts,
9   correct?
10  A.  I think so, yes, if I understand your hypothetical.
11  Q.  But in your work with the Election Integrity Division you
12  never dealt with circumstances in which community
13  organizations did this kind of voter outreach, correct?
14  A.  All of the investigations in cases I recall had to --
15  dealt with paid vote harvesters working for a candidate or a
16  slate of candidates or family of the candidate or the
17  candidate themselves, that I recall.
18  Q.  Thank you for anticipating my next question.
19      And, in fact, you can't recall any instances in which your
20  office prosecuted a defendant when that person was not working
21  for a candidate campaign, slate of candidates, or family
22  member, correct?
23  A.  Correct; although that's not one of the elements of any of
24  the offenses that we prosecuted under, we tended to have
25  knowledge that that was the case.

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE – CROSS

1  Q.  But you would agree with me that the definition of vote

2  harvesting here that we see in front of us is not limited to

3  individuals who are working for a campaign, a candidate, or

4  who are a family member, correct?

5  A.  Well, the criminal activity is covered in subsections B, C

6  and following, so the entirety of the statute isn't under

7  subsection 2 there.  I mean, I think there might be an

8  implication that we are talking about paid activity to deliver

9  votes, right, for a specific candidate, or a specific measure.

10      So I suppose it would be possible for an outside

11  organization that's not directly affiliated with the campaign,

12  say, a political action committee, or something like that, to

13  commit this offense as well.

14  Q.  Or even a nonprofit nonPAC, correct?

15  A.  That's probably true, yes, if all the other elements are

16  met.

17  Q.  But you would agree with me, and if we zoom out a little

18  bit for Section 7.04, you don't see anything in this statute

19  that limits the offense to persons who are being paid by a

20  candidate, campaign, or PAC, correct?

21  A.  I think that's correct.  It's just whether the crux of

22  this is to deliver votes for a candidate or a measure, and we

23  don't define who that entity or person would be.

24  Q.  You do agree that paid — the definition of paid vote

25  harvesting should be defined narrowly enough so that it covers

*Gigi Simcox, RMR, CRR*

1  only objectionable behavior and not political speech, correct?

2  A.  I would agree with that.

3  Q.  And in your view, political speech is fine and encouraged,

4  correct?

5  A.  I would agree with that.

6  Q.  I'm going to shift a little bit to a slightly different

7  topic now.  You say that the typical demographics of voters

8  targeted by mail ballot fraud include low income and minority,

9  is that right?

10  A.  I think what I've usually said is low income and elderly,

11  but I have been asked before whether that includes minorities,

12  and it often does.

13  Q.  And you've also said minority communities are typically

14  the target for vote harvesting schemes, correct?

15  A.  They are a frequent target, yes, ma'am.

16  Q.  And some moments ago you spent some time talking about

17  your prosecution of voter fraud in Gregg County, Texas,

18  against four defendants, is that correct?

19  A.  Yes, ma'am.

20  Q.  And all four of those defendants were Black, were they

21  not?

22  A.  That's correct.

23  Q.  Is it also the case that the majority of defendants you've

24  prosecuted that are listed on your prosecution sheet are

25  Hispanic?

23-50885.41625

Case 5:24-cv-00826-D Document 26-9 Filed 08/02/24 Page 1 of 4 Page ID 00449
Case 5:24-cv-00844-D Document 25 Page Filed 08/02/24 Page 1 of 4 0249
4003

JONATHAN WHITE - CROSS

1  A.  I'm not sure of the answer to that.  I don't track any —
2  we never tracked race in terms of our prosecutions or
3  investigations.  You could be right.  It's not something I
4  track.
5  Q.  Okay.  Now, earlier with my friend Mr. Kercher you looked
6  at State Exhibit 89 and I'd like to ask you a couple of
7  questions about that.
8  A.  Yes, ma'am.
9  Q.  If we could bring up this Exhibit, 89, and scroll to Bates
10  stamp page 054655, which is one of the slides that you
11  reviewed with Mr. Kercher.  This is the unlawful assistance,
12  how it works slide, do you recognize it?
13  A.  Yes, ma'am.
14  Q.  You would agree with me that for one individual to
15  encourage another individual to vote is legal, and it's even
16  political speech, correct?
17  A.  With certain limitations like electioneering, for example,
18  and during the voting process, yes, ma'am, that's correct.
19  Q.  And it's also legal for an individual to offer to provide
20  a ride to the voter to get them to the polling place, correct?
21  A.  I think that's true.
22  Q.  You would agree with me that it is legal to offer to
23  provide assistance to the voter in the polling place, correct,
24  as long as the voter is eligible for assistance?
25  A.  Yeah.  We'd like to see the voter seeking out the

*Gigi Simcox, RMR, CRR*

JONATHAN WHITE – CROSS

1 | assistance rather than the other way around, but in terms of
2 | the legality of it, that's something that I would look, you
3 | know, very specifically at the statutes on.
4 | Q.  You would agree with me that it is legal for me to offer
5 | to provide voter assistance to a voter, correct?
6 | A.  I don't think there is an offense for making the offer,
7 | no.
8 | Q.  And then, of course, you would agree that it is legal for
9 | me to provide that assistance to the voter who is eligible for
10 | assistance, as long as I make sure I carry out the voter's
11 | wishes, correct?
12 | A.  And the voter is eligible for that assistance, yes, ma'am,
13 | and all of the other requirements are met, I would agree.
14 | Q.  But you put all of these lawful acts on your slide:
15 | Offering assistance, providing assistance, transporting a
16 | voter, and approaching a voter to assist them, isn't that
17 | true?
18 | A.  Those are on the page with the elements of the statute
19 | that actually comprise the elements of a criminal activity,
20 | yes, ma'am.
21 | Q.  And you believe the illegal part comes in when an assister
22 | casts a vote or makes sure the vote is cast for a particular
23 | candidate, is that right?
24 | A.  Yes, because I think there's some gray area in the process
25 | where campaign literature is provided and the voter is handed

*Gigi Simcox, RMR, CRR*

23-50885.41627

JONATHAN WHITE - CROSS

1  off to an assistant.  That's not something that's ever going

2  to get prosecuted, so it would be the point of the vote, or

3  that vote is either cast by the assistant or with influence

4  from the assistant.

5  Q.  Do you think it's illegal for a nonprofit organization to

6  provide campaign literature to a voter who is going to vote in

7  the polling place, as long as it's outside the hundred-foot

8  election area perimeter?

9  A.  No, ma'am.

10  Q.  Do you think it's illegal for a nonprofit organization to

11  make available assisters for the voter to use when going into

12  the polling place?

13  A.  Not to my knowledge.

14  Q.  So would it be fair then to say that the point at which it

15  becomes illegal is where a fraudulent assister marks the

16  ballot inconsistent with the wishes of the voter?

17  A.  That's correct, or suggests to the voter how to vote.

18       MISS PERALES:  Your Honor, I have a longer

19  examination but can stop at any time.

20       THE COURT:  Yeah, I've got to take a phone call at

21  12:15 so this is probably a good time to stop.

22       Let's resume at 1:00.

23  (Recess)

24  (Change in reporter)

25

```
 1              (1:05 p.m.)
 2              COURT SECURITY OFFICER:  All rise.
 3              THE COURT:  Thank you.  Please be seated.
 4              Ms. Perales.
 5              MS. PERALES:  Thank you, Your Honor.
 6                        CROSS-EXAMINATION
 7     BY MS. PERALES:
 8     Q.  Good afternoon, Mr. White.
 9     A.  Good afternoon.
10     Q.  We continue.  I would like to put up if we could SB1, the
11     statute, we were in Section 7.04, but would it be too much to
12     ask, John, to put up Joint Exhibit 1?  Is that something you
13     might be able to get?
14         7.04, which is page 60, line 22.  Okay.  Line 15, and this
15     is the other part of Section 7.04, "The Unlawful Solicitation
16     and Distribution of Application to Vote-By-Mail."
17         Do you see that there, Mr. White?
18     A.  Yes, ma'am.
19     Q.  Now, we see here the addition of a new section, 276.016; is
20     that right?
21     A.  Yes, ma'am.
22     Q.  And you'll agree with me that SB1 adds an offense for an
23     election official to solicit the submission of an application
24     for ballot-by-mail from somebody who didn't request it; is that
25     right?
```

Case 5:24-cv-50826-JDW Document 96 Filed 03/02/24 Page 687 of 518
Case 5:24-50826-844-DW Document 26 Page 687/02/Date Filed 01/08/2024

Jonathan White - Examination                    4007

 1   A.  Yes, ma'am, that's one of the subsections.
 2   Q.  But the provision does not apply to party officials; is
 3   that right?
 4   A.  I believe that's correct, although I don't think it's on
 5   this screen.
 6   Q.  Yeah, can we go over to page 61?
 7       Okay.  I know somewhere that you and I at one point agreed
 8   that party officials were not covered by this provision.
 9   A.  Is it a candidate?
10   Q.  Is it a candidate?
11   A.  I'm just -- I'm trying to remember.
12   Q.  Can we go and see them side-by-side, please?  We'll have to
13   go forward.
14       If you recall agreeing with me about that -- and if you
15   don't, just let me know if you don't; but at least at one point
16   we agreed that the statute was written to exclude actions by
17   campaign or candidate.  Do you remember at one point having
18   that understanding?
19   A.  I remember something about that, but I don't remember the
20   specific group that we were talking about.
21   Q.  But you'll agree with me that it does stop election
22   officials from sending out applications for ballot-by-mail,
23   right?
24   A.  Under certain conditions, yes, ma'am.
25   Q.  And if candidates are still allowed to send out unsolicited

1    applications for ballot-by-mail, this would mean that a
2    candidate could still, for example, flood a certain area with
3    applications for a ballot-by-mail that had not been requested
4    by the voter initially, correct?
5    A.  Through the mail, yes, ma'am.
6    Q.  Yes.  Okay.  Now, moving on, I just want to ask you a
7    question about the ID number requirement for an application for
8    ballot-by-mail, Section 5 of the statute.  And I don't have
9    much for you here.
10       Would you agree with me that if a vote harvester has
11   personal identifying information about a voter, that person
12   could forge a registration application and forge application
13   for ballot-by-mail for that individual, correct?
14   A.  Ostensibly, the signatures would match, and if they already
15   had those identifying numbers, they could provide them, yes,
16   and those should be processed.
17   Q.  Thank you.  Now, I think you mentioned earlier that when
18   the Election Integrity Division would receive complaints
19   regarding voter fraud, that primarily it would come through the
20   Secretary of State.  Is that right?
21   A.  Yes, ma'am.  I'd say more than 50 percent of our referrals
22   came through there.
23   Q.  And, in fact, the vast majority of complaints would come to
24   the Election Integrity Division through official channels,
25   correct?

1    A.  I'm not sure what we mean by "official channels."

2    Q.  Well, for example, the Secretary of State's office, you

3    mentioned.  How about local prosecutors and law enforcement?

4    A.  Correct, with the caveat that it would go to the

5    Investigations Division, not the Prosecution Division.

6    Q.  That's right.  Okay.  And so because of that, complaints

7    about alleged voter fraud didn't come directly to you, correct?

8    A.  Generally, no.

9    Q.  And you also would not have seen every investigation

10   referral request, correct?

11   A.  No, I wouldn't see every single referral.  Ones that didn't

12   have merit might not come my way.

13   Q.  And investigators in the Criminal Investigations Division

14   are the ones who would make an initial evaluation of a

15   complaint, correct?

16   A.  More so the lieutenant, who is the -- who's supervising

17   that section, and he would consult with me on a number of those

18   issues.

19   Q.  If he needed to?

20   A.  If he needed to.  And we were working toward that being a

21   more normal part of the process.

22   Q.  And his evaluation would include seeing if there's even a

23   criminal allegation on the surface of the complaint, correct?

24   A.  It would include that, yes, ma'am.

25   Q.  Now, the investigators from the Criminal Investigations

 1   Division were not in your chain of command, correct?

 2   A.  Correct.

 3   Q.  And you did not have direct supervisory authority over

 4   those investigators, correct?

 5   A.  That's correct, not any official chain of command.

 6   Q.  And thus, ultimately, the determination whether a complaint

 7   merited investigation would be made by someone other than you

 8   at the Office of the Attorney General?

 9   A.  To accept a case for -- to an open an investigation, I

10   would not always have a role in that; and frequently I would

11   not.

12   Q.  And, generally, when you learned about the outcome of an

13   investigator's efforts, you would learn about that outcome

14   through one-on-one conversations, correct?

15   A.  One-on-one conversations would be a part of it, yes, ma'am.

16   Q.  Is it true that an investigator would generally not write

17   up their notes?

18   A.  Usually investigators would limit their write-ups to the

19   official narrative or official report, if one existed in the

20   case.

21   Q.  Now, you would generally not question witnesses before a

22   prosecution had been recommended for a case, correct?

23   A.  In most cases, no, I wouldn't be the one questioning them,

24   but that did happen on occasion.

25   Q.  And you didn't always read an entire investigative report

```
 1    if one was provided, correct?
 2    A.  No.  I preferred to skip to the actual evidence and get my
 3    eyes on that if I -- If I could do that.
 4    Q.  And a lot of the information you gathered about an
 5    investigation would be based on the conversation with the
 6    investigator, correct?
 7    A.  Some of it, yeah.  The -- as to the exact elements of the
 8    offense, I would make sure that I saw -- put my eyes on the
 9    actual evidence or listened to the interviews or whatever the
10    evidence was in that case, the official election records.
11    Q.  And when you were supervising the Election Integrity
12    Division or its predecessor, so from 2018 until you left there,
13    you would generally be referring cases to other attorneys in
14    the division, correct?
15    A.  I would refer cases to my line prosecutors after I had made
16    an evaluation of whether we would proceed.
17    Q.  Let's go back to LUPE 182, please.
18        Now, it's correct, isn't it, that if you saw something like
19    this investigative report, this report would probably -- well,
20    let me scratch that and start with a better question.
21        Looking at this type of document, the investigative report,
22    this would not probably even have come to you, correct?
23    A.  No, I wouldn't say that.  But, again, I would get reports,
24    and I would see reports, but my preference would be to actually
25    lay eyes on the evidence so that I could ensure that elements
```

 1    were there.  This particular report, I -- report never came to
 2    me.  It was after my -- my time, I believe.
 3    Q.  But in terms of the typical practices of your office,
 4    wouldn't you agree that the report would probably have just
 5    gone to the line attorney?
 6    A.  No.  The case would always come to me for assignment to a
 7    line attorney, so the report would be available to me.  I would
 8    have conversation with the investigator; probably would have
 9    had a conversation with the lieutenant, as well as looking at
10    the evidence, to make sure that the elements were there before
11    signing it.
12    Q.  Let's see if we can go -- do you remember having a
13    conversation like this when I took your deposition in August of
14    this year?
15    A.  Yes.  I remember I told you something about not liking to
16    read long-winded reports.  I recall that.  That was true.
17    Q.  Do you recall when I asked you about something like this
18    report, you said it probably wouldn't even come to you?
19    A.  Something -- was it this particular report?
20    Q.  Well, because this report is -- I think its final days are
21    just after you left, I think you spoke more in terms of the
22    general practices of your office; that something like this
23    investigative report would probably not even come to you.  Do
24    you recall that?
25    A.  I mean, I might recall something like that if it had to do

1  with either this specific report in the time or if this was a

2  report that really didn't -- it -- you know, it was an

3  investigation that didn't really produce anything notable that

4  could have just been closed administratively, it's possible

5  that I wouldn't see something like this.  I don't know what

6  context I was talking about at the time.

7  Q.  Do you recall saying the report would probably go to the

8  line attorney and not you?

9  A.  I could have said that.  It's possible that I would just

10  route this directly -- this type of investigation directly to a

11  line attorney once I understood what was there.

12  Q.  Okay.  And as the head of the Election Integrity Division,

13  you would generally make a decision about whether a case was

14  worth going forward or not fairly quickly; is that right?

15  A.  I would have an idea fairly quickly if it was a case that

16  could go forward, and there would be some additional analysis

17  before actually charging.

18  Q.  And you would engage in field work generally only when you

19  had a role in the prosecution of the case; is that right?

20  A.  I think that's probably true in terms of getting out in the

21  field, maybe going to an elections office, putting my hands on

22  the records there, talking to witnesses, that sort of thing.

23  Typically, it would be when I was involved as a lead prosecutor

24  in the case or part of the prosecution team.

25  Q.  Do you recall how many times in the last year that you

1    served in your position at the Election Integrity Division, how
2    many times you served as the lead prosecutor?
3    A.  I don't really.  It wouldn't be more than once or twice,
4    though.
5    Q.  Now, with respect to signature matching to process a mail
6    ballot, for example, you would agree that your knowledge about
7    the signature-matching process is secondary, correct?
8    A.  To the extent that it's not based on actually reviewing
9    original election records and what types of ballots were
10   accepted versus not accepted, which I've seen, you know, pretty
11   significant number over my career, I would say that -- and the
12   Election Code itself, and the election law and procedures in
13   there, I would say that a lot of my -- a lot of the things that
14   I learned, I learned from other people like the Secretary of
15   State's office and the elections administrators and things that
16   were uncovered in the course of investigations, so partial.
17   Q.  But you've never served on a signature verification
18   committee, right?
19   A.  Absolutely correct, yes.
20   Q.  You haven't served on an early voting ballot board?
21   A.  That's correct.
22   Q.  You've never been a county elections official?
23   A.  Correct.
24   Q.  And you don't have firsthand knowledge about how ballot
25   boards operate in the 254 counties in Texas, correct?

1   A.  Well, other than I know from the Election Code what the

2   actual procedures that they should be following is, I have not

3   personally witnessed the way that one of those entities

4   operates in person.

5   Q.  I want to shift now to just a few questions about Zul

6   Mohamed.  It's correct to say that you did not question any

7   witnesses in connection with the case against Zul Mohamed; is

8   that right?

9   A.  No, ma'am.  I wasn't the one questioning the witnesses.

10  Q.  And you primarily found out about evidence about

11  Zul Mohamed through an investigator updating you; is that

12  correct?

13  A.  My investigator provided me with those records, which I

14  reviewed.

15  Q.  And you were not personally involved in making sure, for

16  example, that Dallas County or Denton County received materials

17  that you thought might suggest fraud, correct?  That was your

18  investigator?

19  A.  For the most part, I was involved in attempting to get

20  records from the elections office in Dallas, that we actually

21  had some dealings with the D.A.'s Office, but other than that,

22  my investigator primarily was the one who provided those

23  records to the appropriate offices.

24  Q.  And you did not go to Dallas County in connection with

25  Mr. Mohamed's case, correct?

1  A.  No, ma'am.  I had phone calls but did not travel.

2  Q.  And in connection with that case, you didn't talk with the

3  affected families or voters yourself, correct?

4  A.  No, ma'am.  I listened to those interviews, but I did not

5  conduct them myself.

6  Q.  And the illegal act that Zul Mohamed is charged with having

7  committed, those acts were illegal before SB1, correct?

8  A.  Correct.

9  Q.  Now, besides the presentation that we saw, which was the

10  slide show, it's correct, isn't it, that the Election Integrity

11  Division does not do any type of training for election workers,

12  yes?

13  A.  No.  We -- that training is limited to those modules that I

14  provided at the Secretary of State's annual conferences for

15  election officials, so that was it, that you were looking at.

16  Q.  And you agree that any question about whether SB1 would

17  necessitate additional training for election workers would be a

18  little outside of your wheelhouse; is that correct?

19  A.  I would defer to the Secretary of State's office on that.

20  Q.  And similarly, whether SB1 would necessitate additional

21  training of poll watchers would also be a little bit out of

22  your wheelhouse, correct?

23  A.  I would defer on that as well, yes, ma'am.

24  Q.  Earlier in your examination, one of the documents that was

25  shown was just a list of complaints.  Do you recall that?

1    A.  Yes, ma'am.  Referrals?

2    Q.  Referrals.  You did not personally review all the referrals

3    that came in; is that correct?

4    A.  Not all of them, no, ma'am.

5    Q.  And there were referrals that would come in that would not

6    be brought to your attention, correct?

7    A.  That was especially true in the past, earlier in time.

8    Q.  And if there was a referred complaint that didn't merit

9    investigation, it's unlikely that that complaint would be

10   brought to your attention, correct?

11   A.  Right.  There would probably be some notable circumstances

12   that brought it to my attention, if it did.

