# In the United States Court of Appeals for the Fifth Circuit

La Unión del Pueblo Entero et al.,
*Plaintiffs-Appellees,*

*v.*

Gregory W. Abbott et al.,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of Texas, San Antonio Division

## INTERVENOR-DEFENDANTS-APPELLANTS' BRIEF

John M. Gore
E. Stewart Crosland
Louis J. Capozzi, III
Joshua S. Ha
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
jmgore@jonesday.com
scrosland@jonesday.com
lcapozzi@jonesday.com
jha@jonesday.com

Counsel for Intervenor-Appellants

## CERTIFICATE OF INTERESTED PERSONS

No. 24-50826

La Unión del Pueblo Entero et al.,
*Plaintiffs-Appellees*,

*v.*

Gregory W. Abbott et al.,
*Defendants-Appellants.*

The undersigned counsel of record certifies that the following listed persons and entities (other than governmental parties) as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

La Unión del Pueblo Entero

Southwest Voter Registration Education Project

Mexican American Bar Association of Texas

Texas Hispanics Organized for Political Education

JOLT Action

William C. Velasquez Institute

Fiel Houston, Incorporated

Friendship-West Baptist Church

Texas Impact

James Lewin

OCA-Greater Houston

League of Women Voters of Texas

LULAC Texas

Texas Alliance for Retired Americans

Texas AFT

Voto Latino

Delta Sigma Theta Sorority, Incorporated

The Arc of Texas

Republican National Committee

Harris County Republican Party

Dallas County Republican Party

National Republican Senatorial Committee

National Republican Congressional Committee

Kim Ogg

Houston Area Urban League

Mi Familia Vota

Marla Lopez

Marlon Lopez

Paul Rutledge

REVUP-Texas

Nina Perales
Email: nperales@maldef.org
Mexican-American Legal Defense & Educational Fund
110 Broadway Street
San Antonio, TX 78205

Jason Scott Kanterman
Direct: 212-859-8519
Email: jason.kanterman@friedfrank.com
Fried, Frank, Harris, Shriver & Jacobson, L.L.P.
1 New York Plaza
New York, NY 10004

Michael Courtney Keats
Direct: 212-859-8914
Email: michael.keats@friedfrank.com
Fried, Frank, Harris, Shriver & Jacobson LLP
1 New York Plaza
New York, NY 10004

Rebecca L. Martin
Direct: 212-859-8305
Email: rebecca.martin@friedfrank.com
Fried, Frank, Harris, Shriver & Jacobson LLP
1 New York Plaza
New York, NY 10004

Elizabeth Ryan
Direct: 214-746-8158
Email: liz.ryan@weil.com
Fax: 214-746-7777
Weil, Gotshal & Manges, L.L.P.
200 Crescent Court, Suite 300
Dallas, TX 75201

Leah Tulin
Direct: 202-650-6397
Email: tulinl@brennan.law.nyu.edu
Brennan Center for Justice at NYU School of Law
1140 Connecticut Avenue, N.W., Suite 1150
Washington, DC 20036

Zachary Tripp
Direct: 202-682-7000
Email: zack.tripp@weil.com
Fax: 202-857-0940
Weil, Gotshal & Manges, L.L.P.
2001 M Street, N.W., Suite 600
Washington, DC 20036

Aaron J. Curtis
Direct: 212-310-8901
Email: aaron.curtis@weil.com
Weil, Gotshal & Manges, L.L.P.
767 Fifth Avenue
New York, NY 10153-0119

Charles K. Gehnrich
Direct: 212-310-8391
Email: charles.gehnrich@weil.com
Weil, Gotshal & Manges, L.L.P.
767 Fifth Avenue
New York, NY 10153-0119

Sean Morales-Doyle
Direct: 646-292-8363
Email: morales-doyles@brennan.law.nyu.edu
Brennan Center for Justice
120 Broadway, Suite 1750
New York, NY 10271

Patrick Berry
Direct: 646-925-8754
Email: berryp@brennan.law.nyu.edu
Brennan Center for Justice
120 Broadway
New York, NY 10271

Jasleen Kaur Singh
Direct: 646-292-8389
Email: singhj@brennan.law.nyu.edu
Brennan Center for Justice
120 Broadway
New York, NY 10271

Jessica Ring Amunson
Direct: 202-639-6023
Email: jamunson@jenner.com
Fax: 202-661-4993
Jenner & Block, L.L.P.
1099 New York Avenue, N.W., Suite 900
Washington, DC 20001-4412

Thomas Paul Buser-Clancy
Direct: 713-942-8146
Email: tbuser-clancy@aclutx.org
American Civil Liberties Union of Texas
P.O. Box 8306
Houston, TX 77288

Dayton Campbell-Harris
Direct: 425-516-8400
Email: dcampbell-harris@aclu.org
American Civil Liberties Union Foundation
Voting Rights Project
125 Broad Street
New York, NY 10004

Adriel I. Cepeda Derieux
Direct: 212-284-7334
Email: acepedaderieux@aclu.org
Fax: 212-549-2654
American Civil Liberties Union Foundation
915 15th Street, N.W.
Washington, DC 20005

Sarah Xiyi Chen
Direct: 512-474-5073
Email: schen@texascivilrightsproject.org
Texas Civil Rights Project
1405 Montopolis Drive
Austin, TX 78741-3438

Zachary Dolling
Direct: 512-474-5073
Email: zachary@texascivilrightsproject.org
Texas Civil Rights Project
1405 Montopolis Drive
Austin, TX 78741-3438

Ashely Alcantara Harris
Direct: 713-942-8146
Email: aharris@aclutx.org
American Civil Liberties Union of Texas
P.O. Box 8306
Houston, TX 77288

Savannah Kumar
Direct: 713-942-8146
Email: skumar@aclutx.org
American Civil Liberties Union of Texas
Suite 350
5225 Katy Freeway
Houston, TX 77007

Peter Hofer
Direct: 512-454-4816
Email: phofer@disabilityrightstx.org
Fax: 512-454-3999
Disability Rights Texas
2222 W. Braker Lane
Austin, TX 78758

Sophia Lin Lakin
Direct: 212-519-7836
Email: slakin@aclu.org
Fax: 212-549-2654
American Civil Liberties Union Foundation
Voting Rights Project
125 Broad Street, 18th Floor
New York, NY 10004

Christopher McGreal
Direct: 214-630-0916
Email: cmcgreal@disabilityrightstx.org
Disability Rights Texas, North Texas Regional Office
1420 W. Mockingbird Lane, Suite 450
Dallas, TX 75247-4932

Adriana Cecilia Pinon
Direct: 713-942-8146
Email: apinon@aclutx.org
American Civil Liberties Union of Texas
P.O. Box 8306
Houston, TX 77288

Lucia Romano
Direct: 713-974-7691
Email: lromano@drtx.org
Fax: 713-974-7695
Disability Rights Texas
1500 McGowen Street, Suite 100
Houston, TX 77004

Edgar Saldivar
Direct: 713-942-8146
Email: esaldivar@aclutx.org
American Civil Liberties Union of Texas
5225 Katy Freeway, Suite 350
Houston, TX 77007

Ari J. Savitzky
Direct: 212-549-2681
Email: asavitzky@aclu.org
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004-2400

Christopher D. Dodge
Direct: 202-987-4928
Email: cdodge@elias.law
Elias Law Group, L.L.P.
250 Massachusetts Avenue, N.W., Suite 400
Washington, DC 20001

Marcos Mocine-McQueen
Direct: 202-968-4492
Email: mmcqueen@elias.law
Elias Law Group, L.L.P.
250 Massachusetts Avenue, N.W., Suite 400
Washington, DC 20001

Uzoma Nkem Nkwonta
Direct: 202-968-4490
Email: unkwonta@elias.law
Elias Law Group, L.L.P.
250 Massachusetts Avenue, N.W., Suite 400
Washington, DC 20001

Julie Zuckerbrod
Direct: 202-987-5680
Email: jzuckerbrod@elias.law
Elias Law Group, L.L.P.
250 Massachusetts Avenue, N.W., Suite 400
Washington, DC 20001

Jennifer A. Holmes
Direct: 202-682-1300
Email: jholmes@naacpldf.org
NAACP Legal Defense & Educational Fund, Incorporated
700 14th Street, N.W., Suite 600
Washington, DC 20005

J. Michael Showalter
Direct: 312-258-5561
Email: j.michael.showalter@afslaw.com
ArentFox Schiff LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606

Mohammed A. Badat
Direct: 212-965-2200
Email: abadat@naacpldf.org
Fax: 212-226-7592
NAACP Legal Defense & Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006

Eitan G. Berkowitz
Direct: 408-334-8775
Email: eitan.berkowitz@afslaw.com
ArentFox Schiff LLP
44 Montgomery Street, 38th Floor
San Francisco, CA 94104

Kenneth E. Broughton, Jr.
Direct: 713-469-3819
Email: kbroughton@reedsmith.com
Fax: 713-469-3899
Reed Smith LLP
2850 N. Harwood St., Suite 1500
Dallas, TX 75201

James David Cromley
Direct: 312-258-5616
Email: james.cromley@afslaw.com
Fax: 312-258-5600
ArentFox Schiff LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606

William D'Angelo, III
Direct: 949-633-0879
Email: william.dangelo@afslaw.com
ArentFox Schiff LLP
555 W. Fifth Street, 48th Floor
Los Angeles, CA 90013

Victor Genecin
Direct: 212-965-2200
Email: vgenecin@naacpldf.org
Fax: 212-226-7592
NAACP Legal Defense & Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006

Derek H. Ha
Direct: 415-757-5897
Email: derek.ha@afslaw.com
ArentFox Schiff LLP
44 Montgomery Street, 38th Floor
San Francisco, CA 94104

Ann Helen MacDonald
Direct: 312-258-5548
Email: ann.macdonald@afslaw.com
ArentFox Schiff LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606

Roswill Mejia
Direct: 512-409-2718
Email: rmejia@reedsmith.com
Fax: 512-623-1802
Reed Smith LLP
401 Congress Avenue, Suite 1800
Austin, TX 78701

Keely Dulaney Pippin
Direct: 713-469-3888
Email: kpippin@reedsmith.com
Fax: 713-469-3899
Reed Smith
1221 McKinney Street, Suite 2100
Houston, TX 77010

Kathryn Sadasivan
Direct: 212-965-2200
Email: ksadasivan@naacpldf.org
Fax: 212-226-7592
NAACP Legal Defense & Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006

Uruj Sheikh
Direct: 212-965-2275
Email: usheikh@naacpldf.org
NAACP Legal Defense and Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006

Ciara A. Sisco
Direct: 212-965-2200
Email: csisco@naacpldf.org
Fax: 212-226-7592
NAACP Legal Defense & Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006

Sarah C. Stewart
Direct: 469-680-4228
Email: sarah.stewart@reedsmith.com
Fax: 469-680-4299
Reed Smith, LLP
2850 N. Harwood Street, Suite 1500
Dallas, TX 75201

Shira Wakschlag
Direct: 202-534-3708
Email: wakschlag@thearc.org
Fax: 202-534-3731
The Arc of the United States
1825 K Street, N.W., Suite 1200
Washington, DC 20006

Evan Monod
Direct: 202-534-3710
Email: monod@thearc.org
The Arc of the United States
2000 Pennsylvania Avenue, N.W., Suite 500
Washington, DC 20006

Breanna Della Williams
Direct: 405-602-4779
Email: bwilliams@naacpldf.org
NAACP Legal Defense & Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006

Mark L. Bieter
Phone: 208-389-9000
Email: mark.bieter@stoel.com
Fax: 208-389-9040
Stoel Rives LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702

John Bonifaz
Phone: 617-244-0234
Email: jbonifaz@freespeechforpeople.org
Fax: 512-628-0142
Free Speech For People
1320 Centre Street, Suite 405
Newton, MA 02459

Ben Clements
Phone: 617-244-0234
Email: bclements@freespeechforpeople.org
Fax: 512-628-0142
Free Speech For People
1320 Centre Street, Suite 405
Newton, MA 02459

Courtney M. Hostetler
Phone: 617-249-3015
Email: chostetler@freespeechforpeople.org
Fax: 512-628-0142
Free Speech For People
1320 Centre Street #405
Newton, MA 02459

