# In the United States Court of Appeals for the Fifth Circuit

La Union del Pueblo Entero; Southwest Voter Registration Education Project; Mexican American Bar Association of Texas; Texas Hispanics Organized for Political Education; JOLT Action; William C. Velasquez Institute; Fiel Houston, Incorporated; Friendship-West Baptist Church; Texas Impact; James Lewin; Mi Familia Vota;

*Plaintiffs - Appellees*

v.

Gregory W. Abbott, in his official capacity as Governor of Texas; Warren K. Paxton, in his official capacity as Attorney General of Texas; State of Texas; Jane Nelson, in her official capacity as Texas Secretary of State; Harris County Republican Party; Dallas County Republican Party; National Republican Senatorial Committee; Kim Ogg, Harris County District Attorney,

*Defendants - Appellants*

Republican National Committee

*Movant - Appellant*

_____

OCA-Greater Houston; League of Women Voters of Texas,

*Plaintiffs- Appellees*

v.

Ken Paxton, Texas Attorney General,

*Defendant - Appellant*

_____

LULAC Texas; Texas Alliance for Retired Americans; Texas AFT; Vote Latino,

*Plaintiffs - Appellees*

v.

Ken Paxton, in his official capacity as the Texas Attorney General,

*Defendant - Appellant*

_____

Delta Sigma Theta Sorority, Incorporated; The Arc of Texas,
*Plaintiffs-Appellees*

v.

Gregory Wayne Abbott, in his official capacity as the Governor of Texas; Warren Kenneth Paxton, Jr., in his official capacity as the Attorney General of Texas,
*Defendants-Appellants*

————

On Appeal from the United States District Court
for the Western District of Texas, San Antonio Division

————

## BRIEF FOR STATE DEFENDANTS-APPELLANTS

————

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General

WILLIAM F. COLE
Deputy Solicitor General

KATHLEEN T. HUNKER
Special Counsel
Kathleen.Hunker@oag.texas.gov

GARRETT GREENE
Special Counsel

MARK CSOROS
Assistant Attorney General

Counsel for State Defendants

# Certificate of Interested Persons

No. 24-50826

Under the fourth sentence of Fifth Circuit Rule 28.2.1, defendants-appellants, as governmental parties, need not furnish a certificate of interested persons.

/s/ Kathleen T. Hunker
Kathleen T. Hunker
*Counsel of Record for*
*Defendants-Appellants*

# Statement Regarding Oral Argument

On October 11, 2024, the United States District Court for the Western District of Texas permanently enjoined the enforcement of six separate provisions of the Texas Election Integrity Protection Act (commonly known as "S.B.1"), Act of Aug. 31, 2021, 87th Leg., 2d C.S., ch. 1, 2021 Tex. Gen. Laws 3873, after misconstruing § 208 of the Voting Rights Act to guarantee voters their "first choice" of assistor, rather than "a person of the voter's choice." The district court issued its order in the absence of any controlling caselaw, yet its maximalist interpretation of § 208 promises to disrupt the balance between federal and state power over elections. If the district court is correct, then § 208 would preempt any state law that could have an effect on someone's willingness to serve as an assistor, no matter how reasonable, such as prohibitions on electioneering, *see* Tex. Elec. Code § 61.003, or carrying firearms into a polling place, *see* Tex. Penal Code § 46.03. Given these implications, as well as the relative lack of applicable caselaw, Attorney General Ken Paxton and Secretary of State Jane Nelson (collectively, the "State Defendants") respectfully posit that oral argument is appropriate.

# TABLE OF CONTENTS

Page

Certificate of Interested Persons .................................................................... i

Statement Regarding Oral Argument .................................................... ii

Table of Authorities ............................................................................... iv

Introduction ............................................................................................. 1

Statement of Jurisdiction ....................................................................... 4

Issues Presented ...................................................................................... 4

Statement of the Case ............................................................................. 4

    I.    Section 208 of the Voting Rights Act ........................................... 4

    II.   S.B.1's Voter Assistance Provisions ............................................. 5

    III. Procedural History ........................................................................ 9

Summary of the Argument ................................................................... 13

Standard of Review ............................................................................... 15

Argument ................................................................................................ 15

    I.    The District Court Lacked Subject Matter Jurisdiction. .......... 15

        A.   Plaintiffs failed to establish Article III standing. ............... 16

        B.   Plaintiffs' § 208 claims against the Secretary and Attorney General are barred by sovereign immunity. ...................... 27

    II.   Section 208 Does Not Preempt S.B.1's Voter-Assistance Provisions. ..................................................................................... 31

        A.   The district court misconstrued the scope of § 208 in violation of its plain text. .................................................. 32

        B.   The district court misapplied § 208 to virtually every voter-assistance provision at issue. ........................................... 40

    III. Plaintiffs Lack a Private Cause of Action for Their § 208 Claims. ............ 46

Conclusion .............................................................................................. 47

Certificate of Service .............................................................................. 49

Certificate of Compliance ..................................................................... 49

# Table of Authorities

Page(s)

**Cases**

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
  594 U.S. 758 (2021) (per curiam) ................................................32

*Ala. State Conf. of the NAACP v. Alabama*,
  949 F.3d 647 (11th Cir. 2020)....................................................... 28

*Alden v. Maine*,
  527 U.S. 706 (1999) ......................................................................27

*Alexander v. Sandoval*,
  532 U.S. 275 (2001)................................................................ 46, 47

*Altria Grp., Inc. v. Good*,
  555 U.S. 70 (2008) ..................................................................... 1, 2

*Ark. United v. Thurston*,
  626 F.Supp.3d 1064 (W.D. Ark. 2022)........................................ 42

*Arnold v. Cockrell*,
  306 F.3d 277 (5th Cir. 2002) ....................................................... 31

*Ball v. LeBlanc*,
  792 F.3d 584 (5th Cir. 2015)........................................................ 15

*Barrosse v. Huntington Ingalls, Inc.*,
  70 F.4th 315 (5th Cir. 2023) .............................................31, 36, 40

*Bates v. Dow Agrosciences LLC*,
  544 U.S. 431 (2005) ....................................................................... 1

*Brnovich v. Democratic Nat'l Comm.*,
  594 U.S. 647 (2021) ......................................................................45

*Burson v. Freeman*,
  504 U.S. 191 (1992) ......................................................................45

*California v. ARC Am. Corp.*,
  490 U.S. 93 (1989) ....................................................................... 31

*California v. Texas,*
    593 U.S. 659 (2021) ............................................................ 25

*Calumet Shreveport Ref'g, L.L.C v. U.S. Env't Prot. Agency,*
    86 F.4th 1121 (5th Cir. 2023) ........................................... 33

*Castro v. Scanlan,*
    86 F.4th 947 (1st Cir. 2023) ............................................ 18

*City of Austin v. Paxton,*
    943 F.3d 993 (5th Cir. 2019) ........................................... 29

*City of Rancho Palos Verdes v. Abrams,*
    544 U.S. 113 (2005) ........................................................... 46

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ........................................... 17, 20, 21

*Crawford v. Marion Cnty. Election Bd.,*
    553 U.S. 181 (2008) ........................................... 3, 18, 19

*Dellmuth v. Muth,*
    491 U.S. 223 (1989) ......................................................... 28

*Democracy N.C. v. N.C. State Bd. of Elections,*
    476 F.Supp.3d 158 (M.D.N.C. 2020) ......................... 40

*Ex parte Young,*
    209 U.S. 123 (1908) ......................................................... 29

*FDA v. Alliance for Hippocratic Medicine,*
    602 U.S. 367 (2024) ......................................................... 26

*Fox v. Saginaw Cnty.,*
    67 F.4th 284 (6th Cir. 2023) ........................................... 18

*Franco v. Mabe Trucking Co., Inc.,*
    3 F.4th 788 (5th Cir. 2021) ............................................ 33

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
    528 U.S. 167 (2000) ......................................................... 18

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n,*
    505 U.S. 88 (1992) ........................................................... 42

*Gebser v. Lago Vista Indep. Sch. Dist.*,
   524 U.S. 274 (1998) ....................................................... 47

*Gladstone Realtors v. Vill. of Bellwood*,
   441 U.S. 91 (1979) ......................................................... 17

*Glass v. Paxton*,
   900 F.3d 233 (5th Cir. 2018) ......................................... 21

*Google, Inc. v. Hood*,
   822 F.3d 212 (5th Cir. 2016) ......................................... 24

*Haverkamp v. Linthicum*,
   6 F.4th 662 (5th Cir. 2021) (per curiam) ...................... 29

*Health & Hosp. Corp. of Marion Cnty v. Talevski*,
   599 U.S. 166 (2023) ....................................................... 46

*Holy Cross College, Inc. v. Criswell*,
   No. 23-30085, 2024 WL 2318166 (5th Cir. May 22, 2024) ............................. 37

*Howard Hughes Co., L.L.C. v. C.I.R.*,
   805 F.3d 175 (5th Cir. 2015) ......................................... 15

*In re Gee*,
   941 F.3d 153 (5th Cir. 2019) (per curiam) .................... 16

*In re McBryde*,
   120 F.3d 519 (5th Cir. 1997) ......................................... 34

*J.I. Case Co. v. Borak*,
   377 U.S. 426 (1964) ....................................................... 47

*Janvey v. Democratic Senatorial Campaign Comm., Inc.*,
   712 F.3d 185 (5th Cir. 2013) ......................................... 40

*K.P. v. LeBlanc*,
   627 F.3d 115 (5th Cir. 2010) ......................................... 29

*Kimel v. Fla. Bd. of Regents*,
   528 U.S. 62 (2000) ......................................................... 28

*La Union Del Pueblo Entero v. Abbott*,
   119 F.4th 404 (5th Cir. 2024) ................................. passim

*Lightbourn v. Cnty. of El Paso, Tex.*,
  118 F.3d 421 (5th Cir. 1997)....................................................... 22, 30

*Loper Bright Enter. v. Raimondo*,
  603 U.S. 369 (2024) ..................................................................... 35

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .......................................................... 16, 20, 24

*McFadden v. United States*,
  576 U.S. 186 (2015) ..................................................................... 33

*Mi Familia Vota v. Ogg*,
  105 F.4th 313 (5th Cir. 2024)............................................10, 24, 29, 30

*NAACP v. City of Kyle*,
  626 F.3d 233 (5th Cir. 2010)......................................................16, 17

*Nat'l Shooting Sports Found. v. Att'y Gen. of N.J.*,
  80 F.4th 215 (3d Cir. 2023) ........................................................... 21

*OCA-Greater Houston v. Texas*,
  867 F.3d 604 (5th Cir. 2017).................................................... 28, 34

*OCA-Greater Houston v. Texas*,
  No. 1:15-CV-00679-RP, 2016 WL 9651777 (W.D. Tex. Aug. 12, 2016)...........35

*Oelze v. C.I.R.*,
  723 F.2d 1162 (5th Cir. 1983)........................................................26

*Okpalobi v. Foster*,
  244 F.3d 405 (5th Cir. 2001) (en banc).................................... 21, 22

*Ostrewich v. Tatum*,
  72 F.4th 94 (5th Cir. 2023) ...................................................... 30, 31

