No. 24-50826

# In the United States Court of Appeals for the Fifth Circuit

---

LA UNION DEL PUEBLO ENTERO; SOUTHWEST VOTER REGISTRATION
EDUCATION PROJECT; MEXICAN AMERICAN BAR ASSOCIATION OF
TEXAS; TEXAS HISPANICS ORGANIZED FOR POLITICAL EDUCATION;
JOLT ACTION; WILLIAM C. VELASQUEZ INSTITUTE; FIEL HOUSTON,
INCORPORATED; FRIENDSHIP-WEST BAPTIST CHURCH; TEXAS
IMPACT; JAMES LEWIN; MI FAMILIA VOTA,
*Plaintiffs-Appellees*,

v.

GREGORY W. ABBOTT, in his official capacity as Governor of Texas, Texas;
WARREN K. PAXTON, in his official capacity as Attorney General of Texas;
State of Texas; JANE NELSON, in her official capacity as Texas Secretary of
State; HARRIS COUNTY REPUBLICAN PARTY; DALLAS COUNTY
REPUBLICAN PARTY; NATIONAL REPUBLICAN SENATORIAL
COMMITTEE; SEAN TEARE, HARRIS COUNTY DISTRICT ATTORNEY,
*Defendants-Appellants*, and

REPUBLICAN NATIONAL COMMITTEE,
*Movant-Appellant.*

---

OCA-GREATER HOUSTON; LEAGUE OF WOMEN VOTERS OF TEXAS,
*Plaintiffs-Appellees*,

v.

KEN PAXTON, Texas Attorney General,
*Defendant-Appellant*

---

LULAC TEXAS; TEXAS ALLIANCE FOR RETIRED AMERICANS;
TEXAS AFT; VOTE LATINO,
*Plaintiffs-Appellees*,

v.

KEN PAXTON, in his official capacity as Texas Attorney General,
*Defendant-Appellant*

---

DELTA SIGMA THETA SORORITY, INCORPORATED; THE ARC OF TEXAS,
*Plaintiffs-Appellees*,

v.

GREGORY WAYNE ABBOTT, in his official capacity as Governor of Texas,
Texas; WARREN KENNETH PAXTON, JR., in his official capacity as the
Attorney General of Texas,
*Defendants-Appellants*.

————————————————

On Appeal from The United States
District Court for the Western District of Texas
San Antonio Division - No. 5:21-cv-00844

————————————————

**BRIEF OF PLAINTIFFS-APPELLEES
DELTA SIGMA THETA SORORITY, INC., THE ARC OF TEXAS
AND MI FAMILIA VOTA**

————————————————

*(Counsel on Inside Cover)*

Victor Genecin
Uruj Sheikh
Breanna Williams
Maia Cole
NAACP Legal Defense &
Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
T: (212) 965-2200
F: (212) 226-7592
vgenecin@naacpldf.org
usheikh@naacpldf.org
bwilliams@naacpldf.org
mcole@naacpldf.org

Shira Wakschlag
Evan Monod
The Arc of the United States, Inc.
1825 K Street, NW, Suite 1200
Washington, DC 20006
T: (202) 534-3708
F: (202) 534-3731
Wakschlag@thearc.org
Monod@thearc.org

J. Michael Showalter
ARENTFOX SCHIFF LLP
South Wacker Drive, Suite 7100
Chicago, IL 60606
Tel: (312) 258-5561
j.michael.showalter@afslaw.com

***Attorneys for Plaintiffs-Appellees***
**DELTA SIGMA THETA
SORORITY, INC. and THE ARC
OF TEXAS**

Wendy J. Olson
11859 STOEL RIVES LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702
wendy.olson@stoel.com

Courtney Hostetler
Free Speech For People
28 S. Main St., Suite 200
Sharon, MA 02067
(617) 249-3015
chostetler@freespeechforpeople.org

***Attorneys for Plaintiff-Appellees***
**MI FAMILIA VOTA**

*Counsel for Plaintiffs-Appellees*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

LA UNIÓN DEL PUEBLO ENTERO, *ET AL.*,

*Plaintiffs-Appellees*,

v.

GREGORY W. ABBOTT, *ET AL.*,

*Defendants-Appellants,*

The undersigned counsel of record certifies that the following listed persons and entities (other than governmental parties) as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so the judges of this Court may evaluate possible disqualification or recusal:

La Union del Pueblo Entero

Southwest Voter Registration Education Project

Mexican American Bar Association of Texas

Texas Hispanics Organized for Political Education

JOLT Action

William C. Velasquez Institute

Fiel Houston, Incorporated

Friendship-West Baptist Church

Texas Impact

James Lewin

OCA-Greater Houston

League of Women Voters of Texas

LULAC Texas

Texas Alliance for Retired Americans

Texas AFT

Voto Latino

Delta Sigma Theta Sorority, Incorporated

The Arc of Texas

Republican National Committee

Harris County Republican Party

Dallas County Republican Party

National Republican Senatorial Committee

National Republican Congressional Committee

Houston Area Urban League

Mi Familia Vota

Marla Lopez

Marlon Lopez

Paul Rutledge

REVUP-Texas

Nina Perales
Email: nperales@maldeforg
Mexican-American Legal Defense & Educational Fund
110 Broadway Street
San Antonio, TX 78205

Jason Scott Kanterman
Direct: 212-859-8519
Email: jason.kanterman@friedfrank.com
Fried, Frank, Harris, Shriver & Jacobson, L.L.P.
1 New York Plaza
New York, NY 10004

Elizabeth Ryan
Direct: 214-746-8158
Email: liz.ryan@weil.com
Fax: 214-746-7777

Weil, Gotshal & Manges, L.L.P.
Suite 300
200 Crescent Court
Dallas, TX 75201

Leah Tulin
Direct: 202-650-6397
Email: tulinl@brennan.law.nyu.edu
Brennan Center for Justice at NYU School of Law
Suite 1150
1140 Connecticut Avenue, N.W.
Washington, DC 20036

Zachary Tripp
Direct: 202-682-7000
Email: zack.tripp@weil.com
Fax: 202-857-0940
Weil, Gotshal & Manges, L.L.P.
Suite 600
2001 M Street, N.W.
Washington, DC 20036

Aaron J. Curtis
Direct: 212-310-8901
Email: aaron.curtis@weil.com
Weil, Gotshal & Manges, L.L.P.
767 5th Avenue
New York, NY 10153-0119

Sean Morales-Doyle
Direct: 646-292-8363
Email: Morales-doyles@brennan.law.nyu.edu
Brennan Center for Justice
Suite 1750
120 Broadway
New York, NY 10271

Jessica Ring Amunson
Direct: 202-639-6023
Email: jamunson@jenner.com
Fax: 202-661-4993
Jenner & Block, L.L.P.
Suite 900
1099 New York Avenue, N.W.
Washington, DC 20001-4412

Thomas Paul Buser-Clancy
Direct: 713-942-8146
Email: tbuser-clancy@aclutx.org
American Civil Liberties Union of Texas
P.O. Box 8306
Houston, TX 77288

Dayton Campbell-Harris
Direct: 425-516-8400
Email: dcampbell-harris@aclu.org
American Civil Liberties Union Foundation
Voting Rights Project
125 Broad Street
New York, NY 10004

Adriel I. Cepeda Derieux
Direct: 212-284-7334
Email: acepedaderieux@aclu.org
Fax: 212-549-2654
American Civil Liberties Union Foundation
915 15th Street, N.W.
Washington, DC 20005

Sarah Xiyi Chen
Direct: 512-474-5073
Email: schen@texascivilrightsproject.org
Texas Civil Rights Project
1405 Montopolis Drive
Austin, TX 78741-3438

Zachary Dolling
Direct: 512-474-5073
Email: zachary@texascivilrightsproject.org
Texas Civil Rights Project
1405 Montopolis Drive
Austin, TX 78741-3438

Ashley Alcantara Harris
Direct: 713-942-8146
Email: aharris@aclutx.org
American Civil Liberties Union of Texas
P.O. Box 8306
Houston, TX 77288

Savannah Kumar
Direct: 713-942-8146

Email: skumar@aclutx.org
American Civil Liberties Union of Texas
Suite 350
5225 Katy Freeway
Houston, TX 77007

Peter Hofer
Disability Rights Texas
2222 W. Braker Ln.
Austin, TX 78758
(512) 454-4816
512/454-3999 (fax)
phofer@disabilityrightstx.org

Sophia Lin Lakin
Direct: 212-519-7836
Email: slakin@aclu.org
Fax: 212-549-2654
American Civil Liberties Union Foundation
Voting Rights Project
18th Floor
125 Broad Street
New York, NY 10004

Christopher McGreal
Direct: 214-630-0916
Email: cmcgreal@disabilityrightstx.org
Disability Rights Texas
North Texas Regional Office
Suite 450
1420 W. Mockingbird Lane
Dallas, TX 75247-4932

Adriana Cecilia Pinon
Direct: 713-942-8146
Email: apinon@aclutx.org
American Civil Liberties Union of Texas
P.O. Box 8306
Houston, TX 77288

Lucia Romano
Disability Rights Texas
1500 McGowen - Ste 100
Houston, TX 77004
(713) 974-7691
713/974-7695 (fax)

lromano@drtx.org

Edgar Saldivar
Direct: 713-942-8146
Email: ESaldivar@aclutx.org
American Civil Liberties Union of Texas
Suite 350
5225 Katy Freeway
Houston, TX 77007

Ari J. Savitzky
Direct: 212-549-2681
Email: asavitzky@aclu.org
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004-2400

Christopher D. Dodge
Direct: 202-987-4928
Email: cdodge@elias.law
Elias Law Group, L.L.P.
Suite 400
250 Massachusetts Avenue, N.W.
Washington, DC 20001

Marcos Mocine-McQueen
Direct: 202-968-4492
Email: mmcqueen@elias.law
Elias Law Group, L.L.P.
Suite 400
250 Massachusetts Avenue, N.W.
Washington, DC 20001

Uzoma Nkem Nkwonta
Direct: 202-968-4490
Email: unkwonta@elias.law
Elias Law Group, L.L.P.
Suite 400
250 Massachusetts Avenue, N.W.
Washington, DC 20001

Jennifer A. Holmes
Direct: 202-682-1300
Email: jholmes@naacpldf.org
NAACP Legal Defense & Educational Fund, Incorporated
Suite 600

700 14th Street, N.W.
Washington, DC 20005

J. Michael Showalter
Direct: 312-258-5561
Email: j.michael.showalter@afslaw.com
ArentFox Schiff LLP
Suite 7100
233 S. Wacker Drive
Willis Tower
Chicago, IL 60606

Eitan G. Berkowitz
ArentFox Schiff LLP
44 Montgomery Street, 38th Floor
San Francisco, CA 94104
408-334-8775
eitan.berkowitz@afslaw.com

Kenneth E. Broughton, Jr.
Reed Smith LLP
2850 N. Harwood St., Suite 1500
Dallas, TX 75201
713-469-3819
713-469-3899 (fax)
kbroughton@reedsmith.com

James David Cromley
ArentFox Schiff LLP
233 S Wacker Drive, Suite 7100
Chicago, IL 60606
312-258-5616
312-258-5600 (fax)
james.cromley@afslaw.com

Victor Genecin
NAACP Legal Defense & Educational Fund, Inc.
40 Rector Street, Fifth Floor
New York, NY 10006
(212) 965-2200
(212) 226-7592 (fax)
vgenecin@naacpldforg

Derek H. Ha
ArentFox Schiff LLP
44 Montgomery Street

38th Floor
San Francisco, CA 94104
415-757-5897
derek.ha@afslaw.com

Ann Helen MacDonald
ArentFox Schiff LLP
233 S. Wacker Dr., Ste 7100
Chicago, IL 60606 312-258-5548
ann.macdonald@afslaw.com

Roswill Mejia
Reed Smith LLP
401 Congress Avenue
Suite 1800
Austin, TX 78701
United States
512-409-2718
512-623-1802 (fax)
rmejia@reedsmith.com

Keely Dulaney Pippin
Reed Smith/Houston
1221 McKinney Street
Suite 2100
Houston, TX 77010
713-469-3888
713-469-3899 (fax)
kpippin@reedsmith.com

Kathryn Sadasivan
NAACP Legal Defense & Educational Fund, Inc.
40 Rector Street, Fifth Floor
New York, NY 10006
(212) 965-2200
(212) 226-7592 (fax)
ksadasivan@naacpldf.org

Uruj Sheikh
NAACP Legal Defense and Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
212-965-2275
usheikh@naacpldf.org

Maia Cole
NAACP Legal Defense and Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
212-965-2200
mcole@naacpldf.org

Sarah C. Stewart
Reed Smith, LLP
2850 N. Harwood Street, Suite 1500
Dallas, TX 75201
469-680-4228
469-680-4299 (fax)
sarah.stewart@reedsmith.com

Shira Wakschlag
The Arc of the United States
2000 Pennsylvania Ave. NW, Suite 500
Washington, DC 20006
(202) 534-3708
(202) 534-3731 (fax)
wakschlag@thearc.org

Evan Monod
The Arc of the United States
2000 Pennsylvania Ave. NW, Suite 500
Washington, DC 20006
(202) 534-3708
(202) 534-3731 (fax)
monod@thearc.org

Breanna Della Williams
NAACP Legal Defense & Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
405-602-4779
bwilliams@naacpldf.org

Mark L. Bieter
Stoel Rives LLP
101 S. Capitol Blvd., Suite 1900
Boise, ID 83702
(208) 389-9000
(208) 389-9040 (fax)
mark.bieter@stoel.com

John Bonifaz
Free Speech For People
1320 Centre. St. #405
Newton, MA 02459
(617) 244-0234
(512) 628-0142 (fax)
jbonifaz@freespeechforpeople.org

Ben Clements
Free Speech For People
1320 Centre. St. #405
Newton, MA 02459
(617) 244-0234
(512) 628-0142 (fax)
bclements@freespeechforpeople.org

Courtney M. Hostetler
Free Speech For People
1320 Centre. St. #405
Newton, MA 02459
(617) 249-3015
(512) 628-0142 (fax)
chostetler@freespeechforpeople.org

Sean Michael Lyons
Lyons & Lyons, PC
237 W Travis St
Ste 100
San Antonio, TX 78205
210-225-5251
210-225-6545 (fax)
sean@lyonsandlyons.com

Amira Marcella Mattar
Free Speech For People
48 N. Pleasant Street, #304 A
Amherst, MA 01002
617-564-0464
amira@freespeechforpeople.org

Wendy J. Olson
Stoel Rives LLP
101 S. Capitol Blvd
Suite 1900
Boise, ID 83702
208-389-9000

208-389-9040 (fax)
wendy.olson@stoel.com

Bradley R. Prowant
Stoel Rives LLP
33 S. Sixth Street, Suite 4200
Minneapolis, MN 55402-3722
(612) 373-8800
(612) 373-8881 (fax)
bradley.prowant@stoel.com

Laura E. Rosenbaum
Stoel Rives LLP
760 S.W. 9th Avenue, Suite 3000
Portland, OR 97205
(503) 294-9642
(503) 220-2480 (fax)
laura.rosenbaum@stoel.com

John Matthew Gore
Direct: 202-879-3930
Email: jmgore@jonesday.com
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001

Louis Joseph Capozzi, III, Esq.
Direct: 717-802-2077
Email: lcapozzi@jonesday.com
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001

/s/ Victor Genecin
Victor Genecin

*Counsel for Plaintiffs-Appellees*
*DELTA SIGMA THETA SORORITY, INC.*
*and THE ARC OF TEXAS*

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Plaintiffs-Appellees respectfully request oral argument. *See* Fed. R. App. P. 34; 5th Cir. R. 28.2.3. This appeal concerns the interpretation of a federal law, Section 208 of the Voting Rights Act, and Plaintiffs-Appellees believe that oral argument will aid this Court in its decision.

