**No. 24-50826**

# In the United States Court of Appeals for the Fifth Circuit

LA UNIÓN DEL PUEBLO ENTERO; SOUTHWEST VOTER REGISTRATION EDUCATION PROJECT; MEXICAN AMERICAN BAR ASSOCIATION OF TEXAS; TEXAS HISPANICS ORGANIZED FOR POLITICAL EDUCATION; JOLT ACTION; WILLIAM C. VELAZQUEZ INSTITUTE; FIEL HOUSTON, INCORPORATED; FRIENDSHIP-WEST BAPTIST CHURCH; TEXAS IMPACT; JAMES LEWIN; MI FAMILIA VOTA,

*Plaintiffs-Appellees,*

*v.*

GREGORY W. ABBOTT, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF TEXAS; WARREN K. PAXTON, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF TEXAS; JANE NELSON, IN HER OFFICIAL CAPACITY AS TEXAS SECRETARY OF STATE; HARRIS COUNTY REPUBLICAN PARTY; DALLAS COUNTY REPUBLICAN PARTY; NATIONAL REPUBLICAN SENATORIAL COMMITTEE; SEAN TEARE, HARRIS COUNTY DISTRICT ATTORNEY,

*Defendants-Appellants*

REPUBLICAN NATIONAL COMMITTEE,

*Movant-Appellant.*

OCA-GREATER HOUSTON; LEAGUE OF WOMEN VOTERS OF TEXAS,

*Plaintiffs-Appellees,*

*v.*

KEN PAXTON, ATTORNEY GENERAL OF TEXAS,

*Defendant-Appellant.*

*[Caption Continued on Next Page]*

LULAC Texas; Texas Alliance for Retired Americans;
Texas AFT; Voto Latino,

*Plaintiffs-Appellees,*

*v.*

Ken Paxton, in his official capacity as the Texas
Attorney General,

*Defendant-Appellant.*

———————

Delta Sigma Theta Sorority, Incorporated; The Arc of Texas

*Plaintiffs-Appellees,*

*v.*

Gregory Wayne Abbott, in his official capacity as the
Governor of Texas; Warren Kenneth Paxton, Jr., in his
official capacity as the Attorney General of Texas,

*Defendants-Appellant.*

———————

On Appeal from the United States District Court
for the Western District of Texas, San Antonio Division

———————

## REPLY BRIEF FOR STATE DEFENDANTS-APPELLANTS

———————

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General


Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Aaron L. Nielson
Solicitor General

William F. Cole
Principal Deputy Solicitor General
William.Cole@oag.texas.gov

Kathleen T. Hunker
Deputy Chief, Special Litigation Unit

Meagan Corser
Assistant Attorney General

Counsel for State Defendants-Appellants

# Table of Contents

Page

Table of Authorities ............................................................................ ii

Introduction ......................................................................................... 1

Argument ............................................................................................. 2

    I.   The District Court Lacked Article III Jurisdiction. ................... 2

        A.  Plaintiffs have not suffered a cognizable injury. ................. 2

            1.  Plaintiffs lack associational standing .......................... 3

            2.  Plaintiffs lack organizational standing. ...................... 7

        B.  Any injury suffered by Plaintiffs is neither traceable to, nor redressable by, the State Defendants. ................ 10

    II.  Section 208 Does Not Preempt S.B.1's Voter-Assistance Provisions. ..... 12

        A.  Nothing in the text of section 208 supports Plaintiffs' obstacle-preemption argument. .......................... 13

        B.  Plaintiffs' deterrence-or-discouragement theory of obstacle preemption is without merit. ........................ 19

    III.  Plaintiffs Lack a Private Cause of Action for Their Section 208 Claims... 22

Conclusion ......................................................................................... 25

Certificate of Service ......................................................................... 26

Certificate of Compliance ................................................................. 26

# Table of Authorities

**Page(s)**

**Cases:**

*Alexander v. Sandoval*,
    532 U.S. 275 (2001) ............................................................. 22, 23

*Ali v. Fed. Bureau of Prisons*,
    552 U.S. 214 (2008) .................................................................. 14

*Altria Grp., Inc. v. Good*,
    555 U.S. 70 (2008) .................................................................... 13

*Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*,
    86 F.4th 1204 (8th Cir. 2023) ............................................... 23, 24

*Barilla v. City of Houston*,
    13 F.4th 427 (5th Cir. 2021) ........................................................ 9

*Barnhart v. Peabody Coal Co.*,
    537 U.S. 149 (2003) .................................................................. 15

*Barrosse v. Huntington Ingalls, Inc.*,
    70 F.4th 315 (5th Cir. 2023) ...................................................... 13

*California v. Texas*,
    593 U.S. 659 (2021) .................................................................. 11

*Calumet Shreveport Ref'g, LLC v. U.S. EPA*,
    86 F.4th 1121 (5th Cir. 2023) .................................................... 14

*Chamber of Com. of the U.S. v. Whiting*,
    563 U.S. 582 (2011) .................................................................. 13

*City of Austin v. Paxton*,
    943 F.3d 993 (5th Cir. 2019) ...................................................... 12

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ........................................................ 4, 5, 6, 8

*CSX Transp., Inc. v. Easterwood*,
    507 U.S. 658 (1993) .................................................................. 13

*Ctr. for Biological Diversity v. EPA*,
    937 F.3d 533 (5th Cir. 2019) ........................................................ 4

*Deanda v. Becerra*,
    96 F.4th 750 (5th Cir. 2024) ................................................. 13, 18

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) .................................................................. 11

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ................................................................ 7, 8