13   Q.  And you would also receive an investigative report if it

14   was turned over to you from the Criminal Investigations

15   Division; is that right?

16   A.  That's right.  I didn't have direct access to their

17   CrimeStar reporting system, so those would have to be provided

18   to us on the prosecution side.

19   Q.  In your role as chief of the Election Integrity Division,

20   you only wanted to prosecute those cases that you believed you

21   could convict on; is that right?

22   A.  I think that that is pretty accurate.

23   Q.  And with respect to the flow of complaints, referrals to

24   the Election Integrity Division, the Division received on

25   average less than 50 referrals per year going back to 2016; is

1    that right?

2    A.  I'm not sure what that number would be, but I don't imagine

3    it would be too far off of that.

4    Q.  Now, it is the case that your office undertook

5    investigations that did not lead to prosecution, correct?

6    A.  Correct.

7    Q.  But you can't tell us how often that happened because that

8    would require you to review quite a few records; is that right?

9    A.  Yeah, at minimum, it would require that, yes, ma'am.

10   Q.  But you can say that fairly often you decided an

11   investigation should not be a prosecution, correct?

12   A.  I would say that, yes, it was common for us to not proceed

13   with the prosecution on a given investigation.

14   Q.  And the top two reasons for not pursuing it from

15   investigation to prosecution would be first that a crime did

16   not occur, or second, there's insufficient evidence that a

17   crime occurred; is that right?

18   A.  That's probably accurate.  I would include in there

19   insufficient facts or evidence or also just legal and factual

20   evidentiary type issues that could result in that as well.

21   Q.  You agree that a lot of investigations of alleged voter

22   fraud are shut down on the investigation side and don't become

23   prosecutions because of a lack of evidence, yes?

24   A.  Could you repeat just the first few words of that question?

25   Q.  You agree that a lot of investigations --

 1    A.   Okay.

 2    Q.   -- of alleged voter fraud are shut down on the

 3    investigation side and don't become prosecutions because of a

 4    lack of evidence, correct?

 5    A.   I think a significant number do, yes, ma'am.

 6    Q.   And also a lot of investigations of alleged voter fraud are

 7    shut down on the investigation side and don't become

 8    prosecutions because no offense occurred, correct?

 9    A.   I would agree with that.

10    Q.   And also a lot of investigations -- oh, no, you already

11    gave that reason.  I'm just going to stop here so we're not

12    here tomorrow the same time.  Moving along.

13         I would like to display LULAC 61, if we could.

14         In the morning, Mr. White, you went through a chart of

15    pending and resolved prosecutions with Mr. Kercher, and he

16    chose a chart from July of 2022.  Do you recall that?

17    A.   Yes, ma'am.

18    Q.   So there are a number of these charts; is that correct?

19    A.   A number of versions that were updated in time, yes, ma'am.

20    Q.   And so I'm going to start with a slightly earlier chart

21    from Mr. Kercher's, and then I'm going to end with a slightly

22    later chart with Mr. Kercher's, just to -- just to orient you

23    here.

24         You prepared this spreadsheet; is that right?

25    A.   Yes, ma'am, I maintained the spreadsheet.

1   Q.  And you've done your very best to maintain it accurately
2   since the time that you took over in the Division in 2018,
3   correct?
4   A.  Yes, ma'am.
5   Q.  And to your knowledge, the document provides a complete and
6   accurate list of the cases that have been charged by your
7   office and prosecutions pending for election fraud violations;
8   is that right?
9   A.  I would say so, yes, ma'am.
10  Q.  And on the first page of the document, we see the words
11  "*Prosecutions Resolved*" up in the title; is that right?
12  A.  Yes, ma'am.
13  Q.  And then at the very bottom, we'll see the date?
14  A.  Yes, ma'am.
15  Q.  There we go.  So just to get you oriented on here.
16      Now, on page 12 of the document, you would agree with me
17  that the title changes over to "*Prosecutions Pending.*"  So if I
18  wanted to know generally -- if we could just return to the
19  first page of the document and see the whole first page.
20      If I wanted to know how many defendants are involved in
21  either pending or resolved prosecutions, I would add up the
22  names of the people who are listed in the rows of the chart; is
23  that right?
24  A.  That's right, count the rows.
25  Q.  So, for example, we could use the chart to look at the

```
 1   average number of defendants charged with an election offense
 2   or election offenses in any given year, correct?
 3   A.   Yes, ma'am.
 4   Q.   So if we went, for example, to -- if we wanted to look at
 5   how many defendants were charged with offenses related to the
 6   2020 election cycle, we could just flip forward and start
 7   finding elections from 2020, and we could count up the number
 8   of defendants involved, correct?
 9   A.   Correct.  You'd probably find those on both sides of the
10   spreadsheet, the resolved, as well as the pending.  Mostly
11   probably would be on the pending, I'm guessing.
12   Q.   And if we just wanted to look at how many -- well, if we do
13   pending -- except the resolves are first, so let's do -- let's
14   go to page 11 and maybe page 12 internally of this document.
15   And I think we have one defendant with a resolved prosecution
16   at this point.
17        If we could go to the next page.  Oh, there we go.  Look at
18   that.  John found it before I did.
19        So there's one person here with a resolved from Medina
20   County, and then we also have -- on the pending, I think at
21   that point we had about five defendants with pending
22   prosecutions, and that would be farther down in this chart.
23   And you and I established together that every page in the
24   pending prosecutions on this chart is page 17, so I'm not going
25   to have us count our way through it.
```

 1      Now, this number of one resolved and five pending, it
 2  doesn't seam particularly high or low to you, correct?
 3  A.  Correct.  I think there might have been two on the
 4  resolved.  But, yes -- no, it's not a particularly high number.
 5  Not particularly low number in my experience either.
 6  Q.  And I will give you that there may have been two resolved;
 7  one for primary, and one for the general, that may be.
 8      Now, the Office of the Attorney General agrees that until a
 9  conviction is reached, a person is presumed innocent legally,
10  correct?
11  A.  Correct.
12  Q.  And I'd like to talk through some of the people that you
13  discussed with Mr. Kercher starting with, in resolved
14  prosecutions, Christina Lichtenberger, who you talked about
15  earlier this morning.  She's -- these are three cases in
16  Duval/Live Oak County.
17      Let me see if maybe if my friend Mr. Kanterman can help
18  John find Duval/Live Oak County on the left-hand column for
19  Prosecutions Resolved.  You're in Pending now, but if you start
20  in Resolved, you might find them, but we can talk about them
21  without -- there they are.
22      You can't tell us any specific facts about
23  Ms. Lichtenberger's case without reviewing the file, isn't that
24  correct?
25  A.  Yeah.  I don't recall much beyond what's on this document.

23-50885.41645

1    I think that's primarily because it was in 2008 when I took

2    these pleas and reviewed these cases, but it was a

3    vote-harvesting scheme, it was in Duval County, in the 2008

4    primary.  We prosecuted it in Live Oak County under our venue

5    provision.

6    Q.  Understood.  Going forward to Brazos County, and Christine

7    Thomas Shank, who you discussed earlier today with Mr. Kercher.

8    It's also true that beyond what's on the face of the chart, you

9    don't have a specific recollection of this case, so you

10   wouldn't be able to give us any more detail; is that correct?

11   A.  On that particular case, I don't remember a whole lot of

12   details, and I think that that case may not have even been as

13   developed as the Duval County case.

14   Q.  And if we go forward to Dallas/Rockwall County, Gilda

15   Hernandez, it's also true you don't recall much specific

16   information about the fact pattern of that case; is that

17   correct?

18   A.  I think my memory has been refreshed a little bit since we

19   last talked, but I don't know that what I have to share would

20   be particularly helpful for you; but it was associated with the

21   Medrano prosecutions, but she was one of the vote harvesters in

22   this Dallas County election that we tried in Rockwall County,

23   and she pled to these vote-harvesting offenses -- or at least

24   one count.

25   Q.  Now, we have seven Cameron County prosecutions.

Jonathan White – Examination                    4024

1   A.  Might be eight.

2   Q.  We could have eight.  If we zoom back out, we're going to

3   see some resolved prosecutions from Cameron County.  And I'd

4   like to start with Margarita Ozuna.  You don't have a specific

5   recollection of what Ms. Ozuna did to influence the voter; is

6   that correct?

7   A.  This one would have either been suggesting to the voter how

8   to vote, or -- I think it was suggesting the voter how to vote

9   and not marking the ballot against the direction of the voter,

10  so that would be the answer on this one.  Ms. Ozuna I remember

11  quite well.

12  Q.  But you don't have a specific recollection of what

13  Ms. Ozuna did to influence the voter, correct?

14  A.  No.  Just what I told you about suggesting which candidate

15  to vote for.

16  Q.  Let's go forward to Facunda Garcia, also Cameron County.

17  It's true you would have to review the specific facts to know

18  if the voters that she assisted were entitled to assistance or

19  not, correct?

20  A.  My recollection today is that they probably were not, which

21  would be pretty common for this type of case.

22  Q.  Is your recollection different today than a year and some

23  months earlier when I took your deposition?

24  A.  It's not significantly different, but I do remember a few

25  more facts about some of these cases now that we've, you know,

23-50885.41647

 1  refreshed the mental pathway a couple of times.

 2  Q.  Now that 14 months have passed or that you studied up for

 3  your testimony?

 4  A.  No.  I reviewed my deposition transcript and the

 5  spreadsheet.

 6  Q.  Do you recall saying in your deposition transcript with

 7  respect to Facunda Garcia that you would have to review the

 8  specific facts to know if the voters she assisted were entitled

 9  to assistance?

10  A.  Right.  That was based on my memory on that day, and I

11  hadn't really thought about these cases in a number of years at

12  that time.

13  Q.  Now, with respect to Bernice Garcia, who you discussed

14  earlier with Mr. Kercher, you aren't completely sure if she

15  suggested to the voter how to vote because you hadn't looked at

16  the file -- or haven't looked at the file since 2015; is that

17  right?

18  A.  All of that was true on that day, yes, ma'am.

19  Q.  And with respect now going -- let's pass through Cameron

20  County and go to Hidalgo County.  You discussed Lupe Rivera

21  from Hidalgo County.

22      It would be on the next page.

23      And in order to tell us the specific activity that Lupe

24  Rivera engaged in to influence voters, as with all of these,

25  you would have to refresh your recollection deeper than the

1    information on the spreadsheet, isn't that right?

2    A.  To get deeper than suggesting to the voter how to vote in

3    that election, to get any more level of detail, I would

4    probably have to review the file.

5    Q.  And same with Nueces County, Rosita Torres Flores, you

6    would have to review the file to say for sure more details

7    beyond what's in the chart, correct?

8    A.  I'd like to take a look at her entry if possible.  Thank

9    you.

10   Q.  Should be second from the top.

11       Thank you, John.

12       And the question is that in order to give us more detail

13   than what's on the chart, you would have to review the file?

14   A.  What I remember that may not specifically be on this chart

15   is that she voted this ballot without the direction of the

16   voter.  I recall that.  But I do recall that the day in

17   question at the deposition, I testified to what you said.

18   Q.  And then second to last, the two Frio County cases for

19   which there is a diversion program, you don't know what the

20   basis of that was without reviewing the file, so you can't

21   really tell much more about it; is that right?

22   A.  Yes, ma'am.  We didn't discuss these today, but I don't

23   have much recollection of these cases beyond what's on this

24   chart here; that's correct.

25   Q.  And then last, Nueces County, Cynthia Gonzales, in order to

1  talk about more details, you would have to refresh your
2  recollection as to the specifics of the case, correct?
3  A.  Just reviewing these notes.
4     (Pause.)
5     On this one similar to Rosa Flores, we had an instance
6  where she had actually voted the ballot contrary to the voter's
7  wishes, and that I can tell you -- which is implied by this
8  information, but not directly stated on this, and I'm not sure
9  whether or not I told you that at the deposition or not.
10 Q.  Because we see a charge there under Section 64.012,
11 correct?
12 A.  Yes, ma'am.
13 Q.  Illegal voting.
14    But beyond what we see here, you would have to refresh your
15 recollection as to the specifics of the case, correct?
16 A.  Yes, ma'am, I would.
17 Q.  All of these things that we've reviewed just now, these
18 charges, these were all charges under criminal statutes that
19 existed before SB1; is that correct?
20 A.  Correct.
21 Q.  Now, one thing that you do know is that none of the
22 resolved prosecutions of unlawful voter assistance in this
23 chart happened in the polling place, correct?
24 A.  I don't believe any of the ones that we've covered did.  We
25 had some instances of those on the other spreadsheet, I

1   believe, but none of these, you're correct.

2   Q.  So with respect to this spreadsheet, there are no resolved

3   prosecutions of unlawful voter assistance that happened inside

4   the polling place, correct?

5   A.  Not the ones that we've covered, correct.

6   Q.  Well, even beyond the ones that we've discussed

7   specifically, if we just look at this document "Resolved

8   Prosecutions," none of these resolved prosecutions involved

9   unlawful voter assistance in the polling place, correct?

10  A.  I'm not sure about that.  I'm sorry.  And I'll probably

11  have to review those earlier cases in a little more detail just

12  to make sure, but you're probably pretty close to it.  If there

13  aren't any, then it's not going to be very many.

14  Q.  Would it be helpful to review your deposition to refresh

15  your recollection with respect to this question?

16  A.  Probably would be more helpful to review the actual

17  spreadsheet itself if you want an answer today, but I'll

18  certainly take your word for whatever I testified to at the

19  deposition.

20  Q.  Well, I'd rather you not take my word for it.  I would like

21  to get a firm answer to this question.  So if you're hesitant

22  about it, I'd like to refresh your recollection.

23      If we could pull up April 27, 2022, page 75, line 13.  Go

24  to the next page, if you would, page 76.  Starting on line 5 of

25  page 76, if you wouldn't mind looking there.

1    Did you testify at that time that it's your recollection

2    that besides Ms. Barton, which did not involve voter

3    assistance, as you've testified earlier, none of the cases in

4    the exhibit took place in person at the polling place?

5    A.  Yes.  I answered that I wasn't recalling any from my

6    memory, and I agreed with that, to avoid having to look through

7    each of the offenses again.

8    Q.  And then if we can do line 12 through just the end of that,

9    the Patricia Barton case did not involve assistance.  You

10   recall that?

11   A.  Correct.

12   Q.  So let's go back to the chart.

13       Do you recall, with respect to this chart overall, that

14   there are about 74 defendants who are either convicted or go

15   into deferred adjudication or diversion programs?

16   A.  I don't know that, but --

17   Q.  Okay.  Do you recall knowing at any point that 16

18   defendants were convicted as opposed to deferred adjudication

19   or diversion agreements?

20   A.  That sounds probably in the ballpark.

21   Q.  When a case is resolved by a plea, that doesn't require any

22   witness to take the stand; is that right?

23   A.  Correct.  They're making a judicial stipulation of guilt at

24   the time that they take the plea, and that would be the same,

25   whether it's a conviction or deferred adjudication, or in the

1   case of the diversion program; that they're making a

2   stipulation or acknowledgment of the offense.

3   Q.  But not for a no-contest; is that right?

4   A.  No contest would be the one exception to that, yes, ma'am.

5   Q.  Now, for any single defendant who pleaded guilty or had

6   been convicted of harvesting, it would probably be a small

7   number of ballots, correct?

8   A.  In the scheme overall, not necessarily.  In terms of what

9   we made our case on, yes, it's very likely that it would be.

10  You know, I guess what your definition of "a small number of

11  ballots" might be.

12  Q.  Do you recall in the past testifying that when you did do

13  one of these pleas or convictions, it was generally a

14  relatively small number of ballots?

15  A.  Yes.  When we do a plea, we would normally not even -- it

16  would normally be a reduced counts, reduced number of counts

17  from what was originally charged, yes, ma'am.  Sorry if I

18  misunderstood your initial question.

19  Q.  I'm sure it was my fault.

20      Now, generally, you understand that there are over

21  16 million registered voters in Texas, correct?

22  A.  That sounds right.

23  Q.  So if we do the math on the 76 defendants in the chart, in

24  the 16 million, it's a very, very, very small fraction of a

25  percent.  Would you agree?

1    A.  Yes, ma'am.

2    Q.  And if we take out the deferred adjudications and diversion

3    program results, we have --

4            THE COURT:  You need to turn off your phone.  That's a

5    number of times that that's happened with you.

6            MS. PERALES:  I will move on.

7    BY MS. PERALES:

8    Q.  A moment ago you said it sounded more or less reasonable

9    that there would have been 16 defendants who were convicted

10   once we take out the diversion agreements and the deferred

11   adjudications.

12       Would it be your view, then, that we can look at, for

13   example, the number of counts charged, which is the way the

14   spreadsheet is done?  And it's a very high number, over 500,

15   but we can also look at the roughly 16 defendants who are

16   actually convicted, and that would show or tend to show that

17   voter fraud is not that big a deal?

18   A.  I think I've got something for everyone on this

19   spreadsheet.  Whatever you want to see, I would agree that you

20   can probably see it.

21   Q.  And you know the line.  I'm reading from when you testified

22   in the legislature, you said something similar; is that right?

23   A.  I have testified to that, yes, ma'am.

24   Q.  You were having a colloquy with Representative Bucy, and

25   when he started to just focus on the convictions, you did, in

 1   fact, say *"This can be stuff to show that voter fraud is not a*
 2   *big deal"*?
 3   A.  I said I was just glad that I can make everyone happy, both
 4   sides of the aisle.
 5   Q.  Can we look now at OCA Exhibit 377, please.
 6        Now, here we are in some months after the chart that
 7   Mr. Kercher showed you from July of 2022.  Now we're in
 8   September of 2022.  Do you see that there?
 9   A.  Yes, ma'am.
10   Q.  Now, your office had confidentiality -- or maintained some
11   kind of confidentiality in terms of public release of
12   information regarding cases that didn't result in a conviction
13   or deferred adjudication; is that right?
14   A.  I'm not sure what the position was in terms of this
15   litigation, but I'm aware that under the Texas Public
16   Information Act, those are confidential under law in terms of
17   public release.
18   Q.  And you would release this chart, wouldn't you, in -- for
19   example, in response to a request for public records?
20   A.  Correct.  It was the file itself that would be privileged
21   under the law -- or confidential under Texas law.
22   Q.  So if a defendant is acquitted or the charges were dropped,
23   we might not see that outcome reported on, for example, this
24   chart, even though the person might have appeared on an earlier
25   chart, isn't that right?

1    A.  It's possible.  You know, it's happened both ways.

2    Sometimes we've left those on the chart, and I think sometimes

3    they may have been removed; and yes, you're correct on that,

4    though.

5    Q.  So, for example, Mr. Ricardo Molina, he was on the July 15

6    chart, but he has vanished from the September 6, 2022 chart,

7    isn't that right?  That was 2017 City of Edinburg?

8    A.  I'm not sure how to handle testimony that might cover a

9    situation where there's been an expunction, and so it's

10   possible that when a record has been expunged, that there would

11   have been an existing spreadsheet that could have been

12   requested through a public information request, but if we

13   receive a notice of expunction, then we would be required by

14   law to destroy any records pertaining to an arrest or

15   prosecution afterward.  We could still maintain an

16   investigative file about the activity, but no record of arrest

17   or subsequent prosecution.

18   Q.  Do you recall that Mr. Molina was acquitted of engaging in

19   organized election fraud and eleven counts of illegal voting in

20   the 2017 City of Edinburg election?

21   A.  Yes, ma'am, I do.

22   Q.  Do you agree with me that he appears nowhere on the

23   September 62022 chart for resolved prosecutions?

24   A.  He probably should not appear on this chart.

25   Q.  Let's go down to page 11, which is Bates 112170.

1      We have some cases that are additional from the chart that
2  we discussed earlier from April.  By my count there are seven
3  additional cases.  They start here at the bottom of the chart,
4  Gregg County, Shannon Everett Brown?
5  A.  Yes, ma'am.
6  Q.  You discussed that one with Mr. Kercher.  And then the next
7  page we have several more people there, to the bottom?
8  A.  Yes, ma'am.
9  Q.  Where I think we end with Brewster County.  Would you agree
10 with me that none of those new cases involve unlawful
11 assistance?
12 A.  I don't recall any of them involving unlawful assistance.
13 And on the prior version of the spreadsheet, they would have
14 been on the pending sheet, and they would have moved over to
15 "resolved" on this copy.
16 Q.  Would you agree with me that with respect to this chart
17 here, which is current as of September 6, 2022, the resolved
18 voter assistance fraud cases only relate to mail ballots and
19 not assistance in the polling place?
20 A.  I think -- I think that that's true.  I think my answer is
21 going to be about the same as my answer in the deposition, is
22 without going through this with a fine-tooth comb, I would be
23 inclined to agree with you -- I have -- I have recollections of
24 cases that happened, but I don't recall the outcomes, so I'm
25 going to go with your proposed question there.