Sean Michael Lyons
Direct: 210-225-5251
Email: sean@lyonsandlyons.com
Fax: 210-225-6545
Lyons & Lyons, PC
237 W. Travis Street, Suite 100
San Antonio, TX 78205

Amira Marcella Mattar
Phone: 617-564-0464
Email: amira@freespeechforpeople.org
Free Speech For People
48 N. Pleasant Street, Suite 304
Amherst, MA 01002

Wendy J. Olson
Phone: 208-389-9000
Email: wendy.olson@stoel.com
Fax: 208-389-9040
Stoel Rives LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702

Bradley R. Prowant
Phone: 612-373-8800
Email: bradley.prowant@stoel.com
Fax: 612-373-8881
Stoel Rives LLP
33 S. Sixth Street, Suite 4200
Minneapolis, MN 55402-3722

Laura E. Rosenbaum
Phone: 503-294-9642
Email: laura.rosenbaum@stoel.com
Fax: 503-220-2480
Stoel Rives LLP
760 S.W. 9th Avenue, Suite 3000
Portland, OR 97205

Cory R. Liu
Phone: 737-802-1800
Email: cory.liu@butlersnow.com
Butler Snow LLP
1400 Lavaca Street, Suite 1000
Austin, TX 78702

Eric J.R. Nichols
Phone: 737-802-1800
Email: eric.nichols@butlersnow.com
Butler Snow LLP
1400 Lavaca Street, Suite 1000
Austin, TX 78702

John Matthew Gore
Direct: 202-879-3930
Email: jmgore@jonesday.com
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001

E. Stewart Crosland
Direct: 202-879-3951
Email: scrosland@jonesday.com
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001

Louis Joseph Capozzi, III, Esq.
Direct: 717-802-2077
Email: lcapozzi@jonesday.com
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001

Joshua Sung-Jun Ha, Esq.
Direct: 202-879-3419
Email: jha@jonesday.com
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001

/s/ John M. Gore
JOHN M. GORE
*Counsel for Intervenor-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

Intervenor-Appellants respectfully request oral argument.  *See* Fed. R. App. P. 34; 5th Cir. R. 28.2.3.  The order under review raises legally and practically significant questions regarding the legality of the Texas Election Code.  Oral argument will assist this Court in answering those questions.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ............................................... i

STATEMENT REGARDING ORAL ARGUMENT..................................... xvi

INTRODUCTION ................................................................................ 1

JURISDICTIONAL STATEMENT.......................................................... 6

STATEMENT OF ISSUES ................................................................... 6

STATEMENT OF THE CASE ............................................................... 6

     A.    Congress enacted Section 208 to protect voters with disabilities from coercion at the ballot box. .................... 6

     B.    Texas's Election Code has long regulated assistance of voters with disabilities. ................................................. 9

     C.    Texas enacts S.B. 1.............................................................12

     D.    Plaintiffs sue to enjoin S.B. 1.........................................14

     E.    The District Court permanently enjoins S.B. 1's voter-assistance provisions. ...........................................16

SUMMARY OF ARGUMENT ....................................................... 18

STANDARD OF REVIEW ............................................................. 23

     ARGUMENT ......................................................................... 24

     I.    PLAINTIFFS LACK STANDING TO CHALLENGE THE OATH PROVISION AND THE ASSISTOR DISCLOSURE PROVISIONS OF S.B. 1. ................................................................................ 25

     II.    PLAINTIFFS' SECTION 208 CLAIMS FAIL ON THE MERITS. ............ 35

     A.    Section 208 does not preempt reasonable state voter-assistance regulations............................................ 36

     B.    S.B. 1 complies with Section 208. .................................. 45

     C.    The District Court erred by reading Section 208 to preempt every state regulation of voter assistance. ........ 46

     D.    Even if S.B. 1's challenged provisions implicate Section 208, they comply with it.................................... 53

CONCLUSION.................................................................................60

CERTIFICATES OF COMPLIANCE AND SERVICE.................................. 62

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ala. State Conf. of the NAACP v. Marshall,*
No. 2:24-CV-00420-RDP, 2024 WL 4448841
(N.D. Ala. Oct. 4, 2024) ............................................................. 9

*Alexander v. Sandoval,*
532 U.S. 275 (2001) .................................................................. 59

*Altria Group, Inc. v. Good,*
555 U.S. 70 (2008) .................................................................... 37

*Ark. United v. Thurston,*
626 F.Supp.3d 1064 (W.D. Ark. 2022) ...................................... 9

*Barrosse v. Huntington Ingalls, Inc.,*
70 F.4th 315 (5th Cir. 2023) ............................................... 37, 53

*Bd. of Trs. v. Garrett,*
531 U.S. 356 (2001) .......................................................... 43, 44

*Biden v. Nebraska,*
600 U.S. 477 (2023) .................................................................. 48

*Brnovich v. DNC,*
594 U.S. 647 (2021) .................................................................. 41

*Burson v. Freeman,*
504 U.S. 191 (1992) .................................................................. 58

*California v. Texas,*
593 U.S. 659 (2021) .................................................................. 28

*Carey v. Wis. Elections Comm'n,*
824 F.Supp.3d 1020 (W.D. Wis. 2022) ...................................... 9

*Cascabel Cattle Co., L.L.C. v. United States,*
   955 F.3d 445 (5th Cir. 2020) ................................................................ 38

*City of Boerne v. Flores,*
   521 U.S. 507 (1997) ...................................................................... 21, 44

*Crown Castle Fiber, L.L.C. v. City of Pasadena,*
   76 F.4th 425 (5th Cir. 2023) ........................................................ 23, 24

*Democracy N.C. v. N.C. State Bd. of Elec.,*
   476 F. Supp. 3d 158 (M.D.N.C. 2020) ........................................ 39, 45

*Disability Rights N.C. v. N.C. State Bd. of Elections,*
   602 F.Supp.3d 872 (E.D.N.C. 2022) .............................................. 9

*Elmen Holdings, L.L.C. v. Martin Marietta Materials, Inc.,*
   86 F.4th 667 (5th Cir. 2023) .......................................................... 50

*FDA v. All. for Hippocratic Med.,*
   602 U.S. 367 (2024) ............................................................... *passim*

*Gomez v. United States,*
   490 U.S. 858 (1989) .................................................................... 44

*Gonzalez v. Blue Cross Blue Shield Ass'n,*
   62 F.4th 891 (5th Cir. 2023) ........................................................ 28

*Hillman v. Maretta,*
   569 U.S. 483 (2013) .................................................................... 48

*In re Bourgeois,*
   902 F.3d 446 (5th Cir. 2018) ........................................................ 48

*In re Cleveland Imaging & Surgical Hosp., LLC,*
   26 F.4th 285 (5th Cir. 2022) ........................................................ 25

*In re DSCC,*
   950 N.W.2d 280 (Minn. 2020) ...................................................... 9

*In re Gee*,
941 F.3d 153 (5th Cir. 2019) ................................................. 25

*La. Fair Hous. Action Ctr., Inc. v. Azalea Garden Props.,*
*L.L.C.*,
82 F.4th 345 (5th Cir. 2023)................................................. 34

*La Unión Del Pueblo Entero v. Abbott*,
119 F.4th 404 (5th Cir. 2024) ................................... 13, 14, 58

*La Unión Del Pueblo Entero v. Abbott*,
29 F.4th 299 (5th Cir. 2022)................................................14

*La Unión Del Pueblo Entero v. Abbott*,
68 F.4th 228 (5th Cir. 2023) ...............................................14

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ............................................................19

*Mays v. Chevron Pipe Line Co.*,
968 F.3d 442 (5th Cir. 2020) .............................................. 47

*McCulloch v. Maryland*,
17 U.S. 316 (1819)............................................................. 42

*McFadden v. United States*,
576 U.S. 186 (2015)........................................................... 38

*Mi Familia Vota v. Ogg*,
105 F.4th 313 (5th Cir. 2024) .............................................14

*Minnesota Voters All. v. Mansky*,
585 U.S. 1 (2018) .............................................................. 58

*OCA-Greater Houston v. Texas*,
867 F.3d 604 (5th Cir. 2017) ........................................*passim*

*Ostrewich v. Tatum*,
72 F.4th 94 (5th Cir. 2023)................................................ 58

*Priorities USA v. Nessel,*
    628 F.Supp.3d 716 (E.D. Mich. 2022) ................................................ 9, 38

*Purcell v. Gonzalez,*
    549 U.S. 1 (2006) ................................................................................... 52

*Qualkinbush v. Skubisz,*
    826 N.E.2d 1181 (Ill. App. 2004) ......................................................... 53

*Ray v. Texas,*
    No. A.2-06-CV-385TJW, 2008 WL 3457021
    (E.D. Tex. Aug. 7, 2008) ................................................................. 39, 44

*Reule v. Jackson,*
    114 F.4th 360 (5th Cir. 2024) .......................................................... 28, 32

*Servicios Azucareros De Venezuela, C.A. v. John Deere*
    *Thibodeaux, Inc.,*
    702 F.3d 794 (5th Cir. 2012) ................................................................ 32

*Shelby County v. Holder,*
    570 U.S. 529 (2013) ................................................................................ 6

*Shrimpers & Fishermen of the RGV v. Tex. Comm'n on Envtl.*
    *Quality,*
    968 F.3d 419 (5th Cir. 2020) ................................................................ 27

*Snyder v. United States,*
    603 U.S. 1 (2024) .................................................................................. 59

*State ex rel. Ohio Democratic Party v. LaRose,*
    2024-Ohio-4953 (2024) ........................................................................... 9

*Texas State LULAC v. Elfant,*
    52 F.4th 248 (5th Cir. 2022) ...................................................... 19, 30, 31

*Texas v. United States,*
    730 F.2d 339 (5th Cir. 1984) ................................................................ 39

*Timmons v. Twin Cities Area New Party,*
    520 U.S. 351 (1997) ..................................................................1

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) .................................................18, 25, 27

*United States v. Bd. of Comm'rs,*
    435 U.S. 110 (1978) ............................................................. 43

*United States v. Comstock,*
    560 U.S. 126 (2010) ............................................................ 42

*United States v. Paxton,*
    No. 23-50885, ECF 80-1 (5th Cir. Dec. 15, 2023) ...................14

*VanDerStok v. Garland,*
    86 F.4th 179 (5th Cir. 2023) ............................................... 38

*Vote.Org v. Callanen,*
    89.F4th 459, 480-81 (5th Cir. 2023) ......................... 53, 54, 58

*Young Conservatives of Tex. Found. v. Smatresk,*
    73 F.4th 304 (5th Cir. 2023) ................................................ 37

*Zimmerman v. Austin,*
    881 F.3d 378 (5th Cir. 2020) .............................................. 30

**CONSTITUTIONAL AND STATUTORY AUTHORITIES**

U.S. Const. Amendment XIV ........................................5, 21, 43, 44

U.S. Const. Amendment XV ................................................... 6, 43

U.S. Const. Article I, § 4, cl. 1 ................................................. 43

10 ILCS 5/17-14 .................................................................. 42

25 P.S. § 3058 ..................................................................... 42

28 U.S.C. § 1292 ................................................................... 6

28 U.S.C. § 1331 ............................................................. 6

52 U.S.C. § 10508 .................................................... *passim*

52 U.S.C. § 20104 ........................................................ 59

52 U.S.C. § 20105 ........................................................ 59

Act of 1985, S.B. 616 ................................................. 10

Cal. Elec. Code § 14282 .......................................... 42

Colo. Rev. Stat. § 1-7-111 ....................................... 42

Considering Voting Rights Act (May 4, 1982) ......... 41, 56

Haw. Rev. Stat. Ann. § 11-139 ............................... 42

La. R.S. § 18:564 ....................................................... 42

M.C.L.S. § 168.751 ................................................... 42

Miss. Code Ann. § 23-15-549 ................................. 42

N.M. Stat. Ann. § 1-12-15 ...................................... 42

N.Y. Elec. L. § 8-306 ............................................... 42

O.C.G.A. § 21-2-409 ................................................ 42

Tex. Elec. Code Article 8.13 (1957) ..................... 10, 40

Tex. Elec. Code § 62.004 ........................................ 37

Tex. Elec. Code § 64.031 ........................................ 10

Tex. Elec. Code § 64.032 (1985) ........................ 10, 11

Tex. Elec. Code § 64.034 ................................... *passim*

Tex. Elec. Code § 64.036 (2020) ............... 11, 32, 37, 59

Tex. Elec. Code § 86.105................................................ 13, 16, 59, 60