*Planned Parenthood of Hous. & Se. Tex. v. Sanchez*,
  403 F.3d 324 (5th Cir. 2005) ....................................................... 41

*Preston Expl. Co., L.P. v. GSF, L.L.C.*,
  669 F.3d 518 (5th Cir. 2012) ....................................................... 15

*Priorities USA v. Nessel*,
  487 F.Supp.3d 599 (E.D. Mich. 2020), *rev'd and remanded on other
  grounds*, 860 F.App'x 419 (6th Cir. 2021)..........................2, 34, 35, 42

*Ray v. Texas*,
No. 2-06-CV-385, 2008 WL 3457021 (E.D. Tex. Aug. 7, 2008) .............. 34, 35

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947) ...................................................................1, 36, 38

*Richardson v. Flores*,
28 F.4th 649 (5th Cir. 2022) ............................................................ 22

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*,
547 U.S. 47 (2006) .........................................................................25

*Rumsfeld v. Padilla*,
542 U.S. 426 (2005) .......................................................................33

*Russell v. Jones*,
49 F.4th 507 (5th Cir. 2022)............................................................27

*Salazar v. Maimon*,
750 F.3d 514 (5th Cir. 2014) ...........................................................36

*Sprietsma v. Mercury Marine, a Div. of Brunswick Corp.*,
537 U.S. 51 (2002)......................................................................... 40

*State v. Stephens*,
663 S.W.3d 45 (Tex. Crim. App. 2021) ......................... 9, 17, 30, 31

*State v. Zurawski*,
690 S.W.3d 644 (Tex. 2024) ...................................................... 3, 25

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998).........................................................................16

*Stokes v. Sw. Airlines*,
887 F.3d 199 (5th Cir. 2018) ........................................................ 31

*Storer v. Brown*,
415 U.S. 724 (1974) .................................................................32, 36

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .......................................................................25

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) .......................................................................21

*Teltech Sys., Inc. v. Bryant*,
702 F.3d 232 (5th Cir. 2012) ..........................................................36

*Tex. All. For Retired Ams. v. Scott*,
28 F.4th 669 (5th Cir. 2022) ....................................................15, 30

*Tex. Democratic Party v. Abbott*,
961 F.3d 389 (5th Cir. 2020) ...........................................................29

*Tex. Democratic Party v. Abbott*,
978 F.3d 168 (5th Cir. 2020) ...........................................................27

*Tex. Democratic Party v. Benkiser*,
459 F.3d 582 (5th Cir. 2006) ...........................................................16

*Tex. State LULAC v. Elfant*,
52 F.4th 248 (5th Cir. 2022) ....................................................19, 20

*Timmons v. Twin Cities Area New Party*,
520 U.S. 351 (1997) .......................................................................... 2

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ..........................................................18, 19, 25

*Trout Point Lodge, Ltd. v. Handshoe*,
729 F.3d 481 (5th Cir. 2013) ...........................................................33

*Twitter, Inc. v. Paxton*,
56 F.4th 1170 (9th Cir. 2022) ......................................................... 24

*United States v. Duffy*,
92 F.4th 304 (5th Cir. 2024) ...........................................................33

*United States v. Moore*,
71 F.4th 392 (5th Cir. 2023) ...........................................................33

*VanDerStok v. Garland*,
86 F.4th 179 (5th Cir. 2023) ....................................................33, 34

*Veasey v. Abbott*,
830 F.3d 216 (5th Cir. 2016)...........................................................45

*Vote.Org v. Callanen*,
39 F.4th 297 (5th Cir. 2022) ....................................................16, 38

*Vote.Org v. Callanen*,
    89 F.4th 459 (5th Cir. 2023) ...................................................36

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ................................................................ 1, 32

*Wright v. Dougherty Cnty., Ga.*,
    358 F.3d 1352 (11th Cir. 2004) ............................................25

*Yates v. Collier*,
    868 F.3d 354 (5th Cir. 2017) ...................................................1

*Young Conservatives of Tex. Found. v. Smatresk*,
    73 F.4th 304 (5th Cir. 2023) .................................................36

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017) ................................................................47

*Zimmerman v. City of Austin*,
    881 F.3d 378 (5th Cir. 2018) ........................................ 19, 21

## Constitutional Provisions & Statutes

U.S. CONST. art. III, § 2 ...........................................................16

52 U.S.C § 10508 ......................................................................5

52 U.S.C. § 10508 ...........................................................passim

52 U.S.C. § 20104(c) ....................................................... 28, 46

52 U.S.C. § 20105(a) ....................................................... 29, 46

Fla. Stat. § 101.051(5) ...........................................................43

Ill. Comp. Stat. 5/17-14 .........................................................43

Tex. Elec. Code § 1.0015 ..........................................................5

Tex. Elec. Code § 31.006 .........................................................9

Tex. Elec. Code § 32.002 .........................................................7

Tex. Elec. Code § 32.071 .........................................................7

Tex. Elec. Code § 61.003 .....................................................ii, 3

Tex. Elec. Code § 61.003 .......................................................39

Tex. Elec. Code § 64.032 ................................................................. 7

Tex. Elec. Code § 64.0322 ............................................................... 9

Tex. Elec. Code § 64.0322(a) .......................................................... 8

Tex. Elec. Code § 64.0322(b) .......................................................... 9

Tex. Elec. Code § 64.034 ................................................................. 6

Tex. Elec. Code § 64.036(a)(1), (4) .............................................. 43

Tex. Elec. Code § 82.001-.004 ........................................................ 8

Tex. Elec. Code § 83.001(c) ............................................................ 8

Tex. Elec. Code § 83.002 ................................................................. 8

Tex. Elec. Code § 85.001 ................................................................. 8

Tex. Elec. Code § 85.0091 ............................................................... 8

Tex. Elec. Code § 85.031-.033 ........................................................ 8

Tex. Elec. Code § 86.001(a) ............................................................ 8

Tex. Elec. Code § 86.001(b) ............................................................ 8

Tex. Elec. Code § 86.002(a) ............................................................ 8

Tex. Elec. Code § 86.007 ................................................................. 8

Tex. Elec. Code § 86.0105 ............................................................... 6

Tex. Elec. Code § 86.0105(f) .......................................................... 44

Tex. Elec. Code § 86.013(b)(3) ....................................................... 8

Tex. Elec. Code § 87.001 ................................................................. 8

Tex. Elec. Code § 87.041(a), (b) ................................................. 8, 9

Tex. Elec. Code § 87.0431(b)(5) ..................................................... 9

Tex. Elec. Code § 273.001 ............................................................... 9

Tex. Elec. Code § 276.015 ............................................................... 6

Tex. Elec. Code § 276.015 ............................................................. 20

Tex. Elec. Code § 276.019 ............................................................. 23

Tex. Penal Code § 37.02 ......................................................................6, 20

Tex. Penal Code § 46.03 .......................................................................ii, 3

Tex. Penal Code § 46.03(a)......................................................................39

## Other Authorities

Act of Aug. 31, 2021, 87th Leg., 2d C.S., ch. 1, 2021 Tex. Gen. Laws 3873............. ii

S. Rep. No. 97-417 (1982)................................................................passim

# Introduction

Congress, as a matter of common sense and constitutional law, "does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). If Congress wishes to upend states' traditional primacy in an area, it uses unequivocal language to that effect—it does not rely on another branch to give meaning to textual tea leaves. *See Yates v. Collier*, 868 F.3d 354, 369 (5th Cir. 2017) (noting Congress would not have sought "to effect a fundamental change in law through circuitous means"). Because of this, when assessing a potential conflict between federal and state law, courts start "with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *See Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). If a clause is susceptible to more than one plausible meaning, courts ordinarily "accept the reading that disfavors pre-emption." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005).

The district court's October 11, 2024, order did just the opposite, reaching beyond the trial record to determine that Section 208 of the Voting Rights Act (VRA) superseded a half dozen common-sense provisions of S.B.1. Based on the record offered at trial, those provisions had, at most, an incidental effect on voting assistance. The district court nonetheless found them all in violation of § 208 because they might hypothetically affect someone's willingness to serve as a voter assistor. ROA.37703, 37710, 37717, 37726. Neither the language nor the purpose of § 208 supports the district court's interpretation. The statute states that "[a]ny voter who

requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by *a person* of the voter's choice." 52 U.S.C. § 10508 (emphasis added). It "does not say that a voter is entitled to assistance from *the* person of his or her choice or *any* person of his or her choice." *Priorities USA v. Nessel*, 487 F.Supp.3d 599, 619 (E.D. Mich. 2020), *rev'd and remanded on other grounds*, 860 F.App'x 419 (6th Cir. 2021). Even if it had, none of the challenged provisions prohibits anyone from becoming an assistor. The district court created a conflict where none existed.

Further, Congress has acknowledged that § 208 did not truncate "the legitimate right of any state to establish necessary election procedures," assuming those procedures were "designed to protect the rights of voters." S. Rep. No. 97-417, at 63 (1982). "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). Accordingly, "[s]tate provisions would be preempted only to the extent that they unduly burden the right recognized [by § 208], with that determination being a practical one dependent upon the facts." S. Rep. No. 97-417, at 63 (1982). None of the voting-assistance provisions enjoined by the district court meet that criterion. Each provision works in conjunction to protect the very voters that Congress sought to insulate from intimidation and fraud, while imposing a *de minimis* burden on those voters who need assistance. *See Altria Grp.*, 555 U.S. at 76 (describing Congress' purpose as "the ultimate touchstone" in every case). The provisions, in short, advance § 208's purpose. They do not conflict with it.

Absent action by this Court, the district court's contrary construction promises to upend the balance between federal and state power. Under the district court's rubric, any rule or procedure that causes individuals to refrain from providing voting assistance would conflict with § 208 by "narrow[ing] the universe of willing and eligible assistors from which a voter can choose." ROA.37754. Taken to its logical terminus, this construction would mean § 208 effectively preempts all voter-assistance regulations, as well as many rules related to election administration and election integrity, since they could result in an individual refusing to become a voting assistor. Any interpretation that puts § 208 into conflict with reasonable regulations, such as Texas's prohibition on electioneering, *see* Tex. Elec. Code § 61.003, or carrying firearms into a polling place, *see* Tex. Penal Code § 46.03, offends not just federalism, but also the canon against absurdity.

The other problem with the district court's order is that it struck down a presumptively valid state law based on self-inflicted injuries that resembled nothing more than "usual burdens of voting." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198 (2008). To make matters worse, [n]either the Secretary of State nor the Attorney General enforces S.B.1." *La Union Del Pueblo Entero v. Abbott*, 119 F.4th 404, 409 (5th Cir. 2024) *(LUPE)*. Accordingly, the district court's order is little more than an "empty vessel." *State v. Zurawski*, 690 S.W.3d 644, 659 (Tex. 2024). Throughout this case's proceedings, the district court struggled to understand the law governing Article III standing. *See, e.g.,* ROA.40559. To that end, it committed many of the same errors here that it made in partially denying State Defendants'

motion to dismiss; State Defendants' appeal of that prior ruling remains pending
with this Court.