## **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ..........................................i

STATEMENT REGARDING ORAL ARGUMENT ............................ xii

TABLE OF AUTHORITIES ...................................................................xvi

INTRODUCTION ....................................................................................1

JURISDICTIONAL STATEMENT ...........................................................2

ISSUES PRESENTED FOR REVIEW ...................................................3

STATEMENT OF THE CASE ..................................................................3

   I.   STATUTORY BACKGROUND ...................................................3

   II.  FACTUAL BACKGROUND ......................................................4

      A.  Plaintiffs.............................................................................4

      B.  Defendants .........................................................................6

      C.  S.B.1's Assistance Restrictions.......................................6

      D.  Impact of S.B.1's Assistance Restrictions .....................9

   III.  PROCEDURAL HISTORY.....................................................10

SUMMARY OF THE ARGUMENT ......................................................11

STANDARD OF REVIEW ....................................................................14

ARGUMENT ..........................................................................................14

   I. SECTION 208 ABROGATES SOVEREIGN IMMUNITY AND
      ESTABLISHES A PRIVATE RIGHT OF ACTION ........................14

      A.  Congress Enacted Section 208 Pursuant to Constitutional Authority........14

      B.  This Court Has Repeatedly Held that the VRA Abrogates State
         Sovereign Immunity ......................................................17

   II.  SECTION 208 ESTABLISHES A PRIVATE RIGHT OF ACTION ............18

   III.  PLAINTIFFS HAVE STANDING TO BRING SECTION 208
       CLAIMS...................................................................................22

      A.  The Trial Record Demonstrates that the Assistance Restrictions Cause
         Concrete, Particularized, Imminent Injuries to Each Plaintiff..................25

1.  The Assistance Restrictions Harm The Arc and its Members. ..............25

2.  The Assistance Restrictions Harm DST. ................................................27

3.  The Assistance Restrictions harm MFV. ...............................................29

B.  Plaintiffs' Injuries are Traceable to, and Redressable by, Defendants .......30

   1.  Plaintiffs' Injuries are Traceable to, and Redressable by, the Secretary .30

   2.  Plaintiffs' Injuries are Traceable to, and Redressable by, the Attorney General ...................................................................................................32

   3.  Plaintiffs' Injuries are Traceable to, and Redressable by, DA Teare ......34

IV.  SECTION 208 PREEMPTS S.B.1'S ASSISTANCE RESTRICTIONS...36

A.  Section 208 Enumerates the Only Permissible Limitations on a 208 Voter's Choice of Assistor ....................................................................................37

B.  The Assistance Restrictions Conflict with the Letter and Spirit of Section 208. ...............................................................................................43

C.  The Assistance Restrictions Impede Voters' Right to Choose Their Assistors. ..........................................................................................45

   1. The Oath Requirement Deters Would-Be Assistors from Helping 208 Voters. ................................................................................................46

      a.  "Eligibility" for assistance ................................................................46

      b.  "Pressure or Coerce" .........................................................................50

      c.  "Penalty of Perjury" ...........................................................................51

   2.  The Disclosure Requirements Chill Assistors. ......................................53

   3. The Assistance Restrictions Are Preempted by Section 208 Because They Burden Voters' Right to Their Assistor of Choice. ...........................55

      a.  The Assistance Restrictions Pressure 208 Voters to Vote without Assistance. ........................................................................................57

      b.  The Assistance Restrictions Pressure 208 Voters to Rely on Persons Other Than Their Chosen Assistor. .....................................................58

      c.  The Assistance Restrictions Discourage 208 Voters from Voting. .......60

V.   THE DISTRICT COURT'S INJUNCTION AGAINST ALL TEXAS
      PROSECUTORS IS SUPPORTED BY THE RECORD AND THE LAW. .61

CONCLUSION ......................................................................................64

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. Legis. Black Caucus v. Alabama*,
  575 U.S. 254 (2015) ...........................................................................23, 55

*Ala. State Conf. of NAACP v. Marshall*,
  No. 2:24-cv-420, 2024 WL 4448841 (N.D. Ala. Oct. 4, 2024), *stay
  denied* 2024 WL 4481489 (11th Cir. Oct. 11, 2024) ................................*passim*

*Alabama v. United States*,
  304 F.2d 583 (5th Cir. 1962)..............................................................15

*Allen v. Milligan*,
  599 U.S. 1 (2023) ................................................................14, 19, 22

*Allen v. State Bd. of Elections*,
  393 U.S. 544 (1969) ............................................................................18

*Anderson v. City of Bessemer City, N.C.*,
  470 U.S. 564 (1985) ............................................................................14

*Ark. United v. Thurston*,
  517 F. Supp. 3d 777 (W.D. Ark. 2021) ......................................17, 19

*Bates v. Little Rock*,
  361 U.S. 516 (1960) ............................................................................53

*Bond v. United States*,
  572 U.S. 844 (2014) ............................................................................36

*Carey v. Wis. Elections Comm'n*,
  No. 22-cv-402, 2022 WL 3910457 (W.D. Wis. Aug. 31, 2022)......................56

*Citizens for Resp. & Ethics in Wash. v. Fed. Election Comm'n*,
  971 F.3d 340 (D.C. Cir. 2020) ............................................................39

*City of Boerne v. Flores*,
  521 U.S. 507 (1997) ......................................................................15, 16

*Coal. for Educ. in District One v. Bd. of Elections*,
  370 F. Supp. 42 (S.D.N.Y. 1974), *aff'd* 495 F.2d 1090
  (2d Cir. 1974) .................................................................................. 16

*Crawford v. Marion Cnty.*
  553 U.S. 181 (2008) ....................................................................... 23

*Davis v. Fed. Election Comm'n*,
  554 U.S. 724 (2008) ................................................................. 23, 28

*Democracy N.C. v. N.C. State Bd. of Elections*,
  476 F. Supp. 3d 158 (M.D.N.C. 2020) ........................................ 19

*Democracy N.C. v. N.C. State Bd. of Elections*,
  590 F. Supp. 3d 850 (M.D. N.C. 2022) ........................................ 56

*Dep't of Commerce v. New York*,
  588 U.S. 752 (2019) ....................................................................... 53

*Disability Rts. N.C. v. N.C. State Bd. of Elections*,
  602 F. Supp. 3d 872 (E.D.N.C. 2022) ..................................... 44, 45

*Fed. Elec. Comm'n. v. Cruz*,
  596 U.S. 289 (2022) ....................................................................... 33

*First United Pentecostal Church v. Church Mutual Ins. Co.*,
  119 F.4th 417 (5th Cir. 2024) ........................................... 15, 43, 46

*Fish v. Kobach*,
  840 F.3d 710 (10th Cir. 2016) ...................................................... 49

*Fla. State Conf. of NAACP v. Lee*,
  576 F. Supp. 3d 974 (N.D. Fla. 2021) ..................................... 11, 19

*Food & Drug Admin. v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ................................................................*passim*

*G.T. v. Kanawha Cnty. Schs.*,
  No. 2:22-cv-57, 2020 WL 4018285 (S.D. W. Va. July 16, 2020) ..... 26

*Ganpat v. Eastern Pacific Shipping PTE, Ltd.*,
  66 F4th 578 (5th Cir. 2023) .......................................................... 62

*Garza v. Smith*,
    320 F. Supp. 131 (W.D. Tex. 1970) ............................................................ 3, 41

*Gilmore v. Greene Cnty. Democratic Party Exec. Comm.*,
    435 F.2d 457 (5th Cir. 1970) ...................................................................... 16, 41

*Google, Inc. v. Hood*,
    822 F.3d 212 (5th Cir. 2016) .............................................................................. 33

*Harris v. Siegelman*,
    695 F. Supp. 517 (M.D. Ala. 1988) ........................................................... 16, 49

*Health & Hosp. Corp. of Marion Cnty. v. Talevski*,
    599 U.S. 166 (2023) ................................................................................... 18, 21

*State ex rel. Hill v. Pirtle*,
    887 S.W.2d 921 (Tex. 1994) (*en banc*) ..................................................... 62, 63

*Hillman v. Maretta*,
    569 U.S. 483 (2013) .......................................................................................... 42

*Justice v. Hosemann*,
    771 F.3d 285 (5th Cir. 2014) ............................................................................. 27

*K.P. v. LeBlanc*,
    627 F.3d 115 (5th Cir. 2010) ............................................................................. 31

*Kimble v. Marvel Ent., LLC*,
    576 U.S. 446 (2015) .......................................................................................... 22

*La Union Del Pueblo Entero v. Abbott*,
    119 F.4th 404 (5th Cir. 2024) (*LUPE II*) .................................................... 33, 34

*Lamps Plus, Inc. v. Varela*,
    587 U.S. 176 (2019) .......................................................................................... 36

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*,
    66 F.4th 905 (11th Cir. 2023) ........................................................................... 50

*League of Women Voters of Ohio v. LaRose*,
    741 F. Supp. 3d 694 (N.D. Ohio 2024) ........................................... 19, 39, 40, 44

*Louisiana v. United States*,
    380 U.S. 145 (1965) ........................................................ 49

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ........................................................ 23

*LUPE v. Abbott*,
    29 F.4th 299 (5th Cir. 2022) .............................................. 2

*Med. Ctr. Pharm. v. Mukasey*,
    536 F.3d 383 (5th Cir. 2008) ........................................ 13, 37

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996) ........................................................ 36

*MFV v. Fontes*,
    2025 WL 598127 (9th Cir. Feb. 25, 2025) ............................... 49

*MFV v. Ogg*,
    105 F.4th 313 (5th Cir. 2024) ........................................... 34

*Mixon v. Ohio*,
    193 F.3d 389 (6th Cir. 1999) ............................................ 18

*Mock v. Garland*,
    75 F.4th 563 (5th Cir. 2023) ............................................ 62

*Morse v. Republican Party of Va.*,
    517 U.S. 186 (1996) ............................................ 18, 21, 22

*N. Carolina State Conf. of NAACP v. McCrory*,
    831 F. 3d 204 (4th Cir. 2016) ........................................... 16

*N.J. Protection & Advocacy, Inc. v. N.J. Dep't of Educ.*,
    563 F. Supp. 2d 474 (D.N.J. 2008) ...................................... 26

*NAACP v. Alabama*,
    357 U.S. 449 (1958) ........................................................ 53

*Nat'l Rifle Ass'n of Am., Inc. v. McCraw*,
    719 F.3d 338 (5th Cir. 2013) ............................................ 35

*New Ga. Project v. Raffensperger*,
    484 F. Supp. 3d 1265 (N.D. Ga. 2020) ............................................................19

*Nick v. Bethel*,
    No. 07-cv-98, 2008 WL 11456134 (D. Alaska Jul. 30, 2008) ..........................16

*Nw. Austin Mun. Utility Dist. No. One v. Holder*,
    557 U.S. 193 (2004) .........................................................................................15

*OCA-Greater Houston v. Texas*,
    867 F.3d 604 (5th Cir. 2017)......................................................................*passim*

*Oregon v. Mitchell*,
    400 U.S. 112 (1970) .........................................................................................16

*Ostrewich v. Tatum*,
    72 F.4th 94 (5th Cir. 2023)...............................................................................34

*P.R. Org. for Pol. Action v. Kusper*,
    490 F.2d 575 (7th Cir. 1973).............................................................................16

*Parada v. Garland*,
    48 F.4th 374 (5th Cir. 2022)..............................................................................37

*Pederson v. La. State Univ.*,
    213 F.3d 858 (5th Cir. 2000).............................................................................24

*Priorities USA v. Nessel*.
    487 F. Supp. 3d 599 (E.D. Mich. 2020) ...........................................................40

*Richardson v. Flores*,
    28 F.4th 649 (5th Cir. 2022)..............................................................................34

*Robinson v. Ardoin*,
    86 F.4th 574 (5th Cir. 2023)......................................................................*passim*

*Rumsfeld v. F. for Acad. & Inst. Rts., Inc.*,
    547 U.S. 47 (2006) ...........................................................................................24

*Schwier v. Cox*,
    340 F.3d 1284 (11th Cir. 2003).........................................................................21

*Shelby Cnty. v. Holder*,
  570 U.S. 529 (2013) ....................................................................... 15

*Shelton v. Tucker*,
  364 U.S. 479 (1960) ....................................................................... 53

*Shepard v. United States*,
  544 U.S. 13 (2005) ......................................................................... 22

*Singleton v. Allen*,
  740 F. Supp. 3d 1138 (N.D. Ala. 2024) ......................................... 22

*Singleton v. Merrill*,
  582 F. Supp. 3d 924 (N.D. Ala. 2022) (per curiam), *aff'd sub nom.*
  *Allen v. Milligan*, 599 U.S. 1 (2023) ............................................. 19

*South Carolina v. Katzenbach*,
  383 U.S. 301 (1966) ....................................................................... 15

*State v. Stephens*,
  663 S.W.3d 45 (Tex. 2021) ....................................................*passim*

*Steward v. Abbott*,
  189 F. Supp. 3d 620 (W.D. Tex. 2016) .......................................... 26

*Stone v. Allen*,
  717 F. Supp. 3d 1161 (N.D. Ala. 2024) ......................................... 22

*Students for Fair Admission, Inc. v. President & Fellows of Harvard
  Coll.*,
  600 U.S. 181 (2023) ................................................................. 11, 23

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ....................................................................... 33

*Tennessee v. Lane*,
  541 U.S. 509 (2004) ....................................................................... 17

*Texas Democratic Party v. Abbott*,
  978 F.3d 168 (5th Cir. 2020) ......................................................... 31

*Thornburg v. Gingles*,
  478 U.S. 30 (1986) ......................................................................... 41

*Twitter, Inc. v. Paxton*,
  56 F.4th 1170 (9th Cir. 2022)................................................................33

*United Food & Com. Workers Union Local 751 v. Brown Grp.*,
  517 U.S. 544 (1996) ...........................................................................26

*United States v. Alabama*,
  778 F.3d 926 (11th Cir. 2015)............................................................38

*United States v. Berks Cnty.*,
  277 F. Supp. 2d 570 (E.D. Pa. 2003) .................................................16

*United States v. Brockamp*,
  519 U.S. 347 (1997) ...........................................................................37

*United States v. Charleston Cnty.*,
  316 F. Supp. 2d 268 (D.S.C. 2003), *aff'd* 365 F.3d 341 (4th Cir.
  2004)....................................................................................................16

*United States v. Hale Cnty.*,
  No. 5-05CV0043-C (N.D. Tex. Apr. 27, 2006) ..................................56

*United States v. Hall*,
  472 F.2d 261 (5th Cir. 1972)..............................................................62

*United States v. Locke*,
  529 U.S. 89 (2000) .............................................................................45

*United States v. Long Cnty.*,
  No. 06-cv-40, 2006 WL 8458526 (S.D. Ga. Feb. 10, 2006) ..............16

*United States v. Lynd*,
  349 F.2d 790 (5th Cir. 1965)..............................................................15

*United States v. Mississippi*,
  380 U.S. 128 (1965) ...........................................................................15

*United States v. Naranjo*,
  259 F.3d 379 (5th Cir. 2001)..............................................................38

*United States v. Pack*,
  612 F.3d 341 (5th Cir. 2010)..............................................................23

*Villas at Parkside Partners v. City of Farmers Branch,*
    726 F.3d 524 (5th Cir. 2013)................................................................44

*Vote.org v. Callanen,*
    89 F.4th 459 (5th Cir. 2023)........................................................20, 21

*Warth v. Seldin,*
    422 U.S. 490 (1975)..........................................................................26

*Whitman v. Am. Trucking Ass'n,*
    531 U.S. 457 (2001)..........................................................................40

*Wright v. Dougherty County,*
    358 F.3d 1352 (11th Cir. 2004)........................................................24

**Statutes**

28 U.S.C. § 1331 ..................................................................................2

28 U.S.C. § 1343(a)(4) .........................................................................2

28 U.S.C. § 1357 ..................................................................................2

52 U.S.C. § 10302(a) .........................................................................19

52 U.S.C. § 10302(b) ....................................................................19, 20

52 U.S.C. § 10302(c) .........................................................................19

52 U.S.C. § 10310(e) .........................................................................21

52 U.S.C. § 10501 ..............................................................................16

52 U.S.C. § 10501(b)(1) ................................................................20, 61

52 U.S.C. § 10508 .....................................................................*passim*

Tex. Elec. Code § 273.001 ................................................................32