*In re Gee*,
  941 F.3d 153 (5th Cir. 2019) ........................................................ 3, 5, 11
*Google, Inc. v. Hood*,
  822 F.3d 212 (5th Cir. 2016) .............................................................7, 12
*Health & Hosp. Corp. of Marion Cnty. v. Talevski*,
  599 U.S. 166 (2023) ............................................................................ 24
*Hotze v. Hudspeth*,
  16 F.4th 1121 (5th Cir. 2021) ............................................................... 9
*Justice v. Hosemann*,
  771 F.3d 285 (5th Cir. 2014) ................................................................ 9
*Korman & Assocs., Inc. v. United States*,
  527 F.3d 443 (5th Cir. 2008) ...............................................................16
*Laird v. Tatum*,
  408 U.S. 1 (1972) .................................................................................. 9
*Maryland v. Louisiana*,
  451 U.S. 725 (1981) .............................................................................16
*McFadden v. United States*,
  576 U.S. 186 (2015) ............................................................................ 21
*Mi Familia Vota v. Ogg*,
  105 F.4th 313 (5th Cir. 2024) ............................................................. 12
*Miller v. Dunn*,
  35 F.4th 1007 (5th Cir. 2022) ............................................................... 8
*NAACP v. City of Kyle*,
  626 F.3d 233 (5th Cir. 2010) ................................................................ 2
*OCA-Greater Houston v. Texas*,
  867 F.3d 604 (5th Cir. 2017) ..............................................8, 10, 11, 17, 18, 23
*Ostrewich v. Tatum*,
  72 F.4th 94 (5th Cir. 2023) ................................................................ 12
*Rice v. Santa Fe Elevator Corp.*,
  331 U.S. 218 (1947) .............................................................................16
*Robinson v. Ardoin*,
  86 F.4th 574 (5th Cir. 2023).............................................................. 23
*Rodriguez-Avalos v. Holder*,
  788 F.3d 444 (5th Cir. 2015) ............................................................. 14
*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016).............................................................................. 7
*Teltech Sys., Inc. v. Bryant*,
  702 F.3d 232 (5th Cir. 2012) ...............................................................16

*Tex. Democratic Party v. Benkiser*,
   459 F.3d 582 (5th Cir. 2006) ...................................................... 2
*Tex. State LULAC v. Elfant*,
   52 F.4th 248 (5th Cir. 2022) ............................................. 5, 6, 9
*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ................................................................ 3
*Twitter, Inc. v. Paxton*,
   56 F.4th 1170 (9th Cir. 2022) .......................................... 7, 12
*United States v. Bethea*,
   841 F. App'x 544 (4th Cir. 2021) ......................................... 14
*United States v. Segura*,
   747 F.3d 323 (5th Cir. 2014) ............................................... 18
*United States v. Uriarte*,
   975 F.3d 596 (7th Cir. 2020) ............................................... 14
*United States v. Vargas*,
   74 F.4th 673 (5th Cir. 2023) (en banc) ................................ 15
*Vote.org v. Callanen*,
   89 F.4th 459 (5th Cir. 2023) ................................................ 16
*Webster v. Fall*,
   266 U.S. 507 (1925) ............................................................. 23
*Young Conservatives of Tex. Found. v. Smatresk*,
   73 F.4th 304 (5th Cir. 2023) .......................................... 16, 20
*Zimmerman v. City of Austin*,
   881 F.3d 378 (5th Cir. 2018) ............................... 4, 5, 6, 7, 9
*Zyla Life Scis., LLC v. Wells Pharma of Hous., LLC*,
   No. 23-20533, 2025 WL 1076889 (5th Cir. Apr. 10, 2025) ......... 13, 16

**Constitutional Provisions and Statutes:**

U.S. Const. art. I, § IV, cl.1 .................................................... 16
U.S. Const. art. III .......................................... 1, 2, 4, 6, 7, 12
42 U.S.C. § 1983 ............................................................ 22, 24
52 U.S.C.:
   § 10302(a) ...................................................................... 23
   § 10302(b) ...................................................................... 23
   § 10308(d) ...................................................................... 24
   § 10310(c)(1) .................................................................. 17
   § 10504 .......................................................................... 24
   § 10508 .............................. 1, 2, 9, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24

§ 20104(c) ................................................................................ 22
§ 20105(a) ......................................................................... 22, 24
Tex. Elec. Code:
§ 31.001(a) ............................................................................. 11
§ 64.034 ..................................................................... 5, 6,10, 21
§ 64.0322(b) ...................................................................... 3, 7,10
§ 86.006(a-2) .......................................................................... 10
§ 86.013(b) .............................................................................. 3
§ 86.0105(f) ............................................................................ 22
§ 276.015(b)-(c) ........................................................................ 6
§ 276.018 ................................................................................. 7
§ 276.018(a) ....................................................................... 6, 21

**Other Authorities:**
H.R. Rep., No. 97-227 (1981) ................................................ 18
S.Rep., No. 97-417 (1982) .............................................. 19, 22

# Introduction

Section 208 of the Voting Rights Act ("VRA") was enacted to ensure that blind, disabled, and illiterate voters may receive voting assistance from "a person of the voter's choice," 52 U.S.C. § 10508, rather than from a person assigned by the government. Plaintiffs now seek to transform that straightforward provision into a preemptive buzzsaw that fells any state election law that a voter or third-party assistor claims could *subjectively* deter or discourage them from seeking or providing assistance—no matter how idiosyncratic those reasons are. The district court erred in accepting this unbounded, and textually unmoored, theory of obstacle preemption to enjoin a half-dozen provisions of S.B.1 that set forth modest requirements governing the provision of assistance. This Court should reverse the district court's permanent injunction.

At the outset, the district court lacked Article III jurisdiction. Plaintiffs, who are several voter-advocacy and civic-engagement organizations, cannot rely on a theory of associational standing premised on the testimony of voting members who declined to seek assistance because of speculative fears that their assistors might violate S.B.1's requirements and be prosecuted. That is the definition of a self-inflicted injury. Nor can Plaintiffs rely on the vague and hypothetical fears of future prosecution of the voter-assistors themselves, whose fears often rely on a misreading of S.B.1's plain language. And Plaintiffs cannot salvage standing by offering a theory of organizational standing that was repudiated by the Supreme Court just last year. Lastly, even if these speculative future injuries could suffice, they are not traceable to the

Secretary of State or the Attorney General, neither of whom enforces any of these provisions of S.B.1.