 1   Q.  And if we go forward in this chart here, we see some

 2   pending prosecutions that are related to the 2017 City of

 3   Edinburg election.  They would be -- there we go.

 4       If you would just stay there, John.  We have a number of

 5   them.  Can we see the next page, please.  Ah, yes.  Several

 6   more.  If you could highlight them.

 7       Those were all dismissed, weren't they?

 8   A.  I believe these were dismissed by the Hidalgo County

 9   District Attorney's Office.

10   Q.  And if we take those out, we've got roughly 19 defendants

11   left in pending prosecutions as of the most recent chart; is

12   that right?

13   A.  I would have to trust you on the math, but I don't have any

14   reason to disagree with you.

15   Q.  If we go to the first page of Pending Prosecutions, we see

16   three women from Hidalgo County on the left-hand side:  Marcela

17   Gutierrez, Sara Ornelas, and Sylvia Arjona in Hidalgo County.

18   Do you see them there?

19   A.  Yes, ma'am, I do.

20   Q.  They were charged with unlawful assistance of voters.

21   Isn't that right?

22   A.  That's correct.  Those were in the polling place.

23   Q.  That was from the 2016 election?

24   A.  Yes, ma'am.

25   Q.  Those cases were all dismissed, weren't they?

1    A.  I believe they were also dismissed by Hidalgo County
2    subsequent to the *Stephens* decision.  In fact, if it's helpful,
3    I think the majority of these cases were dismissed as a result
4    of the *Stephens* decision.
5    Q.  Now, you recall a case in Nueces County specifically in
6    Robstown -- you've spoken of this before -- where the candidate
7    was accused of attaching himself to voters outside the polling
8    place and taking them through the voting process and voting
9    their ballots, correct?
10   A.  Yes, ma'am, that's correct.
11   Q.  That was Mr. Robert Gonzales, I believe you told me; is
12   that right?
13   A.  Yes, it was.  An attorney from the Criminal Prosecutions
14   Division actually handled that case at trial.
15   Q.  And Mr. Gonzales was acquitted, wasn't he?
16   A.  He was acquitted not of the unlawful assistance of voters
17   or the loitering in the polling place, but he was charged with
18   divulging information about an election, and he was acquitted
19   of that.
20   Q.  So he wasn't charged with unlawful assistance.  You just
21   mentioned that there was unlawful assistance in your view,
22   correct?
23   A.  Yes.  That was the entire scheme, and the choice to go
24   after the felony instead of the misdemeanor, unlawful
25   assistance offenses, was probably a mistake, in retrospect.

1    Q.  Nevertheless, he was acquitted of what he was a charged of,
2    yes?
3    A.  Indeed, indeed.
4    Q.  And acquitted on May 5, 2019, is that correct, thereabouts?
5    A.  I don't have a recollection.
6    Q.  But more than two years later, in July of 2021 when you
7    were testifying on the legislature on SB1 and its predecessors,
8    you continued to mention Mr. Gonzalez and that you felt that he
9    had delivered unlawful assistance in the polling place,
10   correct?
11   A.  I don't recall testifying to that.  But, I mean, you know,
12   I do feel -- I do feel that that's exactly what happened, and
13   we had video of it.
14   Q.  It doesn't bother you that although he was acquitted, you
15   still went to the legislature and testified that he did these
16   crimes?
17   A.  I don't recall ever naming him.  And, no, it doesn't bother
18   me that he was acquitted of a different charge.
19   Q.  Can we pull up the July 10, 2021 Senate Affairs transcript,
20   please.
21       Now, we know Mr. Gonzalez was -- his contest was the only
22   one on the ballot, correct?
23   A.  That's correct.  It was a run-off for his election.
24   Q.  If we can go to July 10, 2021, Senate Affairs, page 117.
25           You don't have the transcript?

1      I believe, Mr. White, we may have to go to the binders that
2  I handed you.  There's one binder that is labeled *Legislative*
3  *Testimony*."  If you could turn to the transcript July 10, 2021,
4  Senate Affairs.
5  A.  Yes, ma'am.
6  Q.  Page 117, line 17, if you could read from there until the
7  first line of the next page, 118.
8  A.  Yes, ma'am.  I think this agrees with my testimony.
9  Q.  Can you read what you said there, starting 117.
10     If we could pull it up, please, page 117, line 17?
11  A.  It says, *"We've seen the candidate themselves get involved*
12  *in certain cases where, you know, for example, a run-off*
13  *election in a county towards South Texas, but not in South*
14  *Texas, we had a campaign -- we had a -- the candidate that was*
15  *on the ballot in a run-off election literally the only race on*
16  *the ballot was his race, bringing voter after voter after voter*
17  *into the polling place and assisting them with their ballots."*
18  Q.  Okay.
19  A.  Do you want me to continue on?
20  Q.  No.  But you did deliver that testimony in July of 2021; is
21  that correct?
22  A.  That appears to be correct, yes, ma'am.
23  Q.  Thank you.
24          MS. PERALES:  One moment, Your Honor.
25          I have no further questions.  Thank you, Mr. White,

 1  for your time.
 2         THE COURT:  Anything else on this side?
 3         MS. HARRIS:  Yes, sir.
 4                    CROSS-EXAMINATION
 5  BY MS. HARRIS:
 6  Q.  Good afternoon, Mr. White.  My name is Ashley Harris.  I
 7  represent the OCAGH plaintiffs.  I have a few more questions
 8  for you about the OAG's investigations and prosecutions.
 9         You stated you were previously the division chief of the
10  Election Integrity Division, correct?
11  A.  Yes, ma'am.
12  Q.  And you left that position on December 1, 2022?
13  A.  Yes, ma'am.
14  Q.  That division handles elections-related prosecutions,
15  right?
16  A.  I think that's fair.
17  Q.  And the majority of things that the division works on are
18  related to elections?
19  A.  Yes, I think that's fair, also, though we have taken some
20  overflow cases from the Criminal Prosecutions Division from
21  time to time.
22  Q.  In that position, you were generally aware of all
23  prosecutions by the division, correct?
24  A.  Correct.
25  Q.  Geoff Barr leads the division today, correct?

1   A.  Correct.

2   Q.  I'm going to turn to discussing the Court of Criminal

3   Appeals case *State v. Stephens*, which you are familiar with,

4   correct?

5   A.  Yes, ma'am.

6   Q.  The decision in *State v. Stephens* was initially issued by

7   the Court of Criminal Appeals on December 15, 2021, correct?

8   A.  That sounds correct, yes, ma'am.

9   Q.  If I refer to that initial order as *"Stephens 1,"* will you

10  understand that to mean this initial order from December 20,

11  2021?

12  A.  Yes, ma'am.

13  Q.  You were working in the Election Integrity Division when

14  *Stephens 1* was issued, correct?

15  A.  Correct.

16  Q.  And OAG's office subsequently filed a motion for rehearing

17  of the *Stephens 1* decision, correct?

18  A.  That's correct.

19  Q.  And that motion was denied on September 28, 2022?

20  A.  That sounds correct, yes, ma'am.

21  Q.  If I refer to that denial as *"Stephens 2,"* will you

22  understand that to mean the rehearing denial issued in

23  September 2022?

24  A.  Yes.

25  Q.  And you were still working in the Election Integrity

1   Division when *Stephens 2* was issued, correct?

2   A.  That's correct.

3   Q.  *Stephens* held that it was unlawful for the OAG to

4   unilaterally prosecute election-related allegations, correct?

5   A.  Correct.

6   Q.  With that in mind, I want to turn to discussing

7   investigations by the OAG.  The Election Integrity Unit handles

8   investigations of potential election-related violations,

9   correct?

10  A.  Yes, ma'am.

11  Q.  And your understanding is that *Stephens* did not alter the

12  OAG's ability to investigate alleged election-related crimes,

13  correct?

14  A.  Correct.  Same authority as state police, just like the

15  Department Public Safety and Texas Rangers.

16  Q.  So they have the same investigative powers as state police?

17  A.  Agreed.

18  Q.  And under certain circumstances, the OAG is statutorily

19  required to investigate election-related allegations, correct?

20  A.  I believe there is a "shall investigate" attached to the

21  provision that allows citizens to make a complaint with two

22  sworn affidavits.  I believe that's correct, yes.

23  Q.  And the OAG considers that "shall" language to make

24  investigation mandatory in those situations, correct?

25  A.  Yes.  I think it requires us to at least make it p

```
 1    investigation into the matter.
 2    Q.  Does the OAG have subpoena power while interviewing
 3    investigation witnesses or suspects?
 4    A.  I would say not any more, because *Stephens* has -- some of
 5    the language in *Stephens* was so broad that it assumes, I think,
 6    that any grand jury activity is initiating a prosecution.  We
 7    don't have any authority over a grand jury.  Even though we
 8    have specific authority to appear before a grand jury, I don't
 9    think we have grand jury subpoena power any more now.
10    Q.  We'll come back to that discussion of grand juries.
11         The OAG has initiated investigations of alleged elections
12    violations after *Stephens 2*, correct?
13    A.  I would imagine they have.
14    Q.  And to the best of your knowledge, the Election Integrity
15    Unit is still investigating alleged elections violations,
16    correct?
17    A.  As far as I know, yes, ma'am.
18    Q.  It is the OAG's practice to communicate with local
19    prosecutors if the OAG is undertaking an investigation of an
20    alleged election violation in that county, correct?
21    A.  I would say particularly now.  At some point in the process
22    the local prosecutor would be brought in, yes, ma'am.
23    Q.  And so that has continued to be the OAG's practice,
24    particularly after *Stephens*?
25    A.  Particularly after.
```

1    Q.  After an investigation, there is typically a referral

2    either for local prosecution or an offer made by the OAG to

3    assist with that prosecution, correct?

4    A.  Could you repeat that?  I'm sorry.

5    Q.  After an investigation, there is typically a referral

6    either for local prosecution or an offer made by the OAG to

7    assist with that prosecution?

8    A.  I'm not advised as to the last part of that, but I would

9    agree with the referral for prosecution would be made,

10   typically, after a case.  Although it may have -- it may just

11   be presenting a case without a push to prosecute, if that makes

12   sense.  Just, Here is the case for your review.  That would

13   typically be made, as far as I know.

14   Q.  And you remember being deposed in August 2023, correct?

15   A.  Yes, ma'am.

16   Q.  I'd like to pull up your deposition testimony from

17   August 2023, page 78, line six through eleven.  And do you see

18   where it says, *"The Election Integrity Unit would investigate,*

19   *and there would be a referral"* -- or your answer was -- there

20   would be -- let me start again.

21       Your answer was, *"The Election Integrity Unit would*

22   *investigate, and then there would be a referral either for*

23   *local prosecution or an offer made for us to assist with that*

24   *prosecution, typically."*

25           MR. KERCHER:  Your Honor, if the witness could have

```
 1   the opportunity to read the question, that he's answering in
 2   the transcript so he could have the full context?
 3              MS. HARRIS:  Sure.
 4          (Pause)
 5              THE WITNESS:  Yes, ma'am, I see.
 6   BY MS. HARRIS:
 7   Q.  Okay.  And then it asks:  "And that is still the case
 8   today?"
 9       And you said, "I believe it is."
10   A.  Correct, yes, ma'am.
11   Q.  Do you stand by that testimony today?
12              MR. KERCHER:  Your Honor, I'd object to an improper
13   impeachment.  No contradiction has been established.
14              THE COURT:  I don't think she's trying to -- what are
15   you trying to do here?
16              MS. HARRIS:  Your Honor, I believe he said that he's
17   not sure whether the OAG still offers to assist with that
18   prosecution today, and in his deposition testimony he said, I
19   believe that that is the case still.
20              THE COURT:  That's noted and overruled.
21              THE WITNESS:  Is the answer if I stand by this
22   statement?
23   BY MS. HARRIS:
24   Q.  Yes.
25   A.  I think I was speaking pretty generally at the time, so I
```

 1    do not know whether an offer is made to assist every time one
 2    of these cases is referred, but that is something that could
 3    very possibly happen.  I just don't know that it happens every
 4    time, so...
 5    Q.  And so in your deposition testimony when you said, *"I
 6    believe it is,"* referring to the fact that an offer is made to
 7    assist with that prosecution typically, which you had
 8    mentioned, was that incorrect at that time?
 9    A.  I was referring in general to the general statement that
10    there would be a referral either for local prosecution or an
11    offer made to assist with the prosecution, typically; just a
12    general statement.
13    Q.  And you're no longer sure if that is typically the case
14    today?
15    A.  I said at the time *"I believe it is,"* which didn't express
16    certainty, because I don't have certainty about exactly how the
17    Election Integrity Division is being conducted, so the answer
18    would be the same today.
19    Q.  And you don't have any specific knowledge that indicates
20    that that is not the case today?
21    A.  No.
22    Q.  I want to now discuss prosecutions more specifically.  Your
23    understand is that *Stephens* did not alter the OAG's ability to
24    concurrently prosecute election-related crimes with the County,
25    correct?

1    A.  Could you define what you mean by "concurrent"?

2    Q.  If they are, for example, deputized or it is done alongside

3    the local prosecuting attorney with their participation?

4    A.  So not exactly.  I think *Stephens* made clear that we would

5    need a deputization from the D.A. before we could proceed, and

6    the Court of Criminal Appeals didn't even reference the Article

7    2.07 of the Code of Criminal Procedure, which allows us to be

8    appointed D.A. pro tem, so it was a written deputization of

9    that D.A. is required for us to be involved in any case.

10   Q.  So those methods through written deputization and being

11   appointed attorney pro tem are unchanged by *Stephens*, correct?

12   A.  In my opinion, yes.

13   Q.  Generally speaking, would you agree that cases with alleged

14   elections violations are political hot potatoes for local DAs?

15   A.  Probably.

16   Q.  And when you say "probably," is there -- do you have a

17   reason to doubt that, or is that a yes?

18   A.  I think in a lot of cases, and in most cases, it probably

19   is, yes, ma'am.

20   Q.  Prior to *Stephens*, in your view, the OAG frequently,

21   independently prosecuted alleged elections violations because

22   local prosecutors found them to be too high profile, correct?

23   A.  Not always.  Occasionally, that would be true.

24   Q.  Would you say that that has been true primarily across the

25   board?

1  A.  No, I wouldn't say across the board.

2         MS. HARRIS:  One moment, Your Honor.

3  BY MS. HARRIS:

4  Q.  I may come back to that in a moment.

5      In your view, in most counties where the OAG has prosecuted

6  elections allegations, the OAG has working relationships with

7  local prosecutors, correct?

8  A.  In many cases that's true, yes.

9  Q.  Would you say it is fair to say the majority of cases?

10  A.  Maybe.

11  Q.  I'd like to pull up your deposition testimony from

12  May 2022, page 61, lines 18 through 22, and I'll give you a

13  chance to read the question before it.

14      (Pause.)

15      Let me know when you're ready.

16  A.  Okay.

17  Q.  Do you see where your answer says on -- starting on line

18  18:  *"I don't think I can characterize relationships without*

19  *getting into privilege materials.  But if you do look at our*

20  *prosecution spreadsheets, so the majority of counties where we*

21  *have prosecuted cases indicate a working relationship with*

22  *local prosecutors."*

23      Do you agree with that statement today?

24  A.  For the most part, yeah, I think I do.

25  Q.  And I would like to turn to your deposition testimony

 1   from -- I'd like to turn to your May 5, 2022 deposition
 2   testimony on page 43.  And I'll give you a moment to read the
 3   question, starting on line page 22.
 4   A.  Okay.
 5   Q.  And do you see where the question says:  *"Is it accurate to*
 6   *say that the OAG before Stephens has taken cases from local*
 7   *county prosecutors and prosecuted them sort of independently on*
 8   *behalf of the county prosecutor because the county prosecutor*
 9   *did not want to handle, like, the political hot potato?"*
10       And you answered:  *"That's been true in a number of cases,*
11   *and we have -- yeah, I think that's been true primarily across*
12   *the board."*
13       Do you still agree with that today?
14   A.  Yeah, so this is a different question than the one you
15   asked, because this is the subset of cases that were brought to
16   us by prosecutors to get them off their plate.  And so I would
17   say that that's probably true in a great many cases, maybe
18   across the board.  I would basically agree with that, yes.
19            MS. HARRIS:  We can take that down.
20   BY MS. HARRIS:
21   Q.  Even prior to *Stephens,* the OAG generally had some form of
22   cooperation from local prosecutors in each prosecution about
23   alleged elections violations, correct?
24   A.  Could you repeat that?
25   Q.  Even prior to *Stephens,* the OAG generally had some form of

1  cooperation from local prosecutors in each prosecution about

2  alleged election violations?

3  A.  If you're referring to each of our prosecutions that was

4  listed on that spreadsheet, then I think I would agree with

5  that.

6  Q.  And that is still true after *Stephens,* correct?

7  A.  I couldn't speak to that.

8  Q.  So after *Stephens 2*, the way that it changed how the law is

9  understood by the OAG's office, it must be true that local

10  prosecutors participate in all prosecutions the OAG conducts,

11  to some extent, correct?

12  A.  To the extent that the D.A. does not recuse, and we're not

13  appointed D.A. pro tem under Article 2.07, then we would have

14  to be deputized by that D.A., and the D.A. would be the one

15  initiating the prosecution, yes, ma'am.

16  Q.  And even in those appointments, there's some involvement

17  between the local prosecuting attorney and the OAG's office to

18  initiate that transition, correct?

19  A.  I couldn't really speak to that, but there would have to be

20  someone.

21  Q.  The OAG still works jointly with local prosecutors on

22  elections prosecutions, correct?

23  A.  I imagine they do.

24  Q.  And you don't have any reason to dispute that they still do

25  that?

Jonathan White - Examination                    4050

```
 1    A.  Where those opportunities exist, I imagine that they do,
 2    and I don't have any reason to think otherwise.
 3    Q.  And that brings me to my next question.  It is the OAG's
 4    practice to obtain appointments for elections-related
 5    prosecutions from local prosecutors if there is an opportunity,
 6    correct?
 7    A.  I can't speak to what their policy is, but that would be a
 8    wise policy going forward after Stephens.
 9    Q.  And that was the practice of the OAG while you were there,
10    correct?
11    A.  No, ma'am.
12    Q.  I would like to pull up your deposition testimony from
13    May 5, 2022 on page 60.  Looking at lines 7 through 11, do you
14    see where starting on line 8, you say:  "Our practice has been
15    where there's an opportunity to obtain appointment or obtain a
16    prosecution from a local prosecutor, that we would seek that"?
17            MR. KERCHER:  Your Honor, I object under the rule of
18    optional completeness.  If we are going to read this into the
19    record, the entire record should be read.
20            MS. HARRIS:  I can read the whole answer.
21    BY MS. HARRIS:
22    Q.  Starting from the beginning:  "We haven't formulated an
23    official policy on that, but our practice has been where
24    there's an opportunity to obtain appointment or obtain a
25    prosecution from a local prosecutor," --
```

1    A.  So when you asked your question earlier, I thought you were

2    referring to our practice going back historically.  Yes, since

3    *Stephens 1* came down, out of abundance of caution, that

4    certainly it was very possible that that would remain the law,

5    and that our motion for rehearing would be denied, I did start

6    working more closely with local DAs during that period of time.

7    Q.  And so after *Stephens 1,* your practice became to seek

8    opportunities to obtain appointments from local prosecutors

9    where there was that opportunity?

10   A.  Yes, ma'am.

11   Q.  After *Stephens,* did the OAG communicate with local

12   prosecutors to encourage them to invite the OAG to assist with

13   elections-related prosecutions?

14   A.  Are we talking about *Stephens 1* or 2?

15   Q.  Let's start with *Stephens 1.*

16   A.  I think we would have those conversations when there was an

17   opportunity to have those conversations with regard to a

18   specific case.  I don't recall going on any sort of road show

19   to try to promote, you know, our services in working together

20   and things like that.  I don't recall anything like that

21   happening.