Tex. Elec. Code § 276.013 ................................................ 11

Tex. Elec. Code § 276.015 ................................................*passim*

Tex. Penal Code Article 258 (1911) ............................. 10

Tex. Penal Code § 12.31 ................................................ 37

Tex. Penal Code § 37.02 (1985) ........................................12, 32, 54

Title 36, Ch. 6, Art. 1790 (1893) ................................... 9

Title 36, Ch. 6, Art. 1791 ................................................ 9

Title 49, Ch. 7, Art. 3003 ................................................ 10

Utah Code Ann. § 20A-3a-208 ..................................... 42

Voting Rights Act of 1965, 79 Stat. 437 ........................ 6

Voting Rights Act Amendments of 1982, 96 Stat. 131 ............................. 7, 40

## OTHER AUTHORITIES

Hearings on S. 1992
   (Jan. 27, 28, Feb. 1, 2, 4, 11, 12, 25, and March 1, 1982)................... 39, 40

S. Rep. No. 97-417 (1982).................................................*passim*

R.A. Taggart & J.C. Henegan, *The Mississippi Election Code of
   1986: An Overview*, 56 Miss. L.J. 535 (1986) .......................................... 7

Webster's New International Dictionary (2d ed. 1954)............................... 38

## INTRODUCTION

"States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). To that end, Texas (like many States) has enacted regulations to facilitate voting assistance for those who need help casting a ballot, subject to crucial guardrails. In particular, Texas has long sought to protect often-vulnerable voters from undue partisan pressure and fraudulent schemes designed to secure votes in the guise of providing assistance.

The Texas Legislature supplemented these measures in Senate Bill 1 ("S.B. 1"). That law does not place any restrictions on voters or their choice of assistors. Rather, it adds three sets of modest requirements to Texas's preexisting rules for those who agree to serve as assistors.

*First*, S.B. 1 adds language to Texas's longstanding voter-assistor oath confirming that (1) the oath is made under penalty of perjury, (2) the assistor did not coerce or pressure the voter into selecting him as an assistor, and (3) the voter represented to his assistor that he is eligible for assistance. *Second*, S.B. 1 requires assistors to disclose to election officials their name, address, and relationship with the voter. *Third*, S.B. 1 builds on Texas's

preexisting ban on schemes in which strangers accept compensation for seeking out voters to "assist."

The District Court enjoined enforcement of *all* these commonsense requirements under the banner of Section 208 of the Voting Rights Act. That section declares that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508. According to the court below, that rarely invoked provision not only forecloses S.B. 1's reforms, but also broadly prohibits *any* regulations that could reduce the willingness of *any* individual to provide voter assistance.

That holding is wrong on every level. To start, Plaintiffs lack standing to challenge S.B. 1's revisions to the voter-assistance oath and amended disclosure requirement. The District Court reasoned that a hypothetical "chill" on would-be assistors—caused by a fear of prosecution for violating the new rules—established standing. That is pure speculation: Plaintiffs presented no evidence of *anyone* being investigated, prosecuted, or threatened with prosecution under the challenged rules. Thus, any alleged unwillingness to provide voter assistance is not traceable to those rules and cannot establish standing.

The District Court's holding is also profoundly wrong on the merits. In its telling, Congress's promise that a voter may be assisted by "a person of the voter's choice" actually guarantees each voter the absolute right to be assisted by "*any* person of the voter's choice." So, if any voter wants to choose a person who refuses to comply with S.B. 1—like someone irrationally fearful of prosecution or simply opposed to the rules on political grounds— Section 208 protects that choice to the point of preempting S.B. 1. In other words, the District Court read Section 208 to grant assistors a right to override the Legislature's neutral, generally applicable voter-assistance regulations merely by refusing to comply with them.

In the District Court's view, the only limit on an assistor is that he cannot be an agent of the voter's employer or union—*anything else goes*. States could not, for example, ban from providing assistance candidates for office, violent felons, or even individuals previously convicted of using the guise of voter assistance to commit voter fraud.

This Court should reverse that unreasonable interpretation of Section 208. Section 208's text and history confirm that Congress enacted it to serve an important but narrow function: preventing States and local governments from forcing voters to use *election officials* as assistants. Rather than being forced to use an assistor chosen by the government, Section 208 permits

voters to receive assistance from "*a* person of [their] choice."  It does not confer an unqualified right to choose *any* person under the sun—including, as relevant here, those unwilling to comply with neutral, generally applicable regulations on voter assistance.

S.B. 1 thus merits *no scrutiny* under Section 208 because it does not require voters to use election officials or members of any other particular class of individuals as assistors.  On the contrary, S.B. 1 permits *any* willing person to serve as an assistor (other than an agent of the voter's employer or union).  All he must do is attest to an updated version of the oath (which states only that the assistor is complying with the law), fill out an updated disclosure form, and decline compensation.  Hard cases involving limits on the categories of people voters may use for assistance—*e.g.*, a law authorizing voters to use only an immediate family member—could possibly arise under Section 208.  But S.B. 1 does not present such a hard case.

Even if this Court concludes that state voter-assistance rules are generally subject to scrutiny under Section 208, it should clarify that such rules are reviewed only for reasonableness and uphold the challenged S.B. 1 provisions.  After all, States possess the constitutional responsibility to enact comprehensive election codes, which is why courts grant considerable deference to the state policy judgments in this area.  And under any kind of

reasonableness review—especially an appropriately deferential one—the challenged provisions pass muster. S.B. 1's revisions to the voter-assistance oath merely convey preexisting legal obligations designed to shield voters from inappropriate behavior. The new modest disclosure requirements help the State monitor the assistance process for such abuse. And the prohibitions on compensated voter assistance and vote harvesting are designed to protect voters with disabilities from undue pressure by paid partisans seeking to deliver votes for their candidates.

According to the District Court, an elephantine preemption rule has slumbered for decades in the unassuming mousehole of Section 208. This reinvention of Section 208 defies the understanding of the Congress that enacted it and dooms an array of voter-assistance laws that stood unchallenged for decades before and after Section 208's enactment. It also transfers substantial authority over elections from state legislatures to the federal courts. And it likely renders Section 208 an unconstitutional abuse of Congress's Fourteenth Amendment enforcement powers.

This Court should reverse, uphold the properly calibrated scope of Section 208 Congress enacted, and reaffirm the authority of States to enact reasonable rules for voter assistors.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under federal law. The District Court entered its findings of facts and conclusions of law on October 11, 2024, following a bench trial. ROA.37783. On October 18, 2024, Intervenor-Defendants and State Defendants each timely filed notices of appeal, which were docketed the same day. ROA.37831; ECF No. 1. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) because the District Court permanently enjoined Sections 6.03-6.07 and 7.04 of S.B. 1.

## STATEMENT OF ISSUES

1. Do Appellees have Article III standing?

2. Does Section 208 of the VRA preempt the challenged provisions?

## STATEMENT OF THE CASE

### A. Congress enacted Section 208 to protect voters with disabilities from coercion at the ballot box.

Congress passed the Voting Rights Act (VRA) "[t]o enforce the fifteenth amendment to the Constitution of the United States, and for other purposes." Voting Rights Act of 1965, 79 Stat. 437. As an exercise of Congress's enforcement powers under the Fourteenth and Fifteenth Amendments, the VRA generally focuses on combating discrimination against racial minorities. *See Shelby County v. Holder*, 570 U.S. 529, 536 (2013).

But in 1982, Congress turned its attention to another minority—voters who "are unable to exercise their rights to vote without obtaining assistance." S. Rep. 97-417, at 62 (1982). Although all States provided assistance to voters with disabilities, some jurisdictions required such voters to accept assistance from election officials. That led to complaints that "having assistance provided by election officials discriminates against voters who need such aid because it infringes upon their right to a secret ballot and can discourage many from voting for fear of intimidation or lack of privacy." *Id.* at 62 n.207.

To solve that problem, the Senate Judiciary Committee added Section 208 to the 1982 amendments to the VRA. *See* Voting Rights Act Amendments of 1982, 96 Stat. 131. Section 208 provides:

> Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union.

52 U.S.C. § 10508. This was Congress's response to reports of intimidation by an election official's presence in the booth. *See, e.g.*, R.A. Taggart & J.C. Henegan, *The Mississippi Election Code of 1986: An Overview*, 56 Miss. L.J. 535, 551 (1986) (Mississippi removed reference to "assistance of one of the [election] managers" in response to Section 208). Henceforth, a voter with a disability could "bring into the voting booth a person whom the voter trusts and who cannot intimidate him." S. Rep. 97-417, at 62.

Section 208 was no revolution. Congress recognized that "many states already provide[d] for assistance by a person of the voter's choice." *Id.* at 63. It also contemplated that States would continue to regulate the terms under which voters with disabilities receive assistance. States would retain "the legitimate right" to "establish necessary election procedures, subject to the overriding principle that such procedures shall be designed to protect the rights of voters." *Id.* Indeed, Congress recognized that voter assistance opens the door to the voter's "actual preference" being "overborne by the influence of those assisting them." *Id.* at 62. That was a special concern of Congress given its view that those requiring assistance are often "more susceptible … to having their vote unduly influenced or manipulated." *Id.* Accordingly, Congress *encouraged* "voter assistance procedures, including measures to assure privacy for the voter and the secrecy of his vote be established in a manner which encourages greater participation in our electoral processes." *Id.* at 62-63.

Given Section 208's limited reach, it is unsurprising that courts have very rarely confronted it. *See, e.g.*, *OCA-Greater Houston v. Texas*, 867 F.3d 604, 607 (5th Cir. 2017) (describing Section 208 as a "less visible" component of the VRA). In recent years, however, activist groups have brought numerous Section 208 claims in a nationwide campaign to roll back

voter-assistance regulations. *See, e.g.*, *Priorities USA v. Nessel*, 628 F.Supp.3d 716 (E.D. Mich. 2022); *Ark. United v. Thurston*, 626 F.Supp.3d 1064 (W.D. Ark. 2022); *Carey v. Wis. Elections Comm'n*, 624 F.Supp.3d 1020 (W.D. Wis. 2022); *Disability Rights N.C. v. N.C. State Bd. of Elections*, 602 F.Supp.3d 872 (E.D.N.C. 2022); *Ala. State Conf. of the NAACP v. Marshall*, No. 2:24-CV-004200-RDP, 2024 WL 4448841 (N.D. Ala. Oct. 4, 2024); *State ex rel. Ohio Democratic Party v. LaRose*, 2024-Ohio-4953 (2024); *In re DSCC*, 950 N.W.2d 280 (Minn. 2020).

**B. Texas's Election Code has long regulated assistance of voters with disabilities.**

Texas has provided avenues for voters with disabilities to receive assistance since long before Section 208's enactment. The general rule has always been that voters must vote alone. Title 36, Ch. 6, Art. 1790 (1893) ("Not more than one person shall at one time be permitted to occupy any one compartment or place provided for electors to prepare their ballots."). But since as early as 1893, Texas has provided exceptions "when an elector is unable to prepare his ballot." *Id.* In that circumstance, the voter could "declare[] to the presiding officer that he can not read or write, or that by blindness or other physical disability he is unable to prepare his ballot." *Id.* Art. 1791. The voter then would "upon request receive the assistance of two of the [election] judges in the preparation [of his ballot]." *Id.*

Soon thereafter, Texas added a requirement that election judges providing assistance must "first sw[ear] that they will not suggest, by word or sign or gesture, how the voter shall vote," and instead "will confine their assistance to answering his questions, to naming candidates, and the political parties to which they belong, and ... will prepare his ballot as the voter himself shall direct." Title 49, Ch. 7, Art. 3003 (1911). Any election judge who prepared a ballot "otherwise than the way the voter himself ... direct[ed]" was "guilty of a misdemeanor." Tex. Penal Code Art. 258 (1911).