## Statement of Jurisdiction

Plaintiffs invoked the original jurisdiction of the district court pursuant to
28 U.S.C. § 1331. The district court lacked jurisdiction, however, because Plaintiffs
failed to establish Article III standing and sovereign immunity applies to State De-
fendants. *See* Part I. This Court has appellate jurisdiction under 28 U.S.C. § 1292
because State Defendants timely appealed, ROA.37826, the district court's order
granting a permanent injunction, ROA.37670.

## Issues Presented

1. Whether the district court had jurisdiction to enjoin S.B.1's voting-assis-
   tance provisions, and if so, whether that jurisdiction extended to State De-
   fendants.

2. Whether Section 208 of the VRA preempts S.B.1's voting-assistance provi-
   sions.

3. Whether Section 208 of the VRA creates a private right of action for these
   plaintiffs.

## Statement of the Case

## I. Section 208 of the Voting Rights Act

Congress enacted VRA § 208 in 1982 to protect certain voters—specifically,
those who are blind, disabled, or unable to read or write—from practices that might
compromise the integrity of their vote. 52 U.S.C. § 10508; S. Rep. No. 97-417, at 63

(1982). Recognizing that such voters "are more susceptible than the ordinary voter to having their vote unduly influenced or manipulated," Congress sought give these voters the opportunity to obtain assistance from someone the voter trusts. S. Rep. No. 97-417, at 62. Specifically, § 208 states,

> "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by *a person* of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union."

52 U.S.C § 10508 (emphasis added).

Congress also made clear that § 208 should coexist with state-level efforts to ensure fair elections. S. Rep. No. 97-417, at 62-63 (noting that Congress "intend[ed] for voter assistance procedures . . . be established in a manner which encourages greater participation in our electoral process"). The Senate Report cautioned that § 208 should be "preempted only to the extent" state provisions "unduly burden the right recognized in this section," thus leaving room for reasonable procedures to protect voters and election integrity. *Id.* at 63. Accordingly, § 208 aims to ensure meaningful assistance for eligible voters while preserving each state's authority to combat voter fraud and intimidation. *Id.* (recognizing "the legitimate right of any state to establish necessary election procedures").

## II. S.B.1's Voter Assistance Provisions

**A.** In 2021, Texas enacted Senate Bill 1 (S.B.1), *see* ROA. 74295-370, to standardize election procedures across the State and address concerns about fraud and voter intimidation. *See* Tex. Elec. Code § 1.0015. Relevant here, S.B.1 contains a

number of measures pertaining to voter assistance (collectively, "voting-assistance provisions") that addressed practices that increased the likelihood of voting assistors applying pressure on the voter. Each measure was designed to protect vulnerable voters from the very abuses Congress sought to curtail through §208. They include:

- **Information Requirements**. Sections 6.03 and 6.05 oblige individuals who assist voters to provide identifying information and disclose any compensation received from a campaign or candidate. These provisions require, for example, the assistor's name, address, and relationship to the voter, all intended to ensure transparency. Section 6.07 provides that official carrier envelopes must have sufficient space to allow assistors to comply with the requirements of Section 6.05.

- **Enhanced Oath.** Section 6.04 revises the assistor's oath to include affirmations about voting assistors' preexisting obligations, such as a promise not to pressure or coerce the voter, a commitment to preserve ballot secrecy, and an acknowledgment that assisting an ineligible voter may invalidate that person's ballot. *Id.* § 64.034. Section 6.04 also informs assistors that the oath is under penalty of perjury—something which has been true since 1974. *See* Tex. Penal Code § 37.02.

- **Ban on Paid Assistance**. Section 6.06 criminalizes compensating voter assistors; offering to compensate voter assistors; and soliciting, receiving, and accepting compensation for assisting voters. Tex. Elec. Code § 86.0105. The provision does not apply if the assistor is an "attendant" or "caregiver" previously known to the voter. *Id.* Nor does it prevent individuals from being reimbursed for their expenses. ROA.40704-05.

- **Ban on Paid Vote Harvesting**: Section 7.04 criminalizes paid vote harvesting, defined as "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." Tex. Elec. Code § 276.015. This provision was at issue in *LUPE*. *See* 119 F4th at 407.

Testimony at trial elucidated the types of conduct these provisions sought to curb, ROA.42724-26, 42731-47, *cf.* 67832-48 (listing election fraud prosecutions), particularly incidents in which paid political operatives influenced or attempted to influence voters—sometimes while voters were marking their ballots inside polling places. ROA.39903-05. One operative allegedly collaborated with an election judge, then later shifted to "curbside voting," ferrying vanloads of voters and overhearing private conversations from inside a vehicle. ROA.39903-05. Jonathan White, formerly of the Attorney General's Election Integrity Division, testified about "frequent flyer assistance," where a single assistor—often a paid operative—appeared on dozens or hundreds of ballots. ROA.42720. In some instances, the operative's efforts resulted in voters' disenfranchisement. ROA.42745-46, 68105. These tactics especially threatened voters who need help due to a disability or inability to read or write—the very individuals Congress aimed to protect.

**B.** Like many aspects of Texas's Election Code, S.B.1's voting-assistance provisions are enforced wholly by local officials. During the regular voting period, each election precinct is staffed by an "election judge[]," appointed by the Commissioners Court, who is "in charge of and [is] responsible for the management and conduct of the election at the polling place." Tex. Elec. Code § 32.002,.071. If assistance is provided by a person of the voter's choice, election workers, at the direction of the presiding judge, "enter the [voting assistor's] name and address on the poll list beside the voter's name," *id.* § 64.032, and administer the oath of assistance. Any "person, other than an election officer, who assists a voter" must "complete a

form" stating their name, address, the relationship to the voter, and whether person assisting the voter received compensation from a candidate, campaign, or political committee." *Id.* § 64.0322(a). That form "must be submitted to an election officer at the time the voter casts a ballot." *Id.* § 64.0322(a). Texas law also provides for a period of early voting. *Id.* §§ 85.001, 86.007. The early voting process is managed by an "early voting clerk"—typically, the county clerk, *id.* § 83.002—who "has the same duties and authority with respect to early voting as a presiding election judge has with respect to regular voting." *Id.* § 83.001(c). Thus, the early voting clerk presides over the early voting polling place and is tasked with checking in voters for in-person voting or selecting election officers to perform these duties. *See, e.g.*, *id.* § 85.031-.033, .0091.

In addition, Texas offers the option to vote by mail to certain qualified citizens. *Id.* § 82.001-.004. The early voting clerk is tasked with "review[ing] each application for a ballot to be voted by mail." *Id.* § 86.001(a). If the applicant meets the requirements, the early voting clerk will mail the eligible voter "an official ballot," *id.* § 86.001(b), along with the official ballot envelope and the mail-in-ballot carrier envelope, *id.* § 86.002(a), which contains a space on the reverse side for indicating the relationship of the person who deposits the carrier envelope in the mail to the voter. *Id.* § 86.013(b)(3). In order "to process early voting results from the territory served by the early voting clerk," the Election Code requires the creation of an early voting ballot board, *id.* § 87.001. It is this ballot board that determines whether to "accept" a ballot voted by mail based upon eight statutory requirements for mail-in ballots, *id.* § 87.041(a), (b). Any person who provides voting assistance in the vote-by-mail

context must submit a form. *Id.* § 64.0322. "The form must be incorporated into the official carrier envelope." *Id.* § 64.0322(b). Failure to properly execute this form is grounds for the ballot board to reject a voter's ballot. *Id.* § 87.041(a), (b); .0431(b)(5).

In regard to the provisions that involve a criminal offense, the Secretary has preliminary investigative authority over criminal election misconduct and must refer such matters to the Attorney General for further investigation upon "reasonable cause to suspect that criminal conduct occurred." *Id.* § 31.006. The Attorney General has discretionary authority to investigate election crimes, but only on referral from the Secretary. *Id.* § 273.001. At the time of S.B.1's enactment, the Attorney General was authorized to prosecute election offenses under Texas Election Code § 273.021. But later that year, the Court of Criminal Appeals held that § 273.021 unconstitutionally "delegate[d] to the Attorney General a power more properly assigned to the judicial department." *State v. Stephens*, 663 S.W.3d 45, 47 (Tex. Crim. App. 2021). So long as *Stephens* remains good law, the Attorney General may prosecute election crimes only with the invitation, consent, or request of a county or district attorney. *Id.* at 56; ROA.42710. The record on appeal does not reflect any instance in which the Attorney General received such an invitation by a local prosecutor to participate in a prosecution pursuant to any of S.B.1's provisions.

## III. Procedural History

Lawsuits seeking to enjoin the enforcement of S.B.1 were filed even *before* the bill was signed into law on September 7, 2021—consequently before S.B.1 took effect. *See* ROA.222, 82613. Additional lawsuits followed, which the district court then

consolidated into the present action.[1] ROA.83431, 82868, 83159. Altogether, five separate sets of private plaintiffs initiated a facial challenge against more than three dozen provisions of S.B.1 under an assortment of the legal theories. This appeal only concerns private plaintiffs' assertion that S.B.1's voting-assistance provisions—Sections 6.03, 6.04, 6.05, 6.06, 6.07, and 7.04—unduly burden the statutory right to receive assistance in violation of VRA § 208 and are preempted by that federal statute.

State Defendants moved to dismiss Plaintiffs' operative second amended complaints on the grounds of sovereign immunity, lack of standing, and lack of a private right of action.[2] ROA.7305, 7338, 7447, 7749. Those motions for dismissal were granted in part and denied in part. ROA.10690, 10771, 10833, 10901. State Defendants' appeals about these denials remain pending before this Court, having been fully briefed and argued in July 2023.[3] While the appeals of the motion-to-dismiss orders were litigated in this Court, discovery in the larger consolidated action proceeded

---

[1] *See* ROA.83479-83 (consolidating *OCA-Greater Houston v. Esparza*, No. 1:21-cv-780 (W.D. Tex. 2021); *Houston Area Urban League v. Abbott*, No. 5:21-cv-848 (W.D. Tex. 2021); *LULAC Texas v. Esparza*, No. 1:21-cv-786 (W.D. Tex. 2021) and *Mi Familia Vota v. Abbott*, No. 5:21-cv-920 (W.D. Tex. 2021) under lead case).

[2] Although the Governor remains listed in the case caption, the district court dismissed the claims against him for lack of standing. ROA.10766, 10771. Plaintiffs have not cross appealed this decision.

[3] The Harris County District Attorney also appealed the district court's partial denial of motion to dismiss. Since then, this Court has ordered Plaintiffs' claims against Ogg to be dismissed on sovereign-immunity grounds because Ogg did not possess any demonstrated willingness to enforce S.B.1 and her mere theoretical ability to prosecute or investigate violations of the Election Code did not demonstrate the requisite compulsion or constraint. *Mi Familia Vota v. Ogg*, 105 F.4th 313, 330-33 (5th Cir. 2024).

apace. Perhaps most tellingly, no Plaintiff group sought discovery or testimony from any of the local prosecutors who are actually charged with enforcing any of the criminal offenses created or amended by S.B.1. As a result, the record—developed over three years of litigation since the enactment of S.B.1—reflects not a single prosecution attempted, threatened, or considered pursuant to Sections 6.04, 6.05, 6.06 and 7.04, let alone by State Defendants.