Tex. Elec. Code § 31.002(a) ..............................................................30

Tex. Elec. Code § 64.0322(b) .......................................................8, 30

Tex. Elec. Code § 31.002(d) ..............................................................31

Tex. Elec. Code § 37.02 ........................................................................35

Tex. Elec. Code § 64.032 ......................................................................28

Tex. Elec. Code § 64.032(a) ..................................................................47

Tex. Elec. Code § 64.034 ...............................................7, 28, 46, 50, 54

Tex. Elec. Code § 64.036 ......................................................................35

Tex. Elec. Code § 86.010 ................................................................28, 35

Tex. Elec. Code § 86.010(c) ....................................................................7

Tex. Elec. Code § 86.010(g) ....................................................................8

Tex. Elec. Code § 86.010(h)(2) ..........................................................8, 54

Tex. Elec. Code § 86.013 ......................................................................28

Tex. Elec. Code § 86.013(d) ..................................................................30

Tex. Elec. Code § 86.013(f) .....................................................................7

Tex. Gov't Code § 402.028 ...................................................................32

Tex. Penal Code §12.35(a) .......................................................................8

Tex. Penal Code § 12.35(b) ......................................................................8

Voting Rights Act. Pub. L. No. 91-285, 84 Stat. 314, 315 (1970) ............3

## Other Authorities

128 Cong. Rec. S7075-142 (daily ed. June 18, 1982) ......................59, 60

2023 Tex. Sess. L. Ch. 765, Art. 2A.104(c) ...........................................64

Fed. R. Civ. P. 52(a)(6) .........................................................................14

Fed. R. Civ. P 65 .....................................................................13, 62, 64

Fed. R. Civ. P. 65(d)(2)(C) ....................................................................62

H.R. Rep. No. 227, 97th Cong., 1st Sess. 14 (1981) ...................16, 42, 44

S. Rep. No. 97-417 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 177
  (1982) ......................................................................................................*passim*

Voting Rights Act: Hearings on 5.53, S. 1761. S. 1992 and H.R. 3112,
  Before the Subcomm. on the Const. of the Sen. Comm. on the
  Judiciary, 97th Cong., 2d Sess. 1783 (1982).......................................................59

## **INTRODUCTION**

Section 208 of the federal Voting Rights Act ("VRA") enshrines the right of citizens who are blind, disabled, or cannot read, write, or understand the voting process to obtain assistance from a person of their choice, "other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508. Today, approximately three million adult citizens in Texas are eligible for assistance under Section 208 ("208 voters"). ROA.42539:15-17.

In 2021, Texas enacted an omnibus election law ("S.B.1") that imposed new restrictions on 208 voters in need of assistance. ROA.37672. Section 6.04 of S.B.1 (the "Oath Requirement") mandates that an assistor swear, "under penalty of perjury" to a burdensome and ambiguous oath before helping a 208 voter, ROA.37710, ¶¶ 136-37, and sections 6.03, 6.05, and 6.07 of S.B.1 (the "Disclosure Requirements") require assistors to disclose personal information on forms prepared by the Secretary of State; ROA.37680.[1] Following a six-week bench trial, the district court entered a detailed opinion, ROA.37670-37783, enjoining the Oath and Disclosure Requirements (collectively, the "Assistance Restrictions") under Section 208. The district court held that Section 208 preempted the Assistance Restrictions because they deterred assistors from providing voting assistance and voters from

---

[1] The Arc and DST do not appeal the district court's dismissal of their challenge to S.B.1 § 6.01 for lack of standing. *See* ROA.37678, ¶ 7, ROA.37777.

requesting assistance, thereby burdening 208 voters' right to assistance. ROA.37755-37766.

The Texas Attorney General ("Attorney General") and Secretary of State ("Secretary") (together, "State Defendants"), and Sean Teare, the Harris County District Attorney[2] ("DA Teare") now appeal, together with certain political organizations that intervened as Defendants.[3] Their briefing ignores binding precedent, *OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017) ("*OCA*"); *Robinson v. Ardoin*, 86 F.4th 574 (5th Cir. 2023), and cannot overcome the clear conflict between the Assistance Requirements and Section 208.

## JURISDICTIONAL STATEMENT

The district court had original jurisdiction over the VRA claim. 28 U.S.C. §§ 1331, 1343(a)(4), 1357. ROA.37728, 37738-44. The VRA abrogates state sovereign immunity. *OCA*, 867 F.3d at 614; *see infra* Argument Section I. Each

---

[2] Then-Harris County District Attorney Kim Ogg was originally a Defendant; DA Teare was substituted on February 3, 2025. ECF No. 200. The Bexar and Travis County District Attorneys and Bexar and Harris County election officials were additional Defendants below, ROA.37686, ¶ 37; they did not appeal.

[3] Intervenor-Defendants-Appellants ("Intervenors") are the Harris County Republican Party, Dallas County Republican Party, Republican National Committee, National Republican Senatorial Committee, and National Republican Congressional Committee. ROA.37675 n.8. Their intervention was allowed based on their asserted interest in S.B.1's regulations concerning partisan poll watchers. *LUPE v. Abbott*, 29 F.4th 299, 306 (5th Cir. 2022). They joined State Defendants' post-trial briefing but did not separately defend against Plaintiffs' Section 208 claims. *See* ROA37675 n. 8-9. It is not clear that Intervenor-Defendants' interest in partisan poll watchers "establishes a commensurate interest in voter assistance regulations." ROA.37675 n.8.

Plaintiff demonstrated, moreover, standing to challenge the Assistance Restrictions. *See infra* Argument Section III. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED FOR REVIEW

1. Whether Section 208 abrogates state sovereign immunity.

2. Whether Section 208 affords a private right of action.

3. Whether Plaintiffs have standing to pursue their claims against all Defendants.

4. Whether Section 208 preempts the Assistance Restrictions.

5. Whether the injunction against all Texas prosecutors is supported by the facts and the law.

## STATEMENT OF THE CASE

### I.     STATUTORY BACKGROUND

Congress imposed a national ban on literacy tests in the 1970 amendments to the Voting Rights Act. Pub. L. No. 91-285, 84 Stat. 314, 315 (1970). Although covered by this ban, Texas continued to prohibit illiterate voters from receiving assistance with their ballots as a type of literacy test. *Garza v. Smith*, 320 F. Supp. 131, 132 (W.D. Tex. 1970). Given the actions of Texas and other states, Congress enacted Section 208 to support the literacy test ban and preempt those state laws that deny assistance to 208 voters. *See* S. Rep. No. 97-417, at 62-63 (1982), *as reprinted*

3

*in* 1982 U.S.C.C.A.N. 177 ("S. Rep."). Congress decided that "the only way to assure meaningful voting assistance" is to permit 208 voters to "have the assistance of a person of their own choice."

Section 208 provides:

> Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union.

52 U.S.C. § 10508. The VRA defines "to vote" as "all action necessary to make a vote effective including, but not limited to, registration . . . , casting a ballot, and having such ballot counted . . . ." *Id.* § 10101(e); *see OCA*, 867 F.3d at 615. At every stage of the voting process, 208 voters are entitled to assistance from a person of their choice. *OCA*, 867 F.3d at 615. Section 208 preempts state laws that limit the choice of assistor. *See id*.

## II.    FACTUAL BACKGROUND

### A. Plaintiffs

Plaintiffs-Appellees are Delta Sigma Theta Sorority, Inc. ("DST"), Mi Familia Vota ("MFV"), and The Arc of Texas ("The Arc").

DST is a national organization that serves Black communities. ROA.37687. Voting-rights advocacy has been central to DST's mission since 1913. ROA.37687. Before S.B.1, DST assisted elderly voters with completing absentee ballots and in-person voting. ROA.37687 (citing ROA.40889:1-18, ROA.41000:9-19); *see*

ROA.41000:20-24. S.B.1 now deters DST from assisting voters who, in the absence of DST's assistance, are denied the assistor of their choice. ROA.37719, ¶¶ 163-64 (citing ROA.60907, ¶ 102, ROA.41000:9-41991:3, ROA.41003:9-14, ROA.41004:10-15); *see also* ROA.40910:9-40912:1.

MFV is a national civic-engagement organization that seeks to increase the political representation and power of Latino communities, ROA.42227:3-6. Its voter education program supports low-propensity Latino voters by encouraging, educating, and assisting them to vote. ROA.42235:6-42236:9; ROA.42256:24-42257:5.

Before S.B.1, MFV developed plans to vote with individual voters who required language or physical assistance, and encouraged them to obtain help from the assistors of their choice. ROA.42256:24-42257:8. MFV now needs more time and resources per voter to help voters develop voting plans without assistance. ROA.42183:24-42184:24; ROA.42257:16-42258:6.

The Arc is a 501(c)(3) membership organization that advocates for the human rights of Texans who have intellectual and developmental disabilities ("IDD"). ROA.37686-37687 (citing ROA.42291:23-25, ROA.42293:18-42294:9, ROA.42296:20-42297:24). Its members include individuals with IDD and their caregivers. ROA.41198:10-20, ROA.42294:25-42295:4, ROA.42298:20-21.

Before S.B.1, members of The Arc provided, or relied on their assistors to provide, assistance with absentee and in-person voting. *See* ROA.42004:18-20, ROA.42044:15-16. S.B.1 now prevents members from voting with their chosen assistors, and prevents the Arc from helping 208 voters. ROA.37703, ¶¶ 113-14.

### B. Defendants

State Defendants and DA Teare are responsible for administering and enforcing the Assistance Restrictions. *See infra* Argument Section III.

### C. S.B.1's Assistance Restrictions

As relevant here, the Oath Requirement mandates that each assistor take the following oath:

> I swear (or affirm) **under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance**[4]; I will not suggest, by word, sign, or gesture, how the voter should vote; I will confine my assistance to reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot; I will prepare the voter's ballot as the voter directs; **I did not pressure or coerce the voter into choosing me to provide assistance**; I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; I will not communicate information about how the voter has voted to another person; **and I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted**.

---

[4] State Defendants' Brief does not mention the requirement that a voter represent to a potential assistor that the voter is eligible for assistance.

6

Tex. Elec. Code § 64.034 ("TEC"); ROA.37678-37679, 37710. The district court enjoined the bolded and underlined language. ROA.37777.

To comply with the Oath Requirement, each assistor must execute a printed form in the presence of an election officer. ROA.37681-37682, ¶ 22 (citing ROA.62624); TEC § 64.034. The Oath Requirement is also printed on the carrier envelope for mail ballots. TEC §§ 86.010(c), 86.013(f). A defective oath may result in rejection of the voter's ballot. ROA.37678-37679 (citing TEC §§ 64.034, 276.018; Tex. Penal Code §§ 12.35(a), (b)).

S.B.1 increased the penalty for violating any part the oath from a Class A misdemeanor to a "state-jail felony." ROA.37757 (citing TEC § 276.018, Tex. Penal Code §§ 37.02, 12.21); *see also* ROA.42775:4-42776:7 (citing other criminal statutes, all Class A misdemeanors, potentially applicable to false swearing, including Tex. Penal Code § 37.10 Prevention of Fraud in the Conduct of an Election, 2017 Tex. Sess. L. (S.B.5) § 17).

S.B.1 § 6.03, 6.05, and 6.07 set forth the Disclosure Requirements. An in-person assistor must swear to a statement of her relationship to the voter. ROA.37680, ¶ 16. An absentee-ballot assistor must provide the same relationship disclosure on the ballot envelope, ROA.37680, ¶ 18, and an assistor who mails in another voter's ballot must disclose their relationship to the voter, ROA.37680. The

absentee-ballot envelope does not distinguish between assistance in completing and assistance with mailing the ballot. ROA.37680-37681, ¶ 20.

The Secretary prescribes the forms that implement the Disclosure and Oath Requirements. ROA.37680,82, ¶¶ 17, 22 (citing TEC § 64.0322(b); ROA.62624); TEC § 64.0322(b). On the oath form and the ballot envelope, the space for the assistor's signature appears in the same section as the Disclosure Requirements, and assistors and voters face identical consequences for non-compliance with the Oath Requirement and the Disclosure Requirements. From the assistor's perspective, therefore, the Oath and Disclosure Requirements operate as a single requirement. ROA.37681-37682, ¶ 22.

Providing mail-ballot assistance without completing the Disclosure Requirements is a state-jail felony, unless the assistor is a close relative of, or lives with, the voter. ROA.37681, ¶ 21 (TEC §§ 86.010(g), (h)(2); Tex. Penal Code §§ 12.35(a), (b)).

Texas purportedly enacted S.B.1 to address concerns about election fraud. *See* ECF No. 192 at 5-6 ("Def. Br.") (citing TEC § 1.0015). Election-related crimes, however, constitute a vanishingly-small fraction of the votes in any election. The Attorney General identified 169 "resolved" assistance-fraud cases since 2004; hundreds of millions of votes were cast in Texas during the same period.

ROA.68567-68575. Not one of the 169 cases concerned assistance inside a polling place. ROA.67832-67848; ROA.42732:18-21; ROA.42828:21-42830:7.

**D. Impact of S.B.1's Assistance Restrictions**

The district court found, based on the testimony of voters and assistors, that the Assistance Restrictions deter 208 voters from obtaining assistance from a person of their choice. ROA.37703 ¶ 112; *see infra* Argument Section IV.C. Because of S.B.1, 208 voters have refrained from asking their preferred caregivers for assistance for fear of exposing their caregivers to criminal liability. *See, e.g.*, ROA.42042:20-42044:11, ROA.42092:11-17, ROA.42124:10-24; *see also infra* Argument Section IV.C.3.a. People who assisted voters in the past are now afraid to risk criminal prosecution. *See, e.g.*, ROA.41000:9-41001:3, ROA.41002:20-41003:14, ROA.42092:1117; *see also infra* Argument Section IV.C.2, 3.a.

Fear of prosecution is reasonable given the Attorney General's public statements that it prioritizes prosecuting voter-assistance fraud. ROA.37695-37696, ¶¶ 79-80, 82. Texas election officials acknowledge that voters and would-be assistors fear inadvertently violating S.B.1. *See, e.g.*, ROA.40116:20-40118:10 (discussing the Disclosure Requirements), ROA.38976:2-38977:16 (discussing the Oath Requirement); ROA.40112:24-40115:9 (discussing both).

The trial record demonstrates that the Assistance Restrictions constitute material impediments for 208 voters. *See infra* Argument Section IV.C. They now

must choose to vote without assistance, a physically and mentally taxing process; to vote with help from an election worker, often giving up their privacy; or not to vote at all. ROA.37721-37722, ¶ 173.

### III.    PROCEDURAL HISTORY

In 2021, Plaintiffs filed a challenge to S.B.1. ROA.37674. The district court held a six-week bench trial in 2023, ROA.37675, and issued Findings of Fact and Conclusions of Law on Plaintiffs' Section 208 claims in October 2024. ROA.37673.

The court entered a permanent injunction, ROA.37777-37781 (the "Injunction"), prohibiting State Defendants and all local prosecutors from enforcing the Oath Requirement, ROA.37778, and prohibiting State Defendants from enforcing the Disclosure Requirements, ROA.37779-37781. The Injunction prohibits the Attorney General from investigating, referring for investigation or prosecution, or prosecuting, alleged violations of the Assistance Restrictions. It further prohibits local prosecutors from prosecuting such alleged violations, or deputizing, or seeking the appointment *pro tem* of the Attorney General to do so.

The Injunction also prohibits the Secretary and local election officials from using forms that contain the enjoined Assistance Restrictions, and commands that forms and training materials be revised accordingly. ROA.37778-37781. The district court stayed the Injunction until after the November 2024 election. ROA.37779-37781; *see also* ROA.37864-37883. One day after that election, State Defendants

and Intervenors again moved this Court to stay the Injunction pending appeal. ECF No. 70. That motion is pending.