On the merits, Plaintiffs lack a private right of action under section 208; but even if they had one, S.B.1's provisions do not clear the high hurdle necessary for obstacle preemption. Rather than obstructing Congress's purpose of protecting vulnerable voters, the challenged provisions further that goal by preventing ballot manipulation and intimidation. Laws that impose a *de minimis* burden—like signing an oath, disclosing a relationship, or precluding compensated assistance and paid vote-harvesting—merely implement section 208's anti-exploitation purpose in tangible ways. Section 208's plain language, along with common sense, undermine Plaintiffs' deterrence-or-discouragement theory of obstacle preemption, which if accepted would allow the preemptive effect of federal statutes to turn on the idiosyncratic responses of plaintiffs to state laws, not *Congress'*s intent.

## ARGUMENT

## I.  The District Court Lacked Article III Jurisdiction.

### A.  Plaintiffs have not suffered a cognizable injury.

Plaintiffs did not prove at trial a cognizable injury sufficient to confer Article III jurisdiction. They have identified no concrete injuries to their *members* for purposes of associational standing, *see Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587-88 (5th Cir. 2006), nor to *themselves* for organizational standing, *see NAACP v. City of Kyle*, 626 F.3d 233, 237-38 (5th Cir. 2010). Plaintiffs' responses confirm this fundamental deficiency in their case.

### 1.    Plaintiffs lack associational standing.

The LUPE and MFV Plaintiffs contend that they have associational standing because some of their members (who are voters entitled to assistance) are allegedly injured by two provisions of S.B.1 that require voter-assistors to provide information (sections 6.03 and 6.05); one provision that requires the Secretary to create a space on the mail-ballot carrier envelope for such information (section 6.07); one provision that requires voter-assistors to take an oath (section 6.04); and one provision that bans paid vote-harvesting (section 7.04). Because "standing is not dispensed in gross," Plaintiffs must have proved at trial their "standing to challenge each provision of law at issue." *In re Gee*, 941 F.3d 153, 161-62 (5th Cir. 2019) (per curiam). They have not done so.

As the State Defendants explained (at 18-19), Plaintiffs lack standing to challenge sections 6.03 and 6.05 because providing a few pieces of information on a form is not a cognizable injury. After all, it has no "close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2021) (cleaned up). It is even harder to see how Plaintiffs could be injured by section 6.07, which requires nothing of any voter or assistor but instead requires the Secretary to include a space on the mail-ballot carrier envelope for indicating the name, address, signature, and relationship to the voter of someone who deposits a voter's mail-in ballot in the mail. Tex. Elec. Code § 86.013(b). This provision is therefore "incapable of injuring" Plaintiffs. *In re Gee*, 941 F.3d at 162. Likewise, Plaintiffs lack standing to challenge section 7.04, because

all they can offer is hypothetical and speculative fears of future prosecution. Tex.Br.20-21.

The LUPE and MFV Plaintiffs respond that their members' injury is "the deterrent effects that the form—or S.B.1's other requirements and prohibitions—have on voter assistance," LUPE.Br.39, which causes a "loss of their voting rights," MFV.Br.25. But the evidence that Plaintiffs point to is legally insufficient to support that deterrence theory for two reasons.

*First*, Plaintiffs point to two voters who chose not to seek assistance because they were "afraid to put their assistors at risk." LUPE.Br.27; MFV.Br.25, 57. But Plaintiffs do not contend that those voters were unable to obtain assistance. They were simply unwilling. A voter's choice *not* to seek assistance is a self-inflicted injury that is insufficient to confer Article III standing. After all, plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). This Court has repeatedly enforced this basic Article III guardrail, even after trial. *See Zimmerman v. City of Austin*, 881 F.3d 378, 389-90 (5th Cir. 2018); *see also Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 541 (5th Cir. 2019).

It should do so here. Plaintiffs' primary witness for this point, Jodi Nunez-Landry, testified that she did not even ask her preferred assistor—her partner—because she "was too afraid to ask [for] his assistance," ROA.42060-61, based upon her fear that her partner might be wrongly accused of, and then later prosecuted for, violating S.B.1's requirements. ROA.42042-44. Yet she nevertheless later testified that her partner *would have* provided her with such assistance if she had asked for it.

ROA.42062. Even if her vaguely defined fears could suffice to support standing—and they cannot, *see infra* at 5-6—Ms. Nunez-Landry testified that her concerns were tied to the oath requirement, ROA.42042-43, 42044, not the information requirements or the paid vote-harvesting ban, *see Gee*, 941 F.3d at 161-62. And Plaintiffs' other witness, Nancy Crowther, is even more unhelpful. Ms. Crowther testified in a deposition that she "did not take [her] attendant with" her to vote in the May 7, 2022, local election, ROA.31950, because she "did not want to jeopardize their relationship with [her] based on the new requirements" of S.B.1, ROA.31949. This is the textbook definition of a self-inflicted injury based on abstract, ill-defined "fears of hypothetical future harm." *Clapper*, 568 U.S. at 416.

*Second*, Plaintiffs also point to testimony from two witnesses whose preferred assistor declined to assist due to nebulous fears of future prosecution tied to section 6.04's oath requirement, ROA.42092-93, 42120, 42124-26, and generalized testimony from organizational plaintiffs that some of their members have ceased providing voter assistance due to vague fears of future prosecutions, *see* LUPE.Br.39-40; MFV.Br.29. A "subjective fear," *Clapper*, 568 U.S. at 418, of future prosecution does not suffice to support standing even when it is the *plaintiff* herself who harbors that trepidation, *Tex. State LULAC v. Elfant*, 52 F.4th 248, 256-57 (5th Cir. 2022). *A fortiori*, such fears cannot support standing when they hinge "in large part on" the abstract, idiosyncratic concerns of third parties. *Zimmerman*, 881 F.3d at 390. That is especially true here, where no evidence suggests that prosecution of these third-party voter-assistors is "certainly impending." *Clapper*, 568 U.S. at 409. To the contrary, the evidence Plaintiffs point to indicates, at most, that these voter-assistors

5

were "uncertain[]" or "confused" about section 6.04's oath requirement and section 7.04's paid vote-harvesting ban (not the other challenged provisions). *See, e.g.*, ROA.37712-16, 37719-20, 37727. But "[u]ncertainty is not the same as intent," *Tex. State LULAC*, 52 F.4th at 256, and the crimes that Plaintiffs' members fear their assistors might accidentally commit require *intent*, not inadvertence, *see* Tex. Elec. Code § 276.015(b)-(c) (requiring vote-harvesting to be done "knowingly"); *id.* § 276.018(a) (requiring "intent to deceive" that was done "knowingly or intentionally" for perjury).