22   Q.  So more so if you were having a conversation, you would

23   explain the *Stephens* situation and say that the OAG would need

24   to be invited by the local prosecutor?

25   A.  While discussing a case, yes, ma'am.

```
 1              MS. HARRIS:  Your Honor, the next set of documents
 2    that I would like to discuss are publicly available records
 3    that we're seeking judicial notice of and have filed a motion
 4    on the docket late last night that we had -- when we filed,
 5    that I had not had time to confer with the parties, but this
 6    morning for this new set, which deal only with the Attorney
 7    General and a County -- that is not a party.  The state
 8    defendants indicated they are not opposed to judicial notice of
 9    certain facts that we are seeking.
10              THE COURT:  So what documents are these?
11              MS. HARRIS:  They are court criminal records, and this
12    set is from Collin County.
13              THE COURT:  Any objection to me taking judicial notice
14    of those?
15              MR. KERCHER:  Of?
16              MS. HARRIS:  Of certain facts within them.
17              MR. KERCHER:  That accurately describes our agreement.
18    I think Mr. Nichols' position is slightly different.
19              MR. NICHOLS:  It's a little different, because I
20    represent the Harris County D.A., and I'm trying to stay in my
21    lane.
22              THE COURT:  Not successfully.
23              MR. NICHOLS:  I always told the Court if you thought I
24    was straying, you could always put me back in my lane.  So I
25    don't want to stray out of my lane.  You tell me I am, if I am,
```

1   but these are materials that were -- just so the record is
2   clear, these are materials that were provided to all
3   defendants, I believe at 5:15 p.m. last Friday, after the
4   plaintiffs had indicated they were calling no more witnesses,
5   and the only thing that was going to be left was the
6   introduction of exhibits.
7           So just to make sure the record is clear, we never had
8   these materials until Friday at 5:15 p.m., which kind of puts
9   everybody -- I'm speaking on behalf of all defendants.
10          THE COURT:  How does this prejudice your client?
11          MR. NICHOLS:  Again, I don't know how they're going to
12  argue things.  I think the Court knows where I'm coming from.
13  I don't think it does hurt us to talk about something that
14  happened in Collin County, so -- but I want to make sure the
15  record is clear that as to why we have an issue procedurally
16  and perhaps otherwise with respect to Harris County if they --
17  if you decide to use those.
18          THE COURT:  So for now, I'm going to take judicial
19  notice.  I'll see where this goes and see if anybody's
20  prejudiced that causes me to reconsider.
21          MS. HARRIS:  Your Honor, I can also answer some of
22  those timing questions now or as they come up.
23          THE COURT:  Go ahead.  Just continue.
24          MS. HARRIS:  Okay.
25  BY MS. HARRIS:

1    Q.  I would like to first pull up some public criminal records

2    from Mark Whitaker.  Namely, his investigation in Collin

3    County.  And it's labeled "Whitaker Investigation."  It is a

4    different document entitled "Whitaker Investigation."

5        (Pause.)

6            MS. HARRIS:  Your Honor, I can also offer the witness

7    a hard copy, and I have hard copies for other parties as well.

8            THE COURT:  Why don't you go ahead and do that.

9    BY MS. HARRIS:

10   Q.  Mr. White, do you have the investigation in front of you?

11   A.  I have the documents I was provided.  The first thing I'm

12   seeing is a docket sheet.

13   Q.  Yes.  If you flip towards Exhibit 7, you should see an

14   incident report.

15   A.  Yes, ma'am.

16   Q.  Looking at page one of this incident report, this is an

17   Election Integrity Division investigation for an election code

18   violation, correct?

19   A.  Yes.  I have no knowledge of this document, but that

20   appears to be the case.

21   Q.  And under *"Synopsis"* in the middle of the page, it's dated

22   6/14/2022, correct?

23   A.  That date appears in the synopsis, yes, ma'am.

24   Q.  And you were still at the Election Integrity Division on

25   that date, correct?

```
 1   A.  I would have been, yes, ma'am.

 2   Q.  Do you see in the middle of the synopsis it says, "This

 3   case was referred by the Secretary of State's Office"?

 4   A.  Yes, ma'am.

 5   Q.  And you've testified that investigations and prosecutions

 6   often originate with referrals from the Secretary of State's

 7   office, correct?

 8   A.  Correct.

 9   Q.  I want to now turn to page 5 of this incident report.  Do

10   you see where in -- towards the top of the page, it says,

11   "1.26," and then, "On 8/17/2022, Sergeant James Quinn and I met

12   with Taylor Reese with the Collin County District Attorney's

13   Office to discuss the investigation"?

14   A.  Yes, ma'am.

15   Q.  This is an example of the Attorney General looping in local

16   prosecutors during elections investigations, correct?

17   A.  It appears to be, yes, ma'am.

18   Q.  I would like to next turn to the indictment filed in this

19   case, which is labeled "Whitaker Indictment," John.

20       And looking at the screen before you, this is an indictment

21   for an election related allegation in the same case, correct?

22   A.  Yes, ma'am, for an offense occurring in November 2020, it

23   appears.

24   Q.  And the indictment itself is dated July 2022, correct?

25   A.  That's right.
```

1   Q.  And the Attorney General is listed as the agency on this

2   indictment?

3   A.  I'm sorry.  I may have misstated the date.  I think it was

4   filed on October 13th of 2022.  I'm not sure what we just

5   talked about.

6   Q.  Yes.  Below where it says *"True Bill of Indictment,"* the

7   date listed is July 2022 before the grand jury, correct?

8   A.  That's when the grand jury was impaneled.  And they would

9   have served six months to the end of year, so the date of this

10  document was actually October 13 of 2022; but, yes, ma'am.

11  Q.  Thank you.  And you were still in the Election Integrity

12  Division in October 2022, correct?

13  A.  That's correct.  I would have been handing off duties to

14  several of my attorneys at that time, and Joseph O'Neill would

15  have been one of them.

16  Q.  And Joseph O'Neill is an OAG attorney listed as the witness

17  on this indictment, correct?

18  A.  He is, yes, ma'am.

19  Q.  So the public record indicates that the OAG brought this

20  indictment, correct?

21  A.  No.  I think that it would be more accurate to say that

22  this -- this field here indicates the law enforcement agency

23  that conducted the investigation.  That's what that field

24  notates.  And that CX number is the case report number, and

25  should match up with the report that you just showed as

 1  Exhibit 7 or whatever it was.

 2  Q.  I would next like to pull up a document listed in this case

 3  as *"Whitaker/O'Neill Deputation."*

 4      Do you see that this document was filed on October 24,

 5  2022, in the top right corner?

 6  A.  Yes, ma'am.

 7  Q.  And signed on October 6, 2022?

 8  A.  Yes, ma'am.

 9  Q.  And you were still working in the Election Integrity

10  Division on that date, correct?

11  A.  Yes, ma'am.  I was on my way out.

12  Q.  And this document says that Joseph O'Neill was appointed as

13  special prosecutor for the Collin County criminal District

14  Attorney in this case, correct?

15  A.  Yes, ma'am.

16  Q.  And this was after the *Stephens 2* decision, correct?

17  A.  Yes, ma'am, that would be correct.

18  Q.  I now want to pull up a document labeled *"Whitaker/Barr*

19  *Deputation."*

20      And this is labeled on the public criminal docket as

21  State's Notice of Appearance of Counsel.  This document says

22  that Geoff Barr was appointed as special prosecutor for the

23  Collin County criminal district attorney in this case, correct?

24  A.  That's what this indicates, yes, ma'am.

25  Q.  And Geoff Barr is the current director of the Election

23-50885.41680

 1   Integrity Division?

 2   A.  Yes, ma'am.

 3   Q.  And this document was signed on August 8, 2023, correct?

 4   A.  Correct.

 5   Q.  So this appears based on the public record and your

 6   understanding of documents like this to be an example of a

 7   local prosecutor deputizing the OAG to prosecute an allegation

 8   of an election-related crime, correct?

 9   A.  Yes, ma'am, that's what happened in this case.

10   Q.  And this deputation was after *Stephens 2* as well, correct?

11   A.  Correct.

12   Q.  We can pull that down.

13        I would like to turn to discussing referrals.

14        The OAG can refer cases to local prosecutors for

15   prosecution, correct?

16   A.  Of course.

17   Q.  I would like to refer to OCA 377, which is the

18   September 2022 version of the spreadsheet you've been

19   discussing.  Turning to page 16, on the last row, do you see

20   Rogers listed?

21   A.  Yes, ma'am.

22   Q.  This was an OAG prosecution for an election-related

23   allegation, correct?

24   A.  That's correct.

25   Q.  And that case was initially filed by the OAG in Montgomery

1    County, correct?

2    A.  That's correct.

3    Q.  That was despite Mr. Rogers residing and allegedly voting

4    in Harris County, correct?

5    A.  That is correct.  It was prosecuted under Chapter 273.024

6    of the Election Code.

7    Q.  And I believe you earlier referred to that as the "Venue

8    Provision"?

9    A.  Yes, ma'am.

10   Q.  Prior to *Stephens,* the OAG understood itself to have

11   jurisdiction to independently prosecute elections-related

12   offenses in counties adjacent to where the offense allegedly

13   occurred, correct?

14   A.  Correct.

15   Q.  Mr. Rogers's case was dismissed in Montgomery County in

16   October 2022, correct?

17   A.  Very possible, yes, ma'am.  I don't know the date.  I know

18   that it was dismissed, yes.

19   Q.  Okay.  That dismissal occurred while you were at the

20   Election Integrity Division, correct?

21   A.  Sure.

22   Q.  The OAG referred these charges to the Harris County

23   District Attorney's Office subsequently, correct?

24   A.  That may have been the case.

25   Q.  Would it be helpful to refresh your recollection about

 1  that?
 2  A.  If you think I need to be refreshed, then please do.
 3  Q.  We can try.  I would like to pull up a document entitled
 4  "Hervis Rogers Article" on page two.
 5      Do you see in the second half of the page where it says,
 6  *"Joe Steinbaker, a spokesperson for OGG's office said the AG's*
 7  *office --"*
 8          MR. KERCHER:  Objection, Your Honor.  And apologize
 9  for interrupting.  This is not a document that I am aware of as
10  having been previously disclosed.  It's not marked as an
11  exhibit, and before begin reading contents into the record, I
12  object to it as hearsay and on the basis that we have no notice
13  of it.
14          MS. HARRIS:  A couple things, Your Honor.  The witness
15  can review it just to refresh his memory.  But it's also not
16  hearsay, because it is the statement of a party opponent,
17  because it was stated by a spokesperson for Harris County
18  District Attorney's office.
19          THE COURT:  So let's take this down and back up and
20  ask your question to the witness.
21          MS. HARRIS:  Okay.
22  BY MS. HARRIS:
23  Q.  The OAG referred these charges to the Harris County
24  District Attorney's Office, correct?
25  A.  I believe that is correct.

1   Q.  And the Harris County District Attorney did not prosecute

2   this case before the OAG dismissed it in Montgomery County,

3   correct?

4   A.  Correct.

5           MS. HARRIS:  I am now going to seek to pull up a

6   public criminal document from Harris County, which I believe

7   Mr. Nichols does have an objection to, and it is also included

8   in our motion filed last night.  It is grand jury documents

9   publicly available from Harris County.  It did -- we weren't

10  aware of them until after they happened relatively recently.

11  We also believe that they likely should have been produced in

12  discovery, and we kind of came about them by happenstance.

13          THE COURT:  Is it for the same proposition that

14  assistant attorney generals are prosecuting cases in counties?

15  Is that where this is going?

16          MS. HARRIS:  It is to show that the Attorney General

17  is referring these cases to local prosecutors post-*Stephens* and

18  therefore feel obligated to take these cases in a way that they

19  did not prior to *Stephens.*  And local district attorneys are

20  still enforcing these as well.

21          THE COURT:  How is he going to testify to what

22  pressured local district attorneys may feel?

23          MS. HARRIS:  Yeah, not to feeling, but the fact that

24  he has stated that they did refer the case.  And just to show

25  that Harris County subsequently did prosecute this case.

1            THE COURT:  Without showing the document, which

2    Mr. Nichols is already going to object to, why can't you just

3    ask him questions?

4            MS. HARRIS:  I can ask.

5    BY MS. HARRIS:

6    Q.  Mr. White, are you -- let me start again.

7        The Harris County District Attorney brought charges against

8    Mr. Rogers to a grand jury, correct?

9    A.  Yes, I believe it was "no-billed."

10   Q.  It was "no-billed."  And that occurred after the OAG

11   referred the case to Harris County, correct?

12   A.  Correct.

13   Q.  Okay.  And last question on this case.  To your knowledge,

14   the Harris County District Attorney would not have attempted to

15   prosecute this case against Hervis Rogers if it had not been

16   referred by the OAG first, correct?

17           MR. NICHOLS:  Objection.  Speculation as to what was

18   in the mind of Harris County District Attorney's Office.

19           THE COURT:  That's sustained.

20           MS. HARRIS:  I'll rephrase.

21   BY MS. HARRIS:

22   Q.  To your knowledge, the Harris County District Attorney did

23   not attempt to prosecute this case against Hervis Rogers before

24   it was referred to the OAG?

25   A.  I disagree with the assumption that there was an attempt

 1  ever to prosecute Hervis Rogers, who simply presented to a
 2  grand jury.
 3  Q.  I would like to look at another case.  Pulling up OCA377,
 4  going to the top of page 17, do you see Ignacio Gonzalez
 5  Beltran listed?
 6  A.  Yes, I do.
 7  Q.  Similar to Mr. Rogers's case, this alleged election
 8  violation occurred in Harris County, but was prosecuted by the
 9  OAG in Montgomery County, correct?
10  A.  Correct.
11  Q.  Mr. Gonzalez's case was also dismissed in Montgomery County
12  in October 2022, correct?
13  A.  I believe that's correct, yes, ma'am.
14  Q.  And the OAG referred these charges to the Harris County
15  District Attorney's Office subsequently, correct?
16  A.  I believe that's true.
17  Q.  And Harris County subsequently brought these charges
18  against Mr. Gonzalez to a grand jury, correct?
19          MR. NICHOLS:  Objection.  Form.  Mischaracterizes the
20  evidence.
21          THE COURT:  That's overruled.
22          THE WITNESS:  I think -- I'm aware that -- I believe
23  I'm aware that the charges were presented to a grand jury -- or
24  that the matter was.  I don't know if an indictment was ever
25  presented or not.

Case 5:24-cv-05826-D Document 26 Page 444 of 518 Date Filed 1/08/2024
Case 5:24-50885-D Document 28 Page Filed 402/Date Filed 1/08/2024

Jonathan White - Examination                    4064

1    BY MS. HARRIS

2    Q.  In Harris County?

3    A.  Yes, ma'am.

4    Q.  If I represented to you that that grand jury returned a "No

5    Bill," would that sound correct?

6    A.  Yes, ma'am.

7    Q.  The Harris County District Attorney did not take any

8    prosecutorial action on this case before it was referred by the

9    OAG, correct?

10   A.  I don't think they took prosecutorial action at any point.

11   Q.  Let me put it another way.  The Harris County District

12   Attorney did not bring these charges to a grand jury before it

13   was referred by the OAG, correct?

14          MR. NICHOLS:  Your Honor, he's already testified that

15   he doesn't know whether any charges were actually brought to

16   grand jury.

17          THE COURT:  Do you recall that?

18          THE WITNESS:  I don't know.

19          THE COURT:  Next question.

20   BY MS. HARRIS:

21   Q.  I would last like to pull up House Bill 17, or HB17, which

22   was passed by the 88th Legislature in 2023.

23      Are you familiar with this bill?  I believe it was

24   discussed earlier.

25   A.  I'm familiar with this bill conceptually, but I have not

1   had an opportunity to read it.

2   Q.  Okay.  Let's take a look at Section 1 where in parentheses

3   3 it defines "Official Misconduct."  And then looking at

4   Subsection b, *"Included in official misconduct is a prosecuting*

5   *attorney's adoption or enforcement of a policy of refusing to*

6   *prosecute a class or type of criminal offense in state law or*

7   *instructing law enforcement to refuse to arrest individuals*

8   *suspected of committing a class or type of offense under state*

9   *law."*

10      Did I read that correctly?

11  A.  Yes, ma'am.

12          MR. NICHOLS:  You need to read the rest of it.

13          THE COURT:  Next question.

14  BY MS. HARRIS:

15  Q.  Is it your understanding that this bill changed the law

16  such that it is official misconduct for local prosecutors to

17  have a policy of refusing to prosecute certain offenses?

18          MR. NICHOLS:  Objection.  Form.  Mischaracterizes the

19  plain text of the statute.

20          THE COURT:  Yeah, I'm not sure where you're headed

21  with this.

22          THE COURT:  This says it's "complete class or type."

23          MS. HARRIS:  I can rephrase.

24  BY MS. HARRIS:

25  Q.  So considering this bill, a prosecuting attorney's -- if a

```
 1   prosecuting attorney had a policy of refusing to prosecute
 2   election-related crimes, that could be considered official
 3   misconduct, correct?
 4   A.  Yeah, to the extent that that's a class offense, like
 5   shoplifting or something like that, yeah, I agree that this
 6   opens that up, subject to the exceptions noted there afterward.
 7   Q.  And so that would apply more specifically as well if a
 8   certain election-related offense -- there was a policy in a
 9   local prosecutor's office to not prosecute that specific
10   elections offense, correct?
11   A.  I don't know about that, because the wording is "committing
12   a class of type of offense," so perhaps it would be, but it's
13   certainly a blanket policy that regardless of the facts of an
14   individual case, this type of crime will not be prosecuted.
15   That's the way I read that.
16            MS. HARRIS:  I have no more questions.  Thank you.
17            THE COURT:  Anything else from this side?
18                        CROSS-EXAMINATION
19   BY MR. WATKINS:
20   Q.  Mr. White, how are you?
21   A.  Good.  Thank you.
22   Q.  My name is Elijah Watkins.  I'm with the law firm of Stoel
23   Rives, and I represent Mi Familia.  You and I have never had
24   the opportunity to meet before, have we?
25   A.  I don't think so.
```

1    Q.  Let me get a little background from you then.  You have

2    been prosecuting election-type cases since in or around 2008;

3    is that right?

4    A.  Yes, sir.

5    Q.  And before going to the OAG's office, were you a county

6    prosecutor?

7    A.  No, sir.  I came straight on to the Attorney General's

8    Office from law school.

9    Q.  So you've been a prosecutor for approximately 20 years or

10   so?

11   A.  Sixteenish, 15, 16 years.

12   Q.  During those 15 to 16 years, you've charged many cases?

13   A.  That's probably fair to say.

14   Q.  Hundreds?

15   A.  Not sure about hundreds.

16   Q.  And you've done that by way of a complaint?

17   A.  We would -- you know, I don't know if the majority would be

18   by indictment, but probably so, probably more indictments than

19   charging by complaint and information.

20   Q.  I want to get a sense of what goes into your thinking in

21   charging these cases over the last 15 to 16 years by way of

22   indictment.

23       You make charging decisions based on investigative reports,

24   right?

25   A.  No, not exclusively.

1  Q.  You make some of your charging decisions based off

2  investigative reports, right?

3  A.  I would say kind of the opposite.  Investigative reports

4  may inform a charging decision, among other things.

5  Q.  And that's fair.  The criminal investigator brings

6  information to you, and then you do some extra, additional

7  digging before you make your charging decision; is that fair?

8  A.  Correct.  And hopefully he would also bring original

9  exhibits -- not exhibits -- sorry -- evidence, election

10  records, recorded interviews; all of those sorts of things with

11  the report.

12  Q.  And that's a great point.  You just don't take the criminal

13  investigator's word for it, right?

14  A.  Correct.

15  Q.  You want to see the proof and evidence that they are making

16  their recommendation on, correct?

17  A.  That's right.

18  Q.  You would expect their report to be written up?

19  A.  In most cases, yeah, the report will be written up before

20  we go to grand jury.  I would say almost always.

21  Q.  And in those reports, sometimes there's witnesses who have

22  been interviewed?