In 1957, the Texas Legislature provided that, instead of being assisted by election judges, a voter "may select any qualified voter residing in the precinct to assist him." Tex. Elec. Code Art. 8.13 (1957). Any such assistor was required to take a similar oath. *See id.*

Texas reorganized its Election Code in 1985. *See* Act of 1985, S.B. 616. The Code's voter-assistance language largely tracked the recently enacted Section 208. Under the 1985 Act, a voter "eligible to receive assistance in marking" the ballot had two options for assistance. Tex. Elec. Code §§ 64.031, 64.032 (1985). *First*, on the "voter's request for assistance," "two election officers shall provide the assistance," with each official from different political parties if possible. *Id.* § 64.032(b) (1985). *Second*, "[o]n the voter's request, the voter may be assisted by any person selected by the voter other

than the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs." *Id.* § 64.032(c).

The Election Code provided that, when the voter chose the second option, "an election officer shall enter the [assistor's] name and address on the poll list beside the voter's name." *Id.* § 64.032(d). The assistor was also required to take the following oath:

> I swear (or affirm) that I will not suggest, by word, sign, or gesture, how the voter should vote; I will confine my assistance to answering the voter's questions, to stating propositions on the ballot, and to naming candidates and, if listed, their political parties; I will prepare the voter's ballot as the voter directs; and I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs.

*Id.* § 64.034(d) (as amended in 2013).

As with previous versions, the 1985 Election Code provided penalties for assistors who violated it. An assistor was guilty of a misdemeanor if he knowingly provided assistance to an ineligible voter, prepared the ballot in a way other than the voter directed, or suggested how the voter should vote while assisting. *Id.* § 64.036. Additionally, violating the oath rendered the assistor guilty of election fraud and perjury. *See id.* § 276.013 (1985) (offense to "knowingly or intentionally ... cause any false or intentionally misleading statement, representation, or information to be provided[] to an election

official"); Tex. Penal Code § 37.02 (1985) (person commits perjury if he "makes a false statement under oath").

## C. Texas enacts S.B. 1.

The Texas Legislature enacted S.B. 1 in 2021. Its voter-assistance amendments aimed to "provid[e] for appropriate voting assistance to elderly and disabled voters" and "ban[] 'vote harvesting.'" Bill Analysis, House Committee Report.

S.B. 1 places no limitations on voters or on whom any voter may select as an assistor. Rather, as relevant to this appeal, S.B. 1 updates the requirements for assistors in three ways. *First*, Section 6.04 (the "Oath Provision") adds the underlined language to the assistor's oath:

> I swear (or affirm) <u>under penalty of perjury</u> that <u>the voter I am assisting represented to me they are eligible to receive assistance;</u> I will not suggest, by word, sign, or gesture, how the voter should vote; <u>I will prepare the voter's ballot as the voter directs; I did not pressure or coerce the voter into choosing me to provide assistance;</u> ~~and~~ I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs<u>; I will not communicate information about how the voter has voted to another person; and I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted</u>.

S.B. 1, § 6.04 (codified at Tex. Elec. Code § 64.034).

*Second*, Sections 6.03, 6.05, and 6.07 (the "Assistor Disclosure Provisions") require the assistor to complete a form (designed by the Secretary of State) listing (1) "the name and address of the [assistor],"

(2) "the relationship to the voter of the [assistor]," and (3) "whether the [assistor] received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee." S.B. 1, § 6.03; *see also* S.B. 1, §§ 6.05, 6.07 (requiring this form's inclusion on the carrier envelope for early-voting ballots).

*Third*, Sections 6.06 and 7.04 (the "Offense Provisions") ban compensated voter assistance and compensated vote harvesting. Section 6.06 criminalizes "offers to compensate another person for assisting voters," as well as soliciting or accepting such offers. S.B. 1, § 6.06 (codified at Tex. Elec. Code § 86.105). Section 7.04 criminalizes giving, offering, or receiving "compensation or other benefit" for "vote harvesting services," which are defined as any "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." S.B. 1, § 7.04 (codified at Tex. Elec. Code § 276.015). A stay panel of this Court has already analyzed Section 7.04, explaining that it provides protections for mail voting similar to secret-ballot and anti-electioneering rules. *La Unión Del Pueblo Entero v. Abbott*, 119 F.4th 404, 409 (5th Cir. 2024).

### D. Plaintiffs sue to enjoin S.B. 1.

Before S.B. 1 was even signed into law, a host of advocacy groups sued to enjoin almost every provision in the bill. Those suits were consolidated into the present action before the District Court. This Court has already heard several appeals arising from the District Court's decisions on various aspects of the plaintiffs' broad-ranging challenges to S.B. 1. *See La Unión Del Pueblo Entero*, 119 F.4th 404 (staying pending appeal District Court's invalidation of S.B. 1's vote-harvesting ban); *Mi Familia Vota v. Ogg*, 105 F.4th 313, 333 (5th Cir. 2024) (reversing District Court's holding that District Attorney Ogg was a proper defendant); *La Unión Del Pueblo Entero v. Abbott*, 68 F.4th 228, 231 (5th Cir. 2023) (reversing District Court's rejection of non-party state legislators' legislative-privilege assertion); *United States v. Paxton*, No. 23-50885, ECF 80-1 at 5 (5th Cir. Dec. 15, 2023) (staying District Court's invalidation of voter-identification requirements for mail ballots); *La Unión Del Pueblo Entero v. Abbott*, 29 F.4th 299, 304 (5th Cir. 2022) (reversing District Court's denial of intervention to Intervenor-Appellants). This appeal concerns Plaintiffs' challenges under Section 208 of the VRA to S.B. 1's voter-assistance provisions.

Plaintiffs generally alleged either associational or organizational standing to invoke the District Court's jurisdiction over their various

challenges, including their Section 208 claims. For associational standing, Plaintiffs have argued that members have been deterred from seeking, and assistors deterred from providing, assistance because of fears of prosecution under S.B. 1. *See, e.g.*, ROA.37691 ("LUPE's membership includes individuals who use assistance to vote by mail and in-person."). For organizational standing, Plaintiffs claimed that S.B. 1 has deterred them from providing voter assistance and forced them to divert resources. *See, e.g.*, ROA.6758 ¶ 162 ("SB1 will force LUPE to divert its resources away from its [Get Out The Vote], voter registration and community education activities, which are central to its mission, in order to counteract the negative effects of SB1 on its members.").

The case proceeded to a bench trial. All along, through dispositive motions and proposed findings of fact and law, Defendants have argued that Plaintiffs lack standing to press most of their Section 208 challenges and that S.B. 1 complies with Section 208 in any event. ROA.36087-36139, 36198-36219. Plaintiffs have insisted that fear of prosecution for violating S.B. 1's voter-assistance provisions is sufficient to provide standing, and that Section 208 means that any person chosen by a voter must be permitted to assist the voter, unless the assistor is an agent of the voter's employer or union. *See, e.g.*, ROA.33707, 34277.

**E.    The District Court permanently enjoins S.B. 1's voter-assistance provisions.**

On October 11, 2024, the District Court permanently enjoined the Oath Provision, the Assistor Disclosure Provisions, and the Offense Provisions. ROA.37777-37783.  It began by determining that Plaintiffs had standing to challenge the Oath Provision and the Assistor Disclosure Provisions. ROA.37738-37744.  As to the Oath Provision, the District Court held that one of the Plaintiff Organizations, The Arc of Texas, had associational standing through individual members who voted without their desired assistors. ROA.37738-37742.  The District Court identified four individual members who forwent assistance in voting, either because their assistants "w[ere] uncomfortable taking the Oath of Assistance" or because they "did not want to expose [their assistors] to criminal liability."  ROA.37738-37739 n.33. Those injuries, said the District Court, were "fairly traceable" to "the credible threat of criminal enforcement of the oath against the[] assistors"—a conclusion based largely on testimony that "attendants specifically cited the 'penalty of perjury' and 'eligibility' language in the Oath as their reasons for declining to provide assistance."  ROA.37740.

The District Court concluded that Plaintiffs also had organizational standing to challenge the Oath Provision and the Assistor Disclosure Provisions.  ROA.37742-37744.  It reasoned that these "requirements are

burdensome to assistors," have "caused delays at polling places that have interfered with voting assistance," and have caused Plaintiff Organizations "difficulty recruiting members to provide voting assistance." ROA.37742-37743. In the District Court's view, "[t]he chilling effect that the Assistor Disclosure and Oath requirements would have on individuals' willingness to provide voting assistance—and the downstream effects on organizations' ability to perform voter-assistance services—was 'sufficiently predictable' to establish causation for standing purposes." ROA.37743.

After resolving standing, the District Court reached the merits of the Section 208 claims, and held that it preempts the Oath Provision, the Assistor Disclosure Provisions, and the Offense Provisions. The District Court reasoned that the Oath Provision has "deterred voters from requesting assistance and narrowed the universe of willing assistors" because it clarifies that the oath is taken under penalty of perjury, requires the voter to say he is eligible for assistance, and requires the assistor to say he did not pressure or coerce the voter to choose him. ROA.37756. The District Court concluded that the Assistor Disclosure Provisions also "deter assistors" because they require assistors "to complete an additional form" and to "disclose their relationship to a voter." *Id.* And because the Offense Provisions prohibit assistors from being paid for assisting voters, the District Court thought they

"facially restrict the class of people who are eligible to provide voting assistance." ROA.37766. Because, in its view, these provisions shrink the pool of potential assistors, the District Court held that Section 208 preempts each of them. ROA.37756-37769.

Defendants timely appealed to this Court. ECF No. 1; ROA.37831.

## SUMMARY OF ARGUMENT

I. The District Court lacked jurisdiction over Plaintiffs' challenges to S.B. 1's Oath Provision and Assistor Disclosure Provisions.

A. Plaintiffs lack associational standing to challenge the Oath Provision and Assistor Disclosure Provisions because none of their members has identified a cognizable injury traceable to S.B. 1.

To start, standing requires a harm bearing a "close relationship" to one "traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). As such, the burden associated with completing a form is not the kind of injury that opens federal courthouse doors. Nor is the supposed "injury" of waiting in a line, as all voters must inevitably do. Neither can Plaintiffs gesture at an undefined increased risk that their members' ballots might be rejected for clerical errors. Injury-in-fact must be "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

Nor can Plaintiffs use a purported fear of prosecution under S.B. 1 to secure standing. Plaintiffs fantasize about ways in which an unreasonable prosecutor might bring unreasonable charges under S.B. 1, but they presented no evidence of any investigations or prosecutions *anywhere in Texas* under the challenged provisions. All they offer is speculation that requires several assumptions about how third parties not before the Court will react. Such speculation cannot establish standing. *See Tex. State LULAC v. Elfant*, 52 F.4th 248, 256 (5th Cir. 2022). Moreover, the District Court's injunction did not even redress Plaintiffs' fears of prosecution because the enjoined oath amendments do not change assistors' legal obligations; they merely communicate to would-be assistors their preexisting, unchallenged obligations.

**B.** Plaintiffs also lack organizational standing. Throughout their complaints, Plaintiffs suggested that their mere use of their resources to counteract S.B. 1 suffices. But the Supreme Court has recently rejected the notion that "standing exists when an organization diverts its resources in response to a defendant's actions." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024). Were the rule otherwise, any plaintiff could simply spend its way into standing. Because Plaintiffs here have alleged only that

they continued to engage in their usual activities in response to S.B. 1, they have not *diverted* any resources in a manner that can establish standing.

**II.** Section 208 does not preempt the challenged S.B. 1 provisions.

**A.** Section 208 is not an absolute prohibition on state regulation of voter assistance. Its text and history demonstrate that it provides an important but narrow protection: prohibiting election officials from forcing voters to use particular people as assistants. That is why Section 208 provides only that a voter "*may* be given assistance by *a* person of the voter's choice"—not by "any" person, let alone those unwilling to comply with a State's neutral, generally applicable voter-assistance regulations.