On September 11, 2023, the district court commenced a six-week bench trial on Plaintiffs' claims. ROA.38802-43737. Parties submitted hundreds of pages of findings of facts and conclusions of law in January 2024. ROA.33411, 33558, 33633, 33749, 34102, 35795. On February 13, 2024, the court heard closing arguments. ROA.43753-44010. And on October 11, 2024—eight months later and mere days before early voting started in the November 2024 election—the district court enjoined Defendants from enforcing the voting-assistance provisions. ROA.37670. In its order, the district court held that multiple litigants, divided among four of the five operative complaints, had standing.[4] Although the district court acknowledged that the MFV Plaintiffs[5] filed their own complaint, ROA.37672 at n.1, the district court never

---

[4] The district court determined that the following plaintiffs had organizational standing: LUPE (Sections 6.03-6.07, 7.04), the Mexican American Bar Association (MABA) (Sections 6.03-6.07), FIEL (Section 6.03-6.05, 6.07), OCA-GH (Section 6.06), League of Women Voters (Section 6.06), League of United Latin American Citizens (LULAC) (Section 7.04), and Delta Sigma Theta (Sections 6.03-6.05, 6.07). ROA.37742-47. The district court also determined that the Arc of Texas had associational standing to challenge Section 6.04. ROA.37738-42.

[5] The MFV Plaintiffs include Mi Familia Vota, Marla López, Marlon López, and Paul Rutledge.

made any finding that an MFV Plaintiff had met the requisites for Article III standing. It instead bundled the group with the HAUL Plaintiffs. ROA.37672 n.2, 37686-87.

Overall, the district court found that S.B.1's voting-assistance provisions presented an obstacle to VRA § 208 because they had the effect of deterring individuals from providing voting assistance and therefore "effectively narrow[ed] the universe of willing and eligible assistors from which a voter can choose." ROA.37754, 37756, 37762. Despite these conclusions, the record does not identify any specific voter who was unable to obtain assistance upon request or successfully cast their ballot. To the contrary, the record shows that any effect was minimal. At least two county elections administrators testified that they were unaware of any voter who lacked necessary assistance or was unable to vote during the November 2022 election. ROA.39106-07, 39903-06. The former Director of Elections likewise testified that the Secretary's office received few if any phone calls related to any confusion or concerns about the voting-assistance provisions. *See*, *e.g.*, ROA.43233.

Following the district court's order, Texas immediately filed a notice of appeal, and sought an emergency stay pending appeal and an administrative stay from this Court. The request for an administrative stay was granted. However, following this Court's ruling in *LUPE*, 119 F.4th at 407—holding that the district court violated the *Purcell* doctrine when it enjoined Section 7.04 in an earlier order—the district court stayed its own injunction of the voting-assistance provisions until after the 2024 election. ROA.37864-83. Accordingly, this Court denied the motion to stay pending appeal and instructed defendants to resubmit their motion if they sought a

stay beyond the November 2024 election. Defendants did so. That motion is now fully briefed and awaiting a ruling from the panel assigned to hear argument in this appeal.

## Summary of the Argument

The district court's sweeping injunction rests on a misunderstanding of both Article III's jurisdictional prerequisites and the unambiguous text of § 208. At issue is a straightforward Texas law with provisions requiring would-be assistors to take an oath, disclose limited information, and refrain from paid vote harvesting. Far from infringing on voters' rights, these rules are tailor-made to protect vulnerable voters from exploitation. Yet the district court struck them down based on an abstract concern that someone, somewhere, might be deterred—a theory unmoored from actual evidence.

Plaintiffs did not satisfy the bedrock Article III requirement to prove an actual, concrete controversy. Their core premise is that unnamed assistors could feel discouraged from helping voters. But they have not identified a single voter who needed help and could not find it upon request. The Constitution requires more than hypothetical fears before a federal court may invalidate a state's duly enacted law. Compounding the jurisdictional defects, the named State Defendants do not enforce the contested provisions. That authority resides with local officials, leaving Plaintiffs unable to establish any injury traceable to or redressable by these State Defendants. Federal courts cannot proceed when there is no real injury and no basis to order the named defendants to do—or refrain from doing—anything that would remedy a nonexistent harm.

Even setting aside the lack of jurisdiction, Texas's narrow rules easily satisfy § 208, which ensures that voters requiring assistance can obtain it from a person of their choice. The statute's purpose is to guard vulnerable voters from losing their voice at the ballot box. But it does not prohibit states from adopting measures to curb manipulation or fraud. Ensuring an assistor is not paid to harvest votes, and requiring them to attest they will not coerce the voter or provide assistance to individuals who do not qualify for assistance, in no way diminishes the voter's freedom to pick a helper. Rather, it keeps unscrupulous individuals from exploiting that role.

Under the district court's approach, however, § 208 would allow anyone—including professional harvesters—to evade even the most basic anti-fraud checks. The court's expansive reading would convert a voter-protective provision into an all-purpose immunity for ballot manipulation. Nothing in the statutory text, history, or logic of § 208 suggests that Congress intended such a free pass for bad actors. Nor does the language suggest that Congress intended to alter the balance of federal and state power over elections. If it had, Congress would have said so explicitly. It does not, as a habit, hide elephants in mouseholes.

Equally striking is the absence of any real-world impact on voters. Plaintiffs point to no specific individual who was prevented from voting, denied the right to choose an assistor, or otherwise burdened in a tangible way. They instead largely rely on speculation that the challenged laws might deter theoretical assistors. This Court should be wary of facially invalidating a State's election law in the absence of concrete proof that such laws have harmed—or will imminently harm—actual voters.

Finally, even if there were a conflict between the enjoined provision of S.B.1 and § 208—and there is not—Plaintiffs would still lack a direct avenue to sue. Congress knows how to create private rights of action in voting-rights statutes; it does so expressly in other sections of the VRA. By contrast, § 208 is silent, and this Court should not manufacture an implied right when Congress has elected not to include one.

## STANDARD OF REVIEW

Following a bench trial, findings of fact are reviewed for clear error, while legal conclusions are reviewed de novo. *Preston Expl. Co., L.P. v. GSF, L.L.C.*, 669 F.3d 518, 522 (5th Cir. 2012). This Court reviews de novo any determinations related to standing and sovereign immunity. *Tex. All. For Retired Ams. v. Scott,* 28 F.4th 669, 671 (5th Cir. 2022) (*TARA*). It also reviews de novo the district court's interpretation of § 208 because it constitutes a question of law. *Howard Hughes Co., L.L.C. v. C.I.R.*, 805 F.3d 175, 180 (5th Cir. 2015). The "[C]ourt reviews permanent injunctions for abuse of discretion," which can occur when the district court (1) relies on "clearly erroneous factual findings," (2) relies on "erroneous conclusions of law," or (3) "misapplies the factual or legal conclusions when fashioning its injunctive relief." *Ball v. LeBlanc*, 792 F.3d 584, 598 (5th Cir. 2015) (cleaned up).

## ARGUMENT

### I. The District Court Lacked Subject Matter Jurisdiction.

Even with the benefit of three years, multiple elections, and a six-week trial, Plaintiffs have failed to substantiate the facts necessary to establish standing.

"Article III specifies that the judicial power of the United States extends only to 'Cases' and 'Controversies.'" *Vote.Org v. Callanen*, 39 F.4th 297, 303 (5th Cir. 2022) (quoting U.S. CONST. art. III, § 2) (*Vote.Org I*). "[I]n the absence of standing, the court has no 'power to declare the law.'" *In re Gee*, 941 F.3d 153, 161 (5th Cir. 2019) (per curiam) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)). Accordingly, the district court lacked jurisdiction to hear Plaintiffs' claims and enjoin the enforcement of six voting-assistance provisions designed to ensure that vulnerable voters can cast their ballot freely and without coercion. Moreover, even if Plaintiffs had satisfied this constitutional minimum, they cannot overcome State Defendants' sovereign immunity. Congress did not abrogate sovereign immunity for VRA § 208 claims. No other exception to sovereign immunity applies.

## A. Plaintiffs failed to establish Article III standing.

The district court misapplied the law governing standing. For Plaintiffs to establish Article III standing, they must have proven by a preponderance of the evidence that (1) they have suffered an "injury in fact," which is (2) fairly traceable to the enforcement of the specific challenged provision, and (3) likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Because Plaintiffs are organizations, they had two avenues by which to meet their burden: (1) associational or (2) organizational. *See NAACP v. City of Kyle*, 626 F.3d 233, 237-38 (5th Cir. 2010). For associational standing, the organization must have shown that *its members* would independently have standing. *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587-88 (5th Cir. 2006). Organizational standing, in contrast, requires

that the organizational plaintiff establish injury *to itself*, causation, and redressability. *City of Kyle*, 626 F.3d at 237-38.

The district court held that multiple litigants, divided among four of the five operative complaints, had standing. None of them, however, established with "evidence adduced at trial," *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 115 n.31 (1979), that they or their members suffered an injury in-fact that is "certainly impending" with respect to at least Sections 6.03, 6.04 6.05, 6.07, and 7.04. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). In addition, the district court, again, ignored the practical and legal implication of the *Stephens* decision, issued by the Court of Criminal Appeals in 2021, which held that prosecutorial discretion was the exclusive province of local district attorneys. *Stephens*, 663 S.W.3d at 56. Accordingly, none of the Plaintiffs can establish that their alleged injuries are traceable to or redressable by State Defendants. This is true for each of the voting-assistance provisions challenged. Lastly, although consolidated, the present action consists of five separate lawsuits, each of which needed at least one litigant with standing to proceed. The district court failed to find that any of the MFV Plaintiffs had standing. Their claims are therefore dead on arrival.

### 1. Plaintiffs have not suffered a cognizable injury.

As a threshold matter, this Court should render judgment against the LUPE Plaintiffs and OCA-Greater Houston (OCA-GH) Plaintiffs because both set of litigants filed their complaints *before* S.B.1 was even signed into law. ROA.222, 82613. They therefore did not (and could not) establish at trial a reasonably certain injury at the time they commenced litigation. This is fatal to their claims. A plaintiff must

have Article III standing from "the outset of the litigation." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). "[A] plaintiff who lacks standing from the start [of a case] cannot rely on factual changes during the suit to establish it." *Fox v. Saginaw Cnty.,* 67 F.4th 284, 295 (6th Cir. 2023); *Castro v. Scanlan*, 86 F.4th 947, 954 (1st Cir. 2023). In this instance, S.B.1 did not exist when the LUPE Plaintiffs and OCA-GH Plaintiffs initiated their respective suits. Even if the challenged provisions later harmed them, that represents a subsequent development that cannot retroactively impart standing.

In all events, no Plaintiff identified at trial an injury-in-fact that would be sufficient to permit them to challenge Sections 6.03, 6.04, 6.05, 6.07, and 7.04.

**a.** Start with the information-requirement provisions of S.B.1, Sections 6.03, 6.05, and 6.07. All Sections 6.03 and 6.05 do is require would-be assistors to provide a few pieces of information on a form. ROA.74345-48. Section 6.07 does not even go that far. It simply states that the carrier envelope must have space for an assistor to provide information. ROA.74349. The obligation to provide such information is not a cognizable injury because it has no "close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2021) (cleaned up). Instead, an assistor's obligation to provide information on a form represents nothing more than the "usual burdens of voting." *Crawford*, 553 U.S. at 198.