## SUMMARY OF THE ARGUMENT

The district court correctly determined that Plaintiffs are entitled to a permanent injunction restraining Defendants from enforcing the Assistance Restrictions in violation of Section 208.

Defendants' jurisdictional arguments regarding sovereign immunity and the existence of a private right of action rehash arguments that the Supreme Court and this Court have already rejected. Binding precedent forecloses sovereign immunity for Section 208 claims. *See Robinson*, 86 F.4th at 588; *OCA*, 867 F.3d at 614. This Court has held, moreover, that "aggrieved persons" may institute private enforcement actions against states. *Robinson*, 86 F.4th at 588. In fact, every court to consider the issue has held that Section 208 is privately enforceable. *Fla. State Conf. of NAACP v. Lee*, 576 F. Supp. 3d 974, 989-90 (N.D. Fla. 2021) (citing *OCA*, 867 F.3d at 609-14).

Defendants' challenge to Plaintiffs' standing fares no better. The Arc has associational standing to sue on behalf of its members who were unable to vote with their chosen assistor because of S.B.1. *See Students for Fair Admission, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). DST, MFV, and The Arc have organizational standing because the Assistance Restrictions directly

11

regulate their activities or otherwise perceptibly impair their core functions of providing voter assistance, education, and advocacy. *See Food & Drug Admin. v. All. for Hippocratic Med.* ("*Alliance*"), 602 U.S. 367, 382, 395 (2024). Plaintiffs' injuries, moreover, are traceable to, and redressable by the Secretary, the Attorney General, and DA Teare, all of whom bear responsibility for enforcing the Assistance Restrictions.

Defendants' substantive arguments are meritless. Section 208 guarantees the right to assistance by "a person of the voter's choice, other than the voter's employer or agent of that employer or an officer or agent of the voter's union." 52 U.S.C. § 10508. The district court correctly held that Section 208 does not allow states to restrict 208 voters' choice of assistor beyond the two enumerated exceptions. This conclusion is compelled by the plain text of Section 208, confirmed by the legislative history, *see* S. Rep. at 62-63, and consistent with the overwhelming weight of case law, *see OCA*, 867 F.3d at 614-15. Accordingly, the Assistance Restrictions—which limit 208 voters' choice of assistor—impermissibly infringe upon the right to assistance guaranteed by Section 208.

The extensive trial record demonstrates how the Assistance Restrictions obstruct voters' free choice of assistor: would-be assistors are wary of providing assistance and exposing themselves to criminal liability, so voters are forced to vote

without their chosen assistor or forfeit their right to vote altogether. This is precisely what Section 208 forbids.

Texas may not engraft restrictions on voter assistance beyond those defined by Section 208. *See Med. Ctr. Pharm. v. Mukasey*, 536 F.3d 383, 395 (5th Cir. 2008). Defendants cannot escape the manifest conflict between the Assistance Restrictions and Section 208 by claiming that S.B.1's goal is to protect vulnerable voters from fraud and intimidation. Even if that were true, and the record shows that it is not, Texas cannot go further in its pursuit of Section 208's goals than Congress did. Congress determined that the best way to protect 208 voters from intimidation is to guarantee that they have assistance from any person of their choice, and Texas cannot second-guess that decision.

The Injunction appropriately prohibits all county and local prosecutors "from deputizing the Attorney General, appointing him *pro tem*, or seeking his appointment *pro tem* from or by a district judge to prosecute alleged violations" of the Assistance Restrictions. This language prevents county and local prosecutors from acting in "active concert or participation" with the Attorney General to do what the Injunction otherwise forbids, consistent with Fed. R. Civ. P 65.

## STANDARD OF REVIEW

Appellate Courts review a district court's factual findings for clear error. Fed. R. Civ. P. 52(a)(6); *Allen v. Milligan*, 599 U.S. 1, 23 (2023). The standard is highly deferential: "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 565 (1985). "[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Id.* at 574-75.

Legal questions are reviewed *de novo*, *Robinson*, 86 F.4th at 587, and injunctions are reviewed for abuse of discretion, *id.* at 586.

## ARGUMENT

### I.   SECTION 208 ABROGATES SOVEREIGN IMMUNITY AND ESTABLISHES A PRIVATE RIGHT OF ACTION

#### A. Congress Enacted Section 208 Pursuant to Constitutional Authority.

Congress enacted the VRA pursuant to its enforcement authority under the Fourteenth and Fifteenth Amendment. *Milligan*, 599 U.S. at 41. The Supreme Court has long recognized Congress's broad authority to enact prophylactic legislation under both amendments. *See id.* (citing *City of Rome v. United States,* 446 U.S. 156,

14

173 (1980)). It is well established that "measures protecting voting rights are within Congress' power to enforce the Fourteenth and Fifteenth Amendments." *City of Boerne v. Flores*, 521 U.S. 507, 518 (1997).

Intervenors' argument, raised for the first time on appeal, that the district court's broad interpretation of Section 208 is not congruent and proportionate to Congress's enforcement authority under the Fourteenth Amendment, Int. Br. 42-44, must be rejected. Intervenors forfeited this argument by failing to raise it below. *See First United Pentecostal Church v. Church Mutual Ins. Co.*, 119 F.4th 417, 426 (5th Cir. 2024). It also fails on its own terms. Federal laws enacted under the Fifteenth Amendment need only be "rational." *Shelby Cnty. v. Holder*, 570 U.S. 529, 550 (2013). "Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting." *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966). Prior to the VRA, states commonly prohibited or severely restricted aid for illiterate voters to discriminate against Black and language-minority voters. *See, e.g.*, *id.* at 312-13; *United States v. Mississipp*i, 380 U.S. 128, 134-35 (1965); *United States v. Lynd*, 349 F.2d 790, 792-93 (5th Cir. 1965); *Alabama v. United States*, 304 F.2d 583, 587 (5th Cir. 1962). "All literacy tests and similar voting qualifications were abolished by [the VRA]. Although such tests may have been facially neutral, they were easily manipulated to keep blacks from voting." *Nw. Austin Mun. Utility Dist. No. One v. Holder*, 557 U.S. 193, 198 (2004). Section 208

is designed to effectuate this national ban on literacy tests, 52 U.S.C. § 10501, and its "implicit requirement" that people who cannot read or understand voting forms "may not be denied assistance." S. Rep. at 63.

As a corollary to the literacy test ban, Section 208 is also a rational means of addressing this pervasive history of discrimination. *See Boerne*, 521 U.S. at 525-26; *Oregon v. Mitchell*, 400 U.S. 112, 118 (1970). In enacting Section 208, Congress was aware that discrimination via restrictions on assistance persisted after 1965. *See* S. Rep. at 62-63 & nn.208-210; H. Rep. No. 97-227, at 14-15 (1981) ("H. Rep."); *see also, e.g.*, *Coal. for Educ. in District One v. Bd. of Elections*, 370 F. Supp. 42, 52-53 (S.D.N.Y. 1974), *aff'd* 495 F.2d 1090 (2d Cir. 1974); *P.R. Org. for Pol. Action v. Kusper*, 490 F.2d 575, 580 (7th Cir. 1973); *Gilmore v. Greene Cnty. Democratic Party Exec. Comm.*, 435 F.2d 457, 491-92 (5th Cir. 1970). Such discrimination continued after 1982. *See, e.g.*, *OCA*, 867 F.3d at 614-15; *N. Carolina State Conf. of NAACP v. McCrory*, 831 F. 3d 204, 217 (4th Cir. 2016); *Nick v. Bethel*, No. 07-cv-98, 2008 WL 11456134 (D. Alaska Jul. 30, 2008); *United States v. Long Cnty.*, No. 06-cv-40, 2006 WL 8458526, at *1 (S.D. Ga. Feb. 10, 2006); *United States v. Charleston Cnty.*, 316 F. Supp. 2d 268, 289 n.23 (D.S.C. 2003), *aff'd* 365 F.3d 341 (4th Cir. 2004); *United States v. Berks Cnty.*, 277 F. Supp. 2d 570, 580-81 (E.D. Pa. 2003); *Harris v. Siegelman*, 695 F. Supp. 517, 525 (M.D. Ala. 1988).

Even if the "congruent and proportionate" standard applied to Section 208, which it does not, it would be satisfied here. Section 208 is congruent and proportionate to Congress's Fourteenth Amendment authority to enact prophylactic protections for people with disabilities based on "a pattern of unequal treatment in the administration of a wide range of public services, . . . including . . . voting." *Tennessee v. Lane*, 541 U.S. 509, 525 (2004) (upholding the constitutionality of a related prophylactic law that protects voters with disabilities); *see also* S. Rep. at 62-63 (documenting pattern of discrimination against voters with disabilities). "[I]n light of Congress's findings regarding the obstacles faced by [208] voters, . . . permitting such voters to have an assistor of their choice is a congruent and proportional remedy to enforce the guarantees of the Equal Protection Clause." *Ark. United v. Thurston*, 517 F. Supp. 3d 777, 789 (W.D. Ark. 2021).[5]

## B. This Court Has Repeatedly Held that the VRA Abrogates State Sovereign Immunity

The VRA permits "aggrieved persons" to institute private enforcement actions against a state, abrogating state sovereign immunity. *Robinson*, 86 F.4th at 588.

As State Defendants concede, binding precedent forecloses their claim to sovereign immunity. Def. Br. 28; *see Robinson*, 86 F.4th at 588; *OCA*, 867 F.3d at

---

[5] Intervenor-Defendants attempt to conjure an illusion of support for the notion that Section 208 exceeds Congressional authority by citing cases from other contexts. ECF No. 191 ("Int. Br."), at 42-44 (citing *Bd. of Trs. v. Garrett*, 531 U.S. 356, 365 (2001) (ADA); *City of Boerne*, 521 U.S. at 520 (RFRA); *Gomez v. United States*, 490 U.S. 858 (1989) (Federal Magistrates Act)). No case holds that Section 208 exceeds Congress's authority.

614. State Defendants admittedly raise this issue only to preserve it for potential *en banc* review. Def. Br. 28-29. Given this admission, Plaintiffs simply note that this Court has already assessed and rejected the substance of State Defendants' arguments. *See Robinson*, 86 F.4th at 588.

## II.    SECTION 208 ESTABLISHES A PRIVATE RIGHT OF ACTION

"Congress should not be accused of abrogating sovereign immunity without some purpose. The purpose surely is to allow the States to be sued by someone." *Robinson*, 86 F.4th at 588.

The text of the VRA and statutory *stare decisis* both compel the same conclusion: Section 2's private right of action has "been clearly intended by Congress since 1965." *Morse v. Republican Party of Va.*, 517 U.S. 186, 232 (1996) (plurality) (quoting S. Rep. at 30); *see id.* at 240 (Breyer, J., concurring) (same). Section 1983 separately provides a vehicle to enforce Section 208, which contains paradigmatic "rights-creating" language. *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 187 (2023).

This Court and nearly every other court to address this issue have already held that Section 2, *Robinson*, 86 F.4th at 588, and various other sections of the VRA are privately enforceable, *see, e.g.*, *Morse*, 517 U.S. at 233-35, 240 (1996) (five justices held that Section 10 of the VRA provides a private right of action); *Allen v. State Bd. of Elections*, 393 U.S. 544, 556-57 (1969) (Section 5); *Mixon v. Ohio*, 193 F.3d 389,

398-99 (6th Cir. 1999) (Section 2); *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1031 (N.D. Ala. 2022) (per curiam) (three-judge court) (collecting cases regarding Section 2), *aff'd sub nom. Allen v. Milligan*, 599 U.S. 1 (2023).

Section 3 of the VRA explicitly permits "an aggrieved person" to pursue various remedies under the VRA or "any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State[.]" 52 U.S.C. §§ 10302(a), (b), (c). Based on Section 3's express statutory text, every court to consider the issue has held that Section 208 is privately enforceable. *See, e.g.*, *Lee*, 576 F. Supp. 3d at 990 (citing *OCA*, 867 F.3d at 609-14); *League of Women Voters of Ohio v. LaRose*, 741 F. Supp. 3d 694 (N.D. Ohio 2024); *Ark. United*, 517 F. Supp. 3d at 790, 798; *New Ga. Project v. Raffensperger*, 484 F. Supp. 3d 1265, 1301 (N.D. Ga. 2020); *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 233-36 (M.D.N.C. 2020). Indeed, this Court implicitly held in *OCA* that Section 208 is privately enforceable. *See* 867 F.3d at 609-14 (Section 208 validly abrogated state sovereign immunity in a private action).

Significantly, Section 3(b) further confirms the correctness of this broad understanding. Section 3(b) expressly permits courts to "suspend the use of tests and devices in [a] State" in a proceeding brought by "an aggrieved person" where the "court finds that a test or device has been used for the purpose or with the effect of denying or abridging the right of any citizen[.]" 52 U.S.C. § 10302(b). The

Assistance Restrictions have the "effect" of abridging the rights of voters who cannot read, right, understand, or interpret certain materials, ROA.37756, 37762, so this private action certainly falls directly within the ambit of Section 3(b). 52 U.S.C. § 10302(b); *see also* 52 U.S.C. § 10501(b)(1) (defining "test or device" as including any requirement that a person "demonstrate the ability to read, write, understand, or interpret any matter" or "demonstrate any . . . knowledge of any particular subject").

Even without Section 3's express private cause of action, Plaintiffs also brought their claims under 42 U.S.C. § 1983. ROA.6248, ¶ 29. A federal statute can be privately enforced under 42 U.S.C. § 1983, if the statute "(1) contains rights-creating language and (2) displays an intent to create a private remedy." *Vote.org v. Callanen*, 89 F.4th 459, 474 (5th Cir. 2023) (citations omitted). "If a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983." *Id*. at 473 (citation omitted).

First, Section 208 protects the individual right of "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write" to "assistance by a person of the voter's choice." 52 U.S.C. § 10508. Thus, the "focus of the text is . . . the protection of each individual's right to vote." *See Vote.org*, 89 F.4th at 474-75 (quoting *Schwier v. Cox*, 340 F.3d 1284, 1295 (11th Cir. 2003)). This is true even if Section 208 is construed as addressing the rights of 208 voters as a

group. *See Talevski*, 599 U.S. at 184 (holding that a statute about the rights of a specific group still contained the requisite individual rights-creating language).

Second, nothing in Section 208 or the VRA suggests that Congress sought to foreclose private enforcement. *See Vote.org*, 89 F.4th at 475. In *Talevski*, the Supreme Court reaffirmed that the mere fact that a statute permits public enforcement does not preclude private enforcement. 599 U.S. at 189-92. This is particularly true where, as here, Congress has repeatedly amended the VRA to make clear that it is privately enforceable, *Morse*, 517 U.S. at 233-34, and, as recently as 2006, made it easier for private litigants to recover attorney's fees and costs, 52 U.S.C. § 10310(e) (allowing the recovery of attorney's fees and expert costs for a "prevailing party, *other than the United States*") (emphasis added). Despite Intervenor-Defendants' contentions that Section 208's public enforcement scheme precludes private enforcement, Intervenor-Defendants themselves acknowledge that this Court "implicitly rejected this argument in *OCA*[]." Int. Br. 59-60 n.2; *accord OCA*, 867 F.3d at 614. Like the rest of the VRA, Section 208's public enforcement scheme is compatible with private enforcement. *See Vote.org*, 89 F.4th at 476 (holding that a voting-rights statute that expressly permitted public enforcement did not preclude a finding that it was also privately enforceable); *Schwier*, 340 F.3d at 1294-95 (same).