Any argument to the contrary depends upon a "highly attenuated chain of possibilities." *Tex. State LULAC*, 52 F.4th at 257 (quoting *Clapper*, 568 U.S. at 410). Consider the testimony of Plaintiffs' witness, Laura Halvorsen. She testified that her personal-care attendant declined to provide assistance because she was "not comfortable with" the oath of assistance because swearing to it might result in her "fac[ing]" a "penalty or perjury that could risk her green card status," ROA.42120, in the event that "a partisan poll watcher . . . assumed [she was] influencing [Halvorsen's] vote in any way," ROA.42124. This is precisely the type of "fanciful notion that Plaintiffs will be charged under" S.B.1 that is insufficient under Article III because it is built on a "highly attenuated chain of possibilities." *Tex. State LULAC*, 52 F.4th at 256 (quoting *Clapper*, 586 U.S. at 410). There is nothing in the record to suggest that such a prosecution is in offing. It is hardly "inevitable," *Zimmerman*, 881 F.3d at 390, that Halvorsen's voter assister (or anyone else's): (1) will be accused by a poll watcher of improperly influencing Halvorsen's vote; (2) the poll watcher will refer the assistor to a district attorney for prosecution; (3) a district attorney will

prosecute the assistor for perjury under Texas Election Code § 276.018 (which requires proof of "intent to deceive"); (4) the assistor will be convicted; and (5) she will lose her green card. Nor is there any evidence that such a hypothesized prosecution has "been imposed on others in the past." *Zimmerman*, 881 F.3d at 390.

Against this, the LUPE Plaintiffs point to a *single* example of an OAG *investigation* into violations of sections 6.03 and 7.04. LUPE.Br.41-42 (citing ROA.37695); *see* MFV.Br.32. But Plaintiffs do not claim these investigations targeted *them* or their voter-assistors; that other unnamed parties may have been investigated can hardly support Plaintiffs' standing here. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). Regardless, the mere existence of an investigation, without more, does not constitute an Article III injury. *See Google, Inc. v. Hood*, 822 F.3d 212, 227-28 (5th Cir. 2016). Even OAG's issuance of a civil investigative demand would not confer an "Article III injury," because "the CID is not self-enforcing" and any suggestion that it might later be enforced would require "speculat[ion] about injuries that have not and may never occur." *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1175-76 (9th Cir. 2022). For similar reasons, any argument that these investigations might later ripen into prosecutions is entirely speculative and hypothetical. *Id.*

### 2. Plaintiffs lack organizational standing.

Plaintiffs also lack organizational standing. While "organizations may have standing to sue on their own behalf for injuries they have sustained," such organizations still "must satisfy the usual standards for injury in fact, causation, and redressability that must apply to individuals." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393-94 (2024) (citation omitted). Plaintiffs have not done so for several reasons.

*First*, the MFV Plaintiffs argue that the challenged provisions of S.B.1 have forced them to "expend resources," "spend more, time, money and resources educating voters," and "divert resources from their non-voting work." MFV.Br.27-29. But the Supreme Court rejected this exact type of claim last year, reasoning that an organization's efforts to "expend considerable time, energy, and resources" and "engag[e] in public advocacy and public education" to combat a disfavored law would not support organizational standing. *All. for Hippocratic Med.*, 602 U.S. at 394. As the Court put it, an argument that a law has "impaired" an organization's "ability to provide services and achieve their organizational mission[]," "does not work to demonstrate standing." *Id.*; *cf.* LUPE.Br.42; MFV.Br.26-27. Similarly, "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *All. for Hippocratic Med.*, 602 U.S. at 394. To the extent that *OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017), suggests differently, *see* MFV.Br.28-29, it is no longer good law and should not be followed. *See, e.g.*, *Miller v. Dunn*, 35 F.4th 1007, 1012 (5th Cir. 2022).

*Second*, Plaintiffs argue that the challenged provisions have injured their organizations because employees, volunteers, and prospective members do not want to engage in voter assistance, and thus have stopped providing it, because they fear "risking criminal liability" and "being accused of violating" the law. MFV.Br.27, 29; LUPE.Br.42-43, 44. This argument fails for the reasons described above: any vague "fears of hypothetical future harm," *Clapper*, 568 U.S. at 416, from a future prosecution are entirely speculative, hypothetical, and unsupported. *Supra* at 5-6.

8

The MFV Plaintiffs try to alter this conclusion by arguing that the "chilling effect" of S.B.1's challenged provisions "is a cognizable injury for standing purposes." MFV.Br.27 (citing *Justice v. Hosemann*, 771 F.3d 285, 291 (5th Cir. 2014)). But the rule that a court "must presume a credible threat of prosecution" when a law has a "chilling effect" applies only in the First Amendment context involving "pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs." *Tex. State LULAC*, 52 F.4th at 257 (quoting *Barilla v. City of Houston*, 13 F.4th 427, 432 (5th Cir. 2021)). Yet this appeal involves Plaintiffs' *statutory* claim under Section 208 of the VRA—not any First Amendment claim involving expressive activity. And even if this line of precedent were applicable, "[t]he chilling effect must have an objective basis; '[a]llegations of a subjective "chill" are not an adequate substitute.'" *Id.* at 256 (quoting *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)). Yet, as explained above, *supra* at 5-6, the threat of prosecution here is "imaginary or wholly speculative," *Zimmerman*, 881 F.3d at 390.