23  A.  Correct.

24  Q.  There might be a written summary of that interview?

25  A.  Yes.

```
 1   Q.  That interview may have been recorded?
 2   A.  Yes.
 3   Q.  And there might be physical evidence involved as well,
 4   correct?
 5   A.  That is true.  Documentary evidence, typically, but yes.
 6   Q.  There would be documents?
 7   A.  Yes.
 8   Q.  Potentially, photographs?
 9   A.  Depending on the case, there could be.
10   Q.  Potentially, video?
11   A.  Depending on the case, there might be.
12   Q.  Potentially, computer data, like, search history?
13   A.  Generally not, but that's possible.
14   Q.  Regardless, that evidence and those written reports are
15   recorded in some form or fashion, correct?
16   A.  For the investigations that are referred for prosecution,
17   yes, they would be.
18   Q.  And you take your job seriously?
19   A.  Well, I do.
20   Q.  And so this is a thorough process that you're engaged in?
21   A.  Prior to December 1 of 2022, I was in this role, yes, sir.
22   Q.  There's considerable energy and resources put into this
23   investigatory process and the decision whether or not to charge
24   someone?
25   A.  Depending on the situation.  And I think the question was
```

Case 5:24-cv-50826-DLC Document 26-9 Filed 02/04/24 Page 450 of 518
Case 5:24-cr-50844-DLC Document 9 Filed 10/18/2024 Page 40 of 18 2049
Jonathan White – Examination                    4070

1    investigative resources, yes; although sometimes we were

2    providing investigative resources on our side, taking the ball

3    from law enforcement and doing a lot of heavy lifting

4    ourselves, but...

5    Q.  And whether or not it's law enforcement doing the

6    investigation or the OAG's office doing the investigation, you

7    would agree that it's taxpayer dollars that are being expended?

8    A.  Certainly.

9    Q.  And you're not here to waste the taxpayers' money, right?

10   A.  That is not one of my goals in life, sir.

11   Q.  And it's important for you to have that physical evidence

12   and that actual report in case the case goes to trial?

13   A.  In most cases, that would be true.

14   Q.  You're not going to try a case without evidence, are you?

15   A.  Certainly I wouldn't try a case without evidence.

16   Q.  Do you ever prosecute people without evidence?

17   A.  I have never been to trial without evidence.

18   Q.  My question was:  Do you ever prosecute people without

19   evidence?

20   A.  Same answer.

21   Q.  So it's important for you to have that evidence.  It's

22   important for you to have those reports, because you don't

23   prosecute people without evidence, and you don't go to trial

24   without evidence, right?

25   A.  I think that's pretty fair.

1  Q.  When we -- throughout the testimony today, you've been
2  talking about various cases that you recall or have worked on.
3  You didn't provide any of the underlying evidence that supports
4  those cases, did you?
5  A.  I was -- I provided what I was asked to provide by counsel,
6  but those investigative files were not in the care, custody,
7  and control of my division in the Election Integrity Division,
8  so I'm not aware what was provided and from where.
9  Q.  You did not provide the investigative files to plaintiffs
10 in this case, right?
11          MR. KERCHER:  Objection.  Asked and answered.
12          THE COURT:  That is overruled.  He can answer.
13          THE WITNESS:  No, my team -- I'm sorry, not my team,
14 but the litigation team would have provided whatever documents
15 that were provided to the plaintiffs in this case.
16 BY MR. WATKINS:
17 Q.  So you also didn't provide those investigative files to the
18 court, right?
19 A.  I didn't directly provide anything to anyone but counsel.
20 Q.  So plaintiffs in this case and the Court, they haven't had
21 the opportunity to review witness statements, for instance?
22 A.  I don't know.
23 Q.  And they haven't had any opportunity to review any
24 documentary evidence that supports your claims of criminality?
25 A.  I don't know.

1   Q.  I want to talk about the standards you employ in

2   determining whether or not to prosecute.  You're obviously

3   familiar with the probable cause standard, right?

4   A.  Yes.

5   Q.  That means that something is more probable than not?

6   A.  Yes, sir.

7   Q.  It's probable that a person named in a charging document

8   committed the offense.  That's probable cause?

9   A.  Sure.

10  Q.  You're also familiar with "beyond a reasonable doubt"?

11  A.  Yes, sir.

12  Q.  Texas has a specific jury instruction which lays out what

13  "beyond a reasonable doubt" means?

14  A.  To some degree.

15  Q.  You would agree that there's a big difference between

16  probable cause and beyond a reasonable doubt, right?

17  A.  Yes.  I agree there's a difference.

18  Q.  Beyond a reasonable doubt is the highest standard in our

19  legal system?

20  A.  Correct.

21  Q.  In Texas, beyond a reasonable doubt is a doubt that would

22  cause a reasonable person to hesitate before acting?

23  A.  We didn't use to define it for juries, but that sounds

24  reasonably accurate.

25  Q.  And the burden is on the State at all stages to prove its

1   case?

2   A.  That's right.

3   Q.  And if a person is charged, they're still presumed

4   innocent, correct?

5   A.  That's correct.

6          THE COURT:  Sir, you have to remember you're doing

7   this at the bench.  This is all kind of -- I mean, unless you

8   think the Fifth Circuit is not smart enough to understand all

9   this, why are we doing this?

10         MR. WATKINS:  I certainly appreciate Your Honor.  I

11  can move on.

12  BY MR. WATKINS:

13  Q.  So just to clarify, on that Exhibit 82, where there's

14  pending prosecutions, those pending prosecutions, you're not

15  representing to the Court that there's a conviction there, but

16  it's just that someone is presumed innocent but you're

17  investigating them?

18  A.  Correct.  And I believe I testified that most of those I

19  believe have been dismissed subsequent to *Stephens*.

20  Q.  On Exhibit 82, all of the cases that were listed there,

21  those were pre-SB1 cases, correct?

22  A.  Yes, I believe that's true.  I might have to look at those

23  pending cases to be sure.  Depending on the date of the

24  document, but at least the resolved ones should have been.

25  Q.  And when you're charging individuals, you use probable

Jonathan White - Examination                    4074

```
 1    cause as your standard whether or not to them and not beyond a
 2    reasonable doubt?
 3    A.  That's the legal standard for charging, yes.
 4    Q.  So my question is, you, in your position as division chief
 5    at the time, you -- and you instructed those in your division
 6    to use the probable-cause standard and not the
 7    beyond-a-reasonable-doubt standard in determining whether or
 8    not to prosecute?
 9    A.  We were probably, to be perfectly honest, looking for
10    something a little bit more than probable cause and something a
11    little bit closer to beyond a reasonable doubt before bringing
12    a case.
13    Q.  I want to make sure I get your testimony correctly.  So the
14    standard that you employed on whether or not to bring
15    prosecution was -- whether to proceed with a case was probable
16    cause, right?
17    A.  That's the legal standard for an indictment or an
18    information.
19    Q.  And I appreciate that.  My question to you is, is that the
20    standard you and your office employed?
21    A.  As I previously testified we were looking probably for
22    something a little higher than probable cause.  We wanted to
23    ensure that we were bringing good cases.
24    Q.  You gave a deposition in this case?
25    A.  Three.
```

23-50885.41697

1    Q.  You gave three depositions in this case?

2    A.  Yes, sir.

3    Q.  Including one in April of 2022?

4    A.  Yes, sir.

5    Q.  Told the truth in that deposition?

6    A.  I'm sure I did the best to my ability.

7    Q.  I'm sure you did.

8        Can we pull up April 27, 2022 deposition, please.  And

9    we're looking for page 16, lines 15 through 19.  Go ahead and

10   highlight that.

11       Said -- *"Question:  And when you say there would be*

12   *sufficient evidence to proceed, is there a legal standard that*

13   *would be relevant in you determining whether to proceed with a*

14   *case?"*

15            MR. KERCHER:  Objection.

16   BY MR. WATKINS:

17   Q.  *"Answer:  Probable cause in Texas."*

18            THE COURT:  One second.

19            MR. KERCHER:  Objection, Your Honor.  Improper

20   impeachment.  There's been no contradiction.

21            THE COURT:  That's sustained.

22   BY MR. WATKINS:

23   Q.  You're aware, of course, though, that other offices have

24   different standards that they employ, right?

25   A.  Well, probable cause is the legal standard, but offices may

1    look at a higher level of proof than just probable cause

2    depending on the type of case, the difficulty of that case, and

3    other factors.  Election cases would probably be on that list.

4    Q.  Okay.  And that's fair.  So other -- other prosecutor's

5    offices may look and say, *Even though I can charge with*

6    *probable cause, I'm going to look for reasonable doubt, because*

7    *even if I can see probable cause here, if I can't get to*

8    *reasonable doubt, what's the point?*

9    A.  I think that's probably fair.  That probably happens quite

10   a bit.

11   Q.  And is that what happened in your office?

12   A.  With regard to certain decisions, I'm sure that did happen,

13   yes.

14   Q.  Did you have a policy that was written or stated --

15   A.  No.

16   Q.  Let me -- let me get my question out.

17       Was there a policy that you had written or stated for the

18   attorneys in your office that instructed them to look for

19   beyond a reasonable doubt and not probable cause?

20   A.  Still no.

21   Q.  You're aware, of course, that an investigation of a crime

22   of an individual, even one that does not lead -- that does not

23   lead to an indictment can negatively impact that person's life?

24   A.  Yes, yeah.  In some cases, that's unavoidable.

25   Q.  It can impact their career?

 1    A.  Could, depending on the circumstances.

 2    Q.  Impact social and family standing?

 3    A.  I assume that's possible in some cases.

 4    Q.  But nonetheless, in your mind, you're pursuing justice in

 5    these cases, so you proceed regardless if there's reasonable

 6    doubt?

 7    A.  With an investigation?

 8    Q.  Yes, sir.

 9          MR. KERCHER:  Objection.  Misstates his testimony,

10    Your Honor.

11          THE COURT:  That's sustained.

12    BY MR. WATKINS:

13    Q.  You started in 2008 at the AG's office?

14    A.  Yes, sir.

15    Q.  And you were initially part of the White Collar Crime

16    Division; is that correct?

17    A.  Section.  White Collar Crime and Public Integrity Section

18    of the Criminal Prosecutions Division.

19    Q.  Thank you for the clarification.

20        And up until recently, you were the division chief for the

21    Election Integrity Division; is that right?

22    A.  That's correct.

23    Q.  That was somewhat of an administrative role?

24    A.  There were certainly administrative aspects of it, yes.

25    Q.  Had to maybe deal with HR issues?

1    A.   I was a little lucky on that front.  We're a small group.

2    Q.   Performance issues of the attorneys in your office?

3    A.   Things like that.

4    Q.   Budgetary issues?

5    A.   Sure.

6    Q.   In fact, there's a separate line item in the AG's budget

7    for the Election Integrity Division; is that right?

8    A.   That may be the case.  I'm not advised on that.

9    Q.   Well, did you ever submit information in order to get your

10   budget set?

11   A.   That's not exactly how it worked, no.

12   Q.   There was no information that you provided that would

13   impact your budget one way or the other?

14   A.   The budget is sort of given to you by the agency.

15   Q.   Well, this budget is approved by the legislature, right?

16   A.   Right.  And so if you're talking about what our agency

17   submitted to the legislature, I am not advised of that.

18   Q.   Did you ever report on the number of prosecutions that your

19   office engaged in?

20   A.   Internally?

21   Q.   Yes, internally.

22   A.   Yes.

23   Q.   And then did you ever publish that information to others

24   that could determine your budget?

25   A.   I imagine that was provided somewhere in the process.  I

```
 1   don't know if I did that directly, though.
 2   Q.  The busier you are, you would expect that to impact your
 3   budget, right?
 4   A.  No, not necessarily.  This is state government.
 5   Q.  Well, in a fiscally conservative place like Texas, you
 6   would hope that the legislature is not looking to waste
 7   taxpayer dollar, right?
 8   A.  I believe that's a fact.
 9   Q.  They're not looking to spend money in a division that's not
10   working?
11   A.  I couldn't say.  Probably not.
12   Q.  Okay.  And so you would report how busy you are?
13   A.  Not as such, no.
14   Q.  The election integrity and voter fraud cases that you would
15   charge, those usually have multiple counts in a single
16   complaint, right?
17   A.  A good number of them did.  Probably a majority did.
18   Q.  And I think we looked at some of those already throughout
19   the day?
20   A.  Yes, sir.
21   Q.  The unit of prosecution is typically a single ballot,
22   though, correct?
23   A.  The unit of prosecution is a ballot?
24   Q.  There is a ballot, and something happened in that ballot
25   that results in some sort of prosecution or charge?
```

1    A.  No, no.  We wouldn't -- a ballot wouldn't be the unit of

2    prosecution.  It would be the -- an offense under the election

3    code would be a unit of prosecution.

4    Q.  And sometimes those offenses are because of what happened

5    on the ballot; for example, what you believe would be a forged

6    signature?

7    A.  Sure.

8    Q.  And in your experience, charged voter fraud cases typically

9    involve more than one vote, right?

10   A.  In the case of illegal voting, it would be very common that

11   it is one single vote at issue; but in ballot-harvesting cases,

12   there would most often be more than one vote included.  That

13   doesn't mean we always got there with a prosecution.  All we

14   might have is that one vote.  But, yes, in general.

15   Q.  Well, and that -- and the reason you say "Yes, in general,"

16   that's because if someone is actually trying to affect an

17   election, the person needs more than one vote or one ballot to

18   impact the election, right?

19   A.  In most cases, yes.

20   Q.  And the election integrity voter fraud cases you charge

21   sometimes involve more than one person engaging in conduct,

22   right?

23   A.  That's true.

24   Q.  There might be one offense but multiple people committing

25   that same instance of offense?

1   A.  If they were acting in concert, yes, that could happen.

2   Q.  And if there's more than one person acting in concert, you

3   charge them in separate charging documents, right?

4   A.  In Texas, we generally charge all defendants separately.

5   We don't charge co-defendants in the same indictment.

6   Q.  So that would result in two entries on your spreadsheet?

7   A.  For each individual?

8   Q.  Yes, sir.

9   A.  Under the scenario that you described, yes; although, I

10  don't recall that specific scenario occurring with a single

11  vote.

12  Q.  Let's talk about specific scenarios then.  I believe in

13  your testimony you referenced a few different cases where you

14  yourself had personal knowledge of the underlying facts of the

15  case.  Do you remember that?

16  A.  Yes, sir.

17  Q.  I think there was an individual named Burns that you talked

18  about?

19  A.  Yes, sir.

20  Q.  And there was an individual named Brown that you talked

21  about?

22  A.  Yes.

23  Q.  And an individual named Ward that you talked about?

24  A.  Yes.

25  Q.  And a fourth individual named Jackson.  Do you remember

1    testifying about that?

2    A.  Yes, sir.

3    Q.  In the case of Burns, there were seven counts brought

4    against Burns; is that right?

5    A.  I'll take your word for it.

6    Q.  And in the Burns case, those seven counts, some of which

7    were felonies, resulted in one misdemeanor.  Is that what you

8    recall?

9    A.  In terms of the plea deal at the end of the case?

10   Q.  The result of the case, you brought seven counts.  You

11   ended up with one misdemeanor, right?

12   A.  Well, the Gregg County District Attorney's Office

13   prosecuted this case, yes.

14   Q.  And the result was one misdemeanor, right?

15   A.  It was a plea agreement to whatever that offense was.  I

16   think it was 86.006, possession of a ballot in that case.

17   Q.  Is that Class A misdemeanor?

18   A.  It depends.

19   Q.  At the time that the plea deal was reached, did you have a

20   recollection of what the result of the plea deal was?

21   A.  Yes, I think I did.

22   Q.  Do you -- as you sit here today, do you remember what the

23   result of that plea deal was?

24   A.  It -- I think in that case, it was a guilty plea to

25   possession of a ballot under 86.006 of the Election Code.

1  Q.  And do you recall, as you sit here today, whether or not

2  possession of the ballot under that provision that you cited

3  was found to be a Class A misdemeanor that was pled to?

4  A.  I don't.  I'll take your word for it.  In this case, it

5  could be a number of categories based on enhancements, if they

6  reached state jail felony or even a third degree felony based

7  on the facts, so I don't know what they reached in this case.

8  If I looked at the spreadsheet and said Class A, then that's

9  what it is.

10  Q.  Would it help to refresh your recollection if you were able

11  to review the docket from the Burns case?

12  A.  I don't know that it would help me, but if it helps you,

13  I'm happy to do it.

14  Q.  I'm just trying to make sure that you understand it was a

15  misdemeanor, that's all.

16  A.  I don't have any problem with that.

17  Q.  Talking about the Brown indictment, in that case, there

18  were 23 counts of fraud that were brought, correct?

19  A.  That sounds correct.

20  Q.  And that resulted in one misdemeanor, right?

21  A.  That was the plea agreement with the Gregg County District

22  Attorney's Office, and we deferred to them on that.

23  Q.  And the Brown case, that was notable because I believe that

24  was the one that Senator Hughes mentioned in the signing of SB1

25  saying if somebody tells you voter fraud doesn't exist, don't

1    believe them, because of that case, right?

2    A.  I think he did cite that case from his jurisdiction.

3    Q.  And then in the Ward case, in that case there was six

4    counts brought, right?

5    A.  Sounds correct.

6    Q.  Some of those were fraud.  I mean -- strike that.

7         Some of those were felonies?

8    A.  I think they were enhanced to a state jail felony, pretty

9    sure.

10   Q.  And that prosecution resulted in one misdemeanor, right?

11   A.  That sounds correct.

12   Q.  And then in the Jackson indictment, that one, there were 97

13   counts of fraud brought, correct?

14   A.  Yes, sir, I remember that.

15   Q.  And those were felonies as well?  Or many of them were

16   felonies as well?

17   A.  I think they might have all been felonies, yes.

18   Q.  And out of those 97 counts, which you believe all of them

19   were felonies, that result in one misdemeanor conviction,

20   right?

21   A.  Yes, I recall that was the plea agreement.

22   Q.  I went ahead, and I did the math.  Maybe you're like me and

23   went to law school because you're no good at math, so I used my

24   phone.  But out of those four cases that you have personal

25   knowledge about, that's 133 counts that were brought.  Of those

```
 1   133 counts, across four individuals, that resulted in four
 2   misdemeanor convictions.  Does that sound right to you?
 3   A.  I have no problem with your math.
 4   Q.  And I went further and did a little bit harder math, and
 5   that shows about a 3 percent conviction rate.  Any reason to
 6   disagree with me on that math?
 7   A.  Yeah, depending on how you're defining "conviction," yeah,
 8   if you'd put it in terms of the four defendants all taking a
 9   plea, that would be a hundred percent.  The number that you
10   chose would be 3 percent, I take your word for it.
11   Q.  If you take the four misdemeanors, the four counts of
12   misdemeanor and divide them by the 133 counts brought, it's
13   3 percent, right?
14       MR. KERCHER:  Objection, Your Honor.  It's attorney
15   testifying.
16       THE COURT:  That's overruled.
17   BY MR. WATKINS:
18   Q.  Is that right?
19   A.  Sounds correct.
20   Q.  And I think we've already established there's about
21   16 million registered voters in Texas?
22   A.  Yes, sir.
23   Q.  It's fair to -- it would be incorrect to say that hundreds
24   of convictions have resulted as a result of election fraud
25   cases, right?
```

A.  Convictions specifically, yeah, that would probably be
incorrect in terms of our prosecutions.  I can't speak for
local and federal.

Q.  And I just want to make sure that I heard your testimony
correctly when you were speaking with Ms. Perales.  These four
individual defendants in which you brought 133 counts, many of
them felonies, which resulted in four misdemeanors, those were
all Black defendants, right?

A.  That's what I recall testifying.

Q.  Counsel on the other side at one point showed you a press
release from the Secretary of State's office.  Do you remember
that?

A.  Could you refresh my memory on what the press release
involved?

Q.  Certainly.  I believe there was a press release shown to
you, and you said some sort of quip about press release have
some room for interpretation, and then the attorney said,
*"Well, we'll leave it at that,"* and moved on.  You generally
remember that?