Legislative history and state practice are in accord. The Senate Judiciary Committee Report confirms that Section 208 was intended only to prevent election officials from forcing voters to use them as assistants, which practice had a deterrent effect on voters who felt intimidated or a lack of privacy. So Congress permitted voters to bring an assistor from outside the State's election apparatus—but it did not eliminate the prerogative of States to adopt reasonable voter-assistance regulations. Indeed, the Senate Report expressly recognized that States could and should adopt voter-assistance regulations designed to protect voters. And consistent with that understanding, in the forty years since Section 208 became the law, States

have extensively regulated voter-assistance procedures. The District Court's reading of Section 208 imperils many of these longstanding laws.

Finally, extending Section 208 beyond its textual and historical reach would jeopardize its constitutionality. Congress enacted Section 208 under its power to enforce the Fourteenth Amendment. Thus, Section 208's protection for voters with disabilities must exhibit "congruence and proportionality" with the protection provided by the Fourteenth Amendment itself. *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997). But because the Fourteenth Amendment provides only limited protection based on disability, the District Court's reading of Section 208 dooms its constitutionality.

**B.** Under a proper understanding of Section 208, S.B. 1's voter-assistance regulations are lawful. They do not force voters to use election officials or any other specific people as voter assistants, and they leave voters free to choose someone else. Instead of requiring voters to use a government-approved assistor, S.B. 1's rules allow a voter to use a person of his choice and merely impose neutral, generally applicable regulations that any would-be assistor can comply with. S.B. 1 thus does not even *implicate* Section 208.

**C.** The District Court read Section 208 to provide a right to *any* assistor, subject only to the two statutory prohibitions on assistance by the voter's employer and assistance by the voter's union. That is triply wrong.

*First*, Congress provided only that "*a* person of the voter's choice," not *any* person of the voter's choice, could serve as an assistor. Congress knows how to use the word "any"—and did so in that same sentence when describing the universe of voters to which Section 208 applies. The District Court should have heeded that variation in terms.

*Second*, the District Court offered the captivating theory that this Court has *already decided* that state regulation of voter assistance is absolutely preempted by Section 208. The case it cites to—*OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017)—does no such thing. This Court made clear that the *only* question before it was the meaning of "assistance to vote" in Section 208, *not* the meaning of "a person of the voter's choice."

*Third*, the District Court's attempts to drain the absurdity from its expansive interpretation of Section 208 fall short. Its proposed exception for "generally applicable" state laws, for instance, is not consistent with its own theory of Section 208. And its proposed allowance for voter-assistance laws that encourage greater participation in the electoral process should have led it to uphold the challenged provisions.

**D.**    If this Court concludes that neutral, generally applicable voter-assistance regulations are subject to scrutiny under Section 208, it should clarify that such regulations are lawful if they are reasonable under a deferential standard of review.  Such a standard comports with caselaw, Section 208's legislative history, the presumption against preemption, constitutional avoidance, and the constitutional prerogative of States to adopt comprehensive election codes.

Under any reasonableness standard, each challenged provision passes muster.  S.B. 1 does not ban any person from assisting any eligible voter or force voters to use any particular person as an assistor.  Rather, it amends Texas's preexisting requirements for assistors by requiring them to attest to an oath designed to protect voters with disabilities, make a banal disclosure, and refrain from accepting payment for their services.  These requirements are reasonably designed to protect voters from inappropriate pressure from would-be assistors and to ensure the integrity of voter assistance.

## STANDARD OF REVIEW

This Court "reviews a permanent injunction for abuse of discretion," which "occurs where the trial court (1) relies on clearly erroneous factual findings, (2) relies on erroneous conclusions of law, or (3) misapplies the factual or legal conclusions when fashioning its injunctive relief."  *Crown*

*Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 433 (5th Cir. 2023) (internal punctuation omitted). "[I]ssues of Article III standing" and "federal preemption" are questions of law which are reviewed *de novo*. *Id.*

## ARGUMENT

The District Court's ruling is multiply erroneous. To start, Plaintiffs lack standing to challenge the Oath Provision and the Assistor Disclosure Provisions because their theories of injury are either not cognizable or not traceable to those provisions.

The District Court's merits ruling is equally flawed. Congress adopted Section 208 for the narrow purpose of preventing election officials from forcing voters to use particular people—like judges of elections or poll watchers—as assistors. Here, however, the challenged S.B. 1 provisions merely place commonsense requirements on the *assistor*; they do not ban voters from receiving assistance from anyone, let alone require them to use someone from a class of government-approved assistors. Such neutral, generally applicable voter-assistance rules do not even implicate Section 208. And even if voter-assistance regulations are subject to some sort of obstacle-preemption or reasonableness review, the challenged provisions easily pass muster.

The Court should reverse.

# I. PLAINTIFFS LACK STANDING TO CHALLENGE THE OATH PROVISION AND THE ASSISTOR DISCLOSURE PROVISIONS OF S.B. 1.

Because it implicates subject-matter jurisdiction, this Court has an obligation to confirm that Plaintiffs possess standing to bring their claims before proceeding to the merits. *In re Cleveland Imaging & Surgical Hosp., LLC*, 26 F.4th 285, 294 (5th Cir. 2022). As the parties invoking federal jurisdiction, Plaintiffs must show (1) "that [they] suffered an injury in fact that is concrete, particularized, and actual or imminent," (2) "that the injury was likely caused by the defendant," and (3) "that the injury would likely be redressed by judicial relief." *TransUnion*, 594 U.S. at 423. These requirements must be met as to each claim, and Plaintiffs must establish standing "to challenge each provision of law at issue." *In re Gee*, 941 F.3d 153, 161–62 (5th Cir. 2019).

Plaintiffs lack standing to challenge the Oath and Assistor Disclosure Provisions. The inconvenience of filling out a form is not a cognizable Article III injury, and any cognizable harm Plaintiffs can identify is either not traceable to S.B. 1 or based on features of the Election Code that, in substance, long predate S.B. 1. This Court should dismiss Plaintiffs' challenges to Sections 6.03, 6.04, 6.05, and 6.07.

### A. Plaintiffs lack associational standing.

Organizations can establish an injury-in-fact for jurisdictional purposes through either associational standing or organizational standing. Associational standing "is derivative of the standing of the association's members," and requires that those members themselves have standing. *OCA-Greater Houston*, 867 F.3d at 610.

Plaintiffs cannot show associational standing because they cannot identify any individual with standing to challenge the Oath or Assistor Disclosure Provisions. They propose several theories for how those provisions harm their members. They say these provisions have "caused delays at polling places that have interfered with voting assistance." ROA.37743. They say the disclosure requirements "increase the risk that the ballot will be rejected because the assistor made a clerical error." ROA.6744 ¶ 112. And they say that the modified oath and disclosure requirements will deter people from serving as assistors "out of fear of criminal prosecution," meaning some voters will be unable to use their assistors of choice. ROA.37739.

None of these theories satisfies the requirements for standing.

**1.** To begin, Plaintiffs' complaint that it will take additional time to vote because of the modified oath and the disclosure requirement cannot

support standing.  To be an injury-in-fact, the alleged harm must bear a "'close relationship" to "a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 424 (cleaned up).  The supposed difficulty of attesting to an oath or filling out a form bears no resemblance to any traditionally cognizable harm.  If it did, then *any* voter would have standing to challenge *any* election rule, which could theoretically add *de minimis* time costs to voting.  Such a theory would violate fundamental standing principles, which are designed to ensure that "only those most immediately affected by a government policy" can bring lawsuits. R. Fallon et al., Hart and Wechsler's The Federal Courts and the Federal System 117 (7th ed. 2015).

**2.**  Next, consider Plaintiffs' concern about "increased risk" that a ballot will be rejected for "clerical error" on the disclosure form.  Injury-in-fact must be "actual or imminent, not conjectural or hypothetical," and "[i]ncreased-risk claims—even when they are particularized—often cannot satisfy" that requirement.  *Shrimpers & Fishermen of the RGV v. Tex. Comm'n on Envtl. Quality*, 968 F.3d 419, 424 (5th Cir. 2020).  Just so here. Plaintiffs have not identified *a single* instance of a ballot being rejected for that reason.  *See id.* at 425 (refusing to "wade into the morass of empirical questions" about increased risk "[w]ithout actual evidence" (cleaned up)).

Even if they did, Plaintiffs must demonstrate "either continuing harm or a real and immediate threat of repeated injury in the future" to have standing to receive injunctive relief. *Gonzalez v. Blue Cross Blue Shield Ass'n*, 62 F.4th 891, 902 (5th Cir. 2023) (citation omitted). A few isolated incidents of assistors making paperwork errors—and Plaintiffs have not even shown *that*—could not indicate any likelihood of repetition in the future. *See id.*

**3.** Finally, Plaintiffs' contention that some voters did not receive the assistance they preferred following S.B. 1's passage fares no better. Plaintiffs allege that their voter members had to vote without assistance either because their preferred assistors refused out of fear of prosecution under S.B. 1, or because the voters themselves refrained from seeking assistance to protect their would-be assistors from prosecution. *See* ROA.37738-37742. According to the District Court, that lack of assistance is the concrete injury sufficient to ground standing. *See id.*

These "injuries" are not "fairly traceable to the challenged action of the defendant." *Reule v. Jackson*, 114 F.4th 360, 367 (5th Cir. 2024). That element is "substantially more difficult to establish" when the "causal relation between injury and challenged action depends upon the decision of an independent third party." *California v. Texas*, 593 U.S. 659, 675 (2021). To "thread the causation needle" in such circumstances, a plaintiff "must

show that the third parties will likely react in predictable ways that in turn will likely injure the plaintiffs." *All. for Hippocratic Med.*, 602 U.S. at 383 (internal quotation marks omitted).

Here, Plaintiffs' members claim that their usual assistors might be unwilling to assist them in the future out of fear of prosecution under S.B. 1. ROA.37738-37742. In other words, Plaintiffs' theory of causation is that unwillingness to provide assistance is caused by fears of prosecution, and that those fears are caused by the challenged provisions. Take, for instance, Amy Litzinger's attendant, who Litzinger testified was concerned about the facing criminal liability for attesting to the modified oath. ROA.42092. In order for that fear to become reality, the following would have to happen:



That is not a credible fear of prosecution. This chain of speculation is impermissibly "depend[ent] … on the actions of third part[ies]" not before the Court. *Zimmerman v. Austin*, 881 F.3d 378, 390 (5th Cir. 2020). Because it is far from "predictable" that any relevant prosecutions will occur, *All. for Hippocratic Med.*, 602 U.S. at 383, a refusal to provide assistance because of such fears is not fairly traceable to S.B. 1.

This Court held as much in *Texas State LULAC*. There, two organizations challenged an election law which prohibited voters from establishing or maintaining a residence "for the purpose of influencing the outcome of a certain election." *Tex. State LULAC*, 52 F.4th at 251 (quoting S.B. 1111). The organizations claimed that they feared prosecution if they mistakenly advised ineligible voters to register. *Id.* at 256.

This Court held that the organizations lacked standing because "there is no credible threat that they will be prosecuted." *Id.* at 257. In particular, "[t]he fanciful notion that Plaintiffs will be charged … depends on a highly attenuated chain of possibilities," including (a) the organizations committing an actual violation of the law, (b) the violation being discovered by the voter registrar, (c) the registrar referring the violation to a prosecutor, (d) the prosecutor determining that the organizations actually violated the law, and

(e) the prosecutor "exercis[ing] his discretion to bring charges against" the organizations. *Id.*

The same analysis applies here, almost to the letter. There is no credible threat of prosecution for any assistor attempting to comply with S.B. 1. Plaintiffs produced *zero* evidence at trial (which occurred after S.B. 1 was on the books for almost three years) of anyone being investigated, prosecuted, or threatened with prosecution for violating the challenged provisions. And just as in *Texas State LULAC*, crediting fears of prosecution requires indulging several layers of speculation. *See id.*

*First*, the Court must assume that would-be assistors for Plaintiffs' members will violate the voter-assistance laws—even though Plaintiffs adduced *zero* evidence at trial that any organizational member or witness was likely to violate the voter-assistance laws. *Second*, the Court must assume that someone would discover the hypothetical violation. *Third*, the Court must assume someone would report any potential violation. And *fourth*, the Court must assume a prosecutor will exercise his discretion to bring charges. To repeat, there is no evidence in the record of *any* of these four events happening *anywhere* in Texas since S.B. 1's enactment, let alone to any of Plaintiffs' witnesses or members.