The district court offered a number of reasons why Plaintiffs established standing to challenge these provisions, but none has merit. *First*, the district court claimed that the disclosure requirements caused would-be assistors to fear prosecutions and

be less willing to assist. *See* ROA.37719-20. But this is unsupported by the record. Not a single witness said the disclosures alone would prevent them from assisting voters. In fact, corporate representatives for Delta Sigma Theta and FIEL Houston testified the reverse; they were unaware of any member who had refused to assist voters because of the relevant requirements. ROA.40925-26; ROA.41269. Nor could such testimony have grounded Article III standing in any event: any such claim depends on the premise that assistors will not fill out forms because they fear prosecution and is thus incredible and far too speculative to confer standing. *See, e.g.*, *Tex. State LULAC v. Elfant*, 52 F.4th 248, 256-57 (5th Cir. 2022). After all, Plaintiffs cited *zero* examples of relevant investigations or prosecutions since S.B.1 was passed, and their speculation about future prosecutions is impermissibly dependent "on the actions of third-part[ies]." *See Zimmerman v. City of Austin*, 881 F.3d 378, 390 (5th Cir. 2018).

*Second*, the district court suggested that Plaintiffs have suffered an organizational injury because form requirements delay assisting voters. ROA.37717-18. Yet no witness quantified those alleged delays, and common sense suggests any delays would be *de minimis*. It does not take long to write one's name and relationship to the voter on a paper and check a box about whether one received compensation, particularly when Texas law already required assistors to check-in before assisting someone to vote. ROA.43225. Any delay represents nothing more than a "usual burden[] of voting," *Crawford*, 553 U.S. at 198, and does not bear any "'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 417 (citation omitted).

**b.** Similar analysis applies to Plaintiffs' claims against Section 6.04, as fear of prosecution is far too "speculative" to support standing.[6] *Elfant*, 52 F.4th at 256-57. No plaintiff has alleged an intent to engage in conduct "arguably proscribed" by this provision. *Id.* at 256. And Plaintiffs have not identified a single person who was prosecuted under the new language, much less wrongly. Because Plaintiffs seek prospective relief, they must establish an "imminent" future injury to satisfy standing. *Lujan*, 504 U.S. at 564. The Supreme Court has repeatedly interpreted this to mean that a "threatened injury must be *certainly impending* to constitute injury in fact" — "[a]llegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (emphasis in original) (quotations omitted). But that is all Plaintiffs have shown.

**c.** Turning to Section 7.04, the district court held that the Arc of Texas had standing because Section 7.04 chills its members willingness to request and offer assistance. ROA.37740. But this theory is founded on a complete misreading of the provision. The paid-vote-harvesting ban only applies in highly specific and narrow circumstances, where individuals are specifically paid to deliver votes for or against a candidate or measure *while the ballot is physically present*. Tex. Elec. Code § 276.015. It does not apply to paid canvassing or voting assistance organized by Plaintiffs. *See* Opening Brief for Defendants-Appellants at 14-28, *LUPE*, 119 F.4th 404 (5th Cir.

---

[6] There is also the matter that any fear of criminal charges is not *caused* by Section 6.04. Each addition to the oath simply informs would-be assistors of their preexisting obligations under Texas law. The conduct the oath proscribes is already illegal under the Election Code, ROA.43227-231, and the voter-assistance oath has been subject to penalty of perjury since 1974. *See* Tex. Penal Code § 37.02.

Dec. 23, 2024). True, a plaintiff who wishes to challenge a law need not "confess that he will in fact violate that law," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014), but the plaintiff "must give [the Court] something to go on," *Nat'l Shooting Sports Found. v. Att'y Gen. of N.J*, 80 F.4th 215, 221 (3d Cir. 2023), to demonstrate that the risk of enforcement is not "imaginary or wholly speculative." *Zimmerman*, 881 F.3d at 390.

Here, Plaintiffs failed to introduce any evidence that local district attorneys have adopted an interpretation of Section 7.04 that would arguably reach Plaintiffs' conduct. Nor could Plaintiffs identify a single person who was investigated or prosecuted under Section 7.04—let alone for conduct in which plaintiffs or their members partake. At best, Plaintiffs have established a "subjective fear" of prosecution, *Clapper*, 568 U.S. at 418, but that "[is] not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Glass v. Paxton*, 900 F.3d 233, 239 (5th Cir. 2018).

### 2. Any injury suffered by plaintiffs is neither traceable to nor redressable by State Defendants.

Regardless of whether Plaintiffs have a cognizable injury, the district court lacks jurisdiction over State Defendants because State Defendants have not caused—and any relief ordered against them would not redress—Plaintiffs' asserted injuries. *See Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) (en banc) ("The requirements of *Lujan* are entirely consistent with the long-standing rule that a plaintiff may not sue a state official who is without any power to enforce the complained-of statute."). As this Court has recognized for decades, Texas manages and administers its

elections through a highly decentralized system, whereby local officials implement the state's voting rules, s*ee, e.g.*, *Lightbourn v. Cnty. of El Paso, Tex.*, 118 F.3d 421, 428 n.7 (5th Cir. 1997), while the Secretary largely provides advice and administrative support. *See*, *e.g.*, *Richardson v. Flores*, 28 F.4th 649, 654 (5th Cir. 2022); *see also* ROA.43112-14, 43117-21. The voting-assistance provisions at issue here do not buck this customary arrangement of relying on local officials to enforce state law. *See supra* at 7-9.

In its ruling, the district court did not dispute that local officials bear primary responsibility for enforcing the voting-assistance provisions in S.B.1—its order in fact cited many of those duties as a justification for finding that Plaintiffs had standing against county election officials. *See* ROA.37740. Instead, the district court highlighted the State Defendants' general duties under the Election Code, even though none of the actions taken pursuant to them are necessary or sufficient to the statute's enforcement. This constitutes reversible error for at least three reasons.

*First,* the district court asserted that any injuries resulting from Sections 6.03, 6.04, 6.05, and 6.07 were traceable to and redressable by the Secretary because she designed the forms local officials use to implement the provisions. ROA.37739-40, 37743-44. This reasoning, however, "confuses [the] statute's immediate coercive effect on the plaintiffs with any coercive effect that might be applied by the *defendants.*"[7] *Okpalobi,* 244 F.3d at 426. The mere existence of prescribed forms does not

---

[7] State Defendants provided a provision-by-provision breakdown of the flaws in the district court's analysis in their brief appealing the district court's partial denial

harm anyone. It is the use of said forms, and the consequences of non-compliance, that Plaintiffs argue discourage voting assistance. Neither of these things is done by the Secretary. The district court's conclusion is based on a false premise. The forms prescribed by the Secretary are best understood as clerical aids. They help county election offices keep track of information and activity required under the new law, but it is the Election Code itself that compels local officials to enforce the provisions, not the forms prescribed by the Secretary. *See, e.g.*, Tex. Elec. Code § 276.019.

Take Section 6.03, for example, which requires voting assistors to provide certain information. Even if the Secretary was enjoined from updating the relevant forms, voters would *still* be obligated under state law to provide the information, just as elections workers would *still* be obliged to collect the information and reject, at check-in, any prospective assistor who refused to provide it. Accordingly, not only have Plaintiffs failed to establish traceability by means of the Secretary's duty to prescribe forms, but they also did not prove redressability, since an injunction prohibiting the Secretary from designing voter-assistance forms would not prevent local officials from enforcing the substantive requirements of these provisions. To be sure, such an injunction would indirectly prevent local officials from *using a form* prescribed by the Secretary; but nothing about such an injunction would relieve local officials—who would not be bound by such an injunction—of their independent obligation to enforce the substantive provisions of state law.

---

of their motion to dismiss. *See* Opening Brief for Defendants-Appellants at 35-40, *La Union del Pueblo Entero v. Scott*, No. 22-50775 (5th Cir. Dec. 9, 2022).

*Second*, the district court concluded that injuries resulting from the voting-assistance provisions satisfied traceability and redressability because State Defendants both have some degree of investigatory authority over criminal violations of the Election Code. ROA.37741, 37743, 37745-47. However, this Court has already stated—with respect to this very statute—that "investigations" are not "enforcement," *see Ogg*, 105 F.4th at 331, because investigations "do[] not rise to the level of compulsion or constraint," *id.* at 332. Instead, an investigation is, at most, a precursor to potential enforcement, *see Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1176 (9th Cir. 2022), which this Court has held does not yet give rise to an Article III controversy, *Google, Inc. v. Hood*, 822 F.3d 212, 225 (5th Cir. 2016). The other problem is that the district court lumped all six provisions together even though not all of them involve a criminal offense. At minimum, Plaintiffs did not have standing to sue State Defendants over Sections 6.03 and 6.07 since neither involve a criminal offense and State Defendants lack authority to investigate.

*Third*, the district court emphasized that the Attorney General may prosecute a violation at the invitation of a county district attorney, ROA.37741-42, but as this Court recently recognized, "the Attorney General" has no authority "to exercise undue influence over [a district court's exclusive] prosecutorial discretion." *Ogg*, 105 F.4th at 331. Following *Stephens*, "all prosecutions under the Election Code require the consent or authorization of the applicable DA," ROA.37550, meaning that the decision is the "the result of the independent action of some third party not before the court," *Lujan*, 504 U.S. at 560 (cleaned up), and neither traceable to nor redressable by the Attorney General. Because, here, "the enjoined official[s] never

had the power to enforce the law in the first place," the district court's order represents little more than an "empty vessel." *Zurawski*, 690 S.W.3d at 659. Federal courts lack jurisdiction to issue such advisory opinions.

### 3. The district court failed to identify a single individual or organization among MFV Plaintiffs that established standing.

Finally, the MFV Plaintiffs lack standing even if the other plaintiff groups meet the case-or-controversy requirement. It is a fundamental precept of standing that "standing is not dispensed in gross." *TransUnion*, 594 U.S. at 431. Instead, in multi-plaintiff cases, each plaintiff bears the burden of proving standing "for each type of relief sought." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). True, where multiple plaintiffs seek injunctive relief, only one needs to establish standing for each claim asserted. *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006). However, where, as here, Plaintiffs filed separate legal actions, later consolidated by the district court, at least one plaintiff in each case must demonstrate the elements of standing to proceed. *Cf. Wright v. Dougherty Cnty., Ga.*, 358 F.3d 1352, 1356 (11th Cir. 2004) ("A case may not be consolidated with another when one set of plaintiffs lack standing to assert a claim against the defendants.").