Finally, Congress is unquestionably aware of the private enforcement of the VRA. S. Rep. at 30; *see also Morse*, 517 U.S. at 232. The doctrine of *stare decisis* therefore carries "special force." *Halliburton Co. v. Erica P. John Fund*, Inc., 573 U.S. 258, 274 (2014). An opinion interpreting a statute is a "ball[] tossed into Congress's court, for acceptance or not as that branch elects." *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 456 (2015). "Because Congress has spurned multiple opportunities to reverse the Supreme Court's and lower courts' treatment of private-party-plaintiff [VRA] actions, . . . [only] a superspecial justification [would] warrant reversal. No superspecial justification exists here." *Stone v. Allen*, 717 F. Supp. 3d 1161, 1173 (N.D. Ala. 2024) (cleaned up); *see also Singleton v. Allen*, 740 F. Supp. 3d 1138, 1169 (N.D. Ala. 2024) (three-judge court). Congress's inaction "enhance[s] even the usual precedential force" of *stare decisis*. *Shepard v. United States*, 544 U.S. 13, 23 (2005). Congress can change this longstanding interpretation of the VRA "if it likes. But until and unless it does, statutory *stare decisis* counsels our staying the course." *Milligan*, 599 U.S. at 39.

In sum, this Court is bound by precedent, which permits private parties to enforce the VRA, including Section 208.

## III.   PLAINTIFFS HAVE STANDING TO BRING SECTION 208 CLAIMS.

To establish standing, a plaintiff must show that it has suffered, or will suffer, "an injury in fact—an invasion of a legally protected interest which is (a) concrete

and particularized. . . and (b) actual or imminent." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up). The injury "need not be substantial; it need not measure more than an identifiable trifle." *OCA*, 867 F.3d at 612 (cleaned up). The injury must be fairly traceable to the challenged action, and it must be likely that the injury will be redressed by a favorable judicial decision. *Lujan*, 504 U.S. at 560-61.[6]

The Arc has associational standing. *See* ROA.37738-37742. Membership organizations may establish associational standing by showing that: (1) a member has standing, (2) the suit is germane to the organization's purpose, and, (3) the claim asserted and relief requested do not require the participation of individual members. *Students for Fair Admission*, 600 U.S. at 199; *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 269 (2015); *OCA*, 867 F.3d at 610. As an association with members who are directly burdened or regulated by S.B.1, the Arc has standing to challenge S.B.1. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008).

DST, MFV, and The Arc have organizational standing. *See* ROA.37742-37744.[7] To establish organizational standing, a plaintiff must show that the

---

[6] To the extent that State Defendants base their attack on Plaintiffs' standing, Def. Br. 18, 19, on *Crawford v. Marion Cnty. Election Bd*, that case is inapposite. It does not concern standing. 553 U.S. 181, 198 (2008). Rather, *Crawford* addresses only the requirement that a state law must impose "a significant increase over the usual burdens of voting" to violate the Equal Protection Clause. An "identifiable trifle" suffices for standing. *OCA*, 867 F. 3d at 612.

[7] Although the district court did not explicitly hold that MFV and The Arc have organizational standing, the record clearly establishes standing for each. *See infra* Section III.B.2–3. Under these circumstances, this Court may affirm on any basis in the record. *United States v. Pack*, 612 F.3d 341, 347 (5th Cir. 2010).

defendant's actions either "require or forbid some action by the plaintiff," or directly affect and interfere with the plaintiff's core business activities. *Alliance*, 602 U.S. at 382, 395; *OCA*, 867 F.3d at 610. Actions interfere with a plaintiff's core business activities if, *inter alia*, they impair its ability to provide services to its constituents or require it to expend resources to counteract the actions. *See Alliance*, 602 U.S. at 394-96 ("issue-advocacy group" lacked standing based on expenditures to challenge a regulation; direct services organization had standing because challenged action impaired its ability to counsel clients); *OCA*, 867 F.3d at 611-12 (expenditures to counteract effects of challenged law support standing; expenses preparing for litigation do not).

The district court's factual findings, which this Court must accept unless they are clearly erroneous, support each Plaintiff's standing. *Pederson v. La. State Univ.*, 213 F.3d 858, 869 (5th Cir. 2000) ("If the district court resolves any factual disputes in making its jurisdictional findings, the facts expressly or impliedly found by the district court are accepted on appeal unless the findings are clearly erroneous." (cleaned up)). This action, moreover, seeks prospective relief only; consequently, the Court need satisfy itself only that any one Plaintiff has standing. *Rumsfeld v. F. for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006).[8]

---

[8] State Defendants seek to evade the "single plaintiff" standard of *Rumsfeld*, citing *Wright v. Dougherty County*, 358 F.3d 1352 (11th Cir. 2004). Def. Br. 25. In *Wright*, the court held that a

**A. The Trial Record Demonstrates that the Assistance Restrictions Cause Concrete, Particularized, Imminent Injuries to Each Plaintiff**

**1. The Assistance Restrictions Harm The Arc and its Members.**

The Oath Requirement inflicts concrete and particularized injuries on The Arc's disabled-voter members.[9] As the district court found, some members who were unable to vote with their chosen assistor underwent the physically and mentally taxing process of voting without assistance. *See infra* Section IV.C.3.a There is a "substantial risk" that this injury will reoccur while § 6.04 remains in effect, particularly because these members' disabilities are progressive. ROA.37739 (quoting *Stringer v. Whitley*, 942 F.3d 715, 721 (5th Cir. 2019)); *see infra* Section IV.C.3.a. State Defendants' and Intervenors' argument, Def. Br. 20; Int. Br. 28-30, that the threat of criminal prosecution is not a concrete injury is thus inapposite: the members' injury is the loss of their voting rights, not the fear of prosecution.

The members' interest in voting with their chosen assistors is germane to the purposes of The Arc, which works to "empower people with disabilities in the voting

---

plaintiff without standing was properly denied consolidation of claims with another plaintiff. Here, the district court never ruled against MFV, DST, or The Arc on their Section 208 claims, and each established, before and after filing their joint amended complaint, that it has an injury-in-fact fairly traceable to State Defendants' unlawful conduct and redressable by the injunction sought.

[9] State Defendants claim The Arc lacks standing to challenge S.B.1 § 7.04, citing a discussion in the district court's order regarding The Arc's standing to challenge § 6.04. Def. Br. 20; *see* ROA.37740. State Defendants then purport to analyze The Arc's standing to challenge § 7.04, which The Arc does not challenge. This Court should reject State Defendants' attack on a non-existent challenge to § 7.04.

process." ROA.377439. No Defendant disputes this. *See, e.g.*, Def. Br. 16-27; Int. Br. 26-33; ECF No. 193 ("Teare Br.") at 15, 17-26. As the district court found, voting is essential to "members' self-determination and voting rights advocacy has been a priority since The Arc's founding." ROA.37739 n.34.

Individual participation of The Arc's members is not required to obtain injunctive relief. *United Food & Com. Workers Union Local 751 v. Brown Grp.*, 517 U.S. 544, 546 (1996). It can "reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Warth v. Seldin*, 422 U.S. 490, 515 (1975). Advocacy organizations representing individuals with disabilities, including chapters of The Arc, satisfy the test for associational standing. *See, e.g.*, *Steward v. Abbott*, 189 F. Supp. 3d 620, 631-32 (W.D. Tex. 2016) (The Arc of Texas); *G.T. v. Kanawha Cnty. Schs.*, No. 2:22-cv-57, 2020 WL 4018285, at *7 (S.D. W. Va. July 16, 2020) (The Arc of West Virginia); *N.J. Protection & Advocacy, Inc. v. N.J. Dep't of Educ.*, 563 F. Supp. 2d 474, 483 (D.N.J. 2008) (The Arc of New Jersey).

The Arc also has organizational standing to challenge the Assistance Restrictions.[10] Voting rights are the "backbone" of the organization's work. ROA.42301:4-12. The Oath Requirement fundamentally changed the nature of The

---

[10] The Arc asserted organizational standing below. *See* ROA.34224. Although it need not establish both associational and organizational standing, it does not waive its claim to organizational standing.

Arc's voting work. In addition to providing information about registration and polling place locations, *see* ROA.42301:22-42302:9, The Arc now must counsel members about the assistance available to voters, and must "quell [members] fears," reassuring them "that they still have the right to vote and they won't get in trouble." ROA.42311:1-18. The Arc must expend resources "to counteract the effect of" S.B.1, "not with a view toward litigation, but toward mitigating its real-world impact on [its] members and the public." *OCA*, 867 F.3d at 612. S.B.1 thus directly "affect[s] and interfere[s]" with The Arc's "core business activities" of providing voting-rights education and counseling for Texans with IDD. *Alliance*, 602 U.S. at 395; *accord Havens*, 455 U.S. at 379.

### 2. The Assistance Restrictions Harm DST.

The district court found that Assistance Restrictions harm DST because the Assistance Restrictions perceptibly impair DST's ability to provide in-person and mail-ballot assistance. ROA.37687-37688, 37742-37743, 37742 n.36, 37743 n.38; *see OCA*, 867 F.3d at 610-12. DST chapters have struggled to recruit voter assistors: would-be volunteers are wary about risking criminal liability under the Assistance Restrictions or assuming the burdens of the Disclosure Requirement. ROA.37742 n.36; ROA.37719, ¶ 164; ROA.40901:11-40902:1, 40910:9-40912:1, 41004:10-41005:6. This chilling effect is a cognizable injury for standing purposes. *Justice v. Hosemann*, 771 F.3d 285, 291 (5th Cir. 2014). This Court's precedent thus forecloses

State Defendants' argument, Def. Br. 18-19, that the Disclosure Requirements do not cause an injury that is sufficiently analogous to a common-law harm.

The record also supports two additional bases for standing. First, the Assistance Restrictions directly regulate DST's assistance to voters. *See Davis*, 554 U.S. at 733 (plaintiff directly regulated by challenged rule has standing); *Alliance*, 602 U.S. at 382 ("Government regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements."). The district court found that DST engages in voter assistance for residents of nursing homes and senior care facilities. ROA.37687-37688, 37743 n.38. The Assistance Restrictions directly regulate these activities by requiring DST volunteers who assist voters to make specified disclosures and swear the prescribed oath. TEC §§ 64.032, 64.034, 86.010, 86.013; *see infra* Section IV.C.2.

Second, the record shows that DST has been forced to dedicate resources to respond to the Assistance Restrictions. *OCA* is dispositive here. Although the *OCA* plaintiff's injury "was not large," this Court concluded that it had standing because it was required to "spend extra time and money educating its members" about how to vote with an interpreter under a new Texas election law. *OCA*, 867 F.3d at 610, 612. Similarly, the trial record shows that DST has been forced to spend more time, money, and resources educating voters to ensure that the Assistance Restrictions do not discourage them from voting, and educating its members to ensure that they can

provide voter assistance. *See* ROA.40901:11-40903:20. Some DST chapters had to divert resources from their non-voting work. ROA.40903:11-14. As in *OCA*, the Assistance Restrictions "perceptibly impair[]" DST's core activities—including voting assistance—inflicting a cognizable injury. *See* 867 F.3d at 612.

### 3. The Assistance Restrictions harm MFV.

As the trial record shows, MFV's employees and volunteers no longer provide voter assistance because they fear being accused of violating the Assistance Restrictions. *See* ROA.42256:16-21; *infra* Section IV.C.2. MFV is therefore less able to help Latino voters obtain trusted assistance, a crucial part of its mission to empower Latinos to vote. *Alliance*, 602 U.S. at 395.

Under the Assistance Restrictions, moreover, MFV must expend more resources to help fewer voters, impairing its program of helping citizens develop voting plans tailored to their specific assistance needs. ROA.42189:12-22; 42190:18-42191:17. Before S.B.1, MFV advised 208 voters to seek assistance from someone they trust. ROA.42256:24-42257:8. Given the risks imposed by the Assistance Restrictions, MFV can no longer give such advice, nor develop voting plans that require reliance on trusted assistors. ROA.42257:16-42258:6. MFV must spend additional one-on-one time with 208 voters who cannot obtain assistance or are afraid to ask for it. ROA.42257:16-42258:6. Developing a voting plan that does not include trusted assistance is difficult and time consuming. ROA.42194:19-

42195:7, 42257:16-42258:14. MFV is thus able to help fewer voters overall. *OCA*, 867 F.3d at 610 (injury-in-fact established where plaintiff organization spent "extra time and money educating its members about [the challenged] Texas [law] and how to avoid [its] negative effects," and "must spend more time on each call (and reach fewer people in the same amount of time) because of Texas's law").[11]

**B. Plaintiffs' Injuries are Traceable to, and Redressable by, Defendants**

**1. Plaintiffs' Injuries are Traceable to, and Redressable by, the Secretary**

"The facial invalidity of a Texas election statute is, without question, fairly traceable to and redressable by the State itself and its Secretary of State, who serves as the 'chief election officer of the state.'" *OCA*, 867 F.3d at 613-14 (quoting TEC § 31.001(a)). Texas's "decentralized" election system was no barrier to standing in *OCA*. *Id*. Indeed, the provision at issue in *OCA*—Texas's requirement that a voter's interpreter be a registered voter—required less involvement by the Secretary than do the Assistance Restrictions. *Id.* at 608, 613-14.

The Secretary has the duty to "prescribe the design and content, consistent with [the TEC], of the forms necessary for the administration of [the TEC]," including the assistor-disclosure form and the ballot-by-mail carrier envelope. TEC

---

[11] It is true, but irrelevant to MFV's standing, that MFV does not canvass on behalf of candidates or ballot measures. Def. Br. 26.

§§ 31.002(a), 64.0322(b), 86.013(d). Local election authorities must use forms designed by the Secretary except in an emergency. TEC § 31.002(d). Thus, the Secretary has "authority to compel or constrain local officials" based on its design of the forms, such as the carrier form governed by § 6.07. *See Texas Democratic Party v. Abbott*, 978 F.3d 168, 180 (5th Cir. 2020). Accordingly, the district court found that the Secretary's creation of "forms implementing Section 6.04" makes the Secretary responsible for Plaintiffs' injuries. ROA.37739-37741, 37743-37744.

Without the Secretary's forms, county officials could not enforce the Oath Requirement's substantive provisions. State Defendants' attempt to shift blame to county officials for distributing and administering the oath at polling places, and their characterization of the Secretary's responsibility for forms as "clerical," Def. Br. 23, thus misses the mark. The district court correctly determined that enjoining the Secretary would change the enforcement of the Oath Requirement, thereby lessening the "chilling effect on voter assistance." ROA.37742, 37744 (citing *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006)).

"[T]racing an injury is not the same as seeking its proximate cause." *K.P. v. LeBlanc*, 627 F.3d 115, 123 (5th Cir. 2010). Although the Secretary is not the only state official who enforces the Assistance Restrictions, a plaintiff need only show "that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his every injury to satisfy redressability." *Id.*

31

(quoting *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982)). Plaintiffs' injuries are clearly traceable to and redressable by the Secretary.

### 2. Plaintiffs' Injuries are Traceable to, and Redressable by, the Attorney General

After *State v. Stephens*, 663 S.W.3d 45, 56 (Tex. 2021), the Attorney General can prosecute TEC violations at the request of district or county attorneys, or refer cases to them. Tex. Gov't Code § 402.028; ROA.37696, ¶ 83; ROA.42709:24-42710:17, 42714:25-42715:11, 42843:14-17, 42852:7-10, 42856:9-42859:11. The Attorney General also may investigate alleged election crimes on its own initiative or upon referral by the Secretary. TEC § 273.001. It "*shall* investigate" allegations of election crimes made by two or more voters and involving multiple counties. ROA.37694-37695, ¶ 78 (quoting TEC § 273.001(a)) (emphasis added). It may assess civil penalties against local election officials who fail to enforce the TEC, including the provisions Plaintiffs challenge. ROA.37696-37697, ¶ 85 (citing §§ 31.128, 31.129, 31.130).

The Attorney General's credible threat of enforcement has, as the district court found, "understandably deterred Plaintiffs and their members from seeking or providing voter assistance." ROA.37854. Investigations tax their targets even when no prosecution ensues. *See* ROA.39676:9-39677:3 (testimony of Dana DeBeauvoir,

Travis County Clerk, who was investigated for obstructing a poll watcher).[12] The investigations that the Attorney General has threatened and launched based on the Assistance Restrictions show that the State "will likely react in predictable ways that in turn will likely injure the plaintiffs." *Alliance*, 602 U.S. at 383 (cleaned up). Plaintiffs' standing thus rests on the "predictable [and actual] effect of Government action on the decisions of third parties." ROA.37741 (quoting *Dep't of Commerce v. New York*, 588 U.S. 752, 767 (2019)); *see also Fed. Elec. Comm'n. v. Cruz*, 596 U.S. 289, 297 (2022) ("[A]n injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application."). An injunction against the Attorney General would halt investigations that intimidate and deter Plaintiffs and their members. *See* ROA.37854.