*Third*, the MFV Plaintiffs argue (at 28) that Delta Sigma Theta has standing to maintain this lawsuit because the challenged provisions of S.B.1 "directly regulate DST's assistance to voters" by "requiring DST volunteers who assist voters to make specified disclosures and swear the prescribed oath." But standing is assessed "on a claim-by-claim basis," *Hotze v. Hudspeth*, 16 F.4th 1121, 1125 (5th Cir. 2021), and while this theory might support DST's standing bring some other kind of claim, it does not supply them standing to bring a claim under *Section 208 of the VRA*. That statute, at most, creates rights for "voter[s]" to obtain voting assistance, 52 U.S.C.

§ 10508; but it confers no right on the *voter-assistors* themselves, much less on any organization of which such assistors are members. DST lacks standing to maintain a claim under a statute that provides them no rights in the first place.

### B. Any injury suffered by Plaintiffs is neither traceable to, nor redressable by, the State Defendants.

Regardless of whether Plaintiffs have a cognizable injury, any such injury is not traceable to the State Defendants and any relief ordered against them would not provide redress. As the State Defendants explained (at 21-25), Plaintiffs cannot bridge this gap by pointing to the Secretary's duty to prescribe forms or to the Attorney General's investigatory power. Plaintiffs' two rejoinders lack merit.

*First*, Plaintiffs double down on their argument that the Secretary caused and can redress their alleged injuries because she designs the forms local officials are required to use. *See* LUPE.Br.41; MFV.Br.30-31; *see also* ROA.37739-40, 37743-44. But the Election Code *independently* requires local "election officials" to collect certain information required under sections 6.03 and 6.05 from voter assistors or those dropping off another individual's ballot, Tex. Elec. Code §§ 64.0322(b), 86.006(a-2), and requires local "election officer[s]" to "administer[]" the oath in section 6.04, *id.* § 64.034. These obligations do not evaporate if the Secretary were to never execute her statutory duty to create the forms, so enjoining the *Secretary* from providing the forms for use by these local officials does not free those local officials from their separate legal obligations and thus would not remedy Plaintiffs' injury.

The MFV Plaintiffs also claim (at 30) that *OCA-Greater Houston* has already resolved the traceability question by holding that "[t]he facial invalidity of a Texas

election statute is, without question, fairly traceable to and redressable by the State itself and its Secretary of State, who serves as the 'chief election officer of the state.'" 867 F.3d at 613-14 (quoting Tex. Elec. Code § 31.001(a)). This traceability analysis is inconsistent with the way the Supreme Court has recently articulated it. To have standing, a plaintiff's injury must be "fairly traceable *to the defendant's challenged behavior*." *Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019) (emphasis added). That means that Plaintiffs must point to the defendant's "action or conduct [that] has caused or will cause the[ir] injury." *California v. Texas*, 593 U.S. 659, 670 (2021). But the Secretary's mere title of "chief election officer" does not constitute "action or conduct" that injures Plaintiffs. *Id.*

Even if it did, *OCA-Greater Houston* involved a post-enforcement challenge to a *single* provision of the Election Code that required voter-interpreters to be a registered voter of the county in which the voter needing interpretation resides. 867 F.3d at 609. But Plaintiffs here challenge six separate provisions of S.B.1, "each" of which they must establish standing to challenge. *In re Gee*, 941 F.3d at 161. At most, then, the traceability analysis in *OCA-Greater Houston* is instructive for cases involving laws similar to the one at issue in that case. But it could not have presaged that the Secretary enforces each of the six provisions of S.B.1 at issue here—much less *every* provision of the Election Code, as the language implies—years before that law was even enacted.

*Second*, Plaintiffs contend that the Attorney General's investigatory authority provides the missing causal link because "investigations tax their targets even when no prosecution ensues." MFV.Br.32; *see also* LUPE.Br.41. But this Court has already

11

twice held, including within the context of challenges to S.B.1, that investigations do not amount to compulsive or constraining enforcement. *See Mi Familia Vota v. Ogg*, 105 F.4th 313, 332 (5th Cir. 2024); *Ostrewich v. Tatum*, 72 F.4th 94, 101 (5th Cir. 2023). The MFV Plaintiffs respond (at 34 n.14) that those observations were limited to the sovereign-immunity context and have no relevance for standing. But this Court has recognized that the "Article III standing analysis and *Ex parte Young* analysis 'significantly overlap.'" *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019) (citation omitted). And even if they did not, *Google* and *Twitter*, demonstrate that the mere existence of a "state investigation" does not constitute a "non-speculative irreparable injury," *Google*, 822 F.3d at 228; *see Twitter*, 56 F.4th at 1175-76 (same).

The MFV Plaintiffs attempt to distinguish (at 33 n.12) *Google* and *Twitter* on the ground that they concerned non "self-enforcing" civil investigative demands, not criminal investigations. But Plaintiffs do not point to any criminal investigation into them by the Attorney General, much less one that made any affirmative demand of them, so they must fall back (at 33) on the argument that the mere existence of such investigations of others "intimdate[s]" and "deter[s]" their members. But again, hypothetical fears that an investigation may ripen into a prosecution are too speculative to confer standing. *Supra* at 5-7.

## II.  Section 208 Does Not Preempt S.B.1's Voter-Assistance Provisions.

The district court also erred in concluding that Section 208 of the VRA impliedly preempts all six of S.B.1's challenged provisions by posing an "obstacle" to accomplishing Congress's objectives. "Preemption analysis begins 'with the

assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Deanda v. Becerra*, 96 F.4th 750, 761 (5th Cir. 2024) (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008)). And "[c]ourts may not conduct 'a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives [because] such an endeavor would undercut the principle that it is Congress rather than the courts that pre-empts state law.'" *Barrosse v. Huntington Ingalls, Inc.*, 70 F.4th 315, 320 (5th Cir. 2023) (quoting *Chamber of Com. of the U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (plurality op.)). As a result, "[e]vidence of pre-emptive purpose [must be] sought in the text and structure of the [federal provision] at issue." *Zyla Life Scis., LLC v. Wells Pharma of Hous., LLC*, No. 23-20533, 2025 WL 1076889, at *1 (5th Cir. Apr. 10, 2025) (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)). Ultimately, "[f]or a state law to be conflict preempted, 'a high threshold must be met.'" *Barrosse*, 70 F.4th at 320 (quoting *Whiting*, 563 U.S. at 607). Plaintiffs have not cleared it.