A.  I remember that.

Q.  Okay.  You would agree that press releases sometimes put
positive spins on facts, right?

A.  That's probably true, yeah.

Q.  And so it would not be surprising to you if occasionally a
press release, say, from the Secretary of State's office, that

1  puts a positive spin on the number of voter fraud prosecutions
2  in the State of Texas, right?
3  A.  That's certainly possible.
4  Q.  Now, you believe that voting in person is better or more
5  secure than voting by mail?
6  A.  Correct.
7  Q.  And you're aware of drive-through voting?  You know what
8  drive-through voting is, sir?
9  A.  I'm aware of an attempt that was made in Harris County,
10  yes.
11  Q.  Well, drive-through voting did, in fact, occur in Harris
12  County.  It wasn't attempted, right?
13  A.  That's probably true.  I'm not an expert on what happened
14  exactly in that election.  I'm just generally aware.
15  Q.  Let's break it down this way.
16     Would you agree with me that in drive-through voting, a
17  voter shows up in person and votes?
18  A.  Yes.
19  Q.  And you're aware that in Harris County, drive-through
20  voting was employed in the November 2020 election, right?
21  A.  Yes, I believe that's the case.
22  Q.  And you're aware that voter turnout in Harris County
23  increased during the November 2020 election, right?
24  A.  I'm not.
25  Q.  In exhibit, I believe it was 82, which is your spreadsheet,

1    there is no cases of voter fraud arising out of use of

2    drive-through voting in Harris County, are there?

3    A.   No.

4    Q.   In fact, there's no instances of voter fraud arising from

5    drive-through voting anywhere on your spreadsheet, correct?

6    A.   I'm not advised if drive-through voting happened anywhere

7    but Harris County.

8    Q.   With drive-through voting, election workers would go up to

9    the car and check in with the voter, right?

10   A.   I'd have to take your word for the process.

11   Q.   To confirm whether the voter is eligible to vote?

12   A.   I'm not sure, but presumably.

13   Q.   You're familiar with curbside voting?

14   A.   Yes.

15   Q.   Curbside voting existed before SB1, right?

16   A.   Correct.

17   Q.   And that was for people that have some sort of mobility

18   issue?

19   A.   Yes.

20   Q.   And in curbside voting, a person shows up in person to

21   vote?

22   A.   Correct.

23   Q.   And you believe that in-person voting is more secure than

24   mail-in voting, right?

25   A.   Yes.

 1    Q.  And you're not aware of any case of voter fraud arising

 2    from curbside voting anywhere in the State of Texas, right?

 3    A.  We've had investigations that involve curbside voting.

 4    Q.  Have you had any convictions that resulted in curbside

 5    voting?

 6    A.  Yes, sir.

 7    Q.  And you're aware that SB1 eliminated drive-through voting

 8    as a form of in-person voting that you believe is more secure

 9    that mail-in voting, correct?

10    A.  I think it clarified --

11            MR. KERCHER:  Objection.  Misstates his testimony,

12    Your Honor.

13            THE COURT:  One second.  You both talked at the same

14    time.  That's overruled.

15            What's your answer?

16            THE WITNESS:  My answer is, I believe it clarified the

17    law in regard to drive-through voting.

18    BY MR. WATKINS:

19    Q.  You're also aware that SB1 removed curbside voting for

20    several types of participants, correct?

21    A.  I'm not advised.  I don't recall.

22    Q.  And curbside voting, I think we established, is a form of

23    in-person voting?

24    A.  Is that a question?

25    Q.  Yes, it is.

```
 1   A.   Yes, sir.
 2   Q.   Are you familiar with the idea of 24-hour voting?
 3   A.   I'm familiar with what happened in Harris County in 2020.
 4   Q.   And in 24-hour voting, a person shows up to vote?
 5   A.   Correct.
 6   Q.   This is a type of in-person voting?
 7   A.   It was something that was done in Harris County.
 8   Q.   I appreciate that.  Try to focus on the question that I
 9   asked.
10        The question I asked is, is 24-hour voting a type of
11   in-person voting?
12   A.   I don't want to testify that it's a valid form of voting in
13   Texas, but if you're asking me does it take place in person,
14   yes, it does.
15   Q.   And you're aware that it happened in Harris County in 2020,
16   right?
17   A.   Generally.
18   Q.   And was there any cases of voter fraud arising from 24-hour
19   voting in Harris County from 2020 that appear on your
20   spreadsheet?
21   A.   Not that I'm aware of.
22   Q.   Are there any cases of voter -- in-person voter fraud
23   occurring from 24-hour voting appearing anywhere in the State
24   of Texas on your spreadsheet?
25   A.   Not aware of any 24-hour voting elsewhere in Texas.
```

1   Q.  Now, when somebody votes in a 24-hour setting, the process

2   is the same as voting during what I'll call "work hours,"

3   right?

4   A.  Not an expert.

5   Q.  A voter comes to a polling place, at least.  Can we agree

6   on that?

7   A.  We would have to assume so, yes.

8   Q.  And you would anticipate that the voter would need to show

9   ID?

10  A.  I would assume so, yes.

11  Q.  And you would also assume that a poll worker verifies the

12  voter's information?

13  A.  I would have to assume they're abiding by other procedures

14  in the Election Code.

15  Q.  And the voter would be given a single ballot to vote that

16  one ballot, right?

17         MR. KERCHER:  Objection, Your Honor.  The witness has

18  testified this is beyond the scope of his personal knowledge.

19         THE COURT:  Yeah, it's very odd.  The man charged with

20  prosecuting doesn't have firsthand knowledge about how it

21  actually operates.  So what are you trying to do?

22         MR. WATKINS:  I think to establish that very point,

23  Your Honor.

24         THE COURT:  Well, then just ask him that.

25  BY MR. WATKINS:

1    Q.  As the man tasked with prosecuting voter fraud in the State

2    of Texas, is it fair to say that you're not aware of all the

3    ways that voting occurs in the State of Texas?

4    A.  I'm not advised upon reading the Election Code of how

5    24-hour voting is supposed to work in Texas.

6    Q.  And by "not advised," you mean you don't know?

7    A.  I don't believe it's in there.

8    Q.  You testified earlier -- strike that.

9        You testified earlier that the special division receives

10   complaints of voter fraud issues typically through the

11   Secretary of State's office; is that right?

12   A.  Which division?

13   Q.  The special Election Integrity Division?

14   A.  The Election Integrity Unit of the Criminal Investigations

15   Division would receive those referrals.

16   Q.  Typically, from the Secretary of State's office?

17   A.  Usually, yes.

18   Q.  I think you testified earlier that it's more than

19   50 percent comes from --

20   A.  I believe that's correct.

21   Q.  Let me get my question out of the way.

22       I think you testified earlier that it's more than

23   50 percent of the complaints come in from the Secretary of

24   State's office?

25   A.  I believe that's correct.

1    Q.  And with respect to the other less than 50 percent --
2    percentage, the vast majority of those complaints come from
3    other official channels, such as prosecutors or whatnot?
4    A.  Those are the options, yes, sir.
5    Q.  And as you sit here today, you don't recall receiving any
6    complaints about inappropriate conduct by poll watchers; is
7    that right?
8    A.  I didn't personally receive any of those complaints that I
9    can recall.
10   Q.  And are you aware of your office receiving any of those
11   complaints, as much as you can recall?
12   A.  I can't think of any right now.
13   Q.  And you're, likewise, not aware of receiving any complaints
14   about voter harassment or intimidation, are you?
15   A.  I did not receive any of those complaints.
16   Q.  Would it surprise you to know that some Texas residents are
17   afraid of or distrust the government?
18   A.  I wouldn't know.
19   Q.  No opinion one way or the other of whether or not voters in
20   the State of Texas, some voters in the State of Texas, might
21   distrust the government?
22   A.  I imagine some do, yes.
23   Q.  Would it surprise you to know that some voters in Texas
24   might have a concern about approaching the Secretary of State's
25   office or law enforcement or a prosecutor if some issue arose

1   with respect to their efforts to vote?

2   A.  I don't know whether that's a fact or not.

3   Q.  I'm not asking if you know it's a fact or not.  I'm asking

4   would it surprise you to know that some voters might find it

5   difficult or be afraid of approaching the Secretary of State's

6   Office, law enforcement, or a prosecutor with respect to some

7   voter impropriety that occurred to them as a voter?

8        MR. NICHOLS:  Objection.  Lack of foundation as the

9   witness has testified.

10        THE COURT:  Yes, he's speculating.  Next question.

11  BY MR. WATKINS:

12  Q.  As the division chief for the unit that you were the chief

13  over until just recently, did you undertake any effort to

14  determine whether or not there was complaints that existed with

15  respect to voter fraud or voter intimidation that were coming

16  in -- that existed outside of the Secretary of State or

17  official channels realm?

18  A.  We reviewed the complaints that were sent to us and

19  processed those.  That's all we did.

20  Q.  You did not go out and independently look to see if people

21  that might be afraid to report still, nonetheless, had

22  violations of law occurring to them?

23  A.  That would not be my job.  I did not do that.

24  Q.  So if it didn't come in through the Secretary of State's

25  office or through official law enforcement channels, you

 1  wouldn't know about it?

 2  A.  I think that's accurate.

 3  Q.  And for the people who were most likely to have harassment

 4  and intimidation occurring on them, are also the ones that are

 5  most likely to be afraid of reporting, you didn't do anything

 6  to follow up with those individuals, did you?

 7          MR. NICHOLS:  Objection.  Lack of foundation,

 8  speculation.

 9          THE COURT:  That's overruled.

10          THE WITNESS:  Could you repeat the question?

11  BY MR. WATKINS:

12  Q.  Sure.  The individuals that are perhaps the most

13  intimidated and the most harassed at voting places and also the

14  ones that are the most afraid of reporting to official

15  channels, you didn't do anything to follow up with that body of

16  voters to see if there was any illegality occurring with

17  respect to them?

18          MR. NICHOLS:  Same objection.

19          THE COURT:  You're right.  That's sustained.

20          Next question.

21  BY MR. WATKINS:

22  Q.  Your office wasn't focused on pursuing justice for those

23  intimidated voters, were they?

24          THE COURT:  That's sustained.  Same question, same

25  line.

```
 1                 MR. WATKINS:  No more questions, Your Honor.  Thank
 2      you.
 3                 THE COURT:  Anyone else from this side?  Anything else
 4      by redirect?
 5                 MR. KERCHER:  A few questions, Your Honor.  Probably
 6      good time for a break.
 7                 THE COURT:  That's fine.  Let's take ten or 15.
 8                 COURT SECURITY OFFICER:  All rise.
 9                 (3:24 p.m.)
10                              *   *   *
11                 (3:38 p.m.)
12                 COURT SECURITY OFFICER:  All rise.
13                 THE COURT:  Thank you.  Please be seated.
14                 MR. KERCHER:  Your Honor, I have redirect, which I
15      won't call brief, because we've all done that, and I -- who
16      knows how long it's going to go.  I don't think it will take
17      very long.  I will tell the Court that there's been some
18      conference among the parties, and there is a willingness, the
19      Court's schedule allowing, to go late this evening, so that we
20      can ensure that we finish with Mr. White today.
21                 THE COURT:  Take us all day to go through one witness?
22                 MR. KERCHER:  So far, so good, right, Judge?
23                 THE COURT:  So they're asking about letting the
24      security downstairs know, what, 6:00, 6:30?
25                 MR. KERCHER:  I think 6:00 or 6:30 would be about
```

 1    right.

 2                      REDIRECT EXAMINATION

 3    BY MR. KERCHER:

 4    Q.  All right, Mr. White, on direct -- or on cross-examination,

 5    you were talked to about Section 4.09 of SB1 and asked a

 6    question in the abstract about whether a particular action

 7    might obstruct the view of a poll watcher.  Do you remember

 8    that?

 9    A.  Yes, sir.

10    Q.  As a prosecutor looking at a statute trying to figure out

11    what the elements are, what they might look like, are you able

12    to do that in the abstract without having the benefit of

13    specific facts to apply to the statute?

14    A.  No.  That's typically not how we work.

15    Q.  Does -- to your knowledge, does the Texas Penal Code

16    describe all of the ways that one person could murder another?

17    A.  No.

18    Q.  Is it a matter of taking facts as reported or investigated

19    and seeing whether or not they fit under a particular statutory

20    definition or not?

21    A.  Correct.

22    Q.  You were also asked about Section 6.04 of SB1, the portion

23    of the oath that reads:  *"I will not suggest by word, sign, or*

24    *gesture how the voter should vote."*

25         Do you recall that?

23-50885.41720

1  A.  Yes, sir.

2  Q.  Ms. Perales asked you a question about cueing a voter who

3  perhaps had autism or another disability.  Do you recall that?

4  A.  Yes.

5  Q.  And my memory of your testimony is that you said it might

6  be a tough call whether or not that kind of cuing to a disabled

7  voter might technically violate Section 6.04.

8      Did I understand that correctly or did I misunderstand?

9  A.  Yes.  But I had also said that it wouldn't be violative of

10 the spirit of the law.

11 Q.  That's what I was going to ask you about.  I think you said

12 it was a tough question of whether it was a technical

13 violation, but not a tough question under prosecutorial

14 discretion.  Can you describe to the Court briefly what you

15 meant?

16 A.  Yeah, that's correct.  It's -- those are situations that

17 could be very easily, you know, eliminated and weeded out by

18 prosecutorial discretion.  Those aren't going to get

19 prosecuted.

20 Q.  If a case comes in where someone has complained about a

21 situation, like the hypothetical Ms. Perales gave you, and that

22 case goes to trial, who will ultimately make the decision about

23 whether the defendant is guilty?

24 A.  A jury would.  And, of course, our burden of proof is

25 beyond a reasonable doubt, so if there's any ambiguity, that

Case 5:24-cv-00826-DAE Document 89 Page 479 of 518 Filed 10/08/2024
Case 5:24-50826 Document 26 Page 4790 Date Filed 12/18/2024

Jonathan White - Examination                    4099

1  will be doubt, and that would accrue to the favor of the

2  defendant.

3  Q.  As a prosecutor, if you are concerned that a jury might not

4  convict on a charge of violating that voter assistance oath

5  because the voter had autism, is that a case you're likely to

6  move forward with?

7  A.  There's no chance of that going forward.

8  Q.  Brian, can we bring up State Exhibit 89.  Go to page 34,

9  please.

10      On cross-examination, Ms. Perales asked you whether this

11  slide describes numerous activities that are, by themselves,

12  lawful.  Do you remember that?

13  A.  Yes.

14  Q.  Is it lawful in the State of Texas to purchase a knife?

15  A.  Yes.

16  Q.  Is it lawful in the State of Texas to use a knife to slice?

17  A.  Sure.

18  Q.  Is it lawful in the State of Texas to use a knife to slice

19  another person with the intent to cause bodily injury?

20  A.  Negative.

21      MR. KERCHER:  Your Honor, I'll pass the witness.

22  Unless there are no additional cross questions, in which case

23  I'll move to my proffer.

24      THE COURT:  Anything else?

25      MR. NICHOLS:  Just very briefly, Judge, if I might.

1                    FURTHER CROSS-EXAMINATION

2    BY MR. NICHOLS:

3    Q.  Mr. White, just three subjects real quick.  First one, I

4    neglected -- in my earlier question, I neglected our friends in

5    state law enforcement from my list.  Remember I asked you about

6    sheriffs and local PDs and constables?  Remember that?

7    A.  Yes.

8    Q.  But are there state agencies, law enforcement agencies with

9    statewide criminal investigation jurisdiction?

10   A.  Yes.  DPS, Rangers, among others.

11   Q.  Okay.  Second topic.  You were asked about three cases:

12   Mark Alfred Whitaker, Gonzalez Beltran, Ignacio, and Hervis

13   Rogers.

14       Do you remember that?

15   A.  Yes, sir.

16   Q.  Okay.  Let's talk about each one of those cases.  Do you

17   still have that binder with you?  I think it was the OCA

18   plaintiffs.  It's the skinny one.

19   A.  Yes.  This has the Whitaker file.

20   Q.  Yes, sir.  So let's talk about Whitaker just for a second.

21   So the Whitaker case -- and if you need to refresh your

22   recollection, you can look at Exhibit 2, the actual indictment

23   charge in that case.

24       Was that charge filed against Mr. Whitaker a charge of

25   illegal voting under the 64.012 statute that I thought we

 1  agreed earlier no one is challenging in this case?

 2  A.  Yes, it is.

 3  Q.  And specifically, was Mr. Whitaker charged with knowingly

 4  voting or attempting to vote more than once in an election?

 5  A.  That's correct.

 6  Q.  Was that an offense, if it could be proven beyond a

 7  reasonable doubt, that was an offense under the State of Texas

 8  long before SB1?

 9  A.  That's correct.

10  Q.  And, in fact, did that charge concern an election that

11  occurred before the effective date of SB1?

12  A.  I believe that's correct, yes.

13  Q.  Okay.  And let's deal with these other two cases similarly

14  very quickly.  Gonzalez Beltran Ignacio and Hervis Rogers, were

15  those both cases involving this same statute of illegal voting,

16  64.012?

17  A.  Yes.

18  Q.  And did both of those cases concern alleged activities that

19  were involved in elections before SB1 ever came into being?

20  A.  Yes, sir.

21  Q.  And if we look quickly, Brian, at exhibit -- State

22  Exhibit 82 and go to the very last page.  So we can go to the

23  top of that very last page.

24      Is that the information that you presented to the Court on

25  the Ignacio Gonzales Beltran matter?

1   A.   Yes.  We discussed that earlier.

2   Q.   And so the Court will have for its reference what charge

3   was involved in that matter as well as the statute, if you look

4   at the far right, 64.012?

5   A.   Yes, sir.  This was a case referred to us by the U.S. State

6   Department.

7   Q.   Okay.

8   A.   Yes, sir.

9   Q.   Okay.  Interesting.  And it shows that it was a -- the "F2"

10  that the Court would see on there, that means second degree

11  felony?

12  A.   Correct.

13  Q.   Okay.  Now let's go to the prior page.  I don't want to

14  lose that.  So the case was referred to your office by the

15  Justice Department?

16  A.   U.S. -- the State Department, the Diplomatic Services Unit,

17  and it was an identity theft by a noncitizen case.

18  Q.   Okay.  And if we look at the second-to-the-last page, the

19  very bottom, that last line there, Brian.

20       Is that the information you provided to the Court with

21  respect to the Hervis Rogers case?

22  A.   Yes, sir.

23  Q.   And again, do we see that as being a case that involved

24  allegations of illegal voting under 64.012?

25  A.   Correct.

1    Q.  Second degree felonies?

2    A.  Yes, sir.

3    Q.  Last subject is with respect to -- you were asked questions

4    a while ago about Section 6.06.  If you can pull up Joint

5    Exhibit 1, please.  Section 6.06 of SB1.

6           MS. PERALES:  Your Honor, 6.06 is outside the scope of

7    redirect.

8           MR. NICHOLS:  No, no.  She asked questions about 6.06.

9           You did, Ms. Perales.

10          THE COURT:  I remember.  Someone talked about

11   compensation.  Go ahead.

12          FURTHER CROSS-EXAMINATION

13   BY MR. NICHOLS:

14   Q.  Yes.  And so on 6.06, you remember you were asked certain

15   questions by Ms. Perales about this provision and how it would

16   work and so forth?

17   A.  Yes, sir.

18   Q.  If you want to go to the very -- let me just represent to

19   you that the Court may have heard some testimony from a Harris

20   County voter who uses a caretaker or a person who assists him

21   regularly in assisting with voting, so I just want to show you.

22       Is there a provision of the changes to 86.0105 that affects

23   a carve-out from prosecution for situations where the person

24   assisting the voter is an attendant or caregiver previously

25   known to the voter?

Jonathan White - Examination                                    4104

1    A.  Yes, sir.

2    Q.  So if you go to the bottom, Brian, if you don't mind, just

3    real quick.

4        And is that additional language added by SB1 in the form of

5    what would ultimately be codified as 86.0105, Sub F?

6    A.  Yes, Subsection F.

7    Q.  And so could any -- would any attendant or caregiver

8    previously known to the voter be in any form of harm's way

9    under this statute, as amended, for assisting the person that

10   they give care or attendance to in voting?

11   A.  No.

12           MR. NICHOLS:  Thank you, Judge.

13           THE COURT:  Anything else on this side?  Anything else

14   based on those questions -- last set of questions?

15           MS. PERALES:  Just a couple.  And I'm sorry about that

16   objection before.  I was completely wrong and just haven't

17   gotten enough sleep.  I'm sorry.

18                   FURTHER CROSS-EXAMINATION

19   BY MS. PERALES:

20   Q.  Mr. White, you mentioned, of course, the very important

21   concept of prosecutorial discretion earlier on redirect.  Do

22   you remember that?

23   A.  Yes, ma'am.

24   Q.  And, in fact, you used the words *those aren't going to get*

25   *prosecuted.*  Is that right?