Finally, Plaintiffs' alleged injury from the Oath Provision cannot be redressed. *See Reule*, 114 F.4th at 368 n.4 (noting that causation and redressability "are often flip sides of the same coin"). Plaintiffs must show "a likelihood that the requested relief"—here, a permanent injunction of S.B. 1—"will redress the alleged injury." *Servicios Azucareros De Venezuela, C.A. v. John Deere Thibodeaux, Inc.*, 702 F.3d 794, 799-800 (5th Cir. 2012).

Plaintiffs contend, and the District Court agreed, that Section 6.04's additions to the oath has deterred assistors. In particular, the District Court found it significant that Section 6.04 has added to the oath that it is taken "under penalty of perjury" and that the voter must have "represented to [the assistor] they are eligible to receive assistance." S.B. 1 § 6.04; *see also* ROA.37740-37741. But the oath has *always* been under penalty of perjury, and it has *always* been an offense to "knowingly … provide[] assistance to a voter who is not eligible for assistance" or to "provide[] assistance to a voter who has not requested assistance." Tex. Elec. Code § 64.036 (2020); *see also* Tex. Penal Code § 37.02 (2020) (defining perjury as making a false statement under oath "with intent to deceive and with knowledge of the statement's meaning"). If assistors are truly worried about being prosecuted for perjury or for assisting an ineligible voter, permanently enjoining S.B. 1 would do nothing to allay their concerns.

In short, no individual member has standing to challenge the Oath or Assistor Disclosure Provisions. Plaintiffs therefore lack associational standing to challenge those provisions.

### B. Plaintiffs lack organizational standing to challenge the Oath and Assistor Disclosure Provisions.

Plaintiffs also claim that they have standing in their own right as voting advocacy organizations. Plaintiffs' primary theory—which the District Court accepted—rests on their claimed inability to assist voters due to fear of prosecution under S.B. 1. ROA.37742-37744. Plaintiffs have also claimed injury from having to "divert time, money, and resources from other activities" to educate voters about S.B. 1. *See* ROA.6254-6262 ¶ 48 (Delta Sigma Theta); *see also, e.g.*, *id.* ¶¶ 57 (Arc of Texas), 64 (Mi Familia Vota); ROA.6410-6411 ¶¶ 116 (OCA-Greater Houston), 117 (League of Women Voters), 119 (REVUP-Texas); ROA.6649-6652 ¶¶ 20 (Texas LULAC), 22 (Voto Latino), 24 (Texas Alliance for Retired Americans), 25 (Texas AFT); ROA.6760-6772 ¶¶ 165 (LUPE), 170 (Friendship-West), 177 (SVREP), 186 (Texas Impact), 192 (MABA-TX), 199 (Texas HOPE), 207 (JOLT Action), 208 (William C. Velasquez Institute), 211 (FIEL).

Plaintiffs lack organizational standing. As with associational standing, Plaintiffs simply cannot show that their difficulty in providing assistance to voters is fairly traceable to the Oath or Assistor Disclosure Provisions. Once

again, Plaintiffs presented no evidence that *anyone* in all of Texas has been investigated or prosecuted under these provisions. And crediting claimed fears of prosecution—and any corresponding "chill"—requires indulging too much speculation to confer standing. *See* Part I.A.1, *supra*.

Plaintiffs' attempts to ground standing in a diversion-of-resources theory are similarly unavailing. The Supreme Court has recently rejected the notion that "standing exists when an organization diverts its resources in response to a defendant's actions." *All. for Hippocratic Med.*, 602 U.S. at 395. That conclusion followed from the well-settled principle that an organization "cannot spend its way into standing simply by expending money" to "advocate against [a] defendant's actions." *Id.* at 394. The question is thus not whether the plaintiff organization spent money to counteract a challenged action, but rather whether the challenged action "perceptibly impaired" its "core" mission. *Id.* at 395.

Plaintiffs cannot show any "perceptible impairment" of their mission. In fact, the expenditures Plaintiffs complain of fall squarely within their wheelhouse—voter education. *See La. Fair Hous. Action Ctr., Inc. v. Azalea Garden Props., L.L.C.*, 82 F.4th 345, 354 (5th Cir. 2023) (organization lacks standing when it simply undertakes "efforts" that "likely fall within the ambit of [its] routine activities") (cleaned up). It is hard to see how "preparing new

educational materials" on S.B. 1 "divert[s] resources" from "community education activities." ROA.6759-6760 ¶¶ 162, 165. If that were enough, every voting advocacy organization would have standing to challenge any voting policy it dislikes, "provided [it] spend[s] a single dollar" doing exactly what it was created to do—educating voters about election law. *All. for Hippocratic Med.*, 602 U.S. at 395.

This Court should dismiss all challenges to Sections 6.03, 6.04, 6.05 and 6.07 for lack of subject-matter jurisdiction.

## II. PLAINTIFFS' SECTION 208 CLAIMS FAIL ON THE MERITS.

Even if this Court has jurisdiction to reach them, Plaintiffs' claims fail on the merits. Plaintiffs contend that Section 208 overrides broad swaths of state voter-assistance laws, but they are wrong. Section 208 simply guarantees voters in need of assistance *an* assistor of their choice—not *any* assistor under *any* circumstance.

In particular, Section 208 does not forbid States from merely asking assistors to identify themselves and to certify that they are complying with the law. And it certainly does not forbid Texas from taking reasonable action to ensure that assisted voters are not taken advantage of, whether by vote-harvesting operations or by paid partisans seeking to deliver votes through

the guise of voter assistance.  This Court should reverse the District Court's erroneous conclusion to the contrary.

### A. Section 208 does not preempt reasonable state voter-assistance regulations.

Section 208 provides:

> Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union.

52 U.S.C. § 10508.

The District Court held that this sentence overrides S.B. 1's Oath Provision, Assistor Disclosure Provisions, and Offense Provisions under the following chain of (il)logic:  John is a voter in need of assistance.  John asks his friend Fred to assist him at the polls.  Fred refuses, because he does not want to comply with S.B. 1's oath requirement.  Because Fred is "a person of [John]'s choice[] other than [John]'s employer or agent of [John]'s employer or officer or agent of [John]'s union," and because Fred will not assist John due to his own unwillingness to comply with S.B. 1, Section 208 renders S.B. 1 a nullity.  *See* ROA.37749.

The scope of that reading of Section 208 is breathtaking.  Apply the District Court's rationale to other provisions of Texas law.  Suppose Fred suffers from claustrophobia, so he does not want to assist anyone in a voting

station that is "in view of the election officers, watchers, and persons waiting to vote." Tex. Elec. Code § 62.004(1). Because Fred is "a person of [John]'s choice," must that state law be preempted too? Or suppose Fred is serving a mandatory life sentence for a capital felony, *see* Tex. Penal Code § 12.31, or has previously been convicted of using the guise of voter assistance to commit voter fraud, *see, e.g.*, *id*. § 64.036. He is still "a person of the voter's choice." Under the District Court's logic, Texas's penal codes must be preempted.

Fortunately, Section 208's text provides no support for such absurd outcomes. This Court "begins with the presumption that Congress did not intend to displace state law." *Young Conservatives of Tex. Found. v. Smatresk*, 73 F.4th 304, 313 (5th Cir. 2023). And that presumption can be overridden only when it is "the clear and manifest purpose of Congress" to do so. *Altria Group, Inc. v. Good*, 555 U.S. 70, 77 (2008). Statutory text, context, and constitutional avoidance principles all confirm that Plaintiffs cannot carry this heavy burden.

**1.** Section 208's text falls far short of the "high threshold" for showing conflict preemption. *Barrosse v. Huntington Ingalls, Inc.*, 70 F.4th 315, 320 (5th Cir. 2023). The statute does *not* say that a voter in need of assistance "*must* be given assistance by *any* person of the voter's choice." It

does not even say that the voter must be given assistance by "*the* person" of the voter's choice. *Priorities USA*, 628 F.Supp.3d at 733. It says that such a voter "*may* be given assistance by *a* person of the voter's choice." 52 U.S.C. § 10508 (emphasis added); *see Priorities USA*, 628 F.Supp.3d at 733. "When used as an indefinite article, 'a' means '[s]ome undetermined or unspecified particular.'" *McFadden v. United States*, 576 U.S. 186, 191 (2015) (quoting Webster's New International Dictionary 1 (2d ed. 1954)). And it is notable that "the statute uses the indefinite article 'a'," which is "inherently non-specific and non-limiting," thus confirming that a voter is not guaranteed the power to pick *any* person of his or her choosing. *Priorities USA*, 628 F.Supp.3d at 733.

That the statute says "a person" instead of "any person" is especially significant given that, earlier in the same sentence, it refers to "*any* voter." *Id.* (emphasis added); *see also Cascabel Cattle Co., L.L.C. v. United States*, 955 F.3d 445, 451 (5th Cir. 2020) ("[D]ifferent words within the same statute should, if possible, be given different meanings."). Section 208 applies to *any* voter in need of assistance, but it does not give such a voter the unqualified right to choose *any* assistor. That "textual distinction" is "particularly powerful" because Congress knew how to use "any" when it wanted to. *VanDerStok v. Garland*, 86 F.4th 179, 203 n.5 (5th Cir. 2023).

Section 208's text thus promises voters needing assistance the chance to make *a choice* as to who will assist them—not *any* choice. Provided a statute does not force the voter to use a particular person or class of persons, it is consistent with Section 208 because the voter "*may*" secure assistance from "*a* person of the voter's choice." 52 U.S.C. § 10508; *accord Ray v. Texas*, No. A.2-06-CV-385TJW, 2008 WL 3457021, at \*7 (E.D. Tex. Aug. 7, 2008); *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F.Supp.3d 158, 233-36 (M.D.N.C. 2020) (enjoining statute that limited assistance to small group of people and had effect of making choice for voter).

**2.** Careful attention to the historical context in which Section 208 was enacted likewise confirms that it plays a narrow (but important) role: preventing election officials from forcing voters to use particular assistants. *See Ray*, 2008 WL 3457021, at \*7; *see also Texas v. United States*, 730 F.2d 339, 350 (5th Cir. 1984) (noting that "federal law will not be held to preempt state regulation" absent "clear direction" in "statutory language or legislative history").

In the decades before Section 208's passage, voters needing assistance—most commonly, blind voters—could receive assistance only from election officials. Subcommittee on the Constitution, Appendix to Hearings on S. 1992 (Jan. 27, 28, Feb. 1, 2, 4, 11, 12, 25, and March 1, 1982),

at 392. This led to "confrontations" between election officials and voters needing assistance because such voters "resent[ed]" having a total stranger look on while they [were] voting." *Id.* at 393. Unwilling to be forced to accept assistance from strangers, "many" voters needing assistance "report[ed] staying away from the polls entirely unless they" could "designate their own assistants." *Id.*

In the 1960s, complaints from voters with disabilities led "many jurisdictions ... to change their laws" to allow voters to choose their own assistor. *Id.* at 392. Texas did just that in 1957, providing that "a voter who is entitled to assistance may select any qualified voter residing in the precinct to assist him." Tex. Elec. Code Art. 8.13 (1957). And when Congress considered amendments to the Voting Rights Act in 1982, the National Federation for the Blind successfully lobbied the Senate Judiciary Committee to add what would become Section 208 as a provision intended to codify the majority practice in the States. *Id.* at 393.

Legislative history confirms that Section 208 was designed only to prevent governments from forcing voters to use particular assistants. The Senate Judiciary Committee Report explained that Section 208 responded to complaints that "assistance provided by election officials ... can discourage many from voting for fear of intimidation or lack of privacy." S. Rep. 97-417,

at 62 n.207. Congress accordingly decided to provide for assistance from "a person of the voter's choice" so that such voters would not be limited to assistance from election officials.