Despite this prerequisite, the district court never made any finding that a MFV plaintiff had an injury in-fact that was "fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *California v. Texas*, 593 U.S. 659, 668-69 (2021). Instead, the district court let the MFV Plaintiffs ride the coattails of two organizations belonging to the HAUL Plaintiffs—Delta Sigma Theta and the Arc of Texas. *See* ROA.37672 n.2. The district court likely

made this error because MFV Plaintiffs and HAUL Plaintiffs often filed their motions jointly during litigation. *See*, *e.g.*, ROA.6235, 7669, 34852. But "[c]onsolidation does not merge the cases or make a party to one action a party to the other." *Oelze v. C.I.R.*, 723 F.2d 1162, 1163 (5th Cir. 1983). The MFV Plaintiffs initiated their own lawsuit on September 27, 2021. ROA.83431. They therefore had an independent obligation to establish all three elements of Article III standing; if they fell short, their case should have been dismissed for want of jurisdiction.

At minimum, this Court should reverse the district court's order and render judgment in favor of defendants on this point. The MFV Plaintiffs did not meet their burden of proof at trial. Mi Familia Vota is not a membership organization. ROA.42268. It therefore cannot rely on associational standing; it must prove that it has standing in its own right, which it did not do. The organization tendered no evidence it engages in canvassing where it presses individuals to vote for particular candidates or ballot measures.[8] ROA.42262-63. And its principal complaint that it "diverted human resources" to educate voters, ROA.42240, in response to S.B.1 collides with the Supreme Court's recent decision in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). Mi Familia Vota "cannot spend its way into standing simply by expending money," *id.* at 394, when it does not directly provide voting

---

[8] To the contrary, Mi Familia Vota's organizational witness testified that MFV's canvassers merely "encourag[e] people to go vote" and are "trained to not influence votes." ROA.42262-63.

assistance, and the challenged provisions do not impede its activities.[9] The remaining plaintiffs in the MFV suit did not challenge the voting-assistance provisions.

## B. Plaintiffs' § 208 claims against the Secretary and Attorney General are barred by sovereign immunity.

Familiar principles of sovereign immunity also bar Plaintiffs' claims against State Defendants. "The doctrine of state sovereign immunity recognizes the 'residua[l] and inviolable sovereignty' retained by the states in the Constitution's wake." *Russell v. Jones*, 49 F.4th 507, 512 (5th Cir. 2022) (quoting *Alden v. Maine*, 527 U.S. 706, 715 (1999)). "This principle, partially embodied in the Eleventh Amendment, is commonly distilled to the proposition that individuals may not sue a state—either in its own courts, courts of other states, or federal courts—without the state's consent." *Id.* In short, unless Plaintiffs can show that sovereign immunity has been "waived by the state, abrogated by Congress, or an exception applies," the state sovereign immunity doctrine will bar the suit. *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020).

State Defendants invoked sovereign immunity early in their motions to dismiss. The district court, however, rejected State Defendants' arguments, citing the Fifth

---

[9] Aside from the problem *Alliance for Hippocratic Medicine* poses to Mi Familia Vota's standing, the organization failed to demonstrate at trial it suffered any financial injury at all. It offered no detail about the amount of resources it diverted on account of the challenged provisions. It offered no evidence about its voter education budget in any year before or after S.B.1. And during her deposition, Mi Familia Vota's corporate representative stated that MFV was not financially impacted by S.B.1. ROA.42273-74.

Circuit's opinion in *OCA-Greater Houston v. Texas*, which held, without analysis, that the Congress "validly abrogated state sovereign immunity" through the VRA. *See*, *e.g.*, ROA.10887 (quoting 867 F.3d 604, 614 (5th Cir. 2017)). Notwithstanding State Defendants' live appeal of this ruling, the district court proceeded to the merits, again relying on congressional abrogation as justification for overcoming State Defendants' sovereign immunity. However, as State Defendants explain in prior briefing, the Fifth Circuit decision upon which the district court based its ruling was wrongly decided and should be overturned. Plaintiffs lack any other alternative route around sovereign immunity.

### 1. Congress did not abrogate sovereign immunity.

Although *OCA-Greater Houston* held that the VRA abrogates State sovereign immunity, 867 F.3d at 614, its perfunctory, one-sentence analysis of this issue is wrong as it both ignores and contravenes the Supreme Court's "simple but stringent test" for identifying abrogation. *Dellmuth v. Muth*, 491 U.S. 223, 228, 230 (1989). Namely, Congress must have "unequivocally expressed its intent to abrogate that immunity" and if it did, Congress must have "acted pursuant to a valid grant of constitutional authority." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000). Section 208 contains no such declaration. *Cf. Ala. State Conf. of the NAACP v. Alabama*, 949 F.3d 647, 655 (11th Cir. 2020) (Branch, J., dissenting) ("Congress did not unequivocally abrogate state sovereign immunity under Section 2 of the Voting Rights Act."). The closest Congress comes is requiring "[t]he chief election officer of each State" to "provide public notice . . . of the availability of . . . assistance under section [208]," 52 U.S.C. § 20104(c), and permitting "a person who is personally

aggrieved" by noncompliance with § 20104 to "bring an action for declaratory or injunctive relief," *id.* § 20105(a). But that language does not extend to violations of § 208 itself, only failure to provide public notice. Despite this, State Defendants recognize that the panel is bound by *OCA-Greater Houston*, and they raise this argument to preserve their right to request reconsideration by the *en banc* Court.[10]

### 2. The *Ex parte Young* Exception also does not apply.

Plaintiffs cannot turn to the exception established in *Ex parte Young*, 209 U.S. 123 (1908), to skirt around sovereign immunity should this Court revisit its holding in *OCA-Greater Houston*. The *Ex parte Young* doctrine stands for the proposition that sovereign immunity does not prohibit "suits against state actors whose conduct violates federal law." *Haverkamp v. Linthicum*, 6 F.4th 662, 669 (5th Cir. 2021) (per curiam). For the doctrine to apply, "state officials must have some connection to the state law's enforcement" and "have taken some step to enforce" it. *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 400-01 (5th Cir. 2020) (cleaned up). In this context, courts have defined "enforcement" to mean some form of "compulsion or constraint." *City of Austin v. Paxton*, 943 F.3d 993, 1000 (5th Cir. 2019) (quoting *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010). The doctrine represents a dead-end to Plaintiffs for many of the same reasons that Plaintiffs failed to establish Article III standing: "Neither the Secretary of State nor the Attorney General enforces S.B.1." *LUPE*, 119 F.4th at 409; *accord Ogg*, 105 F.4th at 332.

---

[10] State Defendants note though that the *OCA-Greater Houston* decision does not relieve Plaintiffs of their burden to show Article III standing.

**a.**    As the Secretary has explained in detail elsewhere, *e.g.*, Opening Brief for Defendants-Appellants at 26-45, *La Union del Pueblo Entero*, No. 22-50775, none of the three "guideposts" that this Court utilizes to identify a sufficient enforcement connection for *Ex parte Young* is present here. *TARA*, 28 F.4th at 672 (describing the guideposts). As it does for many aspects of its Election Code, Texas has delegated enforcement of the challenged S.B.1 provisions to local officials who oversee and manage Texas elections. *See, e.g.*, *Lightbourn*, 118 F.3d at 428 n.7 (recognizing Texas's highly decentralized election system). The Secretary, accordingly, plays no role in administering the oath of assistance or ensuring that prospective assistors provide required information before offering the voter aid. *See*, *e.g.*, ROA.39858, 40628. And her few responsibilities—*i.e.*, designing forms, investigating election complaints—"do[] not rise to the level of compulsion or constraint" necessary to bring her within the scope of *Ex parte Young. See Ogg*, 105 F.4th at 332.

**b.**    Turning to the Attorney General, "[a] recent opinion from the Texas Court of Criminal Appeals is dispositive of this question" about the applicability of *Ex parte Young. Ostrewich v. Tatum*, 72 F.4th 94, 101 (5th Cir. 2023). Specifically, in *Stephens*, the Court of Criminal Appeals held that Section 273.021(a) of the Texas Election Code—which authorized the Attorney General to prosecute election-related crimes—violated the separation of powers clause of the Texas Constitution and was therefore unconstitutional. *Stephens*, 663 S.W.3d at 51-54 (discussing Tex. Const. art. II, § 1). While the Attorney General maintains that *Stephens* was wrongly

decided, the ruling nonetheless binds this Court as to the meaning of Texas law.[11] *See Arnold v. Cockrell*, 306 F.3d 277, 279 (5th Cir. 2002) ("tak[ing] the word of" the Court of Criminal Appeals "as to the interpretation of its law"). As a result, because the Attorney General "cannot initiate the prosecution" of an election law "unilaterally," *Stephens*, 663 S.W.3d at 55, he lacks the necessary enforcement connection to invoke *Ex parte Young*. *Ostrewich*, 72 F.4th at 101. His sovereign immunity remains in place.

## II. Section 208 Does Not Preempt S.B.1's Voter-Assistance Provisions.

On the merits, the district court erred at the outset of its preemption analysis by misinterpreting the scope of § 208. Because of this mistake, it wrongly found that S.B.1's voting-assistance provisions stood "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *California v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989); ROA.37748. When read properly, however, it is clear that none of the voting-assistance provisions challenged by Plaintiffs meets the very "high threshold" needed for obstacle preemption. *See Barrosse v. Huntington Ingalls, Inc.*, 70 F.4th 315, 320 (5th Cir. 2023).

---

[11] Even if *Stephens* was not binding on this panel, *Ostrewich* controls under this Court's rule of orderliness. *Cf. Stokes v. Sw. Airlines*, 887 F.3d 199, 205 (5th Cir. 2018) (noting that a "determination whether a given precedent has been abrogated is itself a determination subject to the rule of orderliness").

## A. The district court misconstrued the scope of § 208 in violation of its plain text.

Congress enacted VRA § 208 to ensure that individuals who need assistance—due to blindness, disability, or limited literacy—could receive meaningful help in casting their votes. Although robust, § 208's guarantee was not intended to be absolute. It permits states to promulgate reasonable rules and procedures, and bring "some sort of order, rather than chaos" to the voting-assistance process. *Storer v. Brown*, 415 U.S. 724, 760 (1974). The district court, however, took a maximalist approach to the statute. By misconstruing a simple statement—"a person of the voter's choice"—to mean "the voter's first choice," the district court effectively read § 208 to allow qualified voters to choose *any* person, under *any* conditions, to be their assistor. Under this rubric, if any measure "deters" a chosen assistor, § 208 categorically preempts it, no matter how sensible.

### 1. Section 208 contemplates reasonable state regulation, not an unbridled right to "any" assistor, under any condition.

The district court's interpretation of § 208 "alter[s] the balance between federal and state power" without "exceedingly clear language," *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) (per curiam), and ignores the basic precept of statutory interpretation: Congress does not hide "elephants in mouseholes," *Whitman*, 531 U.S. at 468. Under VRA § 208, "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by *a* person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508 (emphasis added). Had Congress aimed to strip states of all authority to

exclude disqualified or disruptive assistors, or to impose basic procedural prerequisites, it would have used unequivocal language to that effect. *Cf. VanDerStok v. Garland*, 86 F.4th 179, 203 n.5 (5th Cir. 2023). Instead, § 208's plain text gives a voter the right to assistance from "a person of the voter's choice," 52 U.S.C. § 10508 (emphasis added)—not "the" or "any" person of the voter's choice.