In *La Union Del Pueblo Entero v. Abbott*, 119 F.4th 404, 409 (5th Cir. 2024) (*LUPE II*), this Court concluded, for purposes of its *Ex parte Young* analysis, that State Defendants were not the exclusive enforcers of S.B.1, so they were not subject to an exception to sovereign immunity.[13] This holding does not mean that State

---

[12] State Defendants rely on *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1176 (9th Cir. 2022) and *Google, Inc. v. Hood*, 822 F.3d 212, 224-25 (5th Cir. 2016) to argue that investigations do not support Article III standing. Def. Br. 24. Those cases concerned civil investigative demands that this Court ruled were not self-enforcing. At issue here are criminal investigations. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

[13] *LUPE II* was decided during the compressed timeline before the election, based on an incomplete factual record. Now, the record of the State Defendants' enforcement activities has been supplemented, including by State Defendants' assertion that the Attorney General is

Defendants do not enforce S.B.1 for purposes of traceability and redressability. The

*LUPE II* Court, assessing the district court's analysis under *Purcell*, wrote:

> the import of that injunction for individual voters depends on the
> county. Neither the Secretary of State nor the Attorney General
> enforces S.B.1. . . . So the practical effect of the injunction is to prevent
> enforcement of S.B.1, but only in certain counties in Texas.

*Id. LUPE II* thus held that State Defendants do not have *exclusive* enforcement

authority for violations of S.B.1, and as DAs have the authority to initiate

prosecutions under S.B.1, to enjoin some DAs but not others would create

inconsistency in the pre-election status quo.[14] The DAs' prosecutorial authority,

however, does not mean that State Defendants do not investigate, enforce, and

administer S.B.1.

### 3. Plaintiffs' Injuries are Traceable to, and Redressable by, DA Teare

DA Teare proffers the remarkable argument that prosecution of election laws

such as §§ 6.04 and 6.05 is not traceable to a DA. Teare Br. 13-15. *Stephens* held

that a DA's authorization is required to prosecute a violation of Texas election law.

---

pursuing investigations and prosecutions under the Assistance Restrictions. *See* ECF No. 70, at
29; ROA.37695-37696, ¶ 82. Accordingly, *LUPE II* is no longer apposite.

[14] Similarly, the statements in *Ostrewich v. Tatum*, 72 F.4th 94, 100-01 (5th Cir. 2023), and
*Richardson v. Flores*, 28 F.4th 649, 654 (5th Cir. 2022), that State Defendants do not enforce
S.B.1, are irrelevant here. Those cases were decided under the heightened "compulsion or
constraint" standard of *Ex parte Young*, not the "identifiable trifle" standard, *OCA*, 867 F.3d at
612, for injury-in-fact. Standing and *Ex parte Young* require distinct analyses. *MFV v. Ogg*, 105
F.4th 313, 330 (5th Cir. 2024) ("[W]hat is sufficient for standing will not necessarily establish an
enforcement connection" as necessary to overcome sovereign immunity).

663 S.W.3d at 56. Enjoining enforcement of §§ 6.04 and 6.05 would stop all prosecution of those laws in Harris County.

DA Teare seeks to distinguish §§ 6.04 and 6.05, as civil statutes, from TEC § 64.036 (criminalizing four types of assistance to voters), TEC § 37.02 (criminalizing perjury), and TEC § 86.010 (criminalizing assisting a voter without complying with § 6.05's disclosure requirements), but Plaintiffs have standing to challenge civil and criminal enactments that combine to deprive them of their rights. *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 345 (5th Cir. 2013) (alleged injury traceable to both civil and criminal laws: "both laws, as part of a statutory scheme, combine to deprive plaintiffs of their alleged constitutional rights," and an injunction against either would redress plaintiffs' injuries).

DA Teare's presentation concerning his predecessor's purported willingness to stipulate not to enforce the Assistance Restrictions while this case is pending, Teare Br. 4, merely highlights his authority to enforce them, and the possibility that he will do so in the future if not enjoined. DA Teare has not represented that he will never enforce the Assistance Restrictions; the offer to refrain from enforcement only until this case is resolved compels the opposite conclusion. DA Teare's predecessors, moreover, have prosecuted alleged violations of the TEC, including the provisions that S.B.1 amended; it prosecuted least two such cases jointly with the Attorney

General. ROA.37700-37701, ¶ 105 (citing ROA.42859:17-42860:24, ROA.42862:7-12, ROA.42864:3-42865:6).

## IV.   SECTION 208 PREEMPTS S.B.1'S ASSISTANCE RESTRICTIONS.

The district court correctly determined that the Assistance Restrictions deny the right of 208 voters to their chosen assistors because they prohibit anyone from assisting 208 voters who is unwilling to risk criminal prosecution. ROA.37756. Section 208's plain text, its legislative history, the overwhelming weight of authority, and even State Defendants' own papers support the District Court's conclusion— and all arguments to the contrary must be rejected.

"The purpose of Congress is the ultimate touchstone in every preemption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (cleaned up). A state law is preempted if Congress clearly states its intent to regulate in an area. *See Bond v. United States*, 572 U.S. 844, 858 (2014). Section 208 provides such an "unambiguous" statement—its plain language protects the right of 208 voters to choose who will assist them at every stage of voting. *See OCA*, 867 F.3d at 614-15. A state law conflicts with Section 208 and is preempted if it "stands as an obstacle to the accomplishment and execution" of Congress's "full purposes and objectives." *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 183 (2019) (citation omitted).

S.B.1's Assistance Restrictions undermine Congress's purpose by placing myriad obstacles between 208 voters and the assistance to which they are entitled.

## A. Section 208 Enumerates the Only Permissible Limitations on a 208 Voter's Choice of Assistor

Section 208 guarantees the right to assistance by "a person of the voter's choice, other than [(1)] the voter's employer or agent of that employer or [(2)] an officer or agent of the voter's union." 52 U.S.C. § 10508. States may not impose or apply extra-textual exceptions.

"Where Congress creates specific exceptions to a broadly applicable provision, the 'proper inference . . . is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth.'" *Med. Ctr. Pharm. v. Mukasey,* 536 F.3d 383, 395 (5th Cir. 2008) (quoting *United States v. Johnson*, 529 U.S. 53, 58 (2000)). The "explicit listing of exceptions . . . indicate[s] to [the Court] that Congress did not intend courts to read other unmentioned, open-ended . . . exceptions into the statute that it wrote" *United States v. Brockamp*, 519 U.S. 347, 352 (1997).

In this Court's succinct metaphor:

> [W]hen Congress provided the two exceptions to the . . . requirement, it created all the keys that would fit. It did not additionally create a skeleton key that could fit when convenient. To conclude otherwise "would turn this principle on its head, using the existence of two exceptions to authorize a third very specific exception."

*Parada v. Garland*, 48 F.4th 374, 377 (5th Cir. 2022) (quoting *Quebrado Cantor v. Garland*, 17 F.4th 869, 874 (9th Cir. 2021)). Correctly construed, the two exceptions stated in Section 208's "other than" clause forbid all other limitations.

Section 208 requires that the assistor be "the voter's choice." 52 U.S.C. § 10508. Its crystal-clear formulation cannot be muddied by the notion, urged by State and Intervenor-Defendants, Def. Br. 15-16, 32-35; Int. Br. 37-39, that Section 208 permits any restriction so long as it leaves at least "*a person*" to assist 208 voters. As the district court observed, Congress "viewed the guarantee of choice as so central" that it advised that even the enumerated employer exemption "should yield in certain circumstances where 'the burden on the individual's right to choose a trustworthy assistant would be too great. . . .'" ROA.37752 (quoting S. Rep. at 64).

Section 208 guarantees covered voters assistance from "a person" of their choice except for members of two groups. Congress's use of "a person" instead of "any person" is logical and grammatical:  as the district court explained, anyone asked to help must always be free to decline. ROA.37754 ("A right to assistance from 'the' person of a voter's choice would imply that chosen assistors *must* provide the assistance requested of them.").

"A" is a synonym for "any," as courts routinely hold. *See United States v. Naranjo*, 259 F.3d 379, 382 (5th Cir. 2001) ("'Such a violation' . . . refers to . . . any violation . . . .") (footnote omitted). "In common terms, when 'a' or 'an' is followed by a restrictive clause or modifier, this typically signals that the article is being used as a synonym for either 'any' or 'one.'" *United States v. Alabama*, 778 F.3d 926, 932 (11th Cir. 2015) ("The plain meaning of the term 'an election' is 'any election.'").

Dictionaries contemporaneous with the enactment of Section 208 agree. *See Citizens for Resp. & Ethics in Wash. v. Fed. Election Comm'n*, 971 F.3d 340, 354-55 (D.C. Cir. 2020) (citing dictionary definitions ca. 1982 in which "a" is synonymous with "any"). Moreover, as the district court noted, "Texas and the Fifth Circuit have used 'a' and 'any' interchangeably when interpreting Section 208 without adopting the contrived distinction the State Defendants now propose." ROA.37752; *see also OCA*, 867 F.3d at 608.

The plain text of Section 208 does not permit states to further circumscribe 208 voters' choice of assistor. There is no other plausible reading of the statute. As the district court found, State Defendants' reading would "eviscerate Section 208 by permitting states to give voters a 'choice' between two assistors hand-picked by the state because voters could receive assistance from 'a person' of their choice between the two possibilities." ROA.37754. If Texas could limit who "a person" is under Section 208, the statute's "phrase 'of the voter's choice' is either superfluous or loses all meaning." *LaRose*, 741 F. Supp. 3d at 713; *see Ala. State Conf. of NAACP v. Marshall*, No. 2:24-cv-420, 2024 WL 4448841, at *3 (N.D. Ala. Oct. 4, 2024) (law limiting 208 voters' choice of assistor was preempted by Section 208 even though voters "have other people who could help them"), *stay denied* 2024 WL 4481489 (11th Cir. Oct. 11, 2024).

State and Intervenor-Defendants assert that Congress used the smallest word in the language to signal its intent to permit states to evade Section 208's weightiest command. This is an attempt to beguile the Court with an "elephant[] in [a] mousehole[]." *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001); Def. Br. 15-16, 32-35; Int. Br. 37-39. In support of this argument, they cite a single, out-of-circuit district-court decision that ignores the plain text of Section 208 and flouts the canon that enumerated exceptions are presumed to be exclusive. Def. Br. 34; Int. Br. 37-38 (citing *Priorities USA v. Nessel*. 487 F. Supp. 3d 599, 619 (E.D. Mich. 2020)); *see LaRose*, 741 F. Supp. 3d at 713 ("*Priorities USA* discusses 'a person' but does not address 'of the voter's choice.'"). An indefinite article cannot, as the district court explained, "obviate Section 208's essential guarantee and is no evidence of an 'intent by Congress to allow states to restrict a federally created right[.]'" ROA.37754 (quoting *Disability Rts. N.C. v. N.C. State Bd. of Elections*, 602 F. Supp. 3d 872, 878 (E.D.N.C. 2022)). "Use of an indefinite article is not an invitation for states to act in contravention of Congress' clear intent: allowing disabled voters to choose for themselves a person to assist them with voting." *LaRose*, 741 F. Supp. 3d at 717.

"[A]ny law that limits a § 208 voter's choice or provides additional exceptions to this right unduly burdens the rights of § 208 voters, and is, as a matter of law, in conflict with § 208." *Marshall*, 2024 WL 4446641, at *3. A state cannot, as Texas attempts here, define the terms of assistance "more restrictively than as federally

defined." *OCA*, 867 F.3d at 615. Rather, a state's "limitation on voter choice" serves to "impermissibly narrow[] the right guaranteed by Section 208." *Id.*

Section 208's prohibition on voter-assistance limitations beyond those in the text of the statute is confirmed by the Senate Judiciary Committee's Report—the "authoritative source for legislative intent" interpreting the 1982 Amendments to the VRA. *Thornburg v. Gingles*, 478 U.S. 30, 43 n.7 (1986). The "purpose" of Section 208 was to specify "the method by which the voters who are blind, disabled, or illiterate are entitled to have assistance in a polling booth from a person of their own choosing, with two exceptions." S. Rep. at 62. Before 1982, Texas and other states permitted voters to receive assistance only from poll officials. *See, e.g.*, *Gilmore*, 435 F.2d at 489; *Garza*, 320 F. Supp. at 132 n.1. Congress rejected such a limitation because "it is only natural that many such voters may feel apprehensive about casting a ballot in the presence of, or may be misled by, someone other than a person of their own choice." S. Rep. at 62. Congress determined that "people requiring assistance in some jurisdictions are forced to choose between casting a ballot under adverse circumstances or not being able to choose their own assistance or forfeiting their right to vote," and that "some people in this situation do in fact elect to forfeit their right to vote." *Id.* Congress decided that "having assistance provided by election officials"—or anyone other than chosen assistors—"discriminates against those voters who need such aid because it infringes upon their right to a secret ballot and

can discourage many from voting for fear of intimidation or lack of privacy." *Id.* at 62-63 n.207 ("[M]any [Section 208] voters may feel apprehensive about casting a ballot in the presence of, or may be misled by, someone other than a person of their own choice.").

The House Report is also instructive. Congress understood that the "failure to provide. . . assistance to illiterate[]" voters was evidence of discrimination. H. Rep. 97-227, at 14-15. As examples of such discrimination, Congress cited Alabama's prosecution of a man for assisting to register people to vote and threats by Georgia officials to arrest assistors who stood outside the polls. *Id*. Congress thus anticipated that laws that, like S.B.1, threaten assistors with criminal prosecution for assisting 208 voters would violate the VRA. Section 208 evinces the "clear and manifest intent" of Congress to preempt such laws. "[W]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *Hillman v. Maretta*, 569 U.S. 483, 496 (2013) (citation omitted).

For State and Intervenor-Defendants, the plain meaning of Section 208 would permit courts to enjoin every law that regulates voting assistance. Def. Br. 3; Int. Br. 46-47. As the district court explained, however, "a common-sense reading of § 208 suggests that any assistor chosen by a voter must be willing and able to assist." ROA.37754 n.51 (quoting *Ark. United v. Thurston*, 626 F. Supp. 3d 1064, 1087

(W.D. Ark. 2022)). Assistors remain subject to "generally applicable laws" that govern who is "willing and able to assist," including state laws prohibiting firearms in polling places. *Id.*; *see* Int. Br. 36-37 (raising "fanciful hypotheticals" about people unwilling to assist because of generally applicable laws). But "voter assistance procedures, including measures to assure privacy for the voter and the secrecy of his vote [must be] established in a manner which encourages greater participation in our electoral process." S. Rep. at 62-63; ROA.37754 n.51. The Assistance Restrictions impermissibly regulate Plaintiffs in their capacity as voting assistors, rather than as members of the general public, and do not "encourage[] greater participation" because they deter people who previously served as assistors from serving again. *See infra* Section IV.C.

The plain text of Section 208, as confirmed by the legislative history of the 1982 amendments, is unambiguous—Congress did not intend to allow states to restrict assistance beyond the limitations enumerated within Section 208 itself.

## B. The Assistance Restrictions Conflict with the Letter and Spirit of Section 208.

Despite the manifest conflict between Section 208 and the Assistance Restrictions, State Defendants contend that S.B.1 shares Section 208's goal of "protect[ing] vulnerable voters from intimidation and fraud." Def. Br. 2, 40. This claim has three flaws: *first*, it mischaracterizes Congress's intent in enacting Section 208; *second*, a state may not go farther in pursuit of its understanding of Section

208's goals than Congress did; *Disability Rts. N.C.*, 2022 WL 2678884, at \*5; and *third*, S.B.1 does not protect vulnerable voters. *See* ROA.37759.