## A. Nothing in the text of section 208 supports Plaintiffs' obstacle-preemption argument.

The district court's preemption analysis began from a faulty premise: that because section 208 grants any blind, disabled or illiterate voter the right to voting assistance "by a person of the voter's choice," 52 U.S.C. § 10508, qualified voters are entitled to choose *any* person under *any* conditions such that assistors are exempt from following neutral, generally applicable procedural rules governing the provision of assistance. As the State Defendants have explained (at 32-40), this boundless

13

interpretation of section 208 flouts basic rules of grammar, fails to grapple with the presumption against pre-emption in traditional areas of state regulation (such as elections), and leads to absurd results. The more natural reading of the text is that voters have the right to select someone as their assistor—instead of having one chosen for them by the State (such as election officials at the polls)—but nothing about that limitation exempts assistors from following neutral, generally applicable procedural rules. Tex.Br.32-37. Plaintiffs' attempt to defend the district court's reasoning based on text, precedent, and legislative history falls short.

1. Plaintiffs begin with the text, arguing that the phrase "*a* person" in section 208 should be read to mean "*any* person"—without qualification—because "[i]n ordinary speech, 'a' is a common synonym for 'any.'" LUPE.Br.20-21; MFV.Br.38-39. But "[h]ad Congress intended the phrase 'a [person]' to convey a very broad meaning, it could have used the word 'any,' as it did earlier in the same sentence." *United States v. Bethea*, 841 F. App'x 544, 549 (4th Cir. 2021) (quoting *United States v. Uriarte*, 975 F.3d 596, 604 (7th Cir. 2020)). Congress's drafting choice is presumed intentional. *Rodriguez-Avalos v. Holder*, 788 F.3d 444, 451 (5th Cir. 2015) (per curiam). That is particularly true where, as here, the word "any" has a *more* expansive reading than the word "a." *Compare Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) (defining "any"), *with Calumet Shreveport Ref'g, LLC v. U.S. EPA*, 86 F.4th 1121, 1139-40 (5th Cir. 2023) (defining "a").

Regardless, even if the phrase "a voter" could be read to mean "any voter," nothing in the phrase "any voter" forbids States from enacting reasonable procedural requirements governing the provision of voter assistance. The MFV Plaintiffs

point (at 37-40) to the final clause of section 208—"other than the voter's employer or agent of that employer or officer or agent of the voter's union," 52 U.S.C. § 10508—and argue that this is the only permissible limitation on the provision of assistance. But Plaintiffs' reliance on the *expressio unius* canon of construction is inapt here because the procedural requirements in S.B.1's challenged provisions are "conceptually different from the listed" exceptions in section 208's "other than" clause. *United States v. Vargas*, 74 F.4th 673, 687 (5th Cir. 2023) (en banc). That is, while section 208's other-than clause describes the only two classes of persons who may be categorically precluded from serving as voter-assistors based on their relationship to the voter, the challenged provisions here include generally applicable disclosure requirements, an oath of assistance, and targeted bans on compensated voter assistance and paid vote harvesting. That difference "removes the premise for applying *expressio unius*—'an associated group or series, justifying the inference that items not mentioned were excluded by deliberate choice.'" *Id.* (quoting *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003)). A limited restriction on *who* may serve as a voter-assistor is not logically "associated" with *what* procedures a voter assistor must follow.

Indeed, not even Plaintiffs stand by their absolute rule, conceding at least two additional exceptions: people who are physically unable to assist (for example, because they are incarcerated) and people who are unwilling to assist (for example, because they will not enter polling locations without their guns). *See* LUPE.Br.34-35; MFV.Br.42-43. The MFV Plaintiffs call (at 43) these exceptions "generally applicable laws," yet the same is true of the challenged provisions here. And with respect

15

to the unwillingness exception, there is no principled basis for a distinction based on the *reason* for the person's unwillingness—that is, whether the person is deterred by a firearm restriction or an oath requirement.

At a minimum, any statutory ambiguity on this score is resolved in favor of the State Defendants. For one thing, "conflict preemption begins with the presumption 'that Congress did not intend to displace state law,'" *Young Conservatives of Tex. Found. v. Smatresk*, 73 F.4th 304, 313 (5th Cir. 2023) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)), absent "clear and manifest" evidence, *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). And this presumption "applies with particular force when Congress legislates in a field traditionally occupied by state law." *Teltech Sys., Inc. v. Bryant*, 702 F.3d 232, 236 (5th Cir. 2012). Regulation of the "manner" of elections is squarely within the States' bailiwick, U.S. Const. art. I, § IV, cl.1; *Vote.org v. Callanen*, 89 F.4th 459, 481 (5th Cir. 2023), even if there is some overlapping authority, *Zyla Life Scis.*, 2025 WL 1076889, at *4.

For another thing, Plaintiffs' maximalist interpretation of section 208 would produce "absurd results," *see Korman & Assocs., Inc. v. United States*, 527 F.3d 443, 451 (5th Cir. 2008), including by permitting the highly subjective and idiosyncratic hypothetical fears of some voter assistors to control the preemptive effect of congressional statutes, *see, e.g.*, *supra* at 6-7. And taken to its logical conclusion, the district court's expansive construction of section 208 effectively prohibits Texas from placing any procedural requirements on would-be assistors, no matter how modest. *See* Tex.Br.37-40

**2.**   The LUPE Plaintiffs next pivot (at 16-19) to precedent, arguing that this Court has already resolved the preemption question in *OCA-Greater Houston*. Not so. That case "[a]t bottom" concerned "how broadly to read the term 'to vote' in section 208"—specifically, whether the term was limited "only to the literal act of marking the ballot." *OCA-Greater Hous.*, 867 F.3d at 614. Because the VRA expressly defines the term "vote" broadly, *see* 52 U.S.C. § 10310(c)(1), the Court held that a Texas statute could not "defin[e] terms more restrictively than as federally defined" and thereby "impermissibly narrow[] the right guaranteed by Section 208 of the VRA," *OCA-Greater Hous.*, 867 F.3d at 614-15.