1    A.  Yes, ma'am.

2    Q.  You are no longer in charge of making prosecutorial

3    decisions for the Election Integrity Division; is that right?

4    A.  Right.  And after *Stephens,* we're all in the same boat.

5    Q.  And thus, it's perhaps largely a very large group of

6    district attorneys who are going to be exercising that

7    discretion in the future; is that right?

8    A.  That's correct.

9            MS. PERALES:  No more questions.

10           THE COURT:  Anything else?

11           FURTHER CROSS-EXAMINATION

12   BY MR. WATKINS:

13   Q.  Just briefly on that.  With respect to those tough cases

14   that Ms. Perales was just asking about, prosecutorial

15   discretion, it is up to the assister to decide whether or not

16   they want to see if it's luck of the draw if they get a

17   prosecutor who exercises that discretion to bring the case or

18   doesn't exercise that discretion to bring the case, right?

19   A.  Yeah, it would certainly be the interpretation of the D.A.

20   in that county where that offense took place.  Potential

21   offense.

22   Q.  And if the assister was unlucky and got the prosecutor that

23   decided to bring the case in the tough cases, the jury would --

24   or, strike that.

25       The assister would go in front of the jury, which would

23-50885.41728

1    then be faced with a beyond-a-reasonable-doubt standard, right?

2    A.  Well, if we're talking about a hypothetical where this

3    might happen, my experience would tell me that that wouldn't

4    happen.  But you're correct in your argument.  I understand

5    what you're saying.

6    Q.  And would it surprise you to know if there are assisters

7    that may not want to take the risk of a jury trial, even if

8    they think they could win it?

9           MR. NICHOLS:  Objection, Your Honor.  Lack of

10   foundation.  Pure speculation.

11          THE COURT:  Sustained.

12   BY MR. WATKINS:

13   Q.  You testified earlier that you agree that a system that

14   arbitrarily disenfranchises voters could undermine public

15   confidence, right?

16   A.  Yes.  I generally agree with that statement.

17          MR. WATKINS:  No further questions.

18          THE COURT:  Anything based on those last sets?

19          And now we turn to the proffer.

20          MR. KERCHER:  Yes, Your Honor.

21                          PROFFER

22   BY MR. KERCHER:

23   Q.  Mr. White, you've previously testified that mail ballot

24   fraud was the most common type of voting fraud prosecuted by

25   the OAG.  Do I remember that correctly?

 1    A.  You're correct.

 2    Q.  Why do you believe mail fraud is more likely to occur than

 3    other forms of voter fraud?

 4    A.  I think the reason that's reflected in the numbers is

 5    because of the lack of security mechanisms that are in place

 6    for mail ballots that are in place for other forms of voting;

 7    in-person voting, namely.  And there are quite -- there are

 8    quite a few of those.

 9          THE COURT:  Let me interject right now.  So why is

10    that question in a proffer?  Why wasn't that particular

11    question okay for you to ask in direct?

12          MR. KERCHER:  My understanding of the plaintiff's

13    position is that Mr. White's experience with why certain kinds

14    of fraud may be more prominent or prevalent, more likely to

15    happen, certain kinds of election integrity offenses may be

16    more difficult to spot or to investigate or to prove, would

17    have been beyond the scope of information provided by the OAG

18    and the SOS, and so to the --

19          THE COURT:  Because he didn't provide all the backup

20    for that statement?  Is that the argument?

21          MR. KERCHER:  I will allow plaintiffs counsel to make

22    their own argument, but that is my understanding.  And in order

23    to ensure that the Court didn't misinterpret our questions as

24    trying to skirt the previous order, we wanted to, out of an

25    abundance of caution, ask these questions under the offer of

```
 1    proof.

 2            THE COURT:  So, I mean, I don't want this to get sent

 3    back down on stuff that ultimately people weren't going to

 4    complain about.

 5            MS. PERALES:  We weren't going to complain about that,

 6    but we thought that counsel was just easing into something that

 7    was going to be more problematic.

 8            THE COURT:  So other questions may become more

 9    problematic, but I was trying to analyze this on a

10    question-by-question basis, so if you don't have any objection

11    to that question, if anybody has no objection to that question,

12    I'm going to consider that as if it was a direct examination

13    question and allow the answer to that question.  We're taking

14    this question-by-question basis.

15            MR. KERCHER:  I understand.  Thank you, Your Honor.

16                              PROFFER

17    BY MR. KERCHER:

18    Q.  In your experience prosecuting these kinds of cases, what

19    do mail ballot fraud and voter assistance fraud have in common,

20    if anything?

21    A.  The core element of both is getting between a voter and

22    their ballot in order to influence the outcome of that vote.

23    Q.  Does it matter in your experience that mail ballot fraud

24    and voter assistance fraud may happen outside of a polling

25    place or not?
```

1    A.  What was the first part, does it matter?

2    Q.  Does it matter in your experience, in terms of whether --

3    in terms of how easy it may be or in terms of the prevalence of

4    those kinds of election integrity crimes?

5    A.  I think I would have to say, yes, because of the controls

6    that are in place in a polling place, the number of observers

7    that might be there, election officials that are present;

8    versus mail ballots, which happen in a completely uncontrolled

9    environment, and we typically have no witnesses, no video, none

10   of that, of the harvester/voter interaction.

11   Q.  In your experience in a case of mail ballot fraud, is it

12   possible that some voters may never find out that their

13   identity has been used?

14   A.  Absolutely.

15   Q.  Can you tell the Court whether there is a profile of voter

16   that is disproportionately targeted for mail-ballot fraud in

17   assistance based on your experience prosecuting these cases?

18   A.  Elderly, sometimes disabilities, low-income communities are

19   often targeted for vote harvesting.

20   Q.  Do you know why, based on your experience, those

21   communities tend to be targeted?

22   A.  That's a tough question.  One aspect that makes vote

23   harvesting easier is when voters are not truly engaged with the

24   process.  They're not that concerned with voting.  If you can

25   get them to sign up for a ballot that they didn't want in the

1    first place, they're very likely to turn that over to you or be

2    susceptible to influence during the vote.

3    Q.  In your experience, are vote harvesters or assistance

4    fraudsters typically associated with a campaign?

5    A.  Yes.

6    Q.  And when they are associated with a campaign, in your

7    experience, how are they compensated?

8    A.  Typically cash, off book.  Though, occasionally you may see

9    in the campaign finance reports a paper trail showing something

10   that says something other than vote harvesting, says something

11   like "canvassing, get-out-the-vote," something like that.

12   Q.  When you say "off book," do you mean they may be

13   compensated in a way that's not reflected in election -- in

14   campaign finance reports?

15   A.  Correct.

16   Q.  We have talked extensively at this point about the Gregg

17   County scheme where --

18          THE COURT:  Let me stop you here.  So everything I've

19   heard up to this point, is there any objection to having this

20   considered as direct testimony?

21          MS. PERALES:  Interspersed, Your Honor.  I didn't

22   think it was appropriate to hop up the couple of times that I

23   thought we had tread into the area that's not permissible, but

24   there are other questions that we would not object to.

25          THE COURT:  So --

```
 1          MS. PERALES:  Should I object each time, Your Honor?
 2          THE COURT:  Well, you know, again, I don't want this
 3   thing sent down on something that we could have resolved now.
 4   I haven't heard anything that was objectionable.  What did you
 5   think you heard objectionable?
 6          MS. PERALES:  "Some voters may never find out their
 7   identity has been used" was the answer to one question.
 8          THE COURT:  That's probably accurate.
 9          MS. PERALES:  Well, it would be speculation unless we
10   had something from the witness that supported that statement.
11   And that was in response to, "Why is mail ballot voting less
12   secure," I think he said there were more controls in the
13   polling place.  Mail ballots happen in uncontrolled
14   environment.  We wouldn't contest that mail voting and
15   in-person voting are subject to different procedures, but the
16   testimony that a voter may never find out their identity has
17   been used, we would object to that question, and then --
18          THE COURT:  So, you know, what we're missing is,
19   though, he gets to opine.  That doesn't mean the Court has to
20   believe it or give it all the weight that they would like it to
21   be deserved.  The question becomes does it get admissible as
22   direct examination testimony?
23          So everything I've heard up to right now, I'm going to
24   consider as if it was direct examination testimony.
25          Now you're getting into specifics, I think.
```

Jonathan White - Examination                    4112

```
 1              MS. PERALES:  Yes, the most recent question regarding
 2    how are harvesters typically compensated by a campaign, the
 3    testimony regarding cash off book, called "canvassers" or
 4    "GOTV," we would object to that as carrying the kind of
 5    specificity that we were denied during the discovery phase.
 6              THE COURT:  Now, that's going to be all overruled.
 7              So up to now, this is all considered direct testimony,
 8    and if the plaintiffs later want to cross-examine on those
 9    points, I'll let them do that later.
10              Now, your next question.
11              MR. KERCHER:  And I believe, Your Honor, that because
12    we are doing this in question-and-answer, we need not be
13    fearful that this will come back down from the Fifth Circuit.
14    Because we are making a record, the Court can accept it or not
15    but maybe I'm misunderstanding procedurally.
16              THE COURT:  This is a proffer, though.  So this is
17    stuff that you-all are going to argue I excluded from evidence.
18    And so what I'm trying to say is, No, I'm not excluding
19    everything I've heard right now.
20              MR. KERCHER:  I see.  I see.  I take your point.
21    Thank you, Your Honor, for the clarification.
22                              PROFFER
23    BY MR. KERCHER:
24    Q.  Mr. White, we've talked about the Gregg County scheme that
25    you've discussed now with a half-dozen lawyers or so where the
```

Case 5:24-cv-00826-XR Document 26 Page Filed 02/03/24 Page 1 of 1
Case 5:24-cv-00844-DC Document 98 Filed 03/02/24 Page 1 of 1
Jonathan White - Examination                    4113

1    ABBM were fraudulently filed under the name of young,

2    able-bodied people who did not qualify to vote-by-mail.

3        Do you remember that?

4    A.  Yes, sir.

5    Q.  Is that a common strategy in your experience?

6    A.  Not super common.  It's certainly not at least in the

7    numbers that we saw in this case.  You know, you might see

8    small numbers of that in other types of cases, but in this case

9    where it was 47 percent of the mail ballots returned, that's

10   very unusual.

11   Q.  You've also testified about ballot harvesting and the

12   seeding and harvesting phase.  When harvesters are in the

13   seeding phase and speaking with voters, what tactics do they

14   use to lower the defenses of voters to get access to those

15   applications?

16       MS. PERALES:  Your Honor, we object to that as being

17   squarely within the scope of the motion in limine.

18       THE COURT:  Yeah, so all this is part of the proffer.

19   I guess what I need to hear from you-all is when do you think

20   that was okay, is really -- because all this -- right now from

21   this point forward, we're excluding stuff.  It's not being

22   considered by the Court as evidence.  But if he asks a question

23   that you think should not be excluded and should have been

24   considered as direct testimony, then I need you-all to say "We

25   don't object to that question."

BY MR. KERCHER:

Q.  Do you need for me to ask the question again, sir?

A.  No, I recall.  But just let me clarify that you were asking about the seeding phase and not the harvesting phase of the operation.

Q.  Yes, sir.

A.  The seeding phase isn't -- my opinion -- too difficult to achieve some rapport with the voter.  You know, go up, you know, *"Ms. Smith, would you like to sign up for a mail ballot, so you don't have to go to the polling place?  It's very easy. Just need a signature from you."*

     You're going to fill out the paperwork to make it easy for the voter and that sort of thing.  And provided they comply with the law and provide their information on that application, they've done nothing illegal at that point.  So nothing too complicated.

Q.  What about at the harvesting phase, what tactics might a vote harvester use to win a voter's trust during the harvester phase?

A.  So that would take a little bit more skill because of what you're asking for.  But something like, *"Hello, Mrs. Smith. I'm with the Elections Department"* or *"I'm here to help you vote your mail ballot,"* some approach like that that presents you an official or semi-official capacity or you wouldn't even necessarily have to do that part.  You're just here to help

 1   with the vote, help with their ballot.  Bring a stamp with you.
 2   *"Do you have your ballot?  Could you go inside and get it?"*
 3   And walk them through the process of voting that ballot.  You
 4   would normally, you know, if you could, offer to fill that
 5   ballot out for them.  *"I see you have some eyeglasses there.*
 6   *Let me help you read that ballot."*
 7        And from there they could discuss some other races.  They
 8   could discuss all of the races, they could discuss the top line
 9   race and ask them who they wanted to vote for for president or
10   whatever that line is and then vote the down-ballot candidates
11   that the voter is actually -- or the harvester is actually
12   working for.
13   Q.  In your experience, might vote harvesters use gifts or
14   trinkets in order to win the voter's trust?
15   A.  Yes, we've seen that.
16   Q.  Do you have any experience with mail ballot fraud involving
17   deceased voters?
18   A.  Yes.  We've seen a number of deceased voters get swept up
19   in mail-ballot harvesting scheme.
20   Q.  Can you describe briefly for the Court what that looks
21   like?
22   A.  It could be as simple as a mistake by the harvesting crew
23   not knowing that they've swept up a deceased voter, but they
24   requested an application for a voter that is still on the rolls
25   and shouldn't be, because they weren't removed.  Or it could be

Case 5:24-cv-06844-DM Document 26 Page: 496 Date Filed: 02/24 Page 40/18/2024
Case 24-50885 Document 91 Page: 496 Date Filed: 10/18/2024

Jonathan White - Examination                    4116

 1   purposeful like what we saw in the Mohamed Zul case where he
 2   was targeting voters that had -- didn't have any recent voter
 3   history and, in doing so -- and also elderly, the older voters,
 4   the oldest of the elderly voters.  By doing that, he got a
 5   chunk of deceased voters.
 6           THE COURT:  Now, let me make sure I understand where
 7   we're at from this point.  From this point, you haven't given
 8   the plaintiff's group any documents or evidence to support any
 9   of that; is that correct?
10           THE WITNESS:  I would have to defer to counsel on --
11           THE COURT:  So as far as you know, the State
12   defendants have not provided any documents to support anything
13   you're saying?
14           THE WITNESS:  I honestly don't know, Your Honor.
15           THE COURT:  Okay.  And with regard to what you're
16   saying -- so you're not a frontline investigator, so how are
17   you opining to all this?
18           THE WITNESS:  Based on my review of the election
19   records themselves, the applications for ballot-by-mail that
20   were filled out for these individuals, the voter roll from that
21   county and, where applicable, the carrier envelopes for the
22   mail ballots themselves.  The address where those applications
23   had the ballots sent to and what that location is.  Primarily,
24   that's some of my original evidence review.
25           THE COURT:  So assuming that the plaintiff's group

 1  haven't received those underlying documents to test that, they

 2  have no way of challenging what you say; is that fair?

 3          THE WITNESS:  That seems to be the argument.

 4  BY MR. KERCHER:

 5  Q.  In the example that you provided, Mr. White, of the

 6  Zul Mohamed case, is that a case that was prosecuted

 7  specifically by your office or was it prosecuted by a local

 8  D.A.?

 9  A.  Denton County prosecuted the Denton County piece.  We

10  conducted a separate Dallas County investigation on our own,

11  and that was not accepted for prosecution by Dallas County.

12  Q.  The Denton County D.A. investigatory records, are those in

13  your possession, custody, or control?

14  A.  Not in mine, no.

15  Q.  You were talking about your experience generally with

16  mail-ballot fraud involving deceased voters.  Have you as a

17  prosecutor interacted with the families of those deceased

18  voters whose identities were used to cast fraudulent ballots?

19  A.  Our office has, yes.

20  Q.  What is your office's experience in dealing with those

21  families?

22  A.  They're often upset that their deceased relative was used

23  for this purpose.

24  Q.  Let's talk about the Zul Mohammed case.  You talked about

25  how the OAG performed an investigation alongside Dallas County;

1    is that right?

2    A.   No, Denton County.  We worked with Dallas County, we did on

3    our own, referred it, and they rejected it.

4    Q.   How did your office first come into contact with that case?

5    A.   We received a call from Denton County Sheriff's Office who

6    was investigating at the behest of their election

7    administrator, who had reported the -- some suspicious

8    activity.

9    Q.   Can you describe generally the kinds of communications your

10   office had with the Dallas County DA's office regarding the

11   prosecu -- regarding the investigation of Zul Mohamed?

12   A.   Yes, sir.  We were initially dealing with evidence issues.

13   We were trying to get documents from the election's office, but

14   the election's office is under instruction from Commissioner's

15   Court and ADA that represent Commissioner's Court not to

16   release records without their permission, so...

17   Q.   And before you go on, I should warn you, sir, that not

18   to -- in response to my question, not to provide answers that

19   are not -- that are not publicly available, since this is an

20   ongoing prosecution.

21   A.   Okay.  I think it may not be ongoing at this point, because

22   there's no path to prosecution here.  We've referred the case,

23   it was rejected, and I believe that's the end of it.

24   Q.   Okay.  With that in mind, complete your answer about your

25   office's communications with Dallas County DA's office.

```
1          MS. PERALES:  Just want to lodge a hearsay objection,
2    Your Honor.
3          MR. KERCHER:  Just asking for the kinds of
4    interactions that his office had.  We won't be eliciting any
5    specific statements, Your Honor.
6    A.  I can do that.  Conversations regarding obtaining records,
7    elections records, and conversations regarding the case itself
8    and referring it for potential prosecution.
9    BY MR. KERCHER:
10   Q.  And as I understand your testimony, this is an
11   investigation that the OAG conducted by -- that the Dallas
12   County DA's office elected not to take; is that right?
13   A.  Correct.
14   Q.  What is your understanding, if any, of the reasons the
15   Dallas County District Attorney's office chose not to take it?
16         MS. PERALES:  Objection.  Hearsay.
17         THE COURT:  That's going to be sustained.  Since it's
18   a proffer, you can go ahead and get an answer.
19         MR. KERCHER:  I like that idea, Your Honor.
20   BY MR. KERCHER:
21   Q.  Mr. White, if you would please.
22   A.  Our understanding is that Dallas County DA's office will
23   accept no case for prosecution that comes from the Attorney
24   General's Office.
25   Q.  Can you generally describe to the Court what role signature
```

1    verification, if any, played in preventing Mr. Mohamed from

2    completing his alleged fraud?

3    A.  Signature verification did not help in that case, because

4    he was the one providing the signature on both the application

5    and the carrier envelope, potentially, of those votes, so they

6    would have matched ostensibly.

7    Q.  Do you know how Denton County was able to identify

8    Mr. Mohamed's alleged fraud?

9    A.  The elections office did some additional research when they

10   saw a large number of ballots going to a single address, and

11   they looked up what type of entity it was and found that it was

12   a mailbox store as opposed to a group living facility or

13   something like that.

14   Q.  And how many fraudulent votes or false votes did

15   Mr. Mohamed's allegedly cast?

16          MS. PERALES:  Objection.  Lacks foundation.

17          THE COURT:  How do you know?  Do you know?

18          MR. KERCHER:  I'll ask him that question, Your Honor.

19   BY MR. KERCHER:

20   Q.  Mr. White, if you know, how many votes did Mr. Mohamed

21   allegedly wrongfully cast?

22   A.  In Denton County, because he was arrested in the act and in

23   possession of those envelopes, none of those votes in Denton

24   County were cast, but some were in Dallas.

25          MS. PERALES:  Objection.  Lack of foundation.

```
 1            THE COURT:  How do you know?

 2            THE WITNESS:  I'm familiar with the election records

 3    of those -- the applications that were submitted for that

 4    address that he used as well as the carrier envelopes that were

 5    returned and ultimately counted in Dallas County.

 6            THE COURT:  That's overruled.

 7    BY MR. KERCHER:

 8    Q.  Turning back to that Gregg County case that you discussed

 9    earlier.  In that case, do you know, did the vote harvesting

10    affect the results of the election?

11    A.  It did in that election, yes.

12    Q.  How so?

13    A.  The candidate who lost the race had won in-person voting by

14    a margin of 60 percent to 40 percent, including early voting

15    and on Election Day.  There were so many mail ballots

16    proliferated in that election, and those ballots were cast in

17    favor of Shannon Brown, 75 percent to 25 percent, that he ended

18    up winning the election by six votes.

19            MR. KERCHER:  Thank you, Your Honor.  This ends our

20    offer of proof.

21            MS. PERALES:  Your Honor, we need some time to regroup

22    for examination.  We had talked about an hour.  I think given

23    the shortness of this, perhaps we could do it in 45 minutes?

24            THE COURT:  Yeah.  Well, we're here until -- we're

25    here to finish him up.  So the record is clear, so everything
```

1   else I've heard so far, I've excluded, and I've excluded from

2   consideration as evidence because of the failure of the State's

3   defendant's to provide to the plaintiff's group the underlying

4   documents to support the contentions that were made here.