By contrast, the Report explicitly *disclaimed* any intent to invalidate voter-assistance regulations, and "recognize[d] the legitimate right of any state to establish election procedures, subject to the overriding principle that such procedures shall be designed to protect the rights of voters." *Id.* Moreover, States would maintain "voter assistance procedures, including measures to assure privacy for the voter and the secrecy of his vote." *Id.* at 62-63. Thus, the Committee understood Section 208 to "preempt[]" state provisions "only to the extent that they unduly burden the right recognized in [Section 208], with that determination being a practical one dependent upon the facts." *Id.* at 63. With that limited understanding of Section 208's reach, the Committee voted 17-1 to add Section 208 to the amended VRA. Senate Judiciary Committee, Executive Session Considering Voting Rights Act (May 4, 1982), at 123.

Historical practice confirms that Section 208 was not originally intended or understood to preempt reasonable state voter-assistance regulations. *See Brnovich v. DNC*, 594 U.S. 647, 669-70 (2021) (noting that the "standard practice" in states at the time of enactment is a "relevant

consideration" in applying the VRA).  States have continued to regulate in this area.  *See, e.g.*, Cal. Elec. Code § 14282(a) (voter cannot receive assistance from "more than two persons"); *id.* § 14282(b) (assistor "shall not divulge any information regarding the marking of the ballot"); N.Y. Elec. L. § 8-306(5) (requiring assistor to take an oath); 10 ILCS 5/17-14 (same); Colo. Rev. Stat. § 1-7-111 (same).  They have even continued to regulate *who* may provide assistance.  *See, e.g.*, La. R.S. § 18:564(B) (prohibiting the candidate or commissioner-in-charge from assisting voters); Miss. Code Ann. § 23-15-549 (prohibiting the candidate and poll watchers from assisting voters); Haw. Rev. Stat. Ann. § 11-139 (prohibiting candidate from providing assistance); Utah Code Ann. § 20A-3a-208 (same); N.M. Stat. Ann. § 1-12-15 (same); O.C.G.A. § 21-2-409(b) (prohibiting candidate or candidate's relatives from assisting); M.C.L.S. § 168.751 (prohibiting minors from assisting); 25 P.S. § 3058(b) (prohibiting judge of election from providing assistance).  And until the last couple of years, courts did not wield Section 208 to scrutinize such laws.  *See supra* 8-9.

**3.**    Constitutional avoidance also supports adopting the narrow, text-and-history based reading of Section 208.

The federal Government  is "one of enumerated powers."  *McCulloch v. Maryland*, 17 U.S. 316, 405 (1819).  Accordingly, "every law enacted by

Congress must be based on one or more of those powers." *United States v. Comstock*, 560 U.S. 126, 133 (2010). That includes the VRA. Although the VRA's race-related provisions are authorized by the Fifteenth Amendment, *see United States v. Bd. of Comm'rs*, 435 U.S. 110, 126-27 (1978), Section 208's protections for voters with disabilities can be plausibly traced only to the Fourteenth Amendment's Equal Protection Clause, which guarantees to all the "equal protection of the laws," U.S. Const. amend XIV § 1.[1]

Congress can enforce the Fourteenth Amendment via "appropriate legislation." *Id.* § 5. Legislation enacted under that authority "must exhibit congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Bd. of Trs. v. Garrett*, 531 U.S. 356, 365 (2001) (cleaned up). Thus, courts assessing whether an act of Congress transgresses those bounds must "identify with some precision the scope of the constitutional right at issue." *Id.*

The scope of the constitutional right implicated by Section 208 is limited. "States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions towards

---

[1] Because it applies to federal, state, and local elections, Section 208 cannot be authorized by the U.S. Constitution's Elections Clause, which only authorizes legislation with respect to congressional elections. *See* U.S. Const. art. I, § 4, cl. 1.

such individuals are rational." *Id.* at 367. "If special accommodations for the disabled are to be required, they have to come from positive law and not through the Equal Protection Clause." *Id.* at 368. Thus, short of "a pattern of irrational state discrimination" against voters with disabilities, *id.*, Congress cannot enact a wholesale preemption of voter-assistance laws, *see Boerne*, 521 U.S. at 520.

The Fourteenth Amendment likely cannot authorize the sweeping construction of Section 208 adopted by the court below. Congress did not even *attempt* to gather a record of behavior by states and local governments that would amount to unconstitutional discrimination against voters with disabilities. Fortunately, this Court need not consider Section 208's constitutionality because Plaintiffs' claims are meritless under a text-and-history based reading of the statute. And to the extent the text is unclear, this Court must "avoid an interpretation of a federal statute that engenders constitutional issues." *Gomez v. United States*, 490 U.S. 858, 864 (1989). Rather than jeopardize Section 208's constitutionality, this Court should adopt a reasonable reading of the statute and affirm.

\* \* \*

Laws regulating voter assistance comply with Section 208 as long as they do not force voters to choose particular people as their assistors. *See,*

*e.g.*, *Ray*, 2008 WL 3457021, at *7. Neutral, generally applicable rules—particularly laws that place requirements on assistors rather than voters—that do not so force voters cannot violate Section 208. *See supra* at 39-41. Even if a voter-assistance regulation renders certain individuals unwilling or unable to provide assistance, voters "may" still "be given assistance by a person of the voter's choice," and not by a person mandated by the government. 52 U.S.C. § 10508. That is all Section 208 requires.

**B. S.B. 1 complies with Section 208.**

S.B. 1's voter-assistance provisions merit no scrutiny under Section 208 because they are neutral, generally applicable voter-assistance regulations that do not force voters to use assistors designated by the government. Unlike laws that strictly limit assistance to government-approved categories of people, *see, e.g.*, *Democracy N.C.*, 476 F.Supp.3d at 235, the challenged provisions do not even *implicate* Section 208.

Consider the Oath Provision. Any would-be assistor can take the oath and abide by its requirements—including refraining from pressuring voters or communicating how the elector voted. The Oath Provision does not force voters to choose from the government's approved list of assistors.

The same is true of the Assistor Disclosure provisions. Any would-be assistor can fill out forms. It takes—at most—a couple minutes to do so.

The Offense Provisions also merit no scrutiny under Section 208. Once again, *any* person can comply with these provisions by simply choosing not to accept compensation in exchange for providing voter assistance.

Appellees will likely engage in logical gerrymandering by suggesting that S.B. 1 prohibits categories of people—namely, all those *unwilling to comply with S.B. 1*—from providing voter assistance. *Cf.* ROA.37750-37751, 37754 n.51, 37766. The District Court appeared to indulge this very suggestion. *See* ROA.37553-37554 & n.51. Such wordplay is not persuasive. There is a difference between a law that prohibits an identified category of people from providing assistance *even if* they follow the rules—such as a law permitting only family members to provide voter assistance—and neutral, generally applicable laws that apply to *everyone* who is allowed to provide voter assistance. Because the challenged provisions are the latter type of regulations, they merit no scrutiny under Section 208.

## C. The District Court erred by reading Section 208 to preempt every state regulation of voter assistance.

The District Court offered a fundamentally different vision of Section 208, holding that any "state law[] regulating assistors" is "preempted" because it "pose[s] an obstacle to Congress's clear purpose to allow the voter to decide who assists them at the polls." ROA.37749-37750. The District Court reached that conclusion because, in its view, Section 208's prohibition

of assistance by agents of the voter's employer or union means that assistance by any other means *must* be permitted. ROA.37751. The District Court, moreover, insisted that this Court *already* adopted its absolutist position on Section 208 in *OCA-Greater Houston*. ROA.37752. At the same time, the District Court tried to dodge the absurd consequences of its decision by carving out exceptions for assistors who are incapable of providing assistance and for "generally applicable laws." ROA.37754 n.51.

The District Court erred at every step. *First*, the District Court all but ignored the words Congress actually chose in Section 208—"a person of the voter's choice," not "*any* person." Its only apparent response to that crucial textual distinction is that, since "Texas and the Fifth Circuit" occasionally uses the words "'a' and 'any' interchangeably," Congress must have done the same. ROA.37752. But the starting point of statutory interpretation is the *statutory* text. By contrast, courts are *not* supposed to "pars[e] [an] opinion as if it were a statute," much less import usage from unrelated decisions into statutory text. *Mays v. Chevron Pipe Line Co.*, 968 F.3d 442, 448 (5th Cir. 2020).

When the District Court *did* examine Section 208, it fared no better. According to the District Court, the fact that Section 208 says that the voter's employer or union representative may not serve as an assistor means that

the voter has an absolute right to choose *anyone else*. ROA.37751. In its telling, "where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." ROA.37750-37751 (quoting *Hillman v. Maretta*, 569 U.S. 483, 496 (2013)).

As the District Court's own case indicates, however, *expressio unius* is not an absolute command. "Virtually all the authorities" discussing that canon "emphasize that it must be applied with great caution, since its application depends so much on context." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 107 (2012). This Court, too, has explained that *expressio unius* "is not meant to be mechanically applied" when "[c]ontext ... indicate[s] that Congress did not wish for an express provision of one thing to work towards the exclusion of another." *In re Bourgeois*, 902 F.3d 446, 447-48 (5th Cir. 2018). An everyday example proves the point. If a sign outside a restaurant says "No dogs allowed," a reasonable person would not assume that every other animal—tigers, monkeys, and so forth—are permitted. Scalia & Garner, *supra*, at 107; *see also Biden v. Nebraska*, 600 U.S. 477, 512 (2023) (Barrett, J., concurring) ("Context also includes common sense.").

Here, context forecloses the District Court's interpretation of Section 208. Like the restaurant owner more worried about dogs than giraffes, Congress likely singled out the voter's employer or union because those are the *most likely* assistors a voter would choose (or be coerced into choosing) who may exert improper influence. It is implausible that, by specifying those two categories of assistors, Congress intended that all else goes—from assistors who simply do not want to comply with state law to dangerous felons to convicted vote fraudsters. Applying *expressio unius* to reach that absurd endpoint would abuse the canon.

*Second*, perhaps recognizing the weakness of the textual argument, the District Court boldly asserts that this Court has *already* said that Section 208 entirely preempts voter-assistance regulations, citing *OCA-Greater Houston*. ROA.37752-37753. That case featured a dispute about whether Section 208 guaranteed interpretation assistance outside the voting booth. *OCA-Greater Houston*, 867 F.3d at 614. Texas argued that its provision, which defined "assistance" as action taken "while the [assistor] is in the presence of the voter's ballot or carrier envelope" and excluded assistance outside the voting booth, was acceptable because it "track[ed] the plain language of Section 208." *Id.* at 608, 615. This Court disagreed, because "to vote" under Section

208 "plainly contemplates more than the mechanical act of filling out the ballot sheet." *Id.* at 615.

This Court could not have been clearer about the limited scope of its holding.  "At bottom," said this Court, "the question presented" was "how broadly to read the term 'to vote' in Section 208 of the VRA." *Id.* at 614.  This Court "normally decide[s] only questions presented by the parties." *Elmen Holdings, L.L.C. v. Martin Marietta Materials, Inc.*, 86 F.4th 667, 674 (5th Cir. 2023).  In *OCA-Greater Houston*, the "only" argument litigated by the parties was the scope of the meaning of "to vote" in Section 208, 867 F.3d at 615, *not* the meaning of "a person of the voter's choice."  Texas never argued that its limits on who could serve as an interpreter were justified because a voter in need of assistance could still name "a person of the voter's choice." This Court thus never had need to—and never did—address that issue.

*Third*, the District Court's attempts to evade the consequences of its extreme interpretation of Section 208 are unavailing.  As discussed, the District Court's reasoning is a roadmap for holding just about any state law preempted as applied to a voter assistor.  ROA.37758.  Maybe that assistor is being unreasonable and idiosyncratic, but so long as he is neither the voter's employer nor the agent of the voter's union, the District Court's reasoning endows voters an absolute right to that person's assistance.  *Id.*

Decrying such hypotheticals as "fanciful," ROA.37754 n.51, the District Court tried to distinguish them in ways that gut its own reasoning. It first asserted that "[i]t is self-evident that the assistor must be actually capable … willing and able to assist" the voter. *Id.* In other words, the District Court suggested that Section 208 preempts only state laws that "narrow the universe of willing and eligible assistors from which a voter can choose." ROA.37754.