    **a.** "The task of statutory interpretation begins and, if possible, ends with the language of the statute." *Franco v. Mabe Trucking Co., Inc.*, 3 F.4th 788, 792 (5th Cir. 2021) (quoting *Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481, 486 (5th Cir. 2013)). "When interpreting statutory language, words are given their ordinary, plain meanings, and language must be enforced unless ambiguous." *United States v. Moore*, 71 F.4th 392, 395 (5th Cir. 2023) (citation omitted). In everyday English, using the indefinite article "a" suggests the possibility of more than one potential choice—yet it also leaves room for reasonable boundaries. *See McFadden v. United States*, 576 U.S. 186, 191 (2015); *United States v. Duffy*, 92 F.4th 304, 311 (5th Cir. 2024); *Calumet Shreveport Ref'g, L.L.C v. U.S. Env't Prot. Agency*, 86 F.4th 1121, 1140 (5th Cir. 2023); *accord Rumsfeld v. Padilla*, 542 U.S. 426, 434-35 (2005). No rule of grammar or logic demands that "a person of the voter's choice" be read as an absolute entitlement to the voter's choice, without qualification, including those barred from the polling place by longstanding disqualification rules or because they refuse to comply with basic procedures. Indeed, the more natural reading is that a voter can pick from any legitimately available assistors, subject to neutral, nondiscriminatory state laws. *See Ray v. Texas*, No. 2-06-CV-385, 2008 WL 3457021, at *7 (E.D. Tex. Aug. 7,

2008) (holding that § 208 permits "reasonable and non-discriminatory" regulations); *Priorities USA*, 487 F.Supp.3d at 619.

Any other interpretation of the statute contravenes basic canons of construction, such as the rule against surplusage, under which courts "must construe statutes so as to give meaning to all terms," *In re McBryde*, 120 F.3d 519, 525 (5th Cir. 1997). As this Court has emphasized time and again, courts "cannot accept" a construction that renders statutory text "mere surplusage," *id.*, particularly when the statute demonstrates that Congress, if it wanted, knew how express a lack of restriction when selecting one of a specified class. Here, Congress stipulated that "*any* voter who requires assistance" has a right pursuant to § 208, but it characterized that right as being "given assistance by *a* person of the voter's choice." 52 U.S.C. § 10508 (emphasis added). This "textual distinction" (between "any" and "a") "must be given meaning." *Priorities USA*, 487 F.Supp.3d at 619; *see VanDerStok*, 86 F.4th at 203 n.5 (noting that "textual distinction" was "particularly powerful" because Congress knew how to use another term when it wanted).

This Court's decision in *OCA-Greater Houston* does not stand for the contrary proposition. That case "[a]t bottom" concerned "how broadly to read the term 'to vote' in Section 208," 867 F.3d at 614, not whether "a person of the voter's choice" means "*any* person of the voter's choice," even someone who cannot satisfy general requirements necessary to prevent intimidation.[12] The case thus does not resolve—

---

[12] The district court in that case, likewise, stated that "[t]he question at the heart of this case is whether Section 208 of the VRA . . . is confined to the ballot-box

let alone *definitively* resolve—the question here via stray language picked up from an "example[]" offered by a party attempting to explain its argument. *See id.* at 614-15 (agreeing that "to vote" means more than "the literal act of marking the ballot," and observing with OCA's examples such as "navigating the polling location and communicating with election officials" that "[u]nder OCA's reading, Section 208 guarantees to voters the right to choose any person they want").

**b.** Because § 208 "does not say that a voter is entitled to assistance from *the* person of his or her choice or *any* person of his or her choice," the statute allows for reasonable "state law limitations on the identity of persons who may assist voters." *Priorities USA*, 487 F.Supp.3d at 61; *see Ray*, 2008 WL 3457021, at *7 (holding that § 208 permits "reasonable and non-discriminatory" regulations). However, in the event this Court finds § 208 unclear or ambiguous, it should interpret it not to preempt state law. *See Loper Bright Enter. v. Raimondo*, 603 U.S. 369, 435 n.5 (2024) (Gorsuch, J., concurring) (explaining that the federalism canon "tells courts to presume federal statutes do not preempt state laws because of the sovereignty States enjoy under the Constitution"). After all, courts "start with the assumption that the historic police powers of the States were not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe*

------

activities of reading and marking the ballot, or covers polling place activities beyond the ballot box." *OCA-Greater Houston v. Texas*, No. 1:15-CV-00679-RP, 2016 WL 9651777, at *8 (W.D. Tex. Aug. 12, 2016). Neither it nor the Fifth Circuit confronted whether the statute permits states to limit or regulate who may serve as an assistor and the prerequisites the assistor must meet before she may be selected.

*Elevator Corp.*, 331 U.S. 218, 230 (1947); *Young Conservatives of Tex. Found. v. Smatresk*, 73 F.4th 304, 313 (5th Cir. 2023). This presumption "applies with particular force when Congress legislates in a field traditionally occupied by state law." *Teltech Sys., Inc. v. Bryant*, 702 F.3d 232, 236 (5th Cir. 2012).

Election regulation is a heartland duty of the state legislature. *See Storer*, 415 U.S. at 730. The district court should have respected the "[s]tate's authority to set its electoral rules and the considerable deference to be given to election procedures so long as they do not constitute invidious discrimination." *Vote.Org v. Callanen*, 89 F.4th 459, 481 (5th Cir. 2023) (*Vote.Org II*); *see also Teltech Sys.*, 702 F.3d at 236 (applying presumption even in an area of "significant federal presence" because it was also a traditional area of State regulation). Indeed, courts should not manufacture conflict-preemption absent a true clash between state and federal objectives. *See Barrosse*, 70 F.4th at 320. Texas's purpose in enacting S.B.1 (preventing ballot manipulation and intimidation) aligns with Congress's (protecting vulnerable voters). Laws that impose a *de minimis* burden—like signing an oath, disclosing a relationship, or ensuring the assistor is not an employer—merely "implement" § 208's anti-exploitation purpose in tangible ways.

**c.** The district court also relied on snippets of legislative history to support its analysis. As an initial matter, legislative history is inappropriate here because the statute is plain and—to the extent it is not, the presumption against preemption applies. *Cf. Salazar v. Maimon*, 750 F.3d 514, 518 (5th Cir. 2014). However, even if it were necessary to mine the legislative record to divine Congress's intent, the legislative history disproves the district court's conclusion. The Senate Judiciary

Committee emphasized that § 208 preempts state election laws "only to the extent that they *unduly* burden the right recognized in [§ 208], with that determination being a practical one dependent upon the facts." S. Rep. No. 97-417, at 63 (1982) (emphasis added). The committee in fact underscored that voters who need assistance "are more susceptible than the ordinary voter to having their vote unduly influenced or manipulated." *Id*. at 62. It thus recognized that § 208 does not interfere with "the legitimate right of any State to establish necessary election procedures" that are "designed to protect the rights of voters." *Id*. at 63. Far from banning all oversight, Congress anticipated it.

### 2. At the very least, the canon against absurdity precluded the district court from adopting such an expansive reading.

Even if the statute were ambiguous (it is not) the statutory canons also counsel that absurd results must be avoided if there are plausible alternatives that uphold the purpose of the statutes. *Holy Cross College, Inc. v. Criswell*, No. 23-30085, 2024 WL 2318166, at *3 (5th Cir. May 22, 2024) (Courts are "authorized to deviate from the literal language of a statute only if the plain language would lead to absurd results, or if such an interpretation would defeat the intent of Congress."). Instead of applying these principles to its analysis, the district court jumped the shark. It reasoned that because § 208 says that "a voter's choice" cannot include "the voter's employer or agent of that employer or officer or agent of the voter's union,"52 U.S.C. § 10508, the statute permits no other limitations. ROA.37750-53. The district court then compounded its error, concluding that § 208 preempts laws that might deter voters from requesting—and individuals from providing—assistance because they "narrow the

universe of willing and eligible assistors from which a voter can choose." ROA.37754.

As a matter of statutory interpretation, the district court gets it the wrong way around. *See supra* at 32-37. The language cited by the district court limits the § 208 right. It is not a floor prohibiting any State regulation at all—let alone in the required "clear and manifest" way. *See Rice*, 331 U.S. at 230. And the full implications of the district court's interpretation make this evident. Taken to its logical conclusion, the district court's expansive construction of § 208 effectively prohibits Texas from placing even procedural requirements on would-be assistors. This position overlooks the fundamental reality that "[e]ven the most permissive voting rules must contain some requirements, and the failure to follow those rules constitutes the forfeiture of the right to vote, not the denial of that right." *Vote.Org I*, 39 F.4th at 305 n.6. Protecting vulnerable voters from undue influence or coercion was one of Congress's central motivations in adopting § 208. *See* S. Rep. No. 97-417, at 62-63 (1982). By reading § 208 to bar every "deterring" rule, the district court disables States from enacting commonsense, historically validated protections that guard the very population Congress intended to support—voters with disabilities, low literacy, or other disadvantages. The result is a lesson in absurdity.

For example, under the district court's approach, even an incarcerated felon serving time for ballot tampering or voter intimidation would have a near-absolute right to assist a voter. Texas officials could not lawfully "deter" this person if a voter chose him—even if he presents an "imminent risk" to public safety. According to the district court, the incarcerated felon's lack of credibility or the State's legitimate

concern is immaterial; any denial or burden on that felon's participation constitutes impermissible interference with § 208. Such an expansive reading of § 208 is not a reasonable reading of the statute. Congress surely did not draft § 208 to give criminals a backdoor means of reentering the voting process; had it sought that result, it would have used the phrase "any person," not the more circumscribed "a person."

The absurdities do not end there. The Election Code bans overt electioneering in or near polling places, Tex. Elec. Code § 61.003, to preserve order and shield voters from harassment. Yet under the district court's ruling, if a voter insists on being helped by an individual visibly engaged in active campaigning—such as wearing campaign paraphernalia, handing out flyers, or proclaiming political slogans—state officials must acquiesce. Attempting to enforce the electioneering ban would "deter" that assistor, thus purportedly violating the court's broad vision of § 208 preemption. This outcome places states in an impossible predicament: break neutral anti-electioneering laws designed to protect voters from heated partisanship while in the midst of casting their ballot, or face liability for allegedly restricting the voter's "choice" of assistant. Such an interpretation strips polling places of essential buffers against chaos, exactly the opposite of what election codes have traditionally mandated.

Then, there is the matter of public safety. Like many states, Texas has taken the precaution of banning firearms at polling places. Tex. Penal Code § 46.03(a). The district court's reading puts even that restriction in jeopardy should a voter wish to obtain assistance from someone who insists on carrying a weapon into a polling site. The district court warned that defendants' proposed test would "eviscerate Section

208." ROA.37754. Not so. Defendants agree with cases adopting and enforcing reasonable constructions of § 208. *See*, *e.g.*, *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F.Supp.3d 158, 233-36 (M.D.N.C. 2020). What Defendants protest is the judicial usurpation of the states' traditional prerogative, such that even the most sensible rules like no-gun zones are subject to a heckler's veto.