Congress gave Section 208 "detailed attention before coming to the conclusions reflected in [the] Report." S. Rep. at 1. Among these conclusions were that Section 208 voters "must be permitted to have the assistance of a person of their choice," that protecting that choice is "the only way to assure meaningful voting assistance and to avoid possible intimidation or manipulation of the voter," and that "[t]o do otherwise would deny these voters the same opportunity to vote enjoyed by all citizens." *Id.* at 62. Congress determined that an assistor of choice, not the state's substitute for that choice, would best ensure that the ballot is marked as the voter intends. *See* H.R. Rep. No. 97-227, 97th Cong., 1st Sess. 14 (1981) (importance of deterring coercion by election officials); *see also* S. Rep. at 62 n.207. Texas may not substitute its judgment for that of Congress. *LaRose*, 741 F. Supp. 3d at 713; *Marshall*, 2024 WL 4448841, at \*3. "In [Section] 208, Congress decided that blind, disabled, and illiterate voters' choices as to an assistor could only be limited in two respects." *Marshall*, 2024 WL 4448841, at \*4. States have "no right to further limit that choice[.]" *Id*.

The State's purported solicitude for disabled voters provides no basis for gutting the means Congress chose to address such concerns. Indeed, differing paths to a common goal demonstrate that preemption is appropriate. *See Villas at Parkside*

*Partners v. City of Farmers Branch*, 726 F.3d 524, 529 (5th Cir. 2013) ("As the Supreme Court has cautioned, . . . 'conflict is imminent' when 'two separate remedies are brought to bear on the same activity.'" (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 380 (2000)); *see also United States v. Locke*, 529 U.S. 89, 115 (2000) ("[A] state law is not to be declared a help because it attempts to go farther than Congress has seen fit to go." (cleaned up)).

Congress identified the contemporary state laws it intended to leave undisturbed: those in "many states [that] already provide for assistance by a person of the voter's choice." S. Rep. at 63. Congress could have preserved other, more restrictive, state laws by writing additional exceptions into the text of Section 208. It did not. Texas may not second-guess that decision or rewrite that history.

## C. The Assistance Restrictions Impede Voters' Right to Choose Their Assistors.

Section 208 preempts state laws that impair a voter's right to choose an assistor. *See OCA*, 867 F.3d at 607; *see also Marshall*, 2024 WL 4448841, at *3; *Disability Rts. N.C.*, 602 F. Supp. 3d at 880. S.B.1's Assistance Restrictions impose new legal barriers to voting assistance that conflict with and are therefore preempted by Section 208. *See OCA*, 867 F.3d at 615. The district court's findings, moreover, confirm that S.B.1's Assistance Restrictions burden 208 voters and assistors. ROA.37703, ¶ 112.

### 1. The Oath Requirement Deters Would-Be Assistors from Helping 208 Voters.

S.B.1's Oath Requirement "impermissibly narrows the right guaranteed by Section 208," *OCA*, 867 F.3d at 615; ROA.37755-56; in three ways.

*First*, voters must represent to assistors that they are "eligible" to receive assistance, and assistors must determine, and swear, that the voter is actually "eligible," all without definition of what "eligible" means. ROA.37713-37714, ¶¶ 144, 147-49. *Second*, assistors must swear that they did not "pressure or coerce" the voter into choosing them, but this phrase, too, is not defined. ROA.37715, ¶ 151. *Third*, assistors must explicitly state that they swear "under penalty of perjury" to the foregoing undefined terms. ROA.37710, ¶ 138.

#### a. *"Eligibility" for assistance*

The Oath Requirement compels the voter to demonstrate eligibility for assistance and warns that the ballot of an assisted, but ineligible, voter may be rejected. ROA.37714-37715, ¶¶ 147-149 (citing TEC § 64.034; ROA.38948:1-9, 41345:4-16). The TEC does not define who is "eligible" nor how eligibility is determined. ROA.37713-37714, ¶¶ 144-45, 147-48; *see also* ROA.42792:6-9. The Oath Requirement also lacks a *scienter* requirement: a voter with a good-faith but mistaken belief that she qualifies may have her ballot rejected if she votes with assistance. ROA.37714, ¶ 148; *see* TEC § 64.034.

The Oath Requirement thus forces 208 voters to disclose private health information to establish eligibility for assistance; assistors "cannot reasonably rely on the voter's representation of their own eligibility."[15] ROA.37714-37715, ¶¶ 147-49 (citing ROA.38948:1-9, ROA.41345:4-12); *see also* ROA.39511:6-19. This requirement is an "extra hurdle" that 208 voters must clear. ROA.37722, ¶ 175; ROA.42577:19-25; *see also* ROA.37760 n.55; ROA.42049:3-42050:8. By imposing this "*additional* eligibility requirement," ROA.37713-37714, ¶ 146 (emphasis in original), Texas impermissibly restricts the class of voters who can receive assistance. *See* ROA.37758.

The eligibility language drives 208 voters to make more use of poll workers. In contrast to the hurdle Texas imposes on voters seeking help from their assistor of choice, Texas does not require voters who seek help from poll workers to attest their eligibility for assistance—the voter only needs to ask. *See* TEC § 64.032(a) ("*[O]n a voter's request* for assistance in marking the ballot, two election officers *shall* provide the assistance." (emphasis added)); *id.* § 64.009(a) ("If a voter is physically unable to enter the polling place without personal assistance or likelihood of injuring the voter's health, *on the voter's request*, an election officer *shall* deliver a ballot to

---

[15] Ignoring the text of the Oath Requirement and the trial record, Intervenors argue that by choosing assistors, 208 voters represent their eligibility for assistance. Int. Br. 55, *but see, e.g.*, ROA.37713, ¶ 145; ROA.42792:1-17. The Oath Requirement contains no statement that a request for assistance constitutes such a representation. ROA.37713-37715, ¶¶ 146-49. Without a definition of "eligibility," the Oath Requirement pushes 208 voters to eschew their assistors of choice. ROA.37758-37760; *see* ROA.37708-37709, ¶ 133 (citing ROA.42092:11-17).

the voter at the polling place entrance or curb." (emphasis added)). This kind of limitation on a voter's choice as to who assists them is precisely the evil Congress intended to remedy. S. Rep. at 62 n.207 ("To limit the risks of discrimination against voters in these specified groups and avoid denial or infringement of their right to vote, the Committee has concluded that they must be permitted to have the assistance of a person of their own choice.").

The absence of clarity about which voters are eligible to receive assistance also deters voters from relying on their assistor of choice. *See* ROA.42049:3-16 ("[N]o one quite understands what eligible means, what requirements make them eligible."); ROA.37713, ¶ 144 n.26 (quoting ROA.64295; citing TEC § 62.011) (the Secretary's voter information posters state inaccurate eligibility requirements). Amy Litzinger, a voter with spastic quadriplegic cerebral palsy, was uncomfortable representing to her attendant that she qualified. ROA.37707, ¶ 127; ROA.42094:25-42095:9 ("[I] know that inherently I qualify but because the law isn't clear . . . [and] because of the severe penalties, . . . I wouldn't feel comfortable if [my eligibility] were disputed.").

The Oath Requirement also makes assistors liable for knowingly assisting someone who has not demonstrated eligibility. *See* ROA.37676 (citing TEC § 276.018(b), ROA.42792:1-5) (Oath Requirement criminalizes husband who "helps his blind wife of 20 years cast her ballot at the polls without first securing a

representation from her that she is 'eligible for assistance'"). As the district court observed: "[a]s written, . . . the Oath requires assistors to confirm that voters are eligible to receive assistance to ensure that . . . the voter's ballot will count." ROA.37757. Would-be assistors are unwilling to provide assistance because of the eligibility language and criminal penalties for violating the oath. *See* ROA.38949:9-38950:6 (assistor testified he no longer wants to help voters because he is unsure whether a voter who says "that he needs help" has represented eligibility for assistance); ROA.42092:11-17 (Ms. Litzinger and her assistor "were both uncomfortable with the fact that if [she] was found ineligible [for assistance] it would be a felony" for the assistor).

Because requiring proof of a voter's eligibility burdens the right to vote, courts regularly enjoin election regulations that require voters to take additional steps to prove their eligibility in the voting process. *See e.g.*, *Harris*, 695 F. Supp. at 525-26 (enjoining statute requiring voters requesting assistance to attest they are illiterate); *Fish v. Kobach*, 840 F.3d 710, 716-17 (10th Cir. 2016) (holding that a federal law preempts a state law requiring documentary proof of citizenship to obtain or renew driver's license); *MFV v. Fontes*, 2025 WL 598127, at *11-14 (9th Cir. Feb. 25, 2025) (same); *Louisiana v. United States*, 380 U.S. 145, 150-51 (1965) (affirming injunction invalidating state law making voter registration contingent upon reasonably interpreting section of state or federal constitution).

b.    *"Pressure or Coerce"*

The Oath Requirement mandates that an assistor swear that she did not "pressure or coerce the voter into choosing me to provide assistance," TEC § 64.034, but the TEC nowhere defines "pressure or coerce."[16] ROA.37715-37716, ¶¶ 151, 155. "[B]y its text, the Oath requires an assistor to accurately judge the *actual* consequences of their conduct on another person's state of mind, judged against two undefined terms." ROA.37760. This language deters assistors, violating Section 208. *See e.g.*, *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 947, 951 (11th Cir. 2023) (state's prohibition of "activity with the . . . effect of influencing a voter" held unconstitutionally vague: even if meaning of "influencing" were clear, "[k]nowing what it means to influence a voter does not bestow the ability to predict which actions will influence a voter").

The district court found that the "pressure-or-coerce" clause "is vague enough" that an assistor "might be concerned that they are going to violate [it]," ROA.37716, ¶ 155 (citing ROA.39535:5-7 (testimony of Cameron County Election Administrator)), and that the resulting chilling effect "frustrates Section 208's purpose," ROA.37762. The vague language could encompass a broad swath of activities. *See* ROA.37716 ¶ 154 (citing ROA.42007:11-42008:25, ROA.42015:19-

---

[16] The record belies Intervenors' unsupported assertion that being a voter's "person of choice" alleviates any fear of an appearance of "pressure or coercion" in the complex interactions between 208 voters and their chosen assistors. *See* Int. Br. 55-56; *but see* ROA.37715-37716, ¶¶ 152-54 (citing ROA.41341:11-20, ROA.42007:11-42008:4, ROA.42050:15-42051:2).

42016:9) (discussing Jennifer Miller's concern that volunteering to take her daughter, who has autism and dysgraphia, to polls after she asked her father to assist her might constitute "pressure").

The statewide shortage of personal-care attendants exacerbates 208 voters' concerns about the "pressure-or-coerce" clause. ROA.37715-16, ¶ 153; *see also* ROA.42051:3-9; ROA.42258:7-11. Jodi Nunez Landry testified that a caregiver may fear that a voter who lacks anyone else to ask for help has been "pressure[d] or coerce[d]" into choosing the caregiver. She worries that "people will be too afraid to help us" because of this confusion. ROA.37715-16, ¶ 153 (citing ROA.42050:21-42051:2). Toby Cole, a lawyer who is quadriplegic, testified, "[t]here's pressure all the time" between disabled person and caregiver. ROA.39513:14-15. "[T]here's pressure that I have to choose [someone] because that's the only person that's available to me . . . . [A]nd I don't know what legal jeopardy it could mean for somebody when there is pressure." ROA.39513:16-18, 39514:2-3.

> c.    *"Penalty of Perjury"*

The penalty-of-perjury language, by itself and in conjunction with the vagueness of the Oath Requirement, prevents 208 voters from voting with their assistors of choice. Voters and assistors describe the penalty-of-perjury language as "intimidating," "scary," and "threatening;" as the district court found, voters fear exposing their caregivers to criminal liability if they unintentionally violate the oath,

and assistors, including from Plaintiffs DST and MFV, are wary about providing assistance. ROA.37703-04, 37710 ¶¶ 116, 138 & nn.21, 22, 24 (citing ROA.38948:10-38939:8, ROA.41244:20-41245:14, ROA.41340:12-19, ROA.42125:10-14); ROA.37719, ¶ 164, ROA.40911:22-40912:1 (DST); ROA.42183:22-42184:3 (MFV).

Compounding assistors' fear of prosecution, the Oath Requirement does not include any scienter requirement. Although Texas criminal laws defines perjury as "'*knowingly or intentionally* mak[ing] a false statement or swear to the truth of a false statement' in an oath with 'the intent to deceive,'" ROA.37757 (emphasis added), none of these "scienter requirements [of] the perjury provision appear in the oath itself," "with confusing results." *Id*. "Without any reference to the [enhanced] scienter requirement of the Election Code's perjury provision, there is nothing in the Oath to mitigate" the actual fear created by the addition of the "penalty-of-perjury" language. ROA.37758.

Fear of prosecution is not a hypothetical concern: the district court found that the Attorney General is engaged in ongoing enforcement of the Assistance Restrictions. ROA.37695-37696, ¶¶ 79-84 (citing ROA.42714:9-41716:8, ROA.60673). It established an Election Integrity Division to effectuate its key priorities of investigating and prosecuting allegations of election fraud. ROA.37695, ¶¶ 79-80; ROA.42710:8-17, 42714:9-19. It investigated possible violations of the

Disclosure Requirements in 2023 and publicly confirmed its commitment to acting against alleged "assistance fraud." ROA.37695-37696, ¶¶ 80, 82.

### 2. The Disclosure Requirements Chill Assistors.

The Disclosure Requirements, alone and in conjunction with the Oath Requirement, deter organizations including DST and MFV from assisting voters. ROA.37717-18, ¶ 160. Disclosure requirements chill the activity about which disclosures are required. ROA.37762; *Dep't of Commerce*, 588 U.S. at 767 (affirming holding that compelling disclosure of citizenship status would depress Census response rate); *Shelton v. Tucker*, 364 U.S. 479, 485-86 (1960) (required disclosure of group membership chills members' freedom of association); *Bates v. Little Rock*, 361 U.S. 516, 523-24 (1960) (same); *NAACP v. Alabama*, 357 U.S. 449, 462 (1958) (same).

Would-be assistors are understandably wary of exposing themselves to criminal liability for errors in identifying their relationships to voters. ROA.40911:12-40912:1 (DST), 42182:22-42183:20 (MFV). Jonathan White, former head of the Election Integrity Division, testified that he considers voting assistance by one without a prior relationship to the voter to be less "legitimate" than assistance provided by family members or caregivers, and that the Disclosure Requirements enable the State to distinguish between the two types of assistors.

ROA.37718-37719, ¶¶ 162, 164 (citing ROA42788:5-23, 41000:9-41001:3; 41002:20-41003:14).[17]

The district court found that the Disclosure Requirements thus inhibit organizations from providing voter assistance. They "discourage[] community organizations like the Plaintiffs from providing voter assistance services by implicitly requiring that they have an articulable relationship to the voters they assist[.]" ROA.37764. They impede Section 208's purpose by subjecting certain categories of assistors "to greater scrutiny, greater administrative burdens, and greater penalties for noncompliance than the state's preferred assistors." *Id.*

The district court's factual findings underscore the deterrent effect of the Disclosure Requirements. Some DST chapters have ceased assisting with applications for mail-in ballots. ROA.37742 n.36; ROA.41219:4-41220:9. Other chapters "have shied away from the actual one-to-one assistance." ROA.41000:9-24. Similarly, MFV volunteers are deterred from assisting because they fear an accusation of wrongdoing could compromise their educational or employment opportunities. ROA.42256:16-21; *see also* ROA.42183:22-42184:3 ("I just didn't

---

[17] The pre-S.B.1 oath required assistors to swear that they were not in either category prohibited by Section 208. TEC § 64.034. Consequently, the district court concluded that the purpose of the Disclosure Requirements is not to identify assistors who are in either of the proscribed classes, but rather to distinguish assistors with no relationship to the voter from relatives and caregivers. ROA.37763; *see also* TEC § 86.010(h)(2) (close relatives exempt from criminal penalties for failure to disclose relationship to voter).

want to put my name down on a form and risk myself being prosecuted or sued, for whatever reason."). Other organizations have ceased helping voters to avoid exposing staff and volunteers to criminal liability. ROA.37719, ¶ 165 (citing ROA.38883:3-12, ROA.38912:19-20); *see also* ROA.41243:24-41244:9.[18] When volunteers and community-organization employees are deterred from assisting, 208 voters lose an important source of help: approximately one-fifth of disabled Texas voters receive voting assistance from non-family members, ROA.37718-37719, ¶ 163 (citing ROA.60907, ¶ 102).