*OCA-Greater Houston* is inapposite. It had no occasion to consider any other language in section 208 besides "to vote." And unlike in that case, here no federal statute defines the contested statutory term "a person of the voter's choice" or the "other than" clause. Thus, there is no basis to argue that the six provisions of S.B.1 at issue here "defin[e] terms more restrictively than as federally defined," *see id.* at 615—there is no federal definition to begin with.

The LUPE Plaintiffs resist this conclusion (at 16, 18) by repeatedly citing to a single sentence in the background section of the opinion summarizing various provisions of the *Texas Election Code* as "grant[ing] to physically disabled and English-limited Texas voters the right to select any assistor of their choice, subject only to the restrictions expressed in Section 208 of the VRA itself (that is, the assistor cannot be the voter's employer, an agent of the voter's employer, or an agent of the voter's labor union)." *Id.* at 608. This citation cannot bear the weight the LUPE Plaintiffs would place on it: the Court did not resolve, through a single clause and

17

accompanying parenthetical summarizing provisions of the Election Code, the question of whether imposing modest procedural requirements on voter assistors violates section 208. Moreover, even if it were relevant, that prefatory discussion is nonbinding dicta because it "could have been deleted without seriously impairing the analytical foundations of the holding," *see United States v. Segura*, 747 F.3d 323, 328 (5th Cir. 2014) (citation omitted), which, again, turned on the meaning of the phrase "to vote," *OCA-Greater Hous.*, 867 F.3d at 614.

**3.**   The MFV Plaintiffs (at 41-43) therefore fall back on legislative history. But their attempt to "paper over the statute's silence with legislative history" is "a flashing red sign that no 'clear and manifest' intent to preempt is shown." *Deanda*, 96 F.4th at 765. Regardless, the legislative history that the MFV Plaintiffs cite does not support their argument. The language from the Senate Report that they point to (at 41-42), for example, indicates that section 208 was drafted to prevent States from "permit[ing] voters to receive assistance only from poll officials." But nothing in any of S.B.1's challenged provisions limits voter-assistors to poll workers or election officials. The House Report that the MFV Plaintiffs point to (at 42) is even less helpful. Despite the MFV Plaintiffs' irresponsible suggestion, S.B.1's bans on compensated assistance and paid vote-harvesting are in no way analogous to the examples of racially discriminatory voter intimidation and harassment recounted in the House Report. *See* H.R. Rep., No. 97-227, at 15 (1981).

If anything, the legislative history supports the *State Defendants.* The Senate Report recognizes that section 208 does not interfere with "the legitimate right of any State to establish necessary election procedures" that are "designed to protect the

rights of voters." S. Rep. No. 97-417, at 63 (1982). And it confirms that "[s]tate provisions would be preempted only to the extent that they unduly burden the right recognized in this section, with that determination being a practical one dependent upon the facts." *Id.* That report further recognizes that the purpose of section 208 is to address the fact that, "[b]ecause of their need for assistance, members of these groups are more susceptible than the ordinary voter to having their vote unduly influenced or manipulated." *Id.* at 62. That concern is the same one that animated the challenged provisions of S.B.1 about disclosures, an oath, and bans on coercive activities (such as compensated voter assistance and paid vote harvesting). *See* Tex.Br.43-45.

## B. Plaintiffs' deterrence-or-discouragement theory of obstacle preemption is without merit.

Properly understood, none of S.B.1's voting-assistance provisions obstructs Congress's goal to guarantee blind, disabled, or illiterate voters the right to necessary assistance while at the same time protecting vulnerable voters from intimidation and fraud. To the contrary, those provisions advance that goal. As the State Defendants explained (at 40-45), none of S.B.1's challenged provisions limits the scope of assistance that voter may receive; instead, they implement procedural requirements that ensure qualified voters may cast their ballots free from "undu[e] influence[] or manipulat[ion]." S. Rep. No. 97-417, at 62. Plaintiffs' overarching response is that the challenged provisions thwart Congress's objectives because the new requirements deter or discourage assistors from rendering assistance and voters from requesting

19

it. MFV.Br.45-61; LUPE.Br.21-36. But Plaintiffs' deterrence-or-discouragement theory is flawed for at least three reasons.

*First*, nothing in the "explicit statutory language and the structure and purpose," of section 208, *Young Conservatives*, 73 F.4th at 311, indicates the statute's reach turns on whether voters or their assistors might subjectively feel "deterred" or "discouraged" from asking for, or providing, assistance. Instead of the hypothetical, idiosyncratic fears of voters and their assistors, preemption turns on the plain language and statutory structure that *Congress* chose. *Id.* Any other rule would permit plaintiffs, rather than Congress, to manufacture preemption at will.

*Second*, this deterrence-or-discouragement theory seeks to smuggle unrelated legal concepts into the preemption analysis. For example, the MFV Plaintiffs argue that sections 6.03, 6.05, and 6.07 are preempted because "[d]isclosure requirements chill the activity about which disclosures are required." MFV.Br.53; LUPE.Br.29-30. But the cases Plaintiffs cite primarily concern First and Fourteenth Amendment disputes over freedom of association and expression; none suggests that this concept is relevant to a *preemption* claim, let alone one under section 208. Moreover, there is no evidence in the record of any voter who has been deprived of assistance because of these disclosure requirements; indeed, corporate representatives for at least two of the plaintiff-groups testified that they were aware of no member who had refused to provide assistance because of those requirements. *See* ROA.40925-26, 41269.