5           Okay.  You-all want how much time right now?

6           MS. PERALES:  If we could have 45 minutes, we would be

7   ready at 5:00 p.m.

8           THE COURT:  Why are we breaking for 45 minutes?

9           MS. PERALES:  Oh, because previously we asked Your

10  Honor if we could have time to assemble our cross-examination

11  on the proffer testimony having -- by definition, we have not

12  heard about this testimony before, although it turns out it

13  tracks very closely with the declaration that Mr. White

14  submitted in support of their response to the motion for

15  summary judgment.

16          THE COURT:  So you want 45 minutes to discuss among

17  yourselves the questions you want to ask?  Is that what you

18  want?

19          MS. PERALES:  Yes, if the Court is willing to give it

20  to us.  If the Court is willing to give us 30 minutes, we would

21  appreciate that.

22          THE COURT:  Okay.  Back in 30.

23          COURT SECURITY OFFICER:  All rise.

24          (4:16 p.m.)

25                          *   *   *

```
 1              (4:46 p.m.)
 2              COURT SECURITY OFFICER:  All rise.
 3              THE COURT:  Thank you.  Please be seated.
 4              MS. PERALES:  Thank you, Your Honor.
 5    BY MS. PERALES:
 6    Q.  Good afternoon again, Mr. White.
 7    A.  Good afternoon.
 8    Q.  With respect to your testimony regarding Gregg County and
 9    the prosecutions of the four defendants there, you mentioned
10    something about 47 percent of the mail ballots.  Were you
11    saying 48 percent of the mail ballots were cast by able-bodied
12    voters?
13    A.  No.  47 percent is the number that I recall.  It was close
14    to 50 percent of the applications for mail ballot in that
15    commissioner precinct were for on the basis of disability, and
16    the rest of the precincts combined, the other four precincts, I
17    think had eight disabled voters versus almost 300 in that one
18    precinct that we're talking about.
19    Q.  Understood.  During the time that the Gregg County
20    investigation was coming together and then a prosecution
21    decision was made, you were in the office at that time?
22    A.  Yes, ma'am.
23    Q.  Okay.  So now during this litigation, up until December of
24    2022, so through the discovery period, you were the senior
25    official of the Election Integrity Division; is that right?
```

1   A.  That's correct.

2   Q.  You were also aware that were discovery requests from

3   plaintiffs in this case related to voter fraud and the work of

4   your division, correct?

5   A.  I was aware that there were discovery requests in place,

6   yes, in general.

7   Q.  And you testified that you were not aware of what

8   information was produced by State defendants to plaintiffs from

9   your office; is that right?

10  A.  Correct.

11  Q.  So that means you're not aware if State defendants produced

12  case investigation files related to Gregg County and the four

13  defendants we were discussing a moment ago; is that right?

14  A.  Correct.

15  Q.  And you're also not aware if State defendants produced

16  election records such as ones you mentioned a moment ago, the

17  very high number of applications for ballot-by-mail on the

18  basis of disability for at that case; is that correct?

19  A.  Correct.

20  Q.  And you're also not aware if State defendants produced any

21  witness statements related to the Gregg County case --

22  A.  Correct.

23  Q.  -- cases, right?

24  A.  I'm sorry.  Correct.

25  Q.  I'm sorry too.

1    And you're not aware whether State defendants produced

2    records accounting for the margin of victory that you described

3    by the alleged vote-harvester candidate; is that right?

4    A.  That's correct.

5    Q.  Now, moving along to your discussion of the vote harvesting

6    and the harvesting phase of mail ballots, again, because you're

7    not aware of what information was produced by State defendants

8    to plaintiffs, you're not aware if State defendants turned over

9    any information showing that vote harvesters impersonate

10   election officials during their activities; is that correct?

11   A.  Correct.

12   Q.  And you're not aware if State defendants produced any

13   information about vote harvesters bringing a stamp to the home;

14   is that right?

15   A.  Correct.

16   Q.  And you're not aware whether State defendants produced any

17   information regarding how harvesters convince voters to bring

18   out the ballot and allow the harvester to mark the ballot; is

19   that correct?

20   A.  Correct.

21   Q.  And you're also not aware whether State defendants produced

22   any information showing that harvesters used gifts or trinkets,

23   as you call them, in their operations; is that right?

24   A.  Correct.

25   Q.  You're also not aware whether State defendants produced any

 1   case investigation files containing information that I've just
 2   listed; is that correct?
 3   A.  That's correct.
 4   Q.  Now, moving on to deceased voters and the Mohamed Zul case,
 5   or the Zul Mohamed case.  Because you're not aware of what was
 6   produced by State defendants, you're also not aware whether
 7   State defendants produced any information about Zul Mohamed's
 8   use of deceased voters in his operation; is that correct?
 9   A.  Correct.
10   Q.  Now, you said that when you were doing your work as the
11   head prosecutor of your division, you would look at records
12   such as applications for ballot-by-mail, addresses, voter
13   registration records, and documents along those lines.  Do you
14   remember that testimony?
15   A.  Yes, ma'am.
16   Q.  Do you know if any of that type of -- let me rephrase.
17       Because you don't know what was turned over by State
18   defendants in this case, you also don't know if any of those
19   types of records, ABBM's voter registration, ballot addresses,
20   were turned over to plaintiffs in connection with Mohamed Zul;
21   is that right?
22   A.  Correct.
23   Q.  Would it also be fair, though, that some of what you
24   testified about in this proffer phase, such as things like
25   trinkets or impersonating election officials, that doesn't come

1  from an ABBM or a ballot carrier envelope; that comes from
2  investigator notes, witness statements, and so forth.  Is that
3  right?
4  A.  Among other things, yes, ma'am.
5  Q.  And because you're not aware of what the State defendants
6  have turned over to plaintiffs in this case, you're not aware
7  whether any of those types of materials were turned over to
8  plaintiffs in connection with vote harvesting; is that right?
9  A.  Correct.
10  Q.  Now, at your deposition on August 11, 2023 -- if we could
11  get the August 11, 2023, just in case.
12      You were instructed -- well, actually prior to that, in
13  your prior depositions and particularly -- I still want August
14  11.  I'm sorry.
15      In your various depositions, there were times where you
16  were advised and even instructed to assert various privileges.
17  Do you remember that?
18  A.  I remember being advised particularly in the early
19  depositions, the first two depositions.
20  Q.  Our friend, Mr. Hudson, advised you a number of times
21  regarding the investigative privilege, right?  And you asserted
22  that privilege and didn't testify to certain things.  Do you
23  recall that?
24  A.  I recall following the advice of counsel on a number of
25  occasions, yes, ma'am.

1   Q.  And you did that at times so as not to talk about pending

2   or open investigations.  Do you recall that?

3   A.  Yes.  At the time of those depositions, yes, ma'am.

4   Q.  And you also asserted those privileges with respect to even

5   closed investigations and nonpublic information.  Do you recall

6   that?

7   A.  If you're talking about cases that did not result in a

8   deferred prosecution -- sorry, in a conviction or deferred

9   adjudication, then it's possible that that happened, yes,

10  ma'am.

11  Q.  Do you recall testifying that you were going to assert and

12  rest on the privilege with respect to closed investigations and

13  nonpublic information?

14  A.  If it was in the context I described earlier, then I would

15  take your word for that.

16  Q.  But even beyond that context, would it help if I refresh

17  your recollection?

18  A.  Sure.

19  Q.  This is the only cite I have, but if we could go to

20  page 121, lines 4 through 9.

21       MR. KERCHER:  Your Honor, at this point, I'll

22  interpose an objection as to relevance.  Ms. Perales has

23  already received the ruling I think she hoped to get on the

24  motion in limine, and this line of questioning seems to

25  re-litigate whether she would be entitled to that, so we would

 1    object to relevance.

 2           MS. PERALES:  Well, Your Honor, we -- if this is going

 3    to go as a package, we just want to make sure -- and this is,

 4    of course, my last question -- that the examination is complete

 5    both as to the proffer and as to plaintiff's position as to

 6    what was not turned over.

 7           THE COURT:  Yes.  I want the record clear this goes

 8    up -- and it's going up -- why things were excluded and not

 9    excluded, so that's overruled.

10    BY MS. PERALES:

11    Q.  Mr. White, hopefully this will refresh your recollection,

12    but do you recall being asked:  *"To the extent that you were*

13    *asked during your deposition, did you provide all information*

14    *about closed cases?"*

15       Do you recall answering:  Quote, *"To the extent that they*

16    *existed on the spreadsheet and the publicly available*

17    *information, I did, yes,"* closed quote?

18    A.  Yes.  You're reading that correctly, and I don't know what

19    the context was above this, but -- but that sounds like

20    something I said.

21    Q.  And it was your testimony on that day, correct?

22    A.  I believe so.

23           MS. PERALES:  Thank you.  I have no further questions.

24           THE COURT:  Anything else on this side?  Are we ending

25    an hour early?

```
 1              MR. KERCHER:  Or right on time, depending on how
 2    hopeful one watches the time.  I'll be happy to say we've
 3    over-delivered by one hour.
 4              We have nothing further.  May the witness be excused?
 5              THE COURT:  Yes.  You're excused, sir.
 6              So where are we at for tomorrow?  Or am I -- did you
 7    need him?
 8              MS. PERALES:  We do not.  We also wanted to wish the
 9    witness a Happy Birthday tomorrow.
10              MS. HOLMES:  I believe tomorrow -- I don't want to
11    steal your thunder, but I believe tomorrow we're hearing from
12    Jacqueline Doyer and Keith Ingram.
13              MR. KERCHER:  Correct.
14              MS. HOLMES:  But for my part, for the HAUL plaintiffs,
15    I have some exhibits to move into evidence since it seems like
16    we have some time.
17              THE COURT:  Yes.
18              MS. HOLMES:  Okay.  And I believe, Your Honor, you
19    asked for a written list, which I have for you just to follow
20    along, if I may.
21              I've been advised by counsel that maybe it would be
22    unwise to do this at the moment.  I'm sorry.  There's a
23    miscommunication.  So can I do this tomorrow?  My apologies,
24    Your Honor.
25              THE COURT:  Anything else we need to take up today?
```

```
 1           MR. NICHOLS:  Your Honor, if I might be heard.
 2           I mean, cases do need to come to an end, so just want
 3    to get the Court's -- to weigh in if the Court is willing to do
 4    it, on the fact that we need to get these, whatever the exhibit
 5    issues are, resolved, because the plaintiffs at some point do
 6    need to close their case.  And we're willing to work tonight.
 7    We've got extra time, so if we can just commit among all
 8    parties that we're going to take up the remainder of whatever
 9    the plaintiffs think their case-in-chief is tomorrow morning
10    first thing, we'll get their case closed.
11           MS. PERALES:  Your Honor, we're happy to work with
12    Mr. Nichols, especially, and State defendants, to clear out the
13    last of the exhibit issues and the outstanding objections.
14           THE COURT:  Will you all be in a position to close
15    tomorrow?
16           MS. PERALES:  If we reach agreement on the exhibits,
17    yes, Your Honor.  If not, we may have to have -- I believe
18    Ms. Tulin mentioned earlier today we may have to have oral
19    argument on some of the exhibits.
20           THE COURT:  So this list, can we take care of this
21    list at least today or not?
22           MS. PERALES:  First thing in the morning, Your Honor?
23           THE COURT:  Okay.
24           MS. HARRIS:  Your Honor, if it's helpful, I have a
25    couple of small housekeeping matters from OCA plaintiffs that
```

Case 5:24-cv-00826-DAE Document 196 Filed 12/02/24 Page 164 of 219
Case 5:24-cv-00826-DAE Document 192 Filed 11/28/24 Page 140 of 199
Jonathan White - Examination                    4132

 1   might help get some things out of the way now.

 2        MS. TULIN:  And we also -- there certainly are a

 3   category of LUPE exhibits that I think we know that there --

 4   I'm happy to redo that list and provide a copy to the Court as

 5   well.

 6        THE COURT:  Okay.  So tomorrow first thing we're going

 7   to tackle the HAUL remaining exhibits, and we're going to

 8   tackle the LUPE remaining exhibits.  And do any other

 9   plaintiffs have exhibits that need to be admitted or not?

10        MS. ARMENTA:  No, Your Honor.

11        MR. WATKINS:  Mi Familia does, Your Honor.

12        THE COURT:  Mi Familia does.  So where are you all?

13        MR. WATKINS:  We have four exhibits.

14        THE COURT:  Are you prepared to do that now?

15        MR. WATKINS:  I am.

16        THE COURT:  Okay.  You're after her.

17        MS. HARRIS:  Your Honor, I have two unopposed

18   documents that are the State's admissions during discovery that

19   we'd like to offer to be marked as OCA 472 and 473, and then we

20   can file them electronically this evening.

21        THE COURT:  Any objections to OCA 472 and 473?

22        MR. KERCHER:  No objections, Your Honor.

23        THE COURT:  472 and 473 are admitted.

24        MS. HARRIS:  Thank you, Your Honor.  And the last

25   thing is the motion we filed last night seeking judicial notice

Case 5:24-cv-06044-XR Document 96 Filed 02/02/24 Page 1 of 249
Case 5:24-cv-50826-44-D Document 26 Page Filed 02/02/24 Page 4 of 249
Jonathan White - Examination                    4133

```
 1   on documents.  We want to fix a couple of clerical errors and
 2   update the certificate of conference and file that tonight, and
 3   it will be ready to discuss tomorrow.  Those are the ones we
 4   already discussed.
 5              THE COURT:  Thank you.
 6              MR. NICHOLS:  I think the Court's probably already
 7   dealt --
 8              THE COURT:  Sounds like most of it is mooted.
 9              MS. HARRIS:  There are -- there is at least one
10   document that was not discussed during today's testimony, but
11   it is a public document.
12              THE COURT:  So --
13              MS. HARRIS:  But we can update the motion with today's
14   testimony in mind as well.
15              THE COURT:  So first thing tomorrow morning, then, is
16   OCA going to be in a position to offer your exhibit, and then I
17   make a ruling on it?
18              MS. HARRIS:  Yes, to the extent that it is not an
19   exhibit.  It is seeking judicial notice, but yes.
20              THE COURT:  So you're going to do that, and he'll be
21   in a position to rest.
22              MS. HARRIS:  Yes.
23              THE COURT:  Yes, sir, you're next.
24              MR. WATKINS:  Elijah Watkins for Mi Familia Vota.
25   Your Honor, my understanding is that the State is
```

 1   double-checking some of these exhibits to see if we can

 2   stipulate, but until then, it's HAUL MFV 362, 370, 372 and 388.

 3   And per the Court's instruction, we have a notice that lists

 4   those exhibits for admission.

 5              MR. WASSDORF:  Your Honor, we've got a hearsay

 6   objection on 362.  This is a Mi Familia Vota pamphlet that I

 7   don't have in front of me, but that's what we've got marked

 8   down.

 9              THE COURT:  What about 370, 372 or 388?  Any

10   objections.

11              MR. WASSDORF:  No objections.

12              THE COURT:  370, 372 and 388 are admitted.  I guess I

13   need to see 362.

14              MR. WATKINS:  Can you pull up 362?

15              THE COURT:  So the objection is hearsay.  What's your

16   response?

17              MR. WATKINS:  Well, we're not bringing it in for the

18   truth.  I mean, we're not -- we certainly have other evidence

19   to say that the 2022 mid-terms are set to begin in Texas, but

20   it's simply an internal document to show that Mi Familia Vota

21   was responding to SB1.

22              MR. WASSDORF:  Your Honor, I don't see anything on

23   there that says it's about responding to Senate Bill 1.  It

24   looks like a standard Get-Out-The-Vote pamphlet.

25              THE COURT:  How is this not duplicative of the

     1    testimony your representatives gave about trying to get people

     2    to vote?

     3              MR. WATKINS:  It's not critical, Your Honor.  We can

     4    withdraw it.

     5              THE COURT:  362 is not admitted.

     6              MR. WATKINS:  Thank you, Your Honor.

     7              THE COURT:  Is Mi Familia Vota now able to rest?

     8              MR. WATKINS:  Mi Familia Vota rests, Your Honor.

     9              THE COURT:  Thank you.

    10              MR. WATKINS:  Thank you, Your Honor.

    11              THE COURT:  And so the two other groups, then, are

    12    going to work on this, then, and we'll take care of you-all

    13    first thing in the morning as far as last admissions -- or

    14    whatever judicial notices, and then you-all will rest, correct?

    15              MS. HOLMES:  Yes, Your Honor.

    16              THE COURT:  Okay.

    17              MS. ARMENTA:  Sorry, Your Honor.  LULAC plaintiffs

    18    will be double-checking some exhibits, and then we'll also plan

    19    to rest tomorrow morning.

    20              MR. WASSDORF:  Your Honor, State would move to admit

    21    Exhibits 3 through 11, which are Dr. Hoekstra's report.  He was

    22    the State's expert that will be testifying on Wednesday.

    23              MS. PERALES:  I'm sorry.  We have an agreement that if

    24    the witness comes and testifies, we would not object or have a

    25    hearsay objection, so --

```
 1              THE COURT:  So, premature?

 2              MS. PERALES:  Yes, Your Honor.

 3              MR. WASSDORF:  Okay.  We'll just hold off on those

 4    until he actually does show up, I guess.  Other than that, it

 5    would be State's Exhibits 14, 16, 18, 20, 27, 51, 245, 247,

 6    248, 252, 253 and 255.

 7              MS. TULIN:  Can I just clarify a question?  When I

 8    thought you were standing up, it was going to be based on the

 9    list that you circulated last night.  Is that the list that you

10    circulated last night?

11              MR. WASSDORF:  That's the list I circulated last

12    night.

13              MS. TULIN:  Okay.  I think it's true for all

14    plaintiffs that -- well, there's a couple of HAUL objections, I

15    think, and I think a couple of them may have already been

16    admitted.  That was the other piece of that.

17              MR. WASSDORF:  We've already resolved all that.

18              MS. TULIN:  Okay.

19              THE COURT:  Are there any objections to the numbers

20    that were just stated?

21              MS. ARMENTA:  Yes, Your Honor, for LULAC plaintiffs

22    and Mr. Wassdorf, are you just going to ask to confer about

23    this tonight?

24              THE COURT:  Which number were you objecting to?

25              MS. ARMENTA:  We might have objections.
```

```
 1                THE COURT:  Well, I'd like to admit what we can admit,
 2       so tell me which one --
 3                MS. ARMENTA:  We don't have objections to -- sorry.
 4       We haven't had sufficient time to review, Your Honor.  We have
 5       to hold off until tomorrow.  My apologies.
 6                THE COURT:  Nice try.
 7                Anything else to take up before we leave tonight?
 8                MS. TULIN:  Just again there are LUPE exhibits that I
 9       know there are no objections to, and so I could read that list
10       now or we can wait.  There's a category that we're still
11       working on resolving, so happy to do it piecemeal, if you want
12       to stay and do it now, or I'm happy to do it tomorrow once
13       we've resolved everything.  And we're arguing over some subset.
14                THE COURT:  We'll do it tomorrow.
15                MS. TULIN:  Thank you, Your Honor.
16                THE COURT:  Anything else to take up today?
17                MR. KERCHER:  Not from State defendants, Your Honor.
18                THE COURT:  We'll see you all at 9:00 tomorrow.
19                COURT SECURITY OFFICER:  All rise.
20                (5:07 p.m.)
21                                *   *   *
22
23
24
25                            *   *   *   *   *
```

```
1   UNITED STATES DISTRICT COURT

2   WESTERN DISTRICT OF TEXAS

3

4       I certify that the foregoing is a correct transcript from

5   the record of proceedings in the above-entitled matter.  I

6   further certify that the transcript fees and format comply with

7   those prescribed by the Court and the Judicial Conference of

8   the United States.

9

10  Date signed:  October 16, 2023

11  /s/ Gigi Simcox

12  /s/ Angela M. Hailey
    _____
13  United States District Court
    Official Court Reporters
14  262 West Nueva Street
    San Antonio, Texas  78207
15  (210) 244-5048

16

17

18

19

20

21

22

23

24

25
```