Even if that construction of Section 208 is correct, it requires *upholding* S.B. 1. An assistor who refuses to comply with S.B. 1 is "[un]willing … to assist," not "willing" but banned due to non-membership in the category of government-approved assistors. *Id.* at 37754 & n.51.

The District Court next claimed that "[t]here is no question that assistors remain subject to generally applicable laws." *Id.* Thus, according to the District Court, States can legitimately ban incarcerated persons from serving as assistors because that person's inability "to assist at the polling place for reasons that are completely unrelated to Texas's elections laws." *Id.* No argument there. But it is unclear how the District Court can justify that exception given everything it said before. The crux of the District Court's holding is that, because Section 208 expressly says that the voter's employer or union cannot serve as assistors, no other exceptions are allowed. By that

same token, there is no express "unable to assist because of a generally applicable state law" exception in Section 208, so the District Court's reasoning collapses.

More importantly, the District Court did not even attempt to explain how Section 208 admits of an exception for individuals who are "*unable* to assist because of a generally applicable state law" but *not* for individuals who are *unwilling* to assist "because of a generally applicable state law." Nor could it have done so, had it tried, since it acknowledged that an assistor must be "*willing*" to provide assistance. ROA.37754 n.51. An assistor's unwillingness to comply with a generally applicable state law such as S.B. 1's modest requirements for assistors does not impute a Section 208 violation to the State.

Finally, the District Court apparently conceded that States *can* enact "regulations governing voting assistance," so long as they "encourage greater participation in the electoral process." *Id.* That gives the game away because the challenged S.B. 1 provisions *meet that standard.* Failure to "preserv[e] the integrity of [the] election process" has the effect of "driv[ing] honest citizens out of the democratic process." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). And as the Senate Committee that drafted Section 208 recognized, voters with disabilities who are subject to undue pressure by voter assistors

may be deterred from participating in the electoral process. S. Rep. 97-417, at 62. S.B. 1's voter-assistance provisions preserve election integrity and protect voters from inappropriate behavior and undue influence by assistors. *See* Part II.D, *infra*. Thus, even under the District Court's proposed test, those provisions are consistent with Section 208.

## D. Even if S.B. 1's challenged provisions implicate Section 208, they comply with it.

This Court should adhere to statutory text and history and hold that neutral, generally applicable voter-assistance regulations like those in S.B. 1 never violate Section 208. *See* Part I.A, *supra*. But if this Court disagrees, it should adopt an appropriate standard of review and uphold the challenged provisions.

The Court should ask whether a challenged law is reasonably designed to facilitate voter assistance, protect voters, or pursue other legitimate election-related policy goals. *See Qualkinbush v. Skubisz*, 826 N.E.2d 1181, 1197 (Ill. App. 2004) (assessing Section 208 challenge under similar test). That forgiving standard is similar to the one envisioned by the Senate Judiciary Committee, *see* S. Rep. 97-417, at 62-63; *Qualkinbush*, 826 N.E.2d at 1197, and to obstacle-preemption analysis, *see, e.g.*, *Barrosse*, 70 F.4th at 323 (noting "high" bar for obstacle preemption). Along the way, courts should defer to state legislatures' policy judgments. *Cf. Vote.Org v. Callanen*,

89 F4th 459, 480-81 (5th Cir. 2023) (adopting deferential standard of review for novel Materiality Provision claims). After all, "States have considerable discretion in establishing rules for their own elections," and "considerable deference" must be "given to election procedures so long as they do not constitute invidious discrimination." *Id.*

Under that standard, S.B. 1's challenged provisions easily pass muster.

**1.** Begin with the Oath Provision. The District Court held that Section 208 preempts three of S.B. 1's additions to the Oath: (a) that the Oath is taken "under penalty of perjury"; (b) that "the voter … represented [to the assistor] that they are eligible to receive assistance"; and (c) that the assistor "did not pressure or coerce the voter into choosing [him or her] to provide assistance." ROA.37756-37762. In the District Court's view, these additions "interfer[e] with and frustrat[e] the substantive right Congress created under Section 208." ROA.37756-37757.

Not so. For one, the "penalty of perjury" language merely *clarifies* what has *always* been the case: knowingly making a false oath to a state official is perjury. Whether or not that language is included in the Oath, the assistor *is* taking it under penalty of perjury, *see* Tex. Penal Code § 37.02, so S.B. 1 merely ensures that assistors are *aware* of that fact. The District Court missed the point by fixating on S.B. 1's reclassifying perjury under the

Election Code from a misdemeanor to a state jail felony. ROA.37757. That change is not at issue because the District Court did not block enforcement of the "surviving portions of the Oath under [the enhanced penalty]." ROA.37778. Reminding assistors of the existence of valid state law cannot be impermissible.

The notion that the oath's "eligibility for assistance" language is unreasonable or interferes with Section 208 is likewise nonsensical. Section 208 allows assistance *only* for voters afflicted with "blindness, disability, or inability to read or write." 52 U.S.C. § 10508. A voter in need of assistance who chooses an assistor *necessarily* represents to the latter that he or she is eligible for assistance. If a voter *did not* "represent[] that they are eligible for assistance" to a putative assistor, S.B. 1, § 6.04, one of two things must be true: Either the voter did not choose the assistor (and Section 208 is beside the point), or the voter chose the assistor but was obviously ineligible for assistance (in which case the assistor and voter have violated provisions of Texas law unchallenged here). Either way, the voter eligibility for assistance language is completely consistent with Section 208.

Nor is there any conflict between Section 208 and the requirement that the assistor attest that he "did not pressure or coerce the voter" into choosing him. S.B. 1, § 6.04. After all, Section 208 itself refers to "a person of the

voter's *choice*." 52 U.S.C. § 10508 (emphasis added). An assistor who is a person of the voter's choice can obviously attest that he did not "pressure or coerce" the voter into choosing him. Furthermore, from the outset, Section 208's proponents in Congress emphasized that "[t]here is in fact a whole range of Federal and State laws that would allow [any] person … coercing [voters needing assistance] to be prosecuted." Senate Judiciary Committee, Executive Session Considering Voting Rights Act (May 4, 1982), at 89 (Senator Biden). And that makes sense given Congress's view that voters who need assistance "are more susceptible than the ordinary voter to having their vote unduly influenced or manipulated." S. Rep. No. 97-417, at 62. Texas thus acted reasonably in reminding would-be assistors not to pressure voters into choosing them as assistants.

**2.** Next, consider the Assistor Disclosure Provisions. The District Court held that requiring assistors to "complete an additional form" providing information "and disclose their relationships with the voters they assist have deterred voters from requesting assistance." ROA.37762. Thus, the District Court thought, it interferes with the Section 208 right. ROA.37762-37764.

Wrong again. The District Court did not and could not claim that the Assistor Disclosure Provisions *bar* anyone from assisting voters. All an

56

assistor must do is disclose his relationship with the voter, as well as his name and address.  *See* S.B. 1, § 6.03.  None of those requirements is remotely onerous.  Indeed, if that is enough to run afoul of Section 208, no state voter-assistance regulation is safe:  Any such law would be at the mercy of a plaintiff who can find someone—*anyone*—who is put off by even the most minor inconvenience.

Moreover, Texas had good reasons for requiring assistors to provide information about themselves and their relationship to the voters they assist.  Requiring identifying information helps election officials ensure ineligible individuals (like a voter's employer) are not providing assistance.  It also helps the State monitor for abuses by assistors—a risk which Jonathan White, Texas's former top voter-fraud prosecutor, testified is heightened when strangers provide assistance to large numbers of people.  *See* ROA.42725-42726, 42788.

**3.**  Finally, the Offense Provisions do not "interfere with" or "frustrate the substantive right Congress created under Section 208" either.  *Contra* ROA.37766.  On their face, S.B. 1's bans on compensated voter assistance and vote harvesting do not force the voter to use a person designated by the government or prevent any person from providing voter assistance; they merely require the assistor to decline to be paid.  And if an assistor refuses to

aid a voter because he will not do so absent payment, that is not a denial of the Section 208 right:  It is the assistor exercising his right to refuse and not be "willing" to assist.  ROA.37754 n.51.

Moreover, the Legislature's policies behind the Offense Provisions are reasonable and merit deference.  *See, e.g.*, *Vote.Org*, 89 F.4th at 481.  The Supreme Court and this Court have repeatedly recognized that States can enact laws to preserve secret voting and prevent undue influence or pressure by third parties during the voting process.  *See, e.g.*, *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 7 (2018); *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality op.).  When enacting Section 208, Congress recognized that voters with disabilities are particularly vulnerable to undue influence by assistors.  S. Rep. No. 97-417, at 62.  The Offense Provisions guard against that risk.

Start with Section 7.04's vote-harvesting ban.  This provision is designed to provide the same protection for those voting by mail that all 50 States provide for in-person voters: privacy while filling out a mail ballot or when the mail ballot is immediately at hand.  *See La Unión Del Pueblo Entero*, 119 F.4th at 409 (analyzing Section 7.04); *cf. Ostrewich v. Tatum*, 72 F.4th 94, 104 (5th Cir. 2023).  It applies only to individuals *compensated* to deliver votes for a specific candidate or measure, and then only when a canvasser knows a mail ballot is immediately present and to interactions that

"directly involve" the mail ballot.  Tex. Elec. Code § 276.015.  Anyone hoping to provide assistance can avoid liability either by declining payment or not pushing voters to vote for specific candidates or measures—acts already prohibited under unchallenged Texas statutes.  *See* Tex. Elec. Code § 64.036.

The same is true of Section 6.06's ban on schemes in which individuals are paid to seek out strangers and offer voting assistance.  The Legislature recognized that paid electioneers are more likely than unpaid individuals to apply undue pressure.  (The same instinct helps explain why bribery is illegal but mere influence is not.  *See, e.g.*, *Snyder v. United States*, 603 U.S. 1, 10-12 (2024).)  Meanwhile, Section 6.06 sensibly exempts attendants or caregivers known to the voter because the Legislature recognized that those people, while compensated, are less likely to apply partisan pressure during voting.  Such carefully tailored protections are precisely the type of law Congress expected States to adopt in harmony with Section 208.  *See* Rep. No. 97-417, at 62.[2]

---

[2] Intervenor-Appellants also preserve the argument that there is no private right of action to enforce Section 208.  The VRA specifically requires "[t]he chief election officer of each State" to "provide public notice[] ... of the availability of ... assistance under" Section 208, and expressly authorizes "the United States Attorney General or a person who is personally aggrieved" by noncompliance with that requirement to "bring an action for declaratory or injunctive relief."  52 U.S.C. §§ 20104, 20105.  This reticulated enforcement scheme "suggests that Congress intended to preclude others."  *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001).  Intervenor-Appellants recognize that

## CONCLUSION

This Court should reverse the District Court's order permanently enjoining Sections 6.03, 6.04, 6.05, 6.06, 6.07, and 7.04 and dismiss Appellees' challenges to those provisions.

---

the Court implicitly rejected this argument in *OCA-Greater Houston*, and preserve it for potential *en banc* and Supreme Court review.

January 24, 2025

Respectfully submitted,

_s/John M. Gore_

John M. Gore
  *Counsel of Record*
E. Stewart Crosland
Louis J. Capozzi, III
Joshua S. Ha
JONES DAY
51 Louisiana Ave., N.W.
Washington, DC  20001
(202) 879-3939
jmgore@jonesday.com
scrosland@jonesday.com
lcapozzi@jonesday.com

*Counsel for Intervenor-Appellants*

## CERTIFICATES OF COMPLIANCE AND SERVICE

I certify that this brief complies with Federal Rule of Appellate Procedure 32(a)(5)-(a)(6), (a)(7)(B), (c)(1), and Fifth Circuit Rule 32.1-32.2. Excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2, the brief contains 12,848 words and has been prepared using Microsoft Word in Georgia 14-point font.

I certify that on January 24, 2025, I caused a copy of the foregoing to be served on all counsel of record via CM/ECF.

January 24, 2025

*s/John M. Gore*
John Gore
*Counsel for Intervenor-Appellants*