### B. The district court misapplied § 208 to virtually every voter-assistance provision at issue.

Because the district court misinterpreted § 208, it erred when conducting its preemption analysis of the challenged provisions. Generally, courts have recognized that a federal statute may "implicitly override[] state law either when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively, or when state law is in actual conflict with federal law." *Sprietsma v. Mercury Marine, a Div. of Brunswick Corp.*, 537 U.S. 51, 64 (2002) (citations omitted). In this case, Congress expressly recognized "the legitimate right of any state to establish necessary election procedures," S. Rep. No. 97-417, at 63 (1982), leaving conflict preemption as the only option. To show an actual conflict, one of two things must be true: (1) compliance with both laws is an impossibility; or (2) state law creates an "unacceptable obstacle" to the execution of the full purposes and objectives of Congress. *Barrosse*, 70 F.4th at 320 (citing *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 200 (5th Cir. 2013)). The district court found that the latter applied, but when § 208 is read in its proper scope, none of S.B1's voting-assistance provisions obstruct the realization of Congress's aim to protect vulnerable voters from intimidation and fraud. In fact, the reforms made by S.B.1 advance that goal.

### 1. Sections 6.03, 6.05, and 6.07

To start, the district court incorrectly ruled that the VRA preempts Sections 6.03, 6.05, and 6.07 of S.B.1 because they have "deterred voters from requesting assistance and narrowed the universe of willing assistors." ROA.37756. But S.B.1's disclosure requirements merely require a person who chooses to assist a voter to disclose his relationship to the voter and whether he received compensation for his assistance. Such a minor requirement cannot reasonably trigger preemption, as compliance with both federal and state regulation is not "a physical impossibility," and the challenged provisions do not "stand as an obstacle" to federal policy. *Planned Parenthood of Hous. & Se. Tex. v. Sanchez,* 403 F.3d 324, 336 (5th Cir. 2005).

Sections 6.03, 6.05, and 6.07 do not limit the scope of assistance voters may receive; nor do they predicate the assistance voters can receive on where they are in the voting process. Once the assistor satisfies the procedural prerequisites of Sections 6.03 and 6.05, the assistor may perform any action necessary to make a vote effective. And Section 6.07—far from limiting the action of any potential assistor—merely requires the creation of a space on the carrier envelope for information to be provided. Thus, under the challenged provisions, a voter who requires assistance "may be given assistance by a person of the voter's choice" in whatever manner is necessary to make the voter's vote effective. 52 U.S.C. § 10508.

The provisions are not suddenly brought into conflict with the VRA because a prospective assistor might have an idiosyncratic response and refuse to provide the requisite information. The trial record shows that despite three years, multiple elections, and dozens of witnesses, Plaintiffs (and the district court) could "offer no

examples of instances in which [] voters have been deprived of voting assistance" because Texas required certain disclosures. *Priorities USA*, 487 F.Supp.3d at 620. To the contrary, corporate representatives for Delta Sigma Theta and FIEL Houston testified that they were aware of no member who had refused to provide assistance to voters because of the relevant requirements. ROA.40925-26, 41269. In any event, even if Plaintiffs could find isolated examples of individuals deterred from providing assistance because of S.B.1's disclosure requirements, it cannot be that a State regulation's validity depends on a fishing expedition for people weary of following simple, commonsense rules.

### 2. Section 6.04

For the same reason, the VRA does not preempt Section 6.04's amendments to the existing oath requirement. Section 6.04 does not impose any limits on voting assistance. It merely revises a procedural prerequisite that has existed in some form or another in Texas for decades. Any person who otherwise satisfies Tex. Elec. Code § 64.032(c)—in that the person is not the "voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs"—may act as an assistor upon request once he or she swears or affirms the revised oath. While it is possible that some assistors may object to the revised oath, compliance with both statutes is not "a physical impossibility," *see Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992), and the two statutes can "operate harmoniously." *Ark. United v. Thurston*, 626 F.Supp.3d 1064, 1088 (W.D. Ark. 2022) (upholding laws tracking names and addresses of assistors).

The district court relied upon speculative concerns that the oath might have a "chilling effect" on assistors. ROA.37761-62. But in the three-plus years since S.B.1 took effect, Plaintiffs could not identify a single person who was investigated or prosecuted under this requirement—let alone wrongly prosecuted. *See, e.g.*, ROA.41268. And while county district attorneys have not disavowed enforcement, Plaintiffs have not identified anyone with an intent to engage in conduct "arguably proscribed" by Section 6.04. And they did not show that any county attorney interprets Section 6.04 in such a way as to make prosecution likely. The VRA does not preempt state law simply because someone somewhere has an idiosyncratic and abstract fear that a prosecutor will interpret a law unreasonably. If it did, then § 208 would preclude all oaths of assistance and all criminal statutes governing unlawful assistance, since wrongful prosecutions are always possible even when they are improbable.

Furthermore, the revised oath simply informs would-be assistors of their preexisting obligations under Texas law. ROA.43227-31. If notifying assistors of these rules violates § 208, then it is hard to imagine how the underlying statutes survive later review, even though they provide sensible protection to voters, such as the prohibition on pressuring voters to accept someone as an assistor, *see* Tex. Elec. Code § 64.036(a)(1), (4), that advance Congress's primary objective in passing § 208, *see* S. Rep. No. 97-417, at 241 (avoiding "fear of intimidation and manipulation" by allowing qualified voters to choose assistors they trust), and are common across the states. S*ee*, *e.g.*, Fla. Stat. § 101.051(5), Ill. Comp. Stat. 5/17-14; *see also* ROA.18292-95 (listing oath of assistance requirements nationwide).

### 3. Section 6.06

The district court also misapplied § 208 when it concluded that the law preempts S.B.1's amendments to the ban on compensated-voter assistance by incorrectly reasoning that § 208 entitles voters to assistance from strangers. ROA.37766-68. S.B.1 merely prevents complete strangers from seeking out voters to assist while being paid specifically to do so. ROA.42788, 42792-93. Indeed, the revisions in Section 6.06 do not ban any individual or category of individuals from acting as an assistor. So long as the assistor does not solicit, receive, or accept compensation for that assistance, the assistor may perform any action necessary to make a vote effective. Nor does S.B.1 prevent individuals from being reimbursed for their expenses, ROA.40704-05, or individuals with paid jobs, such as canvassing, from assisting voters in due course, *see, e.g.*, ROA.40703. The Legislature, in fact, expressly exempted attendants or caregivers previously known to the voter to ensure that Section 6.06 would not interfere with their duties. *See* Tex. Elec. Code § 86.0105(f). The provision instead is narrowly targeted at incentive structures that increase the likelihood of assistors applying pressure on the voter in pursuit of partisan or ideological ends. *See* ROA.48778-79. While it is possible some assistors may object to the lack of financial return, nothing in § 208 gives assistors the right to impose conditions on their assistance, such as a demand for compensation.

### 4. Section 7.04

Finally, the district court's conclusion with respect to Section 7.04 is also wrong. Section 7.04 does not abridge or deny voters their right to receive assistance from a person of their choice. It simply precludes prospective assistors from imposing a

condition on the assistance they offer voters: specifically, Section 7.04 bans paid vote harvesting, which it defines as "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." Accordingly, Section 7.04 does not prohibit any individual or category of individuals from acting as an assistor upon the voter's request. The would-be assistor simply cannot be paid by political entities to simultaneously assist voters while actively urging voters to adopt a specific position on their ballot. In that way, Section 7.04 is no different from electioneering laws, which have a long pedigree in Texas, and been found to advance the state's compelling interest "[e]nsuring that every vote is cast freely." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021); *see also LUPE*, 119 F.4th at 409; *Burson v. Freeman*, 504 U.S. 191, 198 (1992).

The district court's misapplication of the law, in part, stems from its confusion on how the paid-vote-harvesting ban operates. *See* Opening Brief for Defendants-Appellants at 14-28, *La Union del Pueblo Entero v. Abbottt*, No. 24-50783 (5th Cir. Dec. 23, 2024) (explaining that Section 7.04 does not apply to canvassing efforts). However, it also reflects the district court's misconception of § 208. Congress drafted § 208 to ensure that voters who are blind, have a disability, or are unable to read and write are able to vote without "fear of intimidation and manipulation." S. Rep. No. 97-417, at 241. It did not intend to bar Texas from enacting reasonable regulations that prevent paid persuaders from advocating while in a ballot's physical presence—a moment when the risk of pressure is highest. *See also LUPE*, 119 F.4th at 409; *Veasey v. Abbott*, 830 F.3d 216, 239 (5th Cir. 2016).

### III. Plaintiffs Lack a Private Cause of Action for Their § 208 Claims.

None of the changes introduced by S.B.1's voting-assistance provisions conflict with § 208. This Court, however, need not even reach that issue because of an antecedent one: Congress did not grant Plaintiffs a private right of action for their § 208 claims. Plaintiffs presumably rely on an implied cause of action, but that does not work either. The statute is enforced through other mechanisms. The VRA, for example, requires "[t]he chief election officer of each State" to "provide public notice[] . . . of the availability of . . . assistance under section [208]," 52 U.S.C. § 20104(c), and it expressly authorizes "the United States Attorney General or a person who is personally aggrieved" by noncompliance with § 20104 to "bring an action for declaratory or injunctive relief," *id*. § 20105(a). The existence of these enforcement schemes "suggests that Congress intended to preclude others." *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001).

It also suggests Congress did not intend for litigants to challenge violations of § 208 through 42 U.S.C. § 1983. "[T]he existence of a more restrictive private remedy [in the statute itself] for statutory violations has been the dividing line between those cases in which we have held that an action would lie under § 1983 and those in which we have held that it would not." *Health & Hosp. Corp. of Marion Cnty v. Talevski*, 599 U.S. 166, 188 (2023) (quoting *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 121 (2005)).

In addition, assuming that the statute creates any rights at all, it does so for certain "voter[s] who require[] assistance." 52 U.S.C. § 10508. The statute does not create any rights in non-voting entities like Plaintiffs. Unless Congress expresses that

intent, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Sandoval*, 532 U.S. at 286-87. To be sure, federal courts have not always followed that strict approach. There was a time when federal courts "assumed it to be a proper judicial function to 'provide such remedies as are necessary to make effective' a statute's purpose." *Ziglar v. Abbasi*, 582 U.S. 120, 132 (2017) (quoting *J.I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964)). That time, however, has passed. Given the Supreme Court's guidance in *Sandoval*, which adopts a strict approach to recognizing private right of actions, this Court should not expand "the scope of [an] implied right" from one type of plaintiff to another. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 284 (1998).

## Conclusion

The Court should reverse the district court's order and vacate the injunction.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

AARON L. NIELSON
Solicitor General

BRENT WEBSTER
First Assistant Attorney General

WILLIAM F. COLE
Deputy Solicitor General

/s/ *Kathleen T. Hunker*

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

KATHLEEN T. HUNKER
Special Counsel
Kathleen.Hunker@oag.texas.gov

GARRETT GREENE
Special Counsel

MARK A. CSOROS
Assistant Attorney General

Counsel for State Defendants-Appellants

## Certificate of Service

On January 24, 2025, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

*/s/ Kathleen T. Hunker*
KATHLEEN T. HUNKER

## Certificate of Compliance

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 13,000 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

*/s/ Kathleen T. Hunker*
KATHLEEN T. HUNKER