The Disclosure Requirements impermissibly substitute the state's choice of assistor for the voter's. *See* ROA.37763, 41000:9-41001:3; 41002:20-41003:14. Apart from the two statutory exceptions, however, Section 208 does not permit states to decide for voters. *See Marshall*, 2024 WL 4448841, at *3; S. Rep. at 62.

### 3. The Assistance Restrictions Are Preempted by Section 208 Because They Burden Voters' Right to Their Assistor of Choice.

Section 208 preempts the Assistance Restrictions because they deter people from assisting who were willing to help 208 voters before S.B.1 and because they deter 208 voters from voting with their preferred assistor. *See* S. Rep. at 62-63. As the district court held, "Section 208 "prohibit[s] regulations that effectively narrow

---

[18] State and Intervenor-Defendants claim that Section 208 does not preempt the Disclosure Requirements because they do not bar anyone from providing assistance. Def. Br. 41-42; Int. Br. 56-57. A state law is preempted, however, when it "stands as an obstacle" to Congress's clear intent. *Oneok*, 575 U.S. at 377. The Disclosure Requirements are an "obstacle" to Section 208 because they chill lawful assistors from providing voting assistance.

the universe of willing and eligible assistors from which a voter can choose." ROA.37754. Burdens on assistors undermine the voter's right to receive assistance from a person of *choice* because voters depend on assistors to help them vote. Recognizing this link, courts have held that laws regulating assistors violate the rights of 208 voters by impeding the voter's practical ability to obtain assistance. *See Democracy N.C. v. N.C. State Bd. of Elections*, 590 F. Supp. 3d 850, 857-60, 869, 872 (M.D. N.C. 2022) ("*DNC*") (denying motion to dismiss Section 208 challenge to state law limiting voter assistors to near relatives, legal guardians, or members of county-authorized assistance team); *Carey v. Wis. Elections Comm'n*, No. 22-cv-402, 2022 WL 3910457, at *2, *10 (W.D. Wis. Aug. 31, 2022) (Section 208 preempts state law prohibiting third-party ballot-return assistance to disabled voters).

Without their assistor of choice, 208 voters must choose between "three dignitary harms—voting without any assistance, losing their privacy while voting, or forgoing the voting process altogether." ROA.37721-37722, ¶ 173 (citing ROA.39508:25-39509:14). Even if 208 voters manage to cast ballots, their rights are violated if they vote without assistance or with an assistor they did not choose. *See DNC*, 590 F. Supp. 3d at 856, 869 (voter who voted absentee with his wife's assistance had standing to challenge law preventing his seeking assistance from nursing home staff); Consent Decree, *United States v. Hale Cnty.*, No. 5-05CV0043-C (N.D. Tex. Apr. 27, 2006) (requiring election administrators to provide language

assistance to voters with limited English proficiency who initially voted without such assistance).

> ### a. The Assistance Restrictions Pressure 208 Voters to Vote without Assistance.

The district court credited the testimony of 208 voters who were forced to vote without assistance because the Assistance Restrictions deterred them from asking their assistor of choice or deterred their preferred assistor from helping. ROA.37704-37709, ¶¶ 118-135. In so doing, the Assistance Restrictions conflict with, and are preempted by, Section 208. *See* ROA.37758.

For example, Ms. Nunez Landry, unwilling to expose her partner—her primary caregiver—to potential criminal liability, did not ask him to help her vote. ROA.37704-37705, ¶¶ 118, 120 (citing ROA.42043:7-14, ROA.42037:11-17); *see also* ROA 42042:20-42044:11; ROA.42057:17-23. She has progressive muscular dystrophy, and voting unassisted in March 2022 elections was arduous:

> I had to lean out of my chair to press the [voting machine] screen and I had to hold up my one arm with the other arm and it was a very long ballot. And . . . my arms get very heavy and slow and so I had to take breaks . . . . I had a lot of cramping.

ROA.42042:7-19. She anticipates greater difficulties in future elections. ROA.42054:20-42055:5.

Laura Halvorson has chronic muscular respiratory failure and progressive muscular dystrophy but voted unassisted in March 2022 because her personal

attendant declined to help her vote by mail: she was uncomfortable taking an oath under penalty of perjury that might risk her immigration status. ROA.37706-37707, ¶¶ 123-26 (citing ROA.42119:25-42120:13). Ms. Halverson's disability made "trying to hold a pen and mark [her] ballot . . . very painful and time-consuming." She had to "move the pen very slowly and carefully to make sure [that her] handwriting was] legible enough to read." ROA.42121:4-18. She completed her mail-in ballot in "10- or 15-minute increments throughout the course of two days. . . . Especially with [her] hip fracture, it was very hard to sit up in [her] wheelchair and fill out that ballot." ROA.42121:19-22; *see* ROA.37706, ¶ 125. Her disability is progressive, so she expects to need more help, especially from caregivers, in future elections. ROA.42134:2-8.

The district court's factual findings underscore why Section 208 must preempt additional restrictions on voter assistance: such restrictions compel 208 voters to vote without the assistance they need.

> b.   *The Assistance Restrictions Pressure 208 Voters to Rely on Persons Other Than Their Chosen Assistor.*

The Assistance Restrictions force some 208 voters to seek help from poll workers, who are, as the district found, an "imperfect substitute for voters' chosen assistors." ROA.37721, ¶ 170; *see also* ROA.37705, ¶ 121 (citing ROA.42045:23-42047:10). In so doing, the Assistance Restrictions contravene Congress's clear intent and are therefore preempted by Section 208. S. Rep. at 62 ("[A]ssistance

provided by election officials discriminates against those voters who need such aid because it infringes upon their right to a secret ballot and can discourage many from voting for fear of intimidation or lack of privacy."); Voting Rights Act: Hearings on 5.53, S. 1761. S. 1992 and H.R. 3112, Before the Subcomm. on the Const. of the Sen. Comm. on the Judiciary, 97th Cong., 2d Sess. 1783 (1982), at 393; *see also* 128 Cong. Rec. S7075-142, at 7109 (daily ed. June 18, 1982) ("The right to cast one's vote with dignity upholds one of the greatest principles of our Constitution."). Foreseeing the "natural" apprehension that "many" citizens would feel about voting under the eye of anyone other than their own chosen assistor, Congress protected voters' right to choose their assistor. S. Rep. at 62.

The district court's findings illustrate why Congress rejected the notion that 208 voters could rely on poll workers for assistance. Voters assisted by election workers do not have secret ballots. ROA.37721, ¶ 172. The assisting election workers view their ballots, and the TEC permits partisan poll watchers to inspect their ballots. ROA.37679, 37721, ¶¶ 11, 172 (citing TEC § 33.057(a); TEC § 33.957(a)). Indeed, in November 2022, Ms. Nunez Landry, forced to vote without her preferred assistor, had to rely on a poll worker to help her use the accessible voting technology. ROA.37705, ¶ 121 (citing ROA.42045:25-42046:24). She

therefore had to vote in full view of an election worker and two other strangers. ROA.37705, ¶ 121 (citing ROA.42046:15-42047:17).[19]

> c. *The Assistance Restrictions Discourage 208 Voters from Voting.*

The Assistance Restrictions erect barriers for 208 voters that increase the likelihood they will be disenfranchised. ROA.37722, ¶¶ 175, 178 (citing ROA .42577:19-42578:8, ROA.60907, ¶ 101, ROA.39515:17-39516:15). They therefore exacerbate a concern that Congress intended Section 208 to address: faced with the choice of forfeiting their right to vote or accepting help from a person they did not choose, citizens who qualify for assistance "do in fact elect to forfeit their right to vote." S. Rep. at 62; *see also* 128 Cong. Rec. S7075-7142, at 7111 (daily ed. June 18, 1982) ("We simply cannot permit qualified voters to forfeit their right to vote because they feel apprehensive about voting in the presence of someone not of their own choice."). Congress wanted 208 voters to exercise their right to vote and granted them nearly unfettered choice of assistor. *See, e.g.*, S. Rep. at 62; *Marshall*, 2024 WL 4448841, at *3.

As the district court found, "[t]rial testimony by voters reified these predictions about the impact that additional barriers to voting can have on people with disabilities." ROA.37722, ¶ 176. Some voters "will be afraid to vote," or will

---

[19] Intervenor-Defendants ignore this finding when they claim that S.B.1 "do[es] not force voters to use election officials or any other specific people as voter assistants." Int. Br. 21.

be embarrassed to disclose their disability to show their eligible for assistance, and therefore "will not go and vote." ROA.42054:3-11, 39519:7-11; *see* ROA.39515:17-39516:15, 42033:6-7, 42131:21-22; 42133:11-19. Other 208 voters may be disenfranchised in Texas because they cannot find anyone to provide the necessary voting assistance. ROA.37722, ¶ 175; *see* ROA.42035:7-11 (describing care crisis in Texas for people with disabilities), ROA.42054:3-9 ("[T]here are going to be a lot of disabled people who are going to have difficulties finding people to assist them with voting."). The Assistance Restrictions stifle the participation of 208 voters, in contravention of Congress's clear intent that states establish voter assistance procedures that "encourage[] greater participation in the electoral process." S. Rep. at 63; *see* 52 U.S.C. § 10501(b)(1).[20]

## V.    THE DISTRICT COURT'S INJUNCTION AGAINST ALL TEXAS PROSECUTORS IS SUPPORTED BY THE RECORD AND THE LAW.

The district court enjoined all county and local prosecutors, "as agents of the State of Texas," "from deputizing the Attorney General, appointing him *pro tem*, or seeking his appointment *pro tem* from or by a district judge to prosecute alleged

---

[20] Intervenor-Defendants argue that the Assistance Restrictions "preserve the integrity of [the] election process," thereby encouraging citizens to vote. Int. Br. 52-53. Congress did not enact Section 208 to reassure voters in general, but, rather, to ensure that 208 voters are encouraged to participate in the electoral process. *Accord* ROA.37759 ("'[P]rotecting' voters who are *ineligible* for assistance does nothing to protect *eligible* voters. . . . Congress did not pass a law to protect voters who are *ineligible* for assistance; it passed a law to protect those who need it. Texas cannot establish laws that protect the former at the expense of the latter.").

violations" of S.B.1 §§ 6.04 & 6.05. ROA.37778, 37780. This prohibition is necessary to afford "complete relief to the plaintiffs." *Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)); *see United States v. Hall*, 472 F.2d 261, 265 (5th Cir. 1972) (affirming contempt finding against nonparty whose actions "if unrestrained, could have upset the court's ability to bind the parties . . .").

DA Teare protests that this portion of the Injunction impermissibly binds non-parties and imposes obligations inconsistent with Texas law. Teare Br. 26-32. Injunctions, however, always bind non-parties who are in "active concert or participation" with a party. Fed. R. Civ. P. 65(d)(2)(C). DAs and local prosecutors can "deputize" the Attorney General to prosecute election crimes. *State v. Stephens*, 663 S.W.3d 45, 55-56 (Tex. 2021); *State ex rel. Hill v. Pirtle*, 887 S.W.2d 921 (Tex. 1994) (*en banc*). A DA or local prosecutor who deputizes the Attorney General to prosecute alleged violations of §§ 6.04 or 6.05, enabling the Attorney General to do precisely what the Injunction forbids, is in active concert with the Attorney General and is therefore bound by the Injunction. *See Ganpat v. Eastern Pacific Shipping PTE, Ltd.*, 66 F4th 578, 585-86 (5th Cir. 2023) ("Defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding.") (cleaned up). The Injunction comports with Rule 65 and does not impermissibly bind non-parties. *See id.*

The Injunction is also consistent with Texas law. DA Teare interprets the district court's description of DAs and local prosecutors as agents of the State to mean "'agents' of other state officials or actors," and objects that DAs and local prosecutors have independent authority. Teare Br. 28. The Injunction, however, nowhere describes DAs and local prosecutors as agents of the Attorney General, and characterization of DAs and local prosecutors as State "agents" is not essential to the Injunction: whatever their status, they cannot act in concert with the Attorney General to prosecute alleged violations of §§ 6.04 and 6.05.

DA Teare also claims that the district court's description of local and county prosecutors as "deputizing the Attorney General" is inconsistent with Texas law, Teare Br. 29, but "deputization" is the word the Texas Court of Criminal Appeals uses for a DA's inclusion of the Attorney General in a prosecution. *Stephens*, 663 S.W.3d at 55-56. Indeed, *Pirtle*, 887 S.W.2d 921, cited by DA Teare, acknowledges that DAs deputize assistant attorneys general, *id.* at 927 (referring to the DA's "deputation order").

DA Teare argues that the Injunction is flawed because DAs may not "appoint[] [the Attorney General] *pro tem,*" nor "seek[] [the Attorney General]'s appointment *pro tem* from or by a district judge." Teare Br. 30, 31 (cleaned up). To the extent that the Injunction prohibits DAs from doing something they lack power to do, they will have no problem complying with it, but DA Teare is wrong that DAs cannot ask a

Texas district judge to appoint the Attorney General *pro tem*: Texas criminal procedure law contemplates exactly that. *See* Tex. Crim. Pro. L Art. 2.07(b-1), *as amended* 2023 Tex. Sess. L. Ch. 765, Art. 2A.104(c); ROA.42768:18-25.

Accordingly, the Injunction complies with Rule 65 of the Federal Rules of Civil Procedure.

## **CONCLUSION**

For the foregoing reasons, this Court should affirm the district court's order permanently enjoining the Assistance Restrictions.

Dated: March 26, 2025

Respectfully submitted,

*/s/ Victor Genecin*
Victor Genecin
Uruj Sheikh
Breanna Williams
Maia Cole
NAACP Legal Defense &
   Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
T: (212) 965-2200
F: (212) 226-7592
vgenecin@naacpldf.org
usheikh@naacpldf.org
bwilliams@naacpldf.org
mcole@naacpldf.org

Shira Wakschlag
The Arc of the United States, Inc.
1825 K Street, NW, Suite 1200
Washington, DC 20006

*/s/ Wendy J. Olson*
Wendy J. Olson
11859 STOEL RIVES LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702
wendy.olson@stoel.com

Courtney Hostetler
Free Speech For People
28 S. Main St., Suite 200
Sharon, MA 02067
(617) 249-3015
chostetler@freespeechforpeople.org

***Attorneys for Plaintiff***
**MI FAMILIA VOTA**

T: (202) 534-3708
F: (202) 534-3731
Wakschlag@thearc.org

J. Michael Showalter
ARENTFOX SCHIFF LLP
South Wacker Drive, Suite 7100
Chicago, IL 60606
Tel: (312) 258-5561
j.michael.showalter@afslaw.com

*Attorneys for Plaintiffs*
**DELTA SIGMA THETA
SORORITY, INC. and THE ARC
OF TEXAS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was filed electronically on March 26, 2025.  Notice of this filing will be sent by electronic mail to all parties by the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

/s/ *Victor Genecin*
Victor Genecin

## CERTIFICATE OF COMPLIANCE

1.      This brief has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman, 14-point.

2.      Exclusive of the table of contents, table of citations, certificate of compliance, and the certificate of service, this Opposition Brief of Plaintiffs-Appellees contains 15,172 words.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.  If the Court so directs, I will provide an electronic version of the brief and a copy of the word or line printout.


/s/ *Victor Genecin*
Victor Genecin