Similarly, Plaintiffs argue that section 6.04's oath requirement contains vague language that depresses voter-assistor participation because such assistors fear future prosecutions for perjury. MFV.Br.48-52; LUPE.Br.26-27. But nothing in the

text of section 208 or general principles of preemption indicates that the analysis turns on the precision of the state statutory language, with less precise language more susceptible to federal preemption. And the remedy for vague statutory language is not a preemption claim but a vagueness claim under the Fourteenth Amendment's Due Process Clause. Regardless, Plaintiffs' vagueness concerns simply ignore the perjury statute's requirement that any false statement be made "with the intent to deceive," through "knowing[] or intentional[]" conduct, Tex. Elec. Code § 276.018(a)—not the inadvertence they fear. This scienter requirement "alleviate[s] vagueness concerns." *McFadden v. United States*, 576 U.S. 186, 197 (2015).

*Third*, Plaintiffs' deterrence-or-discouragement theory of preemption also depends upon a misreading of S.B.1's statutory text. For example, the Plaintiffs say that section 6.04's oath requirement "forces 208 voters to disclose private health information to establish eligibility for assistance" and thereby adds "an extra hurdle that 208 voters must clear." MFV.Br.47; *see* LUPE.Br.26. But section 6.04 says no such thing. The assistor must only swear that "the voter I am assisting *represented to me* they are eligible to receive assistance." Tex. Elec. Code § 64.034. Nothing about this language requires a voter to disclose *why* they are eligible for assistance, only *that* they are eligible for it. The MFV Plaintiffs are therefore flatly wrong to argue (at 49) that the oath "requires voters to take additional steps to prove their eligibility in the voting process."

Likewise, the LUPE Plaintiffs misconstrue (at 21-25) section 6.06's compensated voter-assistance ban and section 7.04's paid vote-harvesting ban. These provisions do not prevent individuals from being reimbursed for their expenses, ROA.40704-

05, or individuals with paid jobs (such as canvassing) from assisting voters in due course, *see, e.g.*, ROA.40703. Indeed, the Legislature expressly exempted attendants or caregivers previously known to the voter to ensure that Section 6.06 would not interfere with their duties. *See* Tex. Elec. Code § 86.0105(f). These provisions are instead narrowly targeted at incentive structures that make it more likely that assistors will apply pressure on the voter for partisan or ideological ends. *See* ROA.48778-79. These provisions are in harmony, not conflict, with section 208's goal of freeing qualified voters from "undu[e] influence[] or manipulat[ion]." S. Rep. No. 97-417, at 62. And though the LUPE Plaintiffs vaguely suggest (at 22) that some voters may wish to have persons who are paid assist them, they point to nothing in section 208 that gives *assistors* the right to demand compensation for their assistance.

## III. Plaintiffs Lack a Private Cause of Action for Their Section 208 Claims.

Plaintiffs also have an antecedent problem: they lack a cause of action. As the State Defendants have explained (at 46-47), section 208's guarantees are enforceable through other provisions of the VRA. *See* 52 U.S.C. §§ 20104(c), 20105(a). The existence of that enforcement scheme "suggests that Congress intended to preclude others," *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001), including enforcement through 42 U.S.C. § 1983. *See* Tex.Br.46. At minimum, section 208 is not enforceable by non-voting organizational entities like Plaintiffs, since section 208 confers rights only on "voter[s] who require[] assistance." 52 U.S.C. § 10508. Plaintiffs' three responses lack merit.

*First*, Plaintiffs point to section 3 of the VRA, as evidence of Congress's intent to create a private remedy for violations of section 208. MFV.Br.19-20; LUPE.Br.46-

47. But section 3 merely authorizes a court to appoint federal observers and suspend the use of tests and devices that deny or abridge the right to vote *if and when* "the Attorney General or an aggrieved person institutes a proceeding under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment." 52 U.S.C. § 10302(a); *see id* § 10302(b). Those provisions presuppose the existence of a cause of action for aggrieved persons, but they do not *create* one. *Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204, 1211 (8th Cir. 2023).

*Second*, the MFV Plaintiffs argue (at 19) that this Court has already implicitly held that section 208 creates a private right of action by adjudicating such a claim in *OCA-Greater Houston*, 867 F.3d at 614-15. But the Court did not confront this question in *OCA-Greater Houston*, and "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925). Nor does *Robinson v. Ardoin*, 86 F.4th 574 (5th Cir. 2023), help. *Cf.* MFV.Br.18. There this Court held that section 2 of the VRA is enforceable under section 3 on the ground that the States must be able "to be sued by someone." *Robinson*, 86 F.4th at 588. But that holding, which conflicts with the Eighth Circuit's contrary holding, *Ark. Conf. of NAACP*, 86 F.4th at 1211-12, is in tension with the principle that, absent congressional intent, "courts may not create" a cause of action "no matter how desirable that might be as a policy matter, or how compatible with the statute." *Sandoval*, 532 U.S. at 286-87. And in any event, *Robinson* involved section 2, not section 208, so it does not control the analysis here.

23

*Third*, Plaintiffs point to 42 U.S.C. § 1983. LUPE.Br.48; MFV.Br.18. But as an initial matter, the question is academic because none of the plaintiff-groups brought their section 208 claim via section 1983. *See* ROA.6347-50, 6429-31, 6702-03, 6783-84; *cf. Ark. Conf. of NAACP*, 86 F.4th at 1218. Even if they had, and even assuming section 208 confers private rights on certain voters, the detailed enforcement provisions that Congress provided elsewhere in the VRA indicates "a more restrictive private remedy" was intended. *See Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 188 (2023); 52 U.S.C. §§ 10308(d), 10504, 20105(a).

## Conclusion

The Court should reverse the district court's order and vacate the injunction.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Aaron L. Nielson
Solicitor General

/s/ William F. Cole
William F. Cole
Principal Deputy Solicitor General
William.Cole@oag.texas.gov

Kathleen T. Hunker
Deputy Chief, Special Litigation Unit

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Meagan Corser
Assistant Attorney General

Counsel for State Defendants-Appellants

## CERTIFICATE OF SERVICE

On April 17, 2025, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ William F. Cole
WILLIAM F. COLE

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,498 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ William F. Cole
WILLIAM F